Page 1

1                    UNITED STATES DISTRICT COURT

2                 FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                          SOUTHERN DIVISION

4

5
                                        )
6     DONALD WAKEFIELD,                  )
                                         )
7               Plaintiff,               )
                                         ) Case No.
8          vs.                           ) 8:21-cv-1585-CJC-DFM
                                         )
9     IGOR OLENICOFF, OLEN               )
      PROPERTIES CORP.; JOHN LIANG,      )
10    an individual, and DOES 1          )
      through 10, inclusive,             )
11                                       )
                Defendants.              )
12                                       )
                                         )
13

14

15              DEPOSITION OF IGOR OLENICOFF

16                Newport Beach, California

17                Friday, November 4, 2022

18

19

20

21

22    Reported by:
      RAQUEL L. BROWN
23    CSR No. 10026, RPR
24    Job No. MW 5563239
25

Page 2

1                  UNITED STATES DISTRICT COURT

2               FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                       SOUTHERN DIVISION

4

5
                                    )
6     DONALD WAKEFIELD,             )
                                    )
7               Plaintiff,          )
                                    ) Case No.
8          vs.                      ) 8:21-cv-1585-CJC-DFM
                                    )
9     IGOR OLENICOFF, OLEN          )
      PROPERTIES CORP.; JOHN LIANG, )
10    an individual, and DOES 1     )
      through 10, inclusive,        )
11                                  )
                Defendants.         )
12                                  )
                                    )
13

14

15               Deposition of IGOR OLENICOFF,

16    taken on behalf of Plaintiff at 7 Corporate Plaza,

17    Newport Beach, California 92660, beginning at

18    9:02 a.m. and ending at 2:36 p.m. on Friday, November 4,

19    2022, before RAQUEL L. BROWN, Certified Shorthand Reporter

20    No. 10026, Registered Professional Reporter.

21

22

23

24

25

```
                                                Page 3
 1   APPEARANCES:

 2

 3   For Plaintiff:

 4           SMITH AMUNDSEN, LLP

 5           BY:  GENE J. BROCKLAND, Attorney at Law

 6           BY:  CHRIS O. MILLER, Attorney at Law

 7           120 South Central, Suite 700

 8           St. Louis, Missouri 63105

 9           (314) 719-3732

10           gbrockland@smithamundsen.com

11           comiller@smithamundsen.com

12           (APPEARING REMOTELY)

13

14

15   For Defendants:

16           SACHS SAX CAPLAN

17           BY:  SPENCER M. SAX, Attorney at Law

18           6111 Broken Sound Parkway NW, Suite 200

19           Boca Raton, Florida 33487

20           (561) 994-4499

21           ssax@ssclawfirm.com

22           (APPEARING REMOTELY)

23   ///

24   ///

25   ///
```

Page 4

1    (APPEARANCES CONTINUED)

2

3    Also Present:

4    JON MANUEL, Videographer

5    LYNN TRUMBOWER, Paralegal (APPEARING REMOTELY)

6    DONALD WAKEFIELD (APPEARING REMOTELY)

7    ERIC BLINKINSOP, Remote Technician (APPEARING REMOTELY)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

```
 1                          INDEX
 2   WITNESS                          EXAMINATION
 3   IGOR OLENICOFF
 4
 5                         BY MR. BROCKLAND      8, 129
 6                         BY MR. SAX          112, 138
 7
 8
 9                         EXHIBITS
10   MARKED                 DESCRIPTION          PAGE
11   Exhibit 2      2022 Florida Limited Liability    23
                    Company Annual Report, 1 pg.
12
     Exhibit 3      Photos, 5 pgs.               28
13
     Exhibit 4      Photos, 4 pgs.               29
14
     Exhibit 5      Judgement, 2 pgs.            34
15
     Exhibit 6      Declaration, 3 pgs.          44
16
     Exhibit 7      April 6, 2001 letter, 1 pg.  55
17
     Exhibit 8      Complaint for Damages, 35 pgs.   58
18
     Exhibit 9      Photos, 1 pg.                61
19
     Exhibit 10     Photos, 1 pg.                63
20
     Exhibit 11     Transcript portion, 5 pgs.   68
21
     Exhibit 12     Photos, 6 pgs.               81
22
     Exhibit 13     Revised Art Application, 68 pgs.   91
23
     Exhibit 14     Amended Answers, 5 pgs.      100
24
     Exhibit 15     Settlement Agreement and Mutual   112
25                  General Release, 7 pgs.
```

Page 6

1    (INDEX CONTINUED.)

2                          EXHIBITS

3    MARKED                    DESCRIPTION                    PAGE

4    Exhibit 16        Notice of Compliance, 4 pgs.         120

5

6

7

8

9    INFORMATION REQUESTED

10   (None)

11

12   QUESTIONS REFUSED TO BE ANSWERED BY WITNESS

13   Page 18/Lines 18-19

     Page 97/Lines 9-10

14

15

16

17

18

19

20

21

22

23

24

25

Page 7

1          Newport Beach, California, Friday, November 4, 2022

2                              9:02 a.m.

3

4      THE VIDEOGRAPHER:  Good morning.  We're now going on

5   the record at 9:03 a.m. on November 4th, 2022.

6              This is the Media Unit No. 1 of the

7   video-recorded deposition of Igor Olenicoff in the matter

8   of Donald Wakefield versus Igor Olenicoff, Olen Properties

9   Corp., et al.  This is filed in the United States District

10  Court for the Central District of California.  The case

11  number is 8:21-cv-1585-CJC-DFM.  The location of this

12  deposition is 7 Corporate Plaza, Newport, California --

13  sorry -- Newport Beach, California 92660.

14              My name is Jon Manuel, representing Veritext

15  Legal Solutions and I'm the videographer.  The court

16  reporter is Raquel Brown from the firm Veritext Legal

17  Solutions.

18              Counsel all present and remotely, will you please

19  state your affiliations for the record and the witness

20  will be sworn in.

21      MR. BROCKLAND:  Yes.  Gene Brockland for the plaintiff

22  Donald Wakefield and with me is my associate Chris Miller.

23      MR. SAX:  Spencer Sax on behalf of the two defendants.

24      THE VIDEOGRAPHER:  Will the court reporter please

25  swear in the witness.

```
                                                    Page 8

 1

 2                    IGOR OLENICOFF,

 3    having been administered an oath, was examined and

 4    testified as follows:

 5

 6                E X A M I N A T I O N

 7    BY MR. BROCKLAND:

 8       Q    Good morning, Mr. Olenicoff.  As you know, my

 9    name is Gene Brockland and I represent the plaintiff

10    Don Wakefield in this case.

11            Just for the record I'm coming to you from my

12    office in St. Louis.  Your counsel Mr. Sax is in Florida.

13    You're in California, correct?

14       A    That is correct.

15            We just lost the video.  Are we okay?

16       THE VIDEOGRAPHER:  Yeah.  You're okay.  Go ahead.

17       THE WITNESS:  Okay.  Yeah.  Got it.  Yes.

18    BY MR. BROCKLAND:

19       Q    Can you hear me okay, sir?

20       A    I can.

21       Q    Present in the room with you are the videographer

22    and the court reporter, correct?

23       A    That's correct.

24       Q    Anyone else present in the room with you?

25       A    No.
```

1      Q     Anytime you need a break today, sir, please let

2   me know and we'll take a break.  We will take some breaks

3   regardless of whether you ask; but if you need a break,

4   let me know and we'll take a break.  Fair enough?

5      A     Fair enough.  And I've had three cups of coffee,

6   so we will be taking some.

7      MR. SAX:  Let me just say one thing.  Igor is in

8   Profile now.

9           Igor, is the camera directly in front of you or

10  is the screen to see Mr. Brockland off to the side?

11     THE VIDEOGRAPHER:  So right now where he's looking at

12  is directly at you, but he's looking at the big screen TV.

13     MR. SAX:  Got it.  Can he see Mr. Brockland in front

14  of him or does he have to go to the big screen TV to see

15  him?

16     THE VIDEOGRAPHER:  He has to look at the big screen TV

17  to see Mr. Brockland.

18     MR. SAX:  Okay.  All right.

19     MR. BROCKLAND:  Is there a way to set it up so that

20  Mr. Olenicoff can look at the camera?

21     THE VIDEOGRAPHER:  So, here, Mr. Olenicoff.  We'll

22  just have you go look over here.

23     THE REPORTER:  Counsel, may we go off the record for

24  this?

25     MR. BROCKLAND:  Yes.

```
                                                          Page 10

 1        MR. SAX:  Sure.

 2        THE VIDEOGRAPHER:  We're now going off the record.

 3   The time is 9:06 a.m.

 4               (DISCUSSION HELD OFF RECORD.)

 5        THE VIDEOGRAPHER:  We are now back on the record.  The

 6   time 9:08 a.m.

 7   BY MR. BROCKLAND:

 8        Q     All right.  Would you state your name for the

 9   record one more time, please.

10        A     Igor Olenicoff.

11        Q     And, Mr. Olenicoff, you're going to give your

12   deposition today.  You're not taking any medications that

13   would impact your ability to provide testimony today, are

14   you?

15        A     Um, no.

16        Q     How old are you, sir?

17        A     80.

18        Q     And I understand that you were born in what is

19   now part of the country of Iran.  Is that correct?

20        A     That's correct.

21        Q     All right.  And then you came to the

22   United States from Russia when you were about 17 --

23   15 years old; is that correct?

24        A     That's correct.

25        Q     And where do you currently live, sir?
```

Page 11

1    A     My, um -- fortunately or unfortunately I travel a

2    lot, um, but my, um, official residency is in Florida.

3    Q     All right.  Do you maintain a residence in

4    California, as well?

5    A     Um, it's my wife's residence.

6    Q     Okay.  You founded the company that is now known

7    as Olen Properties, correct?

8    A     That's correct.

9    Q     You understand that Olen Properties is a

10   defendant in the case that Mr. Wakefield has brought,

11   correct?

12   A     Yes.

13   Q     And is it all right if I simply refer to

14   Olen Properties throughout this deposition as Olen?

15   A     Well, just so there's no confusion, it's limited

16   to that because there is many Olens.

17   Q     Well, do you want me to refer to the company as

18   Olen Properties?

19   A     Yes.

20   Q     All right.  I'll do my best.

21         You individually are a defendant in the action

22   that Mr. Wakefield has brought, as well, correct?

23   A     Yes.

24   Q     All right.  And you founded Olen Properties

25   around 1974; is that right?

```
                                                      Page 12

 1      A     Yes.

 2      Q     And it's grown substantially from 1974 until now

 3   in 2022, correct?

 4      A     Um, yes.  It has grown.  I'll let you define

 5   substantial.

 6      Q     When you founded Olen in 1974, did you start with

 7   one property?

 8      A     Yes.

 9      Q     And today -- today Olen Properties has, I

10   believe, over 8 million square feet of office and flex

11   space.  Is that about right?

12      A     That's approximately right.

13      Q     And it has in excess of 17,000 apartment units;

14   is that correct?

15      A     That is correct.

16      Q     And Olen Properties has developments, as I

17   understand it, in California, Nevada, Arizona, Florida,

18   Georgia, North Carolina, South Carolina, and Tennessee.

19   Is that correct?

20      A     The answer is no and it's -- let me revise my

21   answer to the previous question.  That should be a no,

22   also.

23      Q     Why is that?

24      A     Well, because, um, they are different

25   corporations that own those projects.
```

Page 13

```
 1      Q     All right.  The different corporations that own
 2   those -- you need a break, sir?
 3      A     No.  No.  My dog is banging down the door.
 4      Q     You can let him or her in.
 5      A     Okay.  Hang on a second.  Let me unhook this or
 6   he will be a pest.  Hang on.
 7            Thank you.
 8      Q     Sure.
 9            Olen Properties has subsidiaries, correct?
10      A     Yes.
11      Q     Is it those subsidiaries that own the properties
12   that make up the Olen portfolio that appears on Olen's
13   website?
14      A     Not -- no, not all of them.  There's other
15   subsidiaries that are not Olen subsidiaries.
16      Q     Of the -- of the office -- strike that.
17            You were previously president of Olen Properties,
18   correct?
19      A     That's correct.
20      Q     And as president of Olen Properties did you
21   report to anyone else?
22      A     Well, um -- well, I think, you know, I -- I don't
23   want to limit my answer.  I think obviously we all report
24   to God and we report to the IRS and we report to, um, our
25   lenders and we report to -- you know, that list is
```

Page 14

1    probably endless as to who all or at least I do, you know,

2    report to.

3              So I don't understand your question.  Do I report

4    to anybody?  The answer is yes.

5        Q    As president of Olen Properties did you have a

6    boss within the organization?

7        A    Well, I was -- I was the president.  There was --

8    I don't know that I would report to them, but there is a

9    number of vice-presidents, um, a number of them.  And

10   there's chief financial officer and so it was a

11   collaborative effort.

12       Q    Sure.  But those positions were all below your

13   position as president, correct?

14       A    As I said, they were a collaborative.  They

15   weren't necessarily below or above me.  But, you know, we

16   all work together.

17       Q    All right.  When did you resign as president?

18       A    I don't recall.  It was -- it was several years

19   ago.

20       Q    Who is the president today?

21       A    Natalia Ostensen.

22       Q    Is that your daughter?

23       A    Yes.

24       Q    And she's -- has she been the president of

25   Olen Properties since you resigned, whenever that was?

```
                                                        Page 15

 1      A      Yes.

 2      Q      Are you on Olen Properties board of directors?

 3      A      No.

 4      Q      Is there a board of directors?

 5      A      Um, there might be.  I'm not sure.

 6      Q      During the time that you were president, was

 7   there ever a board of directors to your knowledge?

 8      A      Yes.  We had -- we had directors.

 9      Q      Were you on the board -- strike that.

10             When you were president of Olen Properties, were

11   you also on the board of directors?

12      A      Yes.

13      Q      Were you the chairman of the board of directors?

14      A      Yes.

15      Q      Do you know who the other directors were at any

16   time?

17      A      There was a number of them.  They would, um --

18   over time certain executives were on a -- on the board,

19   yes.

20      Q      Did Olen Properties ever have any what I'll call

21   independent directors, somebody outside the organization?

22      A      A long time ago, yes.

23      Q      Can you give me an approximate time frame of when

24   you had outside directors?

25      A      It's been a number of years.  I would be
```

```
                                                   Page 16
 1   guessing, but, you know --
 2        Q    Don't guess.
 3             So you don't know today whether you're chairman
 4   of the board of Olen Properties?
 5        A    I am not.
 6        Q    Okay.  Do you know who is chairman of the board?
 7        A    Um, I don't know.  Or if they have a board, I --
 8   I don't know.
 9        Q    Okay.  Are you a shareholder?
10        A    No.
11        Q    Were you previously a shareholder?
12        A    Well, when I founded the company, I was, yes.
13        Q    All right.  Do you know when you ceased being a
14   shareholder?
15        A    I don't recall.
16        Q    Are you currently doing any work for
17   Olen Properties?
18        A    I'm a consultant, independent consultant.
19        Q    Do you have a consulting contract?
20        A    I don't.
21        Q    Are you paid?
22        A    Um, I don't get a paycheck, but, um, I'm
23   compensated.
24        Q    How are you compensated?
25        A    Sorry?  What?
```

1      Q      How are you compensated if not by paycheck?

2      A      I get, um, obviously all of my expenses in

3    connection to the work I do paid and, um, certain -- well,

4    just primarily that, you know, my expenses and my -- at

5    times I'll get compensated with a check, but nothing

6    regular.

7      Q      So there's no set -- you don't get a set amount

8    per day or per week for your work; you just get paid

9    occasionally?

10     A      Yes.  On, um -- yes.  For -- for certain, um --

11   yes.

12     Q      Is your pay project-driven or how's it

13   determined?

14     A      There is no written criteria.  It's, um,

15   something that is decided when the occasion is warranted.

16     Q      And who makes that decision?  Is that

17   Natalia Ostensen?

18     A      You know, I don't know how -- how we reached

19   those decisions.

20            You know, beside that, Counsel, I'm sick and

21   tired of answering these questions.  They have to do with

22   your lawsuit, so please move on.  I'm going to refuse to

23   answer any more questions along this line.

24     Q      You're going to refuse to answer any questions

25   about how you're compensated by Olen Properties Corp.?

```
                                                     Page 18

 1     A      I've told you all -- all that there is and, um --
 2   all that there is to say about it.
 3     Q      How many hours a week do you work?
 4     A      As many as I would -- I would like.
 5     Q      Are you busy full-time more or less?
 6     A      Counsel, I just answered that, a question.
 7   You're being repetitive and I'm not going to answer it.
 8   How's that?
 9     Q      Well, you said you worked as much as you want,
10   but you didn't tell me how much you work, sir.
11     A      As much as I want.
12     Q      How much do you want?
13     A      I don't know.
14     MR. SAX:  All right.  Gene, let me know when you get
15   to something relevant, all right?  It's only agitating the
16   witness, which isn't going to help anybody.
17   BY MR. BROCKLAND:
18     Q      What is the nature of work that you do for
19   Olen Properties?
20     A      That's none of your business, Counsel.
21     Q      Are you going to refuse to answer that question?
22     A      Yes.
23     Q      Do you maintain an office in California?
24     A      There's an office at -- at the headquarters that
25   I use, yes, when I'm here.
```

Page 19

1    Q      All right.  Do you have an office at any

2    Olen Properties facility in Florida?

3    A      There is an office there that I use.

4    Q      And where is that office that you use in Florida?

5    A      It's in Coral Springs.

6    Q      While you were president of Olen Properties over

7    the years, you purchased a lot of artwork, correct?

8    A      Um, yes.

9    Q      And some of those -- some of those items were

10   artwork that you bought personally, correct?

11   A      Yes.

12   Q      And did you also select artwork for purchase by

13   Olen Properties or any of its subsidiaries?

14   A      Yes.

15   Q      I understand that you have a -- a large sculpture

16   collection.  Is that correct?

17   A      I have a sculpture -- a collection.  The

18   definition of large is whatever you want to make it.

19   Q      Well, you own about a hundred or so, what you

20   called, large-scale pieces, correct?

21   A      I don't know that I called those or -- I don't

22   recall and I don't know how many there are.

23   Q      And you have about a hundred or so smaller pieces

24   of artwork, sculptures that are in your home or office,

25   correct?

Page 20

1      A      Again, Counsel, I've never counted them and I

2    don't know what's -- when you say I, I'm not sure whether

3    it's owned by the corporation or the family trust or --

4    but I personally at this point don't own any art pieces.

5      Q      You don't personally own any art pieces today?

6      A      That's correct.

7      Q      But over the years, of the sculptures that you've

8    purchased, a number of them are publicly displayed outside

9    of properties that are owned either by Olen Properties or

10   its subsidiaries, correct?

11     A      Yes.

12     Q      Have you designed any sculptures?

13     A      Yes.

14     Q      Do you know the name of any sculpture that you've

15   designed?

16     A      Um, yes.  One is called It Takes All Kinds.

17     Q      Was that something you designed and then had

18   someone else manufacture?

19     A      Um, yes.

20     Q      All right.  Do you recall any other sculptures

21   that you've designed?

22     A      Well, I've -- I've designed various -- and I

23   wouldn't say design, but again that's something you can

24   define.  But I have, you know, certain ideas in terms of

25   architecture that might be considered an art piece.

```
                                              Page 21
```

1    Q    You're an art lover?

2    A    Counsel, that's going nowhere.  I don't know what

3  you mean by art lover.  Do I sleep with them?  The answer

4  is you can decide, you know, but don't be asking questions

5  that are -- basically require, um -- everybody's got their

6  own definition of that word.

7    Q    Are you a fan of art?

8    A    Yes.

9    Q    You appreciate the work that artists do?

10    A    Some of it on a limited -- on a narrow scope.

11    Q    You wouldn't have copies made of an artist's work

12  without their permission, would you?

13    A    No.

14    Q    You wouldn't have someone in China make copies of

15  an artist's work without the artist's permission, would

16  you?

17    A    No.

18    Q    You would agree that it's wrong to copy an

19  artist's work without their permission, wouldn't you?

20    MR. SAX:  Let me object to form.

21         But you can answer the question.

22    THE WITNESS:  Yes.

23  BY MR. BROCKLAND:

24    Q    You would agree it's wrong to copy an artist's

25  work without compensating them for that, wouldn't you?

Page 22

1    MR. SAX:  Object to form.

2         You can answer.

3    THE WITNESS:  You know, that's again, um -- you know,

4    you're going to have to define the artwork and define

5    compensation and define -- you know, there's artwork that

6    is not, um -- that is the public domain.  There's -- well,

7    as a matter of fact, um, let me give you some examples.

8         I bought and own a number, probably five or six

9    or seven, Remington bronze pieces that I did not

10   compensate Remington for because again I bought them from

11   an art gallery or bought them from the people that cast it

12   and so the answer there is no.

13   MR. BROCKLAND:  I'll move to strike that as

14   nonresponsive.  Let me go on.

15   THE WITNESS:  Well, I don't know how much more

16   responsive it could be to the question you asked, Counsel.

17        Counsel, while you're thinking, I need to take a

18   five-minute restroom break.  I'll be right back.

19   MR. BROCKLAND:  Sure.  Let's go off the record.

20   THE VIDEOGRAPHER:  Okay.  We are now going off the

21   record.  The time is 9:31 a.m.

22                     (BRIEF RECESS.)

23   THE VIDEOGRAPHER:  We are now back on the record.  The

24   time is 9:34 a.m.

25   ///

Page 23

1    BY MR. BROCKLAND:

2         Q     Mr. Olenicoff, let me ask you a little bit about

3    Quantum Town Center.  Are you familiar with that

4    development?

5         A     I am, um -- I'm familiar with it.

6         Q     What is Quantum Town Center?

7         A     Quantum Town Center is a project that exists in

8    Florida.  It's -- it's a retail center.

9         Q     Does it also involve apartment units?

10        A     Not Quantum Town Center, no.

11        Q     Okay.  Does it involve any office?

12        A     Yes.

13        Q     Are you familiar with the -- with an

14   Olen Properties subsidiary called Quantum Town Center,

15   LLC?

16        MR. SAX:  Object to form.

17             But you can answer.

18        THE WITNESS:  Um, well, I'm not familiar with the

19   legal aspects of that or -- or -- I'm not familiar with

20   the details of that company.

21        MR. BROCKLAND:  All right.  Let's -- let me show you

22   an exhibit that we've marked as Plaintiff's Exhibit 2.

23   We're going to share it on the screen.

24      (Plaintiff's Exhibit 2 was marked for identification.)

25   ///

Page 24

1    BY MR. BROCKLAND:

2        Q    Do you see that, sir?

3        MR. SAX:  I can't see it.

4        THE WITNESS:  No.  I can't see it.

5        THE VIDEOGRAPHER:  Is it Plaintiff's Exhibit 2?

6        MR. BROCKLAND:  Yes.

7        THE VIDEOGRAPHER:  The annual report?

8        MR. BROCKLAND:  Yes.  Is that up?

9        THE VIDEOGRAPHER:  It's up right now, yeah.

10       MR. SAX:  But I don't have it on my screen.  So I need

11   to be able to see it.  Is it not going to be put up at the

12   same time?

13       MR. BLINKINSOP:  Are you not on through Veritext?

14       MR. SAX:  I am.  It says Veritext Virtual Host.

15       MR. BLINKINSOP:  Go to the Exhibit Share --

16       MR. SAX:  Where it says Share Screen?

17       MR. BLINKINSOP:  No.  The Veritext Exhibit Share.

18       MR. SAX:  Can we go off the record for a minute?

19       MR. BROCKLAND:  Yes.

20       THE VIDEOGRAPHER:  Okay.  We're now going off the

21   record.  The time is 9:37 a.m.

22                   (DISCUSSION HELD OFF RECORD.)

23       THE VIDEOGRAPHER:  We are now back on the record.  The

24   time is 9:38 a.m.

25   ///

Page 25

1    BY MR. BROCKLAND:

2        Q    Mr. Olenicoff, I believe I've shown you what's

3    been marked as Plaintiff's Exhibit 2 which is an annual

4    report for Quantum Town Center, LLC.  Do you see that?

5        A    Yes.

6        Q    And under Authorized Persons there is a reference

7    to a managing member as Natalia Ostensen and

8    Igor Olenicoff.  Do you see that?

9        A    I do see it.

10       MR. SAX:  Object to form.  It's incomplete.

11             But go ahead.  You can answer.

12   BY MR. BROCKLAND:

13       Q    And listed as managers are Dale Lyon and

14   Jane Taylor; is that correct?

15       A    Counsel, you know, the document says what it

16   says.  You know, I'm having a hard time seeing it with my

17   eyesight; but whatever it says, it speaks for itself.

18       Q    Does Quantum Town Center, LLC, own the

19   development that's referred to as Quantum Town Center?

20       A    I don't know that for certain.

21       MR. BROCKLAND:  I'm sorry.  We can take that exhibit

22   down, please.  Thank you.

23       Q    Mr. Olenicoff, you recall that you were sued by

24   Don Wakefield for copyright infringement previously,

25   correct?

Page 26

1      A     Yes.

2      Q     And that first suit by Mr. Wakefield was about

3   certain sculptures that were displayed on Olen Properties

4   in Southern California, correct?

5      A     Yes.

6      Q     And you referred to those sculptures as Human

7   Nature's Many Faces and A Tear Must Fall, correct?

8      MR. SAX:  Object to form.

9          You can answer.

10     THE WITNESS:  No.

11  BY MR. BROCKLAND:

12     Q     Well, you recall that that first lawsuit involved

13  sculptures that were granite, correct?

14     A     Yes.

15     Q     And then some of them were granite with a

16  teardrop, correct?

17     A     Yes.

18     Q     And the ones that were granite with a teardrop

19  were referred to by you as A Tear Must Fall, correct?

20     MR. SAX:  Object to form.

21          You can answer.

22     THE WITNESS:  I've answered that.  The answer -- the

23  answer to that question is no.

24  BY MR. BROCKLAND:

25     Q     You remember what I'm talking about with respect

Page 27

1    to a granite sculpture with a teardrop in it, correct?

2         A     I do.

3         Q     What did you call that sculpture?

4         MR. SAX:  Object to form.

5              But you can answer.

6         THE WITNESS:  Counsel, it's -- I didn't create the

7    sculpture.  I didn't name the sculpture.  So it's not what

8    I called it.  You know, it's what the artist who created

9    it called it.  So your question is misleading.

10   BY MR. BROCKLAND:

11        Q     The sculptures that were displayed outside

12   Olen Properties buildings in Southern California that were

13   part of the first Wakefield suit had placards on them,

14   correct?

15        A     I don't know what you mean by placards, Counsel.

16        Q     A small sign indicating the name of the piece and

17   the artist.  Correct?

18        A     To the best of my recollection.  I'm not sure all

19   of them did, but, yes, some did.

20        Q     All right.  And I understand the distinction that

21   you're making is you say the artist created the name and,

22   fair enough, in terms of your position.

23             But I just want to -- for the sake of clarity the

24   piece with the teardrop was referred to as A Tear Must

25   Fall, correct?

Page 28

1        MR. SAX:  Object to form.

2             You can answer.

3        THE WITNESS:  Yes.

4    BY MR. BROCKLAND:

5        Q     And in the first Wakefield case, the piece

6    without a teardrop was referred to as Human Nature's Many

7    Faces, correct?

8        MR. SAX:  Object to form.

9             You can answer.

10       THE WITNESS:  That's correct.

11   BY MR. BROCKLAND:

12       Q     All right.  And you would recognize both of those

13   sculptures if you saw a photograph of them, would you not?

14       A     Yes, I would.

15       MR. BROCKLAND:  All right.  Let's put up -- we're

16   putting up Plaintiff's Exhibit 3.  Can you share that,

17   please?

18     (Plaintiff's Exhibit 3 was marked for identification.)

19   BY MR. BROCKLAND:

20       Q     Showing you Plaintiff's Exhibit 3.  Is this a

21   photograph of Human Nature's Many Faces?

22       MR. SAX:  Object to form.

23             But you can answer.

24       THE WITNESS:  Um, I believe so.  It seems out of

25   shape, but generally it looks like it, yes.

Page 29

1       MR. BROCKLAND:  We're going to go to A Tear Must Fall.

2   Mr. Olenicoff, we're going to introduce

3   Plaintiff's Exhibit 4, another photograph, and ask that it

4   be shared.

5       THE VIDEOGRAPHER:  Give me a second, Counsel.

6       MR. BROCKLAND:  Yeah.  We'll get there in a second.

7       THE VIDEOGRAPHER:  It looks like it hasn't uploaded

8   yet -- oh, there you go.  Got it.  Give me a quick second.

9     (Plaintiff's Exhibit 4 was marked for identification.)

10      MR. BROCKLAND:  Can you scroll down, please?  Scroll

11  some more.  Right there.  Back one, please.  Thank you.

12      Q     This is a photograph of A Tear Must Fall,

13  correct?

14      MR. SAX:  Object to form.

15            You can answer.

16      THE WITNESS:  Yes.

17  BY MR. BROCKLAND:

18      Q     Going back, sir --

19            And we can take that down.

20            Going back, sir, to my questions about the first

21  Wakefield lawsuit against you for copyright infringement,

22  I take it you reviewed the complaint at some point.

23      A     The -- the first complaint?

24      Q     Yes.

25      A     I don't recall, but I probably did.

```
                                                         Page 30
 1        Q     And you filed an answer and you denied that you

 2   had any liability to Mr. Wakefield, correct?

 3        MR. SAX:  Object to form, document speaks for itself.

 4            But you can answer.

 5        THE WITNESS:  Well, that was going to be my answer,

 6   Mr. Spencer, is I don't recall.  Whatever the answer was,

 7   it was.

 8   BY MR. BROCKLAND:

 9        Q     All right.  And you answered interrogatories

10   under oath in that case, correct?

11        A     I don't recall, Counsel.

12        Q     Do you recall being deposed in that case?

13        A     I don't.

14        Q     Do you recall appearing at trial in that case?

15        A     I do.

16        Q     And you testified at trial, correct?

17        A     I'm not sure.  I believe so, but I'm not sure.  I

18   don't recall.

19        Q     You submitted at least one declaration in that

20   case, correct?

21        A     I have absolutely no recollection of that.

22        Q     At any time during the course of the first

23   Wakefield case, did you disclose to Mr. Wakefield that

24   these sculptures that we just showed you pictures of were

25   located at Quantum Town Center?
```

Page 31

1       MR. SAX:  Object to form.

2             You can answer.

3       THE WITNESS:  Counsel, I don't -- the pictures that

4   you showed me, I don't know where they're located and,

5   furthermore, I've never spoken to Mr. Wakefield about

6   location of the sculptures.

7             And I'm sorry, but I need to take another

8   three-minute break.  Just bear with me.

9       MR. BROCKLAND:  Let's go off the record.

10      THE VIDEOGRAPHER:  We're now going off the record.

11  The time is 9:50 a.m.

12                        (BRIEF RECESS.)

13      THE VIDEOGRAPHER:  We are now back on the record.  The

14  time is 9:51 a.m.

15  BY MR. BROCKLAND:

16      Q    Mr. Olenicoff, are you aware that at some time a

17  sculpture referred to as Human Nature's Many Faces was on

18  public display at Quantum Town Center?

19      MR. SAX:  Object to form.

20             But you can answer.

21      THE WITNESS:  No, not that I can recall.

22  BY MR. BROCKLAND:

23      Q    Are you aware, Mr. Olenicoff, that at some point

24  a sculpture referred to as A Tear Must Fall was publicly

25  displayed at Quantum Town Center?

Page 32

1        MR. SAX:  Same objection.

2             You can answer.

3        THE WITNESS:  My response is the same.

4   BY MR. BROCKLAND:

5        Q     What?  That you don't know?

6        A     Not that I can recall.

7        Q     Do you recall that a sculpture referred to as

8   Human Nature's Many Faces was removed from public display

9   and put in storage at some time after the current lawsuit

10  was filed?

11       MR. SAX:  Object to form.

12            You can answer.

13       THE WITNESS:  Yes.

14  BY MR. BROCKLAND:

15       Q     And are you aware that at some time a sculpture

16  referred to as A Tear Must Fall was removed from public

17  display and put in storage after the current lawsuit was

18  filed?

19       MR. SAX:  Same objection.

20            You can answer.

21       THE WITNESS:  Yes.

22  BY MR. BROCKLAND:

23       Q     So you know that those two sculptures were

24  removed and put into storage, correct?

25       A     I don't know where they were put, Counsel.

1     Q     All right.  But you know that they were removed?

2     A     That's correct.

3     Q     Did you order them to be removed?

4     MR. SAX:  Let me just counsel you, Igor.  Please don't

5     divulge any attorney/client privileged communications.

6     Can you answer that question without doing so?

7     THE WITNESS:  No, I can't.

8     BY MR. BROCKLAND:

9     Q     Do you know where those two sculptures are

10    currently?

11    A     Counsel, I just answered that.

12    Q     I -- it's a new question.  I haven't asked you

13    where they're stored.  Do you know where they're stored?

14    A     Well, I answered that and said, no, I don't know

15    where they're stored.

16    Q     Do you know when either of those sculptures were

17    first placed on public display at Quantum Town Center?

18    A     No, I don't.

19    Q     Do you believe it would have been sometime in

20    2014?

21    A     I have no idea.

22    Q     Who would know that?

23    MR. SAX:  Object to form.

24    Don't speculate.

25    THE WITNESS:  Um, um, well, I don't know who would

1    know but, um -- I don't know when they were placed and so

2    I can't tell you that.  I can't respond to your question.

3    BY MR. BROCKLAND:

4        Q    Mr. Olenicoff, do you recall that in the first

5    Wakefield case you were -- when you were sued by

6    Mr. Wakefield for copyright infringement, it was -- the

7    copyright was in a sculpture that Mr. Wakefield referred

8    to as Untitled?

9        A    Counsel, I don't recall the details of

10   Mr. Wakefield's allegations, so I would have to refer you

11   to the lawsuit itself.  Whatever it says, it says.

12       Q    Okay.  At some point there was an injunction

13   answered in that case, correct?

14       A    I have absolutely no idea.

15       Q    Mr. Olenicoff, we're going to introduce

16   Plaintiff's Exhibit 5 which is the injunction which was

17   entered in the first Wakefield case and I'm going to ask

18   you to take a look at that, if you would.

19       A    Okay.

20    (Plaintiff's Exhibit 5 was marked for identification.)

21   BY MR. BROCKLAND:

22       Q    Do you see that, sir?

23       A    Well, I see the heading on it and that's what I

24   see.  Obviously I see what you see.

25       Q    All right.  It says it's a judgement and you've

Page 35

1    seen this before today, have you not?

2        A     No.  I don't recall if I saw it or not.

3        Q     Well, you were a defendant in the first Wakefield

4    case, correct?

5        A     That's correct.

6        Q     And pursuant to this order the Defendants, one of

7    whom was you, were permanently enjoined from infringing

8    Plaintiff's copyrighted work known as Untitled, correct?

9    That's what it says in the first numbered paragraph?

10       MR. SAX:  Object to form, document speaks for itself.

11            But you can answer.

12       THE WITNESS:  And I don't see --

13       MR. BROCKLAND:  Can you scroll down, please?

14       MR. SAX:  We can't do that.

15   BY MR. BROCKLAND:

16       Q     Do you see, no. 1, sir, where it says Defendants,

17   their officers, agents, servants, employees, and attorneys

18   who are in active concert with Defendants are permanently

19   enjoined from infringing Plaintiff's copyrighted work

20   known as Untitled?  Correct?

21       A     I can't see it well, but it says whatever it

22   says, Counsel.  It's too small for me to read.

23       Q     Well, earlier I sent written copies to your

24   counsel when they asked for them in California to have

25   them printed out.  I don't know if you have those copies

Page 36

1    or have access to them.  Do you?

2        A     No, I don't.

3        MR. SAX:  Jon, can you just blow it up a little

4    bigger?

5              Igor, can you see that?

6        THE WITNESS:  Yes.  Barely.  I see no. 1 and it says

7    what it says, yes.

8    BY MR. BROCKLAND:

9        Q     All right.  And let's look at no. 3.  If you

10   follow along with me, that says Defendants are further

11   ordered to destroy all copies of Human Nature's Many Faces

12   and A Tear Must Fall, exclusive of the bases and the

13   stainless steel tear drops in A Tear Must Fall, within

14   eight months of the entry of this judgement, correct?

15       A     Counsel, it says what it says.  I don't -- I

16   can't see it all that well.  But it says what it says.

17       Q     And you agree that it applied to you, sir, do you

18   not?

19       A     Well, I think you're asking me a legal question

20   and, um, I -- I can't agree with -- you know, with it or

21   disagree with it.  It says what it says.

22       Q     Well, I don't want to ask you for a legal

23   conclusion.  Did you feel that you personally had an

24   obligation to see that all copies of Human Nature's Many

25   Faces and A Tear Must Fall were destroyed after the entry

Page 37

1  of this order?

2       MR. SAX:  Object to form.

3            You can answer.

4       THE WITNESS:  Well, Counsel, as I said, I don't recall

5  this order or -- or reading this order and, um, as such I

6  wouldn't have any feeling about it not knowing about, you

7  know, whatever the judgement said.

8  BY MR. BROCKLAND:

9       Q     Did you personally do anything to assure that you

10 were complying with this order?

11      MR. SAX:  And again let me just counsel you not to

12 divulge any attorney/client communications, but otherwise

13 you can answer the question.

14      THE WITNESS:  Well, again I don't know about complying

15 with this order.  After that case ended, I do recall that

16 counsel indicated to us that there were, I think,

17 initially five sculptures -- if my recollection is right,

18 five sculptures that were identified in that lawsuit by

19 Mr. Wakefield that had to be removed, then destroyed and

20 that's the recollection I have and to the best of my

21 knowledge they were.

22 BY MR. BROCKLAND:

23      Q     But following this order the copies of Human

24 Nature's Many Faces and A Tear Must Fall at Quantum Town

25 Center were not removed and destroyed, were they?

Page 38

```
 1      MR. SAX:  Object to form, lack of predicate.
 2           You can answer the question.
 3      THE WITNESS:  Counsel, I -- you know, first of all, I
 4  don't know.  And secondly there was no knowledge that
 5  those pieces were there or that Mr. Wakefield had not
 6  identified them.  So -- in lawsuit.  As a matter of fact,
 7  there was two sculptures in California, as I recall, that
 8  we weren't aware of and, um, were later made aware of by
 9  Mr. Wakefield and they were removed and destroyed to the
10  best of my knowledge.  I was not involved.
11  BY MR. BROCKLAND:
12      Q    Is it your position that it was Mr. Wakefield's
13  responsibility to identify the location of all the copies
14  so that they could be destroyed?
15      MR. SAX:  Object to form, calls for a legal
16  conclusion.
17           But you can answer the question if you can.
18      THE WITNESS:  Well, I never thought about it and I
19  would never thought as to whose responsibility it was
20  because, you know, whoever had knowledge, they may not
21  have had knowledge of this.
22           And again I apologize, but I got to take a quick
23  break.  Hang on.
24      MR. BROCKLAND:  Let's go off the record.
25      THE VIDEOGRAPHER:  We are now going off the record.
```

Page 39

1    The time is 10:05 a.m.

2                    (BRIEF RECESS.)

3        THE VIDEOGRAPHER:  We're now back on the record.  The

4    time is 10:07 a.m.

5    BY MR. BROCKLAND:

6        Q    All right.  Mr. Olenicoff, with regard to the

7    injunction that was entered against you and

8    Olen Properties in the first case, you made efforts to

9    comply with that?

10       A    The answer is, no, I didn't make any efforts.  I,

11   um -- that was relegated to other people to do and I

12   believe they complied with all the sculptures that were

13   part of that lawsuit.  But I didn't personally -- I wasn't

14   personally involved.

15       Q    Okay.  Do you know who was involved in that?

16       A    In that being what?

17       Q    Complying with the injunction?

18       A    Again you're going to have to be more specific as

19   to what complying with the injunction means.  I --

20       Q    Sure.  How about complying with the part of the

21   injunction that required copies to be removed and

22   destroyed?  Who was involved in that?

23       A    Well, there was construction people and I don't

24   know exactly who in California that were instructed to

25   remove and destroy the pieces that were identified.

Page 40

1      Q     All right.  And when you say the pieces that you

2   were -- that were identified, do you mean that were

3   identified by Mr. Wakefield?

4      A     Well --

5      MR. SAX:  Object to form.

6            You can answer.

7      THE WITNESS:  Well, you know, whatever it was, the

8   subject of that lawsuit.  And as I testified earlier,

9   there was even two pieces that were later discovered by

10   Mr. Wakefield that we were not aware of.  Again there was

11   many pieces and I don't know how many were ordered and

12   placed and I wasn't involved so --

13   BY MR. BROCKLAND:

14      Q     And -- and in that first -- at the time of the

15   first Wakefield lawsuit, there was no mention of any

16   copies in Florida, was there?

17      MR. SAX:  Object to form.

18            You can answer if you can.

19      THE WITNESS:  I don't know, Counsel.  I don't know

20   what was mentioned.  Mr. Wakefield did the investigations

21   and the mentioning, so I don't know if he -- if he

22   mentioned it or not so --

23   BY MR. BROCKLAND:

24      Q     Do you know if you or Olen Properties in that

25   first Wakefield case ever mentioned the two copies in

Page 41

1   Florida?

2       MR. SAX:  Object to form.  Again you say were

3   mentioned.

4           But you can answer if you can.

5       THE WITNESS:  I don't -- I don't recall and I would

6   not have been aware of it.  And when you say

7   Olen Properties, um, I don't know who necessarily that

8   would refer to.  But, you know, they did the best they

9   could in removing whatever was identified.

10  BY MR. BROCKLAND:

11      Q    Do you know if -- if a copy of the injunction was

12  circulated to all of the Olen Properties subsidiaries?

13      A    I don't know.

14      Q    Do you know if photographs of the copies that

15  were found to be infringing in the first Wakefield lawsuit

16  were circulated to all of the Olen Properties

17  subsidiaries?

18      A    I don't know that.

19      Q    Well, do you know how it is that a copy of Human

20  Nature's Many Faces and A Tear Must Fall were still in

21  Florida in 2021 even after that injunction was entered?

22      MR. SAX:  First let me object to form.

23          Also, Igor, I counsel to avoid any

24  attorney/client privileged communications.  You can answer

25  if you can.

Page 42

1     THE WITNESS:  I don't understand the question.

2     It's -- doesn't make any sense.  At least I can't make

3     sense of it.  So you can rephrase it?

4     MR. BROCKLAND:  Sure.

5     Q     You agree with me that the sculptures referred to

6     as Human Nature's Many Faces and A Tear Must Fall were on

7     display at Quantum Town Center when Mr. Wakefield filed

8     the current lawsuit, correct?

9     A     I became aware of it after the lawsuit was filed.

10    Q     All right.  And do you know how it is that those

11    sculptures, those copies, were still there years after the

12    injunction was entered?

13    MR. SAX:  Object to form.

14         But you can answer, again as long as you don't

15    reveal any attorney/client privileged communications.

16    THE WITNESS:  Well, I'd be speculating.  But, you

17    know, they were purchased and installed there by the

18    person or persons who were developing that project on --

19    were developing a project.  That's probably how they got

20    there.

21    BY MR. BROCKLAND:

22    Q     So let me -- maybe I can ask a simpler question.

23    Why weren't they removed and destroyed after the

24    injunction was entered?

25    A     Well, because nobody that -- that knew about the

Page 43

1    judgement, because we -- we felt we had complied with,

2    um -- with the judgement fully and we had, um, were aware

3    that those two pieces were there.

4        Q    And what, if anything, did you personally do to

5    determine where copies were?

6        MR. SAX:  Again, Igor, if you can, answer the

7    question.  Just avoid any attorney/client privileged

8    communications.

9        THE WITNESS:  I don't recall.  I'm not sure I did

10   anything but to comply with what was identified or direct

11   people to comply with what was identified in that

12   judgement to be destroyed.

13   BY MR. BROCKLAND:

14       Q    And in stating that all of the copies had been

15   removed, you were just relying on your memory.  Is that

16   fair to say?

17       MR. SAX:  Object to form --

18       THE WITNESS:  I don't -- I don't know what you're

19   referring to.  You're going to have to show me the

20   document or I testified -- geez, guys, I'm sorry.  I'm

21   going to take another three-minute break.  That

22   coffee's --

23       MR. BROCKLAND:  We'll go off the record.

24       THE VIDEOGRAPHER:  We're now going off the record.

25   The time is 10:16 a.m.

Page 44

1                    (BRIEF RECESS.)

2        THE VIDEOGRAPHER:  We're now back on the record.  The

3    time is 10:20 a.m.

4        MR. BROCKLAND:  Mr. Olenicoff, we're going to mark as

5    an exhibit -- as Plaintiff's Exhibit 6 a declaration that

6    you submitted in the first Wakefield case.

7               Can you share that, please?

8       (Plaintiff's Exhibit 6 was marked for identification.)

9    BY MR. BROCKLAND:

10       Q     Mr. Olenicoff, can you see that declaration?

11       A     Um, I see the heading barely, barely.  But, okay.

12   I do.

13       Q     Well, I'll just kind of walk you through some of

14   it, all right?  On the right-hand side on the first page,

15   it says Declaration of Igor M. Olenicoff in Support of

16   Defendant's Opposition to Plaintiff's Motion for

17   Sanctions.  Do you see that?

18       A     Counsel, I see something that says whatever it

19   says.

20       Q     All right.  Well, does it -- does it say what I

21   just read?

22       A     I can't -- I can't see it.  At the scale it's

23   kind of, um --

24       THE VIDEOGRAPHER:  Let me just --

25       THE WITNESS:  Let's see.  He may adjust it.  It's all

Page 45

1    run together.

2         THE VIDEOGRAPHER:  That's as big as it goes.

3         THE WITNESS:  That's it.

4         MR. BROCKLAND:  Let's go off the record, please.

5         THE VIDEOGRAPHER:  We're now going off the record.

6    The time is 10:22 a.m.

7                   (DISCUSSION HELD OFF RECORD.)

8         THE VIDEOGRAPHER:  We are now back on the record.  The

9    time is 10:25 a.m.

10   BY MR. BROCKLAND:

11        Q    Mr. Olenicoff, we've been having some technology

12   troubles and difficulty in sharing exhibits and you now

13   have your -- what's been marked as Plaintiff's Exhibit 6,

14   which is a declaration dated December 18, 2017, emailed to

15   you from -- from your counsel.

16        A    Yes.

17        Q    And you're looking at that on a separate laptop

18   that you've got at the computer --

19        A    Yes.

20        Q    -- at the deposition?

21        A    Yes.

22        Q    Are you simply looking at the declaration itself

23   right now?

24        A    Yes.

25        Q    All right.  And it says Declaration of

1    Igor Olenicoff in Support of Defendant's Opposition of

2    Plaintiff's Motion for Sanctions, correct?

3         A    Yes.

4         Q    And that was submitted in the second Wakefield

5    case which had been consolidated with the first Wakefield

6    case, correct?

7         A    I don't know that.

8         Q    It starts out -- it says I, Igor M. Olenicoff,

9    hereby declare I am a defendant in the above-referenced

10   action, correct?

11        A    Yes.

12        Q    And in paragraph 2 it says I originally ordered

13   the piece entitled Human Nature's Many Faces and the

14   derivative work years prior to 2008, correct?

15        A    Yes.

16        Q    And, by the derivative work, were you referring

17   to a A Tear Must Fall?

18        A    I don't know what I was referring to.

19        Q    Do you think you were referring to the sculpture

20   that had the teardrop in it?

21        A    Um, I don't recall.  Possibly, but I don't have

22   an independent recollection of what I'm referring to there

23   by -- by derivative work.

24        Q    If you'll scroll down to the second page, please.

25   And all the way at the bottom in paragraph 7, you say in

Page 47

1    July 2017, the Olen parties offered to delivery all pieces

2    of Untitled and derivatives thereof to Wakefield, correct?

3        A     Yes.  That's what it says.

4        Q     And that was true and correct when you stated it,

5    right?

6        A     Yes.

7        Q     And it says Wakefield did not accept the offer of

8    delivery.  It says that, right?

9        A     It says that, yes.

10       Q     And that was correct when you made that

11   statement, was it not?

12       A     Well, I was so informed.  I don't know --

13       Q     Okay.

14       A     -- personally.

15       Q     All right.  It goes on to say, Therefore, the

16   Olen parties removed all sculptures Untitled and

17   derivative pieces from all Olen-controlled properties,

18   including the Olen headquarters and 2 Venture locations.

19   Did I read that right?

20       A     That's what it says.

21       Q     And -- and you made this declaration under

22   penalty of perjury, did you not?

23       A     I believe it says what it says.  Oh, yes.  I see

24   it.  Yes.

25       Q     All right.  Was that last statement true or false

Page 48

1    at the time that it was made?

2         A     It was true.

3         Q     Had the two copies in Florida been destroyed?

4         MR. SAX:  Object to form, lack of predicate.

5              You can answer if you can.

6         THE WITNESS:  Well, we were complying with the order

7    and the pieces that were part of the -- of the judgement

8    and were -- at least I was not aware of the two pieces in

9    Florida.

10             Counsel --

11   BY MR. BROCKLAND:

12        Q     Well, it says --

13        A     I'm going to take a break again.  Sorry, guys.

14        MR. BROCKLAND:  Off the record, please.

15        THE VIDEOGRAPHER:  We are now going off the record.

16   The time is 10:28 p.m.

17                      (BRIEF RECESS.)

18        THE VIDEOGRAPHER:  We are now back on the record.  The

19   time is 10:31 a.m.

20   BY MR. BROCKLAND:

21        Q     Mr. Olenicoff, it's accurate that not all copies

22   had been removed from all Olen-controlled properties as of

23   the date of this declaration, correct?

24        MR. SAX:  Object to form.

25             But you can answer.

Page 49

1      THE WITNESS:  The answer is that to the best of our

2   knowledge and my knowledge all the pieces had been

3   removed.

4   BY MR. BROCKLAND:

5      Q     To the best of your knowledge at that time?

6      A     Is that a question or what --

7      Q     Yes.  When you say to the best of our knowledge,

8   you mean to the best of your knowledge as of the date of

9   the declaration, right?

10     A     That's correct.

11     Q     And it's your contention that you just didn't

12  know about the copies in Florida, right?

13     A     I was at that point not aware or didn't remember

14  that they existed.  The answer is yes.

15     Q     And you hadn't done anything to determine whether

16  there were copies in Florida, had you, other than rely on

17  your memory?

18     MR. SAX:  Object to form.

19         You can answer.

20     THE WITNESS:  Well, the answer is that there's nothing

21  else to rely on that I'm aware of at that point but -- but

22  my memory and -- and the records that we were made aware

23  of in this lawsuit.

24  BY MR. BROCKLAND:

25     Q     So you had your memory to rely on and the things

```
                                                          Page 50
 1    that you were made aware of in the lawsuit, right?

 2        A      That's correct.  That was the focus, yes.

 3        Q      All right.  And to your knowledge there was no

 4    attempt to reach out to the various subsidiaries and the

 5    various properties and see if they had copies?

 6        MR. SAX:  Object to form.

 7             You can answer if you can.

 8        THE WITNESS:  Counsel, there would be no way to do

 9    that, so your question, you know, can't be -- asks

10    something that is not feasible.  So, you know, when you

11    say and who, it was --

12    BY MR. BROCKLAND:

13        Q      So -- so it was not feasible for you to

14    communicate with your subsidiaries and ask somebody if

15    there were certain sculptures on their properties?

16        MR. SAX:  Object to form.

17             You can answer.

18        THE WITNESS:  Well, again the question misstates the

19    facts; and that is, when you say you and me reaching out

20    to my subsidiaries and whether, you know, there's anybody

21    to reach out to.  You know, um, I directed the pieces to

22    be destroyed, the only pieces that we were aware of

23    initially in the lawsuit.  We even missed two pieces that

24    were in California and we moved and destroyed those as

25    soon as we were aware of it.  But there's, um, pieces
```

Page 51

1    that -- that existed that we would have no way of knowing

2    they existed.

3    BY MR. BROCKLAND:

4        Q     And at the time that you signed this declaration,

5    you were president of Olen Properties, correct?

6        A     Yes.

7        Q     And you're saying that as president of

8    Olen Properties in 2017, there was no way for you to find

9    out whether there were additional copies in Florida?

10       A     Well, no.  No.  At least, you know, I wouldn't

11   have any reason to -- to know about them, so there would

12   be no reason for me to inquire.  You have to keep in mind

13   that when you say Olen subsidiaries and various Olen

14   projects, there's -- there was -- or there is 150 projects

15   out there.  So for me to know about them all, um, the

16   answer is no.

17       MR. BROCKLAND:  All right.  We've been going about an

18   hour and-a-half albeit with some breaks, but why don't we

19   take a 15-minute break, Spencer.

20       MR. SAX:  Sure.

21       THE VIDEOGRAPHER:  We are now going off the record.

22   The time is 10:37 a.m.

23                        (BRIEF RECESS.)

24       THE VIDEOGRAPHER:  We are now back on the record.  The

25   time is 10:53 a.m.

Page 52

1    BY MR. BROCKLAND:

2        Q     All right.  Mr. Olenicoff, let me switch gears

3    with you a little bit here.  I want to ask you about a

4    sculptor by the name of John Raimondi.  You know

5    John Raimondi, correct?

6        A     Yes.  I've met him once or -- I think once,

7    twice.

8        MR. SAX:  Let me just give him one -- one direction.

9            Igor, my understanding is that there was some

10   confidentiality provision reached in some agreement there,

11   so just try to not to violate any confidentiality

12   provision.  Okay?

13       THE WITNESS:  Thank you.

14   BY MR. BROCKLAND:

15       Q     I'm sorry.  You said you met Mr. Raimondi once or

16   twice?

17       A     Well, I don't -- honestly I don't specifically

18   recall when or if I met him.  But, um -- well, let me just

19   think.  Well, quite candidly now as I think about it, I

20   don't recall meeting him.

21       Q     All right.  But you had some dealings with him

22   back in 2000 or 2001, correct?

23       MR. SAX:  Object to the use of the word dealing.

24            But you can answer.

25       THE WITNESS:  The answer is -- is no.

Page 53

1    BY MR. BROCKLAND:

2         Q     You don't recall any -- do you recall

3    communications with him back in 2000 or 2001?

4         A     No, I don't.  I don't recall.

5         Q     Mr. Olenicoff, when you were deposed in

6    Mr. Raimondi's case, you said that you had first heard of

7    him sometime in 2000 or maybe 2001.  I don't recall

8    testifying to that?

9         A     I don't recall, Counsel.  Whenever I said, I

10   said, but I -- at this point this is 23 years later or

11   22 years later and I don't recall.

12        Q     Do you want me to show you the deposition

13   testimony, sir?

14        A     No, Counsel.  It says whatever it says.  It's not

15   going to refresh my recollection.

16        Q     All right.  You spoke to him in 2000 or 2001

17   about his artwork, right?

18        A     Counsel, I -- I just answered that, that I don't

19   recall speaking to him then or for that matter ever.

20        Q     All right.  When you were deposed in his case,

21   you were asked do you recall the substance of those talks

22   and your answer was it was regarding his art and, At the

23   time I was looking for some art for various projects we

24   had.  Was that accurate when you stated it?

25        MR. SAX:  Object to form.

1           But you can answer if you can.

2      THE WITNESS:  I think it says what it says, Counsel.

3  I don't recall the deposition.  I don't recall speaking to

4  him.  As I said, it was 22 years ago and there's been a

5  lot of water under the bridge in my life, so I -- I just

6  don't recall meeting him or speaking to him.

7  BY MR. BROCKLAND:

8      Q    All right.  Do you deny that you spoke to him

9  about his -- his art back in 2000 or 2001 or do you just

10 not recall?

11     MR. SAX:  Object to form.

12           You can answer the question.  It's compound.

13           But you can answer.

14     MR. BROCKLAND:  I can make it not compound.

15     Q    Do you deny that you spoke to him about his art?

16  Strike that.

17           Do you deny that you spoke to Mr. Raimondi about

18 his art back in 2000 or 2001?

19     A    Counsel, I stand on my answer, that it was so

20 long ago and I don't recall.  So I don't either admit or

21 deny it.  I just don't recall ever having spoken to him.

22     Q    Do you recall proposing to the City of Brea that

23 Olen Properties submit John Raimondi's sculpture for

24 approval at Olen Pointe Brea?

25     A    No, I don't.

Page 55

1      MR. BROCKLAND:  Let me share an exhibit with you,

2   Mr. Olenicoff.  It's a short one, so hopefully you'll be

3   able to see it through the system we're using here.  It's

4   Plaintiff's Exhibit 7.

5            If you could, share that, please.

6      THE VIDEOGRAPHER:  Copy that.

7     (Plaintiff's Exhibit 7 was marked for identification.)

8      THE WITNESS:  Could you go up --

9   BY MR. BROCKLAND:

10     Q    Mr. Olenicoff --

11     A    Well, I'd like to see the whole thing.  I'm not

12   seeing it --

13     Q    Sure.  Sure.  Yeah.  Take a minute and read it.

14     THE VIDEOGRAPHER:  Just tell me when to scroll down,

15   Mr. Olenicoff.

16     THE WITNESS:  Okay.  Thank you.

17     MR. BROCKLAND:  Let me know when you're ready, sir.

18     THE WITNESS:  Could you scroll down just a bit?  Okay.

19   Yes.  Okay.

20   BY MR. BROCKLAND:

21     Q    Plaintiff's Exhibit 7 is a letter dated April 6,

22   2001, correct?

23     A    That's what it says.

24     Q    And is that your signature on it where -- above

25   where it says Igor M. Olenicoff, President?

Page 56

1     A     It is.

2     Q     You recognize your signature?

3     A     Counsel, I just answered that.

4     Q     Thank you.

5           And the letter is directed to Tim O'Donnell, City

6     Manager, City of Brea, correct?

7     A     It says what it says, Counselor.

8     Q     And that's what it says, right?

9     MR. SAX:   Objection, document speaks for itself.

10          But go ahead, Igor.  You can go ahead and answer.

11    THE WITNESS:  Well, that's what I was going to say.

12    It says what it says.  It speaks for itself, Counsel.  I

13    don't know what you're trying to ask or prove here but --

14    BY MR. BROCKLAND:

15    Q     The second paragraph of the letter, you state We

16    have also not heard relative to the sculpture submittal we

17    made.  If that sculpture is acceptable, the artist

18    John Raimondi indicated that he would need some time to

19    make the piece.  We would like to expedite, as well.

20          Did I read that correctly?

21    A     That's what it says.

22    Q     Does this refresh your recollection that Olen

23    Properties proposed a submittal -- sculpture submittal

24    from John Raimondi to the City of Brea in April of 2001 or

25    thereabout?

Page 57

1        A      It does not.

2        Q      You don't deny that you -- that Olen proposed the

3    use of a John Raimondi sculpture to the City of Brea, do

4    you?

5        A      Counsel, I said I don't recall.  I don't recall

6    the letter and so I don't recall this issue or matter at

7    all.

8        Q      Do you recall getting sued by Mr. Raimondi for

9    copyright infringement?

10       A      Believe it or not I actually don't recall that.

11   But counsel just refreshed, you know, our -- our

12   recollection that evidently we had a settlement agreement

13   with Mr. Raimondi.  I don't recall the suit.

14       Q      Well, I don't want to get into the settlement

15   agreement with you.  I want to ask you a little bit about

16   the litigation.

17              You can take down Exhibit 7, please.

18              Do you --

19              Well, let me -- let's put up the complaint.

20              Mr. Olenicoff, we're marking as

21   Plaintiff's Exhibit 8 the complaint filed by Mr. Raimondi

22   against you and Olen Properties Corp. and I'll just ask

23   you to take a look at the first page of that complaint.

24              If we could, share that, please.

25          THE VIDEOGRAPHER:  Copy that.

Page 58

1      (Plaintiff's Exhibit 8 was marked for identification.)

2     BY MR. BROCKLAND:

3      Q     Mr. Olenicoff, this is the first page of a

4     complaint that was filed in the United States District

5     Court for the Central District of California by

6     John Raimondi against you and Olen Properties Corp.,

7     correct?

8      A     I don't know, Counsel.  If it was, um, you know,

9     the record would speak for itself.  I don't recall it.

10     Q     You were represented by counsel in this case,

11    correct?

12     A     Counsel, if I don't recall the lawsuit, I

13    certainly don't recall if I was represented or not.  But

14    again --

15     Q     And the record --

16     A     -- I'm sure that it --

17     Q     Go ahead.

18     A     -- would speak for itself.

19     Q     There was a stipulation entered in that case and

20    read in open court that said Defendants Igor Olenicoff and

21    Olen Properties Corp. have infringed Mr. Raimondi's

22    copyright in Dian in two locations and Defendants

23    Igor Olenicoff and Olen Properties Corp. have infringed

24    Mr. Raimondi's copyright in Ceres in two locations.  You

25    should, therefore, treat those facts as having been

Page 59

1   proven.

2            Are you aware that your counsel entered into that

3   stipulation on your behalf?

4      MR. SAX:  Object to form, lack of predicate.

5            But you can answer if you know.

6      THE WITNESS:  I'm not aware, Counsel.

7   BY MR. BROCKLAND:

8      Q    Does that come as a surprise to you, that they

9   agreed that you had infringed Mr. Raimondi's copyright in

10  Dian and Ceres?

11     MR. SAX:  Object to form and lack of predicate.

12           But you can answer the question if you know.

13     THE WITNESS:  Well, you just indicated it and I have

14  not even thought about it and have not been aware of it or

15  have forgotten about it.  So I didn't -- I don't have an

16  opinion to respond to your question.

17  BY MR. BROCKLAND:

18     Q    Are you aware that a jury verdict was entered on

19  behalf of Mr. Raimondi for $640,000 in that case?

20     MR. SAX:  Object to form, lack of predicate.

21           You can answer if you know.

22     THE WITNESS:  Again I -- I don't know or I don't

23  recall.

24  BY MR. BROCKLAND:

25     Q    Are you aware that a judgement was entered

1    against you and Olen Properties in that case requiring

2    that certain placards be attached to copies indicating

3    that they were unauthorized copies?

4        MR. SAX:  Same objection.

5            You can answer if you can.

6        THE WITNESS:  Counsel, I -- I don't know.  I don't

7    recall.  You know, whatever the record says, it speaks for

8    itself.

9    BY MR. BROCKLAND:

10       Q    Up until 2012, did you or Olen Properties

11   purchase any sculptures from John Raimondi?

12       A    I don't have a clear recollection, but I believe

13   that, yes, we did.

14       Q    What sculptures of Mr. Raimondi's do you think

15   you had purchased prior to 2012?

16       A    Well, again I'm not clear on the date when you

17   say prior to or post-2012.  But my recollection is that

18   we -- we are -- own a John Raimondi piece.

19       Q    All right.  But let me -- instead of the year,

20   how about before Mr. Raimondi filed suit had you ever

21   purchased any sculpture from him?

22       A    I don't recall when, you know, of -- you know,

23   you're putting a time frame on it and I can't tell you as

24   to when or if.

25       MR. BROCKLAND:  You can take down the exhibit, please.

Page 61

1   Thank you.

2       Q    Mr. Olenicoff, you never purchased a sculpture

3   known as Dian from Mr. Raimondi, did you?

4       A    No, not that I can recall.

5       Q    Similarly you never purchased a sculpture from

6   Mr. Raimondi known as Ceres, did you?

7       A    I don't recall, Counsel.  Those names don't

8   really mean anything.

9       Q    Did you ever -- strike that.

10           Mr. Olenicoff, we're going to mark as

11  Plaintiff's Exhibit 9, and put it up for you, three

12  photographs and I'd like you to take a look at it, please.

13    (Plaintiff's Exhibit 9 was marked for identification.)

14    MR. BROCKLAND:  If you could, scroll down a little

15  bit, please, to the two photographs below.  There you go.

16      Q    Mr. Olenicoff, can you see that?

17      A    Yes, I can.

18      Q    There's a heading that says Intertwined and below

19  that are two photographs.  Do you recognize the sculptures

20  that are depicted below where it says Intertwined?

21      A    I see them, yes.  In the photos.

22      Q    All right.  And -- and one says Olen Pointe Brea,

23  right?

24      A    Um, on the photograph?

25      Q    Yes.

Page 62

1      A     Yes.

2      Q     And below -- below the photograph it says it, but

3   what is Olen Pointe Brea?

4      A     Um, it's an Olen project in Brea.

5      Q     Okay.  And that sculpture that's depicted in that

6   picture on Plaintiff's Exhibit 9 is still at Olen Pointe

7   Brea, is it not?

8      A     I'm not sure.  I don't know.

9      Q     Do you know what the placard that is now on the

10  pedestal of that picture depicted at Olen Pointe Brea

11  says?

12     A     Counsel, if I don't know whether the piece is

13  there or not, there's certainly no way I'd know what the

14  placard -- that's an assumption that it has a placard --

15  what it would say, nor can I see it.

16     Q     Do you know at one time that placard attributed

17  the work to a Chinese artist?

18     A     I don't recall.  I don't know that.

19     Q     All right.  In the photo on the right, that says

20  Century Centre, correct?

21     A     Yes.

22     Q     Do you recognize that sculpture?

23     A     Yes.

24     Q     And is that sculpture still there to this day?

25     A     I believe it is.

Page 63

1      Q     And at one time did it have a placard attributing
2    it to a Chinese artist?
3      A     I don't know, Counsel.
4      Q     Do you know what the placard on it says today?
5      A     No, I don't.
6      Q     Do you know that there is a placard on it?
7      A     No, I don't.
8      MR. BROCKLAND:  You can take that one down, please.
9           Mr. Olenicoff, I'm going to show you a document
10   that we've marked as Plaintiff's Exhibit 10, ask
11   the reporter to share that with you, please.
12     (Plaintiff's Exhibit 10 was marked for identification.)
13     MR. BROCKLAND:  And scroll down again, if you would.
14     Q     Do you see the two photographs at the bottom of
15   Plaintiff's Exhibit 10, Mr. Olenicoff?  They're under a
16   heading that says Link To Compassion.  Do you see that?
17     A     Yes, I do.
18     Q     And the one on the left underneath the
19   photographs says Olen Pointe Brea, correct?
20     A     That's what it says, yes.
21     Q     All right.  Do you recognize that -- that
22   sculpture in that photograph?
23     A     No.  I don't recall that sculpture being at Olen
24   Pointe Brea.
25     Q     How about on the right, the sculpture of Link to

Page 64

1    Compassion at Century Centre?  It's a little bit of a dark

2    photograph, but do you recognize this sculpture?

3        A     Yes, I do.

4        Q     And that sculpture sits between two office

5    towers, correct?

6        A     Yes.

7        Q     Kind of on a -- on a pedestrian plaza?

8        A     Yes.

9        Q     And you were instrumental in acquiring that

10   sculpture, were you not?

11       A     I don't quite recall how we came about to acquire

12   it.

13       Q     Do you recall ordering it from a broker to be

14   manufactured in China?

15       A     I don't recall.

16       MR. SAX:  Object to form.

17           But you can answer.

18       THE WITNESS:  I don't recall, Counsel.

19   BY MR. BROCKLAND:

20       Q     At some point in time you did order artwork from

21   a broker who had things shipped from China, correct?

22       A     I have purchased artwork in China or from China.

23       Q     And, in fact, this sculpture came from China, did

24   it not?

25       A     I don't -- I don't know.  I don't recall where it

```
                                              Page 65
 1    came from.

 2        Q    At one time this sculpture at Century Centre had

 3    a placard on it attributing it to a Chinese artist,

 4    correct?

 5        A    Possibly.

 6        Q    It no longer has that placard on it, does it?

 7        A    I don't know what it -- what it had or what it

 8    has, Counsel.

 9        MR. BROCKLAND:  All right.  You can take that down,

10    please.

11        Q    Mr. Olenicoff, are you aware of you or

12    Olen Properties owning any other copies of sculptures

13    similar to those that we just looked at by Mr. Raimondi?

14        MR. SAX:  Object to form.

15             But you can answer if you can.

16        THE WITNESS:  Well, when you say similar, I don't know

17    what you're referring to.  We, um -- Olen owned some

18    sculptures that are stainless steel that have -- if that

19    makes them similar.

20    BY MR. BROCKLAND:

21        Q    Do you know what a maquette is?

22        A    A maquette or maquette?

23        Q    Yes.

24        A    No, I don't.

25        Q    Do you recall testifying at your deposition in
```

Page 66

1    Mr. Raimondi's case that you had received maquettes of

2    Link to Compassion and Intertwined; in other words, that

3    you had received small versions of these large sculptures

4    that we just looked at?

5        A    I don't recall that testimony.

6        Q    Do you -- you agree that you might have received

7    a maquette of Link to Compassion or Intertwined at some

8    point from the manufacturer?

9        A    I don't recall and I don't want to guess.  I

10   don't -- I don't recall.

11       Q    Do you recall testifying in your deposition in

12   Mr. Raimondi's case that you might still have small

13   versions of those sculptures in a storage room at

14   7 Corporate Plaza?

15       A    I don't recall that testimony and, um, I doubt

16   that we have such a thing.

17       Q    Why do you doubt that you have such a thing?

18       A    Well, I haven't seen it or, um, I can't recall

19   ever seeing it.  So, you know, whatever I testified to was

20   my best recollection then and this is my best recollection

21   now, that, you know, we don't have any such thing at

22   7 Corporate Plaza.

23       Q    Did you ever ask somebody to search the storage

24   room at 7 Corporate Plaza to see if there were more copies

25   of John Raimondi's work?

Page 67

1      A     The answer is no and those were not -- if they

2    existed and I don't know that they existed, um -- well,

3    you know, let me leave it at that.  It's a no.

4      Q     You agree to Mr. Raimondi's case that you

5    infringed his copyrights in two different copyrights and

6    that there were four copies in existence.  Let me ask you

7    this:  Do you know if there are any other copies of

8    Mr. Raimondi's work, copyrighted work, in existence at

9    Olen Properties or in your recollection?

10        MR. SAX:  Object to form, also lack of predicate.

11             But if you want to answer that, you can.

12        THE WITNESS:  Well, it's a compound question.  So the

13    first part was -- was what?  Do I -- you know, you'll have

14    to ask -- re-ask that question and break it down into

15    individual questions, Counsel.

16    BY MR. BROCKLAND:

17      Q     Sure.  Let me try this:  I've shown you pictures

18    of four copies of Mr. Raimondi's copyrighted work,

19    correct?

20        MR. SAX:  Object to form.

21             You can answer if you can.

22    BY MR. BROCKLAND:

23      Q     We just looked at them a few minutes ago.

24        MR. SAX:  You're calling -- my objection is to the use

25    of the word copyright.

Page 68

1           But go ahead.

2        THE WITNESS:  Well, you know, that's my -- my

3     objection, as well, and -- or --

4     BY MR. BROCKLAND:

5        Q     Why do you object to my use of the word copyright

6     with respect to Mr. Raimondi's work?

7        A     I don't know that -- that it is or was or --

8     you're asking me a legal, um, question and a legal

9     conclusion that I'm not in a position to agree with.  You

10    know, whatever the record says or -- it says what it says.

11    I -- I don't want to be guessing.

12       Q     So you'll stand by whatever your counsel

13    stipulated to in the Raimondi case, right?

14       A     Well, I'd have to see it, Counsel.

15       MR. BROCKLAND:  Hang on one second and I'll put that

16    up for you.

17            We're going to mark as Plaintiff's Exhibit 11 a

18    portion of the trial transcript from Day 1 of the jury

19    trial in the case of John Raimondi versus Igor Olenicoff

20    at Olen Properties Corp.

21            If you could share that with the witness, please,

22    I'd appreciate it.

23     (Plaintiff's Exhibit 11 was marked for identification.)

24       MR. BROCKLAND:  And scroll to the second page, please.

25       Q     It says --

Page 69

1          MR. SAX:  They're not there yet.  Hold on.

2          MR. BROCKLAND:  I'm sorry.

3                 Prior to that, prior to the index.  Appearances.

4     Scroll down a little bit, please.

5          Q     Where it says In behalf of the

6     Defendant Igor Olenicoff, et al., William L. Buus and

7     Julie Ann Ault, do you see that, sir?

8          A     I see it, yes.

9          Q     And Ms. Ault is the general counsel at

10    Olen Properties Corp.; is that right?

11         A     Yes.

12         Q     And she was also general counsel back in 2014,

13    correct?

14         A     Um, I'm not clear if she was general counsel at

15    the time.

16         Q     But she was in your -- in the legal offices at

17    Olen Properties at that time?

18         A     I believe so.

19         Q     And Mr. Buus was an outside lawyer who was hired

20    on behalf of you and Olen Properties Corp., correct?

21         A     I believe so.  That's what it says.

22         MR. BROCKLAND:  All right.  Let's go -- scroll down.

23    Keep going, please.  Thank you.  All right.  Stop there,

24    please.

25         Q     The judge is reading here, sir, and on line 19 he

1    says They have agreed to the following facts.  Do you see

2    that?

3        A    Yes.

4        MR. SAX:  Gene, can I just have some clarification?

5    Because I'm not familiar with this document.  Is this

6    being read to the jury or is this prior to the trial

7    starting?

8        MR. BROCKLAND:  It was read to the jury by the judge

9    at the start of the trial.

10       MR. SAX:  Okay.  Thanks.

11   BY MR. BROCKLAND:

12       Q    We'll skip a bit of it and scroll down to the

13   next page, line 13.  It says Olenicoff owns the four

14   sculptures at issue.  Seven, Defendants Igor Olenicoff and

15   Olen Properties Corp. have infringed Mr. Raimondi's

16   copyright in Dian in two locations.

17   Defendants Igor Olenicoff and Olen Properties Corp. have

18   infringed Mr. Raimondi's copyright in Ceres in two

19   locations.  You should, therefore, treat these two facts

20   as having been proven.

21            Do you stand by that stipulation, sir?

22       MR. SAX:  First let me object to form.

23            But you can answer the question if you can.

24       THE WITNESS:  Well, again this is legal -- legalese

25   and it says what it says, Counsel.  And that's the judge

Page 71

1   reading it in, so it says what it says.  I don't know what

2   was in the judge's head or, um -- so it says what it says.

3   I can't --

4   BY MR. BROCKLAND:

5       Q     All right.  Let's show -- I mean, I appreciate

6   you saying it's legalese, but it seems pretty simple to

7   me.  It says you infringed his copyright.  Do you dispute

8   that?  Do you say you did not infringe Mr. Raimondi's

9   copyright right in Dian in two locations?

10      A     No.  Counsel I'm saying at this point you're

11  bringing this up and I don't know, you know, how old this

12  is and I was not party to either drafting this or saying

13  it or necessarily even remembering it or being aware of

14  it.  So it says what it says.  I -- I don't want to either

15  agree or disagree.  It says what it says.

16      Q     And so as we sit here today, you won't agree with

17  me that you infringed Mr. Raimondi's copyright in Dian in

18  two locations?

19      A     I'm not either going to agree with you or to

20  disagree with you.

21      Q     All right.  And you -- as we sit here today, you

22  will not agree with me that you infringed Mr. Raimondi's

23  copyright in Ceres in two locations?

24      A     My answer is the same.  I'm -- -- I'm not here to

25  either agree or to disagree with you, Counsel.  You're

Page 72

1   showing me a document that -- it's somebody's saying it.

2   I guess it's a judge saying it or reading it.  So -- so it

3   is, you know, his opinion or it was -- I did not write it

4   or I didn't say that.  So, you know, whatever it says, it

5   says.

6       Q    Well, sure.  Whatever it says, it says, but let's

7   set aside what the document says and let me just ask you,

8   Igor Olenicoff.  Do you agree that you infringed

9   Mr. Raimondi's copyright in Dian in two locations?  Forget

10  the document.

11      MR. SAX:  Object to form.

12           But you can answer.

13      THE WITNESS:  Well, again I'm not familiar with the

14  copyright, but obviously this was agreed to with the judge

15  having read it.  So if that's what was agreed to, it was

16  agreed to.

17  BY MR. BROCKLAND:

18      Q    So the answer is, yes, you do agree that you

19  infringed Mr. Raimondi's copyright in Dian in two

20  locations?

21      MR. SAX:  Object to form.  You can answer.

22      THE WITNESS:  My answer stands as I -- as I said it,

23  Counsel.

24  BY MR. BROCKLAND:

25      Q    And you do agree with me then that you infringed

Page 73

1   Mr. Raimondi's copyright in Ceres in two locations?

2       A      No, I don't.

3       MR. SAX:  Objection to form, also asked and answered.

4             But you can answer it any way you'd like.

5       THE WITNESS:  I'll answer that, no, I don't agree.

6   I -- you know, my answer in the previous is the same as

7   here.

8   BY MR. BROCKLAND:

9       Q      But you don't think you infringed Mr. Raimondi

10  copyrights in Ceres?

11      A      Counsel --

12      MR. SAX:  Object to form.

13      THE WITNESS:  -- you know, you can ask it six

14  different ways to solicit an answer that you wish to have

15  answered, but I've answered that question to the best of

16  my ability and I refuse to continue with your word games.

17  BY MR. BROCKLAND:

18      Q     I'm just trying to get the facts.  I'm not trying

19  to play word games with you, Mr. Olenicoff.

20      A      Well, the facts are -- are what is written.

21  Evidently it says what it says.

22      MR. BROCKLAND:  All right.  You can take that down,

23  please.

24      Q     Let's shift gears for a minute and I want to ask

25  you about a sculptor by the name of Bill Bedford.  Do you

Page 74

1    remember Mr. Bedford?

2         A      I do.

3         Q      At one time you purchased some sculptures from

4    him, correct?

5         A      At one time I helped him design some sculptures

6    that, um -- that he produced and I purchased then from

7    him, yes.

8         Q      How did it come about that you met Mr. Bedford?

9         A      Um, he -- he approached me, um -- and again I

10   don't recall necessarily just how.  But he approached me

11   and he had some sculptures that he had produced that were,

12   as I recall, in an art gallery and were not selling and he

13   needed the money or wanted, you know, to sell them and

14   offered to sell them to me by pulling them out of the art

15   gallery and -- and having me buy them directly from him.

16        Q      And what -- what sculptures were those -- or,

17   strike that.

18               Did you buy them?

19        A      Yes.

20        Q      What sculptures were those that you bought from

21   Mr. Bedford?  Do you know?

22        A      I don't recall, Counsel.  There was --

23        Q      Do you recall --

24        A      There was a number of them.

25        Q      Do you recall like generally what they -- you

Page 75

1    know, sort of the type of sculpture that they were?

2        A    Well, like I said, there was a whole bunch of

3    them, so there's no way to really describe.

4             Counsel, I'm going to take another five-minute

5    break.

6        MR. BROCKLAND:  Sure.

7        THE VIDEOGRAPHER:  We're now going off the record.

8    The time is 11:37 a.m.

9                       (BRIEF RECESS.)

10       THE VIDEOGRAPHER:  We are now back on the record.  The

11   time is 11:41 a.m.

12   BY MR. BROCKLAND:

13       Q    Mr. Olenicoff, we were talking a little bit about

14   Mr. Bedford, so forgive me if I circle back a little bit.

15   You met him.  You bought some of his sculptures that he

16   was showing in a gallery, correct?

17       A    Well, that's what I understand.  I -- I never saw

18   them and the gallery said they weren't selling and that he

19   would pull them out of the gallery and bring them over and

20   show me.  As I recall, he did.

21       Q    And then you said in your testimony about

22   designing some sculptures.  What did you mean by that?

23       A    Well, then, um, after I bought all the sculptures

24   that he had already produced and, um, had not sold and --

25   I bought those from him.  And then, um, keep in mind

Page 76

1    Mr. Bedford was in financial straits, couldn't pay his

2    rent, was living in a -- in his studio, which was a

3    one-room studio, and needed money and he said, gee, if I

4    could -- could we collaborate or could he make a sculpture

5    for me.

6              So I'd asked him, um, you know, if he ever -- my

7    recollection is that all that he had produced up to that

8    point was -- was Indian -- American Indian sculptures.

9    Those are the ones that I purchased from him.  And so then

10   he and I -- I said that was fine and I advanced him some

11   money and -- and we worked together at the end of each day

12   or, you know, for a while designing certain sculptures

13   and, um, I paid him on a weekly basis or, you know, all

14   the way along the way to, you know, help him out

15   financially.

16             And then we produced -- we produced one piece and

17   I -- I purchased -- I then ordered -- actually I worked

18   with the foundry and actually bought the mold from -- I

19   had the mold made and I owned the mold -- I still own

20   it -- um, for -- for that piece and we made a piece.  Um,

21   and I don't recall the name.  It's -- it's -- you know,

22   represents a man's face on -- on one side, a nose, and I

23   think it's a woman on the backside.  Yes.  In that case

24   both he and I -- I had a small version of it made first

25   and that's in the office at 7 Corporate Park.

Page 77

1    Q     So let me -- let me get some more detail on some

2    of that.  So when you first met Mr. Bedford, he had been

3    producing things that was sort of an American Indian

4    motif, if you will; is that right?

5    A     Exclusively, yes.  That's -- that's all that he

6    did.

7    Q     And you wanted him to -- to do some -- something

8    different, right, in a different motif?

9    A     Well --

10   Q     And he wanted to.

11   A     Yes.  Uh-huh.

12   Q     All right.  And so you said you advanced him some

13   money?

14   A     I advanced him --

15   Q     Do you know how much?

16   A     I advanced him money every week, you know,

17   just --

18   Q     How much was Mr. Bedford paid every week?

19   A     Well, it would depend how much progress he had on

20   the mold.  And I would go by his studio and we would share

21   a beer and talk about where he was headed.  And the ideas

22   for that art were collaborative, maybe more -- more mine

23   than his, but he -- he first -- you know, we -- we built a

24   maquette and then talked to the foundry up in

25   San Francisco that had agreed to produce the mold off the

1    maquette and again I paid Mr. Bedford to -- to be up there

2    and to -- to work with the foundry and have these pieces

3    cast.

4         Q     How did you -- when you say you sort of

5    collaborated on the design and it was more yours than his,

6    how did you work on the design together?  Just how did

7    that process work?

8         A     Well, he -- initially we had, um -- had a clean

9    sheet of paper that we would sit and -- and again the idea

10   of producing large-scale sculptures was -- was exclusively

11   mine.  I had no interest in the sculptures that he had

12   been making even though I purchased what he had just to

13   financially support him.  And so if I was going to buy

14   anything, I wanted it of a certain size and I also wanted

15   it to be an abstract piece as opposed to an Indian chief's

16   head.  So, you know, he had ideas and I had ideas and --

17   and we bounced them around and it was, you know, my ideas

18   that obviously mattered since I was, you know, paying him

19   and supporting him.  And this, you know, went on for

20   several years, maybe more than a few.  And so -- so that's

21   the way it worked.

22        Q     Did you have any kind of a written agreement with

23   Mr. Bedford?

24        A     No.  You know, beside that he couldn't, you

25   know -- he had a hard time, you know, complying with even

Page 79

1    the unwritten agreements that we had.  He couldn't meet

2    his schedule, um, and get work done and -- but again he

3    was a nice guy and he was, you know, in financial straits

4    and needed money.  At the time he actually then had his

5    young daughter join him to live in this basically

6    one-room, um, artist studio in Laguna Canyon here.

7         Q     So this went on for several years with you and --

8    and Mr. Bedford working together to design and create

9    pieces of art?

10        A     Yes.  Every piece.

11        Q     I'm sorry?

12        A     Every piece that he produced for me were, um,

13   virtually my idea except for one that, um, was his idea

14   and I let him roll with that.  And it was -- it had to do

15   with his daughter who was -- my best recollection is 13,

16   14, or 15 years old.  And she was growing up and -- and he

17   had the idea of this girl, or her torso, breaking through

18   a rock crest above her head, which was a huge rock that

19   she was breaking through.  So that was the concept and he

20   said that's what his daughter was going through and, you

21   know, what did I think about it and I said that would be

22   fine, that sounded fine and so he produced that.

23             The others were virtually all my ideas.  The big

24   piece, um -- um, which I remember that is in front of --

25   it's both at Brea and our headquarters, called The Similar

Page 80

```
 1   Equals.  That was entirely my idea, is these two body

 2   masses on a -- teetering and one is all muscular, the

 3   other is big and puffy.  And that was --

 4       Q    Yeah.  So --

 5       A    So anyway --

 6       Q    Let's -- that's great.  Let's talk about this

 7   Similar Equals since you brought it up.  How many of those

 8   were -- were produced?  Do you know?

 9       MR. SAX:  Object to form.

10            But you can answer.

11       THE WITNESS:  To the best of my recollection, it was

12   two.

13   BY MR. BROCKLAND:

14       Q    Okay.  And earlier you said that -- you told me

15   about buying a mold and having it made and you said you

16   still own it.  What was that mold that you were referring

17   to in your testimony?

18       A    I don't recall the name of the piece, but it was

19   the first piece.  It was the, um -- it was a rubber -- a

20   rubber mold, but it was a partial nose of a face.

21       Q    Okay.  Let's talk about a particular sculpture

22   called Cognizance.  Do you recall that sculpture?

23       A    The name -- name sounds familiar, but I can't --

24   I don't remember that piece.  There was a whole bunch of

25   them so --
```

Page 81

1      MR. BROCKLAND:  Yeah.  Let me show you a picture of

2   it, see if that helps.  We're going to mark

3   Plaintiff's Exhibit 12, which are a number of photographs.

4            And ask you to share that with the witness,

5   please.

6      THE VIDEOGRAPHER:  Copy.

7    (Plaintiff's Exhibit 12 was marked for identification.)

8      MR. BROCKLAND:  Might have to resize it because it's a

9   vertical piece.

10     THE VIDEOGRAPHER:  Oh, okay.

11     THE WITNESS:  Oh, yes.

12     MR. BROCKLAND:  Let's just stay on that page.

13     Q     Do you recognize that, Mr. Olenicoff?

14     A     I do.

15     Q     Is that a sculpture referred to as Cognizance?

16     A     I don't recall the name, but I recognize the

17   piece and it was one that I worked or designed with

18   Bill Bedford.

19     Q     Okay.  Let me -- if you don't mind, I'm just

20   going to call it Cognizance because that's what

21   Mr. Bedford calls it and I don't know how else to refer to

22   it.

23            So you say you and Mr. Bedford designed this

24   piece?

25     A     Yes.  Very definitely.

```
                                                    Page 82

 1      Q     And when you say very definitely, why -- why are

 2   you so sure about that in particular?

 3      A     Well, no.  I know them all because, like I said,

 4   I worked on them and, the whole concept behind this piece

 5   and the idea, it goes back to what Olen was -- was -- and

 6   I were experiencing at the time.  It's a lady that's

 7   upsidedown and with, you know, lightening -- lightening

 8   bolt and it had a meaning for, you know, that time and --

 9   in my life and, you know, the company's life and so that's

10   where that idea --

11      Q     So when you worked on -- when you worked on the

12   design of Cognizance with Mr. Bedford, are you talking

13   about, you know, handwritten or -- or drawn -- how did you

14   go about working on the design?

15      A     Well, as I've testified, he and I would meet and

16   we would collaborate and I would leave and he would sketch

17   it up and then we would meet again and he would -- would

18   draw it up and change it.  And then once -- once I -- I

19   liked the design and the idea was -- was there, then --

20   then he was again paid to build a maquette which he --

21   which he built and then it was changed or -- I mean, it

22   was a long-term project.  Each sculpture took a year or

23   more so --

24      Q     And when he built the maquette for Cognizance,

25   what was that maquette made out of?
```

```
                                               Page 83
 1      A      Um, plaster.

 2      Q      Okay.  And that was much smaller than this

 3  version of Cognizance that we're looking at here, correct?

 4      A      Well, the original one was, but then ultimately,

 5  um -- again I would pay him to build a full-scale, um,

 6  sculpture in the size that you see it --

 7      Q      All right.  And the full-scale sculpture of

 8  Cognizance would have been in the first instance made out

 9  of plaster by -- by Mr. Bedford, as well?

10      A      You mean the full-scale one?

11      Q      Yes.

12      A      No.  It would be made by him, but it would be out

13  of clay.

14      Q      Okay.  Out of clay, not plaster.

15             And then from the clay molds are made, correct?

16      A      From the clay, once it's finalized and polished

17  and then sealed, yes, a rubber mold is made of it.

18      Q      All right.  And so to your knowledge a rubber

19  mold was made of the full-sized Cognizance?

20      A      Yes.  That I paid for.

21      Q      Did you pay Mr. Bedford or -- or did you pay

22  some -- some third party to make the mold?

23      A      I paid Mr. Bedford for his labor and I paid a

24  third party, a foundry who had somebody who would make

25  molds and they made the rubber mold.
```

Page 84

1      Q      All right.

2      A      And I -- and I made progress payments to them, as

3    well.

4      Q      To the foundry?

5      A      Well, to the mold maker and then the foundry and

6    then big the bronze.  I mean, it was everybody had to be

7    controlled and paid and I had to make sure that they were

8    progressing with the work.

9      Q      Do you still have records -- well, strike that.

10            This was some time ago, correct?

11     A      Yes.

12     Q      Do you recall when approximately?

13     A      No, I don't.  It was a long time ago.

14     Q      Do you know if you still have records of what was

15   paid either to Mr. Bedford or to the foundry or to the

16   mold maker?

17     A      Oh, I doubt it, no.

18     Q      After the mold was made for Cognizance, there

19   were two bronze, I'll call them, editions, made; is that

20   correct?

21     A      I don't recall them.

22     Q      One of those bronze editions was placed inside at

23   Olen Properties headquarters, was it not?

24     MR. SAX:  Object to form and predicate.

25            You can answer.

Page 85

1        THE WITNESS:  Yes.

2    BY MR. BROCKLAND:

3        Q     All right.  Is it still there today?

4        A     Yes.

5        Q     And there was another bronze edition that was

6    placed outside.  I lost place of where exactly, but do you

7    recall that?

8        A     No, I don't.

9        Q     All right.

10       A     I think there was more -- more made than -- than

11   just two.

12       Q     Do you know how many bronze editions of

13   Cognizance were made?

14       A     Not -- not precisely, but I think there was four

15   to the best of my recollection.

16       Q     And did you pay the -- did you pay the foundry

17   for all four of those?

18       A     Well, my answer, you know, Counsel, is the same

19   as I testified to on two occasions as to how these pieces

20   were produced and whom I paid.

21       Q     Do you know if you paid Mr. Bedford -- do you

22   know how many editions of Cognizance you paid Mr. Bedford

23   for?

24       MR. SAX:  Object to form.

25            You can answer.

Page 86

1        THE WITNESS:  I paid Mr. Bedford for -- for -- you

2    know, as I mentioned, whatever he did, he was paid on a

3    weekly basis or biweekly basis.

4    BY MR. BROCKLAND:

5        Q    So you didn't specifically compensate Mr. Bedford

6    or, you know, pay him a certain amount for any edition to

7    Cognizance?

8        MR. SAX:  Object to form.

9        THE WITNESS:  I don't recall.  I think there was

10   some -- some kind of a bonus payment at the end when it

11   was, you know, delivered, but I don't recall.

12   BY MR. BROCKLAND:

13       Q    Do you know if one of the bronze editions of

14   Cognizance was installed at Olen Pointe in Brea?

15       A    I don't recall, Counsel.

16       Q    At some point Mr. Bedford alleged that he had

17   discovered two copies of Cognizance that were made out of

18   granite in California.  Do you recall that?

19       A    No, I don't.

20       Q    All right.  Have you ever seen granite versions

21   of Cognizance?

22       A    I don't recall, Counsel.  It's been a while since

23   I've seen any of them.

24       MR. BROCKLAND:  Can we scroll down in that

25   Plaintiff's Exhibit 12, please?

Page 87

1              Before we go too far, let's stop there.

2       Q    This is a picture of Cognizance at Quantum Town

3   Center, correct?

4       A    I don't know, Counsel.  I don't know where that

5   is.

6       Q    You don't recognize the building behind it?

7       A    Nope.  No, I don't.

8       MR. BROCKLAND:  Okay.  Let's scroll down to the next

9   picture, please.

10      Q    Does that help you place it at all?

11      A    No.

12      MR. BROCKLAND:  All right.  Let's scroll down to the

13  next picture.

14      Q    How about that?  Does that help you place it?

15      A    No.

16      Q    Does that appear to be granite to you or bronze?

17      A    It could be either.  I don't know.

18      Q    Let's try one more down and see if that helps.

19  No.  I don't think it helps.

20      A    No.  That looks like bronze.

21      Q    The one above it looks like granite, correct?

22      MR. SAX:  Object to form, asked and answered.

23      THE WITNESS:  Yeah.  I've answered that.  It could be

24  either.

25              Gentlemen, I just want to, um, say or put some

Page 88

1    notice in here.  It's 12:05, which is my lunch --

2        MR. BROCKLAND:  Why don't we go off the record.

3        THE VIDEOGRAPHER:  Okay.  We are now going off the

4    record.  The time is 12:08 p.m.

5            (WHEREUPON THE LUNCH RECESS WAS TAKEN.)

6        THE VIDEOGRAPHER:  We are now back on the record.  The

7    time is 12:54 p.m.

8        MR. BROCKLAND:  All right.  Are we back?

9        THE VIDEOGRAPHER:  Yep.

10   BY MR. BROCKLAND:

11       Q    All right.  Mr. Olenicoff, I got a little more to

12   ask you about Mr. Bedford and Cognizance before we move on

13   from that.

14            Correct me if I'm wrong.  I think you said

15   that -- well, let me back up.

16            Did you work on Cognizance, the design of

17   Cognizance, collaboratively with Mr. Bedford?

18       MR. SAX:  Object to form, asked and answered.

19            But you can answer it.

20       THE WITNESS:  Yes.

21   BY MR. BROCKLAND:

22       Q    And do you feel like you contributed more than he

23   did to the design or equal or -- or what?

24       A    I -- I -- I've never thought of it in -- in this

25   way.  I think we each did our part and it's probably

Page 89

1    equal, you know -- yeah.  I'll say about equally.

2        Q    Okay.  All right.  And do you believe that you

3    equally own the copyright in Cognizance?

4        A    I didn't know there was a copyright.

5        Q    So you never thought about whether or not the

6    copyright should belong to you or Mr. Bedford or both of

7    you?

8        A    Well, you're telling me something new.  Um, I

9    wasn't aware that there was a copyright.  But if there is,

10   it should, um, partially belong to me, yes.

11       Q    Have you ever sought to register a copyright in

12   Cognizance?

13       A    No.

14       Q    Did you ever have Cognizance appraised?

15       A    No.

16       Q    Olen Properties or one of the Olen subsidiaries

17   has an employee by the name is John Lyon.  Do you know

18   John Lyon?

19       A    Yes.

20       Q    Is he the son of Dan?

21       A    No.

22       Q    No?  Unrelated?

23       A    Unrelated.

24       Q    Okay.  Do you know for whom John Lyon works

25   currently?

Page 90

1     A     I think it's, um, Realty Services.

2     Q     What is Realty Services?

3     A     That's an employer and an employer of John Lyon.

4   And I may be wrong, but I think that's the case.

5     Q     Okay.  But, Realty Services, is that a subsidiary

6   of Olen Properties?

7     A     I think so, but I'm not certain.

8     Q     What is the business of Realty Services?

9     A     Real estate services.

10    Q     For buildings owned by Olen Properties or its

11  subsidiaries?

12    A     Well, it could be for anybody.

13    Q     Okay.  Do you know what -- what job Mr. Lyon had

14  in May of 2021?

15    A     Not specifically.

16    Q     All right.  Do you know if he had a

17  responsibility for assuring compliance with the

18  Boynton Beach Art in Public Places program?

19    A     I don't know that.  He didn't report to me.

20    Q     Who did he report to in -- in May of 2021?  Do

21  you know?

22    A     Counsel, I'm not involved in the hierarchy, so I

23  don't want to guess.

24    Q     That's fine.  That's fine.

25          Are you -- did you have any involvement with

Page 91

1   Boynton Beach Art in Public Places program?

2       A    Possibly a long time ago at, um, the initial

3   submittal of possibly some art piece, but I don't remember

4   anything specific.

5       Q    Okay.  So we -- I had seen some applications

6   submitted to the Boynton Beach Art in Public Places

7   program back in 2014.  Do you think you might have been

8   involved in those?

9       A    Well, you'd have to show me the applications,

10  Counsel.

11      MR. BROCKLAND:  Okay.  Well, I'll pull up one that you

12  produced or your counsel produced in this case.  It's

13  called the Revised Art Application.  We're going to have

14  that marked as Plaintiff's Exhibit 13.  I'll just show

15  you.

16           If you can, share that with the witness, please.

17      THE VIDEOGRAPHER:  Copy.  13 hasn't uploaded yet.  I'm

18  waiting for it.

19      MR. BROCKLAND:  It's kind of long.  It might be

20  taking --

21                (DISCUSSION HELD OFF RECORD.)

22     (Plaintiff's Exhibit 13 was marked for identification.)

23  BY MR. BROCKLAND:

24      Q    So, Mr. Olenicoff, I've put in front of you

25  Plaintiff's Exhibit 13 which is a revised art application.

Page 92

1  First page says by Olen Lot 17, 52 & Manatee Bay,

2  January 2, 2014.  Do you see that?

3       A    I see it.

4       Q    Do you know if you had any involvement with

5  this -- the submittal of this revised art application?

6       MR. SAX:  Can you scroll through it a little for the

7  witness?  I want to show him the front page.

8       THE VIDEOGRAPHER:  Do you want me to zoom out,

9  Counsel?

10      MR. BROCKLAND:  No.  Whatever the witness is

11 comfortable with.  You can just keep scrolling through it.

12 If he wants you to stop --

13      THE VIDEOGRAPHER:  Copy that.

14      MR. BROCKLAND:  But other than that you can scroll

15 through it.

16      THE WITNESS:  Yeah.  Keep going.

17      MR. BROCKLAND:  So let's back up a little bit -- well,

18 no.  Keep going.  I'm sorry.  Go ahead.

19      Q    Mr. Olenicoff, does this look familiar to you?

20      A    No.

21      Q    Does it refresh your recollection in any way as

22 to your involvement with the Boynton Beach public arts

23 program?

24      MR. SAX:  Object to form.

25           But you can answer.

Page 93

1          THE WITNESS:  Let me see.  Let me see this -- the

2     entire application.

3     BY MR. BROCKLAND:

4          Q     Sure.  See as much of it as you want.

5          A     Okay.  Keep going through it.

6                Okay.  Keep going through it.

7                Okay.  Okay.  Keep going through it.

8                Okay.  Okay.  Okay.  Okay.  Keep going through

9     it.  Uh-huh.

10         Q     I think the rest -- if you can pause there for a

11    minute -- Mr. Olenicoff, I think most of it is

12    information, background information, on Mr. Bedford.

13         MR. SAX:  Can you just do a really quick scan for him

14    then?

15         MR. BROCKLAND:  Sure.

16         THE WITNESS:  Okay.  Keep going.

17         THE VIDEOGRAPHER:  That's it.

18         THE WITNESS:  Okay.  What's the question?

19    BY MR. BROCKLAND:

20         Q     Question was, were you involved with this art

21    application to the City of Boynton Beach in any way?

22         A     No.  Not that I can recall.

23         Q     Do you know if $42,000 was paid to Mr. Bedford

24    for the copy of Cognizance that was proposed to the City

25    of Boynton Beach?

Page 94

1      A      Well, no.  That's -- we didn't pay, as I

2   mentioned, Mr. Bedford, um, for a sculpture.  They were

3   always produced with our involvement literally on a weekly

4   basis with him.

5      Q      And similarly do you know if $160,000 was paid to

6   Mr. Bedford for a copy of Cognizance that was proposed to

7   the City of Brea years before?

8      A      My answer would be the same.  I don't know -- I

9   don't know how much it cost us or how much we paid

10  Mr. Bedford.  We never --

11     Q      Because you don't have those records?

12     A      Well, that and also Mr. Bedford was never paid --

13  this is being redundant -- for a sculpture.  He and I

14  would design it.  We would build the maquettes.  We would

15  build the full-scale model.  We would send it to the

16  foundry.  We would build the mold and I --

17     Q      Okay.

18     A      -- and I paid for all of that along the way,

19  including my time and I paid for Bill Bedford's time.

20     Q      Right.  So just to be clear, he was never paid on

21  a per piece basis?

22     MR. SAX:  Objection, asked and answered.

23          You can answer again.

24     THE WITNESS:  Yeah.  I -- I've answered how he was

25  paid, Counsel.  You can categorize it any way you'd like.

Page 95

1    BY MR. BROCKLAND:

2        Q    Well, I just want to make it clear because your

3    answer was long.  You didn't pay Mr. Bedford on a per

4    piece basis; you paid him on some other basis, right?

5        MR. SAX:  Object to form.

6             You can answer.

7        THE WITNESS:  I've explained how he was paid, Counsel.

8    You can characterize it as you wish, per piece or

9    otherwise.

10   BY MR. BROCKLAND:

11       Q    I'm not trying to categorize it.  I just want to

12   know how he was paid.

13       A    Well, I just explained it and then you said my

14   explanation was way too long for you.  So, you know, what

15   do you want me to do?  Shorten it so you can understand

16   it?  Well, no.  There isn't any short answer.  That's the

17   way.  He was paid piece by piece by, you know -- you know,

18   by parcel and, um -- and -- well, yeah.  So that's it.

19       Q    Well, now you're saying he was paid piece by

20   piece?

21       A    Piece by piece --

22       MR. SAX:  Objection, argumentative.

23             Go ahead.  Give it one more shot.  Go ahead.

24       THE WITNESS:  Piece by piece.  Meaning when he -- when

25   he -- one week when he did the -- the leg hypothetically

1   out of clay, I would inspect it and I knew how many hours

2   or we would agree how many hours he had in it and I'd pay

3   him for that piece and -- and along it went.  Then I --

4        MR. BROCKLAND:  Okay.

5        THE WITNESS:  Then I bought the mold.  I bought the

6   bronze.  I bought everything.  Meanwhile I was paying him

7   almost as an employee.

8   BY MR. BROCKLAND:

9        Q    And were those checks from you or were they from

10  Olen Properties Corp. -- Corporation or from whom?  Do you

11  know?

12       A    I don't recall, Counsel.

13       MR. BROCKLAND:  All right.  You can take that exhibit

14  down, please.

15       Q    For the record, sir, you are a convicted felon,

16  correct?

17       A    That's correct.

18       Q    You pled guilty to income tax evasion?

19       A    I pled guilty to whatever -- whatever the record

20  shows and you would need to be very specific.  I'll be

21  happy --

22       Q    Well, you --

23       A    And I'll be happy to explain it, but it will take

24  an hour and-a-half to two.

25       Q    So you'll -- you pled guilty to whatever's in the

1   plea agreement?  Is that --

2        A     Yes.

3        Q     -- a fact?

4        A     Yes.

5        Q     And as a result of that guilty plea, you ended up

6   paying about 52 million in back taxes and penalties; is

7   that correct?

8        A     Yes.

9        Q     All right.  And, sir, what is your current net

10  worth?

11       MR. SAX:  Object to form.

12            Igor, we're going to have a big fight on

13  discovery in this case regarding his ability to ask you

14  that question.  So at this time I will instruct you not to

15  answer unless you want to answer at this time.

16       THE WITNESS:  Well, I don't know.  I don't have any

17  means of calculating it or estimating it and I'm not going

18  to answer.

19  BY MR. BROCKLAND:

20       Q     Well, I don't want you to guess and -- and I -- I

21  agree with Mr. Sax that maybe we'll have an issue that the

22  court has to decide down the line.  But let me just ask

23  you this since you don't have any way to calculate it:  Do

24  you ever prepare financial statements?

25       A     No.

Page 98

1      Q      Have you ever signed a financial statement in

2    recent years?

3      A      No.

4      Q      Ever submit financial statements to -- to banks

5    or other financial institutions?

6      A      No.

7      Q      Do you file tax returns?

8      A      I do.

9      Q      Every year, State and Federal?

10     A      I do.

11     Q      Let's move on from there.  I'm going to ask you,

12   Mr. Olenicoff, about certain terms you've used.  One is --

13   one is stone mason.  What do you mean by the term stone

14   mason?

15     A      Well, I would say it's the same definition as

16   what's, you know, the Webster dictionary.  I don't want to

17   invent a different definition than what Webster's

18   Dictionary says it is.

19     Q      Is a stone mason different than an artist?

20     A      Yes.

21     MR. SAX:  Object to -- object to form.

22   BY MR. BROCKLAND:

23     Q      Different than a sculptor?

24     A      Counsel, we're playing word -- word games.  I

25   direct you to go to Webster's Dictionary and read them and

1   you can decide whether they're different.

2       Q    Well, they're words that you've used and that's

3   why I'm asking.  Do you consider Mr. Wakefield a stone

4   mason and not a sculptor?

5       A    Well, that's -- that's his definition.  He's

6   never claimed to be a sculptor in the piece that -- I

7   forget now, you know, the -- the piece that, you know, he

8   sued on.  He said -- and he showed a -- photos where he

9   worked as a stone worker at the direction of -- and again

10  I -- I forgot the artist's name, the sculptor, but he

11  was -- was the artist and he paid Mr. Wakefield by the

12  hour, by the day to allegedly prepare that sculpture.  So

13  he even in his application -- applications for the

14  copyright doesn't present himself as being the artist for

15  that piece, whether he's -- you know, whether he's --

16      MR. BROCKLAND:  I move to strike -- go ahead.

17      THE WITNESS:  Well, that's -- strike it and you can

18  ask whatever you want next.

19      MR. BROCKLAND:  It is nonresponsive to the question,

20  sir.

21      Q    You stated in interrogatory responses,

22  Mr. Olenicoff, that the two sculptures that are at issue

23  in the current case were not purchased for a commercial

24  purpose.  What did you mean by commercial purpose?

25      MR. SAX:  Would you be able to show him an excerpt of

```
                                              Page 100
 1    that answer in interrogatories?
 2        MR. BROCKLAND:  Let's see if he remembers using the
 3    word commercial first.
 4        MR. SAX:  Sure.
 5             Go ahead.  Go ahead, Igor.
 6        THE WITNESS:  No, I don't.  I don't even recall
 7    answering that -- that question.  So you'd have to show it
 8    to me.
 9        MR. BROCKLAND:  Let's show it to him.
10        Q    While he's pulling that up, Mr. Olenicoff, do you
11    remember answering interrogatories in the current case?
12        A    No.  I don't, so I'd have to see it.
13        THE VIDEOGRAPHER:  Counsel, is it 14?  Counsel, is it
14    14?
15        MR. BROCKLAND:  Yes.  It will be 14 once we get it up
16    there.
17        THE VIDEOGRAPHER:  Okay.  Copy that.  I'm going to
18    share it.  Give me a second.
19      (Plaintiff's Exhibit 14 was marked for identification.)
20        THE WITNESS:  Okay.  Can you skip down so I can see --
21    let's see.  These interrogatories -- okay.  Okay.
22    BY MR. BROCKLAND:
23        Q    And, if you would, look at your answer to
24    interrogatory no. 2.  It starts with an objection.
25        A    Okay.  (Reading.)  Could you go down?
```

Page 101

1          Next page -- (Reading.)

2          Okay.  And your question?

3     Q    Right.  My question is, what do you mean by

4    commercial purpose?

5     A    Okay.  Commercial purpose -- again I didn't draft

6    this language, but I -- I signed it and I agree with it.

7    Commercial purpose means it is something that is done or

8    purchased in -- in order to generate some -- a commercial

9    liability out of -- out of whatever is purchased, you

10   know, such as something is purchased for commercial

11   reasons to be resold that's at a higher price.  This

12   certainly wasn't purchased for that reason.

13          Or commercial purpose can be something that is

14   purchased to generate income.  Certainly this was not

15   intended and it -- to generate income.

16    Q    Could commercial purpose be to help the company

17   get a certificate of occupancy?

18    A    Well --

19   MR. SAX:  I'll just object to form as to speculative

20   because he used the word could.

21          But you can go ahead and answer.

22   THE WITNESS:  Well, anything could be, but that's

23   not -- not why this specific piece was purchased.  It was,

24   um, purchased and to be installed at that -- a project for

25   beautification reasons.  Or, you know, yes, could be to

Page 102

1    meet the requirement of the City, but that in my mind is

2    not a commercial purpose.

3    BY MR. BROCKLAND:

4        Q    Okay.  But it -- it was purchased -- or it was

5    installed to help meet the requirements of the City,

6    correct?

7        A    Again I don't know if this was specifically, you

8    know, required.  It could be any sculpture, but possibly

9    so.  I don't know.  I was not involved if this was a

10   specific -- well, it certainly wasn't a specific

11   requirement that this sculpture be placed there, but, you

12   know, some sculpture and it just happened to be that this

13   one was chosen and placed.

14       Q    Right.  So the City does require the -- the City

15   of Boynton Beach required that sculptures with certain

16   value be placed on the property, correct?

17       A    I don't know.  You'd have to ask, you know, the

18   City that.

19       Q    Could I ask someone from Olen Properties that

20   other than you?

21       A    No.  You know, they don't make up the City

22   requirements.  You have to ask the City what their

23   requirement is.

24       Q    Right.  Right.  But you have to comply with the

25   City's requirements.  You agree with that?

Page 103

1      A      Yes.  Well, we all have to comply with municipal

2    requirements, yes.

3      MR. BROCKLAND:  All right.  You can take that exhibit

4    down.

5      Q      Mr. Olenicoff, staying with the issue of the two

6    sculptures at issue in this particular case, is the Human

7    Nature's Many Faces sculpture that had been publicly

8    displayed at Quantum Town Center different than the Human

9    Nature's Many Faces that had previously been displayed in

10   California?

11     MR. SAX:  Object to form, compound.

12          But you can answer the question.

13     THE WITNESS:  I don't know.  I never saw that piece

14   and -- but every piece was slightly different.  Every

15   piece was certainly different than the -- the one that,

16   um, Don Wakefield worked as a stone mason on.  You know,

17   the pieces that we purchased were -- were different and

18   each piece that we purchased was different from the

19   previous piece.  Maybe the same idea but significantly

20   different.

21          By way of example, the Wakefield piece that he

22   masoned was considerably thicker and different shape than

23   the ones that Mr. -- I forget his name -- Hong or Zhou

24   sculpted.  So, you know, being that they were all

25   handmade, they're different.

Page 104

1    BY MR. BROCKLAND:

2        Q    So you're saying that all those that came from

3    China were slightly different?

4        A    Absolutely.  Every piece was different.  They're

5    not -- they're not cast in a mold.

6        Q    But even though not cast in a mold, they can

7    still look alike, correct?

8        A    That's true.  But -- and -- and --

9        Q    Let me ask you this --

10       A    And a Cadillac and a Ford look alike.  They have

11   four wheels and a steering wheel and at least two doors,

12   but they're different.

13       Q    As you sit here today, can you tell me specific

14   differences between the Human Nature's Many Faces in

15   Florida and those that had been on display in California?

16       MR. SAX:  Object to form.

17            But you can answer if you can.

18       THE WITNESS:  Well, as I have testified, I never -- I

19   don't recall seeing the ones in Florida.  Um, but, you

20   know, having seen the five -- five here, I could easily

21   distinguish one from the other.  It's -- it's not very

22   hard to do.

23   BY MR. BROCKLAND:

24       Q    So to this day have you not seen the two

25   sculptures at issue in this case that are down in Florida?

Page 105

1        MR. SAX:  Object to form.  Are you talking about in

2    person as opposed to --

3        MR. BROCKLAND:  Yeah.  In person.

4        THE WITNESS:  If I've seen them, I don't recall.

5    BY MR. BROCKLAND:

6        Q     Have you seen photographs of the ones in Florida?

7        A     Yes.

8        Q     All right.  And having seen photographs of the

9    ones in Florida and having seen the ones in California,

10   can you tell me of any specific differences or do you just

11   not know specific differences?

12       MR. SAX:  Object to form.

13            But you can answer.

14       THE WITNESS:  Well, Counsel, they're supposed to be --

15   as I've testified and I'll repeat myself, each one is

16   unique.  Each one is an original.  It's not -- it's not

17   like a Ford -- as a Ford or a Remington sculpture that is

18   cast out of -- out of a mold.  These are sculpted -- well,

19   you know, you actually have the photos of them in China

20   being sculpted, you know.  There's your answer.  You know,

21   you -- you have it in evidence here.  So each one is being

22   sculpted by different stone masons and each one is

23   slightly unique.  They're not cast in a mold.

24       MR. BROCKLAND:  Move to strike as nonresponsive.

25       Q     But, Mr. Olenicoff, so that -- just to follow up

Page 106

1    for a minute -- yeah.  Let me strike that.

2              On the same subject was the Cognizance copy in --

3    or the Cognizance sculpture at Quantum Town Center in

4    Florida cast from a mold?

5        MR. SAX:  Object to form, lack of predicate --

6        THE WITNESS:  I don't recall -- I don't recall the --

7    your introducing or your question is totally new.  You --

8    you haven't shown me if the sculpture that -- or actually

9    the two that you showed me photographs of, I don't know if

10   they're even the same sculpture.  One looked like --

11   BY MR. BROCKLAND:

12       Q    Let me try this:  Do you know if you have -- have

13   you ever seen any copies of Cognizance that were not --

14   that did not come from a mold?

15       A    I don't recall, Counsel.

16       Q    Mr. Olenicoff, at some point a notice of

17   compliance with a judgement was filed on your behalf in

18   the first Wakefield case regarding the destruction of the

19   pieces in California that you'd been ordered to have

20   destroyed.  Do you recall that?

21       A    No, I don't.

22       Q    All right.  Did you have any involvement with the

23   removal of the copies in California?

24       A    No.

25       Q    You weren't there the day they were removed?

Page 107

1        A      My recollection is I was -- I attended the first,

2    um, removal.  I wanted to see the -- the crane and the

3    lifting of the sculpture and -- being placed on a truck.

4    But that's -- that's the best recollection I have.

5        Q      Okay.  So you might have witnessed one of the

6    pieces being lifted up and placed on a truck?

7        A      Yes.

8        Q      All right.  And certainly you didn't accompany

9    the truck to the -- to the dump or the landfill, did you?

10       A      No.

11       Q      Who was responsible for that removal project

12   at -- at Olen?  Do you know?

13       A      Gosh, I don't.  I don't recall.  I think it

14   was -- I think it was, you know, somebody at -- working

15   for a sculptor in San Francisco.

16       Q      Let me ask you, sir, about your discovery

17   responses in this case.  We submitted document requests to

18   your counsel for documents and -- and did you -- did you

19   in this case personally undertake any search for

20   documents?

21       A      Possibly.  I'd have to see the request.  I don't

22   know what you requested so --

23       Q      Well, did you -- did you review any old emails or

24   any old text messages to determine if you had responsive

25   documents?

Page 108

```
 1      A     Counsel, if I don't know what was requested, how

 2   can I answer the question you just posed?

 3      Q     Well, I think you can.  Because I -- if you don't

 4   recall searching for documents, that's fine.  But --

 5      A     Well, I don't know what I'm supposed to be

 6   searching for.  I search for documents all the time.  It

 7   all depends on the -- on, you know, what I'm searching for

 8   or the purpose of it.  And until I know what it is that

 9   you're trying to say I was requested to search for, I

10   can't answer your question and --

11      Q     Did you search for text messages in this case?

12      A     Well, for what?  I don't know.  What was your

13   request?  I can't answer that question without knowing

14   what it is you requested?

15      Q     Did you search for emails in this case?

16      A     Counsel, I won't answer that because it's been

17   asked and answered.

18      Q     What email accounts do you use, sir?

19      A     I don't know what that means, but --

20      Q     What's your email address?

21      A     Well, I think that you have it.  It's -- there's

22   a gmail address and there's -- there's an Olen address.

23      Q     I saw an email address for igorolen@olen.com.  I

24   don't think I've seen a gmail address.  What's your gmail

25   address?
```

Page 109

1        A     I think it's iolenicoff@gmail.

2        Q     Do you know if you searched that account for any

3   documents in this case?

4        A     No.  I can tell you I didn't.

5        Q     Do you use that account solely for personal and

6   not for business?

7        A     Yes.

8        Q     Do you know an individual by the name of

9   Alfred Lafave?

10       A     My recollection is that, yes, I have met him a

11   while ago.

12       Q     In what context did you meet him?

13       A     I -- my recollection is that he -- he used to

14   work for Quantum Town Center or developing Quantum Town

15   Center.

16       Q     Do you know in what position -- what position he

17   held?

18       A     He may have been project manager, but I don't

19   remember exactly what his position was.

20       Q     All right.  So -- so when you were developing

21   Quantum Town Center, there would have been a project

22   manager for the development?

23       A     I don't -- I believe so, but I don't know.  I

24   think that there was naturally -- I take that back.  There

25   was somebody named Steve Fike that headed up that entire

Page 110

1    development.

2         Q        F-E-I-C-K?

3         A        Just F-I-K-E.

4         Q        Oh, thank you.

5                  Do you know why Mr. Lafave left the company?

6         A        I don't.

7         Q        Do you know when was the last time you spoke to

8    him?

9         A        Oh, probably prior to him leaving the company.

10        Q        You haven't spoken to him about any of the issues

11   in the current case brought by Mr. Wakefield?

12        A        No.  No.

13        Q        All right.  When was the last time you spoke to

14   John Liang?

15        A        Gosh.  I don't remember.  I think it was 10,

16   12 years ago or more.

17        MR. BROCKLAND:  Why don't we take a break for about

18   10 minutes.  I think I'm getting close.

19        THE VIDEOGRAPHER:  We are now going off the record.

20   The time is 1:42 p.m.

21                            (BRIEF RECESS.)

22        THE VIDEOGRAPHER:  We are now back on the record.  The

23   time is 1:52 p.m.

24        MR. BROCKLAND:  Mr. Olenicoff, just a few more

25   questions for you hopefully and I'll turn you over to your

Page 111

1    counsel.

2         Q    The Human Nature's Many Faces that was formerly

3    displayed at Quantum Town Center, did you own that

4    personally?

5         A    No.

6         Q    Did you ever own it?

7         A    No.

8         Q    And that Human Nature's Many Faces was publicly

9    displayed at Quantum Town Center until sometime in 2021,

10   correct?

11        A    Um, I believe it was there until 2021, maybe -- I

12   don't know exactly when it was, you know, removed --

13        Q    I won't try to pin you down on the exact date.

14   That's nine.

15             The A Tear Must Fall at Quantum Town Center, did

16   you own that?

17        A    No.

18        Q    Did you ever own it?

19        A    No.

20        Q    And the A Tear Must Fall was publicly displayed

21   at Quantum Town Center also until sometime in 2021,

22   correct?

23        A    Correct.

24        MR. BROCKLAND:  All right.  That's all I have right

25   now.  Thank you.

                                                         Page 112

1          THE WITNESS:  Thank you.

2          MR. SAX:  Madam Reporter, what's the next number in

3     exhibits?

4          THE REPORTER:  15.

5          MR. SAX:  Okay.  Lynn, can you put up on the screen

6     the settlement agreement, the mutual general release?

7               One second, guys.  My paralegal is still there, I

8     believe, so she can put it up if you want.  She only has

9     to bail out at 6:00.

10              Off the record for one minute.

11         THE VIDEOGRAPHER:  We're now going off the record.

12    The time is 1:55 p.m.

13                   (DISCUSSION HELD OFF RECORD.)

14         THE VIDEOGRAPHER:  We're now back on the record.  The

15    time is 1:55 p.m.

16              (Exhibit 15 was marked for identification.)

17

18                   E X A M I N A T I O N

19    BY MR. SAX:

20         Q    Igor, take a look at this document.

21              Can you scroll through it slowly just so he can

22    get a feel for the document?

23              When you get to the last page, Igor, is that your

24    signature in two different places?

25         A    Yes.  That's my signature and those were my

Page 113

1    initials up above.

2        Q    Okay.  Great.  Can you go back to the first page?

3             All right.  Igor, was it your understanding that

4    when you entered into this settlement agreement and mutual

5    general release that this would forever end all claims

6    that Mr. Wakefield could ever assert against you and

7    Olen Properties?

8        MR. BROCKLAND:  Objection, leading.

9    BY MR. SAX:

10       Q    You can answer.

11       A    Yes.  Absolutely.  You know, I wanted to make

12   sure that we were done with Mr. Wakefield.

13       Q    Okay.  Would you have signed it had you known

14   that Mr. Wakefield felt he had the ability to continue to

15   sue you?

16       A    No.  I wouldn't.  I wouldn't have entered into

17   this.

18       Q    Okay.  Taking a look on -- I'm getting feedback.

19            Taking a look at the first page under

20   paragraph 1.2, under Purpose, you see where it says The

21   purpose of this agreement is to settle and compromise all

22   disputes and controversies existing among the parties

23   hereto, including but not limited to any and all claims

24   that are raised or might have been raised in the 2017

25   action?  What significance to you did the language

Page 114

1    including but not limited to have?

2         A     Well, it has a finality to any claims that might

3    be brought known and -- known and unknown and so it's very

4    all encompassing.

5         Q     Okay.  How about the use of the words all claims

6    that are raised or might have been raised?  Did that have

7    any significance to you?

8         A     Very much so.

9         Q     How so?

10        A     Well, in that again Mr. Wakefield, as far as I

11   and Olen were concerned, is -- there's just no satisfying

12   him and that he would, you know, continue to harass us and

13   so we wanted to make sure that it was absolutely ironclad

14   against any claims that he could bring and I asked my

15   counsel if this agreement serves that purpose and I was

16   told yes.

17        Q     Okay.  The language, not just saying raised but

18   or might have been raised, did that have any particular

19   significance to you?

20        A     Well, yes.  Because, you know, I had thought that

21   we had settled everything after Wakefield I and then here

22   he comes with Wakefield II.  So I wanted to make sure that

23   we would be -- wouldn't have this ongoing, um, attack by

24   Mr. Wakefield.

25        MR. SAX:  Okay.  Lynn, if you could, go to the next

Page 115

1    page, 3.1.

2         Q    Okay.  Taking a look at paragraph 3.1 in the

3    middle of it under the release language, you'll see eight,

4    nine lines down it will say Remedies of any nature

5    whatsoever, known or unknown except for those arising as a

6    result of the breach of any provision of this agreement,

7    suspected or unsuspected, that Mr. -- that Wakefield may

8    have against the Olen Properties.

9              So let me break this into separate questions.  Is

10   there any significance to you in the use of the word any

11   nature whatsoever?

12        A    Yes.  I obviously wanted to make sure that it was

13   all encompassing because, you know, my feeling, as I

14   stated, with Mr. Wakefield is that he could have a claim

15   for a slip and fall when he went and looked in one of the

16   sculptures, you know, for, you know -- that's as a

17   hypothetical.  And I just wanted to make sure that we were

18   totally done with any claims that could occur of any kind.

19        Q    Was there any significance behind the use of the

20   words known or unknown?  What were you trying to cover

21   there?

22        A    Well, if there was any -- any claims again, I --

23   well, I think, you know, just what it says.  It's in

24   reasonably plain English.  If there was any claims that he

25   could come up with that -- that he wasn't aware of, that

```
                                              Page 116
 1    he was -- would be barred -- barred from bringing such

 2    claims.

 3        Q    And lastly, suspected or unsuspected, what

 4    significance, if any, did that have to you?

 5        A    Well, I -- well, that even goes a step further.

 6    That simply in my mind meant that whether he's not only

 7    not known about it, but if he even suspected it or didn't

 8    suspect it, that he was giving up those -- that

 9    possibility of bringing further claims.

10        Q    Okay.  Taking a look at the crossed-out language

11    at the end of that paragraph, it says Nothing in this

12    agreement shall be construed to mean that Wakefield is

13    waiving or releasing claims to enforce this agreement or

14    any relief granted in the 2012 action.

15            What was your understanding of the crossing out

16    of that language?  What significance, if any, did it have

17    to you?

18        A    Well, my recollection is that I insisted in it

19    being crossed out because, um -- I can't exactly see the

20    wording.  But it seemed to leave a potential crack in the

21    door for him to open and, you know, come back at us.  So I

22    just wanted to make sure we were done, we were done with

23    the -- with Wakefield I, and this was being done with

24    Wakefield II.

25        Q    Okay.  The relief that was granted in the 2012
```

Page 117

1    action, did that include the injunctive relief about

2    destroying the sculptures?  Was that part of the relief in

3    that lawsuit?

4        A    I believe that's -- that's correct.

5        Q    Was it your understanding that crossing this

6    out -- that this would in fact waive any enforcement of

7    that provision in the -- that was granted as far as relief

8    in the 2012 action?

9        MR. BROCKLAND:  Objection, leading.

10   BY MR. SAX:

11       Q    You can answer.

12       A    Yes.  Absolutely.  Because whatever we were

13   supposed to destroy, um, was removed, destroyed, and we

14   weren't aware of any more sculptures -- or I wasn't.  I

15   didn't want any possible, you know, reopening of any

16   claims by Mr. Wakefield.

17       Q    Was the crossing out of this language intended to

18   accomplish that purpose?

19       A    Yes.

20       Q    Okay.  Taking a look at 3.3, it talks about the

21   California Civil Code Section 1542.  It says The parties

22   understand that the releases provided for in this

23   agreement extend to all claims, whether or not claimed or

24   suspected, up to and including the date of execution

25   hereof, and constitute a waiver of each and all of the

Page 118

1    provisions of California Civil Code Section 1542 which

2    reads as follows.

3         Before I read that section, was there any

4    significance to you of the use of the word whether or not

5    claimed or suspected?

6    A    Well, this was just a further extension.  I had

7    asked -- well, I'm going to go into -- I don't want to go

8    into attorney/client conversations, but my instructions --

9    I wanted to make sure whatever we were doing here was

10   going to be ironclad and be final.  And so it was --

11   because again I'm not familiar with California Civil Code.

12   But this was added and I was assured that this would

13   further reinforce the paragraphs that are -- that we went

14   through that -- you know, just now above.  So this then

15   was specific as to California Code.

16   Q    Then on the last paragraph it says The parties

17   hereby acknowledge that the effect and import of this

18   provision has been fully explained to them and that they

19   are aware of its contents and legal effect.

20        Did that have any significance to you?

21   A    Yes.  Again it was conversations I had with, you

22   know, counsel and that I won't go into, but the intent was

23   that I wanted to make sure that Mr. Wakefield wouldn't

24   then come back and say that he didn't understand what he

25   was signing.  So this was specifically put in as further

```
                                                  Page 119
 1   reassurance to -- to my desire that this be a full and

 2   final end to anything to do with Mr. Wakefield.

 3       Q    Okay.  The indented portion which is a -- a

 4   statement of the California Code Section 1542 says A

 5   general release does not extend to claims which the

 6   creditor does not know or suspect to exist in his or her

 7   favor at the time of executing the release which, if known

 8   by him or her, must have materially affected his or her

 9   settlement with the debtor.

10            Did you understand based upon the previous

11   paragraph that that specific provision that is in the

12   California Code was being waived by Mr. Wakefield?

13       MR. BROCKLAND:  Objection, leading.

14       THE WITNESS:  Yes.

15   BY MR. SAX:

16       Q    You can answer.

17       A    Yes.  Absolutely.  That's what it meant and meant

18   to me.

19       Q    Okay.  Can you then turn to 4.1?  Under B, Igor,

20   it says Wakefield is through this agreement releasing the

21   Olen parties from any and all claims he may have against

22   them arising before the execution of this agreement.

23            Did that -- that sentence have any particular

24   meaning to you?

25       A    Yes.  It was understood that -- I understood it
```

Page 120

1    as him, you know, forever waiving any claims that he might

2    have against the Olen -- Olen parties.

3        MR. SAX:   Okay.  And then if you could, turn to --

4    Lynn, turn to the next page, 5.5, entire agreement.

5        Q     Igor, do you understand what a merger clause is

6    in a contract?

7        A     Yes, I do.

8        Q     What's your understanding as to what the import

9    of a merger clause it?

10       A     The import of a merger clause is that -- that

11   this is -- this entire agreement is to be construed as --

12   as -- as a one agreement and that there's no other

13   representations or -- or understandings or

14   misunderstandings that can be raised and this would bind

15   the parties in this matter forever --

16       Q     Okay.

17       A     -- on their --

18       Q     I'm sorry.

19       A     -- under the terms of this agreement.

20       MR. SAX:   Okay.  Lynn, you can take that down.  Lynn,

21   can you put up on the screen the notice of compliance with

22   judgement dated January 24th, 2018?  We'll mark that

23   Exhibit 16.

24           (Exhibit 16 was marked for identification.)

25   ///

Page 121

1    BY MR. SAX:

2         Q    Okay.  Igor, this document -- Lynn will scroll

3    through it slowly.  It's a short document.  There's a

4    notice of compliance and first two pages -- the next two

5    pages is a declaration by you.  And I'll represent to you

6    this document was filed in Wakefield I and let's --

7              Lynn, if you will, stick with the declaration.

8    Go to the next page so Igor can identify his signature.

9              Igor, is that your signature on the second page?

10        A    Yes, it is.

11        MR. SAX:  Okay.  Lynn, go back to the prior page.

12        Q    Okay.  Igor, under no. 2 it says that On or about

13   July 1, 2017, I caused all of the copies of Human Nature's

14   Many Faces and a A Tear Must Fall to be removed from the

15   following locations and destroyed, and it lists seven

16   locations.

17             Are those the seven locations where -- where the

18   two sculptures were removed and destroyed to the best of

19   your knowledge?

20        A    Yes.

21        Q    Was it your understanding that those were the

22   only locations where those sculptures were located?

23        A    Yes.

24        MR. SAX:  Okay.  If you would, Lynn, go to the

25   declaration that was already marked, Igor's declaration

Page 122

1   from December 18, 2017.

2          Madam Reporter, what was that exhibit number?

3      THE REPORTER:  I'm sorry.  I don't know without having

4   the exhibits in front of me.

5      MR. BROCKLAND:  Which one, Spencer?  What are you

6   looking for?

7      MS. TRUMBOWER:  It was Exhibit No. 6.

8      MR. SAX:  Okay.  Lynn, you can take this one down and

9   put up 6.

10     MS. TRUMBOWER:  Yes.

11     MR. SAX:  If you could, scroll through and we'll go to

12  the last page so he can identify his signature.

13     Q    Igor, is that your signature on the third page?

14     A    Yes, it is.

15     Q    Okay.  Let's go back to the first page.  Igor, in

16  paragraph no. 2 it says I originally ordered the piece

17  entitled Human Nature's Many Faces and the derivative work

18  years prior to 2008.

19          Is that an accurate statement to the best of your

20  recollection today?

21     A    Yes, it is.

22     Q    Okay.  Taking a look at next page --

23          Lynn --

24          The third paragraph, it says Pieces ordered from

25  China were received in various shipments, there were

Page 123

1    numerous complications after the orders were placed, and

2    at the time the shipments contained less items than

3    expected or alternate pieces that were not even ordered.

4    In short, the delivery of the sculptures was entirely

5    disorganized.

6                Is that accurate to the best of your knowledge

7    today?

8        A      Yes.  It was -- it was a mess and --

9        Q      Okay.

10       A      -- there was more pieces than just that -- that

11   one piece that was ordered.  There were other sculptures

12   that were ordered, so -- so it came in as a mishmash.

13       Q      Okay.  Take a look at paragraph 4.  It says

14   Neither Olen nor I maintained any records of what items

15   were received from China or the locations where the

16   sculptures were installed as these pieces, like all the

17   others in the Olen collection, were simply not a prominent

18   part of the business operations of Olen.

19               Is that an accurate statement today?

20       A      Yes, it is.

21       Q      Okay.  Paragraph 5, Olen has artwork and

22   sculptures at nearly every property in its portfolio which

23   includes over 6 million square feet of office space.  Is

24   that still accurate?

25       A      Well, it's a bit broad.  But, yes.  But I

Page 124

```
1    wouldn't say it's nearly every property.  It's multiple
2    properties.
3        Q    Are we talking about hundreds of pieces of
4    artwork at these multiple properties?
5        A    No.  I'd say not.
6        Q    Less than a hundred?  Less than a hundred?
7        A    Yeah.  I would -- well, I don't know honestly.
8    There's quite a few --
9        Q    Got it.
10       A    Yeah.  Quite a few and I don't know where they
11   are or all of them.  But they are where they are.
12       Q    Approximately how many commercial properties does
13   Olen or its various entities have?
14       A    I think it's over a hundred.  A hundred and --
15   between 105 and 110.
16       Q    It goes on to say Additionally there are hundreds
17   of pieces of artwork and sculptures at the Olen
18   headquarters.
19            Was that an accurate statement then and is it
20   still an accurate statement?
21       A    Yes.
22       Q    It says The Olen art collection pieces were
23   acquired and placed over the last five decades to satisfy
24   my personal passion for art and not for any commercial
25   purpose.
```

Page 125

1          Is that accurate?

2     A     Yes.

3     Q     Okay.  No. 6, By the time of the original lawsuit

4  and the related discovery process, I had no independent

5  recollection of the details of the purchase of sculptures

6  from China.  Is that accurate.

7     A     Yes.  You know, they were ordered, um -- many of

8  them were ordered by people directly ordering them from

9  the art dealer who were Olen employees or project managers

10  where an art piece was needed.  They -- they ordered them.

11     Q     Do you know whether the two pieces at Quantum

12  were specifically ordered for the Quantum project?

13     A     That is correct and they were not ordered by me.

14  So --

15     Q     Okay.  Were they -- were they part of some larger

16  order?

17     A     Well, you know, we had an open order with the art

18  dealer on multiple pieces, the piece that -- that I did or

19  designed and -- and others.  And so as art was needed, the

20  project managers would order them.

21     Q     Did you have any idea that these specific two

22  pieces were going to the Boynton Beach project?

23     A     I didn't even know they -- they had been ordered.

24     Q     Okay.  Taking a look on the next page --

25          Lynn, top of the next page -- actually let me

Page 126

1    start at the bottom of the page to get some context.

2            It says, Therefore, the Olen property artist

3    removed all sculptures of Untitled and derivative pieces

4    from all Olen-controlled properties, including the Olen

5    headquarters and 2 Venture locations.

6            Let me ask you specifically about the including

7    the Olen headquarters.  Is it true that in the -- I think

8    I said the first lawsuit, Wakefield I, that the court had

9    determined that the statute of limitations had run and

10   that that sculpture at the Olen headquarters was not

11   subject to any litigation.

12   A     That's my understanding.

13   Q     Notwithstanding that there was no court order yet

14   requiring you to move that sculpture from the Olen

15   headquarters, you, in fact, went forward and moved it, as

16   well.  Is that correct?

17   A     That's correct.

18   Q     Did you do that in order to show your good faith

19   in attempting to comply with the court order?

20   A     Yes.  And, you know, frankly I didn't want it

21   here.

22   MR. SAX:  All right.  Lynn, if you could, turn to --

23   actually I'll just -- I'll just read from it, so you're

24   not going to have to mark the response as an exhibit.

25   Q     In a pleading that you filed in Wakefield II,

Page 127

1    Igor, it says Olen does not maintain any inventory of the

2    artwork or sculptures in this extensive collection.  Is

3    that an accurate statement then and does that remain an

4    accurate statement now?

5        A    Yes.

6        Q    Are you -- are there any records as far as you

7    know that in any way pins down the -- the origin of the

8    two sculptures that have found their way to Boynton Beach?

9        A    No.

10       Q    Do you feel that you have complied with all court

11   orders that were entered in Wakefield I and Wakefield II?

12       A    Yes.

13       Q    Did you act in good faith when you attempted to

14   comply with those various court orders?

15       A    Absolutely, yes.

16       Q    Okay.  Did you feel that you entered into the

17   settlement agreement and release in good faith?

18       A    Yes.

19       Q    Did you intend in any way to deceive

20   Mr. Wakefield or hide any information from him at the time

21   that you entered into the settlement agreement with

22   Mr. Wakefield?

23       A    No.

24       Q    Do you feel that all the declarations that you've

25   signed and filed with the courts were accurate to the best

Page 128

1    of your personal knowledge?

2        A     Yes.

3        Q     Did you see --

4              Lynn, if you could, put the settlement agreement

5    back up on the screen, Exhibit No. 15.

6              Okay.  Start with the first page.  Igor, do you

7    see any provision in this settlement agreement that

8    provides that if there are other sculptures out there in

9    the world that Mr. Wakefield reserved the right to pursue

10   additional claims against you?

11       A     No.  Quite to the contrary.

12       Q     Did having those two sculptures installed in

13   Boynton Beach provide any particular benefit to you

14   individually or to the corporation?

15       A     No.

16       Q     Could any sculpture have filled any need that the

17   City of Boynton Beach had for Art in Public Places?

18       A     Yes.  As a matter of fact, once we -- they

19   removed those, they took some ancient stone that we had on

20   the site and put them in -- in place of that art and it's

21   been presented to the City and approved.  So it has no

22   value whatsoever.

23       Q     Did you take any action that in any way stopped

24   Mr. Wakefield from pursuing his own investigation of the

25   existence of any sculptures around the country or even

Page 129

1   around the world?

2       A    No.

3       MR. SAX:  Okay.  I have no further questions, Gene.

4       MR. BROCKLAND:  Sure.  Let me follow up on that last

5   point.

6

7              F U R T H E R   E X A M I N A T I O N

8   BY MR. BROCKLAND:

9       Q    Mr. Olenicoff, you testified -- you testified

10  that Mr. Wakefield was not stopped from pursuing the

11  existence of any copies of his sculpture.  You weren't

12  stopped from pursuing the existence of any copies either,

13  were you?

14      A    Pursuing -- well, no.  I think that I -- I even

15  directed -- in the previous lawsuits I -- I was aware that

16  the Chinese artist had sold his work, two pieces in Japan

17  and Russia and Germany and I think it was Amsterdam, in

18  Europe.  So those pieces exist there.

19      MR. BROCKLAND:  Move to strike as nonresponsive.

20      Q    Mr. -- is it your position that Mr. Wakefield

21  could have figured out on his own that A Tear Must Fall

22  and Human Nature's Many Faces were at Boynton Beach in

23  Florida?

24      A    Well, yes.  I think that he could have.  He

25  seems -- you know, here and after Wakefield I he uncovered

Page 130

1   two other pieces that were not part of Wakefield I that --

2   that we had -- were un -- where I was unaware of and --

3   and that's how Wakefield II came about.

4        Q     And just --

5        A     You know, let me finish.  You know, let me

6   finish, Counsel.  And, you know, just as they uncovered

7   those two pieces, there was nothing stopping him from

8   uncovering all the pieces at Olen projects.  He certainly

9   was aware of all the projects that Olen owned at that

10  point, so, you know, he looked at just those two.  He

11  could have looked at all of them.

12       Q     And so could you, correct?

13       A     Well, yes.

14       Q     And you didn't?

15       A     No.  I complied with the court order as far as

16  I -- I was aware.  I was not aware --

17       Q     You didn't -- you didn't -- you didn't even

18  bother to check at Quantum Town Center, Florida, which is

19  not too far from where you live, right?

20       A     Well, it's not -- it's not close to where I live,

21  but --

22       Q     Half hour, 45 minutes?

23       A     Yeah.  But I was not aware of those sculptures.

24       Q     And you didn't look for them?

25       A     Um, no.

Page 131

1    Q    All right.  Mr. Sax asked you about the statute

2    of limitations having run on -- on the very first copy

3    and -- but the fact is that that matter went up on appeal

4    and the Court of Appeals reversed that, didn't it, and

5    found that the statute of limitations had not run on the

6    first copy and that's why you had to destroy it, correct?

7    A    I don't know, Counsel.  I don't know those

8    details.

9    Q    All right.  You testified that your project

10   managers would order -- order sculptures based on some

11   open orders; is that right?

12   A    Well, I -- they were aware of where and the

13   pieces that could be ordered from various sources and as

14   art was necessary, they would order them.

15   Q    Okay.  So Olen properties had some sort of a list

16   of art that they could order and they would go to that

17   list and pick something and order it?  Is that how it

18   would work?

19   A    No.

20   MR. SAX:  Object to form.

21        Go ahead.  You can answer.

22   THE WITNESS:  No.  I think they had to go through a

23   process like they had to go through the City and they had

24   to go through other, um, executives to -- to select the

25   piece and -- and then they would order it, yes.

Page 132

1   BY MR. BROCKLAND:

2        Q     All right.  And -- and so are there documents

3   within Olen Properties that show how this would work, how

4   these sculptures were ordered?

5        A     Not -- not that I'm aware of.  Um, you know,

6   there were and all those documents were produced in

7   Wakefield I.

8        Q     Is it your position, sir, that after -- after you

9   signed the settlement agreement you could go out and

10  infringe Mr. Wakefield's copyright if you wanted to and he

11  couldn't do anything about it?

12       MR. SAX:  Objection, but you can -- objection, form.

13            But you can answer if you can.

14       THE WITNESS:  Well, again I think you're asking me a

15  legal question, um, that -- that that document speaks for

16  itself.  It's, um -- as of that point and time, um,

17  Mr. Wakefield was releasing any claims -- any further

18  claims against me and Olen known or unknown and I think

19  again the document is clear as to what the intent was.

20  BY MR. BROCKLAND:

21       Q     Well, you testified earlier about your

22  understanding of the documents and you said that you

23  thought it was ironclad and you wanted to be done with

24  Mr. Wakefield forever, right?

25       A     That's correct.

Page 133

1      Q     And so if you were done with him forever, then

2   you could go out and infringe his copyright and he

3   couldn't sue you, right?

4      A     Well, you're asking me --

5      MR. SAX:  Object to form.

6      THE WITNESS:  You're asking me a legal question.

7   BY MR. BROCKLAND:

8      Q     I'm asking you for your understanding.

9      A     I don't have an understanding of a legal

10  question.

11     Q     Okay.  You don't have an understanding of the

12  settlement agreement?

13     A     I do --

14     MR. SAX:  Object to form.

15     THE WITNESS:  I do and I, um, gave you my testimony of

16  my understanding of it.

17  BY MR. BROCKLAND:

18     Q     Right.  You gave me your testimony in response to

19  Mr. Sax's question.  But my question is, is your

20  understanding of the settlement agreement that, after it

21  was signed, you could go out and infringe Mr. Wakefield's

22  copyright and he couldn't do anything about it?

23     MR. SAX:  Object to form, calls for legal conclusion.

24         You can answer the question.

25     THE WITNESS:  Well, I don't -- I don't have an answer.

Page 134

1   It's a legal question that -- that is -- is being asked

2   and I -- I'm going to have to rely on the agreement and

3   the document and -- and additionally you're asking me a

4   totally hypothetical question.

5   BY MR. BROCKLAND:

6       Q    Well, it's not hypothetical because there were

7   public displays after the settlement agreement.  So it's

8   not hypothetical.

9            Is it your understanding that you could display

10  those copies in Florida after the settlement agreement was

11  signed and Mr. Wakefield could do nothing about it?

12      MR. SAX:  Same objections, asked and answered.

13           You can do it again if you'd like.

14      THE WITNESS:  No.  It's been asked and answered and my

15  answer is that the document -- the settlement agreement

16  speaks for itself and I've testified as to my

17  understanding of it.

18  BY MR. BROCKLAND:

19      Q    So your understanding was, in fact, that you

20  could display those copies in Quantum Town Center and

21  there was nothing Mr. Wakefield could do about it?

22      MR. SAX:  Asked and answered multiple times.

23      MR. BROCKLAND:  He hasn't answered.

24      MR. SAX:  But he's given you the same answer.

25           But feel free, Igor, if you want to answer it

Page 135

1   again.

2       THE WITNESS:  No.  It's the same answer and at this

3   point, um, Mr. Brockland is testifying, so, you know, I

4   think that's the answer he wants.  So I'm not going to

5   compete with -- with his answer.

6           So I've answered the question, Counsel.

7   BY MR. BROCKLAND:

8       Q    Mr. Wakefield didn't raise the issue of the

9   Florida copies in his prior lawsuits, did he?

10      MR. SAX:  Wait.  Wait one second here.  Object to

11  form, calls for a legal conclusion, document speaks for

12  itself.

13          You can answer the question.

14      MS. TRUMBOWER:  What document?

15      MR. SAX:  Document being the complaints in the prior

16  lawsuits, in answer to the off-the-record question, I

17  guess.

18      MR. BROCKLAND:  Right.

19          But you can answer it, Igor.

20      THE WITNESS:  Well, you know, that -- that was going

21  to be my answer, is that I -- I'm not going to phrase

22  the -- well, I've lost track of the question.

23      MR. BROCKLAND:  Let's start over.  Let's start over.

24      Q    You were shown your declaration that was attached

25  to the notice of compliance and Mr. Sax showed it to you.

Page 136

1    And in that declaration you listed locations where -- from

2    where the copies had been removed.  Do you recall that?

3        A    Yes.

4        Q    And those locations were all in California,

5    correct?

6        A    I don't recall.  It speaks for itself.

7        MR. BROCKLAND:  Well, is -- Spencer, is Lynn still

8    there to put it up again?

9        MR. SAX:  Lynn, you can put it up.

10            If she's still there.  I think she's still there.

11   She's there.

12       MS. TRUMBOWER:  I'm here.  Hold on.

13       MR. SAX:  Exhibit 16, paragraph 2 of his declaration.

14   BY MR. BROCKLAND:

15       Q    Those locations are all in California, correct?

16       A    Yes.

17       Q    There's no reference to Quantum Town Center in

18   Florida, correct?

19       A    Counsel, it speaks for itself.  If you can't see

20   it, I guess it doesn't say it.

21       Q    You're not willing to state that those locations

22   are in California?

23       A    I -- I did.  I answered that question, Counsel,

24   but you wanted --

25       Q    It doesn't say California on it, sir.  It says

Page 137

1    Olen Pointe Brea, Century Centre, 7 Corporate Plaza,

2    2 Venture in Irvine, Olen Pointe Brea, Century Centre,

3    7 Corporate Plaza.  I'm simply asking you, are those

4    buildings all in California?

5        A    Counsel, if you want to read my answer back, I

6    answered that specific question, specific question as to

7    whether they're all in California.  You're just trying to

8    badger me and keep asking the same question over and over

9    again.  I answered that question specifically.

10       Q    There's no Florida locations listed, correct?

11       A    No.

12       Q    Did you have discussions with your counsel about

13   what would happen if Don Wakefield later discovered the

14   Florida copies?

15       MR. SAX:  It sounds like attorney/client privileged

16   communication to me, so I'll object and instruct --

17       MR. BROCKLAND:  I would agree with you, Spencer, but I

18   think he's waived it.  He's testified already as to

19   conversations that he had with his counsel about the

20   settlement agreement when you asked him questions.  He

21   volunteered the information.

22       MR. SAX:  On one answer he started to get into it and

23   then he cut himself off on the second question on the --

24   on the subject, so we take the position there's been no

25   waiver of attorney/client privilege.

Page 138

1       MR. BROCKLAND:  Well, I think these -- I think he's

2    waived it and we'll reserve these questions for a later

3    date when we resolve that.

4            That's all I have.

5       MR. SAX:  Okay.  I just have two follow-ups.

6

7            F U R T H E R   E X A M I N A T I O N

8    BY MR. SAX:

9       Q    Igor, anywhere in that settlement agreement that

10   provides that you were required to make an investigation

11   as to locations of additional sculptures?

12      A    No.

13      Q    Is there any provision, any representation made

14   in that settlement agreement that you did, in fact, do an

15   investigation as to the location of additional sculptures?

16      A    No.

17      Q    And regarding --

18            Lynn, if you could, put back up on the screen

19   that paragraph 2 of Exhibit No. 16.

20            And, Igor, specifically that declaration that you

21   filed, you're representing in there that the sculptures

22   were only removed from those locations; is that correct?

23      A    Yes.

24      MR. SAX:  Okay.  I have no other questions.  Gene?

25   He'll read.

Page 139

1          MR. BROCKLAND:  Okay.  Thank you for your time.

2          THE VIDEOGRAPHER:  We are now going off the record.

3     The time is 2:38 p.m. and this concludes today testimony

4     given by Igor Olenicoff.  The total number of media units

5     used was two and will be retained by Veritext Legal

6     Solutions.  Thank you.

7                    (TIME NOTED:  2:36 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 140

1

2

3

4          I, the undersigned, a Certified Shorthand

5    Reporter of the State of California, do hereby certify:

6          That the foregoing proceedings were taken before

7    me at the time and place herein set forth; that any

8    witnesses in the foregoing proceedings, prior to

9    testifying, were placed under oath; that a verbatim record

10   of the proceedings was made by me using machine shorthand

11   which was thereafter transcribed under my direction;

12   further, that the foregoing is an accurate transcription

13   thereof.

14          I further certify that I am neither financially

15   interested in the action nor a relative or employee of any

16   attorney or any of the parties.

17          IN WITNESS WHEREOF, I have this date subscribed

18   my name.

19

20   Dated:  11/8/22

21

22

23

               RAQUEL L. BROWN

24             CSR No. 10026, RPR

25

```
                                                      Page 141
1                        Veritext Legal Solutions
                              1100 Superior Ave
2                                Suite 1820
                            Cleveland, Ohio 44114
3                           Phone: 216-523-1313
4
      November 9, 2022
5
      To: Spencer Sax, Esq.
6
      Case Name: Wakefield, Donald v. Olenicoff, Igor, et al.
7
      Veritext Reference Number: 5563239
8
      Witness:  Igor Olenicoff         Deposition Date:  11/4/2022
9
10    Dear Sir/Madam:
11
      Enclosed please find a deposition transcript.  Please have the witness
12
      review the transcript and note any changes or corrections on the
13
      included errata sheet, indicating the page, line number, change, and
14
      the reason for the change.  Have the witness' signature notarized and
15
      forward the completed page(s) back to us at the Production address
16    shown
17    above, or email to production-midwest@veritext.com.
18
      If the errata is not returned within thirty days of your receipt of
19
      this letter, the reading and signing will be deemed waived.
20
21    Sincerely,
22    Production Department
23
24
25    NO NOTARY REQUIRED IN CA
```

```
                                           Page 142

 1               DEPOSITION REVIEW
              CERTIFICATION OF WITNESS
 2
      ASSIGNMENT REFERENCE NO: 5563239
 3    CASE NAME: Wakefield, Donald v. Olenicoff, Igor, et al.
      DATE OF DEPOSITION: 11/4/2022
 4    WITNESS' NAME: Igor Olenicoff
 5         In accordance with the Rules of Civil
      Procedure, I have read the entire transcript of
 6    my testimony or it has been read to me.
 7         I have made no changes to the testimony
      as transcribed by the court reporter.
 8
      _____         _____
 9    Date                    Igor Olenicoff
10         Sworn to and subscribed before me, a
      Notary Public in and for the State and County,
11    the referenced witness did personally appear
      and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
                Statement; and
14         Their execution of this Statement is of
                their free act and deed.
15
           I have affixed my name and official seal
16
      this _____ day of_____, 20_____.
17
                      _____
18                    Notary Public
19                    _____
                      Commission Expiration Date
20
21
22
23
24
25
```

1                       DEPOSITION REVIEW
                     CERTIFICATION OF WITNESS
2

        ASSIGNMENT REFERENCE NO: 5563239
3       CASE NAME: Wakefield, Donald v. Olenicoff, Igor, et al.
        DATE OF DEPOSITION: 11/4/2022
4       WITNESS' NAME: Igor Olenicoff
5           In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me.
7           I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s).
9           I request that these changes be entered
    as part of the record of my testimony.
10

            I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein.
13  _____          _____
    Date                      Igor Olenicoff
14

            Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17          They have read the transcript;
            They have listed all of their corrections
18              in the appended Errata Sheet;
            They signed the foregoing Sworn
19              Statement; and
            Their execution of this Statement is of
20              their free act and deed.
21          I have affixed my name and official seal
22  this _____ day of_____, 20_____.
23              _____
                Notary Public
24
                _____
25              Commission Expiration Date

Page 144

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 5563239

PAGE/LINE(S) /          CHANGE          /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____        _____
Date                    Igor Olenicoff

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

                        _____
                        Notary Public

                        _____
                        Commission Expiration Date

[& - 58]

| & |
| --- |
| **&**   92:1 |

| 1 |
| --- |
| **1**   1:10 2:10 5:11 5:16,18,19 7:6 35:16 36:6 68:18 121:13 |
| **1.2**   113:20 |
| **10**   1:10 2:10 5:19 63:10,12,15 110:15,18 |
| **100**   5:23 |
| **10026**   1:23 2:20 140:24 |
| **105**   124:15 |
| **10:05**   39:1 |
| **10:07**   39:4 |
| **10:16**   43:25 |
| **10:20**   44:3 |
| **10:22**   45:6 |
| **10:25**   45:9 |
| **10:28**   48:16 |
| **10:31**   48:19 |
| **10:37**   51:22 |
| **10:53**   51:25 |
| **11**   5:20 68:17,23 |
| **11/4/2022**   141:8 142:3 143:3 |
| **11/8/22**   140:20 |
| **110**   124:15 |
| **1100**   141:1 |
| **112**   5:6,24 |
| **11:37**   75:8 |
| **11:41**   75:11 |
| **12**   5:21 81:3,7 86:25 110:16 |

**120**   3:7 6:4
**129**   5:5
**12:05**   88:1
**12:08**   88:4
**12:54**   88:7
**13**   5:22 70:13 79:15 91:14,17 91:22,25
**138**   5:6
**14**   5:23 79:16 100:13,14,15,19
**15**   5:24 10:23 51:19 79:16 112:4,16 128:5
**150**   51:14
**1542**   117:21 118:1 119:4
**1585**   1:8 2:8 7:11
**16**   6:4 120:23,24 136:13 138:19
**160,000**   94:5
**16439**   140:23
**17**   10:22 92:1
**17,000**   12:13
**18**   6:13 45:14 122:1
**18-19**   6:13
**1820**   141:2
**19**   69:25
**1974**   11:25 12:2 12:6
**1:42**   110:20
**1:52**   110:23
**1:55**   112:12,15

| 2 |
| --- |
| **2**   5:11,14 23:22 23:24 24:5 25:3 46:12 47:18 92:2 100:24 121:12 122:16 126:5 136:13 137:2 138:19 |
| **20**   142:16 143:22 144:22 |
| **200**   3:18 |
| **2000**   52:22 53:3 53:7,16 54:9,18 |
| **2001**   5:16 52:22 53:3,7,16 54:9 54:18 55:22 56:24 |
| **2008**   46:14 122:18 |
| **2012**   60:10,15,17 116:14,25 117:8 |
| **2014**   33:20 69:12 91:7 92:2 |
| **2017**   45:14 47:1 51:8 113:24 121:13 122:1 |
| **2018**   120:22 |
| **2021**   41:21 90:14 90:20 111:9,11 111:21 |
| **2022**   1:17 2:19 5:11 7:1,5 12:3 141:4 |
| **216-523-1313**   141:3 |
| **22**   53:11 54:4 |
| **23**   5:11 53:10 |

**24th**   120:22
**28**   5:12
**29**   5:13
**2:36**   2:18 139:7
**2:38**   139:3

| 3 |
| --- |
| **3**   5:12,15 28:16 28:18,20 36:9 |
| **3.1**   115:2 |
| **3.1.**   115:1 |
| **3.3**   117:20 |
| **314**   3:9 |
| **33487**   3:19 |
| **34**   5:14 |
| **35**   5:17 |

| 4 |
| --- |
| **4**   1:17 2:18 5:13 5:13 6:4 7:1 29:3,9 123:13 |
| **4.1**   119:19 |
| **42,000**   93:23 |
| **44**   5:15 |
| **44114**   141:2 |
| **45**   130:22 |
| **4th**   7:5 |

| 5 |
| --- |
| **5**   5:12,14,20,23 34:16,20 123:21 |
| **5.5**   120:4 |
| **52**   92:1 97:6 |
| **55**   5:16 |
| **5563239**   1:24 141:7 142:2 143:2 144:2 |
| **561**   3:20 |
| **58**   5:17 |

[6 - ahead]

**6**

**6** 5:15,16,21 44:5
44:8 45:13
55:21 122:7,9
123:23 125:3
**61** 5:18
**6111** 3:18
**63** 5:19
**63105** 3:8
**640,000** 59:19
**68** 5:20,22
**6:00** 112:9

**7**

**7** 2:16 5:16,25
7:12 46:25 55:4
55:7,21 57:17
66:14,22,24
76:25 137:1,3
**700** 3:7
**719-3732** 3:9

**8**

**8** 5:5,17 12:10
57:21 58:1
**80** 10:17
**81** 5:21
**8:21** 1:8 2:8 7:11

**9**

**9** 5:18 61:11,13
62:6 141:4
**9-10** 6:13
**91** 5:22
**92660** 2:17 7:13
**97** 6:13
**994-4499** 3:20
**9:02** 2:18 7:2

**9:03** 7:5
**9:06** 10:3
**9:08** 10:6
**9:31** 22:21
**9:34** 22:24
**9:37** 24:21
**9:38** 24:24
**9:50** 31:11
**9:51** 31:14

**a**

**a.m.** 2:18 7:2,5
10:3,6 22:21,24
24:21,24 31:11
31:14 39:1,4
43:25 44:3 45:6
45:9 48:19
51:22,25 75:8,11
**ability** 10:13
73:16 97:13
113:14
**able** 24:11 55:3
99:25
**absolutely** 30:21
34:14 104:4
113:11 114:13
117:12 119:17
127:15
**abstract** 78:15
**accept** 47:7
**acceptable** 56:17
**access** 36:1
**accompany**
107:8
**accomplish**
117:18
**account** 109:2,5

**accounts** 108:18
**accurate** 48:21
53:24 122:19
123:6,19,24
124:19,20 125:1
125:6 127:3,4,25
140:12
**acknowledge**
118:17 142:11
143:16
**acquire** 64:11
**acquired** 124:23
**acquiring** 64:9
**act** 127:13
142:14 143:20
**action** 11:21
46:10 113:25
116:14 117:1,8
128:23 140:15
**active** 35:18
**added** 118:12
**additional** 51:9
128:10 138:11
138:15
**additionally**
124:16 134:3
**address** 108:20
108:22,22,23,24
108:25 141:15
**adjust** 44:25
**administered**
8:3
**admit** 54:20
**advanced** 76:10
77:12,14,16
**affiliations** 7:19
**affixed** 142:15
143:21

**agents** 35:17
**agitating** 18:15
**ago** 14:19 15:22
54:4,20 67:23
84:10,13 91:2
109:11 110:16
**agree** 21:18,24
36:17,20 42:5
66:6 67:4 68:9
71:15,16,19,22
71:25 72:8,18,25
73:5 96:2 97:21
101:6 102:25
137:17
**agreed** 59:9 70:1
72:14,15,16
77:25
**agreement** 5:24
52:10 57:12,15
78:22 97:1
112:6 113:4,21
114:15 115:6
116:12,13
117:23 119:20
119:22 120:4,11
120:12,19
127:17,21 128:4
128:7 132:9
133:12,20 134:2
134:7,10,15
137:20 138:9,14
**agreements** 79:1
**ahead** 8:16
25:11 56:10,10
58:17 68:1
92:18 95:23,23
99:16 100:5,5
101:21 131:21

[al - artwork]                                                                    Page 3

al   7:9 69:6 141:6
  142:3 143:3
albeit   51:18
alfred   109:9
alike   104:7,10
allegations
  34:10
alleged   86:16
allegedly   99:12
alternate   123:3
amended   5:23
american   76:8
  77:3
amount   17:7
  86:6
amsterdam
  129:17
amundsen   3:4
ancient   128:19
ann   69:7
annual   5:11 24:7
  25:3
answer   12:20,21
  13:23 14:4
  17:23,24 18:7,21
  21:3,21 22:2,12
  23:17 25:11
  26:9,21,22,23
  27:5 28:2,9,23
  29:15 30:1,4,5,6
  31:2,20 32:2,12
  32:20 33:6
  35:11 37:3,13
  38:2,17 39:10
  40:6,18 41:4,24
  42:14 43:6 48:5
  48:25 49:1,14,19
  49:20 50:7,17

51:16 52:24,25
53:22 54:1,12,13
54:19 56:10
59:5,12,21 60:5
64:17 65:15
67:1,11,21 70:23
71:24 72:12,18
72:21,22 73:4,5
73:6,14 80:10
84:25 85:18,25
88:19 92:25
94:8,23 95:3,6
95:16 97:15,15
97:18 100:1,23
101:21 103:12
104:17 105:13
105:20 108:2,10
108:13,16
113:10 117:11
119:16 131:21
132:13 133:24
133:25 134:15
134:24,25 135:2
135:4,5,13,16,19
135:21 137:5,22
answered   6:12
  18:6 26:22 30:9
  33:11,14 34:13
  53:18 56:3 73:3
  73:15,15 87:22
  87:23 88:18
  94:22,24 108:17
  134:12,14,22,23
  135:6 136:23
  137:6,9
answering   17:21
  100:7,11

answers   5:23
anybody   14:4
  18:16 50:20
  90:12
anytime   9:1
anyway   80:5
apartment   12:13
  23:9
apologize   38:22
appeal   131:3
appeals   131:4
appear   87:16
  142:11 143:15
appearances   3:1
  4:1 69:3
appearing   3:12
  3:22 4:5,6,7
  30:14
appears   13:12
appended
  143:11,18
application   5:22
  91:13,25 92:5
  93:2,21 99:13
applications
  91:5,9 99:13
applied   36:17
appraised   89:14
appreciate   21:9
  68:22 71:5
approached   74:9
  74:10
approval   54:24
approved   128:21
approximate
  15:23
approximately
  12:12 84:12

124:12
april   5:16 55:21
  56:24
architecture
  20:25
argumentative
  95:22
arising   115:5
  119:22
arizona   12:17
art   5:22 20:4,5
  20:25 21:1,3,7
  22:11 53:22,23
  54:9,15,18 74:12
  74:14 77:22
  79:9 90:18 91:1
  91:3,6,13,25
  92:5 93:20
  124:22,24 125:9
  125:10,17,19
  128:17,20
  131:14,16
artist   27:8,17,21
  56:17 62:17
  63:2 65:3 79:6
  98:19 99:11,14
  126:2 129:16
artist's   21:11,15
  21:15,19,24
  99:10
artists   21:9
arts   92:22
artwork   19:7,10
  19:12,24 22:4,5
  53:17 64:20,22
  123:21 124:4,17
  127:2

**aside**  72:7
**asked**  22:16
  33:12 35:24
  53:21 73:3 76:6
  87:22 88:18
  94:22 108:17
  114:14 118:7
  131:1 134:1,12
  134:14,22
  137:20
**asking**  21:4
  36:19 68:8 99:3
  132:14 133:4,6,8
  134:3 137:3,8
**asks**  50:9
**aspects**  23:19
**assert**  113:6
**assignment**
  142:2 143:2
  144:2
**associate**  7:22
**assumption**
  62:14
**assure**  37:9
**assured**  118:12
**assuring**  90:17
**attached**  60:2
  135:24 143:7
**attack**  114:23
**attempt**  50:4
**attempted**
  127:13
**attempting**
  126:19
**attended**  107:1
**attorney**  3:5,6
  3:17 33:5 37:12
  41:24 42:15

43:7 118:8
  137:15,25
  140:16
**attorneys**  35:17
**attributed**  62:16
**attributing**  63:1
  65:3
**ault**  69:7,9
**authorize**  143:11
**authorized**  25:6
**ave**  141:1
**avoid**  41:23 43:7
**aware**  31:16,23
  32:15 38:8,8
  40:10 41:6 42:9
  43:2 48:8 49:13
  49:21,22 50:1,22
  50:25 59:2,6,14
  59:18,25 65:11
  71:13 89:9
  115:25 117:14
  118:19 129:15
  130:9,16,16,23
  131:12 132:5

**b**

**b**  119:19
**back**  10:5 22:18
  22:23 24:23
  29:11,18,20
  31:13 39:3 44:2
  45:8 48:18
  51:24 52:22
  53:3 54:9,18
  69:12 75:10,14
  82:5 88:6,8,15
  91:7 92:17 97:6
  109:24 110:22

112:14 113:2
  116:21 118:24
  121:11 122:15
  128:5 137:5
  138:18 141:15
**background**
  93:12
**backside**  76:23
**badger**  137:8
**bail**  112:9
**banging**  13:3
**banks**  98:4
**barely**  36:6
  44:11,11
**barred**  116:1,1
**based**  119:10
  131:10
**bases**  36:12
**basically**  21:5
  79:5
**basis**  76:13 86:3
  86:3 94:4,21
  95:4,4
**bay**  92:1
**beach**  1:16 2:17
  7:1,13 90:18
  91:1,6 92:22
  93:21,25 102:15
  125:22 127:8
  128:13,17
  129:22
**bear**  31:8
**beautification**
  101:25
**bedford**  73:25
  74:1,8,21 75:14
  76:1 77:2,18
  78:1,23 79:8

81:18,21,23
  82:12 83:9,21,23
  84:15 85:21,22
  86:1,5,16 88:12
  88:17 89:6
  93:12,23 94:2,6
  94:10,12 95:3
**bedford's**  94:19
**beer**  77:21
**beginning**  2:17
**behalf**  2:16 7:23
  59:3,19 69:5,20
  106:17
**believe**  12:10
  25:2 28:24
  30:17 33:19
  39:12 47:23
  57:10 60:12
  62:25 69:18,21
  89:2 109:23
  111:11 112:8
  117:4
**belong**  89:6,10
**benefit**  128:13
**best**  11:20 27:18
  37:20 38:10
  41:8 49:1,5,7,8
  66:20,20 73:15
  79:15 80:11
  85:15 107:4
  121:18 122:19
  123:6 127:25
**big**  9:12,14,16
  45:2 79:23 80:3
  84:6 97:12
**bigger**  36:4
**bill**  73:25 81:18
  94:19

[bind - calculating] Page 5

**bind** 120:14
**bit** 23:2 52:3
  55:18 57:15
  61:15 64:1 69:4
  70:12 75:13,14
  92:17 123:25
**biweekly** 86:3
**blinkinsop** 4:7
  24:13,15,17
**blow** 36:3
**board** 15:2,4,7,9
  15:11,13,18 16:4
  16:6,7
**boca** 3:19
**body** 80:1
**bolt** 82:8
**bonus** 86:10
**born** 10:18
**boss** 14:6
**bother** 130:18
**bottom** 46:25
  63:14 126:1
**bought** 19:10
  22:8,10,11 74:20
  75:15,23,25
  76:18 96:5,5,6
**bounced** 78:17
**boynton** 90:18
  91:1,6 92:22
  93:21,25 102:15
  125:22 127:8
  128:13,17
  129:22
**brea** 54:22,24
  56:6,24 57:3
  61:22 62:3,4,7
  62:10 63:19,24
  79:25 86:14

94:7 137:1,2
**breach** 115:6
**break** 9:1,2,3,4
  13:2 22:18 31:8
  38:23 43:21
  48:13 51:19
  67:14 75:5
  110:17 115:9
**breaking** 79:17
  79:19
**breaks** 9:2 51:18
**bridge** 54:5
**brief** 22:22
  31:12 39:2 44:1
  48:17 51:23
  75:9 110:21
**bring** 75:19
  114:14
**bringing** 71:2
  116:1,9
**broad** 123:25
**brockland** 3:5
  5:5 7:21,21 8:7
  8:9,18 9:10,13
  9:17,19,25 10:7
  18:17 21:23
  22:13,19 23:1,21
  24:1,6,8,19 25:1
  25:12,21 26:11
  26:24 27:10
  28:4,11,15,19
  29:1,6,10,17
  30:8 31:9,15,22
  32:4,14,22 33:8
  34:3,21 35:13,15
  36:8 37:8,22
  38:11,24 39:5
  40:13,23 41:10

42:4,21 43:13,23
  44:4,9 45:4,10
  48:11,14,20 49:4
  49:24 50:12
  51:3,17 52:1,14
  53:1 54:7,14
  55:1,9,17,20
  56:14 58:2 59:7
  59:17,24 60:9,25
  61:14 63:8,13
  64:19 65:9,20
  67:16,22 68:4,15
  68:24 69:2,22
  70:8,11 71:4
  72:17,24 73:8,17
  73:22 75:6,12
  80:13 81:1,8,12
  85:2 86:4,12,24
  87:8,12 88:2,8
  88:10,21 91:11
  91:19,23 92:10
  92:14,17 93:3,15
  93:19 95:1,10
  96:4,8,13 97:19
  98:22 99:16,19
  100:2,9,15,22
  102:3 103:3
  104:1,23 105:3,5
  105:24 106:11
  110:17,24
  111:24 113:8
  117:9 119:13
  122:5 129:4,8,19
  132:1,20 133:7
  133:17 134:5,18
  134:23 135:3,7
  135:18,23 136:7
  136:14 137:17

138:1 139:1
**broken** 3:18
**broker** 64:13,21
**bronze** 22:9 84:6
  84:19,22 85:5,12
  86:13 87:16,20
  96:6
**brought** 11:10
  11:22 80:7
  110:11 114:3
**brown** 1:22 2:19
  7:16 140:23
**build** 82:20 83:5
  94:14,15,16
**building** 87:6
**buildings** 27:12
  90:10 137:4
**built** 77:23 82:21
  82:24
**bunch** 75:2
  80:24
**business** 18:20
  90:8 109:6
  123:18
**busy** 18:5
**buus** 69:6,19
**buy** 74:15,18
  78:13
**buying** 80:15

| c |
|---|

**c** 110:2
**ca** 141:25
**cadillac** 104:10
**calculate** 97:23
**calculating**
  97:17

**california**   1:2,16
  2:2,17 7:1,10,12
  7:13 8:13 11:4
  12:17 18:23
  26:4 27:12
  35:24 38:7
  39:24 50:24
  58:5 86:18
  103:10 104:15
  105:9 106:19,23
  117:21 118:1,11
  118:15 119:4,12
  136:4,15,22,25
  137:4,7 140:5
**call**   15:20 27:3
  81:20 84:19
**called**   19:20,21
  20:16 23:14
  27:8,9 79:25
  80:22 91:13
**calling**   67:24
**calls**   38:15 81:21
  133:23 135:11
**camera**   9:9,20
**candidly**   52:19
**canyon**   79:6
**caplan**   3:16
**carolina**   12:18
  12:18
**case**   1:7 2:7 7:10
  8:10 11:10 28:5
  30:10,12,14,20
  30:23 34:5,13,17
  35:4 37:15 39:8
  40:25 44:6 46:5
  46:6 53:6,20
  58:10,19 59:19
  60:1 66:1,12

67:4 68:13,19
  76:23 90:4
  91:12 97:13
  99:23 100:11
  103:6 104:25
  106:18 107:17
  107:19 108:11
  108:15 109:3
  110:11 141:6
  142:3 143:3
**cast**   22:11 78:3
  104:5,6 105:18
  105:23 106:4
**categorize**   94:25
  95:11
**caused**   121:13
**ceased**   16:13
**center**   23:3,6,7,8
  23:10,14 25:4,18
  25:19 30:25
  31:18,25 33:17
  37:25 42:7 87:3
  103:8 106:3
  109:14,15,21
  111:3,9,15,21
  130:18 134:20
  136:17
**central**   1:2 2:2
  3:7 7:10 58:5
**centre**   62:20
  64:1 65:2 137:1
  137:2
**century**   62:20
  64:1 65:2 137:1
  137:2
**ceres**   58:24
  59:10 61:6
  70:18 71:23

73:1,10
**certain**   15:18
  17:3,10 20:24
  25:20 26:3
  50:15 60:2
  76:12 78:14
  86:6 90:7 98:12
  102:15
**certainly**   58:13
  62:13 101:12,14
  102:10 103:15
  107:8 130:8
**certificate**
  101:17 143:11
**certification**
  142:1 143:1
**certified**   2:19
  140:4
**certify**   140:5,14
**chairman**   15:13
  16:3,6
**change**   82:18
  141:13,14 143:8
  144:3
**changed**   82:21
**changes**   141:12
  142:7 143:7,9
**characterize**
  95:8
**check**   17:5
  130:18
**checks**   96:9
**chief**   14:10
**chief's**   78:15
**china**   21:14
  64:14,21,22,22
  64:23 104:3
  105:19 122:25

123:15 125:6
**chinese**   62:17
  63:2 65:3
  129:16
**chosen**   102:13
**chris**   3:6 7:22
**circle**   75:14
**circulated**   41:12
  41:16
**city**   54:22 56:5,6
  56:24 57:3
  93:21,24 94:7
  102:1,5,14,14,18
  102:21,22
  128:17,21
  131:23
**city's**   102:25
**civil**   117:21
  118:1,11 142:5
  143:5
**cjc**   1:8 2:8 7:11
**claim**   115:14
**claimed**   99:6
  117:23 118:5
**claims**   113:5,23
  114:2,5,14
  115:18,22,24
  116:2,9,13
  117:16,23 119:5
  119:21 120:1
  128:10 132:17
  132:18
**clarification**
  70:4
**clarity**   27:23
**clause**   120:5,9
  120:10

[clay - contract]                                                        Page 7

clay  83:13,14,15
  83:16 96:1
clean  78:8
clear  60:12,16
  69:14 94:20
  95:2 132:19
cleveland  141:2
client  33:5 37:12
  41:24 42:15
  43:7 118:8
  137:15,25
close  110:18
  130:20
code  117:21
  118:1,11,15
  119:4,12
coffee  9:5
coffee's  43:22
cognizance
  80:22 81:15,20
  82:12,24 83:3,8
  83:19 84:18
  85:13,22 86:7,14
  86:17,21 87:2
  88:12,16,17 89:3
  89:12,14 93:24
  94:6 106:2,3,13
collaborate  76:4
  82:16
collaborated
  78:5
collaborative
  14:11,14 77:22
collaboratively
  88:17
collection  19:16
  19:17 123:17
  124:22 127:2

come  59:8 74:8
  106:14 115:25
  116:21 118:24
comes  114:22
comfortable
  92:11
comiller  3:11
coming  8:11
commercial
  99:23,24 100:3
  101:4,5,7,8,10
  101:13,16 102:2
  124:12,24
commission
  142:19 143:25
  144:25
communicate
  50:14
communication
  137:16
communications
  33:5 37:12
  41:24 42:15
  43:8 53:3
company  5:11
  11:6,17 16:12
  23:20 101:16
  110:5,9
company's  82:9
compassion
  63:16 64:1 66:2
  66:7
compensate
  22:10 86:5
compensated
  16:23,24 17:1,5
  17:25

compensating
  21:25
compensation
  22:5
compete  135:5
complaint  5:17
  29:22,23 57:19
  57:21,23 58:4
complaints
  135:15
completed
  141:15
compliance  6:4
  90:17 106:17
  120:21 121:4
  135:25
complications
  123:1
complied  39:12
  43:1 127:10
  130:15
comply  39:9
  43:10,11 102:24
  103:1 126:19
  127:14
complying  37:10
  37:14 39:17,19
  39:20 48:6
  78:25
compound  54:12
  54:14 67:12
  103:11
compromise
  113:21
computer  45:18
concept  79:19
  82:4

concerned
  114:11
concert  35:18
concludes  139:3
conclusion  36:23
  38:16 68:9
  133:23 135:11
confidentiality
  52:10,11
confusion  11:15
connection  17:3
consider  99:3
considerably
  103:22
considered
  20:25
consolidated
  46:5
constitute
  117:25
construction
  39:23
construed
  116:12 120:11
consultant  16:18
  16:18
consulting  16:19
contained  123:2
contention  49:11
contents  118:19
context  109:12
  126:1
continue  73:16
  113:14 114:12
continued  4:1
  6:1
contract  16:19
  120:6

**contrary**   128:11
**contributed**
   88:22
**controlled**   47:17
   48:22 84:7
   126:4
**controversies**
   113:22
**conversations**
   118:8,21 137:19
**convicted**   96:15
**copies**   21:11,14
   35:23,25 36:11
   36:24 37:23
   38:13 39:21
   40:16,25 41:14
   42:11 43:5,14
   48:3,21 49:12,16
   50:5 51:9 60:2,3
   65:12 66:24
   67:6,7,18 86:17
   106:13,23
   121:13 129:11
   129:12 134:10
   134:20 135:9
   136:2 137:14
**copy**   21:18,24
   41:11,19 55:6
   57:25 81:6
   91:17 92:13
   93:24 94:6
   100:17 106:2
   131:2,6
**copyright**   25:24
   29:21 34:6,7
   57:9 58:22,24
   59:9 67:25 68:5
   70:16,18 71:7,9

71:17,23 72:9,14
72:19 73:1 89:3
89:4,6,9,11
99:14 132:10
133:2,22
**copyrighted**
   35:8,19 67:8,18
**copyrights**   67:5
   67:5 73:10
**coral**   19:5
**corp**   1:9 2:9 7:9
   17:25 57:22
   58:6,21,23 68:20
   69:10,20 70:15
   70:17 96:10
**corporate**   2:16
   7:12 66:14,22,24
   76:25 137:1,3
**corporation**   20:3
   96:10 128:14
**corporations**
   12:25 13:1
**correct**   8:13,14
   8:22,23 10:19,20
   10:23,24 11:7,8
   11:11,22 12:3,14
   12:15,19 13:9,18
   13:19 14:13
   19:7,10,16,20,25
   20:6,10 25:14,25
   26:4,7,13,16,19
   27:1,14,17,25
   28:7,10 29:13
   30:2,10,16,20
   32:24 33:2
   34:13 35:4,5,8
   35:20 36:14
   42:8 46:2,6,10

46:14 47:2,4,10
48:23 49:10
50:2 51:5 52:5
52:22 55:22
56:6 58:7,11
62:20 63:19
64:5,21 65:4
67:19 69:13,20
74:4 75:16 83:3
83:15 84:10,20
87:3,21 88:14
96:16,17 97:7
102:6,16 104:7
111:10,22,23
117:4 125:13
126:16,17
130:12 131:6
132:25 136:5,15
136:18 137:10
138:22
**corrections**
   141:12 143:17
**correctly**   56:20
**cost**   94:9
**counsel**   7:18
   8:12 9:23 17:20
   18:6,20 20:1
   21:2 22:16,17
   25:15 27:6,15
   29:5 30:11 31:3
   32:25 33:4,11
   34:9 35:22,24
   36:15 37:4,11,16
   38:3 40:19
   41:23 44:18
   45:15 48:10
   50:8 53:9,14,18
   54:2,19 56:3,12

57:5,11 58:8,10
58:12 59:2,6
60:6 61:7 62:12
63:3 64:18 65:8
67:15 68:12,14
69:9,12,14 70:25
71:10,25 72:23
73:11 74:22
75:4 85:18
86:15,22 87:4
90:22 91:10,12
92:9 94:25 95:7
96:12 98:24
100:13,13
105:14 106:15
107:18 108:1,16
111:1 114:15
118:22 130:6
131:7 135:6
136:19,23 137:5
137:12,19
**counselor**   56:7
**counted**   20:1
**country**   10:19
   128:25
**county**   142:10
   143:15
**course**   30:22
**court**   1:1 2:1
   7:10,15,24 8:22
   58:5,20 97:22
   126:8,13,19
   127:10,14
   130:15 131:4
   142:7
**courts**   127:25
**cover**   115:20

crack 116:20
crane 107:2
create 27:6 79:8
created 27:8,21
creditor 119:6
crest 79:18
criteria 17:14
crossed 116:10
  116:19
crossing 116:15
  117:5,17
csr 1:23 140:24
cups 9:5
current 32:9,17
  42:8 97:9 99:23
  100:11 110:11
currently 10:25
  16:16 33:10
  89:25
cut 137:23
cv 1:8 2:8 7:11

d

dale 25:13
damages 5:17
dan 89:20
dark 64:1
date 48:23 49:8
  60:16 111:13
  117:24 138:3
  140:17 141:8
  142:3,9,19 143:3
  143:13,25
  144:20,25
dated 45:14
  55:21 120:22
  140:20

daughter 14:22
  79:5,15,20
day 17:8 62:24
  68:18 76:11
  99:12 104:24
  106:25 142:16
  143:22 144:22
days 141:18
dealer 125:9,18
dealing 52:23
dealings 52:21
dear 141:10
debtor 119:9
decades 124:23
deceive 127:19
december 45:14
  122:1
decide 21:4
  97:22 99:1
decided 17:15
decision 17:16
decisions 17:19
declaration 5:15
  30:19 44:5,10,15
  45:14,22,25
  47:21 48:23
  49:9 51:4 121:5
  121:7,25,25
  135:24 136:1,13
  138:20
declarations
  127:24
declare 46:9
deed 142:14
  143:20
deemed 141:19
defendant 11:10
  11:21 35:3 46:9

69:6
defendant's
  44:16 46:1
defendants 1:11
  2:11 3:15 7:23
  35:6,16,18 36:10
  58:20,22 70:14
  70:17
define 12:4
  20:24 22:4,4,5
definitely 81:25
  82:1
definition 19:18
  21:6 98:15,17
  99:5
delivered 86:11
delivery 47:1,8
  123:4
denied 30:1
deny 54:8,15,17
  54:21 57:2
department
  141:22
depend 77:19
depends 108:7
depicted 61:20
  62:5,10
deposed 30:12
  53:5,20
deposition 1:15
  2:15 7:7,12
  10:12 11:14
  45:20 53:12
  54:3 65:25
  66:11 141:8,11
  142:1,3 143:1,3
derivative 46:14
  46:16,23 47:17

122:17 126:3
derivatives 47:2
describe 75:3
description 5:10
  6:3
design 20:23
  74:5 78:5,6 79:8
  82:12,14,19
  88:16,23 94:14
designed 20:12
  20:15,17,21,22
  81:17,23 125:19
designing 75:22
  76:12
desire 119:1
destroy 36:11
  39:25 117:13
  131:6
destroyed 36:25
  37:19,25 38:9,14
  39:22 42:23
  43:12 48:3
  50:22,24 106:20
  117:13 121:15
  121:18
destroying 117:2
destruction
  106:18
detail 77:1
details 23:20
  34:9 125:5
  131:8
determine 43:5
  49:15 107:24
determined
  17:13 126:9
developing
  42:18,19 109:14

**[developing - entered]**

109:20
**development** 23:4 25:19 109:22 110:1
**developments** 12:16
**dfm** 1:8 2:8 7:11
**dian** 58:22 59:10 61:3 70:16 71:9 71:17 72:9,19
**dictionary** 98:16 98:18,25
**differences** 104:14 105:10 105:11
**different** 12:24 13:1 67:5 73:14 77:8,8 98:17,19 98:23 99:1 103:8,14,15,17 103:18,20,22,25 104:3,4,12 105:22 112:24
**difficulty** 45:12
**direct** 43:10 98:25
**directed** 50:21 56:5 129:15
**direction** 52:8 99:9 140:11
**directly** 9:9,12 74:15 125:8
**directors** 15:2,4 15:7,8,11,13,15 15:21,24
**disagree** 36:21 71:15,20,25

**disclose** 30:23
**discovered** 40:9 86:17 137:13
**discovery** 97:13 107:16 125:4
**discussion** 10:4 24:22 45:7 91:21 112:13
**discussions** 137:12
**disorganized** 123:5
**display** 31:18 32:8,17 33:17 42:7 104:15 134:9,20
**displayed** 20:8 26:3 27:11 31:25 103:8,9 111:3,9,20
**displays** 134:7
**dispute** 71:7
**disputes** 113:22
**distinction** 27:20
**distinguish** 104:21
**district** 1:1,2 2:1 2:2 7:9,10 58:4 58:5
**division** 1:3 2:3
**divulge** 33:5 37:12
**document** 25:15 30:3 35:10 43:20 56:9 63:9 70:5 72:1,7,10 107:17 112:20 112:22 121:2,3,6

132:15,19 134:3 134:15 135:11 135:14,15
**documents** 107:18,20,25 108:4,6 109:3 132:2,6,22
**dog** 13:3
**doing** 16:16 33:6 118:9
**domain** 22:6
**don** 8:10 25:24 103:16 137:13
**donald** 1:6 2:6 4:6 7:8,22 141:6 142:3 143:3
**door** 13:3 116:21
**doors** 104:11
**doubt** 66:15,17 84:17
**draft** 101:5
**drafting** 71:12
**draw** 82:18
**drawn** 82:13
**driven** 17:12
**drops** 36:13
**dump** 107:9

**e**

**e** 8:6 110:2,3 112:18 129:7,7 138:7,7
**earlier** 35:23 40:8 80:14 132:21
**easily** 104:20
**edition** 85:5 86:6

**editions** 84:19 84:22 85:12,22 86:13
**effect** 118:17,19
**effort** 14:11
**efforts** 39:8,10
**eight** 36:14 115:3
**either** 20:9 33:16 54:20 71:12,14 71:19,25 84:15 87:17,24 129:12
**email** 108:18,20 108:23 141:17
**emailed** 45:14
**emails** 107:23 108:15
**employee** 89:17 96:7 140:15
**employees** 35:17 125:9
**employer** 90:3,3
**enclosed** 141:11
**encompassing** 114:4 115:13
**ended** 37:15 97:5
**endless** 14:1
**enforce** 116:13
**enforcement** 117:6
**english** 115:24
**enjoined** 35:7,19
**entered** 34:17 39:7 41:21 42:12,24 58:19 59:2,18,25 113:4 113:16 127:11

**[entered - feedback]**

127:16,21 143:9

**entire** 93:2
109:25 120:4,11
142:5 143:5

**entirely** 80:1
123:4

**entities** 124:13

**entitled** 46:13
122:17

**entry** 36:14,25

**equal** 88:23 89:1

**equally** 89:1,3

**equals** 80:1,7

**eric** 4:7

**errata** 141:13,18
143:7,10,18
144:1

**esq** 141:5

**estate** 90:9

**estimating** 97:17

**et** 7:9 69:6 141:6
142:3 143:3

**europe** 129:18

**evasion** 96:18

**everybody** 84:6

**everybody's**
21:5

**evidence** 105:21

**evidently** 57:12
73:21

**exact** 111:13

**exactly** 39:24
85:6 109:19
111:12 116:19

**examination** 5:2

**examined** 8:3

**example** 103:21

**examples** 22:7

**excerpt** 99:25

**excess** 12:13

**exclusive** 36:12

**exclusively** 77:5
78:10

**executed** 143:10

**executing** 119:7

**execution** 117:24
119:22 142:14
143:19

**executives** 15:18
131:24

**exhibit** 5:11,12
5:13,14,15,16,17
5:18,19,20,21,22
5:23,24 6:4
23:22,22,24 24:5
24:15,17 25:3,21
28:16,18,20 29:3
29:9 34:16,20
44:5,5,8 45:13
55:1,4,7,21
57:17,21 58:1
60:25 61:11,13
62:6 63:10,12,15
68:17,23 81:3,7
86:25 91:14,22
91:25 96:13
100:19 103:3
112:16 120:23
120:24 122:2,7
126:24 128:5
136:13 138:19

**exhibits** 5:9 6:2
45:12 112:3
122:4

**exist** 119:6
129:18

**existed** 49:14
51:1,2 67:2,2

**existence** 67:6,8
128:25 129:11
129:12

**existing** 113:22

**exists** 23:7

**expected** 123:3

**expedite** 56:19

**expenses** 17:2,4

**experiencing**
82:6

**expiration**
142:19 143:25
144:25

**explain** 96:23

**explained** 95:7
95:13 118:18

**explanation**
95:14

**extend** 117:23
119:5

**extension** 118:6

**extensive** 127:2

**eyesight** 25:17

**f**

**f** 110:2,3 129:7
138:7

**face** 76:22 80:20

**faces** 26:7 28:7
28:21 31:17
32:8 36:11,25
37:24 41:20
42:6 46:13
103:7,9 104:14

111:2,8 121:14
122:17 129:22

**facility** 19:2

**fact** 22:7 38:6
64:23 97:3
117:6 126:15
128:18 131:3
134:19 138:14

**facts** 50:19 58:25
70:1,19 73:18,20

**fair** 9:4,5 27:22
43:16

**faith** 126:18
127:13,17

**fall** 26:7,19
27:25 29:1,12
31:24 32:16
36:12,13,25
37:24 41:20
42:6 46:17
111:15,20
115:15 121:14
129:21

**false** 47:25

**familiar** 23:3,5
23:13,18,19 70:5
72:13 80:23
92:19 118:11

**family** 20:3

**fan** 21:7

**far** 87:1 114:10
117:7 127:6
130:15,19

**favor** 119:7

**feasible** 50:10,13

**federal** 98:9

**feedback** 113:18

[feel - further]                                                           Page 12

**feel** 36:23 88:22
  112:22 127:10
  127:16,24
  134:25
**feeling** 37:6
  115:13
**feet** 12:10
  123:23
**felon** 96:15
**felt** 43:1 113:14
**fight** 97:12
**figured** 129:21
**fike** 109:25
**file** 98:7
**filed** 7:9 30:1
  32:10,18 42:7,9
  57:21 58:4
  60:20 106:17
  121:6 126:25
  127:25 138:21
**filled** 128:16
**final** 118:10
  119:2
**finality** 114:2
**finalized** 83:16
**financial** 14:10
  76:1 79:3 97:24
  98:1,4,5
**financially** 76:15
  78:13 140:14
**find** 51:8 141:11
**fine** 76:10 79:22
  79:22 90:24,24
  108:4
**finish** 130:5,6
**firm** 7:16
**first** 26:2,12
  27:13 28:5

29:20,23 30:22
  33:17 34:4,17
  35:3,9 38:3 39:8
  40:14,15,25
  41:15,22 44:6,14
  46:5 53:6 57:23
  58:3 67:13
  70:22 76:24
  77:2,23 80:19
  83:8 92:1 100:3
  106:18 107:1
  113:2,19 121:4
  122:15 126:8
  128:6 131:2,6
**five** 22:8,18
  37:17,18 75:4
  104:20,20
  124:23
**flex** 12:10
**florida** 3:19 5:11
  8:12 11:2 12:17
  19:2,4 23:8
  40:16 41:1,21
  48:3,9 49:12,16
  51:9 104:15,19
  104:25 105:6,9
  106:4 129:23
  130:18 134:10
  135:9 136:18
  137:10,14
**focus** 50:2
**follow** 36:10
  105:25 129:4
  138:5
**following** 37:23
  70:1 121:15
**follows** 8:4 118:2

**ford** 104:10
  105:17,17
**foregoing** 140:6
  140:8,12 142:13
  143:18
**forever** 113:5
  120:1,15 132:24
  133:1
**forget** 72:9 99:7
  103:23
**forgive** 75:14
**forgot** 99:10
**forgotten** 59:15
**form** 21:20 22:1
  23:16 25:10
  26:8,20 27:4
  28:1,8,22 29:14
  30:3 31:1,19
  32:11 33:23
  35:10 37:2 38:1
  38:15 40:5,17
  41:2,22 42:13
  43:17 48:4,24
  49:18 50:6,16
  53:25 54:11
  59:4,11,20 64:16
  65:14 67:10,20
  70:22 72:11,21
  73:3,12 80:9
  84:24 85:24
  86:8 87:22
  88:18 92:24
  95:5 97:11
  98:21 101:19
  103:11 104:16
  105:1,12 106:5
  131:20 132:12
  133:5,14,23

135:11
**formerly** 111:2
**forth** 140:7
**fortunately** 11:1
**forward** 126:15
  141:15
**found** 41:15
  127:8 131:5
**founded** 11:6,24
  12:6 16:12
**foundry** 76:18
  77:24 78:2
  83:24 84:4,5,15
  85:16 94:16
**four** 67:6,18
  70:13 85:14,17
  104:11
**frame** 15:23
  60:23
**francisco** 77:25
  107:15
**frankly** 126:20
**free** 134:25
  142:14 143:20
**friday** 1:17 2:18
  7:1
**front** 9:9,13
  79:24 91:24
  92:7 122:4
**full** 18:5 83:5,7
  83:10,19 94:15
  119:1
**fully** 43:2 118:18
**further** 36:10
  116:5,9 118:6,13
  118:25 129:3
  132:17 140:12
  140:14

**[furthermore - help]** Page 13

| furthermore | go   8:16 9:14,22 | 75:4,7 78:13 | **h** |
|---|---|---|---|
| 31:5 | 9:23 22:14,19 | 79:20 81:2,20 | |

**furthermore**
31:5

**g**

**gallery**  22:11
74:12,15 75:16
75:18,19
**games**  73:16,19
98:24
**gbrockland**  3:10
**gears**  52:2 73:24
**gee**  76:3
**geez**  43:20
**gene**  3:5 7:21 8:9
18:14 70:4
129:3 138:24
**general**  5:25
69:9,12,14 112:6
113:5 119:5
**generally**  28:25
74:25
**generate**  101:8
101:14,15
**gentlemen**  87:25
**georgia**  12:18
**germany**  129:17
**getting**  57:8
110:18 113:18
**girl**  79:17
**give**  10:11 15:23
22:7 29:5,8 52:8
95:23 100:18
**given**  134:24
139:4
**giving**  116:8
**gmail**  108:22,24
108:24 109:1

**go**  8:16 9:14,22
9:23 22:14,19
24:15,18 25:11
29:1,8 31:9
38:24 43:23
45:4 55:8 56:10
56:10 58:17
61:15 68:1
69:22 77:20
82:14 87:1 88:2
92:18 95:23,23
98:25 99:16
100:5,5,25
101:21 113:2
114:25 118:7,7
118:22 121:8,11
121:24 122:11
122:15 131:16
131:21,22,23,24
132:9 133:2,21
**god**  13:24
**goes**  45:2 47:15
82:5 116:5
124:16
**going**  7:4 10:2
10:11 17:22,24
18:7,16,21 21:2
22:4,20 23:23
24:11,20 29:1,2
29:18,20 30:5
31:10 34:15,17
38:25 39:18
43:19,21,24 44:4
45:5 48:13,15
51:17,21 53:15
56:11 61:10
63:9 68:17
69:23 71:19

75:4,7 78:13
79:20 81:2,20
88:3 91:13
92:16,18 93:5,6
93:7,8,16 97:12
97:17 98:11
100:17 110:19
112:11 118:7,10
125:22 126:24
134:2 135:4,20
135:21 139:2
**good**  7:4 8:8
126:18 127:13
127:17
**gosh**  107:13
110:15
**granite**  26:13,15
26:18 27:1
86:18,20 87:16
87:21
**granted**  116:14
116:25 117:7
**great**  80:6 113:2
**growing**  79:16
**grown**  12:2,4
**guess**  16:2 66:9
72:2 90:23
97:20 135:17
136:20
**guessing**  16:1
68:11
**guilty**  96:18,19
96:25 97:5
**guy**  79:3
**guys**  43:20 48:13
112:7

**h**  129:7 138:7
**half**  51:18 96:24
130:22
**hand**  44:14
**handmade**
103:25
**handwritten**
82:13
**hang**  13:5,6
38:23 68:15
**happen**  137:13
**happened**
102:12
**happy**  96:21,23
**harass**  114:12
**hard**  25:16
78:25 104:22
**he'll**  138:25
**head**  71:2 78:16
79:18
**headed**  77:21
109:25
**heading**  34:23
44:11 61:18
63:16
**headquarters**
18:24 47:18
79:25 84:23
124:18 126:5,7
126:10,15
**hear**  8:19
**heard**  53:6 56:16
**held**  10:4 24:22
45:7 91:21
109:17 112:13
**help**  18:16 76:14
87:10,14 101:16

102:5
**helped**  74:5
**helps**  81:2 87:18 87:19
**hereof**  117:25
**hereto**  113:23
**hide**  127:20
**hierarchy**  90:22
**higher**  101:11
**hired**  69:19
**hold**  69:1 136:12
**home**  19:24
**honestly**  52:17 124:7
**hong**  103:23
**hopefully**  55:2 110:25
**host**  24:14
**hour**  51:18 96:24 99:12 130:22
**hours**  18:3 96:1 96:2
**how's**  17:12 18:8
**huge**  79:18
**huh**  77:11 93:9
**human**  26:6 28:6 28:21 31:17 32:8 36:11,24 37:23 41:19 42:6 46:13 103:6,8 104:14 111:2,8 121:13 122:17 129:22
**hundred**  19:19 19:23 124:6,6,14 124:14

**hundreds**  124:3 124:16
**hypothetical**  115:17 134:4,6,8
**hypothetically**  95:25

**i**

**idea**  33:21 34:14 78:9 79:13,13,17 80:1 82:5,10,19 103:19 125:21
**ideas**  20:24 77:21 78:16,16 78:17 79:23
**identification**  23:24 28:18 29:9 34:20 44:8 55:7 58:1 61:13 63:12 68:23 81:7 91:22 100:19 112:16 120:24
**identified**  37:18 38:6 39:25 40:2 40:3 41:9 43:10 43:11
**identify**  38:13 121:8 122:12
**igor**  1:9,15 2:9 2:15 5:3 7:7,8 8:2 9:7,9 10:10 25:8 33:4 36:5 41:23 43:6 44:15 46:1,8 52:9 55:25 56:10 58:20,23 68:19 69:6

70:14,17 72:8 97:12 100:5 112:20,23 113:3 119:19 120:5 121:2,8,9,12 122:13,15 127:1 128:6 134:25 135:19 138:9,20 139:4 141:6,8 142:3,4,9 143:3 143:4,13 144:20
**igor's**  121:25
**igorolen**  108:23
**ii**  114:22 116:24 126:25 127:11 130:3
**impact**  10:13
**import**  118:17 120:8,10
**include**  117:1
**included**  141:13
**includes**  123:23
**including**  47:18 94:19 113:23 114:1 117:24 126:4,6
**inclusive**  1:10 2:10
**income**  96:18 101:14,15
**incomplete**  25:10
**incorporated**  143:12
**indented**  119:3
**independent**  15:21 16:18 46:22 125:4

**index**  5:1 6:1 69:3
**indian**  76:8,8 77:3 78:15
**indicated**  37:16 56:18 59:13
**indicating**  27:16 60:2 141:13
**individual**  1:10 2:10 67:15 109:8
**individually**  11:21 128:14
**information**  6:9 93:12,12 127:20 137:21
**informed**  47:12
**infringe**  71:8 132:10 133:2,21
**infringed**  58:21 58:23 59:9 67:5 70:15,18 71:7,17 71:22 72:8,19,25 73:9
**infringement**  25:24 29:21 34:6 57:9
**infringing**  35:7 35:19 41:15
**initial**  91:2
**initially**  37:17 50:23 78:8
**initials**  113:1
**injunction**  34:12 34:16 39:7,17,19 39:21 41:11,21 42:12,24

injunctive 117:1
inquire 51:12
inside 84:22
insisted 116:18
inspect 96:1
installed 42:17
86:14 101:24
102:5 123:16
128:12
instance 83:8
institutions 98:5
instruct 97:14
137:16
instructed 39:24
instructions
118:8
instrumental
64:9
intend 127:19
intended 101:15
117:17
intent 118:22
132:19
interest 78:11
interested
140:15
interrogatories
30:9 100:1,11,21
interrogatory
99:21 100:24
intertwined
61:18,20 66:2,7
introduce 29:2
34:15
introducing
106:7
invent 98:17

inventory 127:1
investigation
128:24 138:10
138:15
investigations
40:20
involve 23:9,11
involved 26:12
38:10 39:14,15
39:22 40:12
90:22 91:8
93:20 102:9
involvement
90:25 92:4,22
94:3 106:22
iolenicoff 109:1
iran 10:19
ironclad 114:13
118:10 132:23
irs 13:24
irvine 137:2
issue 57:6 70:14
97:21 99:22
103:5,6 104:25
135:8
issues 110:10
items 19:9 123:2
123:14

j

j 3:5
jane 25:14
january 92:2
120:22
japan 129:16
job 1:24 90:13
john 1:9 2:9 52:4
52:5 54:23

56:18,24 57:3
58:6 60:11,18
66:25 68:19
89:17,18,24 90:3
110:14
join 79:5
jon 4:4 7:14 36:3
judge 69:25 70:8
70:25 72:2,14
judge's 71:2
judgement 5:14
34:25 36:14
37:7 43:1,2,12
48:7 59:25
106:17 120:22
julie 69:7
july 47:1 121:13
jury 59:18 68:18
70:6,8

k

k 110:2,3
keep 51:12 69:23
75:25 92:11,16
92:18 93:5,6,7,8
93:16 137:8
kind 44:13,23
64:7 78:22
86:10 91:19
115:18
kinds 20:16
knew 42:25 96:1
know 8:8 9:2,4
13:22,25 14:1,8
14:15 15:15
16:1,3,6,7,8,13
17:4,18,18,20
18:13,14 19:21

19:22 20:2,14,24
21:2,4 22:3,3,5
22:15 25:15,16
25:20 27:8,15
31:4 32:5,23,25
33:1,9,13,14,16
33:22,25 34:1,1
35:25 36:20
37:7,14 38:3,4
38:20 39:15,24
40:7,11,19,19,21
40:24 41:7,8,11
41:13,14,18,19
42:10,17 43:18
46:7,18 47:12
49:12 50:9,10,20
50:21 51:10,11
51:15 52:4
55:17 56:13
57:11 58:8,8
59:5,12,21,22
60:6,7,22,22
62:8,9,12,13,16
62:18 63:3,4,6
64:25 65:7,16,21
66:19,21 67:2,3
67:7,13 68:2,7
68:10 71:1,11,11
72:3,4 73:6,13
74:13,21 75:1
76:6,12,13,14,21
77:15,16,22,23
78:16,17,18,19
78:24,25,25 79:3
79:21 80:8
81:21 82:3,7,8,9
82:13 84:14
85:12,18,21,22

86:2,6,11,13
87:4,4,17 89:1,4
89:17,24 90:13
90:16,19,21 92:4
93:23 94:5,8,9
95:12,14,17,17
96:11 97:16
98:16 99:7,7,15
101:10,25 102:7
102:8,9,12,17,17
102:21 103:13
103:16,24
104:20 105:11
105:19,20,20
106:9,12 107:12
107:14,22 108:1
108:5,7,8,12,19
109:2,8,16,23
110:5,7 111:12
111:12 113:11
114:12,20
115:13,16,16,23
116:21 117:15
118:14,22 119:6
120:1 122:3
124:7,10 125:7
125:11,17,23
126:20 127:7
129:25 130:5,5,6
130:10 131:7,7
132:5 135:3,20

**knowing**  37:6
51:1 108:13

**knowledge**  15:7
37:21 38:4,10,20
38:21 49:2,2,5,7
49:8 50:3 83:18
121:19 123:6

128:1

**known**  11:6 35:8
35:20 61:3,6
113:13 114:3,3
115:5,20 116:7
119:7 132:18

**l**

**l**  1:22 2:19 69:6
140:23

**labor**  83:23

**lack**  38:1 48:4
59:4,11,20 67:10
106:5

**lady**  82:6

**lafave**  109:9
110:5

**laguna**  79:6

**landfill**  107:9

**language**  101:6
113:25 114:17
115:3 116:10,16
117:17

**laptop**  45:17

**large**  19:15,18
19:20 66:3
78:10

**larger**  125:15

**lastly**  116:3

**law**  3:5,6,17

**lawsuit**  17:22
26:12 29:21
32:9,17 34:11
37:18 38:6
39:13 40:8,15
41:15 42:8,9
49:23 50:1,23
58:12 117:3

125:3 126:8

**lawsuits**  129:15
135:9,16

**lawyer**  69:19

**leading**  113:8
117:9 119:13

**leave**  67:3 82:16
116:20

**leaving**  110:9

**left**  63:18 110:5

**leg**  95:25

**legal**  7:15,16
23:19 36:19,22
38:15 68:8,8
69:16 70:24
118:19 132:15
133:6,9,23 134:1
135:11 139:5
141:1 144:1

**legalese**  70:24
71:6

**lenders**  13:25

**letter**  5:16 55:21
56:5,15 57:6
141:19

**liability**  5:11
30:2 101:9

**liang**  1:9 2:9
110:14

**life**  54:5 82:9,9

**lifted**  107:6

**lifting**  107:3

**lightening**  82:7,7

**liked**  82:19

**limit**  13:23

**limitations**  126:9
131:2,5

**limited**  5:11
11:15 21:10
113:23 114:1

**line**  17:23 69:25
70:13 97:22
141:13 143:7
144:3

**lines**  6:13,13
115:4

**link**  63:16,25
66:2,7

**list**  13:25 131:15
131:17

**listed**  25:13
136:1 137:10
143:7,17

**listing**  143:7

**lists**  121:15

**literally**  94:3

**litigation**  57:16
126:11

**little**  23:2 36:3
52:3 57:15
61:14 64:1 69:4
75:13,14 88:11
92:6,17

**live**  10:25 79:5
130:19,20

**living**  76:2

**llc**  23:15 25:4,18

**llp**  3:4

**located**  30:25
31:4 121:22

**location**  7:11
31:6 38:13
138:15

**locations**  47:18
58:22,24 70:16

**[locations - midwest]** Page 17

70:19 71:9,18,23
72:9,20 73:1
121:15,16,17,22
123:15 126:5
136:1,4,15,21
137:10 138:11
138:22

**long**   15:22 42:14
54:20 82:22
84:13 91:2,19
95:3,14

**longer**   65:6

**look**   9:16,20,22
34:18 36:9
57:23 61:12
92:19 100:23
104:7,10 112:20
113:18,19 115:2
116:10 117:20
122:22 123:13
125:24 130:24

**looked**   65:13
66:4 67:23
106:10 115:15
130:10,11

**looking**   9:11,12
45:17,22 53:23
83:3 122:6

**looks**   28:25 29:7
87:20,21

**lost**   8:15 85:6
135:22

**lot**   11:2 19:7
54:5 92:1

**louis**   3:8 8:12

**lover**   21:1,3

**lunch**   88:1,5

**lynn**   4:5 112:5
114:25 120:4,20
120:20 121:2,7
121:11,24 122:8
122:23 125:25
126:22 128:4
136:7,9 138:18

**lyon**   25:13 89:17
89:18,24 90:3,13

---

**m**

**m**   3:17 8:6 44:15
46:8 55:25
112:18 129:7
138:7

**machine**   140:10

**madam**   112:2
122:2 141:10

**maintain**   11:3
18:23 127:1

**maintained**
123:14

**maker**   84:5,16

**making**   27:21
78:12

**man's**   76:22

**manager**   56:6
109:18,22

**managers**   25:13
125:9,20 131:10

**managing**   25:7

**manatee**   92:1

**manuel**   4:4 7:14

**manufacture**
20:18

**manufactured**
64:14

**manufacturer**
66:8

**maquette**   65:21
65:22,22 66:7
77:24 78:1
82:20,24,25

**maquettes**   66:1
94:14

**mark**   44:4 61:10
68:17 81:2
120:22 126:24

**marked**   5:10 6:3
23:22,24 25:3
28:18 29:9
34:20 44:8
45:13 55:7 58:1
61:13 63:10,12
68:23 81:7
91:14,22 100:19
112:16 120:24
121:25

**marking**   57:20

**mason**   98:13,14
98:19 99:4
103:16

**masoned**   103:22

**masons**   105:22

**masses**   80:2

**materially**   119:8

**matter**   7:7 22:7
38:6 53:19 57:6
120:15 128:18
131:3

**mattered**   78:18

**mean**   21:3 27:15
40:2 49:8 61:8
71:5 75:22
82:21 83:10

**manufacturer**
84:6 98:13
99:24 101:3
116:12

**meaning**   82:8
95:24 119:24

**means**   39:19
97:17 101:7
108:19

**meant**   116:6
119:17,17

**media**   7:6 139:4

**medications**
10:12

**meet**   79:1 82:15
82:17 102:1,5
109:12

**meeting**   52:20
54:6

**member**   25:7

**memory**   43:15
49:17,22,25

**mention**   40:15

**mentioned**   40:20
40:22,25 41:3
86:2 94:2

**mentioning**
40:21

**merger**   120:5,9
120:10

**mess**   123:8

**messages**   107:24
108:11

**met**   52:6,15,18
74:8 75:15 77:2
109:10

**middle**   115:3

**midwest**   141:17
144:1

---

**miller** 3:6 7:22
**million** 12:10
  97:6 123:23
**mind** 51:12
  75:25 81:19
  102:1 116:6
**mine** 77:22
  78:11
**minute** 22:18
  24:18 31:8
  43:21 51:19
  55:13 73:24
  75:4 93:11
  106:1 112:10
**minutes** 67:23
  110:18 130:22
**mishmash**
  123:12
**misleading** 27:9
**missed** 50:23
**missouri** 3:8
**misstates** 50:18
**misunderstand...**
  120:14
**model** 94:15
**mold** 76:18,19
  76:19 77:20,25
  80:15,16,20
  83:17,19,22,25
  84:5,16,18 94:16
  96:5 104:5,6
  105:18,23 106:4
  106:14
**molds** 83:15,25
**money** 74:13
  76:3,11 77:13,16
  79:4

**months** 36:14
**morning** 7:4 8:8
**motif** 77:4,8
**motion** 44:16
  46:2
**move** 17:22
  22:13 88:12
  98:11 99:16
  105:24 126:14
  129:19
**moved** 50:24
  126:15
**multiple** 124:1,4
  125:18 134:22
**municipal** 103:1
**muscular** 80:2
**mutual** 5:24
  112:6 113:4
**mw** 1:24

**n**

**n** 8:6,6 112:18
  112:18 129:7,7
  138:7,7
**name** 7:14 8:9
  10:8 20:14 27:7
  27:16,21 52:4
  73:25 76:21
  80:18,23,23
  81:16 89:17
  99:10 103:23
  109:8 140:18
  141:6 142:3,4,15
  143:3,4,21
**named** 109:25
**names** 61:7
**narrow** 21:10

**natalia** 14:21
  17:17 25:7
**naturally** 109:24
**nature** 18:18
  115:4,11
**nature's** 26:7
  28:6,21 31:17
  32:8 36:11,24
  37:24 41:20
  42:6 46:13
  103:7,9 104:14
  111:2,8 121:13
  122:17 129:22
**nearly** 123:22
  124:1
**necessarily**
  14:15 41:7
  71:13 74:10
**necessary**
  131:14
**need** 9:1,3 13:2
  22:17 24:10
  31:7 56:18
  96:20 128:16
**needed** 74:13
  76:3 79:4
  125:10,19
**neither** 123:14
  140:14
**net** 97:9
**nevada** 12:17
**never** 20:1 31:5
  38:18,19 61:2,5
  75:17 88:24
  89:5 94:10,12,20
  99:6 103:13
  104:18

**new** 33:12 89:8
  106:7
**newport** 1:16
  2:17 7:1,12,13
**nice** 79:3
**nine** 111:14
  115:4
**nonresponsive**
  22:14 99:19
  105:24 129:19
**nope** 87:7
**north** 12:18
**nose** 76:22 80:20
**notarized** 141:14
**notary** 141:25
  142:10,18
  143:15,23
  144:23
**note** 141:12
**noted** 139:7
**notice** 6:4 88:1
  106:16 120:21
  121:4 135:25
**notwithstanding**
  126:13
**november** 1:17
  2:18 7:1,5 141:4
**number** 7:11
  14:9,9 15:17,25
  20:8 22:8 74:24
  81:3 112:2
  122:2 139:4
  141:7,13
**numbered** 35:9
**numbers** 143:7
**numerous** 123:1
**nw** 3:18

| o | | | |
|---|---|---|---|
| **o**   3:6 8:6 112:18 129:7 138:7 | 117:9 119:13 132:12,12 | 39:15 44:11 47:13 52:12 | 23:14 26:3 27:12 39:8 |
| **o'donnell**   56:5 | **objections** 134:12 | 55:16,18,19 62:5 70:10 80:14,21 | 40:24 41:7,12,16 47:1,16,17,18 |
| **oath**   8:3 30:10 140:9 | **obligation**   36:24 | 81:10,19 83:2,14 87:8 88:3 89:2 | 48:22 51:5,8,13 51:13 54:23,24 |
| **object**   21:20 22:1 23:16 | **obviously**   13:23 17:2 34:24 | 89:24 90:5,13 91:5,11 93:5,6,7 | 56:22 57:2,22 58:6,21,23 60:1 |
| 25:10 26:8,20 27:4 28:1,8,22 | 72:14 78:18 115:12 | 93:7,8,8,8,8,16 93:18 94:17 | 60:10 61:22 62:3,4,6,10 |
| 29:14 30:3 31:1 31:19 32:11 | **occasion**   17:15 | 96:4 100:17,20 100:21,21,25 | 63:19,23 65:12 65:17 67:9 |
| 33:23 35:10 37:2 38:1,15 | **occasionally** 17:9 | 101:2,5 102:4 107:5 112:5 | 68:20 69:10,17 69:20 70:15,17 |
| 40:5,17 41:2,22 42:13 43:17 | **occasions**   85:19 | 113:2,13,18 114:5,17,25 | 82:5 84:23 86:14 89:16,16 |
| 48:4,24 49:18 50:6,16 52:23 | **occupancy** 101:17 | 115:2 116:10,25 117:20 119:3,19 | 90:6,10 92:1 96:10 102:19 |
| 53:25 54:11 59:4,11,20 64:16 | **occur**   115:18 | 120:3,16,20 121:2,11,12,24 | 107:12 108:22 113:7 114:11 |
| 65:14 67:10,20 68:5 70:22 | **offer**   47:7 | 122:8,15,22 123:9,13,21 | 115:8 119:21 120:2,2 123:14 |
| 72:11,21 73:12 80:9 84:24 | **offered**   47:1 74:14 | 125:3,15,24 127:16 128:6 | 123:17,18,21 124:13,17,22 |
| 85:24 86:8 87:22 88:18 | **office**   8:12 12:10 13:16 18:23,24 | 129:3 131:15 133:11 138:5,24 | 125:9 126:2,4,4 126:7,10,14 |
| 92:24 95:5 97:11 98:21,21 | 19:1,3,4,24 23:11 64:4 | 139:1 | 127:1 130:8,9 131:15 132:3,18 |
| 101:19 103:11 104:16 105:1,12 | 76:25 123:23 | **old**   10:16,23 71:11 79:16 | 137:1,2 |
| 106:5 131:20 133:5,14,23 | **officer**   14:10 | 107:23,24 | **olen's**   13:12 |
| 135:10 137:16 | **officers**   35:17 | **olen**   1:9 2:9 7:8 | **olen.com.**   108:23 |
| **objection**   32:1 32:19 56:9 60:4 | **offices**   69:16 | 11:7,9,14,14,18 11:24 12:6,9,16 | **olenicoff**   1:9,15 2:9,15 5:3 7:7,8 |
| 67:24 68:3 73:3 94:22 95:22 | **official**   11:2 142:15 143:21 | 13:9,12,15,17,20 14:5,25 15:2,10 | 8:2,8 9:20,21 10:10,11 23:2 |
| 100:24 113:8 | **oh**   29:8 47:23 81:10,11 84:17 110:4,9 | 15:20 16:4,17 17:25 18:19 | 25:2,8,23 29:2 31:16,23 34:4,15 |
| | **ohio**   141:2 | 19:2,6,13 20:9 | 39:6 44:4,10,15 |
| | **okay**   8:15,16,17 8:19 9:18 11:6 13:5 16:6,9 22:20 23:11 24:20 34:12,19 | | |

45:11 46:1,8
48:21 52:2 53:5
55:2,10,15,25
57:20 58:3,20,23
61:2,10,16 63:9
63:15 65:11
68:19 69:6
70:13,14,17 72:8
73:19 75:13
81:13 88:11
91:24 92:19
93:11 98:12
99:22 100:10
103:5 105:25
106:16 110:24
129:9 139:4
141:6,8 142:3,4
142:9 143:3,4,13
144:20
**olens**   11:16
**once**   52:6,6,15
82:18,18 83:16
100:15 128:18
**ones**   26:18 76:9
103:23 104:19
105:6,9,9
**ongoing**   114:23
**open**   58:20
116:21 125:17
131:11
**operations**
123:18
**opinion**   59:16
72:3
**opposed**   78:15
105:2
**opposition**   44:16
46:1

**order**   33:3 35:6
37:1,5,5,10,15
37:23 48:6
64:20 101:8
125:16,17,20
126:13,18,19
130:15 131:10
131:10,14,16,17
131:25
**ordered**   36:11
40:11 46:12
76:17 106:19
122:16,24 123:3
123:11,12 125:7
125:8,10,12,13
125:23 131:13
132:4
**ordering**   64:13
125:8
**orders**   123:1
127:11,14
131:11
**organization**
14:6 15:21
**origin**   127:7
**original**   83:4
105:16 125:3
**originally**   46:12
122:16
**ostensen**   14:21
17:17 25:7
**outside**   15:21,24
20:8 27:11
69:19 85:6
**owned**   20:3,9
65:17 76:19
90:10 130:9

**owning**   65:12
**owns**   70:13

**p**

**p.m.**   2:18 48:16
88:4,7 110:20,23
112:12,15 139:3
139:7
**page**   5:10 6:3,13
6:13 44:14
46:24 57:23
58:3 68:24
70:13 81:12
92:1,7 101:1
112:23 113:2,19
115:1 120:4
121:8,9,11
122:12,13,15,22
125:24,25 126:1
128:6 141:13,15
143:7 144:3
**pages**   121:4,5
**paid**   16:21 17:3
17:8 76:13
77:18 78:1
82:20 83:20,23
83:23 84:7,15
85:20,21,22 86:1
86:2 93:23 94:5
94:9,12,18,19,20
94:25 95:4,7,12
95:17,19 99:11
**paper**   78:9
**paragraph**   35:9
46:12,25 56:15
113:20 115:2
116:11 118:16
119:11 122:16

122:24 123:13
123:21 136:13
138:19
**paragraphs**
118:13
**paralegal**   4:5
112:7
**parcel**   95:18
**park**   76:25
**parkway**   3:18
**part**   10:19 27:13
39:13,20 48:7
67:13 88:25
117:2 123:18
125:15 130:1
143:9
**partial**   80:20
**partially**   89:10
**particular**   80:21
82:2 103:6
114:18 119:23
128:13
**parties**   47:1,16
113:22 117:21
118:16 119:21
120:2,15 140:16
**party**   71:12
83:22,24
**passion**   124:24
**pause**   93:10
**pay**   17:12 76:1
83:5,21,21 85:16
85:16 86:6 94:1
95:3 96:2
**paycheck**   16:22
17:1
**paying**   78:18
96:6 97:6

**payment**  86:10
**payments**  84:2
**pedestal**  62:10
**pedestrian**  64:7
**penalties**  97:6
**penalty**  47:22
**people**  22:11
  39:11,23 43:11
  125:8
**perjury**  47:22
**permanently**
  35:7,18
**permission**
  21:12,15,19
**person**  42:18
  105:2,3
**personal**  109:5
  124:24 128:1
**personally**  19:10
  20:4,5 36:23
  37:9 39:13,14
  43:4 47:14
  107:19 111:4
  142:11 143:15
**persons**  25:6
  42:18
**pest**  13:6
**pg**  5:11,16,18,19
**pgs**  5:12,13,14
  5:15,17,20,21,22
  5:23,25 6:4
**phone**  141:3
**photo**  62:19
**photograph**
  28:13,21 29:3,12
  61:24 62:2
  63:22 64:2

**photographs**
  41:14 61:12,15
  61:19 63:14,19
  81:3 105:6,8
  106:9
**photos**  5:12,13
  5:18,19,21 61:21
  99:8 105:19
**phrase**  135:21
**pick**  131:17
**picture**  62:6,10
  81:1 87:2,9,13
**pictures**  30:24
  31:3 67:17
**piece**  20:25
  27:16,24 28:5
  46:13 56:19
  60:18 62:12
  76:16,20,20
  78:15 79:10,12
  79:24 80:18,19
  80:24 81:9,17,24
  82:4 91:3 94:21
  95:4,8,17,17,19
  95:20,21,21,24
  95:24 96:3 99:6
  99:7,15 101:23
  103:13,14,15,18
  103:19,21 104:4
  122:16 123:11
  125:10,18
  131:25
**pieces**  19:20,23
  20:4,5 22:9 38:5
  39:25 40:1,9,11
  43:3 47:1,17
  48:7,8 49:2
  50:21,22,23,25

78:2 79:9 85:19
  103:17 106:19
  107:6 122:24
  123:3,10,16
  124:3,17,22
  125:11,18,22
  126:3 129:16,18
  130:1,7,8 131:13
**pin**  111:13
**pins**  127:7
**placard**  62:9,14
  62:14,16 63:1,4
  63:6 65:3,6
**placards**  27:13
  27:15 60:2
**place**  85:6 87:10
  87:14 128:20
  140:7
**placed**  33:17
  34:1 40:12
  84:22 85:6
  102:11,13,16
  107:3,6 123:1
  124:23 140:9
**places**  90:18
  91:1,6 112:24
  128:17
**plain**  115:24
**plaintiff**  1:7 2:7
  2:16 3:3 7:21
  8:9
**plaintiff's**  23:22
  23:24 24:5 25:3
  28:16,18,20 29:3
  29:9 34:16,20
  35:8,19 44:5,8
  44:16 45:13
  46:2 55:4,7,21

57:21 58:1
  61:11,13 62:6
  63:10,12,15
  68:17,23 81:3,7
  86:25 91:14,22
  91:25 100:19
**plaster**  83:1,9,14
**play**  73:19
**playing**  98:24
**plaza**  2:16 7:12
  64:7 66:14,22,24
  137:1,3
**plea**  97:1,5
**pleading**  126:25
**please**  7:18,24
  9:1 10:9 17:22
  25:22 28:17
  29:10,11 33:4
  35:13 44:7 45:4
  46:24 48:14
  55:5 57:17,24
  60:25 61:12,15
  63:8,11 65:10
  68:21,24 69:4,23
  69:24 73:23
  81:5 86:25 87:9
  91:16 96:14
  141:11,11
**pled**  96:18,19,25
**point**  20:4 29:22
  31:23 34:12
  49:13,21 53:10
  64:20 66:8
  71:10 76:8
  86:16 106:16
  129:5 130:10
  132:16 135:3

pointe   54:24
    61:22 62:3,6,10
    63:19,24 86:14
    137:1,2
polished   83:16
portfolio   13:12
    123:22
portion   5:20
    68:18 119:3
posed   108:2
position   14:13
    27:22 38:12
    68:9 109:16,16
    109:19 129:20
    132:8 137:24
positions   14:12
possibility   116:9
possible   117:15
possibly   46:21
    65:5 91:2,3
    102:8 107:21
post   60:17
potential   116:20
precisely   85:14
predicate   38:1
    48:4 59:4,11,20
    67:10 84:24
    106:5
prepare   97:24
    99:12
present   4:3 7:18
    8:21,24 99:14
presented
    128:21
president   13:17
    13:20 14:5,7,13
    14:17,20,24 15:6
    15:10 19:6 51:5

51:7 55:25
presidents   14:9
pretty   71:6
previous   12:21
    73:6 103:19
    119:10 129:15
previously   13:17
    16:11 25:24
    103:9
price   101:11
primarily   17:4
printed   35:25
prior   46:14
    60:15,17 69:3,3
    70:6 110:9
    121:11 122:18
    135:9,15 140:8
privilege   137:25
privileged   33:5
    41:24 42:15
    43:7 137:15
probably   14:1
    22:8 29:25
    42:19 88:25
    110:9
procedure   142:5
    143:5
proceedings
    140:6,8,10
process   78:7
    125:4 131:23
produce   77:25
produced   74:6
    74:11 75:24
    76:7,16,16 79:12
    79:22 80:8
    85:20 91:12,12
    94:3 132:6

producing   77:3
    78:10
production
    141:15,17,22
professional
    2:20
profile   9:8
program   90:18
    91:1,7 92:23
progress   77:19
    84:2
progressing   84:8
project   17:12
    23:7 42:18,19
    62:4 82:22
    101:24 107:11
    109:18,21 125:9
    125:12,20,22
    131:9
projects   12:25
    51:14,14 53:23
    130:8,9
prominent
    123:17
properties   1:9
    2:9 7:8 11:7,9
    11:14,18,24 12:9
    12:16 13:9,11,17
    13:20 14:5,25
    15:2,10,20 16:4
    16:17 17:25
    18:19 19:2,6,13
    20:9,9 23:14
    26:3 27:12 39:8
    40:24 41:7,12,16
    47:17 48:22
    50:5,15 51:5,8
    54:23 56:23

57:22 58:6,21,23
    60:1,10 65:12
    67:9 68:20
    69:10,17,20
    70:15,17 84:23
    89:16 90:6,10
    96:10 102:19
    113:7 115:8
    124:2,4,12 126:4
    131:15 132:3
property   12:7
    102:16 123:22
    124:1 126:2
proposed   56:23
    57:2 93:24 94:6
proposing   54:22
prove   56:13
proven   59:1
    70:20
provide   10:13
    128:13
provided   117:22
provides   128:8
    138:10
provision   52:10
    52:12 115:6
    117:7 118:18
    119:11 128:7
    138:13
provisions   118:1
public   22:6
    31:18 32:8,16
    33:17 90:18
    91:1,6 92:22
    128:17 134:7
    142:10,18
    143:15,23
    144:23

**publicly** 20:8
31:24 103:7
111:8,20
**puffy** 80:3
**pull** 75:19 91:11
**pulling** 74:14
100:10
**purchase** 19:12
60:11 125:5
**purchased** 19:7
20:8 42:17
60:15,21 61:2,5
64:22 74:3,6
76:9,17 78:12
99:23 101:8,9,10
101:12,14,23,24
102:4 103:17,18
**purpose** 99:24
99:24 101:4,5,7
101:13,16 102:2
108:8 113:20,21
114:15 117:18
124:25
**pursuant** 35:6
**pursue** 128:9
**pursuing** 128:24
129:10,12,14
**put** 24:11 28:15
32:9,17,24,25
57:19 61:11
68:15 87:25
91:24 112:5,8
118:25 120:21
122:9 128:4,20
136:8,9 138:18
**putting** 28:16
60:23

**q**

**quantum** 23:3,6
23:7,10,14 25:4
25:18,19 30:25
31:18,25 33:17
37:24 42:7 87:2
103:8 106:3
109:14,14,21
111:3,9,15,21
125:11,12
130:18 134:20
136:17
**question** 12:21
14:3 18:6,21
21:21 22:16
26:23 27:9 33:6
33:12 34:2
36:19 37:13
38:2,17 42:1,22
43:7 49:6 50:9
50:18 54:12
59:12,16 67:12
67:14 68:8
70:23 73:15
93:18,20 97:14
99:19 100:7
101:2,3 103:12
106:7 108:2,10
108:13 132:15
133:6,10,19,19
133:24 134:1,4
135:6,13,16,22
136:23 137:6,6,8
137:9,23
**questions** 6:12
17:21,23,24 21:4
29:20 67:15
110:25 115:9

129:3 137:20
138:2,24
**quick** 29:8 38:22
93:13
**quite** 52:19
64:11 124:8,10
128:11

**r**

**r** 129:7,7 138:7,7
**raimondi** 52:4,5
52:15 54:17
56:18,24 57:3,8
57:13,21 58:6
59:19 60:11,18
60:20 61:3,6
65:13 68:13,19
73:9
**raimondi's** 53:6
54:23 58:21,24
59:9 60:14 66:1
66:12,25 67:4,8
67:18 68:6
70:15,18 71:8,17
71:22 72:9,19
73:1
**raise** 135:8
**raised** 113:24,24
114:6,6,17,18
120:14
**raquel** 1:22 2:19
7:16 140:23
**raton** 3:19
**reach** 50:4,21
**reached** 17:18
52:10
**reaching** 50:19

**read** 35:22 44:21
47:19 55:13
56:20 58:20
70:6,8 72:15
98:25 118:3
126:23 137:5
138:25 142:5,6
142:12 143:5,6
143:17
**reading** 37:5
69:25 71:1 72:2
100:25 101:1
141:19
**reads** 118:2
**ready** 55:17
**real** 90:9
**really** 61:8 75:3
93:13
**realty** 90:1,2,5,8
**reason** 51:11,12
101:12 141:14
143:8 144:3
**reasonably**
115:24
**reasons** 101:11
101:25
**reassurance**
119:1
**recall** 14:18
16:15 19:22
20:20 25:23
26:12 29:25
30:6,11,12,14,18
31:21 32:6,7
34:4,9 35:2 37:4
37:15 38:7 41:5
43:9 46:21
52:18,20 53:2,2

53:4,7,9,11,19
53:21 54:3,3,6
54:10,20,21,22
57:5,5,6,8,10,13
58:9,12,13 59:23
60:7,22 61:4,7
62:18 63:23
64:11,13,15,18
64:25 65:25
66:5,9,10,11,15
66:18 74:10,12
74:22,23,25
75:20 76:21
80:18,22 81:16
84:12,21 85:7
86:9,11,15,18,22
93:22 96:12
100:6 104:19
105:4 106:6,6,15
106:20 107:13
108:4 136:2,6
**receipt** 141:18
**received** 66:1,3,6
122:25 123:15
**recess** 22:22
31:12 39:2 44:1
48:17 51:23
75:9 88:5
110:21
**recognize** 28:12
56:2 61:19
62:22 63:21
64:2 81:13,16
87:6
**recollection**
27:18 30:21
37:17,20 46:22
53:15 56:22

57:12 60:12,17
66:20,20 67:9
76:7 79:15
80:11 85:15
92:21 107:1,4
109:10,13
116:18 122:20
125:5
**record** 7:5,19
8:11 9:23 10:2,4
10:5,9 22:19,21
22:23 24:18,21
24:22,23 31:9,10
31:13 38:24,25
39:3 43:23,24
44:2 45:4,5,7,8
48:14,15,18
51:21,24 58:9,15
60:7 68:10 75:7
75:10 88:2,4,6
91:21 96:15,19
110:19,22
112:10,11,13,14
135:16 139:2
140:9 143:9
**recorded** 7:7
**records** 49:22
84:9,14 94:11
123:14 127:6
**redundant** 94:13
**refer** 11:13,17
34:10 41:8
81:21
**reference** 25:6
136:17 141:7
142:2 143:2
**referenced** 46:9
142:11 143:15

**referred** 25:19
26:6,19 27:24
28:6 31:17,24
32:7,16 34:7
42:5 81:15
**referring** 43:19
46:16,18,19,22
65:17 80:16
**refresh** 53:15
56:22 92:21
**refreshed** 57:11
**refuse** 17:22,24
18:21 73:16
**refused** 6:12
**regard** 39:6
**regarding** 53:22
97:13 106:18
138:17
**regardless** 9:3
**register** 89:11
**registered** 2:20
**regular** 17:6
**reinforce** 118:13
**related** 125:4
**relative** 56:16
140:15
**release** 5:25
112:6 113:5
115:3 119:5,7
127:17
**releases** 117:22
**releasing** 116:13
119:20 132:17
**relegated** 39:11
**relevant** 18:15
**relief** 116:14,25
117:1,2,7

**rely** 49:16,21,25
134:2
**relying** 43:15
**remain** 127:3
**remedies** 115:4
**remember** 26:25
49:13 74:1
79:24 80:24
91:3 100:11
109:19 110:15
**remembering**
71:13
**remembers**
100:2
**remington** 22:9
22:10 105:17
**remote** 4:7
**remotely** 3:12,22
4:5,6,7 7:18
**removal** 106:23
107:2,11
**remove** 39:25
**removed** 32:8,16
32:24 33:1,3
37:19,25 38:9
39:21 42:23
43:15 47:16
48:22 49:3
106:25 111:12
117:13 121:14
121:18 126:3
128:19 136:2
138:22
**removing** 41:9
**rent** 76:2
**reopening**
117:15

**[repeat - saw]**                                                                     Page 25

**repeat** 105:15
**repetitive** 18:7
**rephrase** 42:3
**report** 5:11
  13:21,23,24,24
  13:25 14:2,3,8
  24:7 25:4 90:19
  90:20
**reported** 1:22
**reporter** 2:19,20
  7:16,24 8:22
  9:23 63:11
  112:2,4 122:2,3
  140:5 142:7
**represent** 8:9
  121:5
**representation**
  138:13
**representations**
  120:13
**represented**
  58:10,13
**representing**
  7:14 138:21
**represents** 76:22
**request** 107:21
  108:13 143:9,11
**requested** 6:9
  107:22 108:1,9
  108:14
**requests** 107:17
**require** 21:5
  102:14
**required** 39:21
  102:8,15 138:10
  141:25
**requirement**
  102:1,11,23

**requirements**
  102:5,22,25
  103:2
**requiring** 60:1
  126:14
**reserve** 138:2
**reserved** 128:9
**residence** 11:3,5
**residency** 11:2
**resign** 14:17
**resigned** 14:25
**resize** 81:8
**resold** 101:11
**resolve** 138:3
**respect** 26:25
  68:6
**respond** 34:2
  59:16
**response** 32:3
  126:24 133:18
**responses** 99:21
  107:17
**responsibility**
  38:13,19 90:17
**responsible**
  107:11
**responsive** 22:16
  107:24
**rest** 93:10
**restroom** 22:18
**result** 97:5 115:6
**retail** 23:8
**retained** 139:5
**returned** 141:18
**returns** 98:7
**reveal** 42:15
**reversed** 131:4

**review** 107:23
  141:12 142:1
  143:1
**reviewed** 29:22
**revise** 12:20
**revised** 5:22
  91:13,25 92:5
**right** 9:11,18
  10:8,21 11:3,13
  11:20,24,25
  12:11,12 13:1
  14:17 16:13
  18:14,15 19:1
  20:20 22:18
  23:21 24:9
  27:20 28:12,15
  29:11 30:9 33:1
  34:25 36:9
  37:17 39:6 40:1
  42:10 44:14,14
  44:20 45:23,25
  47:5,8,15,19,25
  49:9,12 50:1,3
  51:17 52:2,21
  53:16,17,20 54:8
  56:8 60:19
  61:22,23 62:19
  62:19 63:21,25
  65:9 68:13
  69:10,22,23 71:5
  71:9,21 73:22
  77:4,8,12 83:7
  83:18 84:1 85:3
  85:9 86:20
  87:12 88:8,11
  89:2 90:16
  94:20 95:4
  96:13 97:9

  101:3 102:14,24
  102:24 103:3
  105:8 106:22
  107:8 109:20
  110:13 111:24
  111:24 113:3
  126:22 128:9
  130:19 131:1,9
  131:11 132:2,24
  133:3,18 135:18
**rock** 79:18,18
**roll** 79:14
**room** 8:21,24
  66:13,24 76:3
  79:6
**rpr** 1:23 140:24
**rubber** 80:19,20
  83:17,18,25
**rules** 142:5
  143:5
**run** 45:1 126:9
  131:2,5
**russia** 10:22
  129:17

**s**

**s** 141:15 143:8,8
  144:3
**sachs** 3:16
**sake** 27:23
**san** 77:25 107:15
**sanctions** 44:17
  46:2
**satisfy** 124:23
**satisfying**
  114:11
**saw** 28:13 35:2
  75:17 103:13

108:23
**sax** 3:16,17 5:6
7:23,23 8:12 9:7
9:13,18 10:1
18:14 21:20
22:1 23:16 24:3
24:10,14,16,18
25:10 26:8,20
27:4 28:1,8,22
29:14 30:3 31:1
31:19 32:1,11,19
33:4,23 35:10,14
36:3 37:2,11
38:1,15 40:5,17
41:2,22 42:13
43:6,17 48:4,24
49:18 50:6,16
51:20 52:8,23
53:25 54:11
56:9 59:4,11,20
60:4 64:16
65:14 67:10,20
67:24 69:1 70:4
70:10,22 72:11
72:21 73:3,12
80:9 84:24
85:24 86:8
87:22 88:18
92:6,24 93:13
94:22 95:5,22
97:11,21 98:21
99:25 100:4
101:19 103:11
104:16 105:1,12
106:5 112:2,5,19
113:9 114:25
117:10 119:15
120:3,20 121:1

121:11,24 122:8
122:11 126:22
129:3 131:1,20
132:12 133:5,14
133:23 134:12
134:22,24
135:10,15,25
136:9,13 137:15
137:22 138:5,8
138:24 141:5
**sax's** 133:19
**saying** 51:7 71:6
71:10,12 72:1,2
95:19 104:2
114:17
**says** 24:14,16
25:15,16,17
34:11,11,25 35:9
35:16,21,22 36:6
36:7,10,15,15,16
36:16,21,21
44:15,18,19
45:25 46:8,12
47:3,7,8,9,20,23
47:23 48:12
53:14,14 54:2,2
55:23,25 56:7,7
56:8,12,12,21
60:7 61:18,20,22
62:2,11,19 63:4
63:16,19,20
68:10,10,10,25
69:5,21 70:1,13
70:25,25 71:1,1
71:2,2,7,14,14
71:15,15 72:4,5
72:6,6,7 73:21
73:21 92:1

98:18 113:20
115:23 116:11
117:21 118:16
119:4,20 121:12
122:16,24
123:13 124:22
126:2 127:1
136:25
**scale** 19:20
44:22 78:10
83:5,7,10 94:15
**scan** 93:13
**schedule** 79:2
**scope** 21:10
**screen** 9:10,12
9:14,16 23:23
24:10,16 112:5
120:21 128:5
138:18
**scroll** 29:10,10
35:13 46:24
55:14,18 61:14
63:13 68:24
69:4,22 70:12
86:24 87:8,12
92:6,14 112:21
121:2 122:11
**scrolling** 92:11
**sculpted** 103:24
105:18,20,22
**sculptor** 52:4
73:25 98:23
99:4,6,10 107:15
**sculpture** 19:15
19:17 20:14
27:1,3,7,7 31:17
31:24 32:7,15
34:7 46:19

54:23 56:16,17
56:23 57:3
60:21 61:2,5
62:5,22,24 63:22
63:23,25 64:2,4
64:10,23 65:2
75:1 76:4 80:21
80:22 81:15
82:22 83:6,7
94:2,13 99:12
102:8,11,12
103:7 105:17
106:3,8,10 107:3
126:10,14
128:16 129:11
**sculptures** 19:24
20:7,12,20 26:3
26:6,13 27:11
28:13 30:24
31:6 32:23 33:9
33:16 37:17,18
38:7 39:12 42:5
42:11 47:16
50:15 60:11,14
61:19 65:12,18
66:3,13 70:14
74:3,5,11,16,20
75:15,22,23 76:8
76:12 78:10,11
99:22 102:15
103:6 104:25
115:16 117:2,14
121:18,22 123:4
123:11,16,22
124:17 125:5
126:3 127:2,8
128:8,12,25
130:23 131:10

**[sculptures - sincerely]**

132:4 138:11,15
138:21
**seal** 142:15
143:21
**sealed** 83:17
**search** 66:23
107:19 108:6,9
108:11,15
**searched** 109:2
**searching** 108:4
108:6,7
**second** 13:5 29:5
29:6,8 46:4,24
56:15 68:15,24
100:18 112:7
121:9 135:10
137:23
**secondly** 38:4
**section** 117:21
118:1,3 119:4
**see** 9:10,13,14,17
24:2,3,4,11 25:4
25:8,9 34:22,23
34:24,24,24
35:12,16,21 36:5
36:6,16,24 44:10
44:11,17,18,22
44:25 47:23
50:5 55:3,11
61:16,21 62:15
63:14,16 66:24
68:14 69:7,8
70:1 81:2 83:6
87:18 92:2,3
93:1,1,4 100:2
100:12,20,21
107:2,21 113:20
115:3 116:19

128:3,7 136:19
**seeing** 25:16
55:12 66:19
104:19
**seen** 35:1 66:18
86:20,23 91:5
104:20,24 105:4
105:6,8,9 106:13
108:24
**select** 19:12
131:24
**sell** 74:13,14
**selling** 74:12
75:18
**send** 94:15
**sense** 42:2,3
**sent** 35:23
**sentence** 119:23
**separate** 45:17
115:9
**servants** 35:17
**serves** 114:15
**services** 90:1,2,5
90:8,9
**set** 9:19 17:7,7
72:7 140:7
**settle** 113:21
**settled** 114:21
**settlement** 5:24
57:12,14 112:6
113:4 119:9
127:17,21 128:4
128:7 132:9
133:12,20 134:7
134:10,15
137:20 138:9,14
**seven** 22:9 70:14
121:15,17

**shape** 28:25
103:22
**share** 23:23
24:15,16,17
28:16 44:7 55:1
55:5 57:24
63:11 68:21
77:20 81:4
91:16 100:18
**shared** 29:4
**shareholder**
16:9,11,14
**sharing** 45:12
**sheet** 78:9
141:13 143:7,10
143:18 144:1
**shift** 73:24
**shipments**
122:25 123:2
**shipped** 64:21
**short** 55:2 95:16
121:3 123:4
**shorten** 95:15
**shorthand** 2:19
140:4,10
**shot** 95:23
**show** 23:21
43:19 53:12
63:9 71:5 75:20
81:1 91:9,14
92:7 99:25
100:7,9 126:18
132:3
**showed** 30:24
31:4 99:8 106:9
135:25
**showing** 28:20
72:1 75:16

**shown** 25:2
67:17 106:8
135:24 141:16
**shows** 96:20
**sick** 17:20
**side** 9:10 44:14
76:22
**sign** 27:16
**signature** 55:24
56:2 112:24,25
121:8,9 122:12
122:13 140:23
141:14
**signed** 51:4 98:1
101:6 113:13
127:25 132:9
133:21 134:11
142:13 143:18
**significance**
113:25 114:7,19
115:10,19 116:4
116:16 118:4,20
**significantly**
103:19
**signing** 118:25
141:19
**similar** 65:13,16
65:19 79:25
80:7
**similarly** 61:5
94:5
**simple** 71:6
**simpler** 42:22
**simply** 11:13
45:22 116:6
123:17 137:3
**sincerely** 141:21

**sir** 8:19 9:1
  10:16,25 13:2
  18:10 24:2
  29:18,20 34:22
  35:16 36:17
  53:13 55:17
  69:7,25 70:21
  96:15 97:9
  99:20 107:16
  108:18 132:8
  136:25 141:10
**sit** 71:16,21 78:9
  104:13
**site** 128:20
**sits** 64:4
**six** 22:8 73:13
**size** 78:14 83:6
**sized** 83:19
**sketch** 82:16
**skip** 70:12
  100:20
**sleep** 21:3
**slightly** 103:14
  104:3 105:23
**slip** 115:15
**slowly** 112:21
  121:3
**small** 27:16
  35:22 66:3,12
  76:24
**smaller** 19:23
  83:2
**smith** 3:4
**smithamundse...**
  3:10,11
**sold** 75:24
  129:16

**solely** 109:5
**solicit** 73:14
**solutions** 7:15,17
  139:6 141:1
  144:1
**somebody** 15:21
  50:14 66:23
  83:24 107:14
  109:25
**somebody's** 72:1
**son** 89:20
**soon** 50:25
**sorry** 7:13 16:25
  25:21 31:7
  43:20 48:13
  52:15 69:2
  79:11 92:18
  120:18 122:3
**sort** 75:1 77:3
  78:4 131:15
**sought** 89:11
**sound** 3:18
**sounded** 79:22
**sounds** 80:23
  137:15
**sources** 131:13
**south** 3:7 12:18
**southern** 1:3 2:3
  26:4 27:12
**space** 12:11
  123:23
**speak** 58:9,18
**speaking** 53:19
  54:3,6
**speaks** 25:17
  30:3 35:10 56:9
  56:12 60:7
  132:15 134:16

135:11 136:6,19
**specific** 39:18
  91:4 96:20
  101:23 102:10
  102:10 104:13
  105:10,11
  118:15 119:11
  125:21 137:6,6
**specifically**
  52:17 86:5
  90:15 102:7
  118:25 125:12
  126:6 137:9
  138:20
**speculate** 33:24
**speculating**
  42:16
**speculative**
  101:19
**spencer** 3:17
  7:23 30:6 51:19
  122:5 136:7
  137:17 141:5
**spoke** 53:16 54:8
  54:15,17 110:7
  110:13
**spoken** 31:5
  54:21 110:10
**springs** 19:5
**square** 12:10
  123:23
**ssax** 3:21
**ssclawfirm.com**
  3:21
**st** 3:8 8:12
**stainless** 36:13
  65:18

**stand** 54:19
  68:12 70:21
**stands** 72:22
**start** 12:6 70:9
  126:1 128:6
  135:23,23
**started** 137:22
**starting** 70:7
**starts** 46:8
  100:24
**state** 7:19 10:8
  56:15 98:9
  136:21 140:5
  142:10 143:15
**stated** 47:4
  53:24 99:21
  115:14
**statement** 47:11
  47:25 98:1
  119:4 122:19
  123:19 124:19
  124:20 127:3,4
  142:13,14
  143:19,19
**statements** 97:24
  98:4
**states** 1:1 2:1 7:9
  10:22 58:4
**stating** 43:14
**statute** 126:9
  131:1,5
**stay** 81:12
**staying** 103:5
**steel** 36:13 65:18
**steering** 104:11
**step** 116:5
**steve** 109:25

[stick - terms]

Page 29

stick   121:7
stipulated   68:13
stipulation
58:19 59:3
70:21
stone   98:13,13
98:19 99:3,9
103:16 105:22
128:19
stop   69:23 87:1
92:12
stopped   128:23
129:10,12
stopping   130:7
storage   32:9,17
32:24 66:13,23
stored   33:13,13
33:15
straits   76:1 79:3
strike   13:16 15:9
22:13 54:16
61:9 74:17 84:9
99:16,17 105:24
106:1 129:19
studio   76:2,3
77:20 79:6
subject   40:8
106:2 126:11
137:24
submit   54:23
98:4
submittal   56:16
56:23,23 91:3
92:5
submitted   30:19
44:6 46:4 91:6
107:17

subscribed
140:17 142:10
143:14 144:21
subsidiaries
13:9,11,15,15
19:13 20:10
41:12,17 50:4,14
50:20 51:13
89:16 90:11
subsidiary   23:14
90:5
substance   53:21
substantial   12:5
substantially
12:2
sue   113:15 133:3
sued   25:23 34:5
57:8 99:8
suit   26:2 27:13
57:13 60:20
suite   3:7,18
141:2
superior   141:1
support   44:15
46:1 78:13
supporting
78:19
supposed   105:14
108:5 117:13
sure   10:1 13:8
14:12 15:5 20:2
22:19 27:18
30:17,17 39:20
42:4 43:9 51:20
55:13,13 58:16
62:8 67:17 72:6
75:6 82:2 84:7
93:4,15 100:4

113:12 114:13
114:22 115:12
115:17 116:22
118:9,23 129:4
surprise   59:8
suspect   116:8
119:6
suspected   115:7
116:3,7 117:24
118:5
swear   7:25
switch   52:2
sworn   7:20
142:10,13
143:14,18
144:21
system   55:3

**t**

t   8:6 112:18
129:7,7 138:7,7
take   9:2,2,4
22:17 25:21
29:19,22 31:7
34:18 38:22
43:21 48:13
51:19 55:13
57:17,23 60:25
61:12 63:8 65:9
73:22 75:4
96:13,23 103:3
109:24 110:17
112:20 120:20
122:8 123:13
128:23 137:24
taken   2:16 88:5
140:6

takes   20:16
talk   77:21 80:6
80:21
talked   77:24
talking   26:25
75:13 82:12
105:1 124:3
talks   53:21
117:20
tax   96:18 98:7
taxes   97:6
taylor   25:14
tear   26:7,19
27:24 29:1,12
31:24 32:16
36:12,13,13,25
37:24 41:20
42:6 46:17
111:15,20
121:14 129:21
teardrop   26:16
26:18 27:1,24
28:6 46:20
technician   4:7
technology
45:11
teetering   80:2
tell   18:10 34:2
55:14 60:23
104:13 105:10
109:4
telling   89:8
tennessee   12:18
term   82:22
98:13
terms   20:24
27:22 98:12
120:19

**testified** 8:4
30:16 40:8
43:20 66:19
82:15 85:19
104:18 105:15
129:9,9 131:9
132:21 134:16
137:18
**testifying** 53:8
65:25 66:11
135:3 140:9
**testimony** 10:13
53:13 66:5,15
75:21 80:17
133:15,18 139:3
142:6,7 143:6,9
143:12
**text** 107:24
108:11
**thank** 13:7 25:22
29:11 52:13
55:16 56:4 61:1
69:23 110:4
111:25 112:1
139:1,6
**thanks** 70:10
**thereabout**
56:25
**thereof** 47:2
140:13
**thicker** 103:22
**thing** 9:7 55:11
66:16,17,21
**things** 49:25
64:21 77:3
**think** 13:22,23
36:19 37:16
46:19 52:6,19,19

54:2 60:14 73:9
76:23 79:21
85:10,14 86:9
87:19 88:14,25
90:1,4,7 91:7
93:10,11 107:13
107:14 108:3,21
108:24 109:1,24
110:15,18
115:23 124:14
126:7 129:14,17
129:24 131:22
132:14,18 135:4
136:10 137:18
138:1,1
**thinking** 22:17
**third** 83:22,24
122:13,24
**thirty** 141:18
**thought** 38:18
38:19 59:14
88:24 89:5
114:20 132:23
**three** 9:5 31:8
43:21 61:11
**tim** 56:5
**time** 10:3,6,9
15:6,16,18,22,23
18:5 22:21,24
24:12,21,24
25:16 30:22
31:11,14,16 32:9
32:15 39:1,4
40:14 43:25
44:3 45:6,9 48:1
48:16,19 49:5
51:4,22,25 53:23
56:18 60:23

62:16 63:1
64:20 65:2
69:15,17 74:3,5
75:8,11 78:25
79:4 82:6,8
84:10,13 88:4,7
91:2 94:19,19
97:14,15 108:6
110:7,13,20,23
112:12,15 119:7
123:2 125:3
127:20 132:16
139:1,3,7 140:7
**times** 17:5
134:22
**tired** 17:21
**today** 9:1 10:12
10:13 12:9,9
14:20 16:3 20:5
35:1 63:4 71:16
71:21 85:3
104:13 122:20
123:7,19 139:3
**told** 18:1 80:14
114:16
**top** 125:25
**torso** 79:17
**total** 139:4
**totally** 106:7
115:18 134:4
**towers** 64:5
**town** 23:3,6,7,10
23:14 25:4,18,19
30:25 31:18,25
33:17 37:24
42:7 87:2 103:8
106:3 109:14,14
109:21 111:3,9

111:15,21
130:18 134:20
136:17
**track** 135:22
**transcribed**
140:11 142:7
**transcript** 5:20
68:18 141:11,12
142:5,12 143:5
143:11,17
**transcription**
140:12
**travel** 11:1
**treat** 58:25
70:19
**trial** 30:14,16
68:18,19 70:6,9
**troubles** 45:12
**truck** 107:3,6,9
**true** 47:4,25 48:2
104:8 126:7
**trumbower** 4:5
122:7,10 135:14
136:12
**trust** 20:3
**try** 52:11 67:17
87:18 106:12
111:13
**trying** 56:13
73:18,18 95:11
108:9 115:20
137:7
**turn** 110:25
119:19 120:3,4
126:22
**tv** 9:12,14,16
**twice** 52:7,16

**two** 7:23 32:23
33:9 38:7 40:9
40:25 43:3 48:3
48:8 50:23
58:22,24 61:15
61:19 63:14
64:4 67:5 70:16
70:18,19 71:9,18
71:23 72:9,19
73:1 80:1,12
84:19 85:11,19
86:17 96:24
99:22 103:5
104:11,24 106:9
112:24 121:4,4
121:18 125:11
125:21 127:8
128:12 129:16
130:1,7,10 138:5
139:5
**type** 75:1

**u**

**u** 129:7 138:7
**uh** 77:11 93:9
**ultimately** 83:4
**um** 10:15 11:1,2
11:2,5 12:4,24
13:22,24 14:9
15:5,17 16:7,22
16:22 17:2,3,10
17:10,14 18:1
19:8 20:16,19
21:5 22:3,6,7
23:5,18 28:24
33:25,25 34:1
36:20 37:5 38:8
39:11 41:7 43:2

43:2 44:11,23
46:21 50:21,25
51:15 52:18
58:8 61:24 62:4
65:17 66:15,18
67:2 68:8 69:14
71:2 74:6,9,9
75:23,24,25 76:6
76:13,20,20 78:8
79:2,6,12,13,24
79:24 80:19
83:1,5,5 87:25
89:8,10 90:1
91:2 94:2 95:18
101:24 103:16
104:19 107:2
111:11 114:23
116:19 117:13
125:7 130:25
131:24 132:5,15
132:16,16
133:15 135:3
**un** 130:2
**unauthorized**
60:3
**unaware** 130:2
**uncovered**
129:25 130:6
**uncovering**
130:8
**underneath**
63:18
**undersigned**
140:4
**understand**
10:18 11:9
12:17 14:3
19:15 27:20

42:1 75:17
95:15 117:22
118:24 119:10
120:5
**understanding**
52:9 113:3
116:15 117:5
120:8 121:21
126:12 132:22
133:8,9,11,16,20
134:9,17,19
**understandings**
120:13
**understood**
119:25,25
**undertake**
107:19
**unfortunately**
11:1
**unhook** 13:5
**unique** 105:16
105:23
**unit** 7:6
**united** 1:1 2:1
7:9 10:22 58:4
**units** 12:13 23:9
139:4
**unknown** 114:3
115:5,20 132:18
**unrelated** 89:22
89:23
**unsuspected**
115:7 116:3
**untitled** 34:8
35:8,20 47:2,16
126:3
**unwritten** 79:1

**uploaded** 29:7
91:17
**ups** 138:5
**upsidedown**
82:7
**use** 18:25 19:3,4
52:23 57:3
67:24 68:5
108:18 109:5
114:5 115:10,19
118:4

**v**

**v** 141:6 142:3
143:3
**value** 102:16
128:22
**various** 20:22
50:4,5 51:13
53:23 122:25
124:13 127:14
131:13
**venture** 47:18
126:5 137:2
**verbatim** 140:9
**verdict** 59:18
**veritext** 7:14,16
24:13,14,17
139:5 141:1,7
144:1
**veritext.com.**
141:17
**version** 76:24
83:3
**versions** 66:3,13
86:20
**versus** 7:8 68:19

**vertical** 81:9
**vice** 14:9
**video** 7:7 8:15
**videographer**
4:4 7:4,15,24
8:16,21 9:11,16
9:21 10:2,5
22:20,23 24:5,7
24:9,20,23 29:5
29:7 31:10,13
38:25 39:3
43:24 44:2,24
45:2,5,8 48:15
48:18 51:21,24
55:6,14 57:25
75:7,10 81:6,10
88:3,6,9 91:17
92:8,13 93:17
100:13,17
110:19,22
112:11,14 139:2
**violate** 52:11
**virtual** 24:14
**virtually** 79:13
79:23
**volunteered**
137:21
**vs** 1:8 2:8

**w**

**wait** 135:10,10
**waiting** 91:18
**waive** 117:6
**waived** 119:12
137:18 138:2
141:19
**waiver** 117:25
137:25

**waiving** 116:13
120:1
**wakefield** 1:6
2:6 4:6 7:8,22
8:10 11:10,22
25:24 26:2
27:13 28:5
29:21 30:2,23,23
31:5 34:5,6,7,17
35:3 37:19 38:5
38:9 40:3,10,15
40:20,25 41:15
42:7 44:6 46:4,5
47:2,7 99:3,11
103:16,21
106:18 110:11
113:6,12,14
114:10,21,22,24
115:7,14 116:12
116:23,24
117:16 118:23
119:2,12,20
121:6 126:8,25
127:11,11,20,22
128:9,24 129:10
129:20,25 130:1
130:3 132:7,17
132:24 134:11
134:21 135:8
137:13 141:6
142:3 143:3
**wakefield's**
34:10 38:12
132:10 133:21
**walk** 44:13
**want** 11:17
13:23 18:9,11,12
19:18 27:23

36:22 52:3
53:12 57:14,15
66:9 67:11
68:11 71:14
73:24 87:25
90:23 92:7,8
93:4 95:2,11,15
97:15,20 98:16
99:18 112:8
117:15 118:7
126:20 134:25
137:5
**wanted** 74:13
77:7,10 78:14,14
107:2 113:11
114:13,22
115:12,17
116:22 118:9,23
132:10,23
136:24
**wants** 92:12
135:4
**warranted** 17:15
**water** 54:5
**way** 9:19 46:25
50:8 51:1,8
62:13 73:4 75:3
76:14,14 78:21
88:25 92:21
93:21 94:18,25
95:14,17 97:23
103:21 127:7,8
127:19 128:23
**ways** 73:14
**we've** 23:22
45:11 51:17
63:10

**website** 13:13
**webster** 98:16
**webster's** 98:17
98:25
**week** 17:8 18:3
77:16,18 95:25
**weekly** 76:13
86:3 94:3
**went** 78:19 79:7
96:3 115:15
118:13 126:15
131:3
**whatever's**
96:25
**whatsoever**
115:5,11 128:22
**wheel** 104:11
**wheels** 104:11
**whereof** 140:17
**wife's** 11:5
**william** 69:6
**willing** 136:21
**wish** 73:14 95:8
**witness** 5:2 6:12
7:19,25 8:17
18:16 21:22
22:3,15 23:18
24:4 26:10,22
27:6 28:3,10,24
29:16 30:5 31:3
31:21 32:3,13,21
33:7,25 35:12
36:6 37:4,14
38:3,18 40:7,19
41:5 42:1,16
43:9,18 44:25
45:3 48:6 49:1
49:20 50:8,18

**[witness - zoom]**                                      Page 33

52:13,25 54:2
55:8,16,18 56:11
59:6,13,22 60:6
64:18 65:16
67:12 68:2,21
70:24 72:13,22
73:5,13 80:11
81:4,11 85:1
86:1,9 87:23
88:20 91:16
92:7,10,16 93:1
93:16,18 94:24
95:7,24 96:5
97:16 99:17
100:6,20 101:22
103:13 104:18
105:4,14 106:6
112:1 119:14
131:22 132:14
133:6,15,25
134:14 135:2,20
140:17 141:8,11
142:1,4,11 143:1
143:4,15
**witnessed**  107:5
**witnesses**  140:8
**witness'**  141:14
**woman**  76:23
**word**  21:6 52:23
67:25 68:5
73:16,19 98:24
98:24 100:3
101:20 115:10
118:4
**wording**  116:20
**words**  66:2 99:2
114:5 115:20

**work**  14:16
16:16 17:3,8
18:3,10,18 21:9
21:11,15,19,25
35:8,19 46:14,16
46:23 62:17
66:25 67:8,8,18
68:6 78:2,6,7
79:2 84:8 88:16
109:14 122:17
129:16 131:18
132:3
**worked**  18:9
76:11,17 78:21
81:17 82:4,11,11
99:9 103:16
**worker**  99:9
**working**  79:8
82:14 107:14
**works**  89:24
**world**  128:9
129:1
**worth**  97:10
**write**  72:3
**written**  17:14
35:23 73:20
78:22
**wrong**  21:18,24
88:14 90:4

**x**

**x**  8:6 112:18
129:7 138:7

**y**

**yeah**  8:16,17
24:9 29:6 55:13
80:4 81:1 87:23
89:1 92:16

94:24 95:18
105:3 106:1
124:7,10 130:23
**year**  60:19 82:22
98:9
**years**  10:23
14:18 15:25
19:7 20:7 42:11
46:14 53:10,11
54:4 78:20 79:7
79:16 94:7 98:2
110:16 122:18
**yep**  88:9
**young**  79:5

**z**

**zhou**  103:23
**zoom**  92:8

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.