Page 1

1              UNITED STATES DISTRICT COURT

2          FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                   SOUTHERN DIVISION

4

5    DONALD WAKEFIELD,              ) Case No.: 8:21-cv-
                                    ) 1585-CJC-DFM
6              Plaintiff,           )
                                    )
7    v.                             )
                                    )
8    OLEN PROPERTIES CORP., IGOR    )
     OLENICOFF, JOHN LIANG and Does 1 )
9    through 10, inclusive,         )
                                    )
10             Defendants.          )
     _____)

11

12

13

14

15      VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

16                  DONALD WAKEFIELD

17             Newport Beach, California

18             Tuesday, November 8, 2022

19

20

21

22   Reported by:

23   JANA J. BOMMARITO

24   CSR No. 10880

25   Job No. 5565883

Page 2

1                UNITED STATES DISTRICT COURT

2            FOR THE CENTRAL DISTRICT OF CALIFORNIA

3                     SOUTHERN DIVISION

4

5    DONALD WAKEFIELD,              ) Case No.: 8:21-cv-
                                    ) 1585-CJC-DFM
6              Plaintiff,           )
                                    )
7    v.                             )
                                    )
8    OLEN PROPERTIES CORP., IGOR    )
     OLENICOFF, JOHN LIANG and Does 1 )
9    through 10, inclusive,         )
                                    )
10             Defendants.          )
     _____)

11

12

13           Videotaped videoconference deposition of

14   DONALD WAKEFIELD, taken on behalf of Defendants, at

15   Premier Workspaces, 23 Corporate Plaza, Suite 150,

16   Newport Beach, California, beginning at 10:13 a.m.,

17   and ending at 1:57 p.m., on Tuesday, November 8,

18   2022, before Jana J. Bommarito, Certified Shorthand

19   Reporter No. 10880.

20

21

22

23

24

25

Page 3

1     APPEARANCES:

2

3     FOR PLAINTIFF DONALD WAKEFIELD:

4               SMITH AMUNDSEN
                BY:  GENE J. BROCKLAND, ESQ.

5               120 South Central Avenue
                Suite 700

6               St. Louis, Missouri 63105
                (314) 719-3732

7               gbrockland@smithamundsen.com

8

      FOR DEFENDANT OLEN PROPERTIES CORP. and IGOR

9     OLENICOFF:

10              SACHS SAX & CAPLAN
                BY:  SPENCER M. SAX, ESQ.

11              6111 Broken Sound Parkway NW
                Suite 200

12              Boca Raton, Florida 33487
                (561) 994-4499

13              ssax@ssclawfirm.com

14

      THE VIDEOGRAPHER:

15
                ZAVEN BAGHDANIAN

16

17    ALSO PRESENT:

18              LYNN TRUMBOWER, LITIGATION PARALEGAL
                DALE LYON, SECURED HOLDINGS

19

20

21

22

23

24

25

Page 4

1                          I N D E X
2     WITNESS                                  EXAMINATION
3     DONALD WAKEFIELD
4                                                  PAGE
5              BY MR. SAX                            6
6
7
8
9                       E X H I B I T S
10    Exhibit No.          Description        Page Marked
11
      Exhibit 17      Joint Copyright Ownership      38
12                    Agreement;
                      Bates W00005-W00008
13
      Exhibit 18      Photographs;                   69
14                    Bates W00009-W00013
15    Exhibit 19      Photograph;                    77
                      Bates WAKEFIELD 0590
16
      Exhibit 20      Judgment in Wakefield I        144
17
18
19
20
21            Witness Instructed to Not Answer
22                    Page         Line
23
24                     60           17
25                     61           25

Page 5

1     Newport Beach, California; Tuesday, November 8, 2022

2                    10:13 a.m. - 1:57 p.m.

3

4          THE VIDEOGRAPHER:  Good morning.  We are going

5     on the record at approximately 10:13 a.m. on          10:12

6     November 8, 2022.  This begins Media 1 of the video

7     deposition of Donald Wakefield in the matter of

8     Donald Wakefield vs. Olen Properties Corporation,

9     et al., Case Number 8:21-cv-1585-CJC-DFM.

10          This deposition is being held at              10:13

11     23 Corporate Plaza, Suite 150, Newport Beach,

12     California 92660.  My name is Zaven Baghdanian from

13     the firm Veritext and I'm the vid- -- videographer.

14     The court reporter is Jana Bommarito.

15          Counsel will now state their appearances       10:13

16     and affiliations for the record.

17          MR. BROCKLAND:  Gene Brockland for the

18     plaintiff.

19          MR. SAX:  Spencer Sax for the two defendants.

20          THE VIDEOGRAPHER:  Will the court reporter      10:13

21     please swear in the witness.

22     ///

23     ///

24     ///

25     ///                                                 10:13

Page 6

```
 1                    DONALD WAKEFIELD,

 2   having been first duly sworn by the Certified

 3   Shorthand Reporter, was examined and testified as

 4   follows:

 5                                                10:13

 6                     EXAMINATION

 7   BY MR. SAX:

 8       Q    Please state your name.

 9       A    Don Wakefield.

10       Q    And what is your residential address?    10:13

11       A    47768 Pembroke Drive, Canton, Michigan.

12       Q    What's the zip code there?

13       A    41188.

14       Q    Are you currently employed?

15       A    I'm self-employed.                       10:14

16       Q    How long have you been self-employed?

17       A    Since about 1980.

18       Q    And what do you do for a living right

19   now?

20       A    I'm the president of the Great Lakes Arts   10:14

21   Foundation.

22       Q    And what do you do as president of the

23   Great Lakes Arts Foundation?

24       A    We help other foundations expand their

25   programming.                                      10:14
```

Page 7

1        Q     Does Great Lakes Arts Foundation provide

2    programming?

3        A     Not right now.

4        Q     Okay.  Does it do anything currently?

5        A     Yes.  We're working with another              10:14

6    organization to expand their programming.

7        Q     Okay.  And this is programming in the

8    arts?

9        A     Correct.

10       Q     Any particular art?                            10:15

11       A     The visual arts.

12       Q     And how long have you been president of the

13   Great Lakes Arts Foundation?

14       A     A little over three years.

15       Q     What did you do before that?                   10:15

16       A     Sculptor.

17       Q     Okay.  And when was the last time you

18   sculpted a -- a -- anything?

19       A     Well, I always worked on projects.  I have

20   some going on right now.                                 10:15

21       Q     Okay.  So you still consider yourself a

22   sculptor?

23       A     Yes, but my focus is --

24       Q     Okay.

25       A     -- more with the foundation.                   10:15

1   Q I understand.

2    How many years have you been more focused

3 on the foundation than as a sculptor?

4   A About three.

5   Q Okay.  And before that were you a full-time 10:15

6 sculptor?

7   A Yes.

8   Q Is that what you did for a living?

9   A Yes.

10   Q Was that your sole means of support? 10:15

11   A Yes.

12   Q When did you start sculpting?

13   A About 1980-ish.

14   Q Okay.  And you've been active as a sculptor

15 until about 2019? 10:16

16   A Yeah.  Well, I -- I still am active.  I

17 mean --

18   Q I -- I understand.

19    But as your full-time job rather than as a

20 part-time job? 10:16

21   A Ye- -- yeah, I guess, about that.

22   Q Okay.  And the -- the -- you've given a

23 deposition before; is that correct?

24   A Correct.

25   Q How -- how many depositions have you 10:16

Page 9

1    given?

2         A    Just one.

3         Q    Okay.  Was that in Wakefield I?

4         A    Yes.

5         Q    Okay.  Have you been involved in any other      10:16

6    litigation other than Wakefield I, Wakefield II, and

7    this lawsuit involving alleged copyright

8    infringement?

9         A    No.

10        Q    Have you been involved in any litigation on      10:16

11   any subject during your adult life other than these

12   three lawsuits?

13        A    Yeah, one.

14        Q    Which other one?

15        A    Small claims court.                              10:16

16        Q    Okay.  And what year was that

17   approximately?

18        A    1995, somewhere in there.

19        Q    You understand generally I'm going to ask

20   you questions today.  You're under oath.  You're       10:17

21   going to answer to the best of your ability.  If you

22   don't understand a question, you will tell me.

23   Otherwise I'm -- I'm going to presume you understood

24   what I asked you.

25             Is that fair?                                   10:17

Page 10

1      A    Sure.

2      Q    Okay.  All right.  Regarding the piece

3   Untitled, the subject of this lawsuit, have you ever

4   sold Untitled to anyone?

5      A    Well, it was sold originally.          10:17

6      Q    Okay.  And who was it sold to originally?

7      A    Chick Glickman.

8      Q    Okay.  And how much did you sell it to him

9   for?

10     A    I don't remember exactly right now.      10:17

11     Q    How about approximately?

12     A    Well, it was set up by the hour, so it was

13   $35 an hour back in --

14     Q    Okay.  But can you give me a gross number

15   approximately?  Are we talking less than 5,000, more?   10:18

16   Just can you give me an approximate?

17     A    Around 35,000, I believe.

18     Q    Okay.  And that 35,000 was strictly your

19   labor?

20     A    Yeah, I think so.                        10:18

21     Q    Did it also include materials?

22     A    No.

23     Q    Okay.  Who paid for the materials?

24     A    Mr. Glickman.

25     Q    Okay.  And was Untitled based on a sketch   10:18

Page 11

1    that he had come up with?

2         A    No.  It was --

3         Q    And --

4         A    -- based on a sketch that I came up with.

5         Q    Okay.  And what role did Mr. Glickman play,    10:18

6    if anything, in the creation of Untitled?

7         A    He would come up to my studio and we would

8    discuss some of the design details, but it was mostly

9    my design.

10        Q    I -- I understand.                             10:19

11             But did he contribute anything other than

12   paying you $35,000?

13        A    Minimal.

14        Q    Minimal in the design or minimal in the

15   manufacture?                                             10:19

16        A    Well, nothing in the manufacture and

17   minimal in the design.

18        Q    And to what extent did he provide any

19   substance in the design?

20        A    Initially he looked at some of my designs    10:19

21   and came up with a -- one outline that was similar to

22   other designs I had.

23        Q    Okay.

24        A    And that basically -- that -- that was

25   it.                                                      10:19

Page 12

1          Q     And that one Untitled sculptor found its

2     way to Chicago, correct?

3          A     Correct.

4          Q     All right.  And -- and at Mr. Glickman's

5     s- -- son's house?                                           10:19

6          A     I don't know where it's at right now, but

7     it -- initially it was.

8          Q     Okay.  And do you know if Mr. Glickman

9     charged his son anything for that sculpture?

10         A     I don't know.                                      10:19

11         Q     Okay.  Other than the money you were paid,

12    $35 per hour which totaled approximately $35,000, do

13    you recall anything else being paid by anyone for

14    that sculpture?

15         A     I don't understand the question.                  10:20

16         Q     Sure.

17               Did Mr. Glickman pay you the $35,000 for

18    your labor?

19         A     Yes.

20         Q     Okay.  And other than that, did he pay you        10:20

21    anything else for whatever you did to contribute to

22    the creation of that sculpture?

23         A     Not that I can remember.

24         Q     Okay.  Do you know if that scul- -- where

25    that sculpture is today?                                     10:20

Page 13

1        A     I do not.

2        Q     Do you know if it's ever been resold on the

3    market for some price?

4        A     I do not know.

5        Q     Do you know if there's even a market for          10:20

6    that particular object?

7        A     Oh, of course.

8        Q     Okay.  And what is the market for it?

9        A     Well, the market sculpture original

10   works of art.                                               10:20

11       Q     Meaning who would buy that sculpture

12   today?

13       A     Art collectors.

14       Q     Okay.  Do you know of any in particular who

15   would be interested in buying that sculpture?              10:21

16       A     Well, there's a lot of them out there, so

17   I'm not really approaching art collectors these days,

18   so...

19       Q     Okay.  Well, has anyone ever since the

20   1990s ever approached you to have you reproduce           10:21

21   Untitled so that they could purchase it?

22       A     Well, I don't reproduce any work, period.

23       Q     Okay.  How about -- how about create a

24   similar sculpture?  Has anybody ever approached you

25   to do that over the last 30-some-odd years?               10:21

Page 14

1      A    Well, Mr. Glickman asked me to make

2    something in stainless steel that was vaguely

3    similar.

4      Q    When was that?

5      A    It was after the granite one, so I'm not        10:21

6    really sure.  In the '90s.

7      Q    Okay.  And did he actually commission you

8    to do it?

9      A    Yes.

10      Q    Did you -- did he pay you anything for your    10:21

11    labor?

12      A    Yes.

13      Q    How much?

14      A    I don't remember.  It --

15      Q    Was it --                                      10:22

16          (Simultaneous speaking.)

17      THE WITNESS:  It was probably the same $35 an

18    hour, right.

19    BY MR. SAX:

20      Q    Okay.  Do you think he might have paid you     10:22

21    approximately 35,000 to do it in a stainless product

22    rather than in granite?

23      A    No, it would have been less.

24      Q    Approximately what number do you think that

25    would be?                                             10:22

1      A     I have no idea.

2      Q     Okay.  Then did you actually produce that

3   stainless sculpture?

4      A     Yes.

5      Q     And what did Mr. Glickman do with it, if     10:22

6   you know?

7      A     I do not know.

8      Q     Do you know if he ever resold it?

9      A     I do not know.

10     Q     Okay.  Was it the same dimension?             10:22

11     A     Similar.

12     Q     How -- how did the stainless version differ

13   from the granite version other than the material?

14     A     Well, the stainless one was flat, more or

15   less.  I mean, it had the depth, but there was no --   10:22

16   there wasn't as much detail as the granite version.

17     Q     Are you aware of any market today and any

18   particular art collectors who you have any reason to

19   believe would be interested in purchasing either the

20   stainless steel version or the granite version?        10:23

21     A     Well, I'm not in touch with art collectors,

22   per se.  That is usually done, you know, through an

23   art gallery for the most part, and I'm not -- I'm not

24   focused on selling any work right now.

25     Q     Okay.  But I'm just talking over the last      10:23

1    30 years, do you know whether there was ever a market

2    for those two sculptures?

3         A    Well, yeah, there's a market for it.

4    It's -- in every art gallery could be a market for

5    it.                                                    10:23

6         Q    I understand that.

7              Do you know specifically?  Do you have any

8    facts to support that there is a specific market and

9    what they would pay for either of those two

10   sculptures?                                            10:23

11        A    No.  The contemporary art market, I mean,

12   it's -- you're asking a really general question

13   there, so...

14        Q    Well, do -- I'm asking you specifically

15   about these two pieces.  I'm -- I'm just wondering     10:23

16   whether you have any facts to indicate that there is,

17   in fact, a market for either of those two sculptures

18   and has there been any over the last 30 years.

19        A    Well, I've sold a lot of artworks over the

20   last 30 years, so yes, there's a market for it.       10:24

21        Q    Okay.  And specifically -- I'll get into

22   your other -- other artwork, but as to these two

23   particular pieces, are there any facts that you're

24   aware of that would indicate a specific market and

25   therefore a specific market price for these two       10:24

Page 17

1    sculptures?

2         A    Well, the artist would determine the price.

3         Q    Okay.  And over the last 30 years, have you

4    ever determined the price of either of those two

5    sculptures?                                          10:24

6         A    Well, I did originally.

7         Q    Which was the $35,000 that you've testified

8    to for the granite and something less for the -- for

9    the stainless steel?

10        A    Yes.                                        10:24

11        Q    Okay.  And did you actually sell it to

12   Mr. -- both of those sculptures to Mr. Glickman for

13   those two numbers or did he merely compensate you for

14   your time on an hourly basis?

15        MR. BROCKLAND:  Objection to the extent that it  10:25

16   calls for a legal conclusion, but I think he's

17   described how he was com- -- compensated.

18             You can answer.

19        THE WITNESS:  Well, I was compensated by the

20   hour, you know, which --                              10:25

21   BY MR. SAX:

22        Q    Okay.

23        A    -- can be really common for large works

24   where you don't know exactly how long it's going to

25   take you because it's an original.                    10:25

Page 18

1        Q    Okay.  Let's talk about market for any

2    other sculptures that you've done over the years.

3              Have you ever sold any through any art

4    galleries?

5        A    Yes.                                    10:25

6        Q    Okay.  Have -- where else have you sold any

7    of your sculptures, other than through art

8    galleries?

9        A    Public art programs.

10       Q    Okay.  Anywhere else?                    10:25

11       A    Mo- -- I have to think back.  There --

12    there were probably a time or two where a connection

13    through a friend or somebody purchased the work, but

14    mostly through art galleries and public art

15    programs.                                         10:26

16       Q    Okay.  So how many pieces of sculpture do

17    you think you have sold over the years through art

18    galleries?

19       A    Total --

20       Q    Yes.                                      10:26

21       A    -- throughout my life?

22       Q    Well, throughout -- since the 1990s.

23       A    So hundreds.

24       Q    Okay.  Any larger than the ones that are

25    the subject of this lawsuit?                      10:26

Page 19

1        A     Yes.

2        Q     Are most of them as large or larger than

3     the ones that you sold -- that we're dealing with in

4     this lawsuit?

5        A     Well -- so the tallest one was 10 feet and        10:26

6     others were, you know, 6 or 7 feet.

7        Q     Okay.  Were most of them in the 6 and 7

8     feet range of these hundreds of sculptures?

9        A     No, most of them were much smaller.

10       Q     How much smaller?                                 10:26

11       A     Like what you might call tabletop size, you

12    know, a couple of -- 2 or 3, 4 feet maybe.

13       Q     How many -- first of all, what's the size

14    of -- of Untitled?

15       A     That's between 6 and 7 feet.                      10:27

16       Q     Okay.  And how many 6- or 7-foot sculptures

17    have you sold through art galleries over the last

18    30-some-odd years?

19       A     Well --

20       Q     (Inaudible).                                      10:27

21       A     -- through -- through galleries --

22       Q     Yes.

23       A     -- alone, maybe five or ten.

24       Q     Okay.  And then at public art programs,

25    approximately how many total sculptures have you sold    10:27

Page 20

1    through those programs?

2        A    Oh, maybe another ten or so.

3        Q    And of those ten, how many are the 6- to

4    7-foot range?

5        A    Oh, man, it's hard to think back without        10:27

6    looking at them.

7        Q    I understand.  Just --

8        A    No --

9             (Simultaneous speaking.)

10        THE WITNESS:  -- I'm just guessing.              10:28

11   BY MR. SAX:

12        Q    Just give me an approximate, if you would.

13        A    Well, I think there were a total of about,

14   actually, 30 large scale works, and probably a little

15   more than half of them were through a gallery and the   10:28

16   others were for public art programs.

17        Q    Okay.  So maybe 15 total between art

18   galleries and public art programs sim- -- of similar

19   size as the one that's the subject of this lawsuit,

20   ballpark?                                            10:28

21        A    Somewhere in there.

22        Q    Okay.  As far as the approximate 15,

23   between art galleries and public art programs, what

24   has the market paid for the least expensive and the

25   most expensive of those approximate 7-foot high in     10:28

Page 21

1   sculptures?

2       A    The high might have been about 70,000 or

3   so.  You know, this is looking over a period of many

4   years, and without any documents in front of me, I --

5   I'm just guessing.                                    10:29

6       Q    I understand.

7            Okay.  70 for the high.  What would be the

8   low?

9       A    Oh, about 35,000.

10      Q    Okay.  And did the vast majority of these    10:29

11  fit in any particular range?  Is it, like, most were

12  closer to 70 or most were closer to 35?

13      A    I don't know.  Somewhere in -- in between

14  there.

15      Q    Okay.  And as far as a sale to a friend,      10:29

16  any of them in that 7-foot high sculptures and -- and

17  pay you money for that?

18      A    Well, every sculpture was -- someone paid

19  me for it.

20      Q    Okay.  How about the friend?  Do you          10:29

21  remember what the friend paid for --

22      A    Well, it wasn't -- I mean, through friends

23  of friends.  Not -- I haven't sold a sculpture to a

24  friend, but I had --

25      Q    Me --                                         10:30

Page 22

1      A     -- contacts through people, you know, who

2   were friends who over the years I've done some work

3   for, but --

4      Q     Okay.  But do you remember the price that

5   you sold to the ultimate buyer through the friend?        10:30

6      A     No.

7      Q     Okay.  Do the -- at art galleries do they

8   take a percentage of the payment for your sculpture

9   as a commission?

10     A     Sometimes.                                        10:30

11     Q     Okay.  What's the typical --

12     A     Usually.

13     Q     -- percentage?

14     A     I --

15     Q     What's the typical percentage --               10:30

16     A     It -- it -- it varied.

17     Q     Let me clar- -- let me ask --

18     THE REPORTER:  I --

19   BY MR. SAX:

20     Q     -- the que- -- let me ask the question.        10:30

21           What is the typical percentage that the art

22   gallery would charge to commission one -- to -- to

23   broker one of your sculptures?

24     A     It all depends.  It could be anywhere from

25   like maybe 15 to 20 percent, somewhere in there, for    10:30

Page 23

1     the larger works.

2         Q     Okay.  And then public art programs, do

3     they take a percentage?

4         A     No.

5         Q     Okay.  And your friends, did they make any          10:31

6     profit off of the sale of those sculptures?

7         A     No.

8         Q     Okay.  In Wakefield I, do you recall

9     offering any evidence in that case as to the value of

10    the sculptures that were the subject of that               10:31

11    lawsuit?

12        A     Could you repeat the question?

13        Q     Sure.

14              In Wakefield I, where there was an actual

15    trial, do you recall offering any evidence as to the      10:31

16    value of those -- of the sculptures that were the

17    subject of that lawsuit?

18        MR. BROCKLAND:  I'm going to object that the

19    record speaks for itself as to what offer -- what

20    testimony was offered from Mr. Wakefield by way of        10:31

21    deposition, whatever.

22              But subject to that objection, you can do

23    your best to tell him what you recall about the

24    trial.

25        THE WITNESS:  I mean, we provided evidence for        10:31

1    pricing.

2    BY MR. SAX:

3        Q    What did you use to show evidence of

4    pricing?

5        MR. BROCKLAND:  Same objection.                10:32

6            You can answer.

7        THE WITNESS:  Oh.

8    BY MR. SAX:

9        Q    You can answer.

10       A    We had, I believe, a contract or two from,  10:32

11   you know, the public art committees or the cities

12   that I actually, you know, did the work for.  Could

13   not verify some of the pricing through my gallery at

14   the time because the owner had passed away.

15       Q    Okay.  When was the last time you sold any  10:32

16   sculptures through an art gallery?

17       A    I don't recall.  It's been quite a while.

18       Q    Are -- are we talking more than ten years

19   ago?

20       A    About ten years ago.                       10:32

21       Q    Okay.  And do you remember what that piece

22   was and how much it sold for?

23       A    No.

24       Q    Okay.  On these public art programs, does

25   somebody pay you for that or only the end buyer      10:33

1   who -- who -- who does that?  How -- how do you get

2   compensated through these public art programs?

3        A    No, the City arranges that.

4        Q    I understand.

5             But does the City set the price or do you          10:33

6   set the price?

7        A    Well, it's -- it's sort of a weird deal.

8   The City will have a budget based on the development.

9   So it might be -- a lot of times they call it a

10  1 percent or 2 percent fee, and then that is set          10:33

11  aside for the artist to consider that and what he

12  could give the City for that price.

13       Q    I don't understand the 1 percent,

14  2 percent.  Could you explain that --

15       A    Of the --                                        10:33

16       Q    -- a little better?

17       A    -- total development cost.  Let's say a

18  development costs, you know, 5 million bucks.

19  They'll take 1 percent of that and that goes toward

20  the art budget, and it might be more than one piece.      10:34

21  It -- it's up to the City to decide maybe how much

22  space they're trying to fill up.

23       Q    Does the City pay you the money?

24       A    Yes.

25       Q    Got it.                                          10:34

Page 26

```
1            And then the City just displays it publicly

2       on public property rather than resell it to someone

3       else?

4            A    Correct.

5            Q    Okay.  So would there be any indication of     10:34

6       what the City felt it was worth?

7            A    Well, yeah.  I mean, they evaluate your --

8       your background, your track record, to make sure

9       that, you know, you're a legitimate artist because

10      some developers will try to scoot around that and     10:34

11      bring in a friend --

12           Q    How could --

13           A    -- you know, or something like that.

14           Q    I -- I understand.

15           But how did the City determine how much to     10:34

16      pay you for that particular piece of work that you

17      sold -- that you, I guess, contributed to the art

18      program?

19           A    Well, they would take that budget and

20      that's what they offer you, and then they -- they     10:35

21      look at what you can give them in return for that

22      money.

23           Q    Gotcha.

24           On those public art programs where the

25      sculptures were approximately 7 feet or so, do you     10:35
```

Page 27

1    recall the range of -- of -- of compensation you

2    received from the government, what -- between what

3    price and what price?

4         A    No, I can't really remember.

5         Q    Do you remember the highest price you --          10:35

6    you received through public art programs?

7         A    Not offhand, no.

8         Q    Any of them above 70,000?

9         A    I'm not sure.  Somewhere maybe around

10   there.                                                     10:35

11        Q    Okay.  And how about the lowest number you

12   ever received for that size of art -- of that size

13   sculpture for public art?

14        A    I can't remember the lowest fee.

15        Q    Okay.                                            10:36

16        A    You know --

17        Q    Would it have been --

18        A    -- we're talking many years --

19        Q    -- 2000- --

20        A    -- ago now, so...                                10:36

21        Q    Okay.  When was the last time you sold

22   the -- or -- or you contributed art through public

23   art programs?  How many years ago?  Are we talking,

24   again, more than ten years?

25        A    Yeah, something like that.                       10:36

Page 28

1      Q    Okay.  Any of these -- between the art

2    galleries and the public art programs, which -- you

3    know, what decade are we talking about where you did

4    most of your -- and you were the most prolific?

5           Are we talking the '90s, 2000s?  Where --    10:36

6    when -- when -- when did you -- when were you more

7    prolific?

8      A    I think I've been there my entire life.

9      Q    Okay.  So you're saying it's been pretty

10   evenly spaced?                                      10:36

11     A    Yeah.  I mean, I've stayed very busy.

12     Q    Okay.  Well, I mean, in the last three

13   years when you've been more heavily involved with

14   this foundation, I mean, what type of -- of income

15   have you been receiving from the sale of             10:37

16   sculptures?

17     A    Oh, I haven't been.  I'm not selling any

18   right now.  I'm saving --

19     Q    Okay.

20     A    -- everything.                               10:37

21     Q    Okay.  But what's -- what's your means of

22   support over the last three years, unless a

23   foundation's paying you a salary?

24     MR. BROCKLAND:  Objection that it's asking for

25   his private financial information.  I don't know why  10:37

Page 29

1    his means of support are -- is at all --

2         MR. SAX:  Well, I'll rephrase it then.

3    BY MR. SAX:

4         Q    How much have you received from the sale of

5    sculptures last year?                              10:37

6         A    None.  Zero.

7         Q    How about -- how about the year before?

8         A    Zero.

9         Q    How about the year before that?

10        A    Zero.                                     10:37

11        Q    How about the year before that?

12        A    Zero.

13        Q    When was the last time you were compensated

14   for the sale of sculptures?  What year?

15        A    I'd have to look back.  I don't -- I don't    10:38

16   know.

17        Q    Is it ten years or more?

18        A    About ten years, I get -- I think.

19        Q    Okay.  Other than the sale of sculptures,

20   is there other artwork that you've been selling over    10:38

21   the last ten years?

22        A    No, no.  I mean, there might have been

23   some, say, ten years ago, but again, I'm sort of

24   focusing away from -- in my life from selling

25   artwork.                                            10:38

Page 30

```
 1        Q     And doing what?  Working for a
 2   foundation?
 3        A     Yeah.  Yeah, working with -- with our
 4   foundation and with other foundations.
 5        Q     Okay.  Do you know what benefit, if any,     10:38
 6   Olen Properties received from the display of the two
 7   sculptures in Boynton Beach?
 8        A     Well, the benefits they received?
 9        Q     Yes.
10        A     Well, they got free artwork.                 10:39
11        Q     Okay.  Anything else?
12        A     The property's enhanced --
13        Q     Okay.
14        A     -- dramatically.
15        Q     Anything else?  Anything else?               10:39
16        A     Offhand -- I can't think offhand.
17        Q     Okay.  Do you assign a certain value to the
18   two sculptures that were on display in
19   Boynton Beach?
20        A     Well -- well, financial value --             10:39
21        Q     Yes --
22        A     -- you're talking?
23        Q     -- monetary.  We'll -- we'll go with
24   monetary first.
25        A     Well, I would -- these days if I was going   10:40
```

```
                                                    Page 31
 1    to -- if I was going to sell something, it would be
 2    for maybe quarter of a million dollars.
 3         Q    Have you ever sold any sculpture ever for a
 4    quarter of a million dollars?
 5         A    Nope.                                    10:40
 6         Q    Okay.  What would cause you to believe that
 7    there's a market for your -- those -- those two
 8    sculptures for $250,000 each?
 9         A    Well, because they're very rare, and art
10    collectors or art patrons who have seen it, you know,  10:40
11    have admired it and wondered if it was for sale.
12         Q    Has any -- have any of them ever offered
13    you any money for it -- that sculp- -- those two
14    sculptures?
15         A    Someone did recently, but --             10:40
16         Q    Who did?
17         A    -- it's not for sale.  I --
18              (Simultaneous speaking.)
19         THE WITNESS:  -- don't know the person's name.
20    BY MR. SAX:                                        10:40
21         Q    What did they offer?
22         A    245,000.
23         Q    And where was this person located?
24         A    I met them in Grand Rapids, Michigan.
25         Q    Where did they see the sculpture?        10:40
```

Page 32

```
 1        A    At -- the world's largest art fair festival
 2    is in Grand Rapids.  It's called Art Prize.
 3        Q    Okay.  And you don't remember the name of
 4    this person who offered you $245,000?
 5        A    No.  No, it wasn't for sale.  They -- they      10:41
 6    wanted it, but it -- you know, I'm just not selling
 7    anything.
 8        Q    I understand.
 9             But did they offer you the 245 after you
10    told them it wasn't for sale?                            10:41
11        A    Yeah, because he kept asking me, you know,
12    trying to figure a price that maybe I would part with
13    it.
14        Q    Well, how did the negotiation go?  Did he
15    start with a certain number and work his way up to      10:41
16    245?
17        A    Oh, he was just asking me how much I wanted
18    and I said it wasn't for sale and -- you know.
19        Q    Was he looking at a photograph of it?
20        A    No, he was looking at the sculpture           10:41
21    itself.
22        MR. BROCKLAND:  Don, let me -- Spencer, let me
23    intercede.  I think -- think we're off track here and
24    maybe clarify what sculpture he was talking about in
25    Grand Rapids.                                            10:42
```

Page 33

1          MR. SAX:  I'll -- I'll do that.  Okay.

2          MR. BROCKLAND:  Thank you.

3     BY MR. SAX:

4          Q    What was the particular sculpture in Grand

5     Rapids that somebody offered you $245,000 for?          10:42

6          A    It was called Reflection of a Language.

7          Q    Did it bear any resemblance to the

8     sculptures that are the subject of this lawsuit?

9          A    Similar.  If you looked at the design

10    detail, you might think it was the same artist.         10:42

11         Q    Okay.  Did it have the same shape?

12         A    No, just in that vein.

13         Q    How so?

14         A    Well -- well, close to the same height,

15    close to --                                             10:42

16         Q    Was it --

17         A    -- the same width, but different design

18    details within it.  I created that -- the -- the

19    whole texturing, the -- the contrast of the texturing

20    on the granite, and so you'll see, you know, lines      10:42

21    that are created with saws.  You'll see texturing

22    that's created with miniature jackhammers and other

23    sort of tools to create a distinctive original

24    look.

25         Q    All right.  Other than this gentleman whose    10:43

Page 34

1    name you don't remember, has anyone ever offered you

2    anything for that particular sculpture?

3        A    No, because it's never been for sale.

4        Q    Okay.  Any other basis for believing that

5    the sculptures at Boynton Beach were worth $250,000 a        10:43

6    piece?

7        A    Repeat the question.

8        Q    Sure.

9            Other than the person offering you

10   $245,000, you told him it's not for sale because --          10:43

11   do you have any other offers from anyone indicating

12   that a value for those -- that part- -- for the

13   sculptures?

14       A    Well, just anyone could offer anything they

15   wanted, but I wouldn't take it anyway, so I'm not out        10:43

16   there showing it to -- to sell it.

17       Q    I understand.

18           I'm merely asking, has anybody made you an

19   offer?

20       A    No.                                                 10:43

21       Q    Okay.  And you don't -- is there any

22   records that you have anywhere that would identify

23   the gentleman who you said offered you 245,000 for

24   the sculpture in Grand Rapids called Reflections

25   (sic)?                                                       10:44

Page 35

1      A     Reflection of a Language.

2      Q     Reflection of a Language.

3            Same -- that -- what's your answer to that?

4      A     Yeah, no.

5      Q     Okay.  And has anyone ever offered you any     10:44

6   money for the Untitled?

7      A     Well, it's not for sale.

8      Q     I -- but has anybody offered it, whether

9   it's for sale or not?

10     A     Well, I don't know, because I don't own it     10:44

11  and I'm not around it, so there would be no way for

12  people to offer me anything for it --

13     Q     Okay.

14     A     -- that I know of.

15     Q     All right.  And -- and the only original of     10:44

16  it, you're saying, is -- you're not sure where it's

17  located today; is that correct?

18     A     Correct.

19     Q     And the only time it ever sold was you

20  getting compensated $35 an hour for a total of         10:44

21  $35,000 by Mr. Glickman, correct?

22     A     Correct.

23     Q     Okay.  What's the highest price you ever

24  received for any sculpture you've ever done?

25     A     I think we already talked about that.        10:45

Page 36

1    Around --

2        Q    Yeah, for --

3        A    -- 75 --

4        Q    Well, for --

5        A    -- or --                                        10:45

6        Q    Oh.

7        A    -- so, something like that --

8        Q    Oh.

9        A    -- total.

10       Q    Okay.  My note -- I'm sorry.                    10:45

11            My notes had indicated where -- I thought

12   you were limiting yourself to 7-foot-tall sculptures.

13            Are you saying all of your sculptures, the

14   highest price you've ever gotten is in that $70,000

15   range?                                                   10:45

16            Is that correct?

17       A    Correct.

18       Q    Okay.  Do you remember based on the number

19   of sculptures that were the subject of Wakefield I,

20   based on the determination of damages of $450,000,      10:45

21   how much that comes out to per sculpture?

22       A    I think that was 75,000, something like

23   that.

24       Q    That's your understanding of -- of what the

25   Court determined?                                        10:45

Page 37

```
 1       A    Yeah.  I don't know if it -- they

 2   determined that it was per piece.  It's the way it

 3   sort of works out on math based on what the jury

 4   gave.

 5       Q    Were all of the sculptures similar or was      10:46

 6   there a difference between the various sculptures

 7   that would cause you to believe that it wouldn't be

 8   equally priced?

 9       A    I mean, they were similar.

10       Q    Were they the same -- same size?              10:46

11       A    Ye- -- we're -- we're talking about the two

12   that are on the property?

13       Q    No, I'm talking about the six or seven in

14   Wakefield I.

15       A    It -- yeah.  I mean, they're -- they're        10:46

16   very similar to each other.

17       Q    Okay.

18       A    So like --

19       Q    Were there any different -- were there any

20   differences between them that would cause you to take   10:46

21   a position that one is more valuable than another?

22       A    I don't know.  You know, I didn't like the

23   teardrop in the one.

24       Q    Okay.

25       A    But I don't know that that changes, you        10:47
```

Page 38

1    know...

2         Q    Why didn't you like the teardrop?

3         A    Well, because the original sculpture -- you

4    know, part of it was amputated, so changing an

5    original work around to accommodate your own desires    10:47

6    seems a bit rude.

7         Q    Okay.  Has that -- has that teardrop

8    version ever sold on the open market, as far as you

9    know?

10        A    You might ask your client.                     10:47

11        Q    Well, I'm asking you to the extent you have

12   knowledge.

13        A    I wouldn't know if it sold.  I have nothing

14   to do with that sculpture.

15        Q    Okay.                                          10:47

16        Lynn, if you could put up on the screen the

17   next document which is the Joint Copyright Ownership

18   Agreement which we'll mark as Exhibit 17.

19        (Whereupon Exhibit 17 was marked for

20   identification, a copy of which is attached hereto.)    10:48

21        MR. SAX:  Okay.  Lynn, could you scroll through

22   it.  It's four pages.

23   BY MR. SAX:

24        Q    Mr. Wakefield, take a look at this document

25   and ask you whether you recognize this.  It's two       10:48

Page 39

1   pages of text and then two pages of photographs.

2        A    Yeah, I've seen it before.

3        MR. SAX:  Okay.  Lynn, go to Page 2, if you

4   could.

5   BY MR. SAX:                                          10:48

6        Q    And Mr. Wakefield, is that your -- bottom

7   of the page -- is that your signature at the bottom

8   with a date of 2012?

9        A    Yes, looks like it.

10       Q    Okay.  And is that Mr. Glickman's           10:48

11  signature, as best you know?

12       A    Yeah, I wouldn't know his signature, but...

13       Q    Okay.  Did he sign it in your presence?

14       A    Pardon me?

15       Q    Did he sign it in your presence?           10:48

16       A    No.

17       Q    Okay.  Do you know, was it an attorney who

18  drafted this document?

19       A    Yes.

20       Q    Which attorney?                            10:49

21       A    I'm not sure.

22       Q    Do you remember what law firm?

23       A    Well, there's a couple of different

24  attorneys and different firms.

25       Q    Okay.  Do you remember the name of any of   10:49

Page 40

```
 1    them or any of their firms?
 2        A    Well, Mike -- Michael Kuzinsky, Ku- --
 3    Kuzinsky (sic), is that --
 4        MR. BROCKLAND:  Kuznetsky.
 5        THE WITNESS:  Kuznetsky and -- and Gene, but I'm      10:49
 6    not sure really who came up with all of -- all of
 7    that.
 8    BY MR. SAX:
 9        Q    Okay.  Did Mr. Glickman have an attorney
10    represent him?                                           10:49
11        A    I don't know.
12        Q    Did Gene's firm represent your interest or
13    did they represent both parties' interest?
14        MR. BROCKLAND:  I'm going to object to the
15    extent that it would call for any -- him to reli- --     10:49
16    reveal any communications between myself, if there
17    were any, and Don.
18        MR. SAX:  I -- I understand, but I'm not a- --
19    I'm not asking to reveal any communications.
20        MR. BROCKLAND:  Yeah.  I'm just -- I'm just --       10:50
21    BY MR. SAX:
22        Q    So Mr. --
23        MR. BROCKLAND:  -- cautioning him not to reveal
24    communications.
25        MR. SAX:  Sure.  All right.                          10:50
```

Page 41

1    BY MR. SAX:

2        Q    Mr. Wakefield, do you un- -- are you

3    understanding the question?  I'm just trying to

4    determine who was your attorney on this or was there

5    joint representation?                                    10:50

6        A    Well, Michael and -- and Gene were my

7    representation.

8        Q    Okay.  And you -- and you don't know if

9    Mr. Glickman had an attorney?

10       A    I do not.                                       10:50

11       Q    Okay.  All right.  Taking a look, then, if

12   you go to the first page, all right, on the first

13   "Whereas," it says "Glickman authored an untitled

14   drawing in 1992 as the basis for a sculpture (the

15   'Glickman Work') a copy of which is attached hereto      10:50

16   as Attachment A."

17            So Lynn, if you could, go to actually the

18   last page because they're out of sequence, but go to

19   where it says "Attachment A."  There you go.

20            All right.  That first photograph,              10:50

21   Mr. Wakefield, is that Glickman's work product?

22       A    Yes.

23       Q    Okay.  And how did you first become aware

24   of that drawing?

25       A    He had looked at a couple of my design         10:51

Page 42

1    books and some of my concepts and then came to me --

2    back to me with something that was similar to that,

3    and then that's what he had presented.

4         Q    Okay.  What was his -- what was his

5    business at the time?                                    10:51

6         A    He was retired.

7         Q    Okay.  He was -- was he an art lover?

8         A    Yes.

9         Q    Okay.  And he -- he had -- do you know how

10   he met with you in the first place, knew -- knew that   10:51

11   you were a sculptor?

12        A    Well, we met at a sculpture studio in

13   Vista, California.

14        Q    Got it.

15             And at that time did you sell him any of      10:52

16   your sculptures?

17        A    No.  He was there to learn to make some of

18   his own little sculptures.

19        Q    Okay.  Was he a -- an artist or -- or would

20   be -- or a would-be artist?                             10:52

21        A    Well, he -- you know, he was creating his

22   works, you know, for himself.  He wasn't doing it for

23   commercial value.

24        Q    Okay.  And was he just doing drawings or

25   would he actually go ahead and sculpt?                  10:52

Page 43

```
 1         A     He did at least one small sculpture, maybe
 2    a couple.
 3         Q     Okay.  So he produces this drawing,
 4    Attachment A, and then we go -- Lynn, if you could,
 5    go back to the first page, the second "Whereas."       10:52
 6              What it says is "Wakefield created a new
 7    untitled drawing in 1992 which was based on the
 8    Glickman Work and -- and in which Wakefield added
 9    independently copyrightable expression (the 'Joint
10    Work') a copy of which is attached as Exhibit -- as   10:53
11    Attachment B."
12              And, Lynn, if you can go back to that other
13    page so we get to Attachment B.
14              And is the document that -- or the --
15    it's -- it's hard for me to decipher it, but that's   10:53
16    the copy I have.
17         A     I can't see anything.
18         Q     Yes.
19              Do you -- do you believe that there was a
20    subsequent drawing done in 1992 that you considered   10:53
21    the joint product of both you and Mr. Glickman?
22         A     Yes, there was.
23         Q     Okay.  Did -- who actually did the sketch,
24    you or --
25         A     I --                                        10:53
```

Page 44

1      Q     -- Mr. --

2      A     -- did.

3      Q     -- Glickman or -- you -- you did.

4            And did Mr. Glickman approved it?

5      A     Yes.                                        10:53

6      Q     Okay.  Do you still have a copy of the --

7   the originals of Attachment A and Attachment B?

8      A    Yes -- no, not the original.  He still had

9   that, but I have the original for Attachment B.

10     Q     Okay.  So he has A.  Well, he's passed      10:54

11  away, correct?

12     A     Correct.

13     Q     Okay.  And you have B in your possession

14  somewhere?

15     A     Yes.                                        10:54

16     Q     Okay.  And is -- is it in Michigan?

17     A     Yes.

18     MR. SAX:  Okay.  And let's go to the third

19  "Whereas," Lynn, back to the first page.

20  BY MR. SAX:                                          10:54

21     Q     And then it says "Whereas, the parties

22  collaborated in creating an untitled sculpture in

23  1992 based on the Joint Work, a photograph of which

24  is attached to as Attachment C."

25            So Lynn, can you go to Attachment C.       10:54

Page 45

1           And is this a photograph of the sculpture

2    that was made from the use of Attachment B?

3        A    Yes.

4        Q    Okay.  And you -- is that strictly your

5    handywork?                                          10:54

6        A    Yes.

7        Q    Okay.  And where -- where was this

8    photograph taken?

9        A    The photograph, I believe, was taken in

10   Chicago.                                             10:55

11       Q    Okay.  But this was at Mr. Glickman's son's

12   house?

13       A    Yes.

14       Q    Okay.  Do you remember what year this

15   photograph was taken?                               10:55

16       A    No.

17       Q    Would it have been approximately 1992?

18       A    Somewhere in there.

19       Q    Okay.  Okay.  And what -- and at -- at this

20   point in time, 1992, when this document is -- is     10:55

21   entered into, had you copyrighted any of your

22   sculptures?

23       A    N- --

24       MR. BROCKLAND:  Let -- let me object.  I -- I'm

25   not sure if you were suggesting that this document   10:55

Page 46

1    was entered into in 1992.

2         MR. SAX:  No, I'm -- well, I'm asking him the

3    subject, the 1992 date.

4    BY MR. SAX:

5         Q    W- -- did you enter into any or have any        10:55

6    copyrights in 1992?

7         A    No.

8         Q    Okay.

9         A    Well, you have a copyright when you make

10   it, so yes.                                               10:56

11        Q    Okay.  How about registering it as a

12   copyright?

13        A    No.

14        Q    Okay.  And then in -- say in the 2000s, do

15   you -- prior to -- 2011, I think, is the date of the      10:56

16   copyright that's the subject of this lawsuit.

17            Prior to that date, did you -- did you

18   register any copyrights?

19        A    No.

20        Q    Okay.  Other than the copyright that you        10:56

21   registered for Untitled, have you ever registered any

22   other copyrights?

23        A    No.

24        Q    Okay.  Is the reason that you entered into

25   this agreement in 2012 is because you -- at that time     10:56

Page 47

1    you had become aware of the sculpture at the Olen

2    headquarters?

3         A    We- -- yes.

4         Q    Okay.  Were you aware -- at that time when

5    you entered into this agreement, were you aware of       10:56

6    the location of any other similar sculptures?

7         A    No.

8         Q    Okay.

9         A    That I --

10        Q    Was -- was your -- was -- did you first       10:57

11   become aware of the sculpture at the Olen

12   headquarters based upon a girlfriend of yours telling

13   you that she worked nearby and she noticed it?

14        A    That's how I found out about it, yes.

15        Q    What was the girlfriend's name?             10:57

16        A    Kim Kern.

17        Q    Is she still your girlfriend?

18        A    No.

19        Q    Okay.  Was she your girlfriend in

20   Michigan?                                               10:57

21        A    No.

22        Q    California?

23        A    Just in California.

24        Q    Okay.  When did you live in California?

25        A    From 1979 till 2000-, maybe, '14, '15,        10:57

Page 48

1      somewhere in there.

2           Q    Okay.  Then you moved --

3           A    '14, I think.

4           Q    -- to Michigan?

5                Then you moved to Michigan?                    10:57

6           A    Correct.

7           Q    And am I also right in -- in assuming

8      that -- her name is Kim, correct?

9           A    Correct.

10          Q    Okay.  That Kim then worked somewhere else    10:58

11     in California and then discovered another copy of

12     Untitled; is that correct?

13          A    Correct.

14          Q    And -- so is it fair for me to say she's

15     the one who found those two sculptures?               10:58

16          A    Correct.

17          Q    Did she do anything else to look at any

18     other versions of that sculpture?

19          A    She did -- not to my knowledge.

20          Q    Did you do anything to investigate it?       10:58

21          A    Yes.

22          Q    What did you do?

23          A    Well, when I went to go look at the second

24     one in Irvine, there were a variety of other

25     sculptures on site, and as I looked around a little    10:58

Page 49

1    bit more, I found another one identical to that one

2    and then another one that -- the bastardized version

3    with the teardrop in it.

4        Q    And how did you find the -- the rest of

5    them that were the subject of Wakefield I?                    10:58

6        A    Oh, doing some research.  And I knew

7    that -- found out that Olen Properties had a

8    development in Brea.  I knew Brea had a public art

9    program, went online and saw it, and one of the

10   sculptures, I think the teardrop -- well, I'm not          10:59

11   sure -- one of the sculptures was on their website.

12       Q    Okay.  Did their website indicate that they

13   had properties in Florida?

14       A    Yeah -- Olen's?

15       Q    Yes.                                               10:59

16       A    Yes.

17       Q    Okay.  Did you make any attempt at that

18   time to investigate whether or not any of the

19   properties in Florida had similar copies of -- of

20   Untitled?                                                   10:59

21       A    On Google Maps, yes.

22       Q    Okay.  So if it showed up on Google Maps,

23   then you would know there was that sculpture there?

24       A    Well, if I saw it on Google Maps, then I

25   would have known, but nothing came up at the time.          11:00

Page 50

1      Q    Okay.  And when did you do this?  When did

2    you do this investigation of the properties in

3    Florida listed on the website?  What year?

4      A    Somewhere around 2000- -- between 2010,

5    2012, some- -- somewhere in there.                    11:00

6      Q    Okay.  And subsequent to the filing of

7    Wakefield I, you became aware that there was actually

8    two other sculptures in California, correct, that

9    became the subject of Wakefield II?

10     A    Well, there was --                               11:00

11     MR. BROCKLAND:  I'm -- I'm going to object.

12   The -- the record speaks for itself on what was the

13   subject of Wakefield II.  There's a Complaint.

14          But --

15   BY MR. SAX:                                             11:01

16     Q    I -- I -- you can --

17     MR. BROCKLAND:  -- subject to that --

18   BY MR. SAX:

19     Q    -- answer.

20     MR. BROCKLAND:  -- you can gi- -- give your best     11:01

21   recollection.

22     THE WITNESS:  Ho- -- ask -- ask the question

23   again, please.

24   BY MR. SAX:

25     Q    Sure.                                            11:01

```
                                                      Page 51

 1              Do you remember in Wakefield I that there

 2      was six or seven sculptures that was the subject of

 3      that lawsuit?

 4         A    Yes, I remember.

 5         Q    Do you -- do you remember Wakefield II,     11:01

 6      that there was two other sculptures that was the

 7      subject of that lawsuit?

 8         A    Yes.

 9         Q    Okay.  And -- and did --

10         A    Well, wait a minute.                        11:01

11         Q    And on the other --

12         A    There -- there was --

13         Q    Go ahead.

14         A    There was one more that we found, but

15      Wakefield II also included the very first one that  11:01

16      the -- at the time the judge had removed, you know,

17      from the case.  That came back in after we

18      appealed.

19         Q    Okay.  Well, I'm really just interested in

20      what investigations you made and in what years you  11:01

21      made those investigations.

22              So other than doing the investigation in

23      the 2010 to 2012 range with Google Maps that you

24      talked about, did you do any subsequent

25      investigations to determine whether or not there were 11:02
```

Page 52

1    other copies of Untitled elsewhere on

2    Olen Properties, including in the state of Florida?

3         A    Well, I didn't drive to Florida.  I drove

4    through California and then, like I say, just through

5    Google Maps.                                          11:02

6         Q    Okay.  Did anybody stop you from going

7    outside the state of California to do your

8    investigation?

9         A    No.

10        Q    Okay.  Now, when you became aware that      11:02

11   there were -- that Olen Properties has numerous other

12   properties, did you do any annual or periodic

13   investigation to see after 2012 if there were any

14   copies of Untitled on any of those properties?

15        A    Through Google Maps and occasionally in     11:02

16   California.  I might drive by some of the other

17   properties.

18        Q    Okay.  Through Google Maps did you look in

19   2013, 2014, 2015?  Did you look in any of those years

20   on Google Maps to see if there's any sculptures on     11:03

21   those Olen Properties outside the state of

22   California?

23        A    On Google Maps?

24        Q    On Google Maps or any other way.

25        A    Yeah.  On Google Maps, yes.                 11:03

Page 53

```
 1        Q    Okay.

 2             (Simultaneous speaking.)

 3        MR. BROCKLAND:  He's asking you about specific

 4   years, Don.

 5        THE WITNESS:  Oh, I can't remember specific      11:03

 6   years, no.

 7   BY MR. SAX:

 8        Q    Okay.  Do you remember if it was after

 9   2012?

10        MR. BROCKLAND:  That what?                        11:03

11        MR. SAX:  That he did this Google investigation.

12        THE WITNESS:  I don't know that it was after

13   that.  You know, I've been on the site a few times,

14   but I --

15   BY MR. SAX:                                            11:04

16        Q    I --

17        A    -- I can't remember the years.

18        Q    We- -- I understand.

19             I'm just trying to see if this was a

20   one-off where you happened to go on Google Maps back  11:04

21   in 2010 to 2012 or whether you did that at any point

22   in time after 2012.

23        A    Yes, I did.

24        Q    Okay.  And do you remember approximately

25   what years you did that Google Maps search?           11:04
```

Page 54

1      A    No.

2      Q    Were -- was it after 2014?

3      A    I don't recall.

4      Q    Okay.  Did you do it just prior to the

5  filing of Wakefield II?                              11:04

6      A    Oh.  Ye- -- but I mean, I was still -- at

7  that point I believe I did look on the website to see

8  if maybe there were additional properties that they

9  purchased that might have sculptures.

10     Q    Okay.  And after Wakefield II was filed,     11:04

11 did you ever do any Google Map (sic) or other

12 searches to see if there were Untitled copies

13 elsewhere on Olen Properties in the United States?

14     A    Yes.

15     Q    Okay.  What year did you do that?           11:05

16     A    I -- I don't know exactly.  It -- it was

17 probably several years around -- around that time.

18     Q    Meaning what?  Are we talking about 2020?

19     A    No.  By then once -- once we were done,

20 I -- I -- I wasn't looking anymore.                   11:05

21     Q    Okay.  And are we talking about 2018?  Was

22 that the last time you did a Google Map search

23 looking for the sculptures on other Olen Properties

24 in the United States?

25     A    I can't be sure.                             11:05

Page 55

1        Q    Okay.  Well, let me ask it -- this

2     specifically.

3             Do you remember entering into the

4     Settlement Agreement in Wakefield II?

5        A    I remember we did, yes.                    11:05

6        Q    Okay.  Prior to entering into that

7     Settlement Agreement, did you do a Google Map search

8     to see if there were any copies of Untitled elsewhere

9     on Olen Properties in the United States?

10       A    Yes, I'm sure I did.                       11:06

11       Q    Okay.  Did you look at the Florida

12    properties on Google sear- -- on Google Maps?

13       A    Yes.

14       Q    Did you see any of the sculptures on any of

15    the Olen Properties in Florida in 2018?            11:06

16       A    No.

17       Q    Did you det- -- determine that you could --

18    you were going to do any other type of investigation

19    to see if there were any copies on any of the

20    properties that Olen owned in Florida in 2018?     11:06

21       A    To do additional investigation?

22       Q    Beyond do- -- beyond looking at

23    Google Maps.

24       A    No.

25       Q    Okay.  All right.  Lynn, if you could, go   11:06

Page 56

1    back to the first page.

2         In the last "Whereas" paragraph it says

3    "The parties seek to clarify their rights as to the

4    ownership of the Glickman Work, the Joint Work, and

5    the Sculpture."                                    11:07

6         What -- what -- why was clarification of

7    the rights needed?

8         A    I don't recall.

9         Q    Did you and Mr. Glickman have some

10   disagreement as to who owned what?                  11:07

11        A    Not that I can recall.

12        Q    Okay.  But at the time that this agreement

13   was entered into, you had become aware of the

14   existence of what you purport to say are copies of

15   Untitled on various Olen Properties in the state of   11:07

16   California, correct?

17        A    Repeat that question again.

18        Q    Sure.

19             Madam Reporter, could you read that one

20   back.                                               11:07

21        THE REPORTER:  "Q  But at the time that

22          this agreement was entered into, you had

23          become aware of the existence of what you

24          purport to say are copies of Untitled on

25          various Olen Properties in the State of       11:07

Page 57

```
 1        California, correct?"
 2        THE WITNESS:  I'm not -- I'm not clear on the --
 3   on the -- on the question.
 4   BY MR. SAX:
 5        Q    Sure.  I'll reask it.                    11:08
 6             At the time that you are clarifying the
 7   rights of ownership with Mr. Glickman, you had
 8   already become aware of a potential claim against
 9   Olen Properties regarding copyright infringement of
10   Untitled, correct?                                  11:08
11        A    Well, you say potential claim --
12        Q    Yes.
13        A    -- against them.
14        Q    Of one that you had not yet fought.
15        A    Well, I didn't -- I mean, I didn't find any  11:08
16   more.
17        Q    Okay.  But that's -- that's not what I
18   asked.
19             What I'm simply asking you is, is the
20   timing of this agreement in 2012 because you had     11:08
21   be- -- already become aware that there may be copies
22   of Untitled elsewhere other than in Chicago?
23        A    Well, yeah.
24        Q    Okay.
25        A    I mean, we --                             11:09
```

Page 58

1        Q    And you are --

2        A    Okay.  We knew there were -- you know, I

3    th- -- I think at that point we knew there were

4    five.

5        MR. BROCKLAND:  You -- you've answered the          11:09

6    question.  You said yes.

7        THE WITNESS:  Okay.

8    BY MR. SAX:

9        Q    Okay.  You already know that there were

10   five and you then did subsequent investigation and      11:09

11   you found some additional ones, correct?

12       A    Correct.

13       Q    Okay.  I notice that under paragraph with

14   the Number 1 on it says "The Parties agree that

15   Glickman is the sole author and copyright holder of     11:09

16   all rights in and to the Glickman Work."

17            And as you understood it, that only related

18   to his drawing, Attachment A, right?

19       A    Correct.

20       Q    Okay.  And under Paragraph 3, it says --       11:09

21   says "Glickman shall retain sole ownership of the

22   physical sculpture that was created in 1992 and

23   installed on Glickman's property."

24            You're talking about the sculpture that he

25   paid you hourly for which then found its way to         11:10

Page 59

1    Chicago, correct?

2        A    Correct.

3        MR. SAX:  Okay.  Lynn, go to the next one,

4    Paragraph 4.

5    BY MR. SAX:                                          11:10

6        Q    It says "Glickman hereby assigns to

7    Wakefield the exclusive right to enforce and protect

8    the copyrights in and to the Joint Work and the

9    Sculpture."

10           At this point in time, what familiarity did   11:10

11   you have with what a copyright was and the right to

12   enforce one?

13       A    What year was that?

14       Q    9- -- 9- -- 2012.

15       A    Well, you know, talking to some           11:10

16   attorneys --

17       MR. BROCKLAND:  Don't reveal --

18       THE WITNESS:  Oh.

19       MR. BROCKLAND:  -- attorney-client --

20       THE WITNESS:  Yeah.  Okay.                     11:10

21       MR. BROCKLAND:  -- communication, please.

22   BY MR. SAX:

23       Q    Yeah, just give -- just give me, you know,

24   an overall view of -- of how you became aware without

25   telling me what the attorney specifically told you.   11:10

Page 60

1        A     Yeah, just that att- -- attorney told me

2    about copyright infringement.

3        Q     Okay.  Is there a reason why Glickman

4    assigned it to you to enforce the rights and to file

5    litigation rather than him retaining that right for          11:11

6    himself?

7        A     Well, he didn't want to get involved in any

8    litigation.

9        Q     Okay.

10       A     And he was --                                      11:11

11             (Simultaneous speaking.)

12       THE WITNESS:  -- in very ill health.

13   BY MR. SAX:

14       Q     Okay.  But you were willing to enforce the

15   copyright through litigation, correct?                       11:11

16       A     Yes.

17       Q     Okay.  It goes on to say -- the second to

18   last sentence is, "The parties shall equally split

19   any and all net monies and other relief obtained

20   therefrom after the payment of all costs and                11:11

21   attorneys' fees."

22             Did you, in fact, split the net proceeds

23   with Mr. Glickman regarding the proceeds from

24   Wakefield I?

25       MR. BROCKLAND:  I'm going to object to the               11:11

                                                    Page 61

1    question.  I think it invades the right of privacy of

2    Mr. Wakefield and the right of privacy of -- of

3    Mr. Glickman, albeit Mr. Glickman has passed on, and

4    also would potentially cause the client to have to

5    reveal attorney-client communications contern --          11:12

6    concerning what his attorneys' fees were, and so,

7    therefore, I'm going to instruct him not to answer.

8         MR. SAX:  Well, I'll take care of your last

9    objection first.  I'm not asking him the amount of

10   the attorneys' fees or the costs.  I asked him for      11:12

11   the net amount.

12   BY MR. SAX:

13       Q    Was it -- what -- did they comply with the

14   terms of this agreement where it was split 50/50?

15       A    Well, that was after costs.                     11:12

16       Q    Yes.

17       A    Yeah, there wasn't --

18       Q    Was that co- --

19       A    -- anything after cost.

20       Q    You're saying Mr. Glickman received no          11:12

21   money?

22       A    Correct.

23       Q    Did you receive any money?

24       A    I received some.

25       Q    How much did you receive?                       11:12

Page 62

1      A    I'm not --

2      MR. BROCKLAND:  After costs and after attorneys'

3    fees, again, I think --

4      MR. SAX:  Yeah.

5      MR. BROCKLAND:  -- Spencer, I'm going to have to        11:12

6    object because it gets into matters of

7    attorney-client relationship regarding what our

8    arrangement was concerning attorneys' fees and costs,

9    and I'm going to instruct him not to answer the

10   question --                                             11:13

11     MR. SAX:  Okay.

12     MR. BROCKLAND:  -- on that basis.

13     MR. SAX:  Okay.  I'll cer- -- I'll certify the

14   question.

15   BY MR. SAX:                                             11:13

16     Q    Let me ask you this, Mr. Wakefield.

17          In the Wakefield II case, did you split any

18   proceed -- net proceeds with Mr. Glickman or his

19   estate?

20     A    No.                                              11:13

21     Q    Okay.  Did you receive any net proceeds --

22     MR. BROCKLAND:  Same --

23          (Simultaneous speaking.)

24     MR. BROCKLAND:  -- objection.

25     MR. SAX:  Well -- well, listen, I know you're --      11:13

Page 63

1          (Simultaneous speaking.)

2      MR. SAX:  -- objecting to the amount.

3  BY MR. SAX:

4      Q    But I'm asking, did you receive any net

5  proceeds from Wakefield II?                              11:13

6      MR. BROCKLAND:  Same objection and same

7  instruction, because it would require him to reveal

8  attorney-client communications.

9      MR. SAX:  Again, I'm not asking him for the net

10 amount.  I'm asking him did he receive any, similar   11:13

11 to the first Wakefield I questions that I had.

12          Are -- are you instructing him not to even

13 answer did he receive anything after the net

14 proceed -- the net proceeds?

15     MR. BROCKLAND:  You can rec- -- you can answer    11:14

16 whether you received anything, but not the amount.

17     THE WITNESS:  Yes.

18     MR. SAX:  Okay.  And I'll certify the -- the

19 instruction where -- to instruct him not to tell me

20 the amount.                                            11:14

21 BY MR. SAX:

22     Q    Okay.  Now, if you would, go to Paragraph 6

23 under Miscellaneous.  And if you look about eight

24 lines from the bottom more towards the right-hand

25 side, it says "This document constitutes the entire   11:14

Page 64

1    understanding and agreement of the parties, and any

2    and all prior agreements, understandings, and

3    representations are hereby terminated and cancelled

4    in their entirety and have no further force and

5    effect."                                              11:14

6              Are you familiar that this is typically

7    called a merger provision?

8         A    No, I don't -- I don't know what that's

9    called.

10        Q    Okay.  What did you understand that        11:14

11   sentence to mean?

12        A    I don't know.  You know, it's been a long

13   time.  It's 2012.

14        Q    Did you have any prior agreements with

15   Mr. Glickman before you entered into this agreement   11:15

16   with him?

17        A    No.

18        Q    Okay.  Did you have any -- did he -- he or

19   you make any representations to one another regarding

20   anything that's the subject of this agreement?        11:15

21        A    Well, we had conversations about it, and he

22   understood that it was going to take a lot of time

23   and effort and money to pursue it.

24        Q    Okay.  Did you understand that whatever

25   prior agreements or representations Mr. Glickman and   11:15

Page 65

1     you had made to each other is merged into this

2     document, and this agreement you had with

3     Mr. Glickman in writing was the one and only

4     agreement that either one of you could enforce?

5         A    I don't know if that's true or not.          11:15

6         Q    Okay.  Did you mean it when you said that

7     "all prior agreements, understandings, and

8     representations are hereby terminated and cancelled

9     in their entirety and have no further force and

10    effect"?                                              11:16

11              Did you understand the significance of

12    that?

13        A    I might have at the time, you know.  Again,

14    it's 2012.

15        Q    When you entered into this agreement with    11:16

16    Mr. Glickman, did you expect him to come back after

17    this was signed and come up with some representation

18    that he claims you made which would allow him to get

19    out of this agreement?

20        A    I don't recall.                              11:16

21        Q    Okay.  Did you expect him to make a claim

22    after this agreement was signed to say "Well, we

23    actually had some other agreement and I want to

24    enforce that other agreement"?

25        A    Never really thought about it.               11:16

Page 66

1        Q     Okay.  Let me ask you this.

2              In -- in the agreements that you entered

3        into with these various art galleries over the years,

4        are they in writing?

5        A     Some were.                                    11:17

6        Q     Okay.  And do any of those have merger

7        clauses in them?

8        A     I don't know.

9        Q     Okay.  And then when you do work with these

10       public art programs, do you sign any kind of an       11:17

11       agreement on that?

12       A     Yes.

13       Q     Okay.  Do you know if any of those

14       agreements have merger clauses?

15       A     I don't know.                                  11:17

16       Q     Okay.  In your work as the president of the

17       Great Lakes Art Foundation, do you enter into

18       contracts?

19       A     Not at this time.

20       Q     Okay.  How about over the last three          11:17

21       years?

22       A     No.

23       Q     Okay.  In your professional life as a

24       sculptor, have you entered into written agreements

25       with patrons or other people who commission your     11:17

Page 67

1    art?

2        A    Yes.

3        Q    Who typically drafts that agreement?

4        A    I don't know if it's typical.  Could be an

5    attorney.  One of us might have had a -- an outline.    11:17

6    I don't really recall exactly.

7        Q    Well, did you have an -- I'm sorry.

8             Did -- did you have an agreement with

9    Mr. Glickman on that $35 an hour or written agreement

10   regarding the -- the creation of Untitled?            11:18

11       A    I don't think so.

12       Q    Okay.  How about when you did the stainless

13   steel sculpture, did you have a written agreement

14   with him on that?

15       A    I don't believe so.                          11:18

16       Q    Okay.  In the agreements that you do enter

17   into with patrons, is it you who drafted or typically

18   the patron?

19       A    I don't know that's -- any of it's

20   typical.                                              11:18

21       Q    Okay.  Well, you -- how about just the

22   majority?  Was the majority done by you or the

23   majority done or drafted by the patron?

24       A    Well, usually the art gallery or the city

25   entity would draw that up.                            11:18

Page 68

1        Q    Okay.  And is there any copyrights that are

2    set forth to who gets to own the copyright in those

3    agreements?

4        A    I don't recall.

5        Q    Okay.  As far as you know, is this the only      11:19

6    time you ever entered into an agreement with another

7    party regarding who gets what with the copyrights?

8        A    Yes.

9        MR. SAX:  Okay.  All right.  Lynn, if you could,

10   turn to what we'll mark as --                              11:19

11       MR. BROCKLAND:  Spen- -- Spencer, if you're done

12   with that document, can we take a short break?

13       MR. SAX:  Of course.

14       MR. BROCKLAND:  Or -- or if you're moving on to

15   a different subject.                                       11:19

16       MR. SAX:  Yeah.  Yeah, I'm just -- actually,

17   ca- -- can I take a break after this next document

18   which are a bunch of photos, like, were on -- on the

19   same subject?

20       MR. BROCKLAND:  Yeah.  How long are you --            11:19

21       MR. SAX:  Well, let --

22       MR. BROCKLAND:  How -- how long --

23       MR. SAX:  I mean, I'll take a break.  If you've

24   got to go to the bathroom, you can --

25       MR. BROCKLAND:  No, no --                             11:19

Page 69

1       MR. SAX:  -- take a break.

2       MR. BROCKLAND:  -- no, no, no.  I mean, as long

3    as it's not another half hour.

4       MR. SAX:  No, I don't think so.  It's just going

5    to be some photos I need him to identify.              11:19

6       MR. BROCKLAND:  Sure.

7       MR. SAX:  Okay.  Lynn, could you put up on the

8    screen what we'll mark as 18 which are those photos

9    that were Bates-stamped 9 through 13.

10           (Whereupon Exhibit 18 was marked for          11:19

11    identification, a copy of which is attached hereto.)

12    BY MR. SAX:

13       Q    All right.  And Mr. Wakefield, my paralegal

14    is going to show you some photos that you've produced

15    in this case.                                          11:20

16           Okay.  All right.  Do you recognize the

17    gentleman who's on that first page?

18       A    That would be me.

19       Q    Okay.  And is this a picture of you

20    actually beginning the sculpture of Untitled that      11:20

21    found its way to Chicago?

22       A    Yeah, it was the early stages of it.

23       Q    Okay.  All right.  This wasn't a replica or

24    something else.  This was the granite that was used

25    on that particular sculpture; is that correct?        11:20

Page 70

1       A    Correct.

2       Q    Okay.

3       MR. BROCKLAND:  Hey, Spencer, for the record is

4   this marked as an exhibit?

5       MR. SAX:  Yeah, I just marked it as 18 --          11:20

6       MR. BROCKLAND:  Okay.

7       MR. SAX:  -- and I'm going to mark this as A.

8       MR. BROCKLAND:  Okay.  I just missed that.

9       MR. SAX:  And then -- then go to -- go to the

10  next page, which we'll mark as 18-B.                    11:21

11  BY MR. SAX:

12      Q    Is this the final product?

13      A    Well, it was closer to being finished.

14      Q    Okay.  How -- what percentage of completion

15  would you say that picture was taken?                   11:21

16      A    Can't see the other side, so I'm not sure,

17  but at least 50 percent.

18      Q    Okay.

19           And let's go to the next page, which is

20  18-C.                                                   11:21

21           And let me ask you this.

22           On the top left, is that the actual end

23  product sculpture?

24      A    No.  That was a little maquette of a -- of

25  a stainless steel.                                      11:21

```
                                                        Page 71
 1          Q    Is -- is that material stainless steel?

 2          A    Yes.

 3          Q    Okay.  And when was that done?  Was that

 4     done after the completion of the granite piece?

 5          A    Yes.                                         11:21

 6          Q    Okay.  Do you remember -- remember what

 7     year that was done?

 8          A    No.

 9          Q    Did you do a maquette of the granite piece

10     before you sculpted -- sculpted the actual piece?   11:22

11          A    No.

12          Q    Okay.  Do you typically do a maquette

13     first?

14          A    No.

15          Q    Okay.  When do you do a maquette?          11:22

16          A    I mean, I've made a lot of maquettes or

17     models, you might call them, over the years.  Some I

18     would use it as a leap-off point for doing something

19     larger.  Other times I would just leave it as it was

20     and it's like a small sculpture.                     11:22

21          Q    Do your patrons typically look at the

22     maquette and then you sculpt the larger piece?

23          A    No, not typically.  Usually --

24          Q    Okay.

25          A    -- I finish the piece, and that's what they  11:22
```

Page 72

1    see, you know --

2         Q    Okay.

3         A    -- for -- for a gallery setting.

4         Q    Okay.  Taking a look at the -- to the

5    picture on the top right, who is that?                    11:22

6         A    That's me as well.

7         Q    And what piece is that that you're pointing

8    to or holding?

9         A    That's a stainless steel piece that --

10        Q    Okay.                                            11:23

11        A    -- was created more or less from the

12   maquette that you see on the left-hand side.

13        Q    Okay.  And was there differences between

14   that piece, the stainless steel one, and the granite

15   version?                                                  11:23

16        A    Yeah, a lot.

17        Q    What's the differences?

18        A    All of the texturing.

19        Q    Okay.  Anything else?

20        A    Well, it's not identical.  It's just, you      11:23

21   know, similar.

22        Q    Okay.  Taking a look at the bottom left, is

23   that, like, an early stage of you starting the

24   granite piece or is that -- or am I wrong?

25        A    Well, I -- I'm just drawing it out at that     11:23

Page 73

1   point.

2       Q    Okay.  That's granite, not stainless,

3   right?

4       A    Correct.

5       Q    Okay.  And -- and the picture on the bottom    11:23

6   right, what does that depict?

7       A    That's the granite piece with the drawing

8   on it.

9       MR. SAX:  Okay.  And then let's go to the next

10  page, Lynn.  We'll make that 18-D.                         11:24

11  BY MR. SAX:

12      Q    The one on the left represents a fairly

13  close to finish?

14      A    Can you turn those around?  They're all,

15  like, sideways.                                            11:24

16      Q    Let's see if we can do it.  I mean, that's

17  the way the picture --

18      A    There.

19      Q    -- was given to us.

20      A    Oh, there.                                        11:24

21      Q    Okay.  So -- so now let me change the

22  orientation of -- of -- of -- of my question in

23  relation to the orientation of the photos.

24          Now what I call the top left, which is the

25  bottom left on the way it was presented to me, is         11:24

Page 74

1    that fairly close to the final product in granite?

2         A    Yeah.

3         Q    Okay.

4         A    Maybe 80 percent along the way, some- --

5    something like that.                              11:24

6         Q    Same -- same answer to the photograph on

7    the top right, which on -- on -- on mine would be the

8    top left of my version.

9         A    Right.

10        Q    Okay.  And then the bottom left, which is   11:24

11   the bottom right on mine, that's the final product?

12        A    It's getting there.

13        Q    Okay.  And then how about the last

14   photograph?  Is that also pretty much the final

15   product?                                          11:25

16        A    Yes, very close.

17        MR. SAX:  Okay.  And then, Lynn, if you go to

18   the last page.

19   BY MR. SAX:

20        Q    So this is all that is there.            11:25

21             Do you recognize that?  Is that just a

22   partial photo of a partial piece of the -- of one of

23   the -- of one of the 80 percent versions?

24        A    Right.  Right.

25        Q    Okay.  And it -- and it's there just to   11:25

Page 75

1    show the date?  Is that the reason why this

2    photograph was taken?

3         A    No.  I --

4         Q    Do you --

5         A    -- I -- I don't recall who -- who took that    11:25

6    photo.

7         Q    Okay.  Le- -- let me ask you this.

8              Who took all of these photos?  So you're

9    obviously not the one doing it, so who -- who's

10   taking these photos?                                    11:25

11        A    Yeah, some -- I would sometimes, just set

12   it up on a tripod and, you know, set a timer.

13        Q    Is it typical that you would take

14   photographs while you're sculpting?

15        A    Yes.                                           11:26

16        Q    Any reason why?

17        A    To document the process.

18        Q    Okay.  And -- and document it for who?

19        A    For me.

20        Q    Okay.  What does it do for you having it      11:26

21   documented?

22        A    Oh, just to show the history of it.

23        Q    Well, let me ask you this.

24             In 1992 were you doing other sculptures

25   other than this one?                                    11:26

Page 76

1        A    Yes.

2        Q    How -- approximately how many?

3        A    It's hard to say.  I almost always have a

4    few projects, different materials around the

5    studio.                                              11:26

6        Q    Going at the same time?

7        A    Yeah.  Sometimes it's nice to take a

8    breather from one, get a fresh look at it, you know,

9    later in the day or week, whatever.

10       Q    Did you -- did you -- did you take any     11:26

11   photos of the in-progress work on any of the other

12   sculptures being done in 1992?

13       A    Oh, yes.  Although --

14       Q    Do you have cop- --

15       A    The date --                                11:27

16       Q    Whoops.

17       A    Although I wouldn't have -- normally I

18   wouldn't have a date, so it leads me to believe

19   that -- that somebody else took the picture because I

20   never liked the -- the -- you know, the -- the date  11:27

21   listed on it because that --

22       Q    Okay.

23       A    -- comes -- you know, you -- you can get

24   that in other ways, but...

25       Q    Sure.                                      11:27

1          Do you know who took the photo that had the

2     dates on it?

3          A    I'm not sure.  It might have been my wife's

4     at the time, her camera.  I don't know.

5          Q    Okay.  Was she taking photographs of any of      11:27

6     your other works that were in progress in 1992?

7          A    She might have, but normally I would do

8     that.

9          MR. SAX:  Okay.  All right.  Gene, we can take a

10    break?                                                      11:27

11         MR. BROCKLAND:  All right.  Be about ten

12    minutes.

13         THE VIDEOGRAPHER:  Going off the record.  The

14    time is approximately 11:28 a.m.

15              (Brief recess taken.)                             11:41

16         THE VIDEOGRAPHER:  Going back on the record.

17    The time is approximately 11:42 a.m.

18         MR. SAX:  Okay.  All right.  Lynn, could you put

19    up on the screen what we'll mark as Exhibit 19.

20              (Whereupon Exhibit 19 was marked for             11:41

21    identification, a copy of which is attached hereto.)

22    BY MR. SAX:

23         Q    All right.  Mr. Wakefield, earlier you

24    testified about a -- a version with a teardrop in it.

25              Is this a fair representation of what you        11:41

Page 78

1    were referring to?

2        A    Yes.

3        MR. SAX:   Okay.  All right.  Lynn.  You can take

4    that one off the screen.

5    BY MR. SAX:                                          11:42

6        Q    All right.  Mr. Wakefield, you had

7    testified when I had asked you, you know, what

8    benefit did Olen get, and you had indicated free

9    artwork and property enhanced dramatically.

10           Let me go through the second one first.     11:42

11           Regarding the property enhanced

12   dramatically, what -- what facts do you have that

13   would indicate that the property in Boynton Beach had

14   its value enhanced dramatically?

15       A    Well, I don't know if the property itself   11:42

16   was enhanced dramatically.  So if I said that,

17   it was -- it -- it enhanced the property and --

18       Q    By having -- by having artwork on it?

19       A    Right.

20       Q    Okay.                                        11:42

21       A    And it's --

22       Q    I'm sorry.

23       A    No.

24       Q    I interrupted you.

25       A    No, no.                                      11:42

Page 79

1          Q     Okay.  Are you able to quantify that as

2     a -- it -- you know, in some value as to how much it

3     enhanced the property monetarily or there was no

4     monetary; it's just aesthetic?

5          A     Well -- well, monetarily, I mean, that's        11:42

6     why public art programs exist.  One of the reasons is

7     to enhance the properties, you know, through art.

8     So, you know, cities might have more information on

9     exactly what it does.

10         Q     Well, let me ask a little different.  I'll       11:43

11    break it into two separate questions.

12              First, as to the -- enhancing the value,

13    did -- are you contending that in any way the

14    sculptures have enhanced the value of those

15    properties?                                                 11:43

16         MR. BROCKLAND:  The monetary value?

17         MR. SAX:  Monetary value.

18         THE WITNESS:  Well, yes, because public art

19    programs, you know, pay the artist, so there's value

20    in the art itself.                                          11:43

21    BY MR. SAX:

22         Q     Do you know what the value of the property

23    was before the artwork was installed in 2014?

24         A     No.

25         Q     Do you know what the value was the day          11:44

Page 80

```
 1    after it was installed in 2014?

 2         A    No.

 3         Q    Have you gotten any opinions from

 4    real estate appraisers indicating that the property

 5    value changed as a result of the installation of the    11:44

 6    sculptures?

 7         A    No.  I've read stories in some of the art

 8    trades on -- that it enhances value, but I couldn't

 9    give you an exact price.

10         Q    How about an approximate?  Does it increase    11:44

11    it by a certain percentage?  Is there some factor?

12    I'm just trying to understand what position you're

13    going to take in this lawsuit as to any enhanced

14    value monetarily.

15         A    Well, I don't know.  I don't have any facts    11:44

16    in front of me right here.

17         Q    Okay.  You -- you have them somewhere

18    else?

19         A    No, just, you know, like I say, through

20    stories and articles and different art trades,    11:44

21    talking about the value of public art.

22         Q    Do you have an opinion as to what increase

23    in value, if any, the fact that the sculptures were

24    added to the Olen Properties in Boynton Beach had?

25         A    Well, I mean, I think it enhanced it quite    11:45
```

Page 81

1    a bit.  I -- I couldn't give you an exact figure.  A

2    million.  I don't know.  With --

3         Q    Where --

4         A    -- when you start adding up all of the

5    sculptures.                                                    11:45

6         Q    So where -- where are you pulling the

7    million from?

8         A    Well, because there's more than just my

9    sculptures out there.  You know, there's other

10   sculptures or sculptures work as well, so --              11:45

11        Q    Okay.  Well, but as --

12        A    -- I couldn't give you an exact value.

13        Q    Well, I understand you can't give me an

14   exact.  I'm -- I'm asking for an approximate value.

15             Are you asserting in this case that by       11:45

16   virtue of the sculp- -- your sculptures that you

17   claim that you have a copyright on, that those

18   sculptures specifically increase the monetary value

19   of the property?

20        A    I would just say yes from what I've read.    11:46

21        Q    Okay.  What have you read?

22        A    I just told you, I've read a lot of stories

23   over the years from art trades because it's been a --

24   oh, maybe a popular subject to -- to write about.

25        Q    Okay.  But as far as these -- this specific  11:46

Page 82

1    property in Boynton Beach and these specific

2    sculptures, do you have any facts at this point in

3    time that would indicate a specific monetary value

4    increase?

5        A    Not at this time.                          11:46

6        Q    Okay.  And as far as you know, have you

7    engaged or your attorneys have engaged any experts to

8    give an opinion that the real estate value of a

9    project changed as a result of these two

10   sculptures?                                          11:46

11       A    I don't have anything -- anything here that

12   we've talked about.

13       Q    Do -- are you aware that there have been

14   two replacement sculptures that have been placed on

15   the property?                                        11:47

16       A    No.  I think I saw a picture of a boulder.

17   It wasn't a sculpture.

18       Q    Okay.  Do you know if it satisfied the

19   requirements of the City of Boynton Beach?

20       A    I do not know.                              11:47

21       Q    Okay.  Do you have any opinion as to

22   whether the boulders, as you call it, in any way

23   enhanced the value -- the real estate value of the

24   property?

25       A    I don't -- I don't really know what a      11:47

Page 83

1    bolder does, but I suppose there's still some value

2    there with landscaping.

3        Q    Okay.  You also testified that -- well, let

4    me ask you this.

5            Putting the -- the real estate value aside,     11:47

6    you -- you -- you believe that there's some other

7    enhancement that is -- that -- that the owner, Olen,

8    has gotten by having those two sculptures there.

9            How do you quantify that?

10       A    Well, he's not paying the artist for the     11:47

11   work.

12       Q    Any other thing other than that?

13       A    And I don't know what he's paying the City,

14   but I understand there was some challenges working

15   with Mr. Olenicoff regarding that as well.     11:48

16       Q    Anything else?

17       A    Not that I can think of.

18       Q    Okay.  Do you deny that my client paid the

19   Chinese sculptor in China for the sculptures that

20   were installed at -- in Boynton Beach?     11:48

21       A    He didn't pay any artist in China.

22       Q    Okay.  Did he pay a broker --

23       A    I --

24            (Simultaneous speaking.)

25   ///     11:48

```
 1    BY MR. SAX:

 2        Q    -- in China?

 3        A    I don't know that he did, but we had

 4    receipts to show that he paid a broker.

 5        Q    Okay.  Do you have reason to believe that    11:48

 6    he didn't pay a broker for these sculptures?

 7        A    No, I don't know.

 8        Q    Okay.  Because Mr. Olenicoff does not

 9    personally own that property in Boynton Beach, are --

10    are you asserting in this case that he personally got   11:49

11    a -- a monetary benefit from the placement of these

12    two sculptures?

13        A    Well, if money is coming out of his company

14    to pay for them, then he directly benefits from

15    that.                                                   11:49

16        Q    Okay.  And is that the extent of your

17    testimony on that subject?

18        A    At this time.

19        Q    Okay.  Now, you also said a benefit was

20    free artwork.                                           11:49

21            Again, if -- if the company paid a broker

22    for the artwork, he wasn't getting free artwork, was

23    he?

24        MR. BROCKLAND:  Objection; assumes facts not in

25    evidence.                                               11:49
```

Page 85

```
 1              Go ahead and answer.
 2         THE WITNESS:  Well, he's -- he's obviously
 3    play -- paying a whole lot less.  If he's paying
 4    them, he's paying a lot less than he would have to
 5    pay the artist.                                    11:49
 6    BY MR. SAX:
 7         Q    Okay.  Are you familiar with the artist Zao
 8    (phonetic) in China?
 9         A    Zao?
10         Q    Or any -- do you know the name of the       11:50
11    artist in China who purportedly did the sculptures?
12         A    No.  He doesn't exist.  That was a --
13         Q    You think --
14         A    -- name he came up with.
15         Q    Okay.  All right.  So -- and -- and,        11:50
16    therefore, you also believe that the -- Mr. Olenicoff
17    never saw these in the Sculpture Garden in China?
18         A    Exactly.
19         Q    What facts do you have to indicate that
20    that's not an accurate statement?                    11:50
21         A    We researched all of the art that was on
22    exhibit during the Olympics, and that didn't come up
23    anywhere.
24         Q    Do you know for a fact that they're not
25    located in the Olympic Garden?                       11:50
```

Page 86

1      A    Well, there wasn't anything exactly called

2    the Olympic Garden.  That was just something that he

3    said.

4      Q    Okay.  That -- is that the full extent of

5    your dispute with Mr. Olenicoff and his testimony          11:50

6    that he saw this sculpture in the Olympic Gardens in

7    China?

8      A    Repeat the question.

9      Q    Sure.

10         I'm just trying to understand, is -- is           11:51

11   there more to your statement that Mr. Olenicoff made

12   this up and -- other than what you've already

13   testified to?

14     A    Well, I talked to the broker.

15     Q    Who -- what was the name of the broker?          11:51

16     A    John -- well, he goes by several last

17   names, but John Liang, John Sohu, or John Lyon.

18     Q    Okay.  And did -- how many times did you

19   have conversations with Mr. Liang, we'll call it, for

20   purposes of this question?                                  11:51

21     A    We probably talked, oh, three, four or five

22   times.

23     Q    What years?

24     A    Uh-huh.  That would have been about --

25     Q    Do you know what years?                             11:51

Page 87

```
 1        A    -- maybe 2012.

 2        Q    Okay.  And you reached out to him?

 3        A    I did.

 4        Q    How did you get his name in the first

 5   place?                                           11:52

 6        A    It was on one of the receipts from the City

 7   of Brea.

 8        Q    Okay.  And what did Mr. Liang and you

 9   discuss?

10        A    We discussed the work that he did for      11:52

11   Mr. Olenicoff.

12        Q    Okay.  What did he tell you about the work

13   he did for Mr. Olenicoff?

14        A    He said that Mr. Olenicoff gave him

15   photographs and they -- and they copied it.         11:52

16        Q    Okay.  When you say "they," who's the

17   "they" who copied it?

18        A    The factory in China.

19        Q    Okay.  So it's your understanding based

20   upon your discussion with Mr. Liang that the        11:52

21   sculptures that found their way to Boynton Beach were

22   manufactured in China?

23        A    Yes.

24        Q    Okay.  And did you ever see the photographs

25   that Mr. Liang was referencing?                     11:52
```

Page 88

1      A     Yes.

2      Q     Okay.  Do you have a copy of them

3   somewhere?

4      A     Yes.

5      Q     Okay.  And how did you procure copies of          11:52

6   those photographs?

7      A     He sent them through email.

8      Q     Okay.  And those photographs -- could you

9   tell when those photographs were taken?

10     A     There weren't any date stamps on it, so it        11:53

11  would have just been previous to the email.

12     Q     Okay.  And did you -- how did you identify

13  yourself to Mr. Liang?  Who did he tell you -- who

14  did you tell him you were?

15     A     Don Wakefield.                                    11:53

16     Q     Okay.  Did you tell him that you had some

17  connection with the sculpture?

18     A     No.

19     Q     What -- what -- you called him up out of

20  nowhere and he talked to you.                             11:53

21         Did you indicate why you were calling

22  him?

23     A     I indicated that I was considering using

24  them for some other work, and he volunteered to send

25  me photos that he did for Mr. Olenicoff.                  11:53

```
                                                   Page 89

 1        Q    All right.  So you were posing as somebody

 2   other than really as yourself --

 3        A    No --

 4        Q    -- and --

 5        A    -- it was Don Wakefield.                11:54

 6        Q    Okay.  And -- but were you serious about

 7   asking him to do the work?

 8        A    Well, I was really curious on what prices

 9   were.

10        Q    Okay.  Did he tell you the prices?       11:54

11        A    Yes.

12        Q    What were the prices he told you?

13        A    I don't recall.

14        Q    Do you remember if it was $75,000 or

15   less?                                              11:54

16        A    It was -- let me think about it.

17             No, he just said it would be significantly

18   less than the receipt that he had written in for

19   Mr. Olenicoff.

20        Q    Do you remember the amount on the        11:54

21   receipt?

22        A    I think it was like 150 a piece.

23        Q    And he -- did he indicate to you on the

24   phone how much the real number was?

25        A    It would be, I think, closer to 15,000.  11:54
```

Page 90

1      Q    One-five?

2      A    Yes.

3      Q    Okay.  So his testimony -- not his

4   testimony.  His -- his statement to you was he -- he

5   received $15,000 per piece from Mr. Olenicoff or his      11:55

6   company?

7      A    No.  He just said that's what he would

8   charge me.

9      Q    Got it.

10          Do you have reason to believe that he          11:55

11   charged Mr. Olenicoff more?

12      A    No, I -- I don't know.

13      Q    Did he indicate why he was charging you 15

14   but Mr. Olenicoff another number?

15      A    No.                                            11:55

16      Q    Okay.  And did you order any from him?

17      A    No.

18      Q    Why not?

19      A    Because I usually do my own work, but as I

20   was getting older, I was curious to see what it would   11:55

21   cost to have somebody, you know, help perhaps on a

22   piece.

23      Q    Did you think you were being truthful with

24   Mr. Liang regarding your interest in having him make

25   copies for you?                                         11:55

Page 91

```
 1        A    Say the question again.

 2        Q    Sure.

 3             Do you think you were being honest with

 4   Mr. Liang in your conversation about what you were

 5   asking him about?                                        11:56

 6        A    Did I think I was being honest?

 7        Q    Yeah.

 8        A    Well, I was.

 9        Q    Did you ever have any -- any intention when

10   you placed that phone call to him to actually have       11:56

11   him make sculptures for you?

12        A    No.  I was --

13        Q    Okay.

14        A    -- just shopping.

15        Q    Okay.  And -- or were you really just doing    11:56

16   some investigation for your lawsuit?

17        A    Well, it's both.

18        Q    Okay.  Was this your idea, to make that

19   phone call to Mr. Liang?

20        A    Yes.                                           11:56

21        Q    And how many subsequent calls did you have

22   with Mr. Liang after this first one?

23        A    Oh, we talked, you know, three, four or

24   five times.

25        Q    What was the subjects of those calls?         11:56
```

Page 92

```
 1        A    Just talked about the quality of the work,
 2    where it's made, how much work he did for
 3    Mr. Olenicoff.
 4        Q    Okay.  Did he provide any other numbers to
 5    you other than the ones you've already testified        11:57
 6    to?
 7        A    No, not really.  It wasn't just all about
 8    price.
 9        Q    What else was it about?
10        A    Not -- like, the quality of the work.          11:57
11        Q    Okay.  Did he explain to you that it was
12    good quality?
13        A    That's what he said.
14        Q    Did you think it was good quality?
15        A    I think they have some skilled craftsmen.      11:57
16        Q    In those subsequent calls that you had with
17    Mr. Liang, was your intention just to do more
18    investigation for your litigation?
19        A    Well, I mean, after the first call, I mean,
20    I was following up, you know.                           11:57
21        Q    So it was just a continuation of the first
22    call and your reasons for that?
23        A    Right.
24        Q    Okay.  These photographs, were they taken
25    in China, as far as you know?                           11:57
```

Page 93

1        A    As far as I know.

2        Q    Okay.  They weren't taken in the

3    United States?

4        A    Well, I can't confirm.

5        Q    They weren't a -- they weren't a photograph    11:57

6    of the actual sculpture that was in Chicago, was

7    it?

8        A    No.

9        Q    Okay.  Were they photographs in a -- a

10   place where it was being made or was it out on public    11:58

11   display?

12       A    Yeah, in a place that they were being made,

13   like a factory.

14       Q    Got it.  Okay.

15       A    They were --                                    11:58

16       Q    And --

17       A    Well, no.  Go ahead.

18       Q    Oh, sorry.  No, you --

19       A    No.  There were just --

20            (Simultaneous speaking.)                        11:58

21       THE WITNESS:  -- a few -- you -- you could see a

22   few of them set up side by side.

23   BY MR. SAX:

24       Q    Got it.

25            Were they identical to each other?              11:58

Page 94

1        A    Yes.

2        Q    Were they made out of a mold as opposed to

3    by hand?

4        A    No.  You can't really make a granite

5    sculpture, you know, from a mold.                          11:58

6        Q    So they were all made individually by

7    hand?

8        A    Correct.

9        Q    Okay.  In -- let -- let me ask you this.

10            I'm -- I'm trying to understand in your          11:58

11   career -- the arc of your career, were -- what -- at

12   what point and what years were you getting the

13   highest prices for your artwork?

14       A    I mean, the highest prices, I don't know.

15   2000s, somewhere in there.  Early 2000, late 1990s.      11:59

16       Q    And what was the reason why the prices went

17   down after that?

18       A    They never went down.

19       Q    Okay.  Regarding the -- you know, this

20   lawsuit as well as in the first lawsuit and the          11:59

21   second lawsuit, the -- whatever relief that you were

22   seeking was the destruction of the cop -- of the

23   sculptures that Mr. Olenicoff or his company had at

24   various properties, correct?

25       A    Correct.                                          12:00

Page 95

1       Q    Is there a reason why you wanted them

2    destroyed rather than let them stay on place, be

3    compensated, and have a plaque next to it?

4       A    Yeah.  Well, I only create original works

5    of art.  It's a little embarrassing to see so many    12:00

6    sculptures placed all over his properties.

7       Q    Have you ever for anybody placed a plaque

8    on a -- on a copy or a similar piece where you have

9    asserted that somebody copied you?

10      A    No.                                            12:00

11      Q    Has anybody, as far as you know, ever

12   copied any of your work other than in the three

13   lawsuits that you -- you're familiar with?

14      A    No.

15      MR. SAX:  Now, Lynn, if you could put up on the    12:00

16   screen the Settlement Agreement, Exhibit Number 15.

17   BY MR. SAX:

18      Q    And Mr. Wakefield, you were actually at the

19   deposition of Mr. Olenicoff, correct?

20      A    Yes.                                           12:01

21      Q    All right.  So you saw me go over this

22   agreement with him, correct?

23      A    Correct.

24      Q    Okay.  Have you had an opportunity to

25   review this agreement recently?                        12:01

Page 96

```
 1        A    Yes.

 2        MR. SAX:  Okay.  Lynn, if you could, turn to the

 3   last page and one back.  There you go.  No.  There

 4   you go.

 5   BY MR. SAX:                                           12:01

 6        Q    Is that your signature, Mr. Wakefield?

 7        MR. BROCKLAND:  Hey, Spencer, can we hang on?

 8   Are there things that are on this exhibit that

 9   shouldn't be?

10        MR. SAX:  Yeah, I agree.  There are things.  It   12:01

11   should end on Page 5 of 5.

12        MR. BROCKLAND:  Okay.

13   BY MR. SAX:

14        Q    Okay.  So is that your signature,

15   Mr. Wakefield, on that last page?                     12:01

16        A    It looks like it, yes.

17        Q    Okay.  Good.

18             Were you involved in the negotiations of

19   this agreement?

20        A    Some -- yeah, somewhat, yes.                12:01

21        Q    Okay.  Did you have counsel represent you

22   on this agreement?

23        A    Yes.

24        Q    Do you remember who did the typing of the

25   drafts of the agreement?  Was it your counsel or      12:02
```

Page 97

1    Olen's counsel or both?

2         A    I think it was both.

3         Q    Okay.  Had -- did you see versions of this

4    before it got signed?

5         A    Not to my recollection.                    12:02

6         Q    Okay.  Were you involved in any of the

7    negotiations of this, including price?

8         A    Oh, I can't remember.

9         Q    Okay.  Taking a look -- Lynn, if you go

10   back to the first page under 1.2.                     12:02

11        Okay.  It says "Purpose."  It says "The

12   purpose of this agreement is to settle and compromise

13   all disputes and controversies existing among the

14   parties hereto, including but not limited to any and

15   all claims that are raised or might have been raised  12:02

16   in the 2017 action."

17        Did you understand the 2017 action to be

18   the Wakefield II lawsuit?

19        A    I'm not sure right now.

20        Q    Okay.  Is it fair for me to say that       12:03

21   Wakefield I was filed in 2012 and Wakefield II was

22   filed in 2017?

23        A    That's close.

24        Q    Okay.  Good.  All right.

25        MR. BROCKLAND:  Excuse me.  Spencer, can --      12:03

Page 98

1    Lynn, can you zoom in on that a little bit more?  I

2    think just generally I -- I see the witness --

3         MR. SAX:  Yeah, no problem.

4         MR. BROCKLAND:  -- squinting.

5         MR. SAX:  Okay.                              12:03

6         THE WITNESS:  All right.

7         MR. BROCKLAND:  Thank you.

8         MR. SAX:  No problem.

9         THE WITNESS:  Thank you.

10   BY MR. SAX:                                       12:03

11        Q    All right.  So Mr. Wake- -- Mr. Wakefield,

12   it specifically says "This agreement is -- the

13   purpose of the agreement is to settle and compromise

14   all disputes and controversies existing among the

15   parties."                                         12:03

16        Did you understand that was the purpose of

17   this Settlement Agreement?  Mr. Wakefield?

18        A    Yeah, I'm -- I'm just reading through it

19   and trying to understand it clearly.

20        Q    Okay.  Was that the purpose of this       12:04

21   agreement?

22        A    I believe it was.

23        Q    Okay.  Did you believe it had some other

24   purpose?

25        A    I don't know.                             12:04

Page 99

```
 1        Q    Okay.  Then it goes on to say "including
 2    but not limited to."
 3             I know you're not an attorney, but does
 4    that have any significance to you when a document
 5    says "including but not limited to"?  Does that mean      12:04
 6    anything in particular to you?
 7        A    No, not really.
 8        Q    Okay.  Does it mean to you that you're not
 9    limited to what follows, but it can include other
10    items?  Does that sound familiar as to what your          12:04
11    understanding would be of that term?
12        A    No.  I mean, it's -- it's not open-ended.
13    That's not what I signed.
14        Q    You mean --
15        A    I didn't take it --                              12:05
16             (Simultaneous speaking.)
17        THE WITNESS:  -- to be on --
18        MR. BROCKLAND:  Just stick to his question,
19    please.
20        THE WITNESS:  Okay.                                   12:05
21    BY MR. SAX:
22        Q    Yeah.
23             I'm just asking you where it says
24    "including but not limited to," do you understand
25    that language to mean that it's not limited to the        12:05
```

Page 100

1    language that follows, but it also says not limited

2    to that?

3            Do you understand that concept as a layman?

4        A    You know, I mean, looking at it, trying to

5    put myself back in that time frame, you know, I -- in    12:05

6    the action I guess, you know, anything before that

7    time.

8        Q    Okay.  So that is your understanding of

9    what "including but not limited to" means?

10       A    Well, it just seems vague, but...    12:05

11       Q    But what?  You --

12       A    But I --

13           (Simultaneous speaking.)

14       THE WITNESS:  -- don't know.  You know, I -- I

15    can't really follow up on that.    12:06

16    BY MR. SAX:

17       Q    Okay.  And it says "any and all claims that

18    are raised or might have been raised."

19           Didn't the language "might have been

20    raised" have any significance to you?    12:06

21       A    Well, "might have been raised" earlier.

22       Q    Okay.  "Might have," meaning it didn't

23    actually have to be raised.  It just might have been

24    raised is what was covered by this agreement,

25    correct?    12:06

Page 101

1      MR. BROCKLAND:  Objection; the document speaks

2   for itself.

3      MR. SAX:  His understanding.

4      MR. BROCKLAND:  You can answer.  Give him --

5   give him your understanding.                          12:06

6      THE WITNESS:  The -- the -- we were talking

7   about the pieces that were, you know, previous to

8   this negotiation.

9   BY MR. SAX:

10     Q    Okay.  My question is -- is a little        12:06

11   different.

12           It's simply, it doesn't say all claims that

13   are raised in the 2017 action.  It says "that are

14   raised or might have been raised."

15           Do you understand that you were agreeing    12:06

16   that it includes claims that could have been brought,

17   not those that are s- -- limited to those that were

18   specifically brought?

19           Do you have that understanding?

20     A    Well, if they could have been brought, why  12:07

21   weren't they brought?  I don't know.

22     Q    Okay.  Let's go to 2.3.  Well, actually,

23   I'll -- I'll skip that.  Let's go down -- let's go to

24   3.1 on the next page.  All right.  You see it says

25   "General Release by Wakefield"?                      12:07

```
 1              Did you understa- -- what was your

 2     understanding as to what a general release meant?

 3         A    That I was releasing any of the work

 4     previous to that date.

 5         Q    Did you have an understanding --              12:07

 6         A    Well, previous -- let me step back.  Just

 7     the ones that we had found previous to that date.

 8         Q    Where does that say in this agreement

 9     specifically what you just said?  Where does it say

10     that this general release is limited by those that    12:07

11     you previously were aware of?

12              Where does it say that in this agreement?

13         A    I don't know.

14         Q    It goes on to say -- it releases you and,

15     et, cetera from any and all claims, and it goes on to  12:08

16     say in about the eighth line "of any nature

17     whatsoever."

18              Does that -- does that have any

19     significance to you, that the claims of any nature

20     whatsoever?  Do -- do you see that as broad language?  12:08

21     Did you understand that concept?

22         A    Vaguely, but again, we're still looking at

23     back in that date and things that were previous to

24     that.

25         Q    Okay.  Do you see where it says "known or    12:08
```

                                                    Page 103

1     unknown"?  Did -- does -- did that have any meaning

2     to you where you were not just agreeing to a release

3     of known claims but you were also agreeing to a

4     release of unknown claims?

5              What was your understanding?              12:08

6        A    Back to the date, to the previous date.

7        Q    Okay.  Well, let me ask you this.

8              Those sculptures, the ones in Boynton

9     Beach, were in existence and on location in public

10    view for, what, four years prior to the entering of   12:09

11    the -- entering into this agreement, correct?

12       A    No, I don't know that.

13       Q    Okay.  Do you know today when they were

14    first on display in Boynton Beach?

15       A    I -- I don't know offhand.                  12:09

16       Q    Would you agree with me that if they were

17    on display in Boynton Beach prior to the entering of

18    this agreement that it would be covered?

19       MR. BROCKLAND:  Objection; calls for a legal

20    conclusion.                                         12:09

21    BY MR. SAX:

22       Q    Your understanding.

23       A    No.

24       Q    Is it your understanding that -- well, let

25    me ask you this.                                    12:09

```
                                              Page 104

 1              Had you had a -- if you had done a Google

 2   Map search or Google search and you would have seen

 3   those sculptures there in Boynton Beach before you

 4   signed this agreement, would that have had any effect

 5   on what you did here?                            12:09

 6       A    Well, if I saw them, we would have brought

 7   them up.

 8       Q    And you just failed to look for it?

 9       MR. BROCKLAND:  Failed to look for what?

10       MR. SAX:  For -- for -- on Google Maps to see if  12:10

11   there were any sculptures on those Boynton Beach

12   properties at some point in time prior to the signing

13   of this agreement.

14       THE WITNESS:  No.  I mean, I -- I did a Google

15   search and they were not there.                  12:10

16   BY MR. SAX:

17       Q    Okay.  And what year was that?

18       A    I -- I don't know exactly.

19       Q    Was it shortly before the entering of this

20   agreement?                                       12:10

21       A    I'm not sure.

22       Q    Was it years before?

23       A    Oh, I looked -- I looked years before.

24       Q    Okay.  That was the last time you looked in

25   Boynton Beach to see if the sculptures were there?  12:10
```

Page 105

1       A    No, I'm -- I'm not sure of the exact

2    year.

3       Q    Okay.  It goes on to say "suspected or

4    unsuspected."

5            Did that term mean anything to you, that it    12:10

6    was a claim that it was either suspected or

7    unsuspected?

8       A    I mean, it -- it -- it doesn't have any

9    real meaning because, again, it's -- it's about the

10   date that we signed this on.                           12:11

11      Q    Okay.  Is it your position that the

12   Boynton Beach sculptures were an unsuspected claim?

13      MR. BROCKLAND:  Objection; calls for a legal

14   conclusion.

15   BY MR. SAX:                                            12:11

16      Q    Your understanding.

17      A    Yeah, I don't recall.

18      Q    Okay.  I notice that in the end of that

19   paragraph there's a cross-out, and what was crossed

20   out is "Nothing in this agreement shall be construed   12:11

21   to mean that Wakefield is waiving or releasing claims

22   to enforce this agreement or any relief granted in

23   the 2012 action."

24           Is that your initial there that indicates

25   you were agreeing to the cross-out?                    12:11

Page 106

1          A     I guess I was agreeing to the cross-out.

2          Q     Okay.  Do you -- do you understand why you

3     were crossing it out?

4          MR. BROCKLAND:  Objection; that suggests that he

5     crossed it out.                                          12:12

6     BY MR. SAX:

7          Q     Did you -- as to why it was crossed out?

8          A     No, I don't -- I don't know why it was

9     crossed out.  I just figured that it was something

10    that was -- was not going to be, you know, listed in    12:12

11    the contract.

12         Q     Okay.  Well, let me ask you this.

13               It says "Nothing in this agreement shall be

14    construed to mean that you are waiving a release in

15    claims" -- okay.  Let me go to the last part -- "or     12:12

16    any relief granted in the 2012 action."

17               Was the relief in the 2012 action the

18    $450,000 and the entering of the injunction to

19    destroy the sculptures?  Is that what you understood

20    the relief granted in the 2012 action?                  12:12

21         A     I don't recall.

22         Q     Okay.  Well, do you -- do you -- did you

23    ever understand what the relief that was granted in

24    the 2012 action?

25         A     Now, repeat that.                            12:12

1          Q     Sure.

2                Did you ever understand what -- the relief

3     that was granted in the 2012 action?

4          A     Did I ever --

5          Q     Did you ever know?                              12:12

6          A     Did I ever --

7          Q     Did you ever know?

8          A     -- understand it?

9          Q     Yeah, what you had won in Wakefield I.

10         A     Oh.  Well, I mean, I understood that I          12:13

11    won.

12         Q     Okay.  Did you understand you received

13    monies?

14         A     I understood that I received monies.

15         Q     Did you understand that you got an             12:13

16    injunction requiring the destruction of various

17    sculptures?

18         A     Yes.

19         Q     Okay.  And did you understand that by

20    crossing or agreeing to the cross-out of this            12:13

21    sentence, that you were -- in fact, are waiving any

22    claims regarding the relief granted in the 2012

23    action?

24         MR. BROCKLAND:  Objection; calls for a legal

25    conclusion.                                               12:13

Page 108

1    BY MR. SAX:

2        Q    Your understanding.

3        A    No.  I mean, I just looked at that as

4    something that wasn't going to be in the contract, so

5    I wasn't paying maybe close attention to what's          12:13

6    crossed off.

7        Q    But you agreed to it, correct?

8        A    It looks like it.

9        Q    Okay.  And you would realize that

10   Mr. Olenicoff and his company would rely on the fact     12:13

11   that you agreed to this cross-out, correct?

12       MR. BROCKLAND:  Objection; calls for

13   speculation.

14   BY MR. SAX:

15       Q    Did you intend for Mr. Olenicoff and his        12:14

16   company to -- to -- to -- did you intend for them to

17   rely upon the fact that you had agreed to this

18   deletion in this agreement?

19       A    Repeat that, please.

20       Q    Sure.                                           12:14

21       Did you intend by agreeing to this deletion

22   that Mr. Olenicoff and his company would rely upon

23   the fact that you were now agreeing to the

24   deletion?

25       A    I guess.                                        12:14

Page 109

1     Q    Okay.  Now, do you see any language in this

2   agreement in which you reserve the right to sue

3   Mr. Olenicoff and his company if you subsequently

4   discover other sculptures?

5     MR. BROCKLAND:  Objection; calls for a legal          12:14

6   conclusion.

7   BY MR. SAX:

8     Q    Okay.  You can answer.

9     A    Well, if --

10    Q    Do you see yours- -- do you see that in          12:15

11  here?

12    A    Do I -- well, I haven't read it all

13  today.

14    Q    Okay.  Well, I went over it in graphic

15  detail in Mr. Olenicoff's deposition.  I'll be doing   12:15

16  it here with you.

17         But are you as you sit here today aware of

18  any language in this agreement in which you reserve

19  that right?

20    A    Yeah, by the date.                               12:15

21    Q    Does it say here as of a certain date and

22  anything after that date is reserved for you to make

23  another claim?

24         Do you see that language in here?

25    MR. BROCKLAND:  Yeah.  Objection; compound.  It      12:15

Page 110

1    does say "to date."

2    BY MR. SAX:

3        Q    Okay.  My -- my question to you,

4    Mr. Wakefield, is do you see language in this

5    agreement which -- which you reserve the right to        12:15

6    pursue additional claims against Mr. Olenicoff and

7    his company if you subsequently cover the existence

8    of other sculptures?

9        A    Yes --

10        Q    Yes or no?                                      12:15

11        A    -- because it says "to date."

12        Q    That is what you're relying on as the

13    reservation of your rights; is that correct?

14        A    Well, it makes sense.

15        Q    It -- I'm just asking --                        12:16

16        A    Yes.

17        Q    -- is there anything else that you're

18    relying on?

19        A    Well, there may be other things in there,

20    but the date was what stuck in my mind.  I was not       12:16

21    giving up my rights to the sculpture.

22        Q    Do you remember attempting to negotiate

23    language in this agreement where it specifically said

24    that you reserve the right if you subsequently

25    discover additional sculptures to bring additional       12:16

Page 111

1    claims?

2          Do you remember any of those

3    negotiations?

4        A    Not really.

5        Q    Now, take a look at 3.3.  It says "The        12:16

6    parties understand that the releases provide the" --

7        MR. BROCKLAND:  Hold on.  We're not there yet.

8        MR. SAX:  Okay.  Sorry.

9    BY MR. SAX:

10       Q    "The parties understand that the releases       12:16

11   provided for in this agreement extend to all claims

12   whether or not claimed or suspected."

13          What was your understanding of the

14   significance of the words "whether or not claimed or

15   suspected"?                                              12:17

16       A    Again, everything before that date.

17       Q    Okay.  So are -- you're saying that if you

18   had a claim prior to the date of this agreement which

19   was not suspected, that claim was being waived.

20          Is that your understanding of what you        12:17

21   signed?

22       A    No.

23       Q    Why not?

24       A    Well, because he had -- you know, in court

25   he said he had destroyed all of the works.           12:17

Page 112

1      Q    I'm asking you --

2      A    So we --

3      Q    We'll get into the representations in a

4  minute.

5           I'm just asking you, looking at the          12:17

6  language here and what you had agreed to, what facts

7  do you have to indicate that you were not agreeing to

8  waive all claims suspected or unsuspected prior to

9  the date of the signing of this agreement?

10     A    I -- I don't know.                           12:17

11     Q    It goes on to talk about a waiver of

12 various provisions of the California Civil Code, but

13 specifically says "A general release does not extend

14 to claims which the creditor does not know or suspect

15 to exist in his or her favor at the time of executing  12:18

16 the release, which if known by him or her must have

17 materially affected his or her settlement with the

18 debtor."

19          Were you aware when you signed this

20 agreement that you were waiving the protections of     12:18

21 that California statute?

22     A    No.  I don't know, you know.  It's --

23     Q    Okay.

24     A    -- legal jargon.

25     Q    Okay.  And did anybody stop you from having   12:18

Page 113

1    assistance of counsel so that you could understand

2    this legal jargon?

3        A    Did anybody stop me?

4        Q    Yeah.

5             Did anybody stop you from seeking legal        12:18

6    advice as to the meaning and significance of this

7    language?

8        A    No, not that I remember.

9        Q    Okay.  It goes on to say "The parties

10   hereby acknowledge that the effect and import of this    12:18

11   provision has been fully explained to them and that

12   they are aware of its contents and legal effect."

13            Did you understand the significance of

14   that?

15       A    The significance of it, prob- -- not           12:19

16   really.

17       Q    Okay.  Were -- were you aware of --

18       A    I don't -- I don't see any significance of

19   it really.

20       Q    Well, do you -- are you aware that the         12:19

21   reason why that kind of a sentence is inserted is so

22   people later on can't say "I didn't know about the

23   significance or importance"?

24            Are you aware of that?

25       A    No.                                            12:19

Page 114

1          MR. SAX:  All right.  Lynn, go to 4.1.

2     BY MR. SAX:

3          Q     Under 4.1(b) it says "Wakefield is, through

4     this agreement, releasing the Olen parties from any

5     and all claims he may have against them arising          12:19

6     before the execution of this agreement."

7               Did you understand what that meant?

8          A     I guess I did at the time.

9          Q     Okay.  And then, Lynn if you could, turn to

10    Page 4 of 5, Paragraph 5.5 at the top.                   12:19

11              Okay.  This is the entire agreement

12    provision that says "This agreement contains the sole

13    and entire agreement and understanding of the parties

14    with respect to the entire subject matter hereof,"

15    and it goes on to say that "All discussions,             12:20

16    negotiations, understandings related hereto are

17    hereby merged herein.  No representations, oral or

18    otherwise, express or implied other than those

19    contained herein have been made by any party hereto."

20              Does this bear some resemblance to that       12:20

21    merger provision that was in your agreement with

22    Mr. Glickman that we went over earlier today?

23         A     I -- I don't know.  It's -- again, it's a

24    lot of legal talk.  It --

25         Q     And again, is it legal talk that anybody      12:20

Page 115

1    stopped you from understanding or seeking counsel to

2    understand?

3         A    No.  I mean, I -- I talked to, you know,

4    the -- the attorneys when...

5         Q    Okay.  But no one stopped you?  I don't        12:20

6    want to know what you said to the attorneys or they

7    said to you, but nobody stopped you from seeking

8    whatever legal advice that you wanted to seek

9    regarding understanding what you were agreeing to,

10   correct?                                                 12:21

11        A    Well, repeat that, please.

12        Q    Sure.

13             Is it true that nobody stopped you from

14   seeking legal advice so that you could fully

15   understand what you were -- were signing here?          12:21

16        A    True.

17        Q    Okay.  And again, you're -- are you

18   asserting at all in this case that -- or taking the

19   position that you didn't understand what you signed

20   here?                                                    12:21

21        MR. BROCKLAND:  Well, I think he said already

22   that he didn't understand certain things, but --

23   BY MR. SAX:

24        Q    Are you taking the position in this lawsuit

25   that you did not understand the terms of this           12:21

Page 116

1    agreement when you signed it?

2         A    No.  Well, what I understood was, again,

3    the date.  That -- that was critical.

4         Q    Okay.  Well, 5.5 doesn't deal with a date.

5    That's the merger clause.                                  12:22

6         A    Yeah.

7         Q    Did you --

8         A    Well, there's a lot of clauses --

9         MR. BROCKLAND:  Hang on.  Listen.

10        THE WITNESS:  -- here.                                 12:22

11        MR. BROCKLAND:  Wait -- wait for the question.

12   BY MR. SAX:

13        Q    Are -- are you -- are you taking the

14   position that you did not know what this merger

15   clause meant, but you signed it anyway?                    12:22

16        A    I don't know at the time, you know, what --

17   what I was going through, so -- again, it was a long

18   time ago.

19        Q    Well, let me ask you this.

20             Did you have any discussions in these           12:22

21   negotiations with the Olen entities or -- or

22   Mr. Olenicoff or his attorneys regarding whether --

23   if you subsequently discovered other sculptures

24   whether or not you had the right to make other

25   claims?  Did that ever come up in the discussions?        12:22

Page 117

1        A    I --

2        MR. BROCKLAND:  He asked if you had discussions

3     with Olen or Olenicoff.

4        THE WITNESS:  No.

5        MR. BROCKLAND:  Right.                          12:22

6        MR. SAX:  Right.

7        THE WITNESS:  Yeah, I did not have --

8        MR. SAX:  Okay.

9        THE WITNESS:  -- discussions with --

10    BY MR. SAX:                                        12:22

11       Q    Every- -- everything was done through

12    counsel?

13            Is --

14       A    Ye- -- yes.

15       Q    -- that fair?                              12:22

16       A    Yes.

17       Q    Okay.  All right.  So the only thing you

18    know about what position Olen and Olenicoff were

19    taking is whatever your attorney may or may not have

20    told you, correct?                                 12:23

21       A    Correct.

22       MR. SAX:  Okay.  All right.  Lynn, if you could,

23    put Exhibit 6 up on, which is the Declaration of Igor

24    in Opposition to the Motion for Sanctions.

25       MS. TRUMBOWER:  What's the date of that         12:23

Page 118

1    Declaration?

2         MR. SAX:   That's the date of

3    December 18th, 2017.

4              Go to Paragraph 5.

5    BY MR. SAX:                                          12:24

6         Q    Okay.   It says that "Olen has artwork and

7    sculptures at nearly every property in its portfolio

8    which includes over 6 million square feet of office

9    space."

10             Are you aware of any facts that would in    12:24

11   any way conflict with what is being stated there by

12   Mr. Olenicoff?

13        A    Well, he -- he didn't have sculptures at

14   every property that I saw.

15        Q    And how many properties did you look at?   12:24

16        MR. BROCKLAND:   At what time?

17   BY MR. SAX:

18        Q    It -- whenever you did your Google Maps.

19        A    And how many properties had artwork?

20        Q    Yeah.                                      12:24

21             It says "Olen has artwork at nearly every

22   property in its portfolio," and you're saying you

23   don't believe that to be true because of what you

24   did.

25             What -- what causes you not to believe     12:24

Page 119

1   that?

2        A    No, because I saw a lot of buildings that

3   didn't have any art.

4        Q    Okay.  Were those all in California?

5        A    We're talking at the time?                    12:25

6        Q    Yes.

7        A    Yeah, I -- it -- in all the ones in

8   California.

9        Q    Okay.  And how many other buildings did

10  you -- can you remember what the buildings were which   12:25

11  didn't have artwork and sculptures?

12       A    No.

13       Q    Okay.  Did you look at -- did you do any

14  investigation of any of Ol- -- Olen's properties in

15  Nevada?                                                 12:25

16       A    Yes.

17       Q    Okay.  Did you find sculptures at any of

18  those properties?

19       A    No.

20       Q    Okay.  Did you -- you -- you already         12:25

21  discussed what you did in Boynton Beach.

22            Did you look at any of the other numerous

23  properties in South Florida that Mr. Olenicoff or his

24  company had?

25       A    Yes.                                          12:25

Page 120

1        Q     Okay.  Did you do anything other than a

2    Google Map search?

3        A     Back in the day?

4        Q     Back in the day.

5        A     No, just Google.                              12:25

6        Q     Okay.

7        A     Google Map.

8        Q     Did -- did you see -- did you see

9    sculptures at any of the properties?

10       A     No.                                           12:26

11       Q     Okay.  When you say you do a Google Map

12   search, is that where you -- do you go with, like,

13   the local view where you could get a ground level of

14   what was going on or did you just kind of go from the

15   30,000-foot view?                                       12:26

16       A     Yeah, no.  The street view, so you --

17       Q     Okay.

18       A     -- you know, you can go and look at

19   buildings, you know, the front of them.

20       Q     And it's your testimony that as to all of   12:26

21   the properties in South Florida which you looked at

22   using Google Maps with the street view, you could

23   identify no sculptures at any of those projects when

24   you did your investigation.

25             Is that true?                                 12:26

Page 121

```
 1        A    That's true.

 2        Q    And how many properties did you investigate

 3    in South Florida?

 4        A    The ones that were listed.  I don't know

 5    how many.                                            12:26

 6        Q    Well, which ones were listed?  The ones

 7    that were listed on their website?

 8        A    Yes.  Yeah, I --

 9        Q    Got it.

10        A    -- mean, anything that's not listed on the  12:26

11    website, I -- I wouldn't know about.

12        Q    Okay.  Well, let me ask you this.

13             Did you go ahead and look at, say, at least

14    ten properties in South Florida that were listed on

15    the website?                                         12:27

16        A    If that's how many were listed, that's how

17    many I would have looked at.

18        Q    Well, I'm just asking you now a

19    hypothetical.

20             Do you know whether you looked at ten or     12:27

21    more?

22        A    Oh, I'm not sure.

23        Q    Okay.  Do you know for a fact that you

24    looked at the Boynton Beach property that's the

25    subject of this litigation rather than some other    12:27
```

Page 122

1    property that's the subject of this litiga- --

2    that -- that's not the subject of this litigation?

3         A    No.  I mean, whatever was listed is what I

4    looked at.

5         Q    Are you aware that Olen Properties has        12:27

6    numerous properties in Boynton Beach and not just

7    Quantum?

8         A    Yes.

9         Q    Okay.  Did you look at each one of those

10   properties to see if there was artwork on those other    12:27

11   properties?

12        A    Yes, and I didn't see any.

13        Q    And again, just so I understand the year

14   that you did this Google Map search, what year is

15   your best estimate?                                       12:28

16        A    2012, 2013, '14.  I'm not really sure.

17   It's been a long time.

18        Q    How about '15 or later?

19        A    I'm not sure.

20        Q    Did anybody stop you from looking at          12:28

21   Google Maps' local view, street view or -- in 2015,

22   '16, '17 or '18 before you signed the agreement?

23        A    No one stopped me from looking again.

24        Q    Okay.  It goes on to say in here if we go

25   to -- near the end in se- -- in Paragraph 7 -- well,     12:28

Page 123

1    let -- before I get to Paragraph 7, the end of

2    Paragraph 6, it says "Olen parties would have

3    informed him," meaning Wakefield, "that there were no

4    business records at Olen."

5           Okay?  Now, do you know for -- does -- do      12:29

6    you know if that actually happened in -- with one --

7    either of the first two lawsuits where Olen pro- --

8    parties informed you that there were no business

9    records at Olen regarding the sculptures that are the

10   subject of this litigation?                          12:29

11       A    I believe he said he didn't have any

12   records.

13       Q    Did he say -- "he," being Mr. Olenicoff?

14       A    Yes.

15       Q    Who did he say it to?                        12:29

16       A    No, I just believe it.  I'm not sure

17   if that --

18       Q    Oh.

19       A    -- was part of the deposition or -- or in

20   trial.                                               12:29

21       Q    Okay.  Do you have any facts that would

22   indicate that Mr. Olenicoff knew that there were two

23   sculptures in Quantum in Boynton Beach?

24       A    I believe there were some documents between

25   Olen and the City of Boynton Beach.                  12:30

Page 124

1      Q     Yeah.

2            Were any of them signed by Mr. Olenicoff?

3      A     I'm not sure.

4      Q     Okay.  Again, are you aware of any facts to

5   indicate that Mr. Olenicoff personally was aware of      12:30

6   what sculptures were in Quantum in Boynton Beach?

7      A     Not at this time.

8      Q     Okay.  In Paragraph 7 it says that "Olen

9   parties offered to deliver old pieces of Untitled or

10   derivatives thereof to Wakefield."                        12:30

11           Do you remember the Olen Properties ever

12   offering to deliver the pieces to you rather than

13   destroy them?

14      A     They made an offer for me to pick them up

15   on my own dollar.                                        12:30

16      Q     Okay.  And is it true -- the next sentence

17   says you did not accept the offer of it?

18      A     Correct.

19      Q     Okay.  All right.  Taking a look at --

20   Lynn, if you could put up on the screen the Opp- --      12:31

21   Opposition, Defendants' Opposition to Plaintiff's

22   Motion for Sanctions, and this is on Page 4.

23           Okay.  Go to 4, kind of about two-thirds of

24   the way down.  Okay.  A little further.  There you

25   go.  Yeah, Page 4.  You went too far.  Okay.  Dot --      12:31

Page 125

1    Stop.  Now go a little bit lower down.  Okay.  All

2    right.

3            Mr. Wakefield, I'll represent to you that

4    this was a -- Olen's Opposition to your Motion for

5    Sanctions in Wakefield II, and I just want to go          12:32

6    through certain allegations here to see if you're

7    aware as to whether or not these are facts or it's

8    not true.

9        A    Can you -- can you make this a little

10   bit --                                                   12:32

11       Q    It said --

12       A    -- bigger.

13       Q    Sure.

14           And -- and look at Line 20.  We'll start at

15   Line 20.                                                 12:32

16           It says "While it is unfortunate that the

17   Olen parties were unaware of the exact number and

18   location of the pieces of art sold to them by the

19   Chinese artist through its dealer, at no time was

20   there any efforts by anyone at the Olen parties to       12:32

21   hide the location of the 2 Venture piece, which, in

22   fact, was located at the entryway of a multi-story

23   commercial building in Irvine in plain sight

24   throughout the pendency of the original matter."

25           Okay.  Let me stop there.                        12:32

Page 126

1        Was this piece in -- 2 Venture piece, was

2    this the one that your former girlfriend had found or

3    is that a different piece?

4        A    That's a different piece.

5        Q    Was the other one at Century Centre?        12:33

6        A    The other one that --

7        MR. BROCKLAND:  The one that sh- -- his

8    girlfriend found?

9        MR. SAX:  The girlfriend found.

10       THE WITNESS:  Right.                             12:33

11   BY MR. SAX:

12       Q    Okay.  Just want to get my facts straight.

13            Okay.  Do you have any facts that you're

14   aware of that would lead you to believe that it's

15   untrue where Olen says that it was "unaware of the    12:33

16   exact number and location of the pieces of art sold

17   to them by the Chinese artist through its dealer"?

18       A    Yeah.  I mean, he had to have known the

19   sculptures were on his own property because he loved

20   artwork a lot.                                        12:33

21       Q    Anything else that you base that position

22   that those are facts that rebut this statement?

23       A    Not at this time.

24       Q    Okay.  It goes on to say "At no time was

25   there any effort by anyone at the Olen parties to     12:33

Page 127

1    hide the location of the 2 Venture piece."

2           Are you aware of any facts which indicate

3    that there was an effort by the Olen parties to hide

4    that piece?

5       A    Well, he only admitted to the pieces that     12:34

6    we found at the -- at the time that we found it.

7    He -- he would never admit that there were additional

8    pieces.

9       Q    Any other facts to indicate that there was

10   an intentional hiding of the pieces?                   12:34

11      A    Not at this time.

12      Q    Okay.  It goes on to say in the ne- -- last

13   paragraph, it says "The true facts are that

14   Mr. Olenicoff originally ordered the piece entitled

15   Human Nature's Many Faces and the derivative work      12:34

16   years prior to 2008."

17          Are you aware of any facts that indicate

18   that they were not ordered prior to 2008?

19      A    Well, some of them have plaques on them and

20   it's listed -- the date is 2005.                       12:34

21      Q    Okay.  Does that indicate that this

22   statement's accurate or do you think that shows that

23   it was inaccurate?

24      A    "As sinister as Wakefield's attempts."

25      Q    That's not the language that I'm keying on.    12:35

Page 128

```
 1           I'm saying the true facts are that
 2   Mr. Olenicoff originally ordered the piece entitled
 3   "Human Nature's Many Faces" and the derivative work
 4   years prior to 2008.
 5           Does that plaque that indicated 2005        12:35
 6   indicate to you that this was a true statement?
 7      A    No.
 8      Q    Why not?  What evidence or facts do you
 9   have to indicate that the works were ordered after
10   2008?                                               12:35
11      A    Oh, no, I'm sorry.  Yeah, no, I don't -- I
12   don't have any evidence to -- to show that.
13      Q    Okay.  Now, you had testified earlier when
14   the art collector had offered you $245,000, you had
15   indicated that the piece was not for sale, correct?  12:35
16      A    Correct.
17      Q    Okay.  And just so I understand, this was
18   not Untitled.  This was some other piece, right?
19      A    Correct.
20      Q    Okay.  So were you taking the position at   12:36
21   that time that none of your pieces were for sale?
22      A    Well, none of my pieces are for sale.
23      Q    Okay.  And how long has that -- how -- has
24   that been true, meaning for how many years have your
25   pieces not been for sale?                           12:36
```

Page 129

1      A    The large scale works that I have in the

2    collection, they are all over 20 years old, and as I

3    got older, I just couldn't, you know, physically, you

4    know, work in -- in stone, you know, day after day.

5      Q    So it's 20 years ago that you stopped          12:36

6    selling pieces or --

7      A    The large --

8      Q    -- art --

9      A    Larger --

10     Q    -- sculptures?                                  12:37

11     A    -- pieces.

12     Q    Does "larger pieces" mean 7 feet or more?

13     A    Well, yeah, somewhere around there.

14     Q    Okay.  All right.  It goes on to say, "The

15   pieces ordered from China were received in various      12:37

16   shipments.  There were numerous complications after

17   the orders were placed, and sometimes the shipments

18   were less, sometimes they were more, even things that

19   weren't ordered."

20          Again, I don't -- I can break that into         12:37

21   three separate questions so I don't get a "compound

22   question" objection, but generally, do you have any

23   facts to rebut those statements in that sentence?

24     A    Where -- where are you starting at?

25     Q    "The pieces" --                                 12:37

Page 130

```
 1        MR. BROCKLAND:  Line 4.

 2   BY MR. SAX:

 3        Q    -- "ordered from China."

 4        A    4.

 5        Q    Line 4.                                 12:37

 6        A    Okay.

 7        Q    And -- and you can read it to yourself.

 8   I've --

 9        A    Sure.

10        Q    -- already read it out loud --         12:37

11        A    Okay.

12        Q    -- once.

13             Are you aware of any facts to rebut any of

14   those statements or allegations?

15        A    No.                                     12:37

16        Q    Okay.  Then it says "Neither Olen nor

17   Olenicoff maintain any records of what items were

18   received from China or the locations where the

19   sculptures were installed as these pieces like all

20   others in the Olen collection were simply not a      12:38

21   primary part of the business operations of Olen."

22             Are you in any way rebutting any of the

23   allegations or statements in that sentence?

24        A    Well, a prominent part, maybe it's all

25   relative, but obviously he loved his sculptures      12:38
```

Page 131

1    because he placed them all over quite a few

2    properties.

3         Q    Okay.  Anything else that you would take

4    issue with?

5         A    Not at this time.                          12:38

6         Q    Okay.  And it says "a prominent part of the

7    business operations of Olen."

8              Isn't Olen's business operations the rental

9    of apartments?

10        A    Well, that's part of it, from what I         12:38

11   understand.

12        Q    Okay.  Did you think the business of Olen

13   was the collection of art?

14        A    Well, he collects art, so it's -- it's a

15   part of his business as well.                          12:38

16        Q    It says "Olen has artwork and sculptures at

17   nearly every property," which we've already gone

18   over.  It says "Additionally there are hundreds of

19   pieces of artwork and sculptures at the Olen

20   headquarters."                                         12:39

21             Is that an accurate statement?

22        A    I don't know.

23        Q    Okay.  It says that "The Olen art

24   collection pieces were acquired and placed over the

25   last five decades to satisfy the personal passion for  12:39

Page 132

1    art of Olen's founder, Olenicoff, and not for any

2    commercial purpose."

3             Are you aware of any facts to in any way

4    contradict that sentence?

5        A    Well, yeah, for commercial purpose.  I          12:39

6    mean, he -- again, it's back to the public art

7    projects where he's enhancing his property.  And

8    commercial purpose, you could say that it's

9    commercial.  It's making money for him but not paying

10   the artist the proper amount or a fair amount --       12:39

11       Q    Did you make money --

12       A    -- or any amount --

13       Q    Did you make --

14            (Simultaneous speaking.)

15       THE WITNESS:  -- actually.                          12:39

16   BY MR. SAX:

17       Q    Okay.  Any other parts of that sentence

18   that you take issue with?

19       A    No.  I mean, I don't know if he's been

20   collecting for five decades or not.                    12:40

21       Q    And lastly it says "Olen does not maintain

22   any inventory of the artwork or sculptures in this

23   extensive collection."

24            Are you aware of any facts that in any way

25   contradict that sentence?                              12:40

Page 133

1          A     No, but it sounds ridiculous.

2          Q     But again, are you aware of any facts to

3     contradict it?

4          A     Not at this time.

5          Q     Okay.  And you had ample opportunity in          12:40

6     both Wakefield I and Wakefield II to do whatever

7     discovery you wanted to do to try to disprove those

8     various statements, correct?

9          A     I don't know.  I don't know that I tried to

10    disprove that.                                              12:40

11         Q     Did you -- let me -- hold on one second.

12               Lynn, can you put up on the screen the --

13    it -- it would be Exhibit 16, which is the Notice of

14    Compliance with Judgment and Declaration, and this

15    was dated January 24, 2018.  Okay.  All right.            12:41

16               Mr. Wakefield, I'll represent to you that

17    this is a document that was filed in, I think it was,

18    Wakefield I/Wakefield II.

19               Have you ever seen this document before?

20    It talks about the destruction of sculptures and          12:41

21    images being removed from the Olen Properties

22    website.

23         A     I have probably read this.

24         Q     Okay.  Isn't it a document that I went over

25    in Mr. Olenicoff's deposition that you attended the        12:41

Page 134

1    other day?

2         A    I'm not sure.

3         MR. SAX:  Okay.  Lynn, if you could go to the

4    first page of the Declaration.

5         MR. BROCKLAND:  And for the record, I think it's    12:42

6    just filed in Wakefield I, but --

7         MR. SAX:  Yeah.

8         MR. BROCKLAND:  -- that's just --

9         MR. SAX:  That's why -- that's why I said I or

10   II.  But yeah, I -- I think you told me last time it    12:42

11   was in I.  So yeah, I'll just --

12        MR. BROCKLAND:  Just -- I'm --

13             (Simultaneous speaking.)

14        MR. BROCKLAND:  -- saying based on the case

15   style.                                                 12:42

16        MR. SAX:  Yeah.  Okay.  Number -- but I was

17   looking at the date.  But in any event --

18        MR. BROCKLAND:  Ah.

19        MR. SAX:  Yes.

20   BY MR. SAX:                                             12:42

21        Q    It says -- under Number 2 it says "On or

22   about July 1st, 2017, I caused all copies of that --

23   of" -- I'll say it out loud -- "of Human Nature's

24   Many Faces and A Tear Must Fall to be removed from

25   the following locations and destroyed."                12:42

Page 135

```
 1           And you see seven locations there,
 2    correct?
 3       A    Correct.
 4       Q    And there's two sculptures at Century
 5    Centre, correct?                                    12:42
 6       A    Correct.
 7       Q    Okay.  Do you -- is it your understanding
 8    that, in fact, Olen Properties did, in fact, remove
 9    sculptures from those locations in this Declaration
10    and destroy them?                                   12:43
11       A    I only know --
12       MR. BROCKLAND:  Objection; compound.
13           Go ahead.
14       MR. SAX:  I'll -- I'll -- I'll break it up.  Let
15    me break it up.                                     12:43
16    BY MR. SAX:
17       Q    Do you know for -- do you know -- or let
18    me -- let me -- I'll ask it slightly different.
19           Do you have any reason to believe that this
20    is an inaccurate statement?                         12:43
21       A    Well, the pieces were removed.
22       Q    Okay.
23       A    But he never proved that he destroyed
24    them.
25       Q    Okay.  Do you have reason to believe that   12:43
```

Page 136

1     they weren't destroyed?

2          A     That they were?

3          Q     Were not destroyed.

4          A     I don't have any proof.

5          Q     Do you have reason to believe they were not     12:43

6     destroyed even if you have no proof?

7          A     Not at this time.

8          Q     Okay.  At any point in time were you

9     ever -- did you ever have a suspicion, and was --

10    what was it based on, as to whether or not these     12:43

11    sculptures were actually destroyed?

12         A     Well, if this is the same document that his

13    attorneys signed saying that they were all destroyed,

14    then I figured because the attorneys were on board

15    with it that --     12:44

16         MR. BROCKLAND:  That wasn't his question.

17         THE WITNESS:  Oh.

18         MR. BROCKLAND:  His question was -- I -- I just

19    think you're not listening to the question.

20         THE WITNESS:  Okay.     12:44

21         MR. BROCKLAND:  Can you try it again, Spencer?

22         MR. SAX:  Sure, no problem.

23    BY MR. SAX:

24         Q     Mr. Wakefield, do you have any reason to

25    believe that these sculptures in this Declaration     12:44

Page 137

 1    were not, in fact, destroyed?

 2        A    Do I have any -- I'm sorry.  I am having

 3    a --

 4        Q    Rea- -- rea- --

 5        A    -- problem hearing.                          12:44

 6        Q    Reason to -- reason to believe.

 7        MR. BROCKLAND:  That the sculptures were not

 8    destroyed.

 9        THE WITNESS:  N- --

10        MR. SAX:  Correct.                                12:44

11        THE WITNESS:  No.  I mean, I don't have any

12    evidence that they -- they were not destroyed.

13    BY MR. SAX:

14        Q    Okay.  And do you have any reason to

15    believe that they were reused somewhere else?        12:44

16        A    Not offhand.

17        Q    Okay.  All right.  Let me just drill down

18    back on this agreement.

19             Lynn, can you put back on the screen the

20    Settlement Agreement.                                12:45

21             Okay.  All right.  The date of this

22    Settlement Agreement is January 18th, 2018, correct?

23        A    That's what it says.

24        Q    Well, does that sound right?  Do you

25    remember signing this document on or about           12:45

Page 138

1    January 18, 2018?

2        A    Yeah, I'm not sure, but it looks like

3    that's when it was.

4        Q    Okay.  And as -- as of that date, do you --

5    are you aware of any facts indicating that            12:45

6    Mr. Olenicoff personally knew of the existence of any

7    other sculptures similar to Untitled?

8        A    Yeah, I don't know.

9        Q    Okay.  Are you aware of any facts that

10   indicate that Olen Properties was aware of the        12:46

11   existence of other sculptures that are similar to

12   Untitled as of that date?

13       A    No.

14       Q    Okay.  Do you have any facts as of that

15   date in 2018 that Mr. Olenicoff intentionally hid the  12:46

16   existence of the sculptures in Boynton Beach?

17       A    No.

18       Q    Do you have any facts that you're aware of

19   that would indicate that Olen Properties

20   intentionally hid the existence of the two sculptures  12:46

21   in Boynton Beach?

22       A    No.

23       Q    Other than your then girlfriend, Kim, who

24   discovered two sculptures in California and what

25   you've already testified to as far as what            12:47

Page 139

1    investigation you did, did anyone else on your behalf

2    perform any type of investigation at any point in

3    time as to the whereabouts of similar sculptures to

4    Untitled?

5         MR. BROCKLAND:  Up to the date of the Settlement    12:47

6    Agreement?

7         MR. SAX:  Up to the date of the Settlement

8    Agreement.

9         THE WITNESS:  Well, I mean, I had friends that,

10   you know, were curious and were looking around, and     12:47

11   there was Bill Bedford, one of the other artists,

12   that found one.

13   BY MR. SAX:

14        Q    And where was that one?

15        A    I believe that was at the Ventura (sic)        12:47

16   2.

17        MR. BROCKLAND:  2 Venture.

18        THE WITNESS:  2 Ven- -- 2 Venture.

19   BY MR. SAX:

20        Q    Okay.  But -- but 2 Venture was the subject    12:48

21   of Wakefield II, correct?

22        A    Correct.

23        Q    So that predated the 2018 Settlement

24   Agreement, correct?

25        A    Right.  It's -- you know, forgive me, but      12:48

Page 140

1    there's a lot of dates to -- to go through and --

2        Q    That's fine.

3        A    -- you know, I -- I don't remember all of

4    them.

5        Q    Okay.                                    12:48

6        A    It just sort of all flows from one to the

7    next.

8        Q    All right.  And after anybody else -- I

9    didn't -- I didn't mean to cut off your answer.  So

10   you mentioned Bill Bedford may have helped you do      12:48

11   some investigation.

12            Anybody else other than Kim, yourself, and

13   to the limited extent Mr. Bedford?

14       A    No.

15       Q    Did you -- without telling me discussions     12:48

16   you had with attorneys, did you employ attorneys to

17   go look for other similar sculptures?

18       A    I didn't employ them to go look for

19   sculptures, no.

20       Q    How about did you employ any private         12:48

21   investigators to look for sculptures?

22       A    No.

23       Q    Okay.  Did anyone on behalf of Olen --

24   from -- well, let me just not even limit it to that.

25            Did anyone limit you as far as having        12:49

Page 141

1    attorneys look for sculptures around the

2    United States?

3         A    No.

4         Q    Did anybody limit you from hiring a private

5    investigator to go look at every Olen property in the    12:49

6    world to see if there were similar sculptures?

7         A    No, no one me -- no one did.

8         Q    Okay.  Tell me about Bill Bedford.

9              You knew Bill Bedford before this dispute

10   with Olen or after?                                       12:49

11        A    After.

12        Q    Did you learn about him through --

13   without -- through your attorney?

14        A    No, through --

15        Q    How -- how did you find out about him?         12:49

16        A    Through the public records in the City of

17   Brea.

18        Q    And what were you -- what were you looking

19   for in the public records that caused you to come

20   across Bill Bedford's name?                              12:49

21        A    I was looking for information on the

22   connection with Olen Properties and the Public Art

23   Committee or Public Art Department.

24        Q    But what did that tell you?

25        A    You know, that he knew Mr. Olenicoff and,      12:50

Page 142

1    you know, had done some work for him.

2        Q    Did he say anything negative about

3    Mr. Olenicoff?

4        A    No.

5        Q    Did he say anything positive about          12:50

6    Mr. Olenicoff?

7        A    No.

8        Q    Did he indicate he ever entered into a

9    confidential settlement with Mr. Olenicoff?

10       A    No, but there were some documents in the    12:50

11   Brea file that had some -- some -- I forget what they

12   call it, but some agreement, nondisclosure, I think,

13   agreement.

14       Q    Okay.  Did Mr. Bed indicate the terms of

15   his settlement with Olen Properties?              12:50

16       A    No.

17       Q    Okay.  Anyone else who in any way assisted

18   you in any type of an investigation other than the

19   names you've already given us?

20       A    No.                                         12:50

21       Q    Okay.  How many sculptures were the subject

22   of Wakefield I, to the best of your knowledge?

23       MR. BROCKLAND:  Go ahead.

24       THE WITNESS:  Wakefield I, there were so many in

25   so many years.  Let me think.  I believe it was      12:51

Page 143

1    seven.

2    BY MR. SAX:

3        Q    Okay.  When the Court entered an Injunction

4    in that case, did -- did -- did you assume that it

5    related to the seven sculptures that was the subjects    12:51

6    matter of that lawsuit?  I'm asking about your

7    understanding.

8        A    Repeat the question, please.

9        Q    Sure.

10            In this -- in Wakefield Number I, when the     12:51

11    Court entered the Injunction about destroying the

12    sculptures --

13        A    Uh-huh.

14        Q    -- was it your understanding that the Court

15    was referring to the seven sculptures that were the    12:52

16    subject matter of that litigation?

17        MR. BROCKLAND:  I'm going to object that the

18    document speaks for itself and you're asking him --

19        MR. SAX:  But I'm ask- --

20        MR. BROCKLAND:  -- to recall --                    12:52

21        MR. SAX:  I'm asking him --

22        MR. BROCKLAND:  You're asking him --

23        MR. SAX:  -- his --

24        MR. BROCKLAND:  -- to recall a document that

25    he's not looking at, you're not showing him.            12:52

Page 144

1        MR. SAX:  O- -- okay.  I'll show it to him.

2     I'll -- I'll be fair to him.

3            So Lynn, can you put up on the screen the

4     Judgment.  I don't know if we marked it in the last

5     deposition.                                        12:52

6        MR. BROCKLAND:  I don't think so.

7        MR. SAX:  Okay.  So let's put this up on the

8     screen and we'll mark it as the next number, which

9     would be -- is that 20, Madam Reporter?

10       MR. BROCKLAND:  You threw her for a loop.        12:52

11       THE REPORTER:  Does Lynn know?  I don't have

12    them.

13       MR. SAX:  Okay.

14       MS. TRUMBOWER:  Are you put -- are you making a

15    Joint Motion -- Opposition --                      12:52

16       MR. SAX:  Well --

17       MS. TRUMBOWER:  -- as --

18       MR. SAX:  No, I actually didn't.  The Opposition

19    was, I think, marked at a prior deposition.

20       MS. TRUMBOWER:  Okay.  Then we're on 20 now.     12:53

21       MR. SAX:  Yeah, so this is 20.

22            (Whereupon Exhibit 20 was marked for

23    identification, a copy of which is attached hereto.)

24    BY MR. SAX:

25       Q    All right.  So Mr. Wakefield, what we're    12:53

Page 145

1     going to show you is a page-and-a-half document which

2     purports to be a Judgment entered in Wakefield I.

3              And in the third paragraph it talks about

4     the ordering of -- the destruction of all copies.

5              You see that in numbered Paragraph 3?  Do         12:53

6     you see that language?  And I --

7        A    On Number 1?

8        Q    -- should -- Number 3.

9              And actually, let --

10             (Simultaneous speaking.)                          12:53

11    BY MR. SAX:

12        Q    -- let me just ask you the predicate

13    question, which was have you ever even seen this

14    Judgment before?

15        A    I probably have.                                  12:53

16        Q    Okay.  Well, I mean, if you hadn't seen it,

17    then it's not going to pay for me to ask you your

18    understanding of it.

19             So did -- did -- do you recall rece- --

20    getting a copy of this Judgment, looking at it, and       12:53

21    looking at the language about what was -- what

22    Injunction was being entered by the judge?

23             And I'm not interested in what your

24    attorney told you.  I just want to know, did you look

25    at it and did you understand it?                          12:53

Page 146

1          A    I don't know.  You know, it's been -- it's

2      been a while, so --

3          Q    Okay.  So as far as you having an

4      understanding as to whether the Injunction related to

5      the seven sculptures that were the subject of that          12:54

6      lawsuit, you wouldn't know because you don't even

7      remember the document.

8              Is that true?

9          A    Yeah.  I mean, it's -- it's fuzzy, you

10     know --                                                     12:54

11         Q    Okay.

12         A    -- because there's -- there's a lot of

13     documents.

14         Q    Okay.  That's fine.  I -- I want to be fair

15     to you.                                                     12:54

16             Okay.  Are you aware of any- -- any- --

17     anything in the Settlement Agreement which obligated

18     Olen or Mr. Olenicoff to do any type of a diligent

19     search to see if there was any other sculptures

20     around the country?                                         12:54

21         A    Well, he was supposed to.

22         Q    Did you -- where in that Settlement

23     Agreement do you see any obligation on Olen and

24     Olen Properties to do such a search?

25         A    I don't recall.                                    12:55

Page 147

1      Q    Okay.  But you think it's in there or --

2      A    I'm -- I'm not sure.

3      MR. SAX:  Okay.  Lynn, you can take that exhibit

4  down.

5  BY MR. SAX:                                          12:55

6      Q    Do you have any reason to believe that

7  Mr. Olenicoff ever saw your scul- -- the -- your

8  sculpture in Chicago?

9      A    I have no proof of that, no.

10     Q    Do you have any reason to believe that      12:55

11 John Liang ever saw the sculpture in Chicago?

12     A    No.

13     MR. BROCKLAND:  You mean saw --

14     MR. SAX:  The --

15     MR. BROCKLAND:  -- Untitled while it was in      12:55

16 Chicago?

17     MR. SAX:  Yes.

18     THE WITNESS:  No.

19 BY MR. SAX:

20     Q    Okay.  Do you have any reason to believe or 12:55

21 any facts to indicate that whoever manufactured the

22 sculpture in China ever went to Chicago and saw

23 Untitled?

24     A    No, I have no idea.

25     Q    All right.  Do you have any reason to       12:56

Page 148

1    believe or any facts to indicate that Mr. Olenicoff

2    ever saw your joint sketch with Mr. Glickman?

3         A    No.

4         Q    How -- same question as to whether

5    John Liang would have ever seen the sketch.          12:56

6         A    No.

7         Q    Same question as to whether the

8    manufacturer in China ever saw the sketch.

9         A    No.

10        Q    Okay.  Did you ever tell Mr. Olenicoff or    12:56

11   anybody at Olen that you were, in fact, the artist

12   who created Untitled?

13        A    Yes.

14        Q    Who did you tell?

15        A    Through -- well, there was a secretary        12:56

16   that -- that I talked to at one point, and then

17   through email communication I told Mr. Olenicoff.

18        Q    Okay.  Did you ever -- have you ever

19   personally spoken directly to Mr. Olenicoff ever?

20        A    No, never.                                   12:57

21        Q    Have you ever spoken personally to

22   Dale Lyon who works at Olen Properties?

23        A    Yes.

24        Q    Okay.

25        A    Once.                                        12:57

Page 149

1          Q     Now, there's a -- there's a Dale Lyon and a

2     John Lyon.  Okay?

3                Do you -- do you remember speaking to

4     Dale Lyon rather than John Lyon?

5          A     Yes, Dale Lyon in Newport --                    12:57

6          Q     And -- and --

7          A     -- Beach.

8          Q     And when did -- what year did you speak to

9     him about anything?

10         A     That was in 2008.                               12:57

11         Q     And what was the reason for this

12    conversation?  Was it by phone or in person?

13         A     In person.

14         Q     At corporate office for Olen?

15         A     Yes.                                            12:57

16         Q     You went over there?

17         A     Yes.

18         Q     Unannounced or you had an appointment?

19         A     Unannounced.  I was --

20         Q     And why did you --                              12:57

21         A     -- just looking at the sculpture.

22         Q     Okay.  And -- and where were you that

23    caused you to run into Mr. Lyon?

24         A     Evidently his office was near where the

25    sculpture was and he saw me, you know, looking at it      12:58

Page 150

1    and taking pictures.

2         Q    And this was in approximately 2008?

3         A    Yes.

4         Q    Okay.  And this is after Kim had told you

5    she had seen the sculpture?                              12:58

6         A    Correct.

7         Q    And what did Dale say to you and what did

8    you say to him?

9         A    I can't recall everything, but he had asked

10   me why I was there, and I -- I said I hadn't seen my     12:58

11   sculpture in like 20 years or something like that.

12   And I said -- you know, I told him I was the artist,

13   and he -- and he said "I don't think so."  And I

14   said --

15        Q    Any further?                                   12:58

16        A    I --

17        Q    Go ahead.

18        A    -- got his business card.  I told him I

19   would send him some pictures to prove it.

20        Q    And did you?                                   12:58

21        A    I did --

22        Q    Are they the pic- --

23        A    -- later that day.

24        Q    Are they the pictures that have been marked

25   today for identification?                                12:58

Page 151

1      A    Yes, I believe those --

2      Q    Any other --

3      A    -- are the same pictures.

4      Q    Okay.  And did you get any response from

5    Dale Lyon or anyone at Olen in response to the          12:59

6    pictures you sent to them?

7      A    No.

8      Q    Okay.  You also talked about some emails.

9           Were there emails between you and Dale Lyon

10   other than you sending him the pictures?                12:59

11     A    No.

12     Q    Okay.  Any other documents between you and

13   Mr. Olenicoff or you and Dale Lyon indicating

14   communications that you may have had with them?

15     A    You know, there were some emails between        12:59

16   Mr. Olenicoff and me.

17     Q    I -- I do -- and did he send you an email

18   or did you -- he only received your emails?

19     A    No, he sent me emails.

20     Q    Okay.  And basically what was the purpose       12:59

21   for you sending your emails to him?

22     A    I was trying to find out what the situation

23   was.

24     Q    And what did he -- how did he explain --

25     A    He said --                                       12:59

Page 152

1          Q     -- in response to your emails?

2          A     He says he bought them in China.

3          Q     Okay.  And anything beyond that that you

4     can remember?

5          A     No- -- not offhand.                          01:00

6          Q     Okay.  And how did that back-and-forth with

7     Mr. Olenicoff end?

8          A     He wasn't giving me any information.  He

9     was just trying to find out more information from me

10    regarding where the piece is, how much I paid for it,    01:00

11    any contracts, things of that nature.

12         Q     Did you tell him the piece was in

13    Chicago?

14         A     I did.

15         Q     Did you tell him how much you sold it        01:00

16    for?

17         A     I don't remember.

18         Q     Did you give him a value as to what you

19    thought it was worth?

20         A     I don't remember.                            01:00

21         Q     Did he attempt to purchase it from you, the

22    one in Chicago?

23         A     Well, no, he didn't purchase --

24               (Simultaneous speaking.)

25         THE WITNESS:  -- it from me because I didn't own   01:00

Page 153

1    it then.

2    BY MR. SAX:

3        Q    Okay.  Did you -- did he try to broker

4    something where you would purchase the one in Chicago

5    from Mr. Glickman?                                      01:00

6        A    Say that again.

7        Q    Sure.

8            Even though you didn't own it, did you --

9    when Mr. Olenicoff and you had this back-and-forth,

10   did you try to put him in contact with Mr. Glickman    01:01

11   so Mr. Olenicoff could buy that sculpture?

12       A    No.

13       Q    Okay.  Did Mr. Olenicoff indicate to you

14   that he would pay you something for your potential

15   claim?                                                 01:01

16       A    No.

17       Q    Did you offer to resolve the issue with

18   Mr. Olenicoff under any types of terms, whether it's

19   monetary or otherwise?

20       A    Not that I can recall.                        01:01

21       Q    Any other discussions or communications in

22   writing or verbal that you had with Dale Lyon,

23   Mr. Olenicoff, or anyone else at Olen Properties

24   regarding the subject matter?

25       A    No.  There -- there was a -- like I say,      01:01

Page 154

1    one -- I believe one email to a secretary or somebody

2    who, you know, took incoming, you know, emails, I

3    guess.

4        Q    How -- how did your communications or

5    conversations with John Liang end?  What -- how -- is          01:01

6    it basically you are not going to purchase any of the

7    pieces in China and that's just how it -- how it

8    ended?

9        A    I don't recall.

10       Q    So you don't recall how -- how your              01:02

11   conversations --

12       A    I don't --

13       Q    -- back and forth --

14       A    I don't --

15       Q    -- ended?                                         01:02

16       A    I don't -- I don't recall how it ended.

17       Q    Okay.  Did he provide you any other

18   information regarding this -- the manufacturer of the

19   sculptures in China as far as price goes other than

20   the 15,000 that he had -- you had already testified        01:02

21   to?

22       A    No, not that I can remember.

23       Q    Okay.  Are you aware of any facts to

24   indicate that Olen Properties could not have used

25   some other artist's sculptures in Boynton Beach -- at       01:02

Page 155

1    Quantum in Boynton Beach other than the two that were

2    actually placed there?

3        A    No.  I mean, I guess he could have used

4    other artists.

5        Q    Okay.  How did you determine the $110,000        01:03

6    settlement amount in the Settlement Agreement,

7    Exhibit 15?

8        A    I -- I don't recall.

9        Q    Did you have something to do with that

10   determination?                                            01:03

11       A    I don't know.

12       Q    If my math is right, if there was two

13   sculptures, that would be 55,000 a sculpture.

14            Do you think my math is right?

15       A    Well, yeah.  I mean, that makes sense if        01:03

16   you're looking at, you know, dividing it in two.

17       Q    Okay.  Do you have any reason to believe

18   that the sculptures were worth more than 55,000 a

19   piece when you entered into the settlement?

20       A    Well, I would give it a higher value than       01:04

21   that.

22       Q    But you agreed to the 110, yes?

23       A    Yes.

24       Q    That would be the best evidence of what the

25   value was?                                                01:04

Page 156

```
 1        MR. BROCKLAND:  Objection; calls for a legal

 2   conclusion.

 3   BY MR. SAX:

 4        Q    As a layman, was that -- is that the best

 5   evidence to you as to the value?                        01:04

 6        A    No, just the settlement, not the value.

 7        Q    Okay.  Do you think that number is somewhat

 8   consistent with the number that the jury came back

 9   with in Wakefield I?

10        A    It's less than.                               01:04

11        Q    Like 10- or 20,000 less?

12        A    Yeah.

13        Q    Okay.  Reason why you accepted less than

14   what the jury awarded in Wakefield I?

15        A    What's the question?                          01:04

16        Q    Is there a reason why you accepted in

17   Wakefield II a lesser amount than what the jury

18   awarded in Wakefield I?

19        A    I don't recall why we settled for that

20   amount.                                                 01:04

21        Q    Okay.  Are you aware of any facts to

22   indicate that the sculptures in Boynton Beach were

23   being hidden so that you would not be -- you would

24   not have the ability to locate them?

25        A    No.                                           01:05
```

Page 157

1    Q    They were in public view, were they not?

2    A    Where -- where they were located

3    recently --

4    Q    D- --

5    A    -- they were in public view.                    01:05

6    Q    Okay.

7    A    Yes.

8    Q    Okay.  I'm just going through my notes to

9    see if I can wrap this up.

10        Is it your position that Untitled is the      01:06

11   only sculpture that anyone has ever attempted to copy

12   of yours?

13   A    Yes, as far as I know.

14   Q    Okay.  Is -- is it your position that you

15   are the only one who's been hurt by the fact that     01:07

16   there are pur- -- these purported copies that existed

17   in Boynton Beach?

18   A    Yes, as far as I know.

19   Q    Regarding when you discovered these two

20   sculptures in Boynton Beach, when did you discover it  01:07

21   and how did you discover it?

22   A    The public art director for the City of

23   Boynton Beach called me.

24   Q    Do you remember what year that was?

25   A    I believe 2021.                                  01:07

Page 158

1      Q    Okay.  Do you remember the gentleman's

2   name?

3      A    Glenn Weiss or Glenn Weiss.  Glenn Weiss, I

4   think.

5      Q    Okay.  How many conversations did you have      01:07

6   with Mr. Weiss?

7      A    Maybe two.

8      Q    Do you remember basically in each

9   conversation what he said and what you said?

10     A    No.  Really, just about the discovery of        01:08

11  them.

12     Q    Okay.  Did he say anything negative about

13  Olen Properties or Mr. Olenicoff?

14     A    No.

15     Q    Did he say anything positive about them?        01:08

16     A    No.

17     Q    Okay.  Do you believe that those two

18  sculptures created some kind of a commercial benefit

19  for Olen Properties?

20     A    Well --                                          01:08

21     MR. BROCKLAND:  Other than what he's already

22  testified to?  I think --

23     MR. SAX:  Other -- other than what he's already

24  testified to.

25     MR. BROCKLAND:  Okay.                                 01:08

Page 159

1          THE WITNESS:  I mean, nothing additional.

2     BY MR. SAX:

3          Q    Okay.  And just so I understand what you

4     thought the commercial benefit was, was what?

5          MR. BROCKLAND:  Objection; asked and answered.      01:08

6               You can answer again.

7          THE WITNESS:  Well, he benefited financially and

8     aesthetically.

9     BY MR. SAX:

10         Q    Okay.  But as far as commercial, do you         01:08

11    have any specific facts to support that there was

12    some commercial benefit other than what you testified

13    to?

14         A    Not that I can think of.

15         Q    Okay.  And again, you were talking about        01:09

16    two -- two things.  You were talking about free

17    artwork and property enhanced dramatically, right?

18         A    Right.

19         Q    Okay.  You -- you've -- you've testified a

20    little bit about A Tear Must Fall where they added       01:09

21    the teardrop or they kind of cut into the sculpture.

22              Did -- did that teardrop change your

23    sculpture?

24         A    Well, yes.

25         Q    Okay.  How -- how did the addition of the       01:09

Page 160

1    tear cutting into the sculpture change your

2    sculpture?

3         A    It made it look hideous, that part of it.

4         Q    Did it change the whole concept behind the

5    sculpture?                                            01:10

6         A    No.  I mean, you still have all of the same

7    detail on both sides except for where it's, you know,

8    cut away for the most part and, you know, some minor

9    changes, but no.

10        Q    But is there some purpose behind the -- the    01:10

11   original sculpture?  I mean, was it supposed to

12   represent something?

13        A    There probably was at the time, but, you

14   know, since I didn't title it -- sometimes that would

15   bring back a recollection, but no.                    01:10

16        Q    Okay.  Did the addition of the teardrop

17   change the original purpose of your sculpture?

18        A    Well, purpose, I -- I guess, yes.

19        Q    The original purpose was to have, like, a

20   continuous piece?                                     01:11

21        A    Correct.

22        Q    Okay.  This kind of broke that up, right?

23        A    Right.

24        Q    Okay.  Then you throw the teardrop on top

25   of that?                                              01:11

Page 161

1       A      Right.

2       Q      Okay.  Which you're not a fan of?

3       A      No.

4       Q      Okay.  Is Untitled the only sculpture that

5    you have ever copyrighted?                                01:11

6       A      Yes.

7       MR. BROCKLAND:  That --

8       THE WITNESS:  With --

9       MR. BROCKLAND:  -- he's registered.

10      THE WITNESS:  That I've -- yeah, that I've --       01:11

11           (Simultaneous speaking.)

12      THE WITNESS:  -- registered.

13   BY MR. SAX:

14      Q      Re- -- re- -- which you registered -- which

15   you registered.  I wasn't trying to trick you.  That    01:11

16   you registered.

17      A      Correct.

18      Q      Okay.  So as far as you having any history

19   of selling registered, copyrighted pieces of

20   sculpture, there is no history?                          01:11

21      A      Correct.

22      Q      Other than the one person who was offering

23   you or trying to offer you 245,000 for the other

24   piece which name was?

25      A      Reflection of a Language.                      01:12

Page 162

1      Q   Re- -- Re- -- Reflection of a Language, did

2  anyone else offer you anything for that piece?

3      A   No.  It's been on exhibit, but, you know,

4  I'm not standing there next to it to try to, you

5  know, get people to buy it from me.            01:12

6      Q   I -- no, I understand.

7         But -- but has anybody else made an offer

8  where they were claiming a different price?

9      A   No.

10     Q   Okay.  And the last time you sold a piece    01:12

11  was when?

12     A   I'm not sure.

13     Q   Many years ago?

14     A   Yes.  Yes.

15     Q   Okay.  Does -- is -- is there any type    01:12

16  of -- anything in the art world where they set prices

17  for your works, your sculptures?

18        Is there any publication, anything in the

19  industry where it would show, oh, if you want to buy,

20  you know, Mr. Wakefield, this is what it costs?    01:13

21     A   No.

22     Q   Did -- have you ever had a list when you

23  were actively selling which would list all your

24  sculptures and recommended prices next to it?

25     A   Well, an -- art dealers would.          01:13

Page 163

1          Q     I understand.

2                But did you ever prepare anything like

3     that?

4          A     No, not for me personally, no.

5          Q     Did you have one -- did you have one                    01:13

6     particular art dealer where you would basically give

7     them all of your works and he would then have a list

8     creating the different prices?

9          A     Yeah.  I mean, I had several art dealers in

10    my career, but one main one for, you know, 20           01:13

11    years.

12         Q     Is he still alive?

13         A     No.

14         Q     Okay.  Where was he located, in

15    California?                                             01:13

16         A     Palm -- Palm Springs and Palm Desert,

17    yeah.

18         Q     Okay.  As -- as far as his price list, that

19    I assume you don't have a copy of anymore --

20         A     Huh-uh.                                      01:14

21         Q     -- does -- do you recall what that price

22    range was in whichever price list you can remember?

23         A     No.  Well, in -- mostly smaller works that

24    would fit inside the gallery.

25         Q     Okay.  How much were those selling for       01:14

Page 164

1    approximately?

2         A    In -- in the thousands.

3         Q    Okay.  Let me ask you this.

4              When you -- is it below 10,000?

5         A    Yeah.  Most of the interior works were        01:14

6    below that, you know, the smaller pieces, wall

7    sculptures, you know, a work in stone, metal, wood,

8    glass and ceramics, so...

9         Q    Did you -- did you set that -- those prices

10   or did the dealer say "Here's what I think you should    01:14

11   set it for"?

12        A    I would usually set the price.

13        Q    And was it based pretty much on how much

14   time and labor you put into the project?

15        A    That, and sometimes just the aesthetic        01:15

16   value.  I might charge more just because I liked it

17   more myself.

18        Q    Okay.  Would that enhance -- so how much

19   would that change the price?

20        A    I don't know.                                 01:15

21        Q    Okay.  But was -- was basically the -- the

22   benchmark of -- of the price when you set it was,

23   hey, I put a thousand hours into it and, therefore,

24   I'm doing it a dollar -- certain dollars per hour

25   times the number of hours?                              01:15

Page 165

```
 1        A     Well, I'd figure that out, you know, look

 2   at my overhead and, you know --

 3        Q     Okay.

 4        A     -- add it up.

 5              Would you get me a water in there if we're      01:16

 6   going to go --

 7        MR. BROCKLAND:  Stewart --

 8        THE WITNESS:  -- much longer.

 9        MR. BROCKLAND:  Or, excuse me, Stewart.  Not

10   Stewart.                                                   01:16

11              Spencer, can we go off the record?

12        MR. SAX:  Sure, of course.

13        MR. BROCKLAND:  If -- if you have much more, he

14   needs to get some water.

15        MR. SAX:  Yeah, let -- you know, let -- let me        01:16

16   get --

17        THE REPORTER:  We're not off.

18        MR. SAX:  -- some water too.  I -- I'm just

19   going to probably go through the allegations in the

20   Complaint and the Affirmative Defenses and then I'll       01:16

21   be done.

22        MR. BROCKLAND:  Let's take a break.

23        MR. SAX:  So let -- let -- let's take a five- --

24   want to take a five-minute break?

25        MR. BROCKLAND:  Sure.                                 01:16
```

Page 166

1        MR. SAX:  Okay.

2        THE VIDEOGRAPHER:  Going off the record.  The

3    time is 1:17 p.m.

4            (Brief recess taken.)

5        THE VIDEOGRAPHER:  Going back on the record.        01:24

6    The time is 1:24 p.m.

7    BY MR. SAX:

8        Q    Okay.  Mr. Wakefield, in this case,

9    Wakefield III, there's been various pleadings that

10   have been filed by both your side and my -- and my        01:24

11   clients.  Let me go first through some of the

12   allegations in your Complaint.

13           In your Complaint you talk about the

14   Raimondi case, R-a-i-m-o-n-d-i, case.

15           It -- do you have any personal knowledge of        01:25

16   that case or -- or is it all -- is the only thing

17   that you know whatever your attorneys have told

18   you?

19       A    No.  I mean, I talked to John early on when

20   I found out.                                             01:25

21       Q    Okay.  Tell me about your conversations

22   with John Raimondi.

23       A    There's not much to tell except he said he

24   met Mr. Olenicoff at one point and they were talking

25   about -- Mr. Olenicoff was talking about              01:25

Page 167

1    commissioning the work, and then that never

2    happened.

3         Q    Okay.  Did he in- -- in- -- indicate

4    anything about the litigation he had filed?

5         A    No.                                    01:25

6         Q    Did he ever indicate to you that he had

7    entered into a confidential Settlement Agreement with

8    Olen?

9         A    No.

10        Q    Did he ever tell you what the terms of any   01:25

11   settlement was with Olen?

12        A    No.

13        Q    Did he indicate to you that he had resolved

14   his issues with Mr. Olenicoff and Olen?

15        A    No.  I -- I only talked to him initially.   01:25

16        Q    Okay.  And -- and what was the reason for

17   speaking to him initially?

18        A    Well, his documents from his sculptures

19   came up in the Brea papers.

20        Q    Okay.  So -- so you called him to find out   01:26

21   what?

22        A    If -- it -- it -- to confirm if the -- what

23   was in the file, if it was his work.  There was a

24   blueprint and a photograph of the same --

25        Q    Okay.                                   01:26

Page 168

1        A     -- work.

2        Q     Did -- how did you identify yourself to him

3    and -- and as to why you were calling him?

4        A     I told him I was an artist and that we were

5    looking at the, you know, situation.                    01:26

6        Q     Oh, so you -- so you disclosed to him that

7    you were basically investigating for a claim that you

8    were going to assert?

9        A     Correct.

10       Q     Got it.                                         01:26

11             All right.  In Paragraph 63 in your

12   copyright infringement count it says "Defendants,"

13   and that would be Mr. Olenicoff and Olen Properties,

14   "have infringed and will continue to infringe the

15   artist's," and you're the artist, "exclusive rights    01:27

16   in and to the sculpture by manufacturing and

17   reproducing at least two copies of Untitled."

18             So let me stop you there.

19             Is -- is it your -- do you have any facts

20   to indicate that Mr. Olenicoff actually manufactured   01:27

21   the two pieces that wound up in Boynton Beach?

22       A     No.

23       Q     Were they manufactured by some people in

24   China?

25       A     I don't know.                                  01:27

Page 169

1      Q    Did Mr. Liang indicate to you who the

2   manufacturer of the two pieces were or was?

3      A    No.

4      Q    Okay.  In Paragraph 64 you say that

5   "Defendants," and again, that's Olen and                  01:28

6   Olen Properties, "have knowingly and willfully

7   copied, reproduced, and publicly displayed copies of

8   this Untitled."

9           So my question to you is, what facts are

10  you aware of that indicates that Mr. Olenicoff or         01:28

11  Olen Properties knowingly copied your work?

12     A    Well, it was proven in court.

13     Q    Well, forgetting how it was proven in

14  court, I'm just asking what facts do you have to

15  support the allegation in this lawsuit that              01:28

16  Mr. Olenicoff and Olen Properties knowingly copied

17  your work?

18     A    Well, how could they unknowingly copy them?

19     Q    I -- I --

20     A    I don't know.                                    01:28

21     Q    I -- I -- I appreciate you asking me a

22  question.  I'm just interested in whatever -- I

23  wasn't in Wakefield I.  Okay?

24     A    Okay.

25     Q    I -- I just would like to know what facts       01:28

Page 170

1    you're aware of which would support your allegation

2    that Mr. Olenicoff and/or his company knowingly

3    copied your work.

4        MR. BROCKLAND:  If you can think of anything

5    that didn't come out in Wakefield I, now is your        01:29

6    time.

7    BY MR. SAX:

8        Q    Right.  Or came out in Wakefield I.

9             I'm interested in knowing what are the

10   facts that support your allegation in this lawsuit.     01:29

11       MR. BROCKLAND:  Well, to the extent that you're

12   asking him what came out in Wakefield I, then

13   Wakefield I is the best evidence of that.

14       MR. SAX:  I -- I -- I'm not asking him what came

15   out in Wakefield I.  He's telling me it came out in     01:29

16   Wakefield I.  I'm asking him for the -- for the clean

17   facts.

18   BY MR. SAX:

19       Q    What facts in this lawsuit are you

20   contending supports your claim that Mr. Olenicoff and   01:29

21   his company knowingly copied your Untitled

22   sculpture?

23       A    Well, who else co- -- I mean, he had to

24   have copied it.

25       MR. BROCKLAND:  He's asking you about the word      01:29

Page 171

1    "knowingly."

2    BY MR. SAX:

3        Q    Knowingly.

4        A    Well, I -- I recognize my own work when I

5    see it, and he copied it before, so he copied          01:29

6    it ag- -- who else copied it, you know?

7        Q    Well, let me ask it this -- let me ask it

8    this way then.

9        A    Okay.

10       Q    Mr. Olenicoff never saw your sculpture in     01:30

11   Chicago, to the best of your knowledge, correct?

12       A    Correct.

13       Q    Okay.  Nor did Mr. Liang, nor did the

14   sculptor in China, correct?

15       A    Correct.                                        01:30

16       Q    How could he have copied your piece in

17   Chicago?

18       A    Well, he got it from my website.

19       Q    So is it your testimony that Mr. Olenicoff

20   looked at your website and found it?                    01:30

21       A    Correct.

22       Q    What facts do you have to support that?

23       A    Well, the photos are identical to the ones

24   that I took and the ones that I own.

25       Q    You're talking about the photos that          01:30

```
                                                          Page 172
 1    John Liang sent to you?
 2         A    No.  He sent me pictures of the artwork
 3    itself.
 4         Q    Okay.  So what photos are you talking about
 5    then?                                                  01:30
 6         A    The -- well, the -- well, let me think
 7    about that.
 8              Could you ask the question again?
 9         Q    Sure.
10              I'm trying to understand the facts to        01:31
11    support your allegation that Mr. Olenicoff and his
12    company -- company knowingly copied your piece that
13    was in Chicago.  You've already testified that they
14    weren't in Chicago, nobody was in Chicago, therefore,
15    they didn't see it.                                    01:31
16         A    No, I didn't --
17         Q    Now you --
18         A    No, I don't know that.
19         Q    Well -- well, let --
20         MR. BROCKLAND:  Let him finish.                   01:31
21    BY MR. SAX:
22         Q    Well -- well -- well --
23         A    Okay.
24         Q    -- let me finish.
25              Then -- now you're saying, "Well, they --    01:31
```

Page 173

1    they must have seen my website."

2         And all I want to know is, what facts do

3    you have to indicate that Mr. Olenicoff and his

4    company viewed your website prior to the manufacture

5    of the sculptures in the early 2000s?                    01:31

6         A    Well, he had a photograph --

7         MR. BROCKLAND:  Who's "he"?

8         THE WITNESS:  Oh, Olenicoff had a photograph

9    that he submitted to the City of Brea that had

10   another photo of a sculpture, more of a square shape,   01:31

11   large scale still, and he submitted that to the City

12   of Brea, and the only place you could see that is on

13   my website.

14   BY MR. SAX:

15        Q    Okay.  I -- I can only rely on what you      01:32

16   produced in this case and I have not seen that

17   document, so let's make sure I got -- I can identify

18   it so I can request it.

19        MR. BROCKLAND:  Well, it -- Spencer --

20        MR. SAX:  Why don't --                             01:32

21        MR. BROCKLAND:  -- I'll -- I'll tell you, it --

22   it wasn't requested in this case, but --

23        MR. SAX:  I -- I'm -- I'm just looking for him

24   to identify it so I can ask you for it.

25        MR. BROCKLAND:  Sure.                              01:32

Page 174

1    BY MR. SAX:

2         Q    So what is this photograph that you think

3    supports your claim that Olen knowingly copied

4    something from your website?

5         A    Well, there's two.  One from the City of      01:32

6    Brea with this square sculpture I'm talking about

7    and --

8         Q    Plu- -- stop there.

9              So -- so you're saying you -- there is

10   some- -- something in a file at the City that -- that   01:32

11   shows what?

12        A    That shows a piece of sculpture from a

13   photo that I took that was at my studio at the

14   time.

15        Q    Was that photo on your website?              01:32

16        A    Yes.

17        Q    Okay.  What else?  What's the second thing?

18   I cut you off.

19        A    One of the photographs that his broker sent

20   me.                                                     01:33

21        Q    John Liang?

22        A    Yes, and it was a picture --

23        Q    I put --

24        A    -- of a -- of a different sculpture.

25        Q    That was from your website?                  01:33

Page 175

1        A    Correct.

2        Q    Okay.  So those are the two -- other

3    than -- well, let me make sure I got it clear.

4             So you're saying there's two photographs,

5    one that Liang had and one that the City had, that        01:33

6    you're saying was a -- was a reproduction of photos

7    that were on your website?

8        A    Correct.

9        Q    Okay.  Let me ask you about the one that

10   John Liang had.                                            01:33

11            What does that photograph depict?

12       A    It's a picture of a sculpture in Palm

13   Desert for part of the public art program there, and

14   it had a -- a -- like a -- a little sign in it that

15   had my name and the title of the work.                     01:33

16       Q    But it wasn't a picture of Untitled?

17       A    Correct.

18       Q    Okay.  Now, what about the photograph that

19   John Liang -- you were referring that John Liang had?

20   What was that a photo of?                                  01:34

21       A    I'm sorry.  That's what I was just saying.

22   That was a photo of a --

23       Q    Oh.

24       A    -- sculpture from Palm Desert.

25       Q    Okay.  How about the one that the City had?       01:34

Page 176

1    What was that a photo of?

2        A    That was a photo of another grand sculpture

3    at my studio at the time.

4        Q    But -- but not Untitled?

5        A    But not Untitled, no.                        01:34

6        Q    Can you generally -- since I don't have

7    those photos in front of me, can you generally

8    describe what the -- each of these photos look like,

9    as far as the size of the sculpture, the material,

10   the shape of it?                                      01:34

11        Can you generally describe that to me?

12        A    Yes.  So the one in the Brea file was

13   square-ish, about 6 -- 6, 7 feet tall, hard to

14   des- -- describe an original work of art, but it --

15   let's just say it was square-ish, compared to all of  01:35

16   the sculptures, it was a little different.

17        Whereas, the one in Palm Desert was, you

18   know, in the same vein, I would say, as Untitled, a

19   little taller.  Perhaps the one in Palm Desert was a

20   little taller.  It looked different, but there was    01:35

21   some of the same sort of texturing quality to it.

22        Q    How did it look different?

23        A    It was bigger and different shape.

24        Q    Okay.  Any other facts that you're aware of

25   that would support your claim that Olen and Olen       01:35

Page 177

1    Prop- -- Mr. Olenicoff and Olen Properties knowingly

2    copied Untitled?

3        A    Not that I can think of.

4        Q    Okay.  Are you aware of any facts to

5    indicate that Mr. Olenicoff in -- at any time tried      01:35

6    to sell or resell any of the sculptures that are the

7    subjects of the various lawsuits that you have filed

8    against him?

9        A    No.

10       Q    Okay.  You've alleged in Paragraph 64 that      01:36

11   they -- they purportedly infringed on your copyright

12   for their own benefit, and you testified about what

13   you think that benefit is, and pecuniary interest.

14           An- -- anything that you'd like to add to

15   your testimony as to how their -- their purported       01:36

16   infringement of your sculptures somehow benefited

17   their pecuniary interest?

18       A    No, not at this time.

19       Q    Okay.  As far as the detriment to you, is

20   the detriment that you would have sold the artwork       01:36

21   and made money or you just don't want somebody to,

22   you know, claim that this is somebody else's work and

23   not yours?

24       A    Well, I mean, I -- I wouldn't want my name

25   on a copy, you know, for -- for one thing.               01:37

Page 178

1    That's --

2         Q    That's it?

3         A    Yeah.

4         Q    Okay.  And you weren't going to sell your

5    sculpture because you didn't have the sculpture          01:37

6    anymore, right?

7         A    Right.

8         Q    It was in Chicago.  All right.

9              And you weren't going to duplicate it and

10   sell it to Mr. Olenicoff, right?                          01:37

11        A    Right.

12        Q    Okay.  In Paragraph 68 you're alleging that

13   the two Olen entity -- or the Olen entity and

14   Mr. Olenicoff "has induced, caused, and material or

15   contributed to and continues to induce, cause, and       01:38

16   material contribute to the infringing conduct by such

17   third parties and other defendants."

18             I guess my question to you is, are -- are

19   you asserting in this case that Mr. Olenicoff

20   required John Liang to make the copies?                   01:38

21        A    Well, I don't know who made these last two

22   copies.

23        Q    Okay.  It -- but as far as whether

24   Mr. Liang was just trying to sell sculptures as

25   opposed to Mr. Olenicoff specifically asking him to       01:38

Page 179

1    make sculptures, you -- you're not aware of the facts

2    underlying that, do you?

3        A    Yeah, he -- John told me that he -- they

4    didn't make anything that wasn't ordered from the

5    client.  They -- they weren't designers or artists.        01:38

6    They just made what their client wanted.

7        Q    And do you know if it pertains to the two

8    sculptures that we're here on today?

9        A    No, I don't have any information on -- on

10   those last two.                                             01:39

11       Q    Do you remember when these last two were

12   actually ordered from and -- and manufactured in

13   Chi- -- in China?

14       A    No.

15       Q    In -- in your first count you're -- you're    01:39

16   looking for an injunction, and you say pl- -- you

17   have "no adequate remedy at law and has suffered and

18   is continuing to suffer irreparable harm and damage

19   as a result of the copyright infringement."

20            My -- my question to you is, it says you       01:39

21   have no adequate remedy of law, which means basically

22   monetary damages will not adequately cover what

23   you're claiming here and that you need the Court to

24   require the destruction of the stat- -- of the two

25   sculptures.                                                 01:39

Page 180

```
 1            Is it your position that you are requiring
 2    the destruction of those two sculptures?
 3        A    Yes.
 4        Q    Paragraph 73 you say "Defendants have each
 5    obtained gains, profits, and advantages as a result     01:40
 6    of their wrong -- respective wrongful acts and
 7    amounts within the jurisdiction of this Court."
 8            Co- -- let me break that down.
 9            Do you know what gains and profits, both
10    monetary, that you feel that Mr. Olenicoff and his     01:40
11    company have obtained by purportedly infringing your
12    copyright?
13        A    Well, financially he's -- he's not paying
14    the artist a fair price and he's not supplying the
15    information to the City.                                01:40
16        Q    How about profits?  What profits does he
17    get?
18        A    Well, I mean, he -- he gets money from not
19    paying the artist and he -- and he gets money from --
20    from not paying the -- the -- well, I don't know --     01:40
21    what he's paying the City.
22        Q    Okay.  But he's not reselling it and making
23    a profit, is he?
24        A    I don't know.
25        Q    Okay.  What facts are you aware of that       01:41
```

Page 181

1   would support your allegation that this was an

2   intentional infringement of your copyright rather

3   than an unintentional infringement of the

4   copyright?

5       A    Well, having gone through this so many        01:41

6   times, he -- in my opinion, he had to have known.

7       Q    But as far as any facts to support your --

8   your feeling, are you aware of anything that you

9   haven't already testified to today?

10      A    I can't think of any right now.             01:41

11      Q    Okay.  And without me putting that caveat

12  in, "whatever you testified earlier today," can you

13  specifically point to any specific facts that

14  indicate that this was intentional rather than

15  unintentional?                                        01:41

16      A    Well, it seems to be his track record.

17      Q    Anything else?

18      A    Not that I can think of.

19      Q    Okay.  In Paragraph 80 it says Defendants

20  derives substantial financial benefit from           01:42

21  infringements of your copyright in that Defendants

22  did not pay you the customary price for the purchase

23  of their sculpture.

24           Is it true that there was no customary

25  price for the purchase of this sculpture because you  01:42

Page 182

1    didn't own it anymore?

2        A    That might be true.

3        Q    And are you aware of any other customary

4    price for Untitled other than the $35,000 that you

5    received from Mr. Glickman?                          01:42

6        A    No.

7        Q    You have a count in this lawsuit in Count

8    4, which you call "civil conspiracy," and what it

9    says is "Defendants intended to and did, in fact,

10   form a group of persons who agreed to a common plan   01:43

11   or design to infringe directly, contributorily, or

12   vicariously the artist's copyrights in the sculpture

13   set forth above."

14            Other than what you've testified to

15   regarding what you think is the relationship between  01:43

16   Mr. Olenicoff, John Liang, and the manufacturer in

17   China, are -- are you making any allegation here

18   regarding some other group of persons that you think

19   have somehow done -- conspired against you?

20       A    Employees, his attorneys.                   01:43

21       Q    Tell me about the employees.  Which

22   employees were part of this conspiracy?

23       A    I'd say Dale Lyon would be one.

24       Q    How so?

25       A    Well --                                      01:44

Page 183

1      Q     What did he do to conspire?

2      A     Well, he -- he was aware of it and he -- he

3   said he was one of the key guys, maybe the key guy

4   other than Mr. Olenicoff to decide where the

5   sculptures were going to be located and helped with        01:44

6   the -- installing them himself.

7      Q     Oh, but earlier when I'd asked you about

8   your conversations with Dale, you didn't mention this

9   part.

10          Is there -- is there anything else that you       01:44

11  remember about your conversation with Dale other than

12  what you previously testified to and what you're now

13  testifying to?

14     A     Not that I can think of.

15     Q     Okay.  So let's start from the beginning.        01:44

16          Tell me about what you do remember speaking

17  to Mr. Lyon about when he peered out his window and

18  saw you taking photographs of the sculpture at the

19  headquarters.

20     A     Oh.  Well, let me step back.                     01:44

21          The -- the -- the statements with his

22  involvement were from Mr. Olenicoff during court

23  when -- when --

24     Q     Okay.  So it did -- so it didn't come from

25  Mr. Lyon?                                                  01:45

Page 184

1      A    No.  No.

2      Q    Okay.  So you're saying that your

3  allegation that Mr. Lyon was part of the conspiracy

4  is based upon what Mr. Olenicoff testified to in

5  court?                                            01:45

6      A    I believe so.

7      Q    Was it in court or in a deposition?

8      A    It might have been both.

9      Q    Okay.  And what do you recall Mr. Olenicoff

10  testifying to that implicated Dale Lyon in this     01:45

11  conspiracy?

12      A    That -- that -- that Dale was involved with

13  the installations of the sculptures.

14      Q    Okay.  Anything -- any other facts that you

15  believe support your position that Dale Lyon was part  01:45

16  of this conspiracy?

17      A    Not at this time.

18      Q    Okay.  Do you have any facts to indicate

19  that he knew there was a copyright and he

20  intentionally infringed on that copyright?       01:45

21      A    No.

22      Q    Okay.  Anybody else part of the conspiracy

23  other than the names that you've given me?  I think

24  you said attorneys.

25          What attorneys are you saying was part of    01:46

Page 185

1    this conspiracy?

2         A    So Julie Ault would be one.

3         Q    And how do you think -- how do you think

4    Julie Ault conspired?

5         A    Well, she was helping negotiate all of the        01:46

6    deals, so it seems pretty clear that she -- she was

7    in the know of what was going on.

8         Q    Do you have any re- -- facts to support

9    that she knew about the two sculptures in

10   Boynton Beach?                                              01:46

11        A    Not that I can remember, but there were a

12   lot of documents there as well.

13        Q    Any other attorneys that you believe are

14   part of the conspiracy?

15        A    Potentially William Boost (phonetic), the        01:46

16   attorney from the first case.

17        Q    Do you have any reason to believe he knew

18   about the two sculptures in Boynton Beach?

19        A    I don't know.

20        Q    Okay.  Anybody else part of the conspiracy        01:46

21   other than the people you've already mentioned?

22        A    Not -- not that I know of.

23        Q    Okay.  In -- in this lawsuit you're

24   claiming that Mr. Olenicoff's Declaration where --

25   where he says something about the removal of -- of        01:47

Page 186

1    the -- of, quote, all sculptures, was a

2    representation regarding other sculptures.

3           And my question is this.

4           Other than his Declaration, did he ever say

5    anything to you, write anything to you, or do          01:47

6    anything that in any way indicated some

7    representation by him that he was destroying any

8    sculptures other than the ones that were the subject

9    of Wakefield I and Wakefield II?

10       A    Not that I can remember.                       01:48

11       Q    Okay.  You allege in Paragraph 95 that

12   Olenicoff and Olen Properties knew that their

13   representation was false and made it with the intent

14   to defraud you.

15          What facts are you aware of to indicate          01:48

16   that they knew the representation was false?

17       A    Well, they had to have known the sculptures

18   were there.

19       Q    And then what facts are you aware of that

20   would indicate that it was done with the intent to     01:48

21   defraud you?

22       A    Well -- well, how many times does he have

23   to copy my work, you know, be- -- before I feel

24   defrauded, if that's a word, defrauded.

25       Q    That's your answer.  Okay.                     01:48

Page 187

1           In reliance -- the next Paragraph 96 -- we

2     went over that.

3           Do you know the time period in which the

4     various copies of Un- -- Untitled were -- a- --

5     again, this is your allegation that they were copies,      01:49

6     but when they were manufactured?  Was it between 2005

7     and some date?

8       A    No, I don't have any indication on that.

9       Q    Is your -- do you think it was originally

10    manufactured in 2005?                                       01:49

11      A    Well, you know, it took me about a year to

12    make one, so it might have been manufactured, you

13    know, years earlier.  I don't know.

14      Q    Do you know when the two that were in

15    Boynton Beach were manufactured?                            01:49

16      A    No.

17      Q    Paragraph 103, it says that the defendants

18    obtained commercial advantage and private financial

19    gain.

20          Do you have any other facts to support           01:50

21    those two terms other than what you've already

22    testified to?

23      A    Not that I can think of.

24      Q    Okay.  I'm looking at the answer in the

25    Affirmative Defense.  Let me see if I can shorten         01:50

Page 188

1    this for you.

2           Do you feel that you were adequately

3    represented by counsel in the preparation and

4    execution of the Settlement Agreement?

5         A    I suppose.                                    01:51

6         Q    I think your attorney would like to hear a

7    ringing endorsement, but do -- do -- do you -- do you

8    want to elaborate on that answer at all or are you

9    going to stick with "I suppose"?

10        A    I'll stick with "I suppose."                  01:52

11        Q    Okay.

12        MR. BROCKLAND:  It was Mr. Kuznetsky.

13        THE WITNESS:  Yeah.

14   BY MR. SAX:

15        Q    All right.  Are you -- and do you -- are     01:52

16   you in a position to return the $110,000 that was

17   paid under the Settlement Agreement should the Court

18   rule that the -- the agreement should be rescinded?

19        MR. BROCKLAND:  I'm going to object that it

20   invades his right to privacy about his own personal   01:52

21   financial condition that is not at issue in the case.

22        MR. SAX:  You're -- you're seeking to rescind

23   the Settlement Agreement.  So he'd be ready, willing,

24   and able to -- to perform as part of that --

25        MR. BROCKLAND:  Yeah, but --                      01:52

```
                                              Page 189

 1        MR. SAX:  -- so --

 2        MR. BROCKLAND:  But he doesn't --

 3        MR. SAX:  I mean, we can -- we -- we can -- we

 4   can argue over my questions.

 5            Are you instructing him not to answer?    01:52

 6        MR. BROCKLAND:  No.

 7        MR. SAX:  Okay.

 8        MR. BROCKLAND:  You can answer.

 9        THE WITNESS:  Then yes.

10   BY MR. SAX:                                         01:52

11        Q    Okay.  Do you -- do you have an

12   understanding that if the Court sets aside the

13   Settlement Agreement, you will need to re- --

14   reimburse Olen Properties $110,000?

15        A    Yes.                                      01:53

16        Q    You sat through Mr. Olenicoff's deposition.

17            As you sit here today, do you recall

18   anything standing out to you that you felt where he

19   did not testify truthfully?

20        A    I think that's a long list.               01:54

21        Q    Can you start with some that you remember?

22   Give me the top three.

23        A    Let's see.  Well, the fact that he said he

24   didn't re- -- remember anything about the court case

25   at all.                                             01:54
```

Page 190

1          Q     Anything else?

2          A     I believe he mentioned about the Chinese

3     artist, and we all know that that person does not

4     exist.

5          Q     Anything else?                              01:54

6          A     Not that I can think of offhand.

7          Q     Okay.  Who handled the registration of your

8     copyright?

9          A     I did.

10         Q     Did you get assistance of counsel to do     01:55

11    that?

12         A     I was working with a- -- another attorney

13    at the time, and she just recommended me to do

14    that.

15         Q     And --                                       01:55

16         MR. BROCKLAND:  He's asking you did you have

17    assistance with the actual registration.

18         THE WITNESS:  Oh, no.

19    BY MR. SAX:

20         Q     Yes.                                         01:55

21         A     You do it online.

22         Q     Okay.  And -- and -- and the process was

23    what?  What did you have to submit in order to get

24    the registration?

25         A     Submitted the photos and some -- some        01:55

```
                                                    Page 191

 1    details of it.

 2         Q     Anybody ask you any questions before they

 3    issued the copyright?

 4         A     No.

 5         Q     Pretty easy process?                          01:55

 6         A     Yes.

 7         Q     Was that a federal trade -- copyright?

 8         A     Yes.  Yeah, you just --

 9         Q     And --

10         A     -- pay your fee and they're probably happy    01:55

11    with that.

12         Q     And what was the fee?

13         A     I don't recall, but it's like 45 bucks or

14    something like that.

15         MR. SAX:  Okay.  Okay.  I don't have any other      01:56

16    questions, Mr. Wakefield.  Your attorney may have

17    some, but I don't have any others, so thank you for

18    answering my questions today.

19         THE WITNESS:  Sure.

20         MR. BROCKLAND:  No questions for me.  We'll         01:56

21    review it.

22         MR. SAX:  Okay.  So he'll read?  Great.

23         MR. BROCKLAND:  Yeah.

24         MR. SAX:  I'll -- I'll order it, and I -- I need

25    a mini also.                                             01:56
```

Page 192

1          MR. BROCKLAND:  And I'd just like a mini for

2     me.

3          MR. SAX:  Okay.  Want to -- want to go off --

4          MR. BROCKLAND:  Electronic.

5          MR. SAX:  -- off --                              01:56

6          MR. BROCKLAND:  Yeah.

7          MR. SAX:  You want to go off the record?

8          MR. BROCKLAND:  Yes.

9          MR. SAX:  Okay.

10          THE VIDEOGRAPHER:  This concludes today's       01:56

11     testimony given by Donald Wakefield on

12     November 8, 2022.  The original video media will be

13     retained by Veritext and we are going off the record

14     at approximately 1:57 p.m.

15

16               (Whereupon the videotaped videoconference

17     deposition concluded at 1:57 p.m.  Signature under

18     penalty of perjury.)

19

20

21

22

23

24

25

Page 193

1                           DECLARATION

2                                OF

3                       PENALTY OF PERJURY

4

5

6

7        I declare under penalty of perjury, under the

8    laws of the State of California, that I have read the

9    foregoing transcript, I have made any corrections,

10   additions or deletions that I was desirous of making

11   in order to render the within transcript true and

12   correct, and

13       IN WITNESS WHEREOF, I have hereunto subscribed

14   my name this _____ day of _____,

15   _____.

16

17

18

19

20

21               _____

22                     DONALD WAKEFIELD

23

24

25

Page 194

1    CERTIFICATION OF COURT REPORTER

2                    FEDERAL JURAT

3

4            I, the undersigned, a Certified Shorthand

5    Reporter of the State of California do hereby

6    certify:

7            That the foregoing proceedings were taken

8    before me at the time and place herein set forth;

9    that any witnesses in the foregoing proceedings,

10   prior to testifying, were placed under oath; that a

11   verbatim record of the proceedings was made by me

12   using machine shorthand, which was thereafter

13   transcribed under my direction; further, that the

14   foregoing is an accurate transcription thereof.

15           That before completion of the deposition, a

16   review of the transcript [X] was [ ] was not

17   requested.  I further certify that I am neither

18   financially interested in the action nor a relative

19   or employee of any attorney of any of the parties.

20           IN WITNESS WHEREOF, I have this date

21   subscribed my name this 15th day of November, 2022.

22

23

24

     Jana Bommarito,

25   CSR No. 10880

Page 195

1    GENE J. BROCKLAND, ESQ.

     gbrockland@smithamundsen.com

2

3                                        November 15, 2022

4    RE: Wakefield v Olen Properties Corp., et al.

     11-8-22 Donald Wakefield, Job# 5565883

5

6    The above-referenced transcript has been

7    completed by Veritext Legal Solutions and

8    review of the transcript is being handled as follows:

9    __ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext

10       to schedule a time to review the original transcript at

11       a Veritext office.

12   __ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF

13       Transcript - The witness should review the transcript and

14       make any necessary corrections on the errata pages included

15       below, notating the page and line number of the corrections.

16       The witness should then sign and date the errata and penalty

17       of perjury pages and return the completed pages to all

18       appearing counsel within the period of time determined at

19       the deposition or provided by the Code of Civil Procedure.

20   __ Waiving the CA Code of Civil Procedure per Stipulation of

21       Counsel - Original transcript to be released for signature

22       as determined at the deposition.

23   __ Signature Waived - Reading & Signature was waived at the

24       time of the deposition.

25

Page 196

1    __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF

2      Transcript – The witness should review the transcript and

3      make any necessary corrections on the errata pages included

4      below, noting the page and line number of the corrections.

5      The witness should then sign and date the errata and penalty

6      of perjury pages and return the completed pages to all

7      appearing counsel within the period of time determined at

8      the deposition or provided by the Federal Rules.

9    __ Federal R&S Not Requested – Reading & Signature was not

10      requested before the completion of the deposition.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                        Page 197

 1    Wakefield v Olen Properties Corp., et al.

      11-8-22 Donald Wakefield, Job# 5565883

 2

 3                    E R R A T A   S H E E T

 4    PAGE_____ LINE_____ CHANGE_____

 5    _____

 6    REASON_____

 7    PAGE_____ LINE_____ CHANGE_____

 8    _____

 9    REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11    _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14    _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____        _____

24    WITNESS                             Date

25
```

**&**

**&**   3:10 195:23 196:9

**0**

**0590**   4:15

**1**

**1**   1:8 2:8 5:6 25:10,13,19 58:14 145:7 196:1
**1.2.**   97:10
**10**   1:9 2:9 19:5 156:11
**10,000**   164:4
**103**   187:17
**10880**   1:24 2:19 194:25
**11-8-22**   195:4 197:1
**110**   155:22
**110,000**   155:5 188:16 189:14
**11:28**   77:14
**120**   3:5
**13**   69:9
**14**   47:25 48:3 122:16
**144**   4:16
**14996**   194:24
**15**   20:17,22 22:25 47:25 90:13 95:16 122:18 155:7 195:3
**15,000**   89:25 90:5 154:20
**150**   2:15 5:11 89:22

**1585**   1:5 2:5 5:9
**15th**   194:21
**16**   122:22 133:13
**17**   4:11,24 38:18 38:19 122:22
**18**   4:13 69:8,10 70:5,10,20 73:10 122:22 138:1
**18th**   118:3 137:22
**19**   4:15 77:19,20
**1979**   47:25
**1980**   6:17 8:13
**1990s**   13:20 18:22 94:15
**1992**   41:14 43:7 43:20 44:23 45:17,20 46:1,3,6 58:22 75:24 76:12 77:6
**1995**   9:18
**1:17**   166:3
**1:24**   166:6
**1:57**   2:17 5:2 192:14,17
**1st**   134:22

**2**

**2**   19:12 25:10,14 39:3 125:21 126:1 127:1 134:21 139:16,17 139:18,18,20
**2.3.**   101:22
**20**   4:16 22:25 125:14,15 129:2 129:5 144:9,20 144:21,22 150:11

**163**:10
**20,000**   156:11
**200**   3:11
**2000**   27:19 47:25 50:4 94:15
**2000s**   28:5 46:14 94:15 173:5
**2005**   127:20 128:5 187:6,10
**2008**   127:16,18 128:4,10 149:10 150:2
**2010**   50:4 51:23 53:21
**2011**   46:15
**2012**   39:8 46:25 50:5 51:23 52:13 53:9,21,22 57:20 59:14 64:13 65:14 87:1 97:21 105:23 106:16,17 106:20,24 107:3 107:22 122:16
**2013**   52:19 122:16
**2014**   52:19 54:2 79:23 80:1
**2015**   52:19 122:21
**2017**   97:16,17,22 101:13 118:3 134:22
**2018**   54:21 55:15 55:20 133:15 137:22 138:1,15 139:23
**2019**   8:15

**2020**   54:18
**2021**   157:25
**2022**   1:18 2:18 5:1,6 192:12 194:21 195:3
**2025.520**   195:9 195:12
**23**   2:15 5:11
**24**   133:15
**245**   32:9,16
**245,000**   31:22 32:4 33:5 34:10 34:23 128:14 161:23
**25**   4:25
**250,000**   31:8 34:5

**3**

**3**   19:12 58:20 145:5,8
**3.1**   101:24
**3.3.**   111:5
**30**   13:25 16:1,18 16:20 17:3 19:18 20:14 196:1
**30,000**   120:15
**314**   3:6
**33487**   3:12
**35**   10:13 12:12 14:17 21:12 35:20 67:9
**35,000**   10:17,18 11:12 12:12,17 14:21 17:7 21:9 35:21 182:4
**38**   4:11

| **4** | **7** |
|---|---|
| **4**  19:12 59:4 114:10 124:22,23 124:25 130:1,4,5 182:8 | **7**  19:6,7,15,16 20:4,25 21:16 26:25 36:12 122:25 123:1 124:8 129:12 176:13 |
| **4.1**  114:3 | **70**  21:7,12 |
| **4.1.**  114:1 | **70,000**  21:2 27:8 36:14 |
| **41188**  6:13 | **700**  3:5 |
| **45**  191:13 | **719-3732**  3:6 |
| **450,000**  36:20 106:18 | **73**  180:4 |
| **47768**  6:11 | **75**  36:3 |

| **5** | **75,000**  36:22 89:14 |
|---|---|
| **5**  25:18 96:11,11 114:10 118:4 | **77**  4:15 |

**accept**  124:17
**accepted**  156:13 156:16
**accommodate** 38:5
**accurate**  85:20 127:22 131:21 194:14
**acknowledge** 113:10
**acquired**  131:24
**action**  97:16,17 100:6 101:13 105:23 106:16,17 106:20,24 107:3 107:23 194:18
**active**  8:14,16
**actively**  162:23
**acts**  180:6
**actual**  23:14 70:22 71:10 93:6 190:17
**add**  165:4 177:14
**added**  43:8 80:24 159:20
**adding**  81:4
**addition**  159:25 160:16
**additional**  54:8 55:21 58:11 110:6,25,25 127:7 159:1
**additionally** 131:18
**additions**  193:10
**address**  6:10
**adequate**  179:17 179:21

**adequately** 179:22 188:2
**admired**  31:11
**admit**  127:7
**admitted**  127:5
**adult**  9:11
**advantage** 187:18
**advantages**  180:5
**advice**  113:6 115:8,14
**aesthetic**  79:4 164:15
**aesthetically** 159:8
**affiliations**  5:16
**affirmative** 165:20 187:25
**ag**  171:6
**ago**  24:19,20 27:20,23 29:23 116:18 129:5 162:13
**agree**  58:14 96:10 103:16
**agreed**  108:7,11 108:17 112:6 155:22 182:10
**agreeing**  101:15 103:2,3 105:25 106:1 107:20 108:21,23 112:7 115:9
**agreement**  4:12 38:18 46:25 47:5 55:4,7 56:12,22 57:20 61:14 64:1 64:15,20 65:2,4

**5**  25:18 96:11,11 114:10 118:4
**5,000**  10:15
**5.5**  114:10 116:4
**50**  70:17
**50/50**  61:14
**55,000**  155:13,18
**5565883**  1:25 195:4 197:1
**561**  3:12

| **6** |
|---|
| **6**  4:5 19:6,7,15,16 20:3 63:22 117:23 118:8 123:2 176:13,13 |

**60**  4:24
**61**  4:25
**6111**  3:11
**63**  168:11
**63105**  3:6
**64**  169:4 177:10
**68**  178:12
**69**  4:13

| **8** |
|---|
| **8**  1:18 2:17 5:1,6 192:12 |

**80**  74:4,23 181:19
**8:21**  1:5 2:5 5:9

| **9** |
|---|
| **9**  59:14,14 69:9 |

**90s**  14:6 28:5
**92660**  5:12
**95**  186:11
**96**  187:1
**994-4499**  3:12

| **a** |
|---|
| **a.m.**  2:16 5:2,5 77:14,17 |

**ability**  9:21 156:24
**able**  79:1 188:24

65:15,19,22,23
65:24 66:11 67:3
67:8,9,13 68:6
95:16,22,25
96:19,22,25
97:12 98:12,13
98:17,21 100:24
102:8,12 103:11
103:18 104:4,13
104:20 105:20,22
106:13 108:18
109:2,18 110:5
110:23 111:11,18
112:9,20 114:4,6
114:11,12,13,21
116:1 122:22
137:18,20,22
139:6,8,24
142:12,13 146:17
146:23 155:6
167:7 188:4,17
188:18,23 189:13
**agreements**  64:2
64:14,25 65:7
66:2,14,24 67:16
68:3
**ah**  134:18
**ahead**  42:25
51:13 85:1 93:17
121:13 135:13
142:23 150:17
**al**  5:9 195:4 197:1
**albeit**  61:3
**alive**  163:12
**allegation**  169:15
170:1,10 172:11
181:1 182:17
184:3 187:5

**allegations**  125:6
130:14,23 165:19
166:12
**allege**  186:11
**alleged**  9:7
177:10
**alleging**  178:12
**allow**  65:18
**amount**  61:9,11
63:2,10,16,20
89:20 132:10,10
132:12 155:6
156:17,20
**amounts**  180:7
**ample**  133:5
**amputated**  38:4
**amundsen**  3:4
**annual**  52:12
**answer**  4:21 9:21
17:18 24:6,9 35:3
50:19 61:7 62:9
63:13,15 74:6
85:1 101:4 109:8
140:9 159:6
186:25 187:24
188:8 189:5,8
**answered**  58:5
159:5
**answering**
191:18
**anybody**  13:24
34:18 35:8 52:6
95:7,11 112:25
113:3,5 114:25
122:20 140:8,12
141:4 148:11
162:7 184:22
185:20 191:2

**anymore**  54:20
163:19 178:6
182:1
**anyway**  34:15
116:15
**apartments**  131:9
**appealed**  51:18
**appearances**  3:1
5:15
**appearing**  195:18
196:7
**appointment**
149:18
**appraisers**  80:4
**appreciate**
169:21
**approached**
13:20,24
**approaching**
13:17
**approved**  44:4
**approximate**
10:16 20:12,22
20:25 80:10
81:14
**approximately**
5:5 9:17 10:11,15
12:12 14:21,24
19:25 26:25
45:17 53:24 76:2
77:14,17 150:2
164:1 192:14
**arc**  94:11
**argue**  189:4
**arising**  114:5
**arrangement**
62:8

**arranges**  25:3
**art**  7:10 13:10,13
13:17 15:18,21
15:23 16:4,11
18:3,7,9,14,14,17
19:17,24 20:16
20:17,18,23,23
22:7,21 23:2
24:11,16,24 25:2
25:20 26:17,24
27:6,12,13,22,23
28:1,2 31:9,10
32:1,2 42:7 49:8
66:3,10,17 67:1
67:24 79:6,7,18
79:20 80:7,20,21
81:23 85:21 95:5
119:3 125:18
126:16 128:14
129:8 131:13,14
131:23 132:1,6
141:22,23 157:22
162:16,25 163:6
163:9 175:13
176:14
**articles**  80:20
**artist**  17:2 25:11
26:9 33:10 42:19
42:20 79:19
83:10,21 85:5,7
85:11 125:19
126:17 132:10
148:11 150:12
168:4,15 180:14
180:19 190:3
**artist's**  154:25
168:15 182:12

**artists** 139:11
  155:4 179:5
**arts** 6:20,23 7:1,8
  7:11,13
**artwork** 16:22
  29:20,25 30:10
  78:9,18 79:23
  84:20,22,22
  94:13 118:6,19
  118:21 119:11
  122:10 126:20
  131:16,19 132:22
  159:17 172:2
  177:20
**artworks** 16:19
**aside** 25:11 83:5
  189:12
**asked** 9:24 14:1
  57:18 61:10 78:7
  117:2 150:9
  159:5 183:7
**asking** 16:12,14
  28:24 32:11,17
  34:18 38:11
  40:19 46:2 53:3
  57:19 61:9 63:4,9
  63:10 81:14 89:7
  91:5 99:23
  110:15 112:1,5
  121:18 143:6,18
  143:21,22 169:14
  169:21 170:12,14
  170:16,25 178:25
  190:16
**assert** 168:8
**asserted** 95:9
**asserting** 81:15
  84:10 115:18

178:19
**assign** 30:17
**assigned** 60:4
**assigns** 59:6
**assistance** 113:1
  190:10,17
**assisted** 142:17
**assume** 143:4
  163:19
**assumes** 84:24
**assuming** 48:7
**att** 60:1
**attached** 38:20
  41:15 43:10
  44:24 69:11
  77:21 144:23
**attachment** 41:16
  41:19 43:4,11,13
  44:7,7,9,24,25
  45:2 58:18
**attempt** 49:17
  152:21
**attempted** 157:11
**attempting**
  110:22
**attempts** 127:24
**attended** 133:25
**attention** 108:5
**attorney** 39:17,20
  40:9 41:4,9 59:19
  59:25 60:1 61:5
  62:7 63:8 67:5
  99:3 117:19
  141:13 145:24
  185:16 188:6
  190:12 191:16
  194:19

**attorneys** 39:24
  59:16 60:21 61:6
  61:10 62:2,8 82:7
  115:4,6 116:22
  136:13,14 140:16
  140:16 141:1
  166:17 182:20
  184:24,25 185:13
**ault** 185:2,4
**author** 58:15
**authored** 41:13
**avenue** 3:5
**awarded** 156:14
  156:18
**aware** 15:17
  16:24 41:23 47:1
  47:4,5,11 50:7
  52:10 56:13,23
  57:8,21 59:24
  82:13 102:11
  109:17 112:19
  113:12,17,20,24
  118:10 122:5
  124:4,5 125:7
  126:14 127:2,17
  130:13 132:3,24
  133:2 138:5,9,10
  138:18 146:16
  154:23 156:21
  169:10 170:1
  176:24 177:4
  179:1 180:25
  181:8 182:3
  183:2 186:15,19

| **b** |
|---|
| **b** 4:9 43:11,13
  44:7,9,13 45:2 |

70:10 114:3
  196:1
**back** 10:13 18:11
  20:5 29:15 42:2
  43:5,12 44:19
  51:17 53:20 56:1
  56:20 65:16
  77:16 96:3 97:10
  100:5 102:6,23
  103:6 120:3,4
  132:6 137:18,19
  152:6 153:9
  154:13 156:8
  160:15 166:5
  183:20
**background** 26:8
**baghdanian** 3:15
  5:12
**ballpark** 20:20
**base** 126:21
**based** 10:25 11:4
  25:8 36:18,20
  37:3 43:7 44:23
  47:12 87:19
  134:14 136:10
  164:13 184:4
**basically** 11:24
  151:20 154:6
  158:8 163:6
  164:21 168:7
  179:21
**basis** 17:14 34:4
  41:14 62:12
**bastardized** 49:2
**bates** 4:12,14,15
  69:9
**bathroom** 68:24

**beach** 1:17 2:16
5:1,11 30:7,19
34:5 78:13 80:24
82:1,19 83:20
84:9 87:21 103:9
103:14,17 104:3
104:11,25 105:12
119:21 121:24
122:6 123:23,25
124:6 138:16,21
149:7 154:25
155:1 156:22
157:17,20,23
168:21 185:10,18
187:15
**bear** 33:7 114:20
**bed** 142:14
**bedford** 139:11
140:10,13 141:8
141:9
**bedford's** 141:20
**beginning** 2:16
69:20 183:15
**begins** 5:6
**behalf** 2:14 139:1
140:23
**believe** 10:17
15:19 24:10 31:6
37:7 43:19 45:9
54:7 67:15 76:18
83:6 84:5 85:16
90:10 98:22,23
118:23,25 123:11
123:16,24 126:14
135:19,25 136:5
136:25 137:6,15
139:15 142:25
147:6,10,20

148:1 151:1
154:1 155:17
157:25 158:17
184:6,15 185:13
185:17 190:2
**believing** 34:4
**benchmark**
164:22
**benefit** 30:5 78:8
84:11,19 158:18
159:4,12 177:12
177:13 181:20
**benefited** 159:7
177:16
**benefits** 30:8
84:14
**best** 9:21 23:23
39:11 50:20
122:15 142:22
155:24 156:4
170:13 171:11
**better** 25:16
**beyond** 55:22,22
152:3
**bigger** 125:12
176:23
**bill** 139:11
140:10 141:8,9
141:20
**bit** 38:6 49:1 81:1
98:1 125:1,10
159:20
**blueprint** 167:24
**board** 136:14
**boca** 3:12
**bolder** 83:1
**bommarito** 1:23
2:18 5:14 194:24

**books** 42:1
**boost** 185:15
**bottom** 39:6,7
63:24 72:22 73:5
73:25 74:10,11
**bought** 152:2
**boulder** 82:16
**boulders** 82:22
**boynton** 30:7,19
34:5 78:13 80:24
82:1,19 83:20
84:9 87:21 103:8
103:14,17 104:3
104:11,25 105:12
119:21 121:24
122:6 123:23,25
124:6 138:16,21
154:25 155:1
156:22 157:17,20
157:23 168:21
185:10,18 187:15
**brea** 49:8,8 87:7
141:17 142:11
167:19 173:9,12
174:6 176:12
**break** 68:12,17
68:23 69:1 77:10
79:11 129:20
135:14,15 165:22
165:24 180:8
**breather** 76:8
**brief** 77:15 166:4
**bring** 26:11
110:25 160:15
**broad** 102:20
**brockland** 3:4
5:17,17 17:15
23:18 24:5 28:24

32:22 33:2 40:4
40:14,20,23
45:24 50:11,17
50:20 53:3,10
58:5 59:17,19,21
60:25 62:2,5,12
62:22,24 63:6,15
68:11,14,20,22
68:25 69:2,6 70:3
70:6,8 77:11
79:16 84:24 96:7
96:12 97:25 98:4
98:7 99:18 101:1
101:4 103:19
104:9 105:13
106:4 107:24
108:12 109:5,25
111:7 115:21
116:9,11 117:2,5
118:16 126:7
130:1 134:5,8,12
134:14,18 135:12
136:16,18,21
137:7 139:5,17
142:23 143:17,20
143:22,24 144:6
144:10 147:13,15
156:1 158:21,25
159:5 161:7,9
165:7,9,13,22,25
170:4,11,25
172:20 173:7,19
173:21,25 188:12
188:19,25 189:2
189:6,8 190:16
191:20,23 192:1
192:4,6,8 195:1

**broke**  160:22
**broken**  3:11
**broker**  22:23
  83:22 84:4,6,21
  86:14,15 153:3
  174:19
**brought**  101:16
  101:18,20,21
  104:6
**bucks**  25:18
  191:13
**budget**  25:8,20
  26:19
**building**  125:23
**buildings**  119:2,9
  119:10 120:19
**bunch**  68:18
**business**  42:5
  123:4,8 130:21
  131:7,8,12,15
  150:18
**busy**  28:11
**buy**  13:11 153:11
  162:5,19
**buyer**  22:5 24:25
**buying**  13:15

**c**

**c**  44:24,25 70:20
**ca**  68:17 195:9,12
  195:20
**california**  1:2,17
  2:2,16 5:1,12
  42:13 47:22,23
  47:24 48:11 50:8
  52:4,7,16,22
  56:16 57:1
  112:12,21 119:4

119:8 138:24
  163:15 193:8
  194:5
**call**  19:11 25:9
  40:15 71:17
  73:24 82:22
  86:19 91:10,19
  92:19,22 142:12
  182:8
**called**  32:2 33:6
  34:24 64:7,9 86:1
  88:19 157:23
  167:20
**calling**  88:21
  168:3
**calls**  17:16 91:21
  91:25 92:16
  103:19 105:13
  107:24 108:12
  109:5 156:1
**camera**  77:4
**cancelled**  64:3
  65:8
**canton**  6:11
**caplan**  3:10
**card**  150:18
**care**  61:8
**career**  94:11,11
  163:10
**case**  1:5 2:5 5:9
  23:9 51:17 62:17
  69:15 81:15
  84:10 115:18
  134:14 143:4
  166:8,14,14,16
  173:16,22 178:19
  185:16 188:21
  189:24

**cause**  31:6 37:7
  37:20 61:4
  178:15
**caused**  134:22
  141:19 149:23
  178:14
**causes**  118:25
**cautioning**  40:23
**caveat**  181:11
**ccp**  195:9,12
**central**  1:2 2:2
  3:5
**centre**  126:5
  135:5
**century**  126:5
  135:4
**cer**  62:13
**ceramics**  164:8
**certain**  30:17
  32:15 80:11
  109:21 115:22
  125:6 164:24
**certification**
  194:1
**certified**  2:18 6:2
  194:4
**certify**  62:13
  63:18 194:6,17
**cetera**  102:15
**challenges**  83:14
**change**  73:21
  159:22 160:1,4
  160:17 164:19
  197:4,7,10,13,16
  197:19
**changed**  80:5
  82:9

**changes**  37:25
  160:9
**changing**  38:4
**charge**  22:22
  90:8 164:16
**charged**  12:9
  90:11
**charging**  90:13
**chi**  179:13
**chicago**  12:2
  45:10 57:22 59:1
  69:21 93:6 147:8
  147:11,16,22
  152:13,22 153:4
  171:11,17 172:13
  172:14,14 178:8
**chick**  10:7
**china**  83:19,21
  84:2 85:8,11,17
  86:7 87:18,22
  92:25 129:15
  130:3,18 147:22
  148:8 152:2
  154:7,19 168:24
  171:14 179:13
  182:17
**chinese**  83:19
  125:19 126:17
  190:2
**cities**  24:11 79:8
**city**  25:3,5,8,12
  25:21,23 26:1,6
  26:15 67:24
  82:19 83:13 87:6
  123:25 141:16
  157:22 173:9,11
  174:5,10 175:5
  175:25 180:15,21

civil   112:12 182:8
  195:19,20
cjc   1:5 2:5 5:9
claim   57:8,11
  65:21 81:17
  105:6,12 109:23
  111:18,19 153:15
  168:7 170:20
  174:3 176:25
  177:22
claimed   111:12
  111:14
claiming   162:8
  179:23 185:24
claims   9:15 65:18
  97:15 100:17
  101:12,16 102:15
  102:19 103:3,4
  105:21 106:15
  107:22 110:6
  111:1,11 112:8
  112:14 114:5
  116:25
clar   22:17
clarification   56:6
clarify   32:24 56:3
clarifying   57:6
clause   116:5,15
clauses   66:7,14
  116:8
clean   170:16
clear   57:2 175:3
  185:6
clearly   98:19
client   38:10 59:19
  61:4,5 62:7 63:8
  83:18 179:5,6

clients   166:11
close   33:14,15
  73:13 74:1,16
  97:23 108:5
closer   21:12,12
  70:13 89:25
code   6:12 112:12
  195:9,12,19,20
collaborated
  44:22
collecting   132:20
collection   129:2
  130:20 131:13,24
  132:23
collector   128:14
collectors   13:13
  13:17 15:18,21
  31:10
collects   131:14
com   17:17
come   11:1,7
  65:16,17 85:22
  116:25 141:19
  170:5 183:24
comes   36:21
  76:23
coming   84:13
commercial
  42:23 125:23
  132:2,5,8,9
  158:18 159:4,10
  159:12 187:18
commission   14:7
  22:9,22 66:25
commissioning
  167:1
committee
  141:23

committees   24:11
common   17:23
  182:10
communication
  59:21 148:17
communications
  40:16,19,24 61:5
  63:8 151:14
  153:21 154:4
company   84:13
  84:21 90:6 94:23
  108:10,16,22
  109:3 110:7
  119:24 170:2,21
  172:12,12 173:4
  180:11
compared   176:15
compensate
  17:13
compensated
  17:17,19 25:2
  29:13 35:20 95:3
compensation
  27:1
complaint   50:13
  165:20 166:12,13
completed   195:7
  195:17 196:6
completion   70:14
  71:4 194:15
  196:10
compliance
  133:14
complications
  129:16
comply   61:13
compound
  109:25 129:21

135:12
compromise
  97:12 98:13
concept   100:3
  102:21 160:4
concepts   42:1
concerning   61:6
  62:8
concluded   192:17
concludes   192:10
conclusion   17:16
  103:20 105:14
  107:25 109:6
  156:2
condition   188:21
conduct   178:16
confidential
  142:9 167:7
confirm   93:4
  167:22
conflict   118:11
connection   18:12
  88:17 141:22
consider   7:21
  25:11
considered   43:20
considering
  88:23
consistent   156:8
conspiracy   182:8
  182:22 184:3,11
  184:16,22 185:1
  185:14,20
conspire   183:1
conspired   182:19
  185:4
constitutes   63:25

construed   105:20
  106:14
contact   153:10
  195:9
contacts   22:1
contained   114:19
contains   114:12
contemporary
  16:11
contending   79:13
  170:20
contents   113:12
contern   61:5
continuation
  92:21
continue   168:14
continues   178:15
continuing
  179:18
continuous
  160:20
contract   24:10
  106:11 108:4
contracts   66:18
  152:11
contradict   132:4
  132:25 133:3
contrast   33:19
contribute   11:11
  12:21 178:16
contributed
  26:17 27:22
  178:15
contributorily
  182:11
controversies
  97:13 98:14

conversation
  91:4 149:12
  158:9 183:11
conversations
  64:21 86:19
  154:5,11 158:5
  166:21 183:8
cop   76:14 94:22
copied   87:15,17
  95:9,12 169:7,11
  169:16 170:3,21
  170:24 171:5,5,6
  171:16 172:12
  174:3 177:2
copies   49:19 52:1
  52:14 54:12 55:8
  55:19 56:14,24
  57:21 88:5 90:25
  134:22 145:4
  157:16 168:17
  169:7 178:20,22
  187:4,5
copy   38:20 41:15
  43:10,16 44:6
  48:11 69:11
  77:21 88:2 95:8
  144:23 145:20
  157:11 163:19
  169:18 177:25
  186:23
copyright   4:11
  9:7 38:17 46:9,12
  46:16,20 57:9
  58:15 59:11 60:2
  60:15 68:2 81:17
  168:12 177:11
  179:19 180:12
  181:2,4,21

184:19,20 190:8
  191:3,7
copyrightable
  43:9
copyrighted
  45:21 161:5,19
copyrights   46:6
  46:18,22 59:8
  68:1,7 182:12
corp   1:8 2:8 3:8
  195:4 197:1
corporate   2:15
  5:11 149:14
corporation   5:8
correct   7:9 8:23
  8:24 12:2,3 26:4
  35:17,18,21,22
  36:16,17 44:11
  44:12 48:6,8,9,12
  48:13,16 50:8
  56:16 57:1,10
  58:11,12,19 59:1
  59:2 60:15 61:22
  69:25 70:1 73:4
  94:8,24,25 95:19
  95:22,23 100:25
  103:11 108:7,11
  110:13 115:10
  117:20,21 124:18
  128:15,16,19
  133:8 135:2,3,5,6
  137:10,22 139:21
  139:22,24 150:6
  160:21 161:17,21
  168:9 171:11,12
  171:14,15,21
  175:1,8,17
  193:12

corrections   193:9
  195:14,15 196:3
  196:4
cost   25:17 61:19
  90:21
costs   25:18 60:20
  61:10,15 62:2,8
  162:20
counsel   5:15
  96:21,25 97:1
  113:1 115:1
  117:12 188:3
  190:10 195:18,21
  196:7
count   168:12
  179:15 182:7,7
country   146:20
couple   19:12
  39:23 41:25 43:2
course   13:7 68:13
  165:12
court   1:1 2:1 5:14
  5:20 9:15 36:25
  111:24 143:3,11
  143:14 169:12,14
  179:23 180:7
  183:22 184:5,7
  188:17 189:12,24
  194:1
cover   110:7
  179:22
covered   100:24
  103:18
craftsmen   92:15
create   13:23
  33:23 95:4
created   33:18,21
  33:22 43:6 58:22

72:11 148:12 158:18
creating  42:21 44:22 163:8
creation  11:6 12:22 67:10
creditor  112:14
critical  116:3
cross  105:19,25 106:1 107:20 108:11
crossed  105:19 106:5,7,9 108:6
crossing  106:3 107:20
csr  1:24 194:25
curious  89:8 90:20 139:10
currently  6:14 7:4
customary 181:22,24 182:3
cut  140:9 159:21 160:8 174:18
cutting  160:1
cv  1:5 2:5 5:9

**d**

d  4:1 73:10 157:4 166:14
dale  3:18 148:22 149:1,4,5 150:7 151:5,9,13 153:22 182:23 183:8,11 184:10 184:12,15
damage  179:18

damages  36:20 179:22
date  39:8 46:3,15 46:17 75:1 76:15 76:18,20 88:10 102:4,7,23 103:6 103:6 105:10 109:20,21,22 110:1,11,20 111:16,18 112:9 116:3,4 117:25 118:2 127:20 134:17 137:21 138:4,12,15 139:5,7 187:7 194:20 195:16 196:5 197:24
dated  133:15
dates  77:2 140:1
day  76:9 79:25 120:3,4 129:4,4 134:1 150:23 193:14 194:21
days  13:17 30:25
deal  25:7 116:4
dealer  125:19 126:17 163:6 164:10
dealers  162:25 163:9
dealing  19:3
deals  185:6
debtor  112:18
decade  28:3
decades  131:25 132:20
december  118:3

decide  25:21 183:4
decipher  43:15
declaration 117:23 118:1 133:14 134:4 135:9 136:25 185:24 186:4 193:1
declare  193:7
defendant  3:8
defendants  1:10 2:10,14 5:19 124:21 168:12 169:5 178:17 180:4 181:19,21 182:9 187:17
defense  187:25
defenses  165:20
defraud  186:14 186:21
defrauded 186:24,24
deletion  108:18 108:21,24
deletions  193:10
deliver  124:9,12
deny  83:18
department 141:23
depends  22:24
depict  73:6 175:11
deposition  1:15 2:13 5:7,10 8:23 23:21 95:19 109:15 123:19 133:25 144:5,19

184:7 189:16 192:17 194:15 195:19,22,24 196:8,10
depositions  8:25
depth  15:15
derivative  127:15 128:3
derivatives 124:10
derives  181:20
des  176:14
describe  176:8,11 176:14
described  17:17
description  4:10
desert  163:16 175:13,24 176:17 176:19
design  11:8,9,14 11:17,19 33:9,17 41:25 182:11
designers  179:5
designs  11:20,22
desires  38:5
desirous  193:10
destroy  106:19 124:13 135:10
destroyed  95:2 111:25 134:25 135:23 136:1,3,6 136:11,13 137:1 137:8,12
destroying 143:11 186:7
destruction  94:22 107:16 133:20 145:4 179:24

180:2
**det** 55:17
**detail** 15:16
33:10 109:15
160:7
**details** 11:8 33:18
191:1
**determination**
36:20 155:10
**determine** 17:2
26:15 41:4 51:25
55:17 155:5
**determined** 17:4
36:25 37:2
195:18,22 196:7
**detriment** 177:19
177:20
**developers** 26:10
**development**
25:8,17,18 49:8
**dfm** 1:5 2:5 5:9
**differ** 15:12
**difference** 37:6
**differences** 37:20
72:13,17
**different** 33:17
37:19 39:23,24
68:15 76:4 79:10
80:20 101:11
126:3,4 135:18
162:8 163:8
174:24 176:16,20
176:22,23
**diligent** 146:18
**dimension** 15:10
**direction** 194:13
**directly** 84:14
148:19 182:11

**director** 157:22
**disagreement**
56:10
**disclosed** 168:6
**discover** 109:4
110:25 157:20,21
**discovered** 48:11
116:23 138:24
157:19
**discovery** 133:7
158:10
**discuss** 11:8 87:9
**discussed** 87:10
119:21
**discussion** 87:20
**discussions**
114:15 116:20,25
117:2,9 140:15
153:21
**display** 30:6,18
93:11 103:14,17
**displayed** 169:7
**displays** 26:1
**disprove** 133:7
133:10
**dispute** 86:5
141:9
**disputes** 97:13
98:14
**distinctive** 33:23
**district** 1:1,2 2:1
2:2
**dividing** 155:16
**division** 1:3 2:3
**document** 38:17
38:24 39:18
43:14 45:20,25
63:25 65:2 68:12

68:17 75:17,18
99:4 101:1
133:17,19,24
136:12 137:25
143:18,24 145:1
146:7 173:17
**documented**
75:21
**documents** 21:4
123:24 142:10
146:13 151:12
167:18 185:12
**doing** 30:1 42:22
42:24 49:6 51:22
71:18 75:9,24
91:15 109:15
164:24
**dollar** 124:15
164:24
**dollars** 31:2,4
164:24
**don** 6:9 32:22
40:17 53:4 88:15
89:5
**donald** 1:5,16 2:5
2:14 3:3 4:3 5:7,8
6:1 192:11
193:22 195:4
197:1
**dot** 124:25
**drafted** 39:18
67:17,23
**drafts** 67:3 96:25
**dramatically**
30:14 78:9,12,14
78:16 159:17
**draw** 67:25

**drawing** 41:14,24
43:3,7,20 58:18
72:25 73:7
**drawings** 42:24
**drill** 137:17
**drive** 6:11 52:3
52:16
**drove** 52:3
**duly** 6:2
**duplicate** 178:9

**e**

**e** 4:1,9 195:9,12
196:1 197:3,3,3
**earlier** 77:23
100:21 114:22
128:13 181:12
183:7 187:13
**early** 69:22 72:23
94:15 166:19
173:5
**easy** 191:5
**effect** 64:5 65:10
104:4 113:10,12
**effort** 64:23
126:25 127:3
**efforts** 125:20
**eight** 63:23
**eighth** 102:16
**either** 15:19 16:9
16:17 17:4 65:4
105:6 123:7
**elaborate** 188:8
**electronic** 192:4
**else's** 177:22
**email** 88:7,11
148:17 151:17
154:1

**[emails - facts]**

emails  151:8,9,15
  151:18,19,21
  152:1 154:2
embarrassing
  95:5
employ  140:16,18
  140:20
employed  6:14,15
  6:16
employee  194:19
employees
  182:20,21,22
ended  99:12
  154:8,15,16
endorsement
  188:7
enforce  59:7,12
  60:4,14 65:4,24
  105:22
engaged  82:7,7
enhance  79:7
  164:18
enhanced  30:12
  78:9,11,14,16,17
  79:3,14 80:13,25
  82:23 159:17
enhancement
  83:7
enhances  80:8
enhancing  79:12
  132:7
enter  46:5 66:17
  67:16
entered  45:21
  46:1,24 47:5
  56:13,22 64:15
  65:15 66:2,24
  68:6 142:8 143:3

143:11 145:2,22
  155:19 167:7
entering  55:3,6
  103:10,11,17
  104:19 106:18
entire  28:8 63:25
  114:11,13,14
entirety  64:4 65:9
entities  116:21
entitled  127:14
  128:2
entity  67:25
  178:13,13
entryway  125:22
equally  37:8
  60:18
errata  195:14,16
  196:3,5
esq  3:4,10 195:1
estate  62:19 80:4
  82:8,23 83:5
estimate  122:15
et  5:9 102:15
  195:4 197:1
evaluate  26:7
evenly  28:10
event  134:17
evidence  23:9,15
  23:25 24:3 84:25
  128:8,12 137:12
  155:24 156:5
  170:13
evidently  149:24
exact  80:9 81:1
  81:12,14 105:1
  125:17 126:16
exactly  10:10
  17:24 54:16 67:6

79:9 85:18 86:1
  104:18
examination  4:2
  6:6
examined  6:3
exclusive  59:7
  168:15
excuse  97:25
  165:9
executing  112:15
execution  114:6
  188:4
exhibit  4:10,11
  4:13,15,16 38:18
  38:19 43:10
  69:10 70:4 77:19
  77:20 85:22
  95:16 96:8
  117:23 133:13
  144:22 147:3
  155:7 162:3
exist  79:6 85:12
  112:15 190:4
existed  157:16
existence  56:14
  56:23 103:9
  110:7 138:6,11
  138:16,20
existing  97:13
  98:14
expand  6:24 7:6
expect  65:16,21
expensive  20:24
  20:25
experts  82:7
explain  25:14
  92:11 151:24

explained  113:11
express  114:18
expression  43:9
extend  111:11
  112:13
extensive  132:23
extent  11:18
  17:15 38:11
  40:15 84:16 86:4
  140:13 170:11

**f**

faces  127:15
  128:3 134:24
fact  16:17 60:22
  80:23 85:24
  107:21 108:10,17
  108:23 121:23
  125:22 135:8,8
  137:1 148:11
  157:15 182:9
  189:23
factor  80:11
factory  87:18
  93:13
facts  16:8,16,23
  78:12 80:15 82:2
  84:24 85:19
  112:6 118:10
  123:21 124:4
  125:7 126:12,13
  126:22 127:2,9
  127:13,17 128:1
  128:8 129:23
  130:13 132:3,24
  133:2 138:5,9,14
  138:18 147:21
  148:1 154:23

[facts - frcp]                                                    Page 209

156:21 159:11
168:19 169:9,14
169:25 170:10,17
170:19 171:22
172:10 173:2
176:24 177:4
179:1 180:25
181:7,13 184:14
184:18 185:8
186:15,19 187:20
**failed** 104:8,9
**fair** 9:25 32:1
48:14 77:25
97:20 117:15
132:10 144:2
146:14 180:14
**fairly** 73:12 74:1
**fall** 134:24
159:20
**false** 186:13,16
**familiar** 64:6
85:7 95:13 99:10
**familiarity** 59:10
**fan** 161:2
**far** 20:22 21:15
38:8 68:5 81:25
82:6 92:25 93:1
95:11 124:25
138:25 140:25
146:3 154:19
157:13,18 159:10
161:18 163:18
176:9 177:19
178:23 181:7
**favor** 112:15
**federal** 191:7
194:2 196:1,8,9

**fee** 25:10 27:14
191:10,12
**feel** 180:10
186:23 188:2
**feeling** 181:8
**fees** 60:21 61:6
61:10 62:3,8
**feet** 19:5,6,8,12
19:15 26:25
118:8 129:12
176:13
**felt** 26:6 189:18
**festival** 32:1
**figure** 32:12 81:1
165:1
**figured** 106:9
136:14
**file** 60:4 142:11
167:23 174:10
176:12
**filed** 54:10 97:21
97:22 133:17
134:6 166:10
167:4 177:7
**filing** 50:6 54:5
**fill** 25:22
**final** 70:12 74:1
74:11,14
**financial** 28:25
30:20 181:20
187:18 188:21
**financially** 159:7
180:13 194:18
**find** 49:4 57:15
119:17 141:15
151:22 152:9
167:20

**fine** 140:2 146:14
**finish** 71:25
73:13 172:20,24
**finished** 70:13
**firm** 5:13 39:22
40:12
**firms** 39:24 40:1
**first** 6:2 19:13
30:24 41:12,12
41:20,23 42:10
43:5 44:19 47:10
51:15 56:1 61:9
63:11 69:17
71:13 78:10
79:12 87:4 91:22
92:19,21 94:20
97:10 103:14
123:7 134:4
166:11 179:15
185:16
**fit** 21:11 163:24
**five** 19:23 58:4,10
86:21 90:1 91:24
131:25 132:20
165:23,24
**flat** 15:14
**florida** 3:12
49:13,19 50:3
52:2,3 55:11,15
55:20 119:23
120:21 121:3,14
**flows** 140:6
**focus** 7:23
**focused** 8:2 15:24
**focusing** 29:24
**follow** 100:15
**following** 92:20
134:25

**follows** 6:4 99:9
100:1 195:8
**foot** 19:16 20:4
20:25 21:16
36:12 120:15
**force** 64:4 65:9
**foregoing** 193:9
194:7,9,14
**forget** 142:11
**forgetting** 169:13
**forgive** 139:25
**form** 182:10
**former** 126:2
**forth** 68:2 152:6
153:9 154:13
182:13 194:8
**fought** 57:14
**found** 12:1 47:14
48:15 49:1,7
51:14 58:11,25
69:21 87:21
102:7 126:2,8,9
127:6,6 139:12
166:20 171:20
**foundation** 6:21
6:23 7:1,13,25
8:3 28:14 30:2,4
66:17
**foundation's**
28:23
**foundations** 6:24
30:4
**founder** 132:1
**four** 38:22 86:21
91:23 103:10
**frame** 100:5
**frcp** 196:1

**free** 30:10 78:8
  84:20,22 159:16
**fresh** 76:8
**friend** 18:13
  21:15,20,21,24
  22:5 26:11
**friends** 21:22,23
  22:2 23:5 139:9
**front** 21:4 80:16
  120:19 176:7
**full** 8:5,19 86:4
**fully** 113:11
  115:14
**further** 64:4 65:9
  124:24 150:15
  194:13,17
**fuzzy** 146:9

**g**

**gain** 187:19
**gains** 180:5,9
**galleries** 18:4,8
  18:14,18 19:17
  19:21 20:18,23
  22:7 28:2 66:3
**gallery** 15:23
  16:4 20:15 22:22
  24:13,16 67:24
  72:3 163:24
**garden** 85:17,25
  86:2
**gardens** 86:6
**gbrockland** 3:7
  195:1
**gene** 3:4 5:17
  40:5 41:6 77:9
  195:1

**gene's** 40:12
**general** 16:12
  101:25 102:2,10
  112:13
**generally** 9:19
  98:2 129:22
  176:6,7,11
**gentleman** 33:25
  34:23 69:17
**gentleman's**
  158:1
**getting** 35:20
  74:12 84:22
  90:20 94:12
  145:20
**gi** 50:20
**girlfriend** 47:12
  47:17,19 126:2,8
  126:9 138:23
**girlfriend's** 47:15
**give** 10:14,16
  20:12 25:12
  26:21 50:20
  59:23,23 80:9
  81:1,12,13 82:8
  101:4,5 152:18
  155:20 163:6
  189:22
**given** 8:22 9:1
  73:19 142:19
  184:23 192:11
**giving** 110:21
  152:8
**glass** 164:8
**glenn** 158:3,3,3
**glickman** 10:7,24
  11:5 12:8,17 14:1
  15:5 17:12 35:21

  40:9 41:9,13,15
  43:8,21 44:3,4
  56:4,9 57:7 58:15
  58:16,21 59:6
  60:3,23 61:3,3,20
  62:18 64:15,25
  65:3,16 67:9
  114:22 148:2
  153:5,10 182:5
**glickman's** 12:4
  39:10 41:21
  45:11 58:23
**go** 30:23 32:14
  39:3 41:12,17,18
  41:19 42:25 43:4
  43:5,12 44:18,25
  48:23 51:13
  53:20 55:25 59:3
  63:22 68:24 70:9
  70:9,19 73:9
  74:17 78:10 85:1
  93:17 95:21 96:3
  96:4 97:9 101:22
  101:23,23 106:15
  114:1 118:4
  120:12,14,18
  121:13 122:24
  124:23,25 125:1
  125:5 134:3
  135:13 140:1,17
  140:18 141:5
  142:23 150:17
  165:6,11,19
  166:11 192:3,7
**goes** 25:19 60:17
  86:16 99:1
  102:14,15 105:3
  112:11 113:9

  114:15 122:24
  126:24 127:12
  129:14 154:19
**going** 5:4 7:20
  9:19,21,23 17:24
  23:18 30:25 31:1
  40:14 50:11 52:6
  55:18 60:25 61:7
  62:5,9 64:22 69:4
  69:14 70:7 76:6
  77:13,16 80:13
  106:10 108:4
  116:17 120:14
  143:17 145:1,17
  154:6 157:8
  165:6,19 166:2,5
  168:8 178:4,9
  183:5 185:7
  188:9,19 192:13
**good** 5:4 92:12,14
  96:17 97:24
**google** 49:21,22
  49:24 51:23 52:5
  52:15,18,20,23
  52:24,25 53:11
  53:20,25 54:11
  54:22 55:7,12,12
  55:23 104:1,2,10
  104:14 118:18
  120:2,5,7,11,22
  122:14,21
**gotcha** 26:23
**gotten** 36:14 80:3
  83:8
**government** 27:2
**grand** 31:24 32:2
  32:25 33:4 34:24
  176:2

**granite** 14:5,22
15:13,16,20 17:8
33:20 69:24 71:4
71:9 72:14,24
73:2,7 74:1 94:4
**granted** 105:22
106:16,20,23
107:3,22
**graphic** 109:14
**great** 6:20,23 7:1
7:13 66:17
191:22
**gross** 10:14
**ground** 120:13
**group** 182:10,18
**guess** 8:21 26:17
100:6 106:1
108:25 114:8
154:3 155:3
160:18 178:18
**guessing** 20:10
21:5
**guy** 183:3
**guys** 183:3

**h**

**h** 4:9 197:3
**half** 20:15 69:3
145:1
**hand** 63:24 72:12
94:3,7
**handled** 190:7
195:8
**handywork** 45:5
**hang** 96:7 116:9
**happened** 53:20
123:6 167:2

**happy** 191:10
**hard** 20:5 43:15
76:3 176:13
**harm** 179:18
**he'll** 191:22
**headquarters**
47:2,12 131:20
183:19
**health** 60:12
**hear** 188:6
**hearing** 137:5
**heavily** 28:13
**height** 33:14
**held** 5:10
**help** 6:24 90:21
**helped** 140:10
183:5
**helping** 185:5
**hereof** 114:14
**hereto** 38:20
41:15 69:11
77:21 97:14
114:16,19 144:23
**hereunto** 193:13
**hey** 70:3 96:7
164:23
**hid** 138:15,20
**hidden** 156:23
**hide** 125:21 127:1
127:3
**hideous** 160:3
**hiding** 127:10
**high** 20:25 21:2,7
21:16
**higher** 155:20
**highest** 27:5
35:23 36:14
94:13,14

**hiring** 141:4
**history** 75:22
161:18,20
**ho** 50:22
**hold** 111:7
133:11
**holder** 58:15
**holding** 72:8
**holdings** 3:18
**honest** 91:3,6
**hour** 10:12,13
12:12 14:18
17:20 35:20 67:9
69:3 164:24
**hourly** 17:14
58:25
**hours** 164:23,25
**house** 12:5 45:12
**huh** 86:24 143:13
163:20
**human** 127:15
128:3 134:23
**hundreds** 18:23
19:8 131:18
**hurt** 157:15
**hypothetical**
121:19

**i**

**idea** 15:1 91:18
147:24
**identical** 49:1
72:20 93:25
171:23
**identification**
38:20 69:11
77:21 144:23
150:25

**identify** 34:22
69:5 88:12
120:23 168:2
173:17,24
**igor** 1:8 2:8 3:8
117:23
**ii** 9:6 50:9,13
51:5,15 54:5,10
55:4 62:17 63:5
97:18,21 125:5
133:6,18 134:10
139:21 156:17
186:9
**iii** 166:9
**images** 133:21
**implicated**
184:10
**implied** 114:18
**import** 113:10
**importance**
113:23
**inaccurate**
127:23 135:20
**inaudible** 19:20
**include** 10:21
99:9
**included** 51:15
195:14 196:3
**includes** 101:16
118:8
**including** 52:2
97:7,14 99:1,5,24
100:9
**inclusive** 1:9 2:9
**income** 28:14
**incoming** 154:2
**increase** 80:10,22
81:18 82:4

**independently** 43:9

**indicate** 16:16,24 49:12 78:13 82:3 85:19 88:21 89:23 90:13 112:7 123:22 124:5 127:2,9,17 127:21 128:6,9 138:10,19 142:8 142:14 147:21 148:1 153:13 154:24 156:22 167:3,6,13 168:20 169:1 173:3 177:5 181:14 184:18 186:15,20

**indicated** 36:11 78:8 88:23 128:5 128:15 186:6

**indicates** 105:24 169:10

**indicating** 34:11 80:4 138:5 151:13

**indication** 26:5 187:8

**individually** 94:6

**induce** 178:15

**induced** 178:14

**industry** 162:19

**information** 28:25 79:8 141:21 152:8,9 154:18 179:9 180:15

**informed** 123:3,8

**infringe** 168:14 182:11

**infringed** 168:14 177:11 184:20

**infringement** 9:8 57:9 60:2 168:12 177:16 179:19 181:2,3

**infringements** 181:21

**infringing** 178:16 180:11

**initial** 105:24

**initially** 11:20 12:7 167:15,17

**injunction** 106:18 107:16 143:3,11 145:22 146:4 179:16

**inserted** 113:21

**inside** 163:24

**installation** 80:5

**installations** 184:13

**installed** 58:23 79:23 80:1 83:20 130:19

**installing** 183:6

**instruct** 61:7 62:9 63:19

**instructed** 4:21

**instructing** 63:12 189:5

**instruction** 63:7 63:19

**intend** 108:15,16 108:21

**intended** 182:9

**intent** 186:13,20

**intention** 91:9 92:17

**intentional** 127:10 181:2,14

**intentionally** 138:15,20 184:20

**intercede** 32:23

**interest** 40:12,13 90:24 177:13,17

**interested** 13:15 15:19 51:19 145:23 169:22 170:9 194:18

**interior** 164:5

**interrupted** 78:24

**invades** 61:1 188:20

**inventory** 132:22

**investigate** 48:20 49:18 121:2

**investigating** 168:7

**investigation** 50:2 51:22 52:8 52:13 53:11 55:18,21 58:10 91:16 92:18 119:14 120:24 139:1,2 140:11 142:18

**investigations** 51:20,21,25

**investigator** 141:5

**investigators** 140:21

**involved** 9:5,10 28:13 60:7 96:18 97:6 184:12

**involvement** 183:22

**involving** 9:7

**irreparable** 179:18

**irvine** 48:24 125:23

**ish** 8:13 176:13 176:15

**issue** 131:4 132:18 153:17 188:21

**issued** 191:3

**issues** 167:14

**items** 99:10 130:17

## j

**j** 1:23 2:18 3:4 195:1

**jackhammers** 33:22

**jana** 1:23 2:18 5:14 194:24

**january** 133:15 137:22 138:1

**jargon** 112:24 113:2

**job** 1:25 8:19,20 195:4 197:1

**john** 1:8 2:8 86:16,17,17,17 147:11 148:5

149:2,4 154:5
166:19,22 172:1
174:21 175:10,19
175:19 178:20
179:3 182:16
**joint** 4:11 38:17
41:5 43:9,21
44:23 56:4 59:8
144:15 148:2
**judge** 51:16
145:22
**judgment** 4:16
133:14 144:4
145:2,14,20
**julie** 185:2,4
**july** 134:22
**jurat** 194:2
**jurisdiction**
180:7
**jury** 37:3 156:8
156:14,17

**k**

**kept** 32:11
**kern** 47:16
**key** 183:3,3
**keying** 127:25
**kim** 47:16 48:8
48:10 138:23
140:12 150:4
**kind** 66:10
113:21 120:14
124:23 158:18
159:21 160:22
**knew** 42:10,10
49:6,8 58:2,3
123:22 138:6
141:9,25 184:19

185:9,17 186:12
186:16
**know** 12:6,8,10
12:24 13:2,4,5,14
15:6,7,8,9,22
16:1,7 17:20,24
19:6,12 21:3,13
22:1 24:11,12
25:18 26:9,13
27:16 28:3,25
29:16 30:5 31:10
31:19 32:6,11,18
33:20 35:10,14
37:1,22,22,25
38:1,4,9,13 39:11
39:12,17 40:11
41:8 42:9,21,22
49:23 51:16
53:12,13 54:16
58:2,9 59:15,23
62:25 64:8,12,12
65:5,13 66:8,13
66:15 67:4,19
68:5 72:1,21
75:12 76:8,20,23
77:1,4 78:7,15
79:2,7,8,19,22,25
80:15,19 81:2,9
82:6,18,20,25
83:13 84:3,7
85:10,24 86:25
90:12,21 91:23
92:20,25 93:1
94:5,14,19 95:11
98:25 99:3 100:4
100:5,6,14,14
101:7,21 102:13
103:12,13,15

104:18 106:8,10
107:5,7 111:24
112:10,14,22,22
113:22 114:23
115:3,6 116:14
116:16,16 117:18
120:18,19 121:4
121:11,20,23
123:5,6 129:3,4,4
131:22 132:19
133:9,9 135:11
135:17,17 138:8
139:10,25 140:3
141:25 142:1
144:4,11 145:24
146:1,1,6,10
149:25 150:12
151:15 154:2,2
155:11,16 157:13
157:18 160:7,8
160:14 162:3,5
162:20 163:10
164:6,7,20 165:1
165:2,15 166:17
168:5,25 169:20
169:25 171:6
172:18 173:2
176:18 177:22,25
178:21 179:7
180:9,20,24
185:7,19,22
186:23 187:3,11
187:13,13,14
190:3
**knowing** 170:9
**knowingly** 169:6
169:11,16 170:2
170:21 171:1,3

172:12 174:3
177:1
**knowledge** 38:12
48:19 142:22
166:15 171:11
**known** 49:25
102:25 103:3
112:16 126:18
181:6 186:17
**ku** 40:2
**kuzinsky** 40:2,3
**kuznetsky** 40:4,5
188:12

**l**

**labor** 10:19 12:18
14:11 164:14
**lakes** 6:20,23 7:1
7:13 66:17
**landscaping** 83:2
**language** 33:6
35:1,2 99:25
100:1,19 102:20
109:1,18,24
110:4,23 112:6
113:7 127:25
145:6,21 161:25
162:1
**large** 17:23 19:2
20:14 129:1,7
173:11
**larger** 18:24 19:2
23:1 71:19,22
129:9,12
**largest** 32:1
**lastly** 132:21
**late** 94:15

**law**  39:22 179:17
179:21
**laws**  193:8
**lawsuit**  9:7 10:3
18:25 19:4 20:19
23:11,17 33:8
46:16 51:3,7
80:13 91:16
94:20,20,21
97:18 115:24
143:6 146:6
169:15 170:10,19
182:7 185:23
**lawsuits**  9:12
95:13 123:7
177:7
**layman**  100:3
156:4
**le**  75:7
**lead**  126:14
**leads**  76:18
**leap**  71:18
**learn**  42:17
141:12
**leave**  71:19
**left**  70:22 72:12
72:22 73:12,24
73:25 74:8,10
**legal**  17:16
103:19 105:13
107:24 109:5
112:24 113:2,5
113:12 114:24,25
115:8,14 156:1
195:7
**legitimate**  26:9
**lesser**  156:17

**level**  120:13
**liang**  1:8 2:8
86:17,19 87:8,20
87:25 88:13
90:24 91:4,19,22
92:17 147:11
148:5 154:5
169:1 171:13
172:1 174:21
175:5,10,19,19
178:20,24 182:16
**life**  9:11 18:21
28:8 29:24 66:23
**liked**  76:20
164:16
**limit**  140:24,25
141:4
**limited**  97:14
99:2,5,9,24,25
100:1,9 101:17
102:10 140:13
**limiting**  36:12
**line**  4:22 102:16
125:14,15 130:1
130:5 195:15
196:4 197:4,7,10
197:13,16,19
**lines**  33:20 63:24
**list**  162:22,23
163:7,18,22
189:20
**listed**  50:3 76:21
106:10 121:4,6,7
121:10,14,16
122:3 127:20
**listen**  62:25 116:9
**listening**  136:19

**litiga**  122:1
**litigation**  3:18
9:6,10 60:5,8,15
92:18 121:25
122:2 123:10
143:16 167:4
**little**  7:14 20:14
25:16 42:18
48:25 70:24
79:10 95:5 98:1
101:10 124:24
125:1,9 159:20
175:14 176:16,19
176:20
**live**  47:24
**living**  6:18 8:8
**local**  120:13
122:21
**locate**  156:24
**located**  31:23
35:17 85:25
125:22 157:2
163:14 183:5
**location**  47:6
103:9 125:18,21
126:16 127:1
**locations**  130:18
134:25 135:1,9
**locked**  195:12
196:1
**long**  6:16 7:12
17:24 64:12
68:20,22 69:2
116:17 122:17
128:23 189:20
**longer**  165:8
**look**  26:21 29:15
33:24 38:24

41:11 48:17,23
52:18,19 54:7
55:11 63:23
71:21 72:4,22
76:8 97:9 104:8,9
111:5 118:15
119:13,22 120:18
121:13 122:9
124:19 125:14
140:17,18,21
141:1,5 145:24
160:3 165:1
176:8,22
**looked**  11:20 33:9
41:25 48:25
104:23,23,24
108:3 120:21
121:17,20,24
122:4 171:20
176:20
**looking**  20:6 21:3
32:19,20 54:20
54:23 55:22
100:4 102:22
112:5 122:20,23
134:17 139:10
141:18,21 143:25
145:20,21 149:21
149:25 155:16
168:5 173:23
179:16 187:24
**looks**  39:9 96:16
108:8 138:2
**loop**  144:10
**lot**  13:16 16:19
25:9 64:22 71:16
72:16 81:22 85:3
85:4 114:24

116:8 119:2
126:20 140:1
146:12 185:12
**loud** 130:10
134:23
**louis** 3:6
**loved** 126:19
130:25
**lover** 42:7
**low** 21:8
**lower** 125:1
**lowest** 27:11,14
**lynn** 3:18 38:16
38:21 39:3 41:17
43:4,12 44:19,25
55:25 59:3 68:9
69:7 73:10 74:17
77:18 78:3 95:15
96:2 97:9 98:1
114:1,9 117:22
124:20 133:12
134:3 137:19
144:3,11 147:3
**lyon** 3:18 86:17
148:22 149:1,2,4
149:4,5,23 151:5
151:9,13 153:22
182:23 183:17,25
184:3,10,15

**m**

**m** 3:10 166:14
**machine** 194:12
**madam** 56:19
144:9
**main** 163:10
**maintain** 130:17
132:21

**majority** 21:10
67:22,22,23
**making** 132:9
144:14 180:22
182:17 193:10
**man** 20:5
**manufacture**
11:15,16 173:4
**manufactured**
87:22 147:21
168:20,23 179:12
187:6,10,12,15
**manufacturer**
148:8 154:18
169:2 182:16
**manufacturing**
168:16
**map** 54:11,22
55:7 104:2 120:2
120:7,11 122:14
**maps** 49:21,22,24
51:23 52:5,15,18
52:20,23,24,25
53:20,25 55:12
55:23 104:10
118:18 120:22
122:21
**maquette** 70:24
71:9,12,15,22
72:12
**maquettes** 71:16
**mark** 38:18 68:10
69:8 70:7,10
77:19 144:8
**marked** 4:10
38:19 69:10 70:4
70:5 77:20 144:4
144:19,22 150:24

**market** 13:3,5,8,9
15:17 16:1,3,4,8
16:11,17,20,24
16:25 18:1 20:24
31:7 38:8
**material** 15:13
71:1 176:9
178:14,16
**materially**
112:17
**materials** 10:21
10:23 76:4
**math** 37:3 155:12
155:14
**matter** 5:7
114:14 125:24
143:6,16 153:24
**matters** 62:6
**mean** 8:17 15:15
16:11 21:22
23:25 26:7 28:11
28:12,14 29:22
37:9,15 54:6
57:15,25 64:11
65:6 68:23 69:2
71:16 73:16 79:5
80:25 92:19,19
94:14 99:5,8,12
99:14,25 100:4
104:14 105:5,8
105:21 106:14
107:10 108:3
115:3 121:10
122:3 126:18
129:12 132:6,19
137:11 139:9
140:9 145:16
146:9 147:13

155:3,15 159:1
160:6,11 163:9
166:19 170:23
177:24 180:18
189:3
**meaning** 13:11
54:18 100:22
103:1 105:9
113:6 123:3
128:24
**means** 8:10 28:21
29:1 100:9
179:21
**meant** 102:2
114:7 116:15
**media** 5:6 192:12
**mention** 183:8
**mentioned**
140:10 185:21
190:2
**merely** 17:13
34:18
**merged** 65:1
114:17
**merger** 64:7 66:6
66:14 114:21
116:5,14
**met** 31:24 42:10
42:12 166:24
**metal** 164:7
**michael** 40:2 41:6
**michigan** 6:11
31:24 44:16
47:20 48:4,5
**mike** 40:2
**million** 25:18
31:2,4 81:2,7
118:8

**mind** 110:20
**mine** 74:7,11
**mini** 191:25
192:1
**miniature** 33:22
**minimal** 11:13,14
11:14,17
**minor** 160:8
**minute** 51:10
112:4 165:24
**minutes** 77:12
**miscellaneous**
63:23
**missed** 70:8
**missouri** 3:6
**mo** 18:11
**models** 71:17
**mold** 94:2,5
**monetarily** 79:3
79:5 80:14
**monetary** 30:23
30:24 79:4,16,17
81:18 82:3 84:11
153:19 179:22
180:10
**money** 12:11
21:17 25:23
26:22 31:13 35:6
61:21,23 64:23
84:13 132:9,11
177:21 180:18,19
**monies** 60:19
107:13,14
**morning** 5:4
**motion** 117:24
124:22 125:4
144:15

**moved** 48:2,5
**moving** 68:14
**multi** 125:22

**n**

**n** 4:1 45:23 137:9
166:14
**name** 5:12 6:8
31:19 32:3 34:1
39:25 47:15 48:8
85:10,14 86:15
87:4 141:20
158:2 161:24
175:15 177:24
193:14 194:21
**names** 86:17
142:19 184:23
**nature** 102:16,19
152:11
**nature's** 127:15
128:3 134:23
**ne** 127:12
**near** 122:25
149:24
**nearby** 47:13
**nearly** 118:7,21
131:17
**necessary** 195:14
196:3
**need** 69:5 179:23
189:13 191:24
**needed** 56:7
**needs** 165:14
**negative** 142:2
158:12
**negotiate** 110:22
185:5

**negotiation** 32:14
101:8
**negotiations**
96:18 97:7 111:3
114:16 116:21
**neither** 130:16
194:17
**net** 60:19,22
61:11 62:18,21
63:4,9,13,14
**nevada** 119:15
**never** 34:3 65:25
76:20 85:17
94:18 127:7
135:23 148:20
167:1 171:10
**new** 43:6
**newport** 1:17
2:16 5:1,11 149:5
**nice** 76:7
**nondisclosure**
142:12
**nope** 31:5
**normally** 76:17
77:7
**notating** 195:15
196:4
**note** 36:10
**notes** 36:11 157:8
**notice** 58:13
105:18 133:13
**noticed** 47:13
**november** 1:18
2:17 5:1,6 192:12
194:21 195:3
**number** 5:9
10:14 14:24
27:11 32:15

36:18 58:14
89:24 90:14
95:16 125:17
126:16 134:16,21
143:10 144:8
145:7,8 156:7,8
164:25 195:15
196:4
**numbered** 145:5
**numbers** 17:13
92:4
**numerous** 52:11
119:22 122:6
129:16
**nw** 3:11

**o**

**o** 144:1 166:14
**oath** 9:20 194:10
**object** 13:6 23:18
40:14 45:24
50:11 60:25 62:6
143:17 188:19
**objecting** 63:2
**objection** 17:15
23:22 24:5 28:24
61:9 62:24 63:6
84:24 101:1
103:19 105:13
106:4 107:24
108:12 109:5,25
129:22 135:12
156:1 159:5
**obligated** 146:17
**obligation** 146:23
**obtained** 60:19
180:5,11 187:18

| | | | |
|---|---|---|---|
| **obviously** 75:9 | **okay** 7:4,7,17,21 | 58:13,20 59:3,20 | 109:1,8,14 110:3 |
| 85:2 130:25 | 7:24 8:5,14,22 | 60:3,9,14,17 | 111:8,17 112:23 |
| **occasionally** | 9:3,5,16 10:2,6,8 | 62:11,13,21 | 112:25 113:9,17 |
| 52:15 | 10:14,18,23,25 | 63:18,22 64:10 | 114:9,11 115:5 |
| **odd** 13:25 19:18 | 11:5,23 12:8,11 | 64:18,24 65:6,21 | 115:17 116:4 |
| **offer** 23:19 26:20 | 12:20,24 13:8,14 | 66:1,6,9,13,16,20 | 117:8,17,22 |
| 31:21 32:9 34:14 | 13:19,23 14:7,20 | 66:23 67:12,16 | 118:6 119:4,9,13 |
| 34:19 35:12 | 15:2,10,25 16:21 | 67:21 68:1,5,9 | 119:17,20 120:1 |
| 124:14,17 153:17 | 17:3,11,22 18:1,6 | 69:7,16,19,23 | 120:6,11,17 |
| 161:23 162:2,7 | 18:10,16,24 19:7 | 70:2,6,8,14,18 | 121:12,23 122:9 |
| **offered** 23:20 | 19:16,24 20:17 | 71:3,6,12,15,24 | 122:24 123:5,21 |
| 31:12 32:4 33:5 | 20:22 21:7,10,15 | 72:2,4,10,13,19 | 124:4,8,16,19,23 |
| 34:1,23 35:5,8 | 21:20 22:4,7,11 | 72:22 73:2,5,9,21 | 124:24,25 125:1 |
| 124:9 128:14 | 23:2,5,8 24:15,21 | 74:3,10,13,17,25 | 125:25 126:12,13 |
| **offering** 23:9,15 | 24:24 26:5 27:11 | 75:7,18,20 76:22 | 126:24 127:12,21 |
| 34:9 124:12 | 27:15,21 28:1,9 | 77:5,9,18 78:3,20 | 128:13,17,20,23 |
| 161:22 | 28:12,19,21 | 79:1 80:17 81:11 | 129:14 130:6,11 |
| **offers** 34:11 | 29:19 30:5,11,13 | 81:21,25 82:6,18 | 130:16 131:3,6 |
| **offhand** 27:7 | 30:17 31:6 32:3 | 82:21 83:3,18,22 | 131:12,23 132:17 |
| 30:16,16 103:15 | 33:1,11 34:4,21 | 84:5,8,16,19 85:7 | 133:5,15,24 |
| 137:16 152:5 | 35:5,13,23 36:10 | 85:15 86:4,18 | 134:3,16 135:7 |
| 190:6 | 36:18 37:17,24 | 87:2,8,12,16,19 | 135:22,25 136:8 |
| **office** 118:8 | 38:7,15,21 39:3 | 87:24 88:2,5,8,12 | 136:20 137:14,17 |
| 149:14,24 195:11 | 39:10,13,17,25 | 88:16 89:6,10 | 137:21 138:4,9 |
| **oh** 13:7 20:2,5 | 40:9 41:8,11,23 | 90:3,16 91:13,15 | 138:14 139:20 |
| 21:9 24:7 28:17 | 42:4,7,9,19,24 | 91:18 92:4,11,24 | 140:5,23 141:8 |
| 32:17 36:6,8 49:6 | 43:3,23 44:6,10 | 93:2,9,14 94:9,19 | 142:14,17,21 |
| 53:5 54:6 59:18 | 44:13,16,18 45:4 | 95:24 96:2,12,14 | 143:3 144:1,7,13 |
| 73:20 75:22 | 45:7,11,14,19,19 | 96:17,21 97:3,6,9 | 144:20 145:16 |
| 76:13 81:24 | 46:8,11,14,20,24 | 97:11,20,24 98:5 | 146:3,11,14,16 |
| 86:21 91:23 | 47:4,8,19,24 48:2 | 98:20,23 99:1,8 | 147:1,3,20 |
| 93:18 97:8 | 48:10 49:12,17 | 99:20 100:8,17 | 148:10,18,24 |
| 104:23 107:10 | 49:22 50:1,6 51:9 | 100:22 101:10,22 | 149:2,22 150:4 |
| 121:22 123:18 | 51:19 52:6,10,18 | 102:25 103:7,13 | 151:4,8,12,20 |
| 128:11 136:17 | 53:1,8,24 54:4,10 | 104:17,24 105:3 | 152:3,6 153:3,13 |
| 162:19 168:6 | 54:15,21 55:1,6 | 105:11,18 106:2 | 154:17,23 155:5 |
| 173:8 175:23 | 55:11,25 56:12 | 106:12,15,22 | 155:17 156:7,13 |
| 183:7,20 190:18 | 57:17,24 58:2,7,9 | 107:12,19 108:9 | 156:21 157:6,8 |

157:14 158:1,5
158:12,17,25
159:3,10,15,19
159:25 160:16,22
160:24 161:2,4
161:18 162:10,15
163:14,18,25
164:3,18,21
165:3 166:1,8,21
167:3,16,20,25
169:4,23,24
171:9,13 172:4
172:23 173:15
174:17 175:2,9
175:18,25 176:24
177:4,10,19
178:4,12,23
180:22,25 181:11
181:19 183:15,24
184:2,9,14,18,22
185:20,23 186:11
186:25 187:24
188:11 189:7,11
190:7,22 191:15
191:15,22 192:3
192:9
**ol** 119:14
**old** 124:9 129:2
**older** 90:20 129:3
**olen** 1:8 2:8 3:8
5:8 30:6 47:1,11
49:7 52:2,11,21
54:13,23 55:9,15
55:20 56:15,25
57:9 78:8 80:24
83:7 114:4
116:21 117:3,18
118:6,21 122:5

123:2,4,7,9,25
124:8,11 125:17
125:20 126:15,25
127:3 130:16,20
130:21 131:7,12
131:16,19,23
132:21 133:21
135:8 138:10,19
140:23 141:5,10
141:22 142:15
146:18,23,24
148:11,22 149:14
151:5 153:23
154:24 158:13,19
167:8,11,14
168:13 169:5,6
169:11,16 174:3
176:25,25 177:1
178:13,13 186:12
189:14 195:4
197:1
**olen's** 49:14 97:1
119:14 125:4
131:8 132:1
**olenicoff** 1:8 2:8
3:9 83:15 84:8
85:16 86:5,11
87:11,13,14
88:25 89:19 90:5
90:11,14 92:3
94:23 95:19
108:10,15,22
109:3 110:6
116:22 117:3,18
118:12 119:23
123:13,22 124:2
124:5 127:14
128:2 130:17

132:1 138:6,15
141:25 142:3,6,9
146:18 147:7
148:1,10,17,19
151:13,16 152:7
153:9,11,13,18
153:23 158:13
166:24,25 167:14
168:13,20 169:10
169:16 170:2,20
171:10,19 172:11
173:3,8 177:1,5
178:10,14,19,25
180:10 182:16
183:4,22 184:4,9
186:12
**olenicoff's** 109:15
133:25 185:24
189:16
**olympic** 85:25
86:2,6
**olympics** 85:22
**once** 54:19,19
130:12 148:25
**ones** 18:24 19:3
58:11 92:5 102:7
103:8 119:7
121:4,6,6 171:23
171:24 186:8
**online** 49:9
190:21
**open** 38:8 99:12
**operations**
130:21 131:7,8
**opinion** 80:22
82:8,21 181:6
**opinions** 80:3

**opp** 124:20
**opportunity**
95:24 133:5
**opposed** 94:2
178:25
**opposition**
117:24 124:21,21
125:4 144:15,18
**oral** 114:17
**order** 90:16
190:23 191:24
193:11
**ordered** 127:14
127:18 128:2,9
129:15,19 130:3
179:4,12
**ordering** 145:4
**orders** 129:17
**organization** 7:6
**orientation** 73:22
73:23
**original** 13:9
17:25 33:23
35:15 38:3,5 44:8
44:9 95:4 125:24
160:11,17,19
176:14 192:12
195:10,21
**originally** 10:5,6
17:6 127:14
128:2 187:9
**originals** 44:7
**outline** 11:21
67:5
**outside** 52:7,21
**overall** 59:24
**overhead** 165:2

**owned**  55:20
  56:10
**owner**  24:14 83:7
**ownership**  4:11
  38:17 56:4 57:7
  58:21

**p**

**p.m.**  2:17 5:2
  166:3,6 192:14
  192:17
**page**  4:4,10,22
  39:3,7 41:12,18
  43:5,13 44:19
  56:1 69:17 70:10
  70:19 73:10
  74:18 96:3,11,15
  97:10 101:24
  114:10 124:22,25
  134:4 145:1
  195:15 196:4
  197:4,7,10,13,16
  197:19
**pages**  38:22 39:1
  39:1 195:14,17
  195:17 196:3,6,6
**paid**  10:23 12:11
  12:13 14:20
  20:24 21:18,21
  58:25 83:18 84:4
  84:21 152:10
  188:17
**palm**  163:16,16
  163:16 175:12,24
  176:17,19
**papers**  167:19
**paragraph**  56:2
  58:13,20 59:4

63:22 105:19
114:10 118:4
122:25 123:1,2
124:8 127:13
145:3,5 168:11
169:4 177:10
178:12 180:4
181:19 186:11
187:1,17
**paralegal**  3:18
  69:13
**pardon**  39:14
**parkway**  3:11
**part**  8:20 15:23
  32:12 34:12 38:4
  106:15 123:19
  130:21,24 131:6
  131:10,15 160:3
  160:8 175:13
  182:22 183:9
  184:3,15,22,25
  185:14,20 188:24
**partial**  74:22,22
**particular**  7:10
  13:6,14 15:18
  16:23 21:11
  26:16 33:4 34:2
  69:25 99:6 163:6
**parties**  40:13
  44:21 56:3 58:14
  60:18 64:1 97:14
  98:15 111:6,10
  113:9 114:4,13
  123:2,8 124:9
  125:17,20 126:25
  127:3 178:17
  194:19

**parts**  132:17
**party**  68:7 114:19
**passed**  24:14
  44:10 61:3
**passion**  131:25
**patron**  67:18,23
**patrons**  31:10
  66:25 67:17
  71:21
**pay**  12:17,20
  14:10 16:9 21:17
  24:25 25:23
  26:16 79:19
  83:21,22 84:6,14
  85:5 145:17
  153:14 181:22
  191:10
**paying**  11:12
  28:23 83:10,13
  85:3,3,4 108:5
  132:9 180:13,19
  180:20,21
**payment**  22:8
  60:20
**pdf**  195:12 196:1
**pecuniary**  177:13
  177:17
**peered**  183:17
**pembroke**  6:11
**penalty**  192:18
  193:3,7 195:16
  196:5
**pendency**  125:24
**people**  22:1 35:12
  66:25 113:22
  162:5 168:23
  185:21

**percent**  22:25
  25:10,10,13,14
  25:19 70:17 74:4
  74:23
**percentage**  22:8
  22:13,15,21 23:3
  70:14 80:11
**perform**  139:2
  188:24
**period**  13:22 21:3
  187:3 195:18
  196:7
**periodic**  52:12
**perjury**  192:18
  193:3,7 195:17
  196:6
**person**  31:23
  32:4 34:9 149:12
  149:13 161:22
  190:3
**person's**  31:19
**personal**  131:25
  166:15 188:20
**personally**  84:9
  84:10 124:5
  138:6 148:19,21
  163:4
**persons**  182:10
  182:18
**pertains**  179:7
**phone**  89:24
  91:10,19 149:12
**phonetic**  85:8
  185:15
**photo**  74:22 75:6
  77:1 173:10
  174:13,15 175:20
  175:22 176:1,2

**photograph** 4:15
32:19 41:20
44:23 45:1,8,9,15
74:6,14 75:2 93:5
167:24 173:6,8
174:2 175:11,18
**photographs**
4:13 39:1 75:14
77:5 87:15,24
88:6,8,9 92:24
93:9 174:19
175:4 183:18
**photos** 68:18 69:5
69:8,14 73:23
75:8,10 76:11
88:25 171:23,25
172:4 175:6
176:7,8 190:25
**physical** 58:22
**physically** 129:3
**pic** 150:22
**pick** 124:14
**picture** 69:19
70:15 72:5 73:5
73:17 76:19
82:16 174:22
175:12,16
**pictures** 150:1,19
150:24 151:3,6
151:10 172:2
**piece** 10:2 24:21
25:20 26:16 34:6
37:2 71:4,9,10,22
71:25 72:7,9,14
72:24 73:7 74:22
89:22 90:5,22
95:8 125:21
126:1,1,3,4 127:1

127:4,14 128:2
128:15,18 152:10
152:12 155:19
160:20 161:24
162:2,10 171:16
172:12 174:12
**pieces** 16:15,23
18:16 101:7
124:9,12 125:18
126:16 127:5,8
127:10 128:21,22
128:25 129:6,11
129:12,15,25
130:19 131:19,24
135:21 154:7
161:19 164:6
168:21 169:2
**pl** 179:16
**place** 42:10 87:5
93:10,12 95:2
173:12 194:8
**placed** 82:14
91:10 95:6,7
129:17 131:1,24
155:2 194:10
**placement** 84:11
**plain** 125:23
**plaintiff** 1:6 2:6
3:3 5:18
**plaintiff's** 124:21
**plan** 182:10
**plaque** 95:3,7
128:5
**plaques** 127:19
**play** 11:5 85:3
**plaza** 2:15 5:11
**pleadings** 166:9

**please** 5:21 6:8
50:23 59:21
99:19 108:19
115:11 143:8
**plu** 174:8
**point** 45:20 53:21
54:7 58:3 59:10
71:18 73:1 82:2
94:12 104:12
136:8 139:2
148:16 166:24
181:13
**pointing** 72:7
**popular** 81:24
**portfolio** 118:7
118:22
**posing** 89:1
**position** 37:21
80:12 105:11
115:19,24 116:14
117:18 126:21
128:20 157:10,14
180:1 184:15
188:16
**positive** 142:5
158:15
**possession** 44:13
**potential** 57:8,11
153:14
**potentially** 61:4
185:15
**predated** 139:23
**predicate** 145:12
**premier** 2:15
**preparation**
188:3
**prepare** 163:2

**presence** 39:13
39:15
**present** 3:17
**presented** 42:3
73:25
**president** 6:20,22
7:12 66:16
**presume** 9:23
**pretty** 28:9 74:14
164:13 185:6
191:5
**previous** 88:11
101:7 102:4,6,7
102:23 103:6
**previously**
102:11 183:12
**price** 13:3 16:25
17:2,4 22:4 25:5
25:6,12 27:3,3,5
32:12 35:23
36:14 80:9 92:8
97:7 154:19
162:8 163:18,21
163:22 164:12,19
164:22 180:14
181:22,25 182:4
**priced** 37:8
**prices** 89:8,10,12
94:13,14,16
162:16,24 163:8
164:9
**pricing** 24:1,4,13
**primary** 130:21
**prior** 46:15,17
54:4 55:6 64:2,14
64:25 65:7
103:10,17 104:12
111:18 112:8

127:16,18 128:4
144:19 173:4
194:10
**privacy**  61:1,2
188:20
**private**  28:25
140:20 141:4
187:18
**prize**  32:2
**pro**  123:7
**prob**  113:15
**probably**  14:17
18:12 20:14
54:17 86:21
133:23 145:15
160:13 165:19
191:10
**problem**  98:3,8
136:22 137:5
**procedure**
195:19,20
**proceed**  62:18
63:14
**proceedings**
194:7,9,11
**proceeds**  60:22
60:23 62:18,21
63:5,14
**process**  75:17
190:22 191:5
**procure**  88:5
**produce**  15:2
**produced**  69:14
173:16
**produces**  43:3
**product**  14:21
41:21 43:21
70:12,23 74:1,11

74:15
**professional**
66:23
**profit**  23:6
180:23
**profits**  180:5,9,16
180:16
**program**  26:18
49:9 175:13
**programming**
6:25 7:2,6,7
**programs**  18:9
18:15 19:24 20:1
20:16,18,23 23:2
24:24 25:2 26:24
27:6,23 28:2
66:10 79:6,19
**progress**  76:11
77:6
**project**  82:9
164:14
**projects**  7:19
76:4 120:23
132:7
**prolific**  28:4,7
**prominent**
130:24 131:6
**proof**  136:4,6
147:9
**prop**  177:1
**proper**  132:10
**properties**  1:8
2:8 3:8 5:8 30:6
49:7,13,19 50:2
52:2,11,12,14,17
52:21 54:8,13,23
55:9,12,15,20
56:15,25 57:9

79:7,15 80:24
94:24 95:6
104:12 118:15,19
119:14,18,23
120:9,21 121:2
121:14 122:5,6
122:10,11 124:11
131:2 133:21
135:8 138:10,19
141:22 142:15
146:24 148:22
153:23 154:24
158:13,19 168:13
169:6,11,16
177:1 186:12
189:14 195:4
197:1
**property**  26:2
37:12 58:23 78:9
78:11,13,15,17
79:3,22 80:4
81:19 82:1,15,24
84:9 118:7,14,22
121:24 122:1
126:19 131:17
132:7 141:5
159:17
**property's**  30:12
**protect**  59:7
**protections**
112:20
**prove**  150:19
**proved**  135:23
**proven**  169:12,13
**provide**  7:1 11:18
92:4 111:6
154:17

**provided**  23:25
111:11 195:19
196:8
**provision**  64:7
113:11 114:12,21
**provisions**
112:12
**public**  18:9,14
19:24 20:16,18
20:23 23:2 24:11
24:24 25:2 26:2
26:24 27:6,13,22
28:2 49:8 66:10
79:6,18 80:21
93:10 103:9
132:6 141:16,19
141:22,23 157:1
157:5,22 175:13
**publication**
162:18
**publicly**  26:1
169:7
**pulling**  81:6
**pur**  157:16
**purchase**  13:21
152:21,23 153:4
154:6 181:22,25
**purchased**  18:13
54:9
**purchasing**  15:19
**purport**  56:14,24
**purported**
157:16 177:15
**purportedly**
85:11 177:11
180:11
**purports**  145:2

**purpose** 97:11,12
  98:13,16,20,24
  132:2,5,8 151:20
  160:10,17,18,19
**purposes** 86:20
**pursue** 64:23
  110:6
**put** 38:16 69:7
  77:18 95:15
  100:5 117:23
  124:20 133:12
  137:19 144:3,7
  144:14 153:10
  164:14,23 174:23
**putting** 83:5
  181:11

**q**

**quality** 92:1,10
  92:12,14 176:21
**quantify** 79:1
  83:9
**quantum** 122:7
  123:23 124:6
  155:1
**quarter** 31:2,4
**que** 22:20
**question** 9:22
  12:15 16:12
  22:20 23:12 34:7
  41:3 50:22 56:17
  57:3 58:6 61:1
  62:10,14 73:22
  86:8,20 91:1
  99:18 101:10
  110:3 116:11
  129:22 136:16,18
  136:19 143:8

  145:13 148:4,7
  156:15 169:9,22
  172:8 178:18
  179:20 186:3
**questions** 9:20
  63:11 79:11
  129:21 189:4
  191:2,16,18,20
**quite** 24:17 80:25
  131:1
**quote** 186:1

**r**

**r** 166:14 197:3,3
**r&s** 196:1,9
**raimondi** 166:14
  166:22
**raised** 97:15,15
  100:18,18,20,21
  100:23,24 101:13
  101:14,14
**range** 19:8 20:4
  21:11 27:1 36:15
  51:23 163:22
**rapids** 31:24 32:2
  32:25 33:5 34:24
**rare** 31:9
**raton** 3:12
**rea** 137:4,4
**reached** 87:2
**read** 56:19 80:7
  81:20,21,22
  109:12 130:7,10
  133:23 191:22
  193:8
**reading** 98:18
  195:23 196:9

**ready** 188:23
**real** 80:4 82:8,23
  83:5 89:24 105:9
**realize** 108:9
**really** 13:17 14:6
  16:12 17:23 27:4
  40:6 51:19 65:25
  67:6 82:25 89:2,8
  91:15 92:7 94:4
  99:7 100:15
  111:4 113:16,19
  122:16 158:10
**reask** 57:5
**reason** 15:18
  46:24 60:3 75:1
  75:16 84:5 90:10
  94:16 95:1
  113:21 135:19,25
  136:5,24 137:6,6
  137:14 147:6,10
  147:20,25 149:11
  155:17 156:13,16
  167:16 185:17
  197:6,9,12,15,18
  197:21
**reasons** 79:6
  92:22
**rebut** 126:22
  129:23 130:13
**rebutting** 130:22
**rec** 63:15
**recall** 12:13 23:8
  23:15,23 24:17
  27:1 54:3 56:8,11
  65:20 67:6 68:4
  75:5 89:13
  105:17 106:21
  143:20,24 145:19

  146:25 150:9
  153:20 154:9,10
  154:16 155:8
  156:19 163:21
  184:9 189:17
  191:13
**rece** 145:19
**receipt** 89:18,21
**receipts** 84:4 87:6
**receive** 61:23,25
  62:21 63:4,10,13
**received** 27:2,6
  27:12 29:4 30:6,8
  35:24 61:20,24
  63:16 90:5
  107:12,14 129:15
  130:18 151:18
  182:5
**receiving** 28:15
**recess** 77:15
  166:4
**recognize** 38:25
  69:16 74:21
  171:4
**recollection**
  50:21 97:5
  160:15
**recommended**
  162:24 190:13
**record** 5:5,16
  23:19 26:8 50:12
  70:3 77:13,16
  134:5 165:11
  166:2,5 181:16
  192:7,13 194:11
**records** 34:22
  123:4,9,12
  130:17 141:16,19

referenced  195:6
referencing
  87:25
referring  78:1
  143:15 175:19
reflection  33:6
  35:1,2 161:25
  162:1
reflections  34:24
regarding  10:2
  57:9 60:23 62:7
  64:19 67:10 68:7
  78:11 83:15
  90:24 94:19
  107:22 115:9
  116:22 123:9
  152:10 153:24
  154:18 157:19
  182:15,18 186:2
register  46:18
registered  46:21
  46:21 161:9,12
  161:14,15,16,19
registering  46:11
registration
  190:7,17,24
reimburse  189:14
related  58:17
  114:16 143:5
  146:4
relation  73:23
relationship  62:7
  182:15
relative  130:25
  194:18
release  101:25
  102:2,10 103:2,4
  106:14 112:13,16

released  195:21
releases  102:14
  111:6,10
releasing  102:3
  105:21 114:4
reli  40:15
reliance  187:1
relief  60:19 94:21
  105:22 106:16,17
  106:20,23 107:2
  107:22
rely  108:10,17,22
  173:15
relying  110:12,18
remedy  179:17
  179:21
remember  10:10
  12:23 14:14
  21:21 22:4 24:21
  27:4,5,14 32:3
  34:1 36:18 39:22
  39:25 45:14 51:1
  51:4,5 53:5,8,17
  53:24 55:3,5 71:6
  71:6 89:14,20
  96:24 97:8
  110:22 111:2
  113:8 119:10
  124:11 137:25
  140:3 146:7
  149:3 152:4,17
  152:20 154:22
  157:24 158:1,8
  163:22 179:11
  183:11,16 185:11
  186:10 189:21,24
removal  185:25

remove  135:8
removed  51:16
  133:21 134:24
  135:21
render  193:11
rental  131:8
repeat  23:12 34:7
  56:17 86:8
  106:25 108:19
  115:11 143:8
rephrase  29:2
replacement
  82:14
replica  69:23
reported  1:22
reporter  2:19
  5:14,20 6:3 22:18
  56:19,21 144:9
  144:11 165:17
  194:1,5
represent  40:10
  40:12,13 96:21
  125:3 133:16
  160:12
representation
  41:5,7 65:17
  77:25 186:2,7,13
  186:16
representations
  64:3,19,25 65:8
  112:3 114:17
represented
  188:3
represents  73:12
reproduce  13:20
  13:22
reproduced
  169:7

reproducing
  168:17
reproduction
  175:6
request  173:18
requested  173:22
  194:17 196:1,9
  196:10
require  63:7
  179:24
required  178:20
requirements
  82:19
requiring  107:16
  180:1
rescind  188:22
rescinded  188:18
research  49:6
researched  85:21
resell  26:2 177:6
reselling  180:22
resemblance  33:7
  114:20
reservation
  110:13
reserve  109:2,18
  110:5,24
reserved  109:22
residential  6:10
resold  13:2 15:8
resolve  153:17
resolved  167:13
respect  114:14
respective  180:6
response  151:4,5
  152:1
rest  49:4

**result** 80:5 82:9
  179:19 180:5
**retain** 58:21
**retained** 192:13
**retaining** 60:5
**retired** 42:6
**return** 26:21
  188:16 195:17
  196:6
**reused** 137:15
**reveal** 40:16,19
  40:23 59:17 61:5
  63:7
**review** 95:25
  191:21 194:16
  195:8,10,13
  196:2
**ridiculous** 133:1
**right** 6:18 7:3,20
  10:2,10 12:4,6
  14:18 15:24
  28:18 33:25
  35:15 40:25
  41:11,12,20 48:7
  55:25 58:18 59:7
  59:11 60:5 61:1,2
  63:24 68:9 69:13
  69:16,23 72:5
  73:3,6 74:7,9,11
  74:24,24 77:9,11
  77:18,23 78:3,6
  78:19 80:16
  85:15 89:1 92:23
  95:21 97:19,24
  98:6,11 101:24
  109:2,19 110:5
  110:24 114:1
  116:24 117:5,6

  117:17,22 124:19
  125:2 126:10
  128:18 129:14
  133:15 137:17,21
  137:24 139:25
  140:8 144:25
  147:25 155:12,14
  159:17,18 160:22
  160:23 161:1
  168:11 170:8
  178:6,7,8,10,11
  181:10 188:15,20
**rights** 56:3,7 57:7
  58:16 60:4
  110:13,21 168:15
**ringing** 188:7
**role** 11:5
**rude** 38:6
**rule** 188:18
**rules** 196:8
**run** 149:23

---

**s**

**s** 4:9 12:5 101:17
  197:3
**sachs** 3:10
**salary** 28:23
**sale** 21:15 23:6
  28:15 29:4,14,19
  31:11,17 32:5,10
  32:18 34:3,10
  35:7,9 128:15,21
  128:22,25
**sanctions** 117:24
  124:22 125:5
**sat** 189:16
**satisfied** 82:18

**satisfy** 131:25
**saving** 28:18
**saw** 49:9,24
  82:16 85:17 86:6
  95:21 104:6
  118:14 119:2
  147:7,11,13,22
  148:2,8 149:25
  171:10 183:18
**saws** 33:21
**sax** 3:10,10 4:5
  5:19,19 6:7 14:19
  17:21 20:11
  22:19 24:2,8 29:2
  29:3 31:20 33:1,3
  38:21,23 39:3,5
  40:8,18,21,25
  41:1 44:18,20
  46:2,4 50:15,18
  50:24 53:7,11,15
  57:4 58:8 59:3,5
  59:22 60:13 61:8
  61:12 62:4,11,13
  62:15,25 63:2,3,9
  63:18,21 68:9,13
  68:16,21,23 69:1
  69:4,7,12 70:5,7
  70:9,11 73:9,11
  74:17,19 77:9,18
  77:22 78:3,5
  79:17,21 84:1
  85:6 93:23 95:15
  95:17 96:2,5,10
  96:13 98:3,5,8,10
  99:21 100:16
  101:3,9 103:21
  104:10,16 105:15
  106:6 108:1,14

  109:7 110:2
  111:8,9 114:1,2
  115:23 116:12
  117:6,8,10,22
  118:2,5,17 126:9
  126:11 130:2
  132:16 134:3,7,9
  134:16,19,20
  135:14,16 136:22
  136:23 137:10,13
  139:7,13,19
  143:2,19,21,23
  144:1,7,13,16,18
  144:21,24 145:11
  147:3,5,14,17,19
  153:2 156:3
  158:23 159:2,9
  161:13 165:12,15
  165:18,23 166:1
  166:7 170:7,14
  170:18 171:2
  172:21 173:14,20
  173:23 174:1
  188:14,22 189:1
  189:3,7,10
  190:19 191:15,22
  191:24 192:3,5,7
  192:9
**saying** 28:9 35:16
  36:13 61:20
  111:17 118:22
  128:1 134:14
  136:13 172:25
  174:9 175:4,6,21
  184:2,25
**says** 41:13,19
  43:6 44:21 56:2
  58:14,20,21 59:6

63:25 97:11,11
98:12 99:5,23
100:1,17 101:13
101:24 102:25
106:13 110:11
111:5 112:13
114:3,12 118:6
118:21 123:2
124:8,17 125:16
126:15 127:13
130:16 131:6,16
131:18,23 132:21
134:21,21 137:23
152:2 168:12
179:20 181:19
182:9 185:25
187:17
**scale**   20:14 129:1
173:11
**schedule**   195:10
**scoot**   26:10
**screen**   38:16 69:8
77:19 78:4 95:16
124:20 133:12
137:19 144:3,8
**scroll**   38:21
**scul**   12:24 147:7
**sculp**   31:13 81:16
**sculpt**   42:25
71:22
**sculpted**   7:18
71:10,10
**sculpting**   8:12
75:14
**sculptor**   7:16,22
8:3,6,14 12:1
42:11 66:24
83:19 171:14

**sculpture**   12:9,14
12:22,25 13:9,11
13:15,24 15:3
18:16 21:18,23
22:8 27:13 31:3
31:25 32:20,24
33:4 34:2,24
35:24 36:21 38:3
38:14 41:14
42:12 43:1 44:22
45:1 47:1,11
48:18 49:23 56:5
58:22,24 59:9
67:13 69:20,25
70:23 71:20
82:17 85:17 86:6
88:17 93:6 94:5
110:21 147:8,11
147:22 149:21,25
150:5,11 153:11
155:13 157:11
159:21,23 160:1
160:2,5,11,17
161:4,20 168:16
170:22 171:10
173:10 174:6,12
174:24 175:12,24
176:2,9 178:5,5
181:23,25 182:12
183:18
**sculptures**   16:2
16:10,17 17:1,5
17:12 18:2,7 19:8
19:16,25 21:1,16
22:23 23:6,10,16
24:16 26:25
28:16 29:5,14,19
30:7,18 31:8,14

33:8 34:5,13
36:12,13,19 37:5
37:6 42:16,18
45:22 47:6 48:15
48:25 49:10,11
50:8 51:2,6 52:20
54:9,23 55:14
75:24 76:12
79:14 80:6,23
81:5,9,10,10,16
81:18 82:2,10,14
83:8,19 84:6,12
85:11 87:21
91:11 94:23 95:6
103:8 104:3,11
104:25 105:12
106:19 107:17
109:4 110:8,25
116:23 118:7,13
119:11,17 120:9
120:23 123:9,23
124:6 126:19
129:10 130:19,25
131:16,19 132:22
133:20 135:4,9
136:11,25 137:7
138:7,11,16,20
138:24 139:3
140:17,19,21
141:1,6 142:21
143:5,12,15
146:5,19 154:19
154:25 155:13,18
156:22 157:20
158:18 162:17,24
164:7 167:18
173:5 176:16
177:6,16 178:24

179:1,8,25 180:2
183:5 184:13
185:9,18 186:1,2
186:8,17
**se**   15:22 122:25
**sear**   55:12
**search**   53:25
54:22 55:7 104:2
104:2,15 120:2
120:12 122:14
146:19,24
**searches**   54:12
**second**   43:5
48:23 60:17
78:10 94:21
133:11 174:17
**secretary**   148:15
154:1
**secured**   3:18
**see**   31:25 33:20
33:21 43:17
52:13,20 53:19
54:7,12 55:8,14
55:19 70:16 72:1
72:12 73:16
87:24 90:20
93:21 95:5 97:3
98:2 101:24
102:20,25 104:10
104:25 109:1,10
109:10,24 110:4
113:18 120:8,8
122:10,12 125:6
135:1 141:6
145:5,6 146:19
146:23 157:9
171:5 172:15
173:12 187:25

189:23
**seek** 56:3 115:8
**seeking** 94:22
  113:5 115:1,7,14
  188:22
**seen** 31:10 39:2
  104:2 133:19
  145:13,16 148:5
  150:5,10 173:1
  173:16
**self** 6:15,16
**sell** 10:8 17:11
  31:1 34:16 42:15
  177:6 178:4,10
  178:24
**selling** 15:24
  28:17 29:20,24
  32:6 129:6
  161:19 162:23
  163:25
**send** 88:24
  150:19 151:17
**sending** 151:10
  151:21
**sense** 110:14
  155:15
**sent** 88:7 151:6
  151:19 172:1,2
  174:19
**sentence** 60:18
  64:11 107:21
  113:21 124:16
  129:23 130:23
  132:4,17,25
**separate** 79:11
  129:21
**sequence** 41:18

**serious** 89:6
**set** 10:12 25:5,6
  25:10 68:2 75:11
  75:12 93:22
  162:16 164:9,11
  164:12,22 182:13
  194:8
**sets** 189:12
**setting** 72:3
**settle** 97:12 98:13
**settled** 156:19
**settlement** 55:4,7
  95:16 98:17
  112:17 137:20,22
  139:5,7,23 142:9
  142:15 146:17,22
  155:6,6,19 156:6
  167:7,11 188:4
  188:17,23 189:13
**seven** 37:13 51:2
  135:1 143:1,5,15
  146:5
**sh** 126:7
**shape** 33:11
  173:10 176:10,23
**shipments** 129:16
  129:17
**shopping** 91:14
**short** 68:12
**shorten** 187:25
**shorthand** 2:18
  6:3 194:4,12
**shortly** 104:19
**show** 24:3 69:14
  75:1,22 84:4
  128:12 144:1
  145:1 162:19

**showed** 49:22
**showing** 34:16
  143:25
**shows** 127:22
  174:11,12
**sic** 34:25 40:3
  54:11 139:15
**side** 63:25 70:16
  72:12 93:22,22
  166:10
**sides** 160:7
**sideways** 73:15
**sight** 125:23
**sign** 39:13,15
  66:10 175:14
  195:16 196:5
**signature** 39:7,11
  39:12 96:6,14
  192:17 194:24
  195:21,23,23
  196:9
**signed** 65:17,22
  97:4 99:13 104:4
  105:10 111:21
  112:19 115:19
  116:1,15 122:22
  124:2 136:13
**significance**
  65:11 99:4
  100:20 102:19
  111:14 113:6,13
  113:15,18,23
**significantly**
  89:17
**signing** 104:12
  112:9 115:15
  137:25

**sim** 20:18
**similar** 11:21
  13:24 14:3 15:11
  20:18 33:9 37:5,9
  37:16 42:2 47:6
  49:19 63:10
  72:21 95:8 138:7
  138:11 139:3
  140:17 141:6
**simply** 57:19
  101:12 130:20
**simultaneous**
  14:16 20:9 31:18
  53:2 60:11 62:23
  63:1 83:24 93:20
  99:16 100:13
  132:14 134:13
  145:10 152:24
  161:11
**sinister** 127:24
**sit** 109:17 189:17
**site** 48:25 53:13
**situation** 151:22
  168:5
**six** 37:13 51:2
**size** 19:11,13
  20:19 27:12,12
  37:10 176:9
**sketch** 10:25 11:4
  43:23 148:2,5,8
**skilled** 92:15
**skip** 101:23
**slightly** 135:18
**small** 9:15 43:1
  71:20
**smaller** 19:9,10
  163:23 164:6

smith   3:4
smithamundsen...
  3:7 195:1
sohu   86:17
sold   10:4,5,6
  16:19 18:3,6,17
  19:3,17,25 21:23
  22:5 24:15,22
  26:17 27:21 31:3
  35:19 38:8,13
  125:18 126:16
  152:15 162:10
  177:20
sole   8:10 58:15
  58:21 114:12
solutions   195:7
somebody   18:13
  24:25 33:5 76:19
  89:1 90:21 95:9
  154:1 177:21,22
somewhat   96:20
  156:7
son   12:9
son's   12:5 45:11
sorry   36:10 67:7
  78:22 93:18
  111:8 128:11
  137:2 175:21
sort   25:7 29:23
  33:23 37:3 140:6
  176:21
sound   3:11 99:10
  137:24
sounds   133:1
south   3:5 119:23
  120:21 121:3,14
southern   1:3 2:3

space   25:22 118:9
spaced   28:10
speak   149:8
speaking   14:16
  20:9 31:18 53:2
  60:11 62:23 63:1
  83:24 93:20
  99:16 100:13
  132:14 134:13
  145:10 149:3
  152:24 161:11
  167:17 183:16
speaks   23:19
  50:12 101:1
  143:18
specific   16:8,24
  16:25 53:3,5
  81:25 82:1,3
  159:11 181:13
specifically   16:7
  16:14,21 55:2
  59:25 81:18
  98:12 101:18
  102:9 110:23
  112:13 178:25
  181:13
speculation
  108:13
spen   68:11
spencer   3:10 5:19
  32:22 62:5 68:11
  70:3 96:7 97:25
  136:21 165:11
  173:19
split   60:18,22
  61:14 62:17
spoken   148:19,21

springs   163:16
square   118:8
  173:10 174:6
  176:13,15
squinting   98:4
ssax   3:13
ssclawfirm.com
  3:13
st   3:6
stage   72:23
stages   69:22
stainless   14:2,21
  15:3,12,14,20
  17:9 67:12 70:25
  71:1 72:9,14 73:2
stamped   69:9
stamps   88:10
standing   162:4
  189:18
start   8:12 32:15
  81:4 125:14
  183:15 189:21
starting   72:23
  129:24
stat   179:24
state   5:15 6:8
  52:2,7,21 56:15
  56:25 193:8
  194:5 195:9,12
stated   118:11
statement   85:20
  86:11 90:4
  126:22 128:6
  131:21 135:20
statement's
  127:22
statements
  129:23 130:14,23

  133:8 183:21
states   1:1 2:1
  54:13,24 55:9
  93:3 141:2
statute   112:21
stay   95:2
stayed   28:11
steel   14:2 15:20
  17:9 67:13 70:25
  71:1 72:9,14
step   102:6 183:20
stewart   165:7,9
  165:10
stick   99:18 188:9
  188:10
stipulation
  195:20
stone   129:4 164:7
stop   52:6 112:25
  113:3,5 122:20
  125:1,25 168:18
  174:8
stopped   115:1,5,7
  115:13 122:23
  129:5
stories   80:7,20
  81:22
story   125:22
straight   126:12
street   120:16,22
  122:21
strictly   10:18
  45:4
stuck   110:20
studio   11:7 42:12
  76:5 174:13
  176:3

**style** 134:15
**subject** 9:11 10:3
  18:25 20:19
  23:10,17,22 33:8
  36:19 46:3,16
  49:5 50:9,13,17
  51:2,7 64:20
  68:15,19 81:24
  84:17 114:14
  121:25 122:1,2
  123:10 139:20
  142:21 143:16
  146:5 153:24
  186:8
**subjects** 91:25
  143:5 177:7
**submit** 190:23
**submitted** 173:9
  173:11 190:25
**subscribed**
  193:13 194:21
**subsequent** 43:20
  50:6 51:24 58:10
  91:21 92:16
**subsequently**
  109:3 110:7,24
  116:23
**substance** 11:19
**substantial**
  181:20
**sue** 109:2
**suffer** 179:18
**suffered** 179:17
**suggesting** 45:25
**suggests** 106:4
**suite** 2:15 3:5,11
  5:11

**supplying** 180:14
**support** 8:10 16:8
  28:22 29:1
  159:11 169:15
  170:1,10 171:22
  172:11 176:25
  181:1,7 184:15
  185:8 187:20
**supports** 170:20
  174:3
**suppose** 83:1
  188:5,9,10
**supposed** 146:21
  160:11
**sure** 10:1 12:16
  14:6 23:13 26:8
  27:9 34:8 35:16
  39:21 40:6,25
  45:25 49:11
  50:25 54:25
  55:10 56:18 57:5
  69:6 70:16 76:25
  77:3 86:9 91:2
  97:19 104:21
  105:1 107:1
  108:20 115:12
  121:22 122:16,19
  123:16 124:3
  125:13 130:9
  134:2 136:22
  138:2 143:9
  147:2 153:7
  162:12 165:12,25
  172:9 173:17,25
  175:3 191:19
**suspect** 112:14
**suspected** 105:3,6
  111:12,15,19

  112:8
**suspicion** 136:9
**swear** 5:21
**sworn** 6:2

**t**

**t** 4:9 197:3,3
**tabletop** 19:11
**take** 17:25 22:8
  23:3 25:19 26:19
  34:15 37:20
  38:24 61:8 64:22
  68:12,17,23 69:1
  75:13 76:7,10
  77:9 78:3 80:13
  99:15 111:5
  131:3 132:18
  147:3 165:22,23
  165:24
**taken** 2:14 45:8,9
  45:15 70:15 75:2
  77:15 88:9 92:24
  93:2 166:4 194:7
**talk** 18:1 112:11
  114:24,25 166:13
**talked** 35:25
  51:24 82:12
  86:14,21 88:20
  91:23 92:1 115:3
  148:16 151:8
  166:19 167:15
**talking** 10:15
  15:25 24:18
  27:18,23 28:3,5
  30:22 32:24
  37:11,13 54:18
  54:21 58:24
  59:15 80:21

  101:6 119:5
  159:15,16 166:24
  166:25 171:25
  172:4 174:6
**talks** 133:20
  145:3
**tall** 36:12 176:13
**taller** 176:19,20
**tallest** 19:5
**tear** 134:24
  159:20 160:1
**teardrop** 37:23
  38:2,7 49:3,10
  77:24 159:21,22
  160:16,24
**tell** 9:22 23:23
  63:19 87:12 88:9
  88:13,14,16
  89:10 141:8,24
  148:10,14 152:12
  152:15 166:21,23
  167:10 173:21
  182:21 183:16
**telling** 47:12
  59:25 140:15
  170:15
**ten** 19:23 20:2,3
  24:18,20 27:24
  29:17,18,21,23
  77:11 121:14,20
**term** 99:11 105:5
**terminated** 64:3
  65:8
**terms** 61:14
  115:25 142:14
  153:18 167:10
  187:21

**testified**  6:3 17:7
  77:24 78:7 83:3
  86:13 92:5
  128:13 138:25
  154:20 158:22,24
  159:12,19 172:13
  177:12 181:9,12
  182:14 183:12
  184:4 187:22
**testify**  189:19
**testifying**  183:13
  184:10 194:10
**testimony**  23:20
  84:17 86:5 90:3,4
  120:20 171:19
  177:15 192:11
**text**  39:1
**texturing**  33:19
  33:19,21 72:18
  176:21
**th**  58:3
**thank**  33:2 98:7,9
  191:17
**therefrom**  60:20
**thereof**  124:10
  194:14
**thing**  83:12
  117:17 166:16
  174:17 177:25
**things**  96:8,10
  102:23 110:19
  115:22 129:18
  152:11 159:16
**think**  10:20 14:20
  14:24 17:16
  18:11,17 20:5,13
  28:8 29:18 30:16
  32:23,23 33:10

35:25 36:22
  46:15 48:3 49:10
  58:3 61:1 62:3
  67:11 69:4 80:25
  82:16 83:17
  85:13 89:16,22
  89:25 90:23 91:3
  91:6 92:14,15
  97:2 98:2 115:21
  127:22 131:12
  133:17 134:5,10
  136:19 142:12,25
  144:6,19 147:1
  150:13 155:14
  156:7 158:4,22
  159:14 164:10
  170:4 172:6
  174:2 177:3,13
  181:10,18 182:15
  182:18 183:14
  184:23 185:3,3
  187:9,23 188:6
  189:20 190:6
**third**  44:18 145:3
  178:17
**thirds**  124:23
**thought**  36:11
  65:25 152:19
  159:4
**thousand**  164:23
**thousands**  164:2
**three**  7:14 8:4
  9:12 28:12,22
  66:20 86:21
  91:23 95:12
  129:21 189:22
**threw**  144:10

**throw**  160:24
**till**  47:25
**time**  7:17 8:5,19
  8:20 17:14 18:12
  24:14,15 27:21
  29:13 35:19 42:5
  42:15 45:20
  46:25 47:4 49:18
  49:25 51:16
  53:22 54:17,22
  56:12,21 57:6
  59:10 64:13,22
  65:13 66:19 68:6
  76:6 77:4,14,17
  82:3,5 84:18
  100:5,7 104:12
  104:24 112:15
  114:8 116:16,18
  118:16 119:5
  122:17 124:7
  125:19 126:23,24
  127:6,11 128:21
  131:5 133:4
  134:10 136:7,8
  139:3 160:13
  162:10 164:14
  166:3,6 170:6
  174:14 176:3
  177:5,18 184:17
  187:3 190:13
  194:8 195:10,18
  195:24 196:7
**timer**  75:12
**times**  25:9 53:13
  71:19 86:18,22
  91:24 164:25
  181:6 186:22

**timing**  57:20
**title**  160:14
  175:15
**today**  9:20 12:25
  13:12 15:17
  35:17 103:13
  109:13,17 114:22
  150:25 179:8
  181:9,12 189:17
  191:18
**today's**  192:10
**told**  32:10 34:10
  59:25 60:1 81:22
  89:12 117:20
  134:10 145:24
  148:17 150:4,12
  150:18 166:17
  168:4 179:3
**tools**  33:23
**top**  70:22 72:5
  73:24 74:7,8
  114:10 160:24
  189:22
**total**  18:19 19:25
  20:13,17 25:17
  35:20 36:9
**totaled**  12:12
**touch**  15:21
**track**  26:8 32:23
  181:16
**trade**  191:7
**trades**  80:8,20
  81:23
**transcribed**
  194:13
**transcript**  193:9
  193:11 194:16
  195:6,8,10,13,13

[transcript - use]                                                        Page 230

195:21 196:2,2
**transcription**
194:14
**trial** 23:15,24
123:20
**trick** 161:15
**tried** 133:9 177:5
**tripod** 75:12
**true** 65:5 115:13
115:16 118:23
120:25 121:1
124:16 125:8
127:13 128:1,6
128:24 146:8
181:24 182:2
193:11
**trumbower** 3:18
117:25 144:14,17
144:20
**truthful** 90:23
**truthfully** 189:19
**try** 26:10 133:7
136:21 153:3,10
162:4
**trying** 25:22
32:12 41:3 53:19
80:12 86:10
94:10 98:19
100:4 151:22
152:9 161:15,23
172:10 178:24
**tuesday** 1:18 2:17
5:1
**turn** 68:10 73:14
96:2 114:9
**two** 5:19 16:2,9
16:15,17,22,25
17:4,13 18:12

24:10 30:6,18
31:7,13 37:11
38:25 39:1 48:15
50:8 51:6 79:11
82:9,14 83:8
84:12 123:7,22
124:23 135:4
138:20,24 155:1
155:12,16 157:19
158:7,17 159:16
159:16 168:17,21
169:2 174:5
175:2,4 178:13
178:21 179:7,10
179:11,24 180:2
185:9,18 187:14
187:21
**type** 28:14 55:18
139:2 142:18
146:18 162:15
**types** 153:18
**typical** 22:11,15
22:21 67:4,20
75:13
**typically** 64:6
67:3,17 71:12,21
71:23
**typing** 96:24

**u**

**uh** 86:24 143:13
163:20
**ultimate** 22:5
**un** 41:2 187:4
**unannounced**
149:18,19
**unaware** 125:17
126:15

**underlying** 179:2
**undersigned**
194:4
**understa** 102:1
**understand** 8:1
8:18 9:19,22
11:10 12:15 16:6
20:7 21:6 25:4,13
26:14 32:8 34:17
40:18 53:18
64:10,24 65:11
80:12 81:13
83:14 86:10
94:10 97:17
98:16,19 99:24
100:3 101:15
102:21 106:2,23
107:2,8,12,15,19
111:6,10 113:1
113:13 114:7
115:2,15,19,22
115:25 122:13
128:17 131:11
145:25 159:3
162:6 163:1
172:10
**understanding**
36:24 41:3 64:1
87:19 99:11
100:8 101:3,5,19
102:2,5 103:5,22
103:24 105:16
108:2 111:13,20
114:13 115:1,9
135:7 143:7,14
145:18 146:4
189:12

**understandings**
64:2 65:7 114:16
**understood** 9:23
58:17 64:22
106:19 107:10,14
116:2
**unfortunate**
125:16
**unintentional**
181:3,15
**united** 1:1 2:1
54:13,24 55:9
93:3 141:2
**unknowingly**
169:18
**unknown** 103:1,4
**unsuspected**
105:4,7,12 112:8
**untitled** 10:3,4,25
11:6 12:1 13:21
19:14 35:6 41:13
43:7 44:22 46:21
48:12 49:20 52:1
52:14 54:12 55:8
56:15,24 57:10
57:22 67:10
69:20 124:9
128:18 138:7,12
139:4 147:15,23
148:12 157:10
161:4 168:17
169:8 170:21
175:16 176:4,5
176:18 177:2
182:4 187:4
**untrue** 126:15
**use** 24:3 45:2
71:18

**usually** 15:22
22:12 67:24
71:23 90:19
164:12

**v**

**v** 1:7 2:7 195:4
197:1
**vague** 100:10
**vaguely** 14:2
102:22
**valuable** 37:21
**value** 23:9,16
30:17,20 34:12
42:23 78:14 79:2
79:12,14,16,17
79:19,22,25 80:5
80:8,14,21,23
81:12,14,18 82:3
82:8,23,23 83:1,5
152:18 155:20,25
156:5,6 164:16
**varied** 22:16
**variety** 48:24
**various** 37:6
56:15,25 66:3
94:24 107:16
112:12 129:15
133:8 166:9
177:7 187:4
**vast** 21:10
**vein** 33:12 176:18
**ven** 139:18
**ventura** 139:15
**venture** 125:21
126:1 127:1
139:17,18,20

**verbal** 153:22
**verbatim** 194:11
**verify** 24:13
**veritext** 5:13
192:13 195:7,9
195:11
**version** 15:12,13
15:16,20,20 38:8
49:2 72:15 74:8
77:24
**versions** 48:18
74:23 97:3
**vicariously**
182:12
**vid** 5:13
**video** 5:6 192:12
**videoconference**
1:15 2:13 192:16
**videographer**
3:14 5:4,13,20
77:13,16 166:2,5
192:10
**videotaped** 1:15
2:13 192:16
**view** 59:24
103:10 120:13,15
120:16,22 122:21
122:21 157:1,5
**viewed** 173:4
**virtue** 81:16
**vista** 42:13
**visual** 7:11
**volunteered**
88:24
**vs** 5:8

**w**

**w** 46:5
**w00005** 4:12
**w00008** 4:12
**w00009** 4:14
**w00013** 4:14
**wait** 51:10
116:11,11
**waive** 112:8
**waived** 111:19
195:23,23
**waiver** 112:11
**waiving** 105:21
106:14 107:21
112:20 195:20
**wake** 98:11
**wakefield** 1:5,16
2:5,14 3:3 4:3,15
4:16 5:7,8 6:1,9
9:3,6,6 23:8,14
23:20 36:19
37:14 38:24 39:6
41:2,21 43:6,8
49:5 50:7,9,13
51:1,5,15 54:5,10
55:4 59:7 60:24
61:2 62:16,17
63:5,11 69:13
77:23 78:6 88:15
89:5 95:18 96:6
96:15 97:18,21
97:21 98:11,17
101:25 105:21
107:9 110:4
114:3 123:3
124:10 125:3,5
133:6,6,16,18,18
134:6 136:24

139:21 142:22,24
143:10 144:25
145:2 156:9,14
156:17,18 162:20
166:8,9 169:23
170:5,8,12,13,15
170:16 186:9,9
191:16 192:11
193:22 195:4,4
197:1,1
**wakefield's**
127:24
**wall** 164:6
**want** 60:7 65:23
115:6 125:5
126:12 145:24
146:14 162:19
165:24 173:2
177:21,24 188:8
192:3,3,7
**wanted** 32:6,17
34:15 95:1 115:8
133:7 179:6
**water** 165:5,14
165:18
**way** 12:2 23:20
32:15 35:11 37:2
52:24 58:25
69:21 73:17,25
74:4 79:13 82:22
87:21 118:11
124:24 130:22
132:3,24 142:17
171:8 186:6
**ways** 76:24
**we've** 82:12
131:17

**website** 49:11,12
  50:3 54:7 121:7
  121:11,15 133:22
  171:18,20 173:1
  173:4,13 174:4
  174:15,25 175:7
**week** 76:9
**weird** 25:7
**weiss** 158:3,3,3,6
**went** 48:23 49:9
  94:16,18 109:14
  114:22 124:25
  133:24 147:22
  149:16 187:2
**whatsoever**
  102:17,20
**whereabouts**
  139:3
**whereof** 193:13
  194:20
**whichever**
  163:22
**whoops** 76:16
**width** 33:17
**wife's** 77:3
**willfully** 169:6
**william** 185:15
**willing** 60:14
  188:23
**window** 183:17
**witness** 4:2,21
  5:21 14:17 17:19
  20:10 23:25 24:7
  31:19 40:5 50:22
  53:5,12 57:2 58:7
  59:18,20 60:12
  63:17 79:18 85:2
  93:21 98:2,6,9

99:17,20 100:14
101:6 104:14
116:10 117:4,7,9
126:10 132:15
136:17,20 137:9
137:11 139:9,18
142:24 147:18
152:25 159:1,7
161:8,10,12
165:8 173:8
188:13 189:9
190:18 191:19
193:13 194:20
195:13,16 196:2
196:5 197:24
**witnesses** 194:9
**won** 107:9,11
**wondered** 31:11
**wondering** 16:15
**wood** 164:7
**word** 170:25
  186:24
**words** 111:14
**work** 13:22 15:24
  18:13 22:2 24:12
  26:16 32:15 38:5
  41:15,21 43:8,10
  44:23 56:4,4
  58:16 59:8 66:9
  66:16 76:11
  81:10 83:11
  87:10,12 88:24
  89:7 90:19 92:1,2
  92:10 95:12
  102:3 127:15
  128:3 129:4
  142:1 164:7
  167:1,23 168:1

169:11,17 170:3
171:4 175:15
176:14 177:22
186:23
**worked** 7:19
  47:13 48:10
**working** 7:5 30:1
  30:3 83:14
  190:12
**works** 13:10
  17:23 20:14 23:1
  37:3 42:22 77:6
  95:4 111:25
  128:9 129:1
  148:22 162:17
  163:7,23 164:5
**workspaces** 2:15
**world** 141:6
  162:16
**world's** 32:1
**worth** 26:6 34:5
  152:19 155:18
**wound** 168:21
**wrap** 157:9
**write** 81:24 186:5
**writing** 65:3 66:4
  153:22
**written** 66:24
  67:9,13 89:18
**wrong** 72:24
  180:6
**wrongful** 180:6

| x |
| --- |
| **x** 4:1,9 194:16 |

| y |
| --- |

**ye** 8:21 37:11
  54:6 117:14
**yeah** 8:16,21 9:13
  10:20 16:3 26:7
  27:25 28:11 30:3
  30:3 32:11 35:4
  36:2 37:1,15 39:2
  39:12 40:20
  49:14 52:25
  57:23 59:20,23
  60:1 61:17 62:4
  68:16,16,20
  69:22 70:5 72:16
  74:2 75:11 76:7
  91:7 93:12 95:4
  96:10,20 98:3,18
  99:22 105:17
  107:9 109:20,25
  113:4 116:6
  117:7 118:20
  119:7 120:16
  121:8 124:1,25
  126:18 128:11
  129:13 132:5
  134:7,10,11,16
  138:2,8 144:21
  146:9 155:15
  156:12 161:10
  163:9,17 164:5
  165:15 178:3
  179:3 188:13,25
  191:8,23 192:6
**year** 9:16 29:5,7
  29:9,11,14 45:14
  50:3 54:15 59:13
  71:7 104:17
  105:2 122:13,14

**[year - zoom]**

149:8 157:24
187:11
**years** 7:14 8:2
13:25 16:1,18,20
17:3 18:2,17
19:18 21:4 22:2
24:18,20 27:18
27:23,24 28:13
28:22 29:17,18
29:21,23 51:20
52:19 53:4,6,17
53:25 54:17 66:3
66:21 71:17
81:23 86:23,25
94:12 103:10
104:22,23 127:16
128:4,24 129:2,5
142:25 150:11
162:13 163:11
187:13

**z**

**zao** 85:7,9
**zaven** 3:15 5:12
**zero** 29:6,8,10,12
**zip** 6:12
**zoom** 98:1

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.