Page 1

1                UNITED STATES DISTRICT COURT
2            FOR THE CENTRAL DISTRICT OF CALIFORNIA
3                     SOUTHERN DIVISION
4
5
                                    )
6    DONALD WAKEFIELD,              )
                                    )
7              Plaintiff,           )
                                    ) Case No.
8         vs.                       ) 8:21-cv-1585-CJC-DFM
                                    )
9    IGOR OLENICOFF, OLEN           )
     PROPERTIES CORP.; JOHN LIANG,  )
10   an individual, and DOES 1      )
     through 10, inclusive,         )
11                                  )
               Defendants.          )
12                                  )
                                    )
13
14
15              DEPOSITION OF DALE LYON
16                Costa Mesa, California
17             Thursday, November 17, 2022
18
19
20
21
22   Reported by:
     RAQUEL L. BROWN
23   CSR No. 10026, RPR
24   Job No. MW 5581188
25   PAGES 1 - 182

Page 2

1                UNITED STATES DISTRICT COURT
2            FOR THE CENTRAL DISTRICT OF CALIFORNIA
3                      SOUTHERN DIVISION
4
5
                                    )
6    DONALD WAKEFIELD,              )
                                    )
7               Plaintiff,          )
                                    ) Case No.
8         vs.                       ) 8:21-cv-1585-CJC-DFM
                                    )
9    IGOR OLENICOFF, OLEN           )
     PROPERTIES CORP.; JOHN LIANG,  )
10   an individual, and DOES 1      )
     through 10, inclusive,         )
11                                  )
                Defendants.         )
12                                  )
                                    )
13
14
15              Deposition of DALE LYON,
16   taken on behalf of Plaintiff at 611 Anton Boulevard,
17   5th Floor, Costa Mesa, California 92626, beginning at
18   8:57 a.m. and ending at 12:57 p.m. on Thursday,
19   November 17, 2022, before RAQUEL L. BROWN, Certified
20   Shorthand Reporter No. 10026, Registered Professional
21   Reporter.
22
23
24
25

```
                                                    Page 3

 1   APPEARANCES:

 2

 3   For Plaintiff:

 4           SMITH AMUNDSEN, LLP

 5           BY:  CHRIS O. MILLER, Attorney at Law

 6           120 South Central, Suite 700

 7           St. Louis, Missouri 63105

 8           (314) 719-3732

 9           comiller@smithamundsen.com

10

11

12   For Defendants:

13           SACHS SAX CAPLAN

14           BY:  SPENCER M. SAX, Attorney at Law

15           6111 Broken Sound Parkway NW, Suite 200

16           Boca Raton, Florida 33487

17           (561) 994-4499

18           ssax@ssclawfirm.com

19           (APPEARING REMOTELY)

20

21

22   Also Present:

23   ELANNE ZAMBRANO, Videographer

24   LYNN TRUMBOWER, Paralegal (APPEARING REMOTELY)

25
```

Page 4

1                           INDEX

2    WITNESS                               EXAMINATION

3    DALE LYON

4

5                           BY MR. MILLER          8, 177

6                           BY MR. SAX          171, 179

7

8

9                           EXHIBITS

10   MARKED              DESCRIPTION              PAGE

11   Exhibit 21      Deposition notice, 5 pgs.        10

12   Exhibit 22      Declaration of Quantum Town       27
                     Center, LLC, 2 pgs.
13
     Exhibit 23      Invoices, OLEN00073 - 75, 3 pgs.  120
14
     Exhibit 24      April 24, 2013 letter, OLEN00071 - 123
15                   72, 2 pgs.

16

17

18                       REFERENCED EXHIBITS

19   MARKED              DESCRIPTION              PAGE

20   Exhibit 3       Photos, 5 pgs.              11

21   Exhibit 4       Photos, 4 pgs.              51

22   Exhibit 5       Judgement, 2 pgs.           42

23   Exhibit 6       Declaration, 3 pgs.         61

24   Exhibit 12      Photos, 6 pgs.             148

25   Exhibit 13      Revised Art Application, 68 pgs.   73

Page 5

1    (INDEX CONTINUED.)

2                    REFERENCED EXHIBITS

3    MARKED                    DESCRIPTION                    PAGE

4    Exhibit 15      Settlement Agreement and Mutual      150
                     General Release, 7 pgs.

5
     Exhibit 16      Notice of Compliance, 4 pgs.          56

6

7

8

9

10   INFORMATION REQUESTED

11   (None)

12

13

14   QUESTIONS INSTRUCTED BY COUNSEL NOT TO ANSWER

15   Page 33/Lines 17-19
     Page 46/Lines 16-18

16   Page 58/Lines 20-21
     Page 83/Line 25 - Page 84/Lines 1-4

17   Page 117/Line 7
     Page 158/Line 21

18   Page 161/Lines 11-13
     Page 161/Lines 19-20

19

20

21

22

23

24

25

Page 6

1       Costa Mesa, California, Thursday, November 17, 2022

2                          8:57 a.m.

3

4       THE VIDEOGRAPHER:  Good morning, everyone.  We are on

5    the record.  The time is 8:59 a.m. Pacific time.  Today is

6    November 17th, 2022.

7           My name is Elanne Zambrano.  I am a video

8    technician with Veritext Legal Solutions located in

9    Los Angeles, California.

10          We are recording these proceedings at

11   611 Anton Boulevard, Costa Mesa, California.  This is the

12   video deposition of Dale Lyon in the action entitled

13   Wakefield, Donald versus Olenicoff, Igor, et al.  This

14   deposition is being taken on behalf of Plaintiffs.  The

15   case number is 8:21-cv-1585-CJC-DFM.

16          Now would you all please identify yourself and

17   who you represent starting with the noticing attorney.

18       MR. MILLER:  This is Chris Miller.  I'm the attorney

19   for the Plaintiff Donald Wakefield.

20          Spencer?

21       THE WITNESS:  Can't hear you.

22       THE VIDEOGRAPHER:  I see someone logging onto Zoom, so

23   I'm going to admit them.

24          Can you hear us?  Should we go off the record?

25       MR. MILLER:  Yeah.  If we have to.

Page 7

```
 1        THE VIDEOGRAPHER:  We're going off the record.  The

 2   time is 9:01 a.m.

 3                  (DISCUSSION HELD OFF RECORD.)

 4        THE VIDEOGRAPHER:  All right.  Good morning, everyone.

 5   We are on the record.  The time is 9:05 a.m. Pacific time.

 6   Today is November 17th, 2022.

 7             My name is Elanne Zambrano.  I'm a video

 8   technician with Veritext Legal Solutions located in

 9   Los Angeles, California.

10             We are recording these proceedings at

11   611 Anton Boulevard, Costa Mesa, California.  This is the

12   video deposition of Dale Lyon in the action entitled

13   Wakefield, Donald versus Olenicoff, Igor, et al.  This

14   deposition is being taken on behalf of plaintiffs.  The

15   case number is 8:21-cv-1585-CJC-DFM.

16             Now would you all please identify yourself and

17   who you represent starting with the noticing attorney.

18        MR. MILLER:  For Plaintiff this is Chris Miller.  I'm

19   the attorney for Donald Wakefield.

20        MR. SAX:  And Spencer Sax for the two defendants.

21        THE VIDEOGRAPHER:  Okay.  Thank you, everyone.

22             Now will the court reporter please administer the

23   oath.

24   ///

25   ///
```

Page 8

1                          DALE LYON,

2     having been administered an oath, was examined and

3     testified as follows:

4

5                    E X A M I N A T I O N

6     BY MR. MILLER:

7         Q     Good morning.  Would you state your name for the

8     record.

9         A     Dale Lyon.

10        Q     And what's your address, sir?

11        A     Work or home?

12        Q     Let's start with home.

13        A     25382 Elderwood, Lake Forest, California.

14        Q     And for work?

15        A     7 Corporate Plaza, Newport Beach.

16        Q     So you're here today as a corporate

17    representative of the Defendant Olen Properties

18    Corporation, correct?

19        A     Yes.

20        Q     I'm going to refer to that company throughout

21    this deposition as Olen.  Does that make sense?

22        A     Yes.

23        Q     Have you ever given a deposition before?

24        A     Yes.

25        Q     When's the last time you were deposed?

Page 9

1      A      Month ago.

2      Q      Month ago?

3             Was that as part as a representative of Olen?

4      A      Yes.

5      Q      Okay.  So you probably have heard these ground

6      rules before.  I want to kind of go over them a little bit

7      more.

8             The court reporter's here.  She's taking down

9      everything that me and you are saying.  I'm going to ask

10     you some questions today.  To make her life easier I'm

11     going to ask that you wait for me to finish my question

12     before giving any answer.  And if you don't, I might ask

13     you to -- you know, I might interrupt you and tell you to

14     please wait for me to finish.  I'm not trying to be rude

15     or anything.  I'm just trying to make her job easier so

16     we've got a record of, you know, what my question is and

17     then what your answer is.  Does that make sense?

18     A      Yes.

19     Q      I'm going to do my very best to do the same exact

20     thing for you so you get a chance to answer any question I

21     ask you.

22            If at any time you need a break today, let me

23     know.  The only thing I do ask is that if there's a

24     question pending, that you answer the question before we

25     take a break.  Does that sound fair?

Page 10

1      A      It does.

2      Q      And if at any time you don't understand my

3    question or it's unclear in any way, please ask me to

4    rephrase and I will.  I will assume, though, that if you

5    don't say anything that you understood my question.  Does

6    that sound fair?

7      A      Yes.

8      MR. MILLER:  Okay.  So you said earlier that you're

9    here as a corporate representative of Olen.  I want to

10   show you what's been marked as Exhibit 21, plaintiff's

11   Exhibit 21, which is the notice of deposition.

12           (Exhibit 21 was marked for identification.)

13      MR. MILLER:  I'm handing you on a copy of that.

14           And, Spencer, I previously put that up on the

15   Exhibit Share.

16      MR. SAX:  That's fine.

17   BY MR. MILLER:

18      Q      Will you please review that for a moment, sir.

19           Okay.  So have you -- before you got here today,

20   had you reviewed that notice of deposition before?

21      A      I had.

22      Q      And are you here -- are you able to testify about

23   the topics that are listed therein?

24      A      The majority of them, I think, yes.

25      Q      Are there any topics that you are not prepared to

Page 11

1    testify about today?

2         A     Well, why don't you ask me questions about them

3    and I'll see if I can answer your questions.

4         Q     Well, after looking at all of them, is there any

5    of them that you're not able to testify as the corporate

6    representative of Olen about today?

7         MR. SAX:  Just so you know -- let me just pose an

8    objection.  There's a -- objections that we had filed

9    through discovery of various things including financial

10   information.  So, Chris, you really will need to go

11   through each one in order to elicit his testimony as to

12   what he can testify to on each one.

13   BY MR. MILLER:

14        Q     Okay.  So, Mr. Lyon, how about you go through

15   each one of these and tell me which numbers of topics

16   you're not prepared to testify about today.

17        A     Well, no. 1, those are the facts that were filed

18   by Wakefield and not by Olen, so I don't see how that is

19   really ours to answer.

20        Q     Sir, have you reviewed the complaint filed in the

21   instant case?

22        A     I have.

23        Q     And are you prepared to testify about the facts

24   that are alleged in that complaint as far as Olen's aware?

25        A     I can.

```
                                                  Page 12

 1      Q     Okay.  Any other topics that you don't believe

 2   you can testify to today on behalf of Olen?

 3      A     Well, let me read each one for you and -- I'll

 4   read them to myself and give you an answer.  Really, some

 5   of these, it all depends on the questions you ask whether

 6   I have knowledge of them or not.

 7      Q     But is there any particular topics that as you

 8   sit here today you can say you're not able to testify

 9   about as -- on behalf of Olen?

10      A     Other than if my attorney objects and -- but I --

11   I'll make an attempt to give you the -- the honest answers

12   that I have -- and knowledge that I have about them.

13      Q     Okay.  So I mentioned this earlier, but you are

14   here as a representative of Olen today and I want to make

15   sure that you understand that when I ask you if you have

16   knowledge of something, I'm asking you if Olen has

17   knowledge of something.  So if you say I don't know, that

18   means that Olen doesn't know.  Does that make sense?

19      MR. SAX:  I just want to state something for the

20   record.  I have offered up Mr. Olenicoff as the corporate

21   representative which your partner would not agree, so

22   Dale's going to testify to what he knows.  Igor's already

23   given his deposition as to what he knows.  I just want to

24   make sure the record is clear on that.

25      MR. MILLER:  Well, no.  I don't think the record is
```

1    clear on that because this is a deposition of Olen's

2    corporate representative.  It's not a deposition of

3    Mr. Lyon and his particular knowledge.  It's a deposition

4    of the representative of Olen who knows about the topics

5    listed in the notice.  And if Mr. Olenicoff is the only

6    person at Olen that's aware of some of these topics, is

7    the only one capable of testifying on behalf of Olen for

8    those topics, then he should have been designated as a

9    representative for those particular topics.

10        MR. SAX:  I attempted to.  You deposed him and I

11   offered him up as the corporate rep.  If you don't want to

12   accept that, then Dale doesn't need to give his

13   deposition; we'll stand by Mr. Olenicoff's deposition as

14   the corporate.

15        MR. MILLER:  That's not how it works.  That's not how

16   the Federal Rules of Civil Procedure are allowed to be.

17   You can't say that I'm just here for a deposition of

18   myself and for the corporation.

19             We're entitled to take a separate deposition of a

20   corporate representative.  You've produced Mr. Lyon here

21   today.  If he's unable to answer on behalf of the

22   organization on something, then we'll find that out today.

23   But as far as I'm aware, the designated corporate

24   representative for Olen is Mr. Lyon and he's going to be

25   testifying today on all the topics listed on the notice.

Page 14

```
 1        MR. SAX:  To the best of his knowledge, sure.

 2        MR. MILLER:  Just as any other witness.

 3        MR. SAX:  Just as any other witness.

 4   BY MR. MILLER:

 5        Q     Mr. Lyon, as I was mentioning, you're here on

 6   behalf of Olen today and when I am asking you questions,

 7   it's not just in your personal knowledge but in Olen's

 8   organizational knowledge.  And so at various times I might

 9   ask -- if you say I don't know something, I might ask you

10   following up does anybody else at Olen know and that's

11   because again you're here as a representative of Olen.

12   Does that make sense?

13        A     That makes sense.

14        Q     Okay.  So when you say I don't know, that means

15   that nobody else at Olen knows either, right?

16        A     Unless I clarify and say there could be someone

17   else.

18        Q     Okay.  What'd you do to prepare for this

19   deposition in advance?

20        A     Other than talk with our attorneys?

21        Q     Other than talk to your attorneys.

22        A     I reviewed documents.

23        Q     Which documents?

24        A     Um, most of the documents that are referenced

25   here in this notice.
```

Page 15

1     Q     Did you review any other documents?

2     A     No.

3     Q     Did you speak with any employees of Olen?

4     A     No.

5     Q     Did you speak with Mr. Olenicoff?

6     A     Not about my testimony today.

7     Q     Did you speak with him about this lawsuit?

8     A     Um, not really, no.

9     Q     Have you ever spoken to Mr. Olenicoff about this

10    lawsuit?

11    A     This one or the previous ones?  I've -- I've been

12    involved with them all along, so we have talked, yes.

13    Q     What about this particular lawsuit?

14    A     Just in passing.

15    Q     And when was that?

16    A     When it was filed when, um -- you know, told him

17    that I was -- Spencer wanted to notice me as the -- we

18    just talked about that.

19    Q     Okay.  So I want to turn your attention to topic

20    no. 10, which is -- well, let's back up for a moment here.

21          Olen is a corporation.  Where's it headquartered

22    at?

23    A     Um --

24    MR. SAX:  Object to form.

25          But you can answer the question.

Page 16

1       THE WITNESS:   7 Corporate Plaza, Newport Beach.

2    BY MR. MILLER:

3       Q       What's your particular title within the

4    corporation?

5       A       I'm the senior vice president of construction.

6       Q       How long have you had that title?

7       A       20 years.

8       Q       20 years?

9               Do you know how many employees Olen has?

10      A       Um, probably around 400.

11      Q       Okay.   And, those employees, are they in charge

12   of managing and operating all of Olen's various

13   properties?

14      A       I'm sorry.   I have to clarify that answer that

15   Olen has a management company that does -- and everyone

16   including myself gets paid by and works for.   And so,

17   Olen, I'm not sure if from a legal answer is the employee.

18   So Realty Services Corp. is the management of all the --

19   and hires and pays all the employees.

20      Q       So Olen itself has no employees?

21      A       That's my understanding, yes.

22      Q       You're not an employee of Olen then?

23      A       No.

24      Q       Realty Management Services?   Is that what you

25   said that company's name is?

```
                                                    Page 17

 1        A       Realty Services Corp.

 2        Q       That's a subsidiary of Olen?

 3        A       Yeah.  Olen would be considered the parent, yeah.

 4        Q       And that's who you've been employed by for the

 5   last 20 or so years you said?

 6        A       I've been employed by an Olen entity for

 7   43 years, but the title I have is probably employee,

 8   20 years.

 9        Q       Your title senior vice president, that is with

10   Olen?

11        A       Um, yeah.  Yeah.  And other entities.  Yeah.

12        Q       So I want to ask you a couple of questions about

13   those other entities.  Before I do, I guess, help me

14   understand this.

15               Olen owns and operates properties throughout the

16   country, correct?

17        A       Well, many of the properties are under different

18   corporate names and different corporate identities, so

19   Olen isn't always the owner or the manager of those

20   properties.

21        Q       How about this then:  Olen through its subsidiary

22   companies owns and manages properties throughout the

23   country; is that true?

24        A       That's probably accurate, yes.

25        Q       And those total properties, that's a -- that Olen
```

Page 18

1    or its subsidiaries manages or owns, that's over 8 million

2    square foot of property, right?

3        A    Well, I think it's closer to, you know, probably

4    6 million in the office portfolio and then, you know, 16,

5    17,000 apartments.

6        Q    So you know that based on your duties and your

7    employment at Olen, right?

8        A    Yes.

9        Q    And --

10       A    Again I work for the --

11       Q    Sorry.  I'm not trying to trick you on that.

12            You know that based on your time with Olen and

13   its subsidiaries?

14       A    Yes.

15       Q    So who -- does Olen assign a particular employee

16   or a particular -- is there a particular employee or

17   worker -- strike all that.

18            Who manages each specific property within Olen or

19   any of its subsidiary entities?

20       MR. SAX:  Object to form.

21            But you can answer if you can.

22       THE WITNESS:  Each property has a property manager and

23   some properties have -- that property manager may have,

24   you know, several properties.

25   ///

Page 19

1    BY MR. MILLER:

2         Q     Okay.  Are you a property manager for any of

3    Olen's properties?

4         A     I am not.

5         Q     Okay.  But somebody at Olen could figure out who

6    is each particular manager for each particular property?

7         A     Yes.

8         Q     Okay.  One of the properties that is included in

9    Olen's portfolio is Quantum Town Center located in

10   Boynton Beach, Florida, correct?

11        A     Yes.

12        Q     Okay.  And who is the property manager for that

13   particular property?

14        A     Oh, that's a lady.  Her name is Cecelia.

15        Q     Cecelia?  What's her last name?

16        A     I couldn't tell you.  I know her as Cecelia.

17        Q     Who does Cecelia report to?

18        A     She would report most likely to Natalia Ostensen.

19        Q     Who is Natalia Ostensen?

20        A     She is the president of Olen Properties and other

21   entities.

22        Q     Is that the highest ranking official or company

23   officer for Olen?

24        A     Yes.

25        Q     Okay.  And before she was the president,

Page 20

1    Igor Olenicoff was the president of Olen, correct?

2        A    Yes.

3        Q    When did he stop becoming president -- strike all

4    that.

5             When did Mr. Olenicoff cease being president of

6    Olen?

7        A    I don't know the exact time.  I don't know a

8    date.

9        Q    Do you have an estimate of -- was it decades ago?

10   Years ago?  Months ago?

11       A    Years ago.

12       Q    And do you report directly to the president of

13   Olen?

14       A    I do.

15       Q    Okay.  And how long have you reported directly to

16   the president of Olen?

17       A    Well, I think each -- she came into the business,

18   you know, into the Olen companies, you know, and she was

19   always the heir apparent.  So I've always reported to her

20   and Igor when he was president.

21       Q    So it's my understanding that Ms. Ostensen is

22   Mr. Olenicoff's daughter.  Is that correct?

23       A    Yes.

24       Q    Okay.  And you're saying that you've always

25   reported to either him or her?

Page 21

1      A      Yes.

2      Q      And how many employees report to you directly?

3      A      Well, you know, I said because of my tenure there

4   and my longevity and position, um, I would say a lot to

5   across the board, but in my department alone it's probably

6   around 14.

7      Q      14.

8             When Mr. Olenicoff was president of Olen, did he

9   report to anybody else in the organization?

10     A      No.

11     Q      Okay.  And does Ms. Ostensen report to anybody

12  else in the organization?

13     A      No.

14     Q      Is Mr. Olenicoff currently involved in the -- in

15  Olen's day-to-day operations?

16     A      I would say, you know, yes, he is.  You know, he

17  goes by founder and, you know, certainly he is a

18  consultant and -- and his time is, you know -- and

19  expertise is utilized.

20     Q      And what expertise is that?

21     A      Real estate development.

22     Q      Because that's the kind of company Olen is;

23  they're a real estate development company.  Is that fair

24  to say?

25     A      Yes.  We build, own, manage real estate.

Page 22

1      Q      So when we talk about the Olen portfolio, that's

2    the real estate that Olen either through itself or its

3    subsidiaries builds, owns, and manages, right?

4      A      And purchases, yes.

5      Q      So as part of Olen's operations, Olen obtains

6    occupancy permits from various municipalities for these

7    properties in its portfolio, correct?

8      A      If it was built by Olen or built by a general

9    contractor, they would.  Or if it was already an existing

10   property that was purchased, they would already be in

11   place.

12     Q      Is it important for Olen to have occupancy

13   permits for the properties in its portfolio?

14     A      Yes.

15     Q      Why?

16     A      So you can occupy the building.

17     Q      Why is it important to occupy the building?

18     A      We gain rents.

19     Q      So you can collect rent from each property?

20     A      Correct.

21     Q      Would you say that obtaining and maintaining

22   occupancy permits is essential to Olen's business?

23     A      It is.

24   MR. SAX:  Object to form.

25            But you can answer.

```
                                                Page 23
 1        THE WITNESS:  It is.
 2    BY MR. MILLER:
 3        Q     You understand that this is a lawsuit about
 4    copyright infringement claims, right?
 5        A     Yes.
 6        Q     And you're familiar with my client Don Wakefield,
 7    correct?
 8        A     I know his name.  I'm not familiar with him.
 9        Q     Okay.  But you are aware that he's previously
10    filed lawsuits against Olen for copyright infringement,
11    correct?
12        A     Yes.
13        Q     And you testified at the first of those lawsuits,
14    right?
15        A     I did.
16        Q     And you're aware that a jury found that Olen
17    infringed on his copyright, correct?
18        A     They did.
19        Q     And that jury awarded him $450,000 in damages,
20    correct?
21        A     You know, I believe that's the number.
22        Q     And the court in that case ordered Olen to
23    destroy all of the infringing works, correct?
24        A     Yes.
25        MR. SAX:  Object to form, document speaks for itself.
```

Page 24

1          But you can answer if you can.

2      THE WITNESS:  Yeah.  They gave us a list and we did

3  that.

4  BY MR. MILLER:

5      Q     A list of infringing works to destroy, correct?

6      A     It was a list that gave locations and infringing

7  works.

8      Q     Okay.  And Olen was ordered to destroy all the

9  infringing works, is that correct, in that --

10     MR. SAX:  Same objections, object to form.

11     THE WITNESS:  Yes.  Sorry.

12  BY MR. MILLER:

13     Q     Let's -- let's get back to that in a moment.  I

14  want to talk to you first about topic 10 now which was the

15  retail and residential complex referred to as Quantum Town

16  Center.

17          You're familiar with Quantum Town Center,

18  correct?

19     A     Yes.

20     Q     And what is it?

21     A     It's a retail center with some mixed use

22  apartments.

23     Q     It's part of Olen's portfolio, correct?

24     A     If we can continue to say that, you know, Olen

25  and its entities and -- if you want to keep saying Olen,

```
                                                    Page 25
 1    then that -- I'll go with that.
 2         Q     Well, I'm just trying to clarify that Quantum
 3    Town Center is part of Olen's portfolio.
 4         A     The overall company, yeah.
 5         Q     And where is Quantum Town Center located?
 6         A     Boynton Beach, Florida.
 7         Q     Is Quantum Town Center among the properties
 8    that -- strike all that.
 9               I believe you said earlier that an individual
10    named Cecelia is the manager for Quantum Town Center.
11         A     Yes.
12         Q     And --
13         A     The retail side of it.  She's not the manager of
14    the residential side, though.
15         Q     Who is the manager of the residential side?
16         A     I don't remember her name.
17         Q     Does Cecelia report to you?
18         A     No.
19         Q     Does anybody at Quantum Town Center report to
20    you?
21         A     You know, I have -- there's a construction
22    manager who, you know, works around that area that reports
23    to me and, you know, others in the company.
24         Q     Who is that?
25         A     His name is John Lyon.
```

```
                                              Page 26

1      Q    Any relation?

2      A    No.

3      Q    You said John's a construction manager?

4      A    Yes.

5      Q    Does John have a Olen email address?

6      A    He does.

7      Q    And that email address -- strike that.

8           You have an Olen email address, as well, right?

9      A    I do.

10     Q    That ends with @olen.com?

11     A    It does.

12     Q    So does John's?

13     A    It does.

14     Q    So you could reach out and contact John whenever

15  you need to as part of your job?

16     A    I can.

17     Q    And what about Cecelia?  Does she have an Olen

18  email address?

19     A    Um, I'm not sure if hers ends in olen.com or --

20  or another Olen, but she has an email address that is

21  accessible.

22     Q    And that's something that either you or somebody

23  else in charge at Olen can access and contact her with,

24  right?

25     A    Yes.
```

1       Q      Okay.   Was -- how long has Cecelia been the

2   manager of Quantum Town Center?

3       A      Several years.

4       Q      Would that be dating back all the way to 2014?

5       A      Um, I'm not sure about that.

6       Q      Okay.   I want to turn your attention to --

7              Let me mark this on Exhibit Share.

8       MR. SAX:   And off the record for one second.   We can

9   keep the video running.

10                      (DISCUSSION HELD OFF RECORD.)

11      MR. MILLER:   Why don't we go off the record for a

12  second.

13      THE VIDEOGRAPHER:   We're going off the record.   The

14  time is 9:30 a.m.

15                           (BRIEF RECESS.)

16      THE VIDEOGRAPHER:   We're going on the record.   The

17  time is 9:32 a.m.

18          (Exhibit 22 was marked for identification.)

19  BY MR. MILLER:

20      Q      Mr. Lyon, I'm handing you what's been marked as

21  Exhibit 22.   At the time top of page 1 it is titled

22  Declaration of Quantum Town Center, LLC.   Do you see that?

23      A      I do.

24      Q      All right.   I want you to review Exhibit 22 for a

25  moment and let me know when you're ready to answer some

Page 28

1   questions about it.

2       A    I'm ready.

3       Q    All right.  Mr. Lyon, what is Quantum Town

4   Center, LLC?

5       A    It's a LLC corporation that Olen is the managing

6   member.

7       Q    And this is a declaration that you signed on

8   behalf of Quantum Town Center, LLC, correct?

9       A    Yes.

10      Q    On the bottom of page 2, that's your signature,

11  correct?

12      A    It is.

13      Q    And right below that it says that you're Quantum

14  Town Center, LLC's, authorized representative; is that

15  correct?

16      A    Yes.

17      Q    Do you remember signing this declaration?

18      A    Not really, no.

19      Q    You don't doubt that you did sign it, though,

20  correct?

21      A    Correct.

22      Q    Looking at it now are you familiar with the facts

23  in this declaration?

24      A    Yeah.  Yes.

25      Q    Okay.  Did you personally write this declaration?

```
                                              Page 29

 1      A      No.

 2      Q      Do you know who wrote this declaration?

 3      A      No.

 4      Q      Okay.  Before you signed this declaration -- I

 5   guess -- strike that.

 6             Do you believe that you read this declaration

 7   before signing it?

 8      A      I'm sure I did.

 9      Q      And why is that?

10      A      It makes sense that I would read it before I

11   signed it.

12      Q      But why would you read something before you

13   signed it?

14      A      Well, if I was signing it and -- and saying that

15   that -- items that were contained in it were -- were

16   accurate, then I would read them.

17      Q      You wouldn't want to sign a declaration without

18   knowing if the statements therein were true, correct?

19      A      Yes.

20      Q      And if you saw something in a declaration that

21   you weren't sure about, would you look into that further

22   before signing it?

23      A      If I --

24   MR. SAX:  Object to form.

25             But you can answer the question.
```

Page 30

```
 1        THE WITNESS:  If I saw something, then yes.  I hope I
 2    would.
 3    BY MR. MILLER:
 4        Q    Okay.  So did you investigate any of the facts
 5    listed in this declaration before signing it?
 6        MR. SAX:  Object to form.
 7             You can answer if you can.
 8        THE WITNESS:  I don't think I did.
 9    BY MR. MILLER:
10        Q    Okay.  And why didn't you?
11        A    I didn't see anything that I had a problem with.
12        Q    And when you say that you didn't see anything you
13    had a problem with, what does that mean?
14        A    Well, as I said, you know, I felt it was
15    accurate, so I signed it.
16        Q    Did you know it was accurate?
17        A    I thought it was accurate.
18        Q    And if you didn't think it was accurate, you
19    wouldn't sign it?
20        MR. SAX:  Object to form.
21             You can answer.
22        THE WITNESS:  At the time, no.  Yeah.  I wouldn't sign
23    it if I thought it was inaccurate.
24    BY MR. MILLER:
25        Q    Because you'd agree with me that it would be
```

```
                                                        Page 31
 1    wrong to sign a declaration without knowing whether its
 2    contents were true, correct?
 3         MR. SAX:  Object to form.
 4         THE WITNESS:  To the best of my knowledge --
 5         MR. SAX:  You can answer it if you can.
 6         THE WITNESS:  Yeah.  To the best of my knowledge I
 7    signed this thinking everything was correct.
 8    BY MR. MILLER:
 9         Q    Well, my question, though, is, you would agree
10    with me that it is wrong to sign a declaration without
11    knowing whether the contents of that declaration are true
12    or false, correct?
13         MR. SAX:  Object to form.
14              You can answer it if you can.
15              Sorry.  Asked and answered.
16              But you can try it again.
17         THE WITNESS:  Same answer.  I -- at the time if I
18    thought they were correct, I signed it.
19    BY MR. MILLER:
20         Q    All right.  Let me maybe ask this way:  Are you
21    telling the jury that you don't know if it's wrong to lie?
22         A    Is there a jury here?
23         MR. SAX:  Object to form, argumentative.  Oh, my God,
24    is that objectionable.
25              Dale, you can answer it again if you want.
```

Page 32

1      THE WITNESS:  Is there a jury here I'm talking to?

2    BY MR. MILLER:

3      Q     Sir, is it wrong to lie, yes or no?

4      A     I think it's wrong to lie.

5      Q     And is it wrong to sign a declaration without

6    knowing if it's true or false?

7      MR. SAX:  Same objection.

8              You can answer if you can.

9              Object to form.

10     THE WITNESS:  I would say yes.

11   BY MR. MILLER:

12     Q     Okay.  I want to talk about the contents of this

13   declaration a little bit.  Can you turn your attention to

14   paragraph 8?

15     MR. SAX:  Can you scroll down to 8 so I can see it?

16   Thank you.

17   BY MR. MILLER:

18     Q     It says On information and belief Olen Properties

19   Corp. intends to call the following witnesses, all of whom

20   are residents of Florida and necessary for the defense of

21   this action:  A, Igor Olenicoff, B, Current City of

22   Boynton Beach Planning Department record custodia, C,

23   Quantum Town Center Property Manager Cecelia Aruaz, D,

24   Previous property manager of Quantum Town Center

25   Robert Jones, and, E, Custodial staff of Quantum Town

```
                                                    Page 33
 1    Center.

 2            Do you see that?

 3      A     I see that.

 4      Q     All right.  Have you ever spoken with any of the

 5    people listed in paragraph 8 about this lawsuit?

 6      A     I have not.

 7      Q     Okay.

 8      A     Well, Igor I've talked to.

 9      Q     And we've already discussed all that you've

10    talked to Igor about about this lawsuit?

11      A     Yes.

12      Q     Do you know anybody at the Boynton Beach Planning

13    Department?

14      A     I know people there.

15      Q     Do you know their record custodian?

16      A     No.

17      Q     Okay.  Do you know of anybody in the planning

18    department that Olen intends to call as a witness at trial

19    in this lawsuit?

20      MR. SAX:  Object to -- you know what?  You're getting

21    into attorney/client communications.  I'm not going to

22    have him answer that.  It's also work product.

23            So, no.  I instruct you not to answer that

24    question, Dale.

25    ///
```

1    BY MR. MILLER:

2         Q     Mr. Lyon, are you following your attorney's

3    advice and refusing to answer the question?

4         MR. SAX:  You can bet and don't you dare ask him that

5    question again.

6         MR. MILLER:  I'm just asking so that I can move on.

7         MR. SAX:  No.  No.  You can move on once I've already

8    instructed him not to answer.  You don't have to read him

9    the riot act.

10        MR. MILLER:  Fair enough.

11        Q     Sir, paragraph 8C mentions Quantum Town Center

12   property manager Cecelia Aruaz.  Is that the same Cecelia

13   you had mentioned earlier?

14        A     Yes.

15        Q     Okay.  Is that her last name right there?

16        A     I really don't know her last name.

17        Q     Oh, okay.  And you said you don't remember how

18   long she's been the property manager?

19        A     Correct.

20        Q     Okay.  Before she was the property manager of

21   Quantum Town Center, was Robert Jones the property

22   manager?

23        A     Yes.

24        Q     Okay.  Was there any other property managers

25   in-between Mr. Jones and Ms. Aruaz?

Page 35

```
 1      A     No.
 2      Q     Then the last one is custodial staff of Quantum
 3   Town Center.  Do you know any of the names of the
 4   custodial staff of Quantum Town Center?
 5      A     I don't.
 6      Q     Is that a reference to like the janitorial staff?
 7      A     Um, no.  I think they have porters and -- and
 8   people that work directly for like Cecelia now.  Not --
 9   not -- janitorial would be an outside company.
10      Q     So, the custodial workers, would they be in
11   charge of the grounds at Quantum Town Center?
12      A     Yes.
13      Q     So would they be in charge of removing sculptures
14   from the grounds if that came to be?
15      A     Yes.
16   MR. SAX:  Object to form.
17            But you can answer it.
18   BY MR. MILLER:
19      Q     Is that who's also responsible for installing
20   sculptures on the property?
21   MR. SAX:  Object to form as to word responsible.
22            You can answer if you can.
23   THE WITNESS:  I don't know who installed them.
24   BY MR. MILLER:
25      Q     You agree with me that there are sculptures that
```

Page 36

1    are installed at Quantum Town Center, correct?

2         A    Yes.

3         Q    Those are publicly displayed on the property?

4         A    Yes.

5         Q    Okay.  They're publicly displayed on the property

6    in order to obtain a occupancy permit for Quantum Town

7    Center, correct?

8         MR. SAX:  Object to form.

9              You can answer if you can.

10        THE WITNESS:  Yes.

11   BY MR. MILLER:

12        Q    Okay.  And when were they installed on the

13   property?

14        A    I would imagine that, um, they started probably

15   in the 2008 era thereabouts and several pieces have been

16   added since probably up until '13, 2013.

17        Q    Okay.  And were you involved at all in the

18   installation of any sculptures at Quantum Town Center?

19        A    No.

20        Q    Who was?

21        A    Um, the original was probably a guy named

22   Steve Fike and later on Alfred Lafave.

23        Q    Let's start with Mr. Fike.  What was -- was he an

24   employee of Olen?

25        A    Well, there again we're going to say he was an

```
                                                    Page 37
 1   employee of, right?  So, yeah.  He was the VP of
 2   construction in the Florida region.
 3       Q    And he had an Olen email address?
 4       A    Yes.
 5       Q    And how long was he the VP of construction?
 6       A    Several years.
 7       Q    Do you know when he stopped being the VP of
 8   construction?
 9       A    I don't, um, recall that date but probably in
10   that 2013.  '12, '13, somewhere in there.
11       Q    All right.  And you mentioned another individual,
12   Alfred Lafave?
13       A    Yes.
14       Q    What was his role at Olen?
15       A    He was a VP, also, of construction.  He replaced
16   Fike.
17       Q    Replaced Fike.  Okay.
18            And he also, I assume, then had an Olen email
19   address.
20       A    He did.
21       Q    And who did he report to?
22       A    I mean, ultimately it would come up to me, but
23   they were very self-sufficient.  They were over there in
24   Florida.  I was here in California.
25       Q    Would -- could you give him directions, you know,
```

1    or directives in the course of his performance of his

2    duties as VP of construction?

3         A     I could.

4         Q     So if you -- strike that.

5               How often would you speak to Mr. Lafave?

6         MR. SAX:  What year are we talking about, Chris?

7         MR. MILLER:  That's a good question.

8         Q     When -- how long was Mr. Lafave the VP of

9    construction?

10        A     Several years.

11        Q     Do you know when he stopped?

12        A     Maybe six years ago, seven years ago.

13        Q     He's no longer with the company?

14        A     He's no longer with the company.

15        Q     Was he replaced by somebody else?

16        A     He had a junior guy that worked under him and

17   then, um, John Lyon came on.

18        Q     Okay.  So while Mr. Lafave was the VP of

19   construction, he reported to you.  Do you know how often

20   generally you spoke with him during his time with the

21   company?

22        A     I gave him advice and talked to him, you know, in

23   his -- beginning when he first came on and probably a lot

24   more then, you know, later on.

25        Q     Okay.  So back in 2014, for example, was that a

Page 39

1   time when you were talking to him regularly?

2        A     No.

3        Q     What about 2013?  Were you talking with him

4   regularly?

5        A     No.

6        Q     Okay.  So when did you -- do you know when you

7   stopped talking to him regularly?

8        A     I don't.  I mean, I'm not saying I didn't talk to

9   him during that time, but it was very intimate.

10       Q     What does that mean, intimate?

11       A     Intermittent.  It wasn't on a regular basis.

12       Q     Intermittent.  Okay.  I'm sorry.

13             So -- but if you wanted to, you could email him

14   at any time during his employment?

15       A     I could.

16       Q     Okay.  Let's talk about topic no. 4, the

17   permanent injunction entered against Olen in Wakefield I.

18   Now, we've talked a little bit already about the prior

19   lawsuits my client has filed against Olen.  I'm going to

20   refer to the very first one as Wakefield --

21       A     Sorry.  What number are we looking at?

22       Q     Topic 4.

23       MR. SAX:  Chris, can you take down that screen?  I

24   think that's the confusing part.

25       THE WITNESS:  Sorry.  We moved to --

Page 40

1        MR. MILLER:   No problem.

2        MR. SAX:   Yeah.   Okay.   So we're back to Exhibit 21.

3    I'm sorry, Chris.   What was the question?

4    BY MR. MILLER:

5        Q      I'm going to pull it up and share it from my

6    screen for you on Exhibit 21.   Topic no. 4 is the

7    permanent injunction entered against Olen in Wakefield I.

8    Do you see that?

9        A      I do.

10       Q      So we talked about this a little earlier, but,

11   the first lawsuit that my client filed against Olen, I'm

12   going to refer to it as Wakefield I.   Does that sound

13   right?

14       A      Yes.

15       Q      Okay.   And that went to a trial that you

16   testified at, correct?

17       A      Yes.

18       Q      Okay.   And after trial was concluded, a permanent

19   injunction was entered against Olen, correct?

20       A      Yes.

21       Q      When did you first learn about the permanent

22   injunction?

23       A      Probably shortly thereafter it was issued.

24       Q      Olen was served with it, right?

25       A      Yes.

Page 41

1      Q     And the permanent injunction prohibited Olen from

2   infringing on Mr. Wakefield's sculpture Untitled, correct?

3      MR. SAX:  Objection, form, the document speaks for

4   itself.

5           You can answer to the best of your knowledge.

6      THE WITNESS:  You know, as I sit here, I'm not sure

7   what the verbiage was.  But the thing I was -- I have read

8   it, so I really don't recall what -- all the exact

9   language in it.

10      MR. MILLER:  Fair enough.

11      Q     And before I show a copy of it to you, I want to

12   ask you if you're aware that Mr. Wakefield's copyrighted

13   sculpture that was issued in that case was called

14   Untitled.  Are you aware of that, sir?

15      A     Is that the one we know as many -- Nature's Many

16   Faces?

17      Q     Let's start just with Untitled.  If you're

18   unaware of exactly which one that is, that's okay.  I'm

19   just trying to understand if you do or not.

20      A     Yeah.  There were two, so I'm trying to put the

21   two together here.

22      Q     So the first one you're referred to is Human

23   Nature's Many Faces?

24      A     I think that's what it was called, yes.

25      Q     And that was a sculpture that Olen had displayed

Page 42

1    on its properties in California, correct?

2        A      Yes.

3        Q      And there's another sculpture called a A Tear

4    Must Fall, correct?

5        A      Yes.

6        Q      There's another sculpture that Olen displayed on

7    its properties in California, correct?

8        A      Yes.

9        Q      All right.  So you're aware that Olen was ordered

10   to destroy all copies of Human Nature's Many Faces and A

11   Tear Must Fall, correct?

12       MR. SAX:  Object to form, document speaks for itself.

13             You can give him your understanding, your best

14   recollection or whatever you want to do.

15       THE WITNESS:  Right.  I was -- the attorneys at the

16   time had given me a list after the injunction and that

17   list were the ones that we destroyed, took down and

18   destroyed.

19       MR. MILLER:  All right.  Let's -- I have another

20   exhibit for you, sir.  One moment.

21             Spencer, I'm sharing this with you now.  It's

22   already been marked as plaintiff's Exhibit 5.

23       MR. SAX:  And I can see it.  Thank you.

24   BY MR. MILLER:

25       Q      Sir, I'm handing you what has been marked as

```
 1    plaintiff's Exhibit 5.  Can you review that for a moment
 2    and let me know when you're ready to answer some
 3    questions?
 4        MR. SAX:  Chris, you're saying it's marked Exhibit 5,
 5    but I have it as 20.  But go ahead.
 6        MR. MILLER:  This is from --
 7        MR. SAX:  I have it marked in my -- mine as
 8    Exhibit No. 20.  But that's fine.  As long as you got a 5
 9    sticker on it, we'll call it 5 today.
10    BY MR. MILLER:
11        Q    Are you ready, sir?
12        A    Yes.
13        Q    All right.  Exhibit 5 is the permanent injunction
14    that was entered against Olen in Wakefield I; is that
15    correct?
16        A    Yes.
17        Q    And Olen was served with a copy of this permanent
18    injunction, correct?
19        A    Yes.
20        Q    Okay.  And the permanent injunction orders Olen
21    to destroy all copies of Human Nature's Many Faces and A
22    Tear Must Fall, correct?
23        MR. SAX:  Object to form, document speaks for itself.
24    And I'm just going to have a continuing objection in any
25    categorization that you make of this document.
```

Page 44

```
 1            But go ahead, Dale.  You may answer the best that
 2    you can.
 3         THE WITNESS:  That's what it says.
 4    BY MR. MILLER:
 5         Q    And did you send a copy of this injunction out to
 6    Mr. Lafave?
 7         A    No.
 8         Q    Whose responsibilities at Olen was it to remove
 9    all of Human Nature's Many Faces and A Tear Must Fall?
10         MR. SAX:  Object to form.
11              But you can answer.
12         THE WITNESS:  It was mine.
13    BY MR. MILLER:
14         Q    And was it also your responsibility to destroy
15    all of Human Nature's Many Faces and A Tear Must Fall?
16         MR. SAX:  Object to form.
17         THE WITNESS:  I'm sorry.  Can you repeat that?
18         MR. MILLER:  Yeah.
19         Q    Was it also your responsibility to destroy all
20    copies of Human Nature's Many Faces and A Tear Must Fall?
21         MR. SAX:  Same objection.
22         THE WITNESS:  The ones that we knew about, yes.
23    BY MR. MILLER:
24         Q    Okay.  Is it your -- you say the ones we knew
25    about.  Does this permanent injunction say anything about
```

Page 45

1   destroying all of -- all copies of Human Nature's Many

2   Faces and A Tear Must Fall that Olen knows about?

3       MR. SAX:  Object to form, document speaks for itself.

4           But you can answer.

5       THE WITNESS:  It says all and if I didn't know about

6   them, then I couldn't take them down and destroy them.  So

7   these are the ones that we were given -- eventually given

8   a list on properties in California that we did comply

9   with.

10  BY MR. MILLER:

11      Q    Okay.  But this permanent injunction doesn't list

12  out all the places where Human Nature's Many Faces and A

13  Tear Must Fall was located, correct?

14      MR. SAX:  Objection, document speaks for itself.

15          You can answer again to however you want.

16      THE WITNESS:  Certainly the -- the subject A Tear Must

17  Fall and Many Faces and the ones that were part of this

18  lawsuit were very clear where they were located and we did

19  comply.

20  BY MR. MILLER:

21      Q    Sir, my question was, does this permanent

22  injunction list out all the locations where Human Nature's

23  Many Faces and A Tear Must Fall needed to be removed and

24  destroyed?

25      MR. SAX:  Same objection, asked and answered.

Page 46

1           You can do it again if you'd like.

2       THE WITNESS:  There again the ones that I knew about

3    we destroyed.

4    BY MR. MILLER:

5       Q     Sir, that's not my question.  My question was --

6       A     Well, that's my answer.

7       Q     -- does the permanent injunction tell you the

8    location of the ones that need to be removed, yes or no?

9       MR. SAX:  Okay.  Let me -- hold on.  Hold on.

10           First, object to form, document speaks for

11    itself.

12           Dale, give it a third shot and after that I'll

13    instruct you not to answer.  Go ahead.

14       THE WITNESS:  I'm sticking with my answer.

15    BY MR. MILLER:

16       Q     You're not willing to say whether or not this

17    order says where all the locations were of the sculptures

18    that needed to be destroyed?

19       MR. SAX:  Same objection, document speaks for itself.

20    It's argumentative.

21           So, Dale, I'll instruct you not to answer.

22       MR. MILLER:  I'm sorry.  I've granted you and you've

23    already taken on the record an ongoing objection to that.

24    I'm not sure what interrupting every time I ask a question

25    about it does for him.  I think it's very simple.

Page 47

1        Q      Let me ask it this way, Mr. Lyon:  Do --
2   let's strike that.
3              You said that it was your responsibility to
4   destroy all of the copies known as Human Nature's Many
5   Faces and A Tear Must Fall after this order was entered,
6   right?
7        A      Yes.
8        MR. SAX:  Object to form.
9              You can answer.
10       THE WITNESS:  Yes.
11   BY MR. MILLER:
12       Q      And what did you do to do that?
13       A      Um, well, there are other court actions that took
14   place that -- before that happened and, um, there was a
15   very definitive list of what we were to do.  And my
16   knowledge of being, you know, at trial -- testifying at
17   trial, there was a very clear list of properties,
18   locations, and the two pieces.
19       Q      Okay.  So my question is, what did you do to
20   investigate -- or strike all that.
21              What did -- what efforts did you take to ensure
22   that you were destroying all copies of Human Nature's Many
23   Faces and A Tear Must Fall?
24       MR. SAX:  Object to form, lack of predicate.
25              But you can answer the question if you can.

Page 48

1          THE WITNESS:  I -- I went by what I knew and what I

2     knew at the time.

3          MR. MILLER:  Okay.

4          THE WITNESS:  And that's how we did it.

5     BY MR. MILLER:

6          Q     Did you send a copy of this permanent injunction

7     out to every property manager of the properties in Olen's

8     portfolio?

9          A     No.

10         Q     Did you visit any of the properties in Olen's

11    portfolio to see if they were displaying Human Nature's

12    Many Faces or A Tear Must Fall?

13         A     No.

14         Q     Did you ever instruct Mr. Lafave to remove Human

15    Nature's Many Faces and A Tear Must Fall from Quantum Town

16    Center?

17         A     No.

18         Q     You would agree that at the time this injunction

19    was entered Human Nature's Many Faces was on display at

20    Quantum Town Center, correct?

21         MR. SAX:  Object to form.

22              But you can answer if you know.

23         THE WITNESS:  Now I think you're right, yes.

24    BY MR. MILLER:

25         Q     Well, and you --

Page 49

1      A      I didn't know that at the time.

2      Q      And I appreciate you making that distinction.  I

3  just want to know for the record at the time this

4  injunction was entered, July 6, 2015, Human Nature's Many

5  Faces was publicly displayed at Quantum Town Center.

6  Correct?

7      A      Yes.

8      Q      Okay.  And at the time of this injunction,

9  July 6, 2015, A Tear Must Fall was also publicly displayed

10  at Quantum Town Center, correct?

11      MR. SAX:  Objection to form and the predicate.

12          But, you know, you can answer, Dale, based on

13  your previous answers and previous objections.  Go ahead.

14      THE WITNESS:  I know that now, yes.  But back in --

15  then I did not know that.

16  BY MR. MILLER:

17      Q    Olen knew it, though, back then, correct?

18      MR. SAX:  Object to form.

19          You can answer if you can.

20      THE WITNESS:  Well, they were there.  Someone knew.

21  BY MR. MILLER:

22      Q    Yeah.  Someone at Olen knew those two sculptures

23  were on display at Quantum Town Center, correct?

24      A      Yes.

25      Q      Okay.  And that person would be Alfred Lafave,

```
                                                 Page 50

  1   correct?

  2       A    He would know that.

  3       Q    And nobody reached out to Mr. Lafave saying

  4   destroy those two sculptures, correct?

  5       MR. SAX:  Object to form, lack of predicate.

  6            You can answer if you can.

  7       THE WITNESS:  Best of my knowledge, no.

  8       MR. MILLER:  Let me change gears here for a moment.

  9   We'll stop sharing Exhibit 5.

 10            I'm going to share what's been previously marked

 11   as Exhibit 3.

 12            Spencer, I'm putting this up on the screen for

 13   you.  One second.

 14       MR. SAX:  Okay.

 15            I can see it.  Thanks.

 16   BY MR. MILLER:

 17       Q    Exhibit 3, Mr. Lyon, you've taken a look at

 18   those?

 19       A    I have.

 20       Q    Looks like it's about five different photographs,

 21   right?

 22       A    Yes.

 23       Q    Okay.  Is the sculpture depicted in the five

 24   photographs shown on Exhibit 3 Human Nature's Many Faces?

 25       A    As I knew it then, yes.
```

```
                                          Page 51

 1        Q      Well, as you know it now?

 2        A      It looks like it, yes.

 3        Q      Looks like Human Nature's Many Faces?

 4        A      Yes.

 5        MR. MILLER:  Okay.  Next exhibit is going to be

 6   Exhibit 4.  See it Spencer?

 7        MR. SAX:  Yes, I can.

 8   BY MR. MILLER:

 9        Q      Okay.  Take a look at the photographs in

10   Exhibit 4, sir.  Exhibit 4, it looks like there are four

11   photographs in it, correct?

12        A      Yes.

13        Q      And they all depict a A Tear Must Fall, correct?

14        A      They do.

15        Q      Okay.  And that's all I have on that exhibit, as

16   well.

17             The A Tear Must Fall that we just saw photographs

18   of, that's the same A Tear Must Fall that we were talking

19   about earlier in connection with the permanent injunction,

20   right?

21        A      The same one?

22        Q      They are both called A Tear Must Fall, right?

23        A      There were several in California that was A Tear

24   Must Fall, yes.

25        Q      Right.  And that's the same exact sculpture,
```

Page 52

1    right?

2        A     I don't know if it's exact.

3        Q     But it's the same -- it's got the same name?

4        A     Yeah.  Yeah.  Same name.

5        Q     And the Human Nature's Many Faces that we just

6    looked at, that's got the same name as the sculpture we

7    talked about earlier in the injunction?

8        A     Yes.

9        Q     Okay.  How many -- I guess you mentioned that at

10   the time of the injunction those two sculptures were on

11   display at Quantum Town Center and were not removed or

12   destroyed.  Do you know as you sit here today if those

13   sculptures that were at Quantum Town Center have been

14   destroyed yet?

15       MR. SAX:  Object to form.

16           But you can answer.

17       THE WITNESS:  My understanding is that they have not.

18   They have been taken down and they are in, you know, a

19   garage and out of sight.

20   BY MR. MILLER:

21       Q     Which garage?

22       A     The garage that's at the apartments behind

23   Quantum Town Center.

24       Q     And why are they there?

25       MR. SAX:  Dale, don't go into any attorney/client

Page 53

```
 1   communications, but you can answer it otherwise if you

 2   can.

 3        THE WITNESS:  Attorney/client.  We talked about that.

 4   BY MR. MILLER:

 5        Q    Okay.  And I don't want to know anything that you

 6   talked about to Spencer or any of your other attorneys, so

 7   I think it's a good instruction for all of the questions.

 8             But let me ask you this:  Those two sculptures

 9   were ordered to be destroyed, correct?

10        MR. SAX:  Object to form, document speaks for itself

11   and we're arguing over the lawsuit.

12             But you can -- you can answer that to the best of

13   your understanding, Dale.

14        THE WITNESS:  You know, I didn't know about them at

15   the time of the injunction and didn't -- had I, I would

16   have.  And once we got the lawsuit, I was shocked by it

17   and we talked to the attorneys and we took them down

18   almost immediately because they were there.

19   BY MR. MILLER:

20        Q    To be clear, to this day they haven't been

21   destroyed, correct?

22        A    No, they haven't.

23        Q    Even though the court already ordered them to be

24   destroyed, correct?

25        MR. SAX:  Object to form.  The court order speaks for
```

Page 54

1   itself.  We can have argument all you want over it.

2           Dale, you can give them your understanding.

3       THE WITNESS:  My understanding was that we would take

4   them down in good faith and we would put them out of sight

5   until everything was shaped out in this case.

6   BY MR. MILLER:

7       Q    Okay.  So let's talk about -- you mentioned you

8   finding out about A Tear Must Fall and Human Nature's Many

9   Faces at Quantum Town Center.  When did you first

10  personally become aware that they were there?

11      A    The lawsuit.

12      Q    This lawsuit?

13      A    This lawsuit.

14      Q    Okay.  So how did you find that out?

15      A    Attorneys brought it to my attention.

16      MR. SAX:  Dale, try not to answer what attorneys told

17  you or didn't tell you, okay?

18  BY MR. MILLER:

19      Q    You said that you were shocked to learn they were

20  on display there?

21      A    Yes.  I was shocked about the lawsuit, too,

22  because I thought we were done with Mr. Wakefield and the

23  lawsuits.

24      Q    So why were you shocked about the -- learning

25  about the sculptures on display there?

```
                                                        Page 55
 1      A      Because I -- I didn't know that they were there.
 2      Q      Other than Mr. Lafave was there anybody else at
 3   Olen that knew that they were there?
 4      A      Steve Fike would have known.
 5      Q      Steve Fike?  Anybody else?
 6      A      The manager on-site.
 7      Q      And that would be -- who's the manager on site
 8   again?
 9      A      Cecelia.
10      Q      Did you ever send Cecelia a copy of the
11   injunction that was entered in Wakefield I?
12      A      No.
13      Q      Did you send a copy of the injunction entered in
14   Wakefield I to anybody at Olen?
15      A      No.
16      Q      Did you do anything to investigate where --
17   strike that.
18             Did you do anything to investigate whether any
19   properties in the Olen portfolio were displaying either a
20   A Tear Must Fall or Human Nature's Many Faces after the
21   injunction was entered?
22      MR. SAX:  Object to form.
23             But you can answer.
24      THE WITNESS:  Here again my answer to that question,
25   there were very, very distinct locations and artwork that
```

Page 56

1    were to be part of that lawsuit and those were complied

2    with.

3         MR. MILLER:  Can we go off the record for a second?

4         MR. SAX:  Sure.

5         THE VIDEOGRAPHER:  We're going off the record.  The

6    time is 10:06 a.m.

7                        (BRIEF RECESS.)

8         THE VIDEOGRAPHER:  We're going on the record.  The

9    time is 10:15 a.m.

10        MR. MILLER:  I spoke too soon because I thought this

11   is on the Exhibit Share and now I can't find it.  So can

12   we go off the record again?  I'm sorry.

13        THE VIDEOGRAPHER:  We're going off the record.  The

14   time is 10:15 a.m.

15                        (BRIEF RECESS.)

16        THE VIDEOGRAPHER:  We're going on the record.  The

17   time is 10:17 a.m.

18   BY MR. MILLER:

19        Q    Sir, I am showing you what's been marked as

20   exhibit -- plaintiff's Exhibit 16 and this is a document

21   entitled Notice Of Compliance With Judgement And

22   Declaration In Support Thereof.  Do you see that?

23        A    I do.

24        Q    Okay.  I want to turn your attention to the first

25   page.  Will you please review that, the first two pages

```
                                                    Page 57

 1    anyway.

 2        A     Okay.

 3        Q     Okay.  I want to point your attention to the

 4    first sentence there.  It says Please take notice --

 5    strike that.  I'm sorry.  I'm going to start before that

 6    even.

 7              Where it says To the Court, parties and their

 8    attorneys of record:  Please take notice that the

 9    defendants Igor M. Olenicoff and Olen Properties Corp.,

10    collectively Olen, pursuant to the terms of the judgement

11    entered July 6, 2015, hereby advise that all copies of

12    Human Nature's Many Faces and A Tear Must Fall have been

13    removed and destroyed and the images have been removed

14    from the Olen Properties website.

15              Do you see that?

16        A     I see that.

17        Q     Okay.  And this was filed, it looks like at the

18    very top, on January 24th, 2018, correct?

19        A     That's what it says.

20        Q     Okay.  On January 24th, 2018, you would agree

21    with me that all copies of Human Nature's Many Faces and a

22    A Tear Must Fall had not been removed and destroyed,

23    correct?

24        MR. SAX:  Object to form, misstates what's there.  The

25    word the is missing in your question.  Also let me just
```

Page 58

1    object this is a pleading filed by an attorney, not by the

2    witness.

3            So go ahead.  You can answer the question, Dale,

4    subject to my objection.

5        THE WITNESS:  Well, in the third page it gives a list

6    of what was.

7    BY MR. MILLER:

8        Q    I'm asking you about the first page, sir.

9        A    I can't answer unless I look at the whole

10   document.

11       Q    Well, is the first sentence of the first page --

12   is that a true statement?

13       A    In relationship to the third page, yes.

14       Q    In relationship to everything else was it true?

15       A    To the third page.  It's in relationship to that

16   third page that lists all of the sculptures.

17       Q    I'm sorry.  Sir, wouldn't -- this document,

18   Exhibit 16, it was filed by Olen's attorneys, right?

19       A    Yes.

20       Q    Okay.  So -- and Olen authorized its attorneys to

21   file this document, right?

22       MR. SAX:  Hold on.  That's a attorney/client

23   privilege.

24            Dale, don't answer that question.

25   ///

Page 59

1   BY MR. MILLER:

2       Q    Mr. Lyon, the statement on page 1 of Exhibit 16,

3   was it true at the time that this was filed?

4       A    Yes.

5       Q    Even though at the time this was filed Human

6   Nature's Many Faces and A Tear Must Fall were still

7   publicly displayed at Quantum Town Center?

8       MR. SAX:  Object to form, lack of predicate, lack of

9   relevant time period.

10          But you can answer the question again if you

11  want.

12      THE WITNESS:  Again page 3 of this document lists the

13  ones that were destroyed and known about.

14  BY MR. MILLER:

15      Q    Okay.  Let's set aside the exhibit.

16      MR. SAX:  Let me just make a standing objection then

17  because it's -- the document is -- includes the exhibit.

18  So, I mean, if --

19      MR. MILLER:  There's not a question pending right now.

20  Let's move off from the exhibit.

21      MR. SAX:  Okay.

22  BY MR. MILLER:

23      Q    Sir, I appreciate you looking at the document.

24  I'm not going to ask you about the document anymore.

25          I want to know whether on January 24th, 2018 --

Page 60

1    I'll let you put that away.

2            On January 24th, 2018, was the Human Nature's

3    Many Faces publicly displayed at Quantum Town Center?

4        A    As --

5        MR. SAX:  Object to form.

6            But you can answer.

7        THE WITNESS:  As I know it now, yes.

8    BY MR. MILLER:

9        Q    And on January 24th, 2018, was A Tear Must Fall

10   publicly displayed at Quantum Town Center?

11       MR. SAX:  Same objection.

12           You can give your answer.

13       THE WITNESS:  As I know it now, yes.

14   BY MR. MILLER:

15       Q    And would you agree then that it would be false

16   to say that either of those sculptures had been removed

17   and destroyed at that date, correct?

18       MR. SAX:  Object to form.  It's like a double

19   negative.

20           But you can answer if you can.

21       THE WITNESS:  They were not.

22       MR. MILLER:  Let me put my mic. back on me.  Sorry.

23       Q    They had not been removed and destroyed at that

24   date?

25       A    Yes.

Page 61

1          MR. SAX:  You're just repeating the question because

2     the mic. was off?  I just want to make sure I was

3     following you.

4               You can answer.

5     BY MR. MILLER:

6          Q     Those two sculptures had not been removed and

7     destroyed as of January 24th, 2018, correct?

8          A     That's correct.

9          Q     I will now turn your attention to

10    plaintiff's Exhibit 6.

11              Here you go, Spencer.

12         MR. SAX:  I got it.

13    BY MR. MILLER:

14         Q     Plaintiff's Exhibit 6 is what I just handed you,

15    sir.

16         MR. SAX:  Scroll down a little bit.

17         MR. MILLER:  Oh, scroll down?

18         MR. SAX:  Yeah.

19    BY MR. MILLER:

20         Q     Sir, I want to turn your attention to paragraph 7

21    of Exhibit 6 --

22         MR. SAX:  Do you want him to read it first, the

23    document?

24         MR. MILLER:  If you'd like to review it, yes, sir.

25    But I'd really like to turn your attention to paragraph 7.

Page 62

1        MR. SAX:  Dale, do a quick scan and --

2        THE WITNESS:  Okay.

3   BY MR. MILLER:

4        Q       So Exhibit 7 is a declaration of Igor Olenicoff,

5   correct?

6        A       It is.

7        Q       At the time of this declaration Mr. Olenicoff was

8   the president of Olen, correct?

9        A       Yes.

10       Q       And this declaration was made on behalf of Olen,

11   correct?

12       A       Yes.

13       Q       Okay.  And this declaration in paragraph 7

14   states, quote, In July 2017 the Olen parties offered to

15   deliver -- delivery all pieces of Untitled and derivatives

16   thereof to Wakefield.

17              Do you see that?

18       A       I do.

19       Q       All pieces of Untitled and derivatives thereof,

20   that is a reference to Human Nature's Many Faces and A

21   Tear Must Fall, correct?

22       A       Yes.

23       MR. SAX:  Give -- that's fine.

24   BY MR. MILLER:

25       Q       And in July of 2017, the Olen parties offered to

Page 63

1    deliver all of those pieces to Mr. Wakefield, correct?

2        A    That's what it says.

3        Q    And as you sit here today, is that true?

4        A    I didn't make that offer to them, but my

5    understanding is that offer was made to him.

6        Q    And that's your understanding as to Olen's

7    corporate representative, correct?

8        A    Yes.

9        Q    And the next sentence in paragraph 7 states,

10   quote, Wakefield did not accept the offer of delivery,

11   unquote.

12            Do you see that?

13       A    Yes.

14       Q    Okay.  So is it your understanding as Olen's

15   corporate representative that Mr. Wakefield did not accept

16   delivery of Human Nature's Many Faces and A Tear Must Fall

17   in July of 2017 from Olen?

18       A    That's my understanding.

19       Q    Okay.  And then the next sentence after that

20   says, Therefore, the Olen parties removed all sculptures

21   of Untitled and derivatives pieces from all

22   Olen-controlled properties including the Olen headquarters

23   and 2 Venture locations.  Do you see that?

24       A    I don't.

25       Q    I'm talking on the last -- it's the third

Page 64

1    sentence in paragraph 7 of the affidavit, the very last

2    line of that page.  Do you see that?

3       A    Oh, I see it now.  I thought it was part of the

4    bottom there.

5       Q    Yeah.  It continues on to the next page, right?

6       A    Yeah.

7       Q    So, that sentence, just again it says, quote,

8    Therefore, the Olen parties removed all sculptures of

9    Untitled and derivative pieces from all Olen-controlled

10   properties including the Olen headquarters and 2 Venture

11   locations.

12            Do you see that?

13      A    I see that.

14      Q    Okay.  So the reference to in that sentence all

15   sculptures of Untitled and derivative pieces, again that's

16   a reference to Human Nature's Many Faces and A Tear Must

17   Fall, correct?

18      A    It is.

19      Q    And, all Olen-controlled properties, that's a

20   reference to all of the properties in Olen's portfolio,

21   correct?

22      MR. SAX:  Object to form.

23            But you can answer if you understand it.  If

24   not -- you can go ahead.  Igor signed them.  You can

25   answer it.

Page 65

1        THE WITNESS:  Reading the rest of this document as --

2    as he knew it at the time, I'm sure that this was an

3    accurate statement.

4    BY MR. MILLER:

5        Q     Well, that wasn't my question.  My question was

6    just that, the phrase all Olen-controlled properties as it

7    appears in the third sentence of paragraph 7 of the

8    declaration in front of you, that's a reference to all of

9    the properties in Olen's portfolio, correct?

10       MR. SAX:  Object to form.

11             But you can answer.

12             The document speaks for itself.

13             But you can answer.

14       THE WITNESS:  It said that.  I think it's not fair to

15   take that one line out of context with the rest of the

16   document, but that's what it says.

17   BY MR. MILLER:

18       Q     So you're saying that does not then represent all

19   of the properties in Olen's portfolio?

20       A     I think what it says is known at the time.

21       Q     Does -- is that what the paragraph says; it says

22   known at the time?

23       A     It doesn't say that, but I say that the other

24   paragraphs and line items allude to that.

25       Q     At the time, December 18th, 2017, was Quantum

Page 66

1    Town Center an Olen-controlled property?

2        A      Yes.

3        Q      Okay.  And at the time do you have any reason to

4    believe that Mr. Wakefield -- strike that.

5               Would you agree with me that it would be

6    reasonable for Mr. Wakefield to read paragraph 7 and

7    believe that this meant that all of Human Nature's Many

8    Faces and A Tear Must Fall had been removed from all of

9    the properties in Olen's portfolio?

10       MR. SAX:  Objection, speculative, objection to form,

11   reading somebody else's mind.

12              But you can answer the question if you can, Dale.

13       THE WITNESS:  You know, he identified all of the ones

14   that needed to be taken down.  Even this document talks

15   about one that had not been discovered and we discovered

16   it because we really don't know what's everywhere.  And

17   this one covers that one at 2 Venture and so I don't know

18   what -- what he actually -- you know, he certainly could

19   have done more discovery.

20   BY MR. MILLER:

21       Q      You're talking about Mr. Wakefield?

22       A      Yeah.

23       Q      Okay.  Let's -- let's take away that -- that

24   exhibit.

25              And I just want to ask you generally, does Olen

Page 67

1    believe that it was Mr. Wakefield's responsibility to

2    remove and destroy all copies of Human Nature's Many Faces

3    and A Tear Must Fall?

4        A    No.

5        Q    That was Olen's responsibility, correct?

6        MR. SAX:  Wait a minute.  Hold on.  Hold on.  Could

7    you read back the question before this last one, Madam

8    Reporter?

9            (WHEREUPON, THE RECORD WAS READ BY THE COURT

10       REPORTER AS FOLLOWS:

11           "Question:  Okay.  Let's -- let's take away

12       that -- that exhibit.

13           And I just want to ask you generally, does

14       Olen believe that it was Mr. Wakefield's

15       responsibility to remove and destroy all copies of

16       Human Nature's Many Faces and A Tear Must Fall?")

17       MR. SAX:  Okay.  I -- that's fine.  What was his

18    answer?

19       THE REPORTER:  "No."  Answer was, "No."

20       MR. SAX:  Okay.  I'm sorry.  Go ahead, Chris.

21    BY MR. MILLER:

22       Q    Next question is, it was Olen's responsibility to

23    remove and destroy all copies of Human Nature's Many Faces

24    and A Tear Must Fall, correct?

25       MR. SAX:  Object to form, orders and documents speak

Page 68

1   for themselves.

2           But you can give your understanding, Dale.

3       THE WITNESS:  My understanding was that the ones we

4   knew about and that were part of the case were complied

5   with and it was our responsibility.

6   BY MR. MILLER:

7       Q    Okay.  And Olen could have easily looked up where

8   all of Human Nature's Many Faces and A Tear Must Fall were

9   on display on its properties, correct?

10      A    No.

11      MR. SAX:  Object to form.

12          Go ahead.

13  BY MR. MILLER:

14      Q    And why do you say no?  I don't understand.  How

15  could Olen not -- are you saying that Olen doesn't know

16  what sculptures are located -- on display on each of its

17  properties?

18      A    I don't think they do.  I don't think anyone

19  does.  We have a lot of properties.  We talked about it

20  earlier, you know, 6 million square feet.  We have 17,000

21  apartments.  I mean, there's -- in our office alone

22  there's tons of artwork in and out.  But we don't know

23  where everything is.

24      Q    Well, let me ask you this then:  Does Olen know

25  where all of its properties are located?

Page 69

1          MR. SAX:  Properties or sculptures, Chris?

2          MR. MILLER:  Properties.

3          MR. SAX:  You said properties.

4               Oh, okay.  You can answer the question.

5          THE WITNESS:  I forget sometimes where all of them

6     are.  It's pretty hefty.

7     BY MR. MILLER:

8          Q     But somebody at Olen knows, right?

9          A     I don't know if one person knows, but between the

10    group we can get there.

11         Q     Right.  And the group is the employees that Olen

12    has to manage each property, right?

13         A     Yes.

14         Q     Okay.  So somebody at Olen, whether it's one

15    person or all of the individuals who actually manage each

16    property -- there's at least one person who knows what's

17    located on each property?

18         MR. SAX:  Object to form, compound.

19               But you can answer if you can.

20         THE WITNESS:  I don't think there's one person knows

21    what's on every property.

22    BY MR. MILLER:

23         Q     If Olen had to, could Olen investigate and

24    determine what sculptures are located on each of its

25    properties?

Page 70

1          MR. SAX:  Object to form, lack of predicate.

2               But you can answer the question.

3          THE WITNESS:  Anything's possible.

4     BY MR. MILLER:

5          Q     Well, certainly Olen could do that, correct?

6          MR. SAX:  Same objections.

7               But you can answer.

8          THE WITNESS:  Yes.

9     BY MR. MILLER:

10         Q     You're not saying like Olen wouldn't be allowed

11    to go on its own properties and determine if the

12    sculptures were located there or not, right?

13         A     I'm not saying that.

14         Q     And there's nothing stopping Olen from, you know,

15    investigating its properties to determine what sculptures

16    are located there, right?

17         A     No.

18         Q     Okay.  And Olen just chose not to do this after

19    the injunction was entered, correct?

20         MR. SAX:  Object to form.

21              You can answer if you can.  Just don't get into

22    attorney/client privileged communications.

23         THE WITNESS:  I think the lawsuit identified

24    properties and statues and, um, to the best of our

25    knowledge at the time those were complied with.

1    BY MR. MILLER:

2        Q    Right.  But my question was, is, Olen never

3    actually looked at its properties to determine where these

4    sculptures were located, correct?

5        MR. SAX:  Object to form.

6            You can answer if you can.

7        THE WITNESS:  Are you --

8    BY MR. MILLER:

9        Q    At any time point in time has Olen ever

10   investigated its properties to look for the sculptures

11   Human Nature's Many Faces and A Tear Must Fall?

12       MR. SAX:  Again objection to form as to the time and

13   relevancy of that time you're asking.

14           But go ahead you can answer if you can.

15       THE WITNESS:  Well, after this case was filed, I did.

16   BY MR. MILLER:

17       Q    You did?

18       A    I did.

19       Q    When did you do that?

20       A    After the case was filed.

21       Q    Why'd you do that?

22       A    Because I was shocked about this case and I was

23   shocked about that they were there in Florida.

24       Q    So I guess you weren't sure that there weren't

25   others on display, were you?

1     A     I wasn't sure after I saw this case.

2     Q     Okay.  So how did you go about investigating the

3   other properties?

4     A     Um, well, I know the California properties

5   myself.  You know, I've been to them.  And then in Florida

6   I talked to John Lyon and I asked him and so I checked it

7   out.

8     Q     What did John Lyon tell you when you asked him?

9     A     There were not.

10    Q     There were not any other Human Nature's Many

11   Faces and A Tear Must Fall?

12    A     Yes.

13    Q     Other than the ones at Quantum Town Center?

14    A     Well, yes.

15    Q     What else did you do to investigate whether those

16   sculptures were located at any of Olen's other properties?

17    A     That was it.

18    Q     Okay.  So as you sit here today, can you tell me

19   with confidence that there are no other Human Nature's

20   Many Faces publicly displayed at Olen's properties?

21    A     As a -- as I know it today and with confidence,

22   that's my understanding.

23    Q     Okay.  And you are confident about that because

24   you've investigated all of Olen's properties?

25    MR. SAX:  Object to form as far as the use of the word

Page 73

1    investigation.

2            But you can answer the question.

3            He's already answered what he did.

4            But go ahead, Dale.

5       THE WITNESS:  Yeah.  Yes.

6    BY MR. MILLER:

7       Q    As you sit here today you're confident that A

8    Tear Must Fall is not publicly displayed at any of Olen's

9    other properties?

10      A    Correct.

11      Q    Okay.  Was anybody else at Olen aware that Human

12   Nature's Many Faces was still on display -- strike all

13   that.

14           You've talked earlier about -- I guess it sounds

15   like Olen doesn't keep a database like an Excel

16   spreadsheet or any other sort of conglomeration of data as

17   to each and every sculpture located on each and every one

18   of its properties.  Is that right?

19      A    That's right.

20      Q    But there are documents that do identify what

21   sculptures are on each property, correct?

22      A    I don't think that's accurate.

23      Q    Okay.  I want to turn your attention now to

24   plaintiff's Exhibit 13.

25           Handing what I'm sharing with you, Spencer.

1       MR. SAX:  Yeah.  And, Chris, just to let you know,

2   they're not necessarily plaintiff's exhibit.  They're all

3   just sequential documents.  So just Exhibit No. 13.

4   BY MR. MILLER:

5       Q     Take a look at Exhibit No. 13.  I want to ask you

6   some questions about it when you're ready.

7       A     Okay.

8       Q     Sir, Exhibit 13 is a -- on the first page says

9   Revised Application at the top.  Do you see that?

10      A     I do.

11      Q     At the bottom of the first page it says

12  OLEN00003, right?

13      A     It does.

14      Q     This is an application submitted by Olen to the

15  City of Boynton Beach, correct?

16      A     That's what it says.

17      Q     Well, is it?

18      A     I don't know.

19      Q     Okay.  Well, this was produced by Olen in

20  discovery in this case, correct?

21      A     I looked at that.  I think I've seen it.

22      Q     Well -- and that's what the Bates numbers on the

23  bottom is, is Olen put those numbers there, right?

24      A     I don't know how the Bates got there.

25      Q     Are you saying this isn't -- this wasn't produced

Page 75

1   by Olen during discovery in this case?

2       A    No.   I'm just saying I don't know what that whole

3   list is.

4       Q    Okay.   Let's then turn our attention back to

5   Exhibit 21.

6       A    Okay.

7       Q    Exhibit No. 21, I want to turn your attention to

8   paragraph 13 -- sorry.   Before we get to paragraph 13,

9   let's get to paragraph 27.

10          Paragraph 27 says, quote, The records produced by

11  Olen in response to plaintiff's first request for

12  production of documents in the instant case.

13          Do you see that?

14      A    I see it.

15      Q    Are you here today to testify as Olen's corporate

16  representative as to the records produced by Olen in

17  response to plaintiff's first request for production of

18  documents in this case?

19      A    Yes.

20      Q    Can you then as Olen's corporate representative

21  confirm for me that Exhibit 13 that's been Bates-marked

22  OLEN 3 through OLEN 64 were among the documents produced

23  by Olen in response to plaintiff's first request for

24  production in this case?

25      A    As I sit here today, I can't tell you that for

Page 76

```
 1   sure.  If you wanted, you know, say -- although it says

 2   64, this document goes to 70, maybe goes to 71.

 3        Q    Fair enough.

 4             But I guess my question still remains, which is,

 5   can you tell me yes or no if Exhibit 13 was among the

 6   documents that Olen produced in response to plaintiff's

 7   first request for production in this case?

 8        A    I reviewed those documents.  There are parts of

 9   this document that look familiar to me, but, you know,

10   there's a lot of pages here.

11        Q    Is there anybody else at Olen that would know

12   whether they were among the documents produced by Olen in

13   this case?

14        A    The attorneys.

15        Q    But nobody else at Olen?

16        A    I doubt it.

17        Q    So what you're saying is as you sit here today

18   you're not capable of testifying as to what documents were

19   produced by Olen during the course of discovery in this

20   case?

21        MR. SAX:  Object to form.  That's not what he said.

22        THE WITNESS:  I didn't say that.

23        MR. SAX:  But you can answer the question.

24        MR. MILLER:  Spencer, I feel like this is a pretty

25   easy question to answer.  If he's not ready to testify
```

Page 77

1    about the --

2        MR. SAX:  Chris --

3        MR. MILLER:  -- documents that Olen produced in this

4    case, then I'm -- my question for you is who is?

5            Because he's -- you know, this is -- this is

6    classic --

7        MR. SAX:  Dale is the one -- Dale plus attorneys

8    produced documents.  You're asking him does he recall this

9    document specifically.  He says he's not a hundred percent

10   sure.  What do you want me to do?

11       MR. MILLER:  I didn't say recall.  I didn't say

12   recall.

13       Q    The question is, is Exhibit 13 or the documents

14   that appear in Exhibit 13 documents that Olen produced

15   during the course of discovery in this case?

16       MR. SAX:  If you know, Dale, go ahead.

17       THE WITNESS:  Like I told you, I reviewed the

18   documents and went through them.  There are pages in here

19   that I recall reviewing.  But, I mean, there are a lot of

20   documents that I reviewed.

21   BY MR. MILLER:

22       Q    Let me ask it this way:  Is there any reason in

23   your mind to believe that the documents appearing in

24   Exhibit 13 are not among those that were produced by Olen

25   during the course of discovery in this case?

Page 78

1      A     No.

2      Q     Okay.  So Exhibit 13 identifies Human Nature's

3   Many Faces by name, correct?

4      MR. SAX:  Well, the -- objection, document speaks for

5   itself.  You want to point him to a page?

6      MR. MILLER:  No.  I want to know.

7      MR. SAX:  Yeah.  Well, Dale, read through the

8   document.

9      THE WITNESS:  What was your -- what was the name

10  you're looking for?

11     MR. MILLER:  Human Nature's Many Faces.

12          Let's strike that.  I think this is a easier way

13  to go about this.

14     Q     Sir, you would agree with me that Exhibit 13 was

15  available to Olen prior to the filing of the instant

16  lawsuit, right?

17     A     Yes.

18     Q     And Exhibit 13 was submitted by Olen's employee

19  or an employee of its subsidiary Alfred Lafave, correct?

20     A     That's my understanding.

21     Q     So at the time that the permanent injunction was

22  entered in Wakefield I, Olen could have looked up this

23  document and -- correct?

24     MR. SAX:  Objection, speculative.

25          But you can answer the question if you want.

Page 79

1      THE WITNESS:  I think the people that were, you know,

2  involved in the case wouldn't know where this document was

3  and wouldn't think to ask for it.

4  BY MR. MILLER:

5      Q     Let me ask you this:  How did Olen go about

6  identifying and finding this document to produce during

7  discovery in this case?

8      MR. SAX:  Dale, you can tell him how you did it.  Just

9  don't mention attorneys.

10     THE WITNESS:  We already went through what I did.

11 BY MR. MILLER:

12     Q     I'm sorry.  I don't think we talked about how you

13 found this particular document.

14     A     I don't think I found this document so --

15     Q     Who did?

16     A     I would think the attorneys somehow did.

17     Q     Through Olen's, I guess, own records and servers?

18     A     I don't know how that happened.

19     Q     Was this document Exhibit 13 -- was this

20 available on Olen's servers?

21     A     Not that I'm aware of.

22     Q     Do you know how it was found and produced during

23 discovery in this case?

24     A     No.

25     Q     In any event you agree, the documents that appear

Page 80

```
 1    in Exhibit 13, they were available to Olen at the time the

 2    permanent injunction was entered in Wakefield I, correct?

 3        MR. SAX:  Object to form, also asked and answered.

 4            You can answer it again.

 5        THE WITNESS:  There again if it was somewhere in

 6    Florida, if it was -- I mean, my guess is the City would

 7    have these documents, as well.

 8    BY MR. MILLER:

 9        Q    Right.  But Olen certainly had them, too,

10    correct?

11        A    I don't know that.

12        Q    Eventually, though, you are saying that Olen had

13    it later on, right?

14        A    Well, if they produced them, we produced them,

15    yeah.

16        Q    Okay.  And you just don't know if it was before

17    or after the injunction?

18        A    We didn't produce them until after the case was

19    filed, so that was after the injunction.

20        Q    Why did Olen file the art application that

21    appears in Exhibit 13?

22        A    My understanding is it was a requirement of the

23    City's Art in Public Places program.

24        Q    And that was necessary to obtain occupancy

25    permits from the City of Boynton Beach, correct?
```

Page 81

```
 1      A      Yes.

 2      Q      You said it was submitted by Mr. Lafave?

 3      A      That's my understanding.

 4      Q      Okay.  So let's turn to page 2 of Exhibit 13

 5   which is Bates numbered OLEN 4.  This describes four

 6   separate sculptures that Olen wanted to display at Quantum

 7   Town Center, correct?

 8      A      It does.

 9      MR. SAX:  Hey, Chris, can you take down the --

10      MR. MILLER:  Yep.

11      MR. SAX:  -- other document that's there and do you

12   want to put -- I'm looking at my copy, which is fine.  But

13   if you want to put it up on the screen, I won't stop you.

14      MR. MILLER:  No.  As long as you've got your copy in

15   front of you, that's --

16      MR. SAX:  I have my copy.  It's a lengthy document.

17   So that's fine.  Go ahead.

18   BY MR. MILLER:

19      Q      So we're looking at OLEN 4, page 2 of Exhibit 13.

20   There are four sculptures listed on here.  And I think my

21   question is, these four sculptures are sculptures that

22   Olen wanted to display public at Quantum Town Center,

23   right?

24      A      You said OLEN 4.  This exhibit --

25      Q      Plaintiff's 13, page 2 of that is Bates-numbered
```

Page 82

1    OLEN 4 at the bottom.

2        A      Okay.  Got you.

3        Q      And this lists four different sculptures on here

4    that Olen wanted to display at Quantum Town Center, right?

5        A      Yes.

6        Q      Okay.  A Tear Must Fall is the sculpture we

7    previously talked about that was at issue in Wakefield I,

8    right?

9        A      Yes.

10       Q      And that was the sculpture that was found to be

11   infringing upon Mr. Wakefield's sculpture, correct?

12       MR. SAX:  Object to form, court pleading speaks for

13   itself.

14            But you can answer the question.

15       THE WITNESS:  I'm sorry.  What was your question?

16   BY MR. MILLER:

17       Q      My question was, A Tear Must Fall, that's the

18   sculpture that was found to be infringing upon

19   Mr. Wakefield's work in Wakefield I, correct?

20       MR. SAX:  Same objection.

21            But you can answer if you can.

22       THE WITNESS:  Yeah.  Yes.

23   BY MR. MILLER:

24       Q      Okay.  Did Mr. Wakefield ever authorize Olen to

25   display A Tear Must Fall at Quantum Town Center?

Page 83

```
 1      A     Not that I'm aware of.

 2      Q     Anybody else at Olen aware of that?

 3      A     No.

 4      Q     Okay.  What about Human Nature's Many Faces?  Did

 5  Mr. Wakefield ever authorize Olen to display Human

 6  Nature's Many Faces at Quantum Town Center?

 7      MR. SAX:  First of all let me also make a continuing

 8  objection -- I should have picked it up earlier -- to lack

 9  of predicate.

10          But you can answer the question.  Go ahead.

11      THE WITNESS:  No.

12  BY MR. MILLER:

13      Q     And nobody else at Olen is aware of Mr. Wakefield

14  authorizing Olen to display Human Nature's Many Faces at

15  Quantum Town Center either, correct?

16      A     I would think not.

17      Q     Okay.  There's another sculpture listed on that

18  page.  It's listed as Cognizance.  Do you see that?

19      A     I see that.

20      Q     Who's the artist of that sculpture?

21      A     I don't know.

22      Q     Would it surprise you to learn that it would be

23  Bill Bedford?

24      A     Um, no.

25      Q     Do you know if you had Mr. Bedford's
```

Page 84

1    permission -- strike that.

2           Did Olen have permission from Mr. Bedford to

3    publicly display Cognizance at Quantum Town Center at any

4    time?

5       MR. SAX:  Dale -- this is subject to a confidential

6    settlement, Dale, so I have to instruct you not to answer

7    a question about that.

8       THE WITNESS:  It's pronounced Cognizance.

9       MR. MILLER:  Cognizance.

10      MR. SAX:  Whichever, okay?  The same objection and

11   same instruction.

12   BY MR. MILLER:

13      Q    Can you tell me whether or not Cognizance was a

14   sculpture created by an artist named Bill Bedford?

15      A    That's my understanding.

16      Q    Okay.  I want to turn your attention to the

17   Bates-numbered page on OLEN -- on plaintiff's Exhibit 13,

18   OLEN 6.  Do you see at the top part of it it says

19   Completed By Owner?

20      A    Where?  Where's it -- oh, yeah.  I got it.

21      Q    Completed by owner.  And is it your understanding

22   that Olen was the owner?

23      A    Or an Olen entity.

24      Q    Fair enough.  Do you see where it says Olen's

25   contact person Alfred Lafave?  Do you see that?

Page 85

1      A      Where does it say that?

2      Q      In the table right below the Completed By Owner

3   part.

4      A      Yes.

5      Q      Did Mr. Lafave -- I think I already asked all

6   that.  I think we're good on this particular exhibit at

7   this point, sir.

8             What I want to ask you about separate from the

9   exhibit, though, is how much Olen paid to acquire the

10  sculptures -- let's take them one by one.

11            The sculpture displayed at Quantum Town Center

12  called A Tear Must Fall, how much did Olen pay for that

13  particular sculpture?

14     A      I don't know.

15     Q      Does anyone else at Olen know?

16     A      I -- I -- if anyone could recall it, it might be

17  Igor.

18     Q      But no one else knows?

19     A      I would highly doubt it.

20     Q      What about Human Nature's Many Faces?  How much

21  did Olen pay to acquire that particular sculpture that was

22  displayed at Quantum Town Center?

23     A      Same answer.

24     Q      What about Cognizance?

25     A      Same answer.

Page 86

```
1        Q      Okay.  So Mr. Olenicoff's the only person who

2   might know that information?

3        A      He might know it, yeah.

4        Q      And if Mr. Olenicoff said that he didn't know

5   that information, nobody at Olen would be able to answer

6   those questions, correct?

7        A      I don't think so.

8        Q      Okay.  I just asked you about the cost of those

9   particular sculptures.

10              I want to ask you now, do you know what the value

11  of the sculpture called A Tear Must Fall that was

12  displayed at Quantum Town Center is?

13       MR. SAX:  Let me just pose an objection to his

14  qualifications as to valuation.  He's not an art dealer or

15  anyone who would be able to testify to that.

16              But you can answer if you can, Dale.

17       THE WITNESS:  You know, as far as what Spencer said, I

18  liked his answer.

19  BY MR. MILLER:

20       Q      No.  And that's fair enough.  I just want to make

21  sure.

22              You don't have any opinions as to what the value

23  of A Tear Must Fall was that was displayed at Quantum Town

24  Center is, right?

25       MR. SAX:  I mean, you can give a personal opinion,
```

```
                                                     Page 87
  1    Dale.  I'm just making the objection to, you know, a true

  2    valuation expert opinion.

  3         THE WITNESS:  My opinion is it's worth zero.

  4    BY MR. MILLER:

  5         Q     Your opinion is that A Tear Must Fall is worth

  6    nothing?

  7         A     Yes.

  8         Q     Okay.  And what do you base that opinion on?

  9         A     It's not displayed anymore.

 10         Q     Oh, okay.  And when it was displayed, did it have

 11    any value?

 12         A     Whatever it was paid for.

 13         Q     And same question about Human Nature's Many

 14    Faces.  When it was on display at Quantum Town Center, do

 15    you have any opinion as to what its value was?

 16         A     I don't.

 17         Q     What about Cognizance?  Any opinion on the value

 18    of it when it was on display?

 19         A     No.

 20         MR. SAX:  Dale, as long as you don't get into the

 21    confidential settlement agreement, that's fine.

 22    BY MR. MILLER:

 23         Q     I guess, does anybody else at Olen have any

 24    opinions as to the value of any of those sculptures?

 25         A     There again if -- if anyone had a recollection to
```

Page 88

1    that value or -- it would be Igor.

2         Q     Okay.  If he said that he doesn't have any

3    opinions on the value, then nobody else at Olen has an

4    opinion, right?

5         A     Not that I'm aware of.

6         MR. MILLER:  It's been about another hour here and

7    we're making very good progress.  Can we take a brief 10-

8    or 15-minute break here?

9         MR. SAX:  Of course.

10        THE VIDEOGRAPHER:  We're going off the record.  The

11   time is 10:56 a.m.

12                       (BRIEF RECESS.)

13        THE VIDEOGRAPHER:  We're going on the record.  The

14   time is 11:09 a.m.

15   BY MR. MILLER:

16        Q     All right.  I want to ask you about Olen's

17   policies and procedures.  Does Olen have any policies and

18   procedures in place to, you know -- regarding the display

19   of artwork on its properties?

20        A     No, not really.  Mr. Olenicoff might acquire

21   something and, lo and behold, they get put up.

22        Q     So Mr. Olenicoff is -- when he was president, he

23   was -- he had a lot of control over what happened at Olen?

24        A     He did.

25        Q     He was the only guy in control.  He was the head

Page 89

1    guy in charge, right?

2         A     Yeah.   He liked the team approach, but he was the

3    head guy.

4         Q     And since he stopped being president, he still

5    has some control over the organization, right?

6         MR. SAX:  Object the use of the word control.

7              But you can answer it in layman's way, sure.

8         THE WITNESS:  You know, if he asked me to do

9    something, I'd do it.

10   BY MR. MILLER:

11        Q     And if he had asked you to investigate all the

12   properties that -- in Olen's portfolio to determine which

13   ones were displaying Human Nature's Many Faces and A Tear

14   Must Fall, you would have done that, right?

15        MR. SAX:  Objection to form, objection to lack of

16   predicate, objection to speculative.

17              But you can now answer the question.

18        THE WITNESS:  If he asked me to, I would.

19   BY MR. MILLER:

20        Q     Okay.  And did he ask you to do any of those

21   things after the permanent injunction was entered in this

22   case -- strike all that.

23              Did Mr. Olenicoff ever ask you to investigate the

24   properties in Olen's portfolio to determine whether A Tear

25   Must Fall or Human Nature's Many Faces was being publicly

Page 90

```
 1   displayed at any of them?

 2       A     No.

 3       MR. SAX:  Objection as to time frame.

 4             But you can answer the question.

 5       THE WITNESS:  You said after the injunction?

 6       MR. MILLER:  Yes.

 7       THE WITNESS:  No.

 8   BY MR. MILLER:

 9       Q     Had he asked you that, would you have done it?

10       A     Yes.

11       Q     Because he was in charge of Olen?

12       A     Yes.

13       Q     He was the boss?

14       A     He's my boss.

15       Q     Okay.  Did his daughter ever ask you to do that?

16       A     No.

17       Q     Had she done so, would you have done it?

18       A     Sure.

19       MR. SAX:  Objection, speculative.

20             But you can answer the question if you can.

21   BY MR. MILLER:

22       Q     I started by asking you about Olen's policies

23   displaying artwork.  Are you aware of any policy in place

24   at Olen at any time regarding the public display of

25   artwork on any of Olen's properties?
```

```
                                                   Page 91
 1      A      I'm not aware of any policy.
 2      Q      Who was the one who made a determination at Olen
 3   about which piece of artwork would be displayed at any
 4   property?
 5      MR. SAX:  Objection, assumes facts not in question.
 6            But you can answer the question if you can.  It's
 7   kind of a general question but go ahead.
 8      THE WITNESS:  Igor would be the one, but there's
 9   interior designers that pick artwork, as well, that get
10   displayed.
11   BY MR. MILLER:
12      Q      Are those interior designers employed by Olen or
13   any of its subsidiaries?
14      A      They are.
15      Q      Who are those people?  Do you know any of them by
16   name?
17      A      Well, we have an in-house lady, um,
18   Lauren Rodenbeck.  We have outside interior decorators
19   that -- when we do apartment complexes.  They vary.  I
20   can't remember names.  Um --
21      Q      Are those individuals involved -- you said they
22   are involved in determining what sculptures are displayed
23   at Olen's properties?
24      A      Oh, I thought you said artwork.
25      Q      Well, let's start with artwork more broadly.  You
```

Page 92

1    say they are involved in determining what's displayed as

2    artwork more generally?

3         A    Yeah.

4         Q    Are they involved in the sculpture?

5         A    Typically, no.

6         Q    Would Mr. Olenicoff be the only person involved

7    in that process?

8         A    Yeah.  And now Natalia's more -- is someone

9    involved in that.

10        Q    Okay.  So there's no policy or procedure that's

11   written anyway as to how Olen selects which sculptures are

12   displayed on its property, right?

13        A    Not that I'm aware of.

14        Q    So you're also -- would there -- strike that.

15            There's not any policies you're aware of that

16   prohibit Mr. Olenicoff or anybody else at Olen from

17   displaying artwork that they don't have the right to

18   display on Olen's property, right?

19      MR. SAX:  Objection to form, lack of predicate, also

20   as to time frame.

21            But you can answer the question.

22      THE WITNESS:  I don't know any policy about that.

23   BY MR. MILLER:

24        Q    Do you know if any employee was disciplined after

25   it came out that Human Nature's Many Faces and A Tear Must

Page 93

1    Fall were still on display at Quantum Town Center?

2        A     Not aware of that.

3        Q     Are you aware of any policy that would bar Olen

4    or any of its employees from displaying artwork that

5    infringed upon somebody else's copyright on Olen's

6    properties?

7        MR. SAX:  Object to form, also as to time period.

8    That would have to predate this lawsuit.  Otherwise I

9    would instruct him not to answer.

10             But you can go ahead and answer the question,

11   Dale, if you understand the time frame.

12       THE WITNESS:  Can you repeat the question, please?

13       MR. MILLER:  Yeah.  Can you read it back, please?

14             (WHEREUPON, THE RECORD WAS READ BY THE COURT

15        REPORTER AS FOLLOWS:

16             "Question:  Are you aware of any policy that

17        would bar Olen or any of its employees from

18        displaying artwork that infringed upon somebody

19        else's copyright on Olen's properties?")

20       MR. SAX:  Yeah.  Dale, I had a bunch of objections,

21   including the form of the question.  The reason I said

22   time frame was I don't want to get into any subsequent

23   remedial actions.  That would not be admissible in court.

24   So I'm limiting you to prior to the filing of this

25   lawsuit.

Page 94

1      THE WITNESS:  I'm not aware of any policies or

2    procedures.

3    BY MR. MILLER:

4      Q    Okay.  So you would agree with me, though,

5    generally Olen respects artists' copyrights and their

6    work, right?

7      A    I don't know anything about artists' copyrights.

8      Q    Would you agree with me that Olen respects the --

9    strike that.

10          You'd agree that Olen believes it's not okay to

11   steal an artist's work without compensating them for it?

12     A    I would agree with that.

13     Q    And you would agree that Mr. Wakefield is an

14   artist, right?

15     MR. SAX:  Let me object to the use of the word artist.

16          But you can -- you can answer the question, Dale,

17   if that will move it along.

18     THE WITNESS:  I don't know one way or the other to be

19   polite.

20   BY MR. MILLER:

21     Q    Do you know what an artist is?

22     A    Someone who creates art, I guess.

23     Q    So you're saying you don't know if

24   Mr. Wakefield's an artist?

25     A    I don't know that.

Page 95

1        Q      Okay.  Have you ever heard someone call him a

2   stone mason?

3        A      I think I have.

4        Q      Who'd you hear that from?

5        A      I don't remember, but I -- maybe it was in the

6   trial I heard that, in the first one.

7        Q      Has Mr. Olenicoff ever told you that he believes

8   Mr. Wakefield is a stone mason?

9        A      I don't think I've heard him say that, but I -- I

10  think I've heard that because that's when I was debating

11  before whether he was an artist or not.

12       Q      Is there a difference between a stone mason and

13  an artist in your opinion?

14       A      Yes.

15       Q      What is that difference?

16       A      I think one is somebody who designs and creates

17  and, you know, is artistic about the creation and then

18  someone who then just performs, you know, grinding and

19  chipping and hammering.

20       Q      Earlier I asked you if you believed it was okay

21  to steal an artist's artwork.  Do you believe it's okay to

22  steal from a stone mason their creations?

23       MR. SAX:  Object to the form.

24            But you can answer the question.

25       THE WITNESS:  I don't think stealing's appropriate in

Page 96

1   anything.

2   BY MR. MILLER:

3       Q    What about taking advantage of their work without

4   compensating them?  Do you think that's appropriate for a

5   stone mason?

6       MR. SAX:  Object to form.

7            You can answer.

8       THE WITNESS:  There again I don't think it's

9   appropriate in any subcontractor or contractor.

10  BY MR. MILLER:

11      Q    Do you believe that Mr. Wakefield did anything

12  wrong in terms of the display of Human Nature's Many Faces

13  and A Tear Must Fall at Quantum Town Center?

14      MR. SAX:  Object to form.  You used the word wrong.

15           But you can answer if you understand it.

16      THE WITNESS:  I don't think he should have filed a

17  lawsuit.

18  BY MR. MILLER:

19      Q    Why not?

20      A    I think that if he discovered that they were

21  there, he should have made it known and we would have

22  taken them down if we felt it was appropriate.

23      Q    To be clear, Olen didn't take it down after the

24  permanent injunction was entered, right?

25      A    Didn't know about them.  We didn't do it.

Page 97

1     Q     Okay.  But you do agree that they were displayed

2     on Olen's properties until 2021, correct?

3     A     At Quantum Town Center.

4     Q     Yes.

5     A     Everywhere else, no.

6     Q     Okay.  But they were displayed until 2021, right?

7     A     They were there.

8     Q     And Olen didn't have any permission to do that,

9     right?

10    MR. SAX:  Object to form.

11         You can answer if you can.

12    THE WITNESS:  I don't know if that's a legal question

13    or not.

14    BY MR. MILLER:

15    Q     Okay.  So you don't know if Olen had permission?

16    MR. SAX:  Same objection, calls for a legal

17    conclusion.

18         But you can answer if you can.

19    THE WITNESS:  I can't.

20    BY MR. MILLER:

21    Q     So earlier you said that you don't think

22    Mr. Wakefield should have filed this lawsuit.  You said

23    that -- I believe it was that Mr. Wakefield should let us

24    know.  Right?

25    A     Sure.

Page 98

1      Q      Okay.  And why -- why does Mr. Wakefield have

2   to -- you know, strike all that.

3            You're saying had Mr. Wakefield contacted Olen,

4   Olen would have taken down Human Nature's Many Faces and A

5   Tear Must Fall at Quantum Town Center?

6      MR. SAX:  Object to form, mischaracterizes testimony.

7            But you can answer again, Dale, if you can.

8      THE WITNESS:  If it was appropriate and legal counsel

9   said take them down, we would.

10  BY MR. MILLER:

11     Q      So you don't know for sure whether or not him

12  contacting Olen before filing the lawsuit would have

13  resulted in them coming down?

14     A      I don't know that unless the attorneys, you know,

15  worked it out.

16     Q      Okay.  Because certainly you don't believe that

17  Mr. Wakefield should allow others to display his art

18  without his permission, right?

19     MR. SAX:  Object to form, calls for legal conclusion.

20           But you can answer the question if you can.

21     THE WITNESS:  As you posed the question, I would say

22  you shouldn't do that.

23  BY MR. MILLER:

24     Q      You shouldn't do what?

25     A      Display his artwork without his permission.

Page 99

1      Q     And you agree that Olen did that, though, right?

2      MR. SAX:  Object to form.

3      THE WITNESS:  It was there.  Was it in violation of

4   other agreements, that's a legal question.  That's why

5   we're here today.

6   BY MR. MILLER:

7      Q     Okay.  So does Olen believe it had permission

8   from Mr. Wakefield to put them up there?

9      A     I think that the agreement and the settlement

10  agreement may have allowed it.

11     Q     Okay.  So is there any other agreement that you

12  believe Olen had with Mr. Wakefield that allowed Olen to

13  put up Human Nature's Many Faces at Quantum Town Center or

14  A Tear Must Fall at that location?

15     MR. SAX:  Object to form.  You used the word put up.

16          But you can testify if you can.

17     THE WITNESS:  I'm not aware of any.

18  BY MR. MILLER:

19     Q     Okay.  So it's only based on the settlement

20  agreement?

21     A     From my standpoint, um, there is many clauses in

22  the settlement agreement that I think are well worth, um,

23  investigating in this lawsuit.

24     Q     And as you sit here today, is it your belief that

25  the settlement agreement did constitute permission or just

Page 100

1   may have constituted permission?

2       A     I think it did.

3       Q     It did.  Okay.

4             Which clause in the settlement agreement gave

5   Olen permission?

6       A     Do you have it?  We can go through it.

7       Q     Do you know it off the top of your head?

8       A     There's many that talk about that this was a

9   full -- in my world of construction I'll use the word full

10  and final release.  And that's -- that's final.  It's

11  over.  You've waived all your rights against anything at

12  that point.  It says full, final, known, unknown,

13  suspected, unsuspected, clauses like that that I believe

14  if we had -- they were unknown, we -- he waived it all.

15      Q     After finding out that -- and I'm talking but you

16  personally.  When you personally found out that Human

17  Nature's Many Faces and A Tear Must Fall was at Quantum

18  Town Center, you said you were shocked, right?

19      A     I was.

20      Q     And you immediately took them down, right?

21      A     After talking with counsel.

22      Q     Oh, okay.  So in your opinion, though, Olen had

23  permission to put those things up in the first place and

24  keep them up?

25      A     Never gave it a thought.

```
                                                    Page 101

 1        MR. SAX:  It's a -- wait.  Let me get the objection

 2   also as to time frame about putting them up initially.

 3             But go ahead and answer the question if you can.

 4        THE WITNESS:  I really never gave it a thought because

 5   I didn't know they were there.

 6   BY MR. MILLER:

 7        Q    In your opinion as you sit here today, keeping

 8   them up after the injunction was entered, that was totally

 9   okay?

10        MR. SAX:  That calls for a legal conclusion objection.

11             But you can answer the question if you can.

12        THE WITNESS:  I think we complied with the injunction.

13   BY MR. MILLER:

14        Q    I want to ask you about -- we were talking about

15   policies and procedures earlier with respect to artwork.

16   Does Olen have any policies that allowed its employees to

17   infringe upon an artist's artwork?

18        A    We don't have any policies to that nature.

19        Q    Does Olen have any policies about -- strike that.

20             Does Olen have any policies prohibiting its

21   employees from signing false declarations?

22        A    No.

23        Q    Okay.  So if an Olen employee were to lie in an

24   affidavit, that would be totally okay with Olen?

25        MR. SAX:  Object to form.  That's not -- lack of
```

Page 102

1    predicate.

2            But go ahead.  You can answer the question.

3        THE WITNESS:  No.

4    BY MR. MILLER:

5        Q    It would be wrong, right?

6        MR. SAX:  Object to form, use of the word wrong.

7            But you can go ahead and answer the question,

8    Dale, as a layman.

9        MR. MILLER:  Well, let's take it back for a second.

10       Q    Mr. Lyon, you know the difference between right

11   and wrong, right?

12       A    Yes.

13       Q    And it would be wrong for Olen's employees to

14   make a false statement in a sworn declaration, correct?

15       A    Knowingly make it, yes.

16       Q    But if you found out that it was wrong after the

17   fact, would you -- strike all that.

18            You would agree --

19       MR. SAX:  Go ahead.  Go ahead.  You're just getting

20   argumentative.  But go ahead.  You can keep going.  I'm

21   sorry.

22   BY MR. MILLER:

23       Q    You would agree that, the declarations that Olen

24   signed after the permanent injunction was entered, they

25   were false, correct?

Page 103

1        MR. SAX:  Object to form.

2              You can answer --

3              The document speaks for itself.

4              But you can answer the question.

5        THE WITNESS:  I don't think so.

6    BY MR. MILLER:

7        Q     The declaration we looked at earlier for

8    Mr. Olenicoff on behalf of Olen where he said all the

9    derivative copies of Untitled were moved, that was false,

10   wasn't it?

11       MR. SAX:  Object to form, document speaks for itself,

12   asked and answered.  This -- he doesn't have the document

13   in front of him.

14             But you can go ahead and answer the question if

15   you can.

16       THE WITNESS:  I remember that -- the question from

17   before and my answer was that as we knew it at the time.

18   BY MR. MILLER:

19       Q     Right.  And you learned later, though, that that

20   was wrong, correct?

21       A     Yes.

22       Q     So as you sit here today, the declaration that

23   Mr. Olenicoff made was false, correct?

24       MR. SAX:  Object to form, lack of predicate.  It's --

25   I've got other objections.

Page 104

1           But go ahead and answer the question, Dale.

2      THE WITNESS:  At the time that it was executed I don't

3   think it was wrong.

4   BY MR. MILLER:

5      Q     And as you sit here today it was wrong, though,

6   correct?

7      A     Well, you know, we got into the --

8      MR. SAX:  Object to form.

9      THE WITNESS:  We got into the settlement agreement and

10  that's why we're here, is to figure out legally was it

11  wrong.

12  BY MR. MILLER:

13     Q     I'm not asking legally.  I'm asking factually.

14  As you sit here today was it false?

15     MR. SAX:  Asked and answered five times but you can --

16  objection, form, time period.

17           You can answer it again, Dale.

18     THE WITNESS:  Same answer.  I don't know.

19  BY MR. MILLER:

20     Q     You don't know if it was true or false?

21     A     I don't know.  That's why there's a lawsuit

22  today, to figure out whether it is true or false.

23     Q     Okay.  So at the time that the injunction --

24  strike all that.

25           Let's talk about some other policies and

Page 105

1   procedures that Olen had.  Does Olen currently have a

2   document retention policy?

3       A    In legal matters?

4       Q    In any matter.

5       A    I know we have one in legal matters.

6       Q    And what is that policy?

7       A    I can't quote it, but if there's a lawsuit filed,

8   typically there's a notice sent out by the attorneys

9   saying that, you know, you need to, you know, compile and

10  hold all documents.

11      Q    Does Olen have any other document retention

12  policy?

13      A    I don't know.

14      Q    Has Olen ever had any other document retention

15  policy since 2009?

16      A    The only one I know of with that title would be

17  the one dealing with legal matters.

18      Q    Okay.  And that's a written policy, you said?

19      A    It's sent out every time there's a lawsuit to the

20  appropriate people involved.

21      Q    Okay.  So did anybody send out a copy of that

22  policy to the manager of Quantum Town Center after

23  Mr. Wakefield filed his first lawsuit?

24      A    No.  It wasn't deemed necessary.

25      Q    Why was it deemed not necessary?

Page 106

1      A      Didn't think there was a reason to do that.

2      Q      Was that policy sent out to you after

3   Mr. Wakefield filed his first lawsuit?

4      A      Certainly Igor, myself, um -- I don't know who

5   else.

6      Q      And did you save documents pursuant to that

7   policy then?

8      A      And I gave them all to the attorneys.

9      Q      Okay.  So are you aware of any documents related

10  to the display of Human Nature's Many Faces and A Tear

11  Must Fall at Quantum Town Center that have been destroyed

12  at any time?

13     A      No.

14     Q      Are you aware of any -- any documents that, I

15  guess, were set aside or -- or preserved at any time

16  for -- strike all that.  I'm sorry.

17            You don't know if they were -- strike that, as

18  well.

19            Who would have been in charge of documents

20  related to the sculptures on display at Quantum Town

21  Center from 2009 to the present?

22     MR. SAX:  Wait.  Wait.  Madam Reporter, can you read

23  that one back?

24  ///

25  ///

```
                                              Page 107
 1              (WHEREUPON, THE RECORD WAS READ BY THE COURT
 2        REPORTER AS FOLLOWS:
 3              "Question:  Who would have been in charge of
 4        documents related to the sculptures on display at
 5        Quantum Town Center from 2009 to the present?")
 6        MR. SAX:  Okay.  I thought we're talking about
 7    retention policies.  So you're switching gears?
 8              Okay.  Dale, did you understand the question?
 9        THE WITNESS:  I think I do.
10        MR. SAX:  Okay.
11    BY MR. MILLER:
12        Q    Who was in charge of that, sir?
13        A    Steve Fike would have been at the time.
14    Alfred Lafave would have been at the time.  Now John Lyon.
15        Q    When was the last time you spoke with Mr. Lafave?
16        A    Year ago.
17        Q    What'd you speak to him about?
18        A    Another case.
19        Q    Another lawsuit?
20        A    Yes.
21        Q    Did it involve Mr. Wakefield?
22        A    No.
23        Q    Did it involve artwork of any kind?
24        A    No.
25        Q    Before that when was the last time you had spoken
```

Page 108

```
 1  with him?

 2      A      Years.

 3      Q      What about Mr. Fike?  When was the last time you

 4  spoke with him?

 5      A      Mr. Fike has deceased.

 6      Q      Was he employed by Olen or any of its

 7  subsidiaries at any time?

 8      A      No.  He became ill and stepped down and then

 9  later we found he had moved -- I don't know -- to the

10  mid-West somewhere and then we had heard that he had

11  passed away.

12      Q      John Lyon, you said he would be in charge of

13  documents related to the sculptures on display at Quantum

14  Town Center, right?

15      A      Well, he wouldn't have any because he came in

16  after.

17      Q      But how would John -- are you saying that Olen

18  kept no records from property manager to property manager?

19      MR. SAX:  Object to form.  He's not a property

20  manager.

21              But you can answer the question.

22      THE WITNESS:  I don't know how that works.

23  BY MR. MILLER:

24      Q      Okay.  Do you know what documents are available

25  to Mr. Lyon in overseeing the property at Quantum Town
```

Page 109

1    Center?

2         MR. SAX:  Object to form.

3              But you can answer the question.

4              Lack of predicate, facts not in evidence.

5              But you can answer.

6         THE WITNESS:  He has access to files, but I don't -- I

7    think we asked him and nothing was -- came to surface.

8    BY MR. MILLER:

9         Q    When did you ask -- I guess what did you ask him?

10        A    Well, at the time of the filing of the lawsuit

11   and he would have been instructed on the hold and to go

12   look for stuff.

13        Q    Okay.  And do you know if he did go look for

14   documents?

15        A    He said he did.

16        Q    Okay.  And did he find any documents?

17        A    Not that I'm aware of.

18        Q    Do you know what he looked -- what he -- where he

19   looked for those documents?

20        A    I don't know what, you know, files he would have

21   gone into, but, um, you know, the search I think were

22   instructed, you know, certain names and things, you know,

23   to go -- so it's all part of that policy and he'd go --

24   like in this case I was instructed to type in Wakefield,

25   you know?  And I had nothing left because I had given it

Page 110

1    all away.

2         Q    Type in Wakefield like in your email account?

3         A    Yeah.  Into the files, emails.  Yeah.

4         Q    And, I guess, did anybody ever get instructed to

5    look for files that had the name Human Nature's Many Faces

6    in it?

7         A    You know, I don't -- I don't recall the actual

8    noticing, what we did.

9         Q    At some point you had looked for files that had

10   the words Human Nature's Many Faces in them, right?

11        A    At some point, yes.

12        Q    And at some point you've also looked for files

13   that have the words A Tear Must Fall in them, correct?

14        A    I have.

15        Q    And in searching for those documents, at some

16   point the Revised Art Application we looked at earlier in

17   Exhibit 13 was uncovered by Olen, correct?

18        A    There again I don't know how that was uncovered.

19        Q    Can you think of any other way other than typing

20   in those keywords that it was uncovered?

21        A    Could have came from the City.

22        Q    Came from the City of?

23        A    City of Boynton Beach.

24        Q    How would you know that it came from the City?

25        A    I think the City would have provided it at one

Page 111

1   point.

2       Q      When?

3       A      After the lawsuit or before the lawsuit.

4       Q      And what makes you think that?

5       A      I think I saw letters to that effect and -- and,

6   um, that's how Wakefield got notice of the -- of the art.

7       Q      Okay.  But how did you see those letters?  Did

8   you type in Human Nature's Many Faces into your records

9   search?

10      A      No.

11      Q      Then where are these documents coming from?

12      A      I think you may have produced them or the City

13  produced them.  I'm not sure where they came from.

14      Q      Right.  So this is why I'm trying to

15  understand -- why you're confident they didn't come from

16  Olen itself.

17      A      Well, because they didn't come from me.  They

18  didn't come from John.  I can't explain -- I don't know

19  who else would have provided those other than maybe the

20  City.

21      Q      Olen still has access to Alfred Lafave's emails,

22  correct?

23      A      No.

24      Q      Olen doesn't have access to his email account

25  anymore?

                                                    Page 112

1       A     No.

2       Q     So no one has ever looked into Alfred Lafave's

3   email in responding to discovery in this case?

4       A     Not that I'm aware.

5       Q     So there could be documents related to Human

6   Nature's Many Faces and A Tear Must Fall that were

7   installed at Quantum Town Center that are in Mr. Lafave's

8   email inbox?

9       MR. SAX:  Object to form, speculative, asked and

10  answered.

11            But you can go ahead, Dale.

12      THE WITNESS:  I don't think so.

13  BY MR. MILLER:

14      Q     What -- why don't you think so if you don't know?

15      A     I think what he did is gone, if he did anything

16  and we don't have those.

17      Q     How do you know it's gone, though?  That's what

18  I'm trying to get at.

19      A     That's part of after so many months, when someone

20  leaves the company, the emails are, and his email is,

21  taken down and removed.

22      Q     So that's what I was trying to get at when I'm

23  talking about document retention policy.  You're saying

24  there's a policy at Olen to delete someone's email inbox

25  and outbox after they leave the company?

```
                                              Page 113

 1        MR. SAX:  Object to form as far as document retention

 2   policy.

 3             But you can answer the question.

 4        THE WITNESS:  Yeah.  That's my understanding.

 5   BY MR. MILLER:

 6        Q    How long after someone leaves the company?

 7        A    I don't know that date.

 8        Q    Is it within a year?

 9        A    Don't know that.

10        Q    Okay.  Either way you know that at some point

11   someone at Olen has deleted all of Mr. Lafave's emails

12   inbox and outbox?

13        A    That's my understanding.

14        Q    Okay.  And that inbox and outbox would have

15   emails and documents related to Human Nature's Many Faces

16   and A Tear Must Fall, correct?

17        MR. SAX:  Object to form, lack of predicate, assumes

18   facts not in evidence, speculative.

19             Go ahead and answer the question, Dale.

20        THE WITNESS:  I don't know what was in his email.

21   BY MR. MILLER:

22        Q    What about Mr. Olenicoff's emails?  Have those

23   been deleted?

24        A    No idea.

25        Q    Has anyone at Olen even looked for them?
```

Page 114

1       A      Don't know that.

2       Q      So in responding to discovery in this case you

3    can't tell if Mr. Olenicoff has looked through his inbox

4    and outbox of emails, right?

5       A      I wouldn't know that.

6       Q      Well, you're the one that assembled the documents

7    during the course of discovery in this case, right?

8       A      Some.

9       Q      And who else was in charge at Olen of doing that?

10      A      Attorneys.

11      Q      Attorneys?  So you're the only non-attorney

12   that's done that, correct?

13      A      Don't know that.  Mr. Olenicoff could have, but I

14   don't know that.

15      Q      Okay.  And you don't know that Mr. Olenicoff did

16   that either?

17      A      That's what I just said.

18      Q      Okay.  So Mr. Olenicoff, though, he was the one

19   that originally acquired all of the copies of Human

20   Nature's Many Faces, right?

21      A      That's my understanding.

22      Q      And you understand that because that's what he's

23   told you, correct?

24      A      Yeah.  I don't know how he went about all that.

25   I've read.  He's talked about the -- you know, the Chinese

Page 115

1    artist and all that, but I don't follow all that.

2        Q     You're here as Olen's corporate representative

3    and -- and to your knowledge, to Olen's knowledge,

4    Mr. Olenicoff is the one who acquired all of the copies of

5    Human Nature's Many Faces, right?

6        A     Yes.

7        Q     And he's also the individual who acquired all of

8    A Tear Must Fall, right?

9        A     Yes.

10       Q     Okay.  And nobody at Olen to your knowledge has

11   looked through Mr. Olenicoff's emails inbox and outbox for

12   the keywords Human Nature's Many Faces, correct?

13       A     I don't know who -- maybe he did.

14       Q     You don't know if anybody has one way or another,

15   right?

16       A     That's correct.

17       Q     And you don't know one way or another if

18   anybody's looked up A Tear Must Fall in Mr. Olenicoff's

19   inbox and outbox, correct?

20       A     Same question.  I don't know.

21       Q     Okay.  And, in fact, at this moment as you sit

22   here today, you don't know if Olen has already deleted all

23   of Mr. Olenicoff's emails inbox and outbox, right?

24       A     I don't know that.

25       MR. SAX:  Object to form, assumes facts not in

Page 116

```
 1   evidence, lack of predicate.
 2           But you can answer.
 3   BY MR. MILLER:
 4      Q    So there could be documents, emails sent to or
 5   from Mr. Olenicoff about the infringing sculptures and
 6   they haven't been produced because they were deleted by
 7   Olen, right?
 8      MR. SAX:  Object to form.  To say that is speculative
 9   is an understatement.
10           But go ahead.  You can answer the question, Dale.
11      THE WITNESS:  I have no idea.
12   BY MR. MILLER:
13      Q    But it's possible, right?
14      A    Well, given enough money and time --
15      MR. SAX:  Dale -- Dale, give him the best of your
16   knowledge.  Don't be guessing.  Don't speculate.  Go
17   ahead.  You can answer.
18      THE WITNESS:  I was going to say given enough time and
19   money, my grandmother can build a high-rise.  I mean,
20   anything's possible.
21   BY MR. MILLER:
22      Q    Right.  But you don't know, right?  You don't
23   know if documents regarding the infringing sculptures were
24   destroyed by Olen, right?
25      A    I would highly doubt it.
```

Page 117

1        Q      But you don't know one way or another, correct?

2        A      Again I highly doubt it.

3        Q      So -- and I don't -- I'm not trying to trick you,

4    sir.  I'm just trying to say, you don't know, correct?

5        A      You've asked it about five times.  I'm just going

6    to say I don't know and I highly doubt it.

7        Q      So you don't know?

8        A      I highly doubt it.

9        MR. SAX:  Chris, come on.

10       MR. MILLER:  No.  He -- I mean, just because he says

11   an answer that's nonresponsive doesn't mean he can repeat

12   it over and over again and say the question's been asked

13   and answered.

14       MR. SAX:  Chris, he said he doesn't know but he highly

15   doubts it.  How many times you want him to say that?

16       MR. MILLER:  I just want him to answer the question.

17   I'll take it, though.

18       MR. SAX:  I think he answered it.  You know what?

19   I'll move it.

20             Dale, I'll instruct you not to answer.  You've

21   already answered the question multiple times.

22   BY MR. MILLER:

23       Q      Any other policies -- so we talked about emails.

24   The inboxes and outboxes of email accounts get deleted at

25   some point after an employee leaves Olen, right?

Page 118

1      A      Yes.

2      Q      Any other policies or procedures whereby Olen

3    deletes documents in its normal day-to-day business?

4      A      You know, I've heard that in accounting they keep

5    them for so many years and then they -- they get

6    destroyed, but I don't know how many years that is.

7      Q      Who'd you hear that from?

8      A      The CFO.

9      Q      And who's the CFO?

10      A      I think that's her title.  It's

11    Jane Telfer (phonetic).

12      Q      Jane Telfer, is she involved at all in the

13    selection of placement of artwork on Olen's properties?

14      A      No.

15      Q      Is the artwork that's displayed on Olen's

16    properties -- is that included in Olen's financial

17    statements?

18      A      I don't think so.

19      Q      So Olen doesn't value any of them as assets?

20      A      No.

21      Q      Okay.  Let's get back to Quantum Town Center and

22    the sculptures that were displayed there.  At some point

23    you've said that Human Nature's Many Faces was removed

24    from Quantum Town Center, right?

25      A      Yes.

Page 119

1      Q      Do you know when that was?

2      A      It was shortly after the lawsuit was filed.

3      Q      Okay.  And you said you were personally involved

4  in that removal?

5      A      Well, my -- I called John Lyon and asked him to

6  do it.

7      Q      Why'd you call John Lyon?

8      A      He's the guy there in Florida.

9      Q      He's the person in charge of Quantum Town Center

10 today?

11     A      No.

12     Q      How come you didn't call Cecelia?

13     A      She doesn't have the expertise to do those

14 things.

15     Q      What's the expertise that's required to remove

16 these sculptures?

17     A      We had to rent a forklift and get straps and get

18 guys to help and take them down.

19     Q      Did Cecelia report to John Lyon?

20     A      No.

21     Q      But John Lyon has the expertise to do that and

22 Cecelia doesn't?

23     A      Yes.

24     MR. MILLER:  Okay.  I'd like to mark as exhibit --

25 what exhibit are we on?

```
 1        MS. TRUMBOWER:  I believe 23, Mr. Miller.

 2        MR. MILLER:  You following along here, Spencer?

 3        MR. SAX:  I can see it.

 4            (Exhibit 23 was marked for identification.)

 5    BY MR. MILLER:

 6        Q    Mr. Lyon, I'm handing you what has been marked as

 7    plaintiff's Exhibit 23.  Take a look at that.  I believe

 8    it's three pages.  Let me know when you're ready to answer

 9    some questions about it.

10        A    Okay.

11        Q    Okay.  Sir, are you familiar with these

12    documents?

13        A    Not really.  I've seen them.

14        Q    You've seen them?  Are these documents Olen

15    produced in discovery in this case?

16        A    I believe so, yes.

17        Q    And they've been Bates-numbered by Olen as

18    OLEN 73 through OLEN 75, correct?

19        A    Yes.

20        Q    Okay.  Do you know what these documents reflect?

21        A    It's Sunbelt Rentals' invoicing for a shooting

22    boom forklift.

23        Q    Okay.  Do you know if these are the forklift

24    rentals that were used by Olen to remove Human Nature's

25    Many Faces from Quantum Town Center?
```

```
                                                  Page 121

 1      A      That's my understanding, yes.

 2      Q      Okay.  Are they also the ones used to remove A

 3   Tear Must Fall?

 4      A      Yes.

 5      Q      And the date of these invoices is in October of

 6   2021, correct?

 7      A      Yes.

 8      Q      Okay.  So would you agree with me that Human

 9   Nature's Many Faces and A Tear Must Fall were removed from

10   Quantum Town Center in October of 2021?

11      A      October 5 and 6 probably, yes.

12      Q      Okay.  You said that they are since being stored

13   in a garage somewhere?

14      A      Yes.

15      Q      Do you know which garage?

16      A      No.

17      Q      Were there any other records related to the

18   removal of A Tear Must Fall and Human Nature's Many Faces

19   from Quantum Town Center?

20      MR. SAX:  Madam Reporter, can you read that one back?

21           (WHEREUPON, THE RECORD WAS READ BY THE COURT

22      REPORTER AS FOLLOWS:

23           "Question:  Were there any other records

24      related to the removal of A Tear Must Fall and

25      Human Nature's Many Faces from Quantum Town
```

Page 122

1      Center?")

2          MR. SAX:  Okay.  No problem.  Go ahead.  You can

3      answer, Dale.

4          THE WITNESS:  Not that I recall.

5      BY MR. MILLER:

6          Q     Okay.  And who was the person who operated the

7      forklift removing those pieces from Quantum Town Center?

8          A     I think it was John Lyon.

9          Q     Him personally?

10         A     I think it was.

11         Q     Anybody else involved?

12         A     He had a couple of laborers help him.

13         Q     Do you know who those people were?

14         A     I don't.

15         Q     Would anybody else at Olen know?

16         A     John would know.

17         Q     Have you ever asked him?

18         A     No.

19         Q     Okay.  And you're unaware which specific garage

20     they were taken to?

21         A     I am unaware.

22         Q     Okay.  John Lyon would know, though?

23         A     Um, yeah.  He put them there.

24         Q     Okay.  Did Olen pay the amounts listed on these

25     invoices?

Page 123

1      A    Oh, I don't know what account that would have

2   come out of, whether it would have been the property

3   account or where.  Looks like maybe on the second page it

4   says it was paid on a credit card, AMEX card, John Lyon.

5      Q    So it looks like Olen paid about 1300 bucks to

6   remove those sculptures.

7      A    Is that what it totalled out at?  Yeah.

8      MR. MILLER:  Okay.  You can put that one aside.

9      THE WITNESS:  Do you want to put a number on this,

10  Counsel?

11     MR. MILLER:  Yes.

12          I'm going to mark another exhibit now.

13     MR. SAX:  Chris, you think another half hour?

14     MR. MILLER:  Hour.

15     MR. SAX:  One hour?

16     MR. MILLER:  Yeah.

17     MR. SAX:  Okay.

18     MR. MILLER:  All right.  Spencer, you see that?

19  That's Exhibit 24.

20     MR. SAX:  I do.

21          (Exhibit 24 was marked for identification.)

22  BY MR. MILLER:

23     Q    Mr. Lyon, I'm handing it to you now.  It's been

24  marked as Exhibit 24.  Take a look at both pages and let

25  me know when you're ready to answer questions about them.

```
                                              Page 124

   1      A     Okay.

   2      Q     Okay.  So this is a letter that's dated

   3   April 24th, 2013, correct?

   4      A     Yes.

   5      Q     It was sent to Alfred Lafave, correct?

   6      A     It was.

   7      Q     From the City of Boynton Beach Art Commission,

   8   correct?

   9      A     Well, lady -- staff lady.

  10      Q     I'm sorry.  It was sent by Debby Coles-Dobay,

  11   correct?

  12      A     Yes.

  13      Q     And it's a document that Olen produced during the

  14   course of discovery in this lawsuit, right?

  15      A     Yes.

  16      Q     It was in Olen's possession at the time of the

  17   permanent injunction, correct?

  18      A     I don't know that.

  19      Q     Well, it was sent before the permanent

  20   injunction, correct?

  21      A     This letter was, yes.

  22      Q     Okay.  And so you -- do you have any knowledge

  23   that this was deleted by Olen before the entry of the

  24   permanent injunction?

  25      MR. SAX:  Objection to form.  It's --
```

Page 125

1           Go ahead, Dale.  You can try to answer that

2     question.

3         THE WITNESS:  I don't know.

4     BY MR. MILLER:

5         Q     Okay.  So to Olen's knowledge this was in its

6     files at the time of the permanent injunction, correct?

7         A     I don't know that.

8         Q     Because it -- at the time of the permanent

9     injunction, Mr. Lafave, he was still employed by Olen,

10    correct?

11        A     Um, yes --

12        MR. SAX:  Object to form, compound.

13            But you can answer.

14        THE WITNESS:  The permanent injunction was when?  '18?

15        MR. MILLER:  2015, sir.

16        THE WITNESS:  '15?

17        MR. MILLER:  Yes.

18        THE WITNESS:  Um, close.  I'm not sure when he -- when

19    he left.

20    BY MR. MILLER:

21        Q     But at that point at least Mr. Lafave's emails

22    had not been deleted by Olen yet, right?

23        A     Don't know that.

24        Q     They could have been deleted by then?

25        A     Not -- not at the time in 2013, because he was

Page 126

1     still working.

2         Q    Right.  So you don't know, though, whether at the

3     time of the permanent injunction Mr. Lafave's emails had

4     been deleted by Olen?

5         A    I don't know that.

6         Q    Okay.  You'd agree with me that this letter

7     Exhibit 24 identifies A Tear Must Fall, correct?

8         A    Yes.

9         Q    It also identifies Human Nature's Many Faces,

10    correct?

11        MR. SAX:  Objection, document speaks for itself.

12             But you can repeat it and answer it.

13        THE WITNESS:  Yep.  I see it.  It does.

14    BY MR. MILLER:

15        Q    So Olen could have identified if -- if these --

16    this document was in its records at the time of the

17    permanent injunction, Olen could have identified Quantum

18    Town Center as being a place where the infringing

19    sculptures were still displayed by just searching the

20    names Human Nature's Many Faces and A Tear Must Fall,

21    correct?

22        MR. SAX:  Object to form, compound, assumes facts not

23    in evidence, lack of predicate, speculative.

24             You can answer the question if you can.

25        THE WITNESS:  Lot of ifs there, Counsel.  I don't --

Page 127

1    this was Alfred Lafave's.  I had no reason to include him

2    in any of that at the time.

3    BY MR. MILLER:

4        Q     Well, why not?  Why didn't you have any reason?

5        A     Didn't think it was necessary.  We were dealing

6    with all of the sculptures that we knew about at the time

7    in Irvine and Newport Beach and -- I think that's it.

8        Q     Well, you would agree with me that in Wakefield I

9    Olen was asked directly to identify all of Human Nature's

10   Many Faces in its possession, correct?

11       MR. SAX:  Object to form, assumes facts not in

12   evidence.  What document are you referring to?

13       MR. MILLER:  I'm not referring to a document.  I'm

14   asking him whether during the course of Wakefield I Olen

15   was asked to identify all copies of Human Nature's Many

16   Faces in its possession.

17       THE WITNESS:  Yeah.  I don't know.

18       MR. SAX:  Same -- same objection --

19            Dale, let me get all my objections in there.

20            Same objections as to form and what -- who asked

21   and when asked, through what, through court pleading,

22   discovery.  You know, it's just so speculative but --

23   that's my objection.

24            But, Dale, you can answer the question.

25   ///

Page 128

1    BY MR. MILLER:

2        Q     What was your answer, sir?

3        A     I don't know.

4        Q     Okay.  If Olen was asked to identify all copies

5    of Human Nature's Many Faces in its possession, would Olen

6    be able to identify Quantum Town Center back in 2013?

7        A     I don't think so.

8        MR. SAX:  Object to form --

9    BY MR. MILLER:

10       Q     You don't think so --

11       MR. SAX:  -- speculative.

12       THE WITNESS:  I don't think so.

13   BY MR. MILLER:

14       Q     Why is that?  Why don't you think so?

15       A     Just wasn't on our radar at all.

16       Q     So would you agree with me that at least

17   Mr. Wakefield would have no reason to know about Quantum

18   Town Center during the course of the beginning of

19   Wakefield I, right?

20       MR. SAX:  Objection to form about reading someone

21   else's mind.

22            But go ahead and answer the question, Dale, if

23   you want to speculate.

24       THE WITNESS:  He went out and researched a lot of

25   places and came up with all of them.

Page 129

1    BY MR. MILLER:

2        Q    He researched it, but Olen never did, did they?

3        MR. SAX:  Objection, argumentative.

4             You can answer the question.

5             Also compound.

6             But you can answer.

7        THE WITNESS:  I'm not sure we were obligated to do

8    that.

9    BY MR. MILLER:

10       Q    Right.  It was Mr. Wakefield's obligation to go

11   and determine what was in Olen's possession.  That's what

12   you're saying, right?

13       A    He -- that's what he did.

14       Q    Right.  But you're saying that Olen didn't have

15   any obligation to determine whether any infringing copies

16   were located in other properties, right?

17       A    You know, I'm not sure legally what that answer

18   is, but I can say that we did to the best of our knowledge

19   in Wakefield I and II.

20       Q    And to the best of your knowledge Olen's search

21   came up short, right?

22       MR. SAX:  Object to form.

23             You can answer.

24       THE WITNESS:  Yeah.

25   ///

Page 130

1    BY MR. MILLER:

2        Q     And -- and that wasn't Mr. Wakefield's fault, was

3    it?

4        A     Well --

5        MR. SAX:  Objection, calls for a legal conclusion.

6              But you can answer the question.

7        THE WITNESS:  I think he should have -- I think he's

8    admitted to looking at all our properties.

9    BY MR. MILLER:

10       Q     No.  But I'm asking you.  Olen coming up short,

11   that wasn't Mr. Wakefield's fault, was it?

12       MR. SAX:  Objection to the use of the word coming up

13   short.  That's not what he said but -- asked and

14   answered --

15       MR. MILLER:  He said yes.

16       MR. SAX:  -- object to form -- object to form.

17             Go ahead, Dale.  You can answer.

18       THE WITNESS:  To the best of my knowledge at the time,

19   we thought we had taken care of all of the pieces of art

20   in question.

21   BY MR. MILLER:

22       Q     So it would be reasonable for Mr. Wakefield to

23   trust Olen when -- when Olen represented that that's what

24   it had done, right?

25       MR. SAX:  Object to form as far as using the word

Page 131

1    representation, speculative as to what was in

2    Mr. Wakefield's mind, what he did or didn't do or choose

3    not to do.

4           You can go ahead and answer the question, Dale,

5    if you understand it.

6       THE WITNESS:  I think he should have done due

7    diligence on his own and he said he did.

8    BY MR. MILLER:

9       Q     What kind of due diligence do you think

10   Mr. Wakefield should have done?

11      A     He should have looked at all our properties.

12      Q     And did Olen do that?

13      A     We thought we did.

14      Q     Okay.  But Olen did not, in fact, do that,

15   correct?

16      A     We didn't.

17      Q     Did you say didn't?

18      A     We didn't.

19      Q     Okay.  I want to change gears here and talk about

20   John Raimondi.  Are you familiar with that individual?

21      A     I know the name.  I'm not familiar with the

22   individual.

23      Q     You agree that he previously -- I'm sorry.

24    Strike that.

25           You agree that Olen previously infringed upon his

Page 132

1    copyrighted sculpture, correct?

2        MR. SAX:  Object to form, calls for legal conclusion.

3            But you can give an understanding.  Also, if

4    there's a confidential settlement, don't get into it

5    either.

6        THE WITNESS:  I think there is a confidential

7    settlement.

8    BY MR. MILLER:

9        Q    It's not very confidential.  You just said it,

10   right?

11       MR. SAX:  Well, the terms are.

12       MR. MILLER:  I'm not asking about the terms.

13       Q    I'm asking, is it true that Olen has previously

14   infringed on John Raimondi's copyrighted sculpture, yes or

15   no?

16       MR. SAX:  And I said calls for a legal conclusion, but

17   you can answer the question, Dale, if you know.

18       THE WITNESS:  I really don't know the answer to that.

19   Sounds like a legal question to me.

20   BY MR. MILLER:

21       Q    Are you saying that you're unaware that Olen

22   admitted to infringing on Mr. Raimondi's copyrighted

23   sculpture at a trial?

24       A    Now that you've refreshed my memory, I do

25   remember that.

Page 133

1     Q    Okay.  So Olen has infringed upon Mr. Raimondi's

2  copyrighted sculpture before, as well?

3     MR. SAX:  Same objections.

4     THE WITNESS:  Yes.

5  BY MR. MILLER:

6     Q    Okay.  And when did that occur?

7     A    In that same time frame.

8     Q    Same time frame as the infringement of

9  Mr. Wakefield's sculptures?

10     A    Yeah.

11     MR. SAX:  Object to form --

12     THE WITNESS:  I'm not sure of exact dates but, yeah,

13  in that range.

14  BY MR. MILLER:

15     Q    And it was during the time period in which

16  Mr. Olenicoff was controlling Olen as an entity, right?

17     MR. SAX:  Object to the use of the word control.

18        But you can answer the question --

19     THE WITNESS:  Yes.

20  BY MR. MILLER:

21     Q    It was during Mr. Olenicoff's time as president,

22  correct?

23     A    Yes.

24     Q    And it involved again sculptures that

25  Mr. Olenicoff had handpicked to be displayed at Olen's

Page 134

1   properties, correct?

2       A     Yes.

3       MR. SAX:  Object to form --

4   BY MR. MILLER:

5       Q     And --

6       MR. SAX:  -- lack of predicate.

7   BY MR. MILLER:

8       Q     -- prior to displaying those infringing works,

9   Mr. Olenicoff had actually met with Mr. Raimondi and took

10  him to dinner, right?

11      A     Oh, I don't know that.

12      Q     But he had -- are you aware of Olen approaching

13  Mr. Raimondi about buying some of his copyrighted

14  sculptures?

15      MR. SAX:  Again, Dale, I just caution you to the

16  extent you don't get into anything that's confidential.

17  That's all.

18      THE WITNESS:  Yeah.  I'm not sure how to answer that

19  without -- you know, what's confidential and what isn't.

20  BY MR. MILLER:

21      Q     Okay.  So you're saying that you can't answer

22  whether or not Olen attempted to buy Mr. Raimondi's

23  sculptures from him prior to displaying infringing copies

24  instead?

25      MR. SAX:  Object to form.

Page 135

1            But you can answer the question if you know.

2       THE WITNESS:  I really don't know the answer to that.

3    BY MR. MILLER:

4       Q    Mr. Raimondi said that he did go to dinner with

5    Mr. Olenicoff and that Olen had offered to buy his

6    copyrighted sculptures and that before that purchase

7    happened that they decided to just instead display

8    infringing copies.  Would Mr. Raimondi be wrong?

9       MR. SAX:  Objection -- let me get my objections out on

10   this one, Dale.

11           Object to form, compound, assumes facts not in

12   evidence, hearsay.

13           Now you can go and answer the question if you

14   can.

15      THE WITNESS:  I don't know any of that.

16   BY MR. MILLER:

17      Q    So you have no reason to dispute Mr. Raimondi,

18   though, right?

19      MR. SAX:  Same objections.  That's the same thing.

20   Plus lack of predicate now.

21           You can answer if you can.

22      THE WITNESS:  I don't know.

23   BY MR. MILLER:

24      Q    Mr. Bedford, he's another artist that Olen has

25   infringed upon his copyrights, too, right?

1       MR. SAX:  Object to form, calls for legal conclusion.

2            You can answer the question if you know.

3       THE WITNESS:  I don't know that.  I don't think so.

4   BY MR. MILLER:

5       Q    He's accused Olen previously of infringing on his

6   copyrights, right?

7       A    I don't know that.

8       Q    Does anybody at Olen know that?

9       A    Mr. Olenicoff would probably know.

10      Q    Anybody else?

11      A    Probably not.

12      Q    And --

13      A    Other than attorneys, if that in fact happened.

14      Q    Olen had -- strike that.

15           Are you or anybody else at Olen aware of any

16  communications between Olen and Mr. Bedford about

17  displaying any of his copyrighted sculptures at Quantum

18  Town Center?

19      MR. SAX:  And again, Dale, I caution you not to get

20  into any privileged, confidential settlement agreements.

21      THE WITNESS:  When I wasn't --

22      MR. SAX:  You can --

23      THE WITNESS:  -- and I don't know so --

24  BY MR. MILLER:

25      Q    You're not aware of anybody else at Olen that

Page 137

1    would know, right?

2        A     I would imagine Mr. Olenicoff.

3        Q     Anybody else?

4        A     No.

5        Q     Okay.  Olen certainly never paid Mr. Bedford to

6    display any of these copyrighted sculptures at Quantum

7    Town Center, correct?

8        A     Don't know that.

9        MR. SAX:  Same objection -- Dale, same objections as

10   to don't reveal any confidential settlements, but you can

11   answer if you know.

12       THE WITNESS:  Don't know.

13   BY MR. MILLER:

14       Q     Does anybody know at Olen whether Mr. Bedford was

15   paid for any of his copyrighted sculptures that were

16   displayed at Quantum Town Center?

17       A     Well, you're assuming they were copyrighted, so I

18   don't know.  And if anyone did, it would have been Igor

19   would know that.

20       Q     Because he was in charge of all the art at that

21   time?

22       MR. SAX:  Object to form.

23       THE WITNESS:  Yes.

24       MR. SAX:  You can answer the question.

25   ///

                                                    Page 138

1    BY MR. MILLER:

2         Q     We talked about the artists earlier.  You would

3    agree John Raimondi is an artist, correct?

4         A     Yes.

5         Q     You agree Bill Bedford's an artist, correct?

6         A     Yes.

7         Q     Is Mr. Olenicoff an artist?

8         A     He is.

9         Q     He is?  Does Olen display any of his artwork at

10   its properties?

11        A     We do.

12        Q     Currently?

13        A     Yes.

14        Q     What kinds of artwork does it display on its

15   properties that's from Mr. Olenicoff?

16        A     There's granite and marble sculptures that he's

17   done.

18        Q     Any at Quantum Town Center ever?

19        A     Geez, I don't know.  I don't know what's there.

20        Q     You have investigated what all the sculptures are

21   at Olen's properties since the filing of this lawsuit,

22   right?

23        A     No.  I --

24        MR. SAX:  Object to --

25             Dale, let me get my objections out.

Page 139

1          Object to form, object to the word investigate.

2          Go ahead, Dale.  You can answer the question.

3      THE WITNESS:  No.  I investigated looking for Nature's

4  Many Faces and A Tear Must Fall.  There's other pieces of

5  art all over the place.

6  BY MR. MILLER:

7      Q     Any of them similar to Mr. Wakefield's

8  copyrighted sculpture?

9      A     Not that I'm -- I really doubt it, no.

10     Q     You said you're unaware if any of Mr. Olenicoff's

11 artwork is displayed at Quantum Town Center, right?

12     A     Yeah.  I can't remember everything that's out

13 there.

14     Q     Are you familiar with an artist by the name of

15 Zhou Hong?

16     A     I've heard the name.  I have no idea who it is.

17     Q     Who'd you hear the name from?

18     A     Um, I heard it, um, in a -- Olen Pointe Brea in

19 the City of Brea's Art in Public Places submittal.

20     Q     Is that a submittal that Olen submitted for

21 another local arts ordinance?

22     A     A local city of Brea, California.

23     Q     And I guess what did you hear about that

24 submittal?  What was that submittal for?

25     MR. SAX:  Dale, again just don't go into anything you

Page 140

1   learned from an attorney.  You can answer it otherwise.

2       THE WITNESS:  Several pieces of art, um, we submitted

3   to the City for an Art in Public Places program.

4   BY MR. MILLER:

5       Q    And that's in a different place than

6   Boynton Beach, right?

7       A    Yes.

8       Q    Okay.  But that's also to get your occupancy

9   permit for the City of Brea, right?

10      A    I don't know if they really do this that way.  I

11  don't think they did.  But it was a requirement of the

12  process.

13      Q    Okay.  And in the course of that process, that's

14  the same process that resulted in the display of

15  infringing works of Mr. Wakefield's artwork in the City of

16  Brea, correct?

17      MR. SAX:  Object to form, use of the word --

18      MR. MILLER:  I'm going to strike all of it anyways.

19  Sorry.

20      MR. SAX:  Yeah.  No problem.

21  BY MR. MILLER:

22      Q    Olen previously displayed Human Nature's Many

23  Faces and A Tear Must Fall to comply with the City of

24  Brea's local public displays of art requirements, right?

25      A    We did.

```
                                                  Page 141
 1      Q     Okay.  And that was for commercial purpose,

 2   right?

 3      MR. SAX:  Object to form, use of the legal term

 4   commercial purpose, so calls for a legal conclusion.

 5           But you can give him whatever layman

 6   understanding you have, Dale.

 7      THE WITNESS:  I don't know what you mean by commercial

 8   purpose.

 9   BY MR. MILLER:

10      Q     Well, it was in order to, you know, comply with

11   the local ordinance of the City of Brea, right?

12      A     Yes.

13      Q     And it was to further the development that Olen

14   was, you know, creating in the City of Brea, right?

15      A     It was an ordinance.  You know, further the

16   development, I don't think so, but it was an ordinance we

17   had to adhere to.

18      Q     Well, if you don't adhere to it, the development

19   couldn't go forward, right?

20      A     Well, there were other -- we have a beef with

21   them over that.  Um, we put a lot of art up without their

22   approval, too, so --

23      Q     Right.  But you did ask them for approval to put

24   up Human Nature's Many Faces and A Tear Must Fall, right?

25      A     We did.
```

Page 142

1    Q    And that was to satisfy their local art

2    requirements, right?

3    A    Yes.

4    Q    Okay.  And you did that because, in order to, I

5    guess, make money on the development, you had to comply

6    with the municipal ordinances, right?

7    MR. SAX:  Object to form.

8         Go ahead, Dale.  You can tell him whatever you

9    want to tell him.

10   THE WITNESS:  Yeah.  I don't think so.  I don't think

11   to make money on the development that that -- and

12   certainly no one comes and rents from us because we have

13   some artwork out there.

14   BY MR. MILLER:

15   Q    So why did you want to comply with the municipal

16   ordinance in the city of Brea?

17   A    I didn't want to.

18   Q    But why did Olen end up doing it?

19   A    It was part of the ordinance and, you know, we

20   put money up and did it that way.

21   Q    Because Olen didn't want to lose money on its

22   developments in the city of Brea, correct?

23   A    No.

24   MR. SAX:  Object to form.

25   ///

Page 143

1   BY MR. MILLER:

2       Q    Well, then I don't understand why then.  Why did

3   Olen comply with the City of Brea's ordinance?

4       MR. SAX:  Asked and answered.

5            But you can answer it again.

6       THE WITNESS:  We -- we put in a lot of art.  They

7   fought us over the valuation of our art, um, to meet

8   the -- whatever percentage of the costs were.  We had a

9   lot more art that -- out there that they didn't -- we

10  didn't include and eventually we reached a settlement

11  and -- but we were occupying and -- and leasing and going

12  forward with development.

13  BY MR. MILLER:

14      Q    My question was, why did you care to comply with

15  the City of Brea's municipal ordinance?

16      A    Well, we reluctantly complied with it and reached

17  a settlement with them on it.

18      Q    But why?

19      A    It was part of the ordinance.  It's a

20  requirement.

21      Q    Why do you care about complying with the

22  ordinance?

23      A    It was a requirement of the City.

24      Q    And why did Olen care about complying with the

25  City's ordinances?

Page 144

1       A       Because the City was like making a beef over it.

2       Q       But why did Olen care if the City was making a

3   beef?

4       A       You know, I really don't -- that's a great

5   question.  I -- I wish that, um, I knew the answer.  But

6   they -- they -- we had them over a barrel, but we didn't

7   want to play that game.  We had plenty of art out there.

8   And they agreed finally.  So --

9       Q       Did money have anything to do with that

10  decision-making process?

11      MR. SAX:  Object to form, vague.

12              You can answer the question.

13      THE WITNESS:  Money had nothing to do except we were

14  fighting over valuations of different pieces and how many

15  pieces.  But it had nothing to do with the performance of

16  the property.

17  BY MR. MILLER:

18      Q       Okay.  So what was the value of the Human

19  Nature's Many Faces that was displayed at Olen's property

20  in the City of Brea?

21      A       I don't recall.

22      Q       What was the value of the A Tear Must Fall that

23  was displayed by Olen in the City of Brea?

24      A       The value of --

25      Q       A Tear Must Fall.

Page 145

1      A      I don't recall.

2      Q      It was more than zero, right?

3      MR. SAX:  Well, let me just object to any valuations

4  that he gives.  Again he's no expert on that.  But as far

5  as costs that's a different issue.

6          But you can answer it, Dale, as best you can.

7      THE WITNESS:  You know, the values that we gave them

8  didn't just include the art.  It included shipping.  It

9  included design.  It included setting the bases.  It was a

10  lot more to it than that.  And so it wasn't just that

11  number.

12  BY MR. MILLER:

13      Q      But it was the value that Olen was saying those

14  sculptures were worth was more than zero, correct?

15      A      It was more than zero.

16      Q      Olen had spent thousands of dollars to install

17  those pieces on its property, right?

18      A      Olen Pointe Brea?

19      Q      Yes.

20      A      Yes.

21      Q      And Olen's not a nonprofit corporation, right?

22      A      We are not.

23      Q      And any of the subsidiaries that operate or

24  manage the property in Brea, they're not nonprofits

25  either, right?

Page 146

1    A    Correct.

2    Q    They're in the business of making money, right?

3    A    Correct.

4    Q    And in that business they spent thousands of

5  dollars to display Human Nature's Many Faces and A Tear

6  Must Fall, correct?

7    A    Yes.

8    Q    Okay.  And so certainly Olen would have valued

9  those two pieces of artwork more than the thousands they

10 paid to actually display them, right?

11   A    No.

12   Q    What did Olen value them at then?

13   A    I don't know.

14   MR. SAX:  Asked and answered.

15 BY MR. MILLER:

16   Q    But you do know it's less than the cost of the

17 thousands that it spent to display them?

18   MR. SAX:  Objection, argumentative.

19       You can answer, Dale.

20   THE WITNESS:  I don't think that was your question.

21 BY MR. MILLER:

22   Q    You can say that Olen didn't value them more than

23 the thousands that they spent to display them on the

24 property, right?

25   A    The value of them was strictly to meet the City's

```
                                                Page 147
 1   number.  It's not necessarily the number.  Because we have
 2   huge buying power and what we pay and market value is very
 3   different.
 4       Q    So to comply with the City of Brea's ordinances,
 5   though, Olen spent thousands of dollars, right?
 6       A    You can say that 12 times.  Yes 12 times.
 7       Q    Okay.  And Olen also spent thousands of dollars
 8   to install and display Human Nature's Many Faces and A
 9   Tear Must Fall at Quantum Town Center, correct?
10       A    What's thousands of dollars to you?
11       Q    More than $2,000.  Thousands of dollars.
12       A    More than 2,000.
13       Q    Yes?
14       A    Yes.
15       Q    More than 10,000?
16       A    I don't know that.
17       Q    Do you know how much?
18       A    No.
19       MR. MILLER:  Okay.  We're coming close to the end
20   here.  I've got some housekeeping stuff.  I want to
21   organize my last exhibits quick.  Can we go off the
22   record?
23       MR. SAX:  Of course.
24       THE VIDEOGRAPHER:  We're going off the record.  The
25   time is 12:13 p.m.
```

Page 148

```
 1                       (BRIEF RECESS.)

 2          THE VIDEOGRAPHER:  We're going on the record.  The

 3    time is 12:21 p.m.

 4    BY MR. MILLER:

 5          Q      Mr. Lyon, I'm handing you what's been previously

 6    marked as plaintiff's Exhibit 12 which consists of some

 7    photographs.  I believe it's five -- six separate

 8    photographs.  Would you take a look at those, please.

 9          A      Okay.

10          Q      Do you recognize these photographs?

11          A      I, um -- I kind of recognize the piece of art.

12          Q      It's a granite sculpture that's displayed at

13    Quantum Town Center, correct?

14          A      That is Quantum Town Center, yes.

15          Q      What's displayed in the photographs is a granite

16    sculpture, right?

17          A      Yes.

18          Q      And do you know what this sculpture is called?

19          A      No.

20          Q      Do you know who the artist who created this

21    sculpture is?

22          A      I think it's Bill Bedford.

23          Q      And we've talked a little bit about this earlier.

24    I just want to clarify.  Olen has never paid Mr. Bedford

25    for creating this sculpture, correct?
```

```
                                               Page 149

 1        MR. SAX:  Again, Dale, just to the extent there's a

 2    confidential settlement, just, you know, stay away from

 3    that.  Otherwise you can answer the question.

 4        THE WITNESS:  I don't know.

 5    BY MR. MILLER:

 6        Q    Certainly has Olen ever told anybody that they've

 7    paid Bill Bedford for this sculpture?

 8        A    I don't know.

 9        Q    Does anyone else at Olen know?

10        A    Mr. Olenicoff would know.

11        Q    Anybody else other than him?

12        A    I highly doubt it.

13        Q    So if Mr. Olenicoff were to say he doesn't know,

14    then nobody else at Olen knows?

15        A    That's my understanding.

16        Q    Okay.  Next I want to talk about Olen has filed

17    some counter claims in this lawsuit, correct?

18        A    Yes.

19        Q    And they both arise out of the settlement

20    agreement between Mr. Wakefield, correct?

21        A    That's my understanding.

22        Q    What are Olen's damages in this case?

23        MR. SAX:  Calls for a legal conclusion.

24            But, Dale, if you can answer, that's fine.

25        THE WITNESS:  I mean, certainly the cost to defend it
```

Page 150

1    is a damage.

2    BY MR. MILLER:

3        Q     The attorney fees that they've incurred in

4    defending this lawsuit?

5        A     Yes.

6        Q     How much have those been?

7        A     I don't know that.

8        Q     Okay.  Any other damages?

9        A     They may allude to them in the counter claim, but

10   I don't know off the top of my head.

11       Q     Well, you're certainly not able to testify about

12   any other damages that have been caused, right?

13       MR. SAX:  Object to form.  He said he needs to see the

14   counter claim.

15       THE WITNESS:  If I saw the counter claim, I could

16   maybe answer that.

17   BY MR. MILLER:

18       Q     Right.  But as you sit here today, you don't know

19   any other damages that have been caused?

20       A     Not in my head, no.

21       Q     Okay.  I want to turn your attention now to

22   previously marked Exhibit 15.  Let me pull this up quick.

23             Hey, Spencer, this is the settlement agreement.

24       MR. SAX:  Yeah.

25       MR. MILLER:  Do you have that in front of you?  Do you

Page 151

```
 1   need me to pull it up on the screen?

 2        MR. SAX:  No.  I have it.  As long as the witness has

 3   it, I'm fine.  I mean, it -- if he's looking at the hard

 4   copy, no.  But if you want to put it up on the screen and

 5   point to paragraphs, that may be -- depends how you guys

 6   are looking at it.

 7        MR. MILLER:  Well, I want to turn your attention to --

 8   let's see if -- let me know if you need me to put it on

 9   the screen or not.  How about that?

10        MR. SAX:  Sure.

11        MR. MILLER:  As we go through.

12        Q    First, why don't you take a look at Exhibit 15

13   and let me know when you're ready to answer some questions

14   about it.

15        A    Go ahead.

16        Q    This was a settlement agreement that was entered

17   into between Mr. Wakefield, Olen, and Mr. Olenicoff,

18   correct?

19        A    Yes.

20        Q    On the first page I want to turn your attention

21   to section 1.2.  Do you see that?

22        A    Yes.

23        Q    Can you please read for me what the purpose of

24   this agreement as stated in Section 1.2 states?

25        A    You want me to read it?
```

Page 152

1        Q      Yes, please.

2        A      The purpose.  The purpose of this agreement is to

3    settle and compromise all disputes and controversies

4    existing among the parties hereto including but not

5    limited to any and all claims that are raised or might

6    have been raised in the 2017 action.

7        Q      Do you agree that was the purpose of the

8    settlement agreement?

9        A      Yes.

10       Q      Okay.  Let me ask you to turn your attention to

11   Section 2.3.  No.  Not that one.  Sorry.

12              Section 3.3 on the next page.

13       A      Okay.

14       Q      Do you see where it says the parties understand

15   that the releases provided for in this agreement extend to

16   all claims whether or not claimed or suspected up to and

17   including the day of execution hereof.  Do you see that?

18       A      I do.

19       Q      Okay.  Would you agree with me that the word

20   future does not appear in Section 3.3?

21       MR. SAX:  Objection, document speaks for itself.

22              But you can answer.

23       THE WITNESS:  In what you just read it doesn't appear.

24   BY MR. MILLER:

25       Q      Does the word future appear in any section of the

```
                                              Page 153

1    settlement agreement in front of you?

2        A    I'd have to read it --

3        MR. SAX:  Object to form, document speaks for itself.

4             You can read through the whole agreement if you'd

5    like.

6    BY MR. MILLER:

7        Q    And if that's what you need to do to determine if

8    the word future appears anywhere in it, then please do so,

9    sir.  Because my question is, does the word future appear

10   in any of the sections of the settlement agreement?

11       A    You're really going to make me read it?

12       Q    I'll tell you that it doesn't.

13       A    Based on your representation that it doesn't,

14   then I'll tell you that future doesn't appear.

15       Q    Excellent.

16            After the settlement agreement was signed by

17   Olen, did Olen file it with the copyright office?

18       A    Don't know that.

19       Q    Does anybody else at Olen know that?

20       A    Probably not.  Maybe an attorney but I don't know

21   that.

22       Q    Okay.  Is it your understanding that this

23   settlement agreement gave Olen ownership over

24   Mr. Wakefield's copyrighted sculpture Untitled?

25       MR. SAX:  Again calls for legal conclusion.
```

```
                                                Page 154

 1              But give the best answer you can based on your

 2      understanding if you have any.

 3          THE WITNESS:  I don't.  I really don't know that.

 4      BY MR. MILLER:

 5          Q    Okay.  Do you believe -- sorry.  Strike that.

 6              Does Olen believe that this settlement agreement

 7      gave Olen permission to display Mr. Wakefield's

 8      copyrighted works on its properties in the future

 9      indefinitely?

10          MR. SAX:  Object to form, calls for legal conclusion.

11              But again you can answer if you know.

12          THE WITNESS:  Yeah.  I think that's a legal question.

13      I don't have a -- an opinion on that.

14      BY MR. MILLER:

15          Q    So you don't know one way or the other if it gave

16      Olen permission?

17          A    Yeah.  I don't know about permission.

18          Q    Okay.  Let's turn to 4.1, Section 4.1.  I'm going

19      to start reading at the top where it says Further

20      Acknowledgements.  The parties further fully understand,

21      acknowledge, and agree as follows.  And then, subpart B,

22      it says, quote, Wakefield is through this agreement

23      releasing the Olen parties from any and all claims he may

24      have against them arising from the execution of this

25      agreement, unquote.
```

Page 155

1          Did I read that correctly?

2     A     You did.

3     Q     Does Olen understand that section to mean that

4  Mr. Wakefield has released all claims he might have

5  against them in the future, as well?

6     MR. SAX:  Objection to form, document speaks for

7  itself.

8          But you can give him your understanding.

9     THE WITNESS:  I think it releases any and all claims

10  going forward or backwards.

11  BY MR. MILLER:

12    Q     Even though it says arising before the execution

13  of this agreement?

14    MR. SAX:  Objection, asked and answered,

15  argumentative.

16          But you can answer it again if you'd like.

17    THE WITNESS:  Yeah.  Yes.

18  BY MR. MILLER:

19    Q     Okay.  So according to -- Olen's position is that

20  this means Mr. Wakefield can never sue Olen again for

21  anything in the future, correct?

22    MR. SAX:  You can answer it to the extent you

23  understand it.

24          The document speaks for itself, object to form,

25  asked and answered, repetitive.

Page 156

1          Go ahead, Dale.  Go for it.

2      THE WITNESS:  So when you say anything, I would say to

3  deal with this case or cases, yes.

4  BY MR. MILLER:

5      Q    Okay.  So it certainly -- Olen doesn't mean that

6  this settlement agreement allows them to steal from

7  Mr. Wakefield in the future with impunity, right?

8      MR. SAX:  Object to form, document speaks for itself.

9          Again if you have an understanding you want to

10  tell him, Dale, you can give your understanding.

11     THE WITNESS:  I don't -- I don't -- when you say

12  anything else -- but I'm saying any claims having to deal,

13  you know, with these pieces or these lawsuits, I think

14  it's absolutely clear he's waived that.  He's given his

15  final release.

16  BY MR. MILLER:

17     Q    Right.  But Olen doesn't believe that this

18  settlement agreement allows them to steal all of his

19  artwork in the future, right?

20     A    No.

21     Q    Certainly not.

22         And Olen also doesn't believe that this

23  settlement agreement allows them to commit intentional

24  torts against Mr. Wakefield in the future, right?

25     MR. SAX:  Objection, calls for a legal conclusion.

Page 157

1    I'm sure he doesn't even know what an intentional tort is.

2            But go ahead.  You can answer.

3        THE WITNESS:  I don't know what an intentional tort

4    is.

5    BY MR. MILLER:

6        Q    Okay.  So it's certainly not Olen's position that

7    this gave them any permission to, you know, commit harm

8    against Mr. Wakefield in the future, right?

9        MR. SAX:  Object to form, calls for legal conclusion,

10   hypothetical, speculative.  I'll say that as to the last

11   three questions that's my objection.

12           But go ahead, Dale.  If you want to speculate, go

13   ahead.

14       THE WITNESS:  Well, I think again my answer is having

15   to do with these cases and these art pieces, yes, but not

16   anything to do with other things or other crimes, if you

17   want to call them that.

18   BY MR. MILLER:

19       Q    So -- so do you believe -- does Olen believe that

20   this was a purchase of the -- of Mr. Wakefield's

21   copyrighted sculpture?

22       MR. SAX:  Object to form.

23           Answer if you can.

24       THE WITNESS:  I don't know about purchase.  I don't

25   know how that would play into this settlement agreement.

Page 158

1   BY MR. MILLER:

2        Q     So certainly then Olen doesn't believe that this

3   was a purchase then, right?

4        A     No.  I don't know.

5        MR. SAX:  Object to form.  It's asked and answered.

6   Rephrase -- you're restating his answer incorrectly.

7               But go ahead --

8   BY MR. MILLER:

9        Q     Who do the copyright -- strike all of that.

10              Who do the copyrights to Mr. Wakefield's

11   sculpture Untitled belong to?

12       A     I think there were two people, Wakefield and

13   another guy, the guy who designed it.

14       Q     Not Olen, right?

15       A     No.

16       Q     And not Mr. Olenicoff, right?

17       A     No.

18       Q     Okay.  Even this settlement agreement doesn't

19   change that, right?

20       A     I don't think so.

21       Q     Okay.  What's Olen current net worth?

22       MR. SAX:  Don't answer.  I have a pending objection as

23   to these net worth questions.  So don't answer, Dale.

24   That will be decided by the judge.

25   ///

Page 159

1    BY MR. MILLER:

2        Q    I suppose you're not also going to answer any

3    questions about Olen's financial statements regarding any

4    assets depreciation schedules for the sculptures that are

5    listed in the complaint?

6        MR. SAX:  Well, no.  You can actually ask him about

7    financial things related to the sculptures.  I haven't

8    stopped you there.  But I don't think the witness knows

9    that, but you can ask him.

10   BY MR. MILLER:

11       Q    Sir, you're here today.  I want to turn your

12   attention back to Exhibit 21.  Let's look at topic 30.

13       A    I've looked at it.

14       Q    Topic 30 is Olen's financial statements,

15   including but not limited to any asset depreciation

16   schedules for any sculpture displayed on any property

17   under its control since January 1, 2012.  Are you here

18   prepared to testify as to that topic today?

19       MR. SAX:  Let me just state -- so let me refresh the

20   witness's recollection.

21          Dale, just so you know, we have filed a objection

22   to producing the financial statements, so just depends on

23   the question he wants to ask you whether you'll answer it

24   or not.  So --

25   ///

Page 160

1    BY MR. MILLER:

2         Q     The question again, though, is, are you prepared

3    to testify as to topic 30?

4         MR. SAX:  In general, no.  He's -- I'm instructing him

5    not to answer it.  You know, if you had asked him that

6    specific question you asserted before, I may have allowed

7    him to answer that one.

8         MR. MILLER:  So you're instructing him not to answer

9    any questions in topic 30?

10        MR. SAX:  Well, no.  It depends on the question.

11        MR. MILLER:  Then let him answer.  I'm trying to get

12   this done.

13        MR. SAX:  Why don't you just ask him the specific

14   question.  I have a feeling, Chris, just to save you time,

15   when you ask him about, you know, that stuff, he's going

16   to say he doesn't know.  But, you know --

17        MR. MILLER:  Well, I -- that's a -- you know, don't

18   forecast that to him.

19        Q     My question, though, is -- and I think I'm

20   entitled to an answer on this one, which is, are you here

21   prepared to testify about the topic in topic no. 30?

22        MR. SAX:  And I'll say that for the record we have

23   posed an objection to the production of the financial

24   records.  So if that encompasses your question of can he

25   testify to it, I guess the answer is, no, except for

Page 161

1   certain, select questions about the valuation of

2   sculptures --

3        MR. MILLER:  Well, what's interesting --

4        MR. SAX:  -- that he's aware of.

5        MR. MILLER:  There's never been any objections filed

6   to this notice after we sent it, before this deposition.

7   You're talking about a request for documents.  None of

8   these documents --

9        THE WITNESS:  Yes.

10       MR. MILLER:  -- have ever been objected to.

11       Q    So I want to know right now as you sit here

12   today, Mr. Lyon, are you ready and willing to testify

13   about topic no. 30?

14       MR. SAX:  He's not.

15       MR. MILLER:  So you're not -- okay.  That's fine.

16       MR. SAX:  It will just be part of the overall argument

17   we have on the financials.

18   BY MR. MILLER:

19       Q    Do you intend to offer any expert opinions at

20   trial in this case?

21       MR. SAX:  Actually that's a -- a work product strategy

22   question, so I'm going to have him not answer that

23   question.

24   BY MR. MILLER:

25       Q    Personally you haven't developed any expert

Page 162

1   opinions in this case, right?

2       MR. SAX:  You can answer that one, Dale.

3       THE WITNESS:  Um, I have not.

4   BY MR. MILLER:

5       Q    Let me ask it more generally.  Maybe I should

6   have asked this earlier.  Tell me about your educational

7   background.

8       A    I have an associate's degree in Electrical

9   Engineering.  I -- I have several courses I've taken at

10  the college levels dealing with construction and

11  development.

12      Q    And where -- where's your highest level of

13  education from?

14      A    Franklin Institute of Boston.

15      Q    When did you receive that degree?

16      A    1978.

17      Q    After you received that degree, is that when you

18  started working at Olen or for Olen?

19      A    A year later.

20      Q    So you've been with Olen your entire career?

21      A    I've had electrical jobs.  I went to night school

22  for four years to get my associate degree.

23      Q    Do you consider yourself an expert in any

24  subject?

25      A    Many subjects.

```
                                               Page 163

 1      Q      What do you consider yourself an expert in?

 2      A      Just about anything.

 3      Q      Anything to do with art?

 4      A      Nothing to do with art.

 5      Q      Nothing to do with art valuation?

 6      A      No.

 7      Q      Nothing to do with -- let me just ask you this:

 8   Anything having to do with the issues in this lawsuit?

 9      A      If it came down to, you know, setting the art or

10   taking it down, I would have input on that.  But as far as

11   art's concerned, it's not my bailiwick.

12      Q      Do you have any opinions about taking down the

13   Human Nature's Many Faces and A Tear Must Fall that were

14   displayed at Quantum Town Center?

15      A      I'm not sure I understand.

16      Q      And I'm not trying to trip you up.  I'm trying to

17   go off what you just told me which is you might have

18   opinions on the taking down of art in this case, right?

19      A      Yeah.

20      Q      What opinions are those?

21      A      I -- I -- you know, John asked me, you know, how

22   would you take them down because I took the ones down in

23   California or I was responsible for that.  And I said, you

24   know, a forklift and, you know, straps and pallets and

25   gave him -- gave him the lowdown on that.
```

Page 164

1      Q      Okay.  That makes sense.  So you told -- you told

2  Mr. Lyon how to take down these sculptures at Quantum Town

3  Center then?

4      A      Well, I gave him my opinion.  He's a pretty smart

5  guy.

6      Q      Okay.  You don't have any other opinions related

7  to any of the other issues in this case, right?

8      A      No.

9      Q      Outside of -- I guess have you ever spoken with

10  Mr. Wakefield?

11      A      Um, one short time back when he first was outside

12  my office looking at a piece of art.

13      Q      And that was at Olen's headquarters in

14  Newport Beach?

15      A      Yes.

16      Q      Okay.  Other than that conversation you've never

17  spoken with him again?

18      A      No.

19      Q      What about Bill Bedford?  Have you ever spoken

20  with Bill Bedford?

21      A      I have.

22      Q      When's the last time you spoke with Bill Bedford?

23      A      Years ago.

24      Q      Do you remember when?

25      A      No.

Page 165

1      Q      Do you remember what you spoke with him about?

2      A      We were setting a piece of art that, um, we

3   were -- at one of our old headquarters.

4      Q      Was that in Quantum Town Center?

5      A      No.

6      Q      It was in California here?

7      A      Yes.

8      Q      Okay.  And did you ever talk to him about any of

9   the art displayed at Quantum Town Center?

10      A      No.

11      Q      Do you know if anybody at Olen ever spoke with

12   Mr. Bedford about the art displayed at Quantum Town

13   Center?

14      A      Um, I don't know that.

15      Q      Earlier we talked about the Wakefield I permanent

16   injunction, right?  Do you remember that?

17      A      Yes.

18      Q      And we talked about the efforts that Olen took to

19   comply with that permanent injunction, right?

20      A      We did.

21      Q      Okay.  As you sit here today, has Olen complied

22   with that permanent injunction?

23      MR. SAX:  Chris, calls for a legal conclusion.  So let

24   me put that objection.

25            And again I thought we went over this earlier in

```
                                                Page 166
 1    the depo, but, Dale, you can say whatever you want on this
 2    one.
 3        THE WITNESS:  Well, because of the two we discovered
 4    in, um, Boynton Beach, we took them down at the advice of
 5    counsel until --
 6        MR. SAX:  Again try not to get into conversations with
 7    counsel.  But go ahead.
 8        THE WITNESS:  Okay.  Until, you know, we were able to
 9    determine whether or not they really need to.  So we
10    haven't destroyed them, so, um, whether we needed to or
11    not or don't need to is really the subject of this
12    lawsuit.
13    BY MR. MILLER:
14        Q    Okay.  So you'd agree then that Olen has not
15    complied with the Wakefield I permanent injunction?
16        MR. SAX:  Objection to form, misstates his testimony.
17             Go ahead.
18             Asked and answered, Dale.  Go ahead.  You can
19    answer again.
20        THE WITNESS:  Yeah.  Same answer.
21    BY MR. MILLER:
22        Q    Did Olen ever notify the court in Wakefield I
23    that, hey, we discovered two more copies of A Tear Must
24    Fall and Human Nature's Many Faces that were never
25    destroyed?
```

Page 167

1        MR. SAX:  Dale, again don't reveal any confidential

2    conversations with attorneys.

3        THE WITNESS:  Yeah.  I don't -- I would have to rely

4    on that discussion with Spencer so --

5    BY MR. MILLER:

6        Q    Has Olen ever tried to correct the record with

7    the court in Wakefield I about its prior declarations that

8    were submitted under oath saying that all of the

9    infringing copies had been removed?

10       MR. SAX:  Object to form, improper predicate, assumes

11   facts not in evidence that there was anything in -- not

12   accurate.

13            So go ahead.  You can answer the question, Dale,

14   if you can, if you know.  But again don't talk about what

15   attorneys did or don't do for the corporation.

16       THE WITNESS:  I'm going to say that was

17   attorney/client privilege.  We talked -- we talked about

18   things, but I don't feel comfortable answering.

19   BY MR. MILLER:

20       Q    I understand.  I'm not trying to ask any

21   questions about what you talked about with your attorneys.

22            I'm asking has Olen ever told the court, the

23   court in Wakefield I, that our prior sworn declaration was

24   inaccurate?

25       MR. SAX:  Again assumes facts not in evidence, lack of

Page 168

1    predicate, object to form.  Also there would be a court

2    pleading.  It would speak for itself.

3              But, Dale, you can answer the question with all

4    those objections if you can, if you know.

5        THE WITNESS:  I don't know.

6    BY MR. MILLER:

7        Q    Do you think it would be important to correct the

8    record for the court if what you told them originally was

9    false?

10       MR. SAX:  Object to form, assumes facts not in

11   evidence, not false, lack of predicate.

12             Go ahead, Dale.  We're just going to get

13   argumentative here for a while.  Go ahead.

14       THE WITNESS:  I still think that that's why we're here

15   and we're relying on this lawsuit to determine whether or

16   not it's false or not false.

17   BY MR. MILLER:

18       Q    Because you believe -- strike that.  Let's -- I

19   got some for housekeeping stuff.

20             Alfred Lafave, do you remember what his exact

21   title was?

22       A    Vice president of construction or development,

23   yeah.

24       Q    That's the same job title as John Lyon?

25       A    No.  I don't think Lyon's vice president.  He's

Page 169

1    director of construction.

2        Q     So director is lower than vice president?

3        A     Yes.

4        Q     And your current title is vice president of

5    construction, right?

6        A     Senior vice president.

7        Q     Senior vice president.

8        A     Because I'm old.

9        Q     What were Mr. Lafave's job duties as vice

10   president of construction?

11       A     He was responsible for hiring architects and

12   engineers and general contractors and getting entitlements

13   through cities, different municipalities.

14       Q     And I think you might have said this earlier, but

15   he reported directly to you, right?

16       A     Yeah.

17       Q     And you reported directly to Mr. Olenicoff?

18       A     Yeah.

19       MR. SAX:  Asked and answered.  Come on, Chris.  You've

20   already gone over these earlier in the deposition.

21       MR. MILLER:  I -- he can just say yes and move on

22   because I want to make sure I got it.

23       MR. SAX:  You already know the answer is yes.

24            Go ahead, Dale.  Pretty soon, Dale, I'm going to

25   instruct you not to answer because the questions are

Page 170

1  getting repetitive and I think he's just trying to wear

2  you out so --

3       THE WITNESS:  Yes.

4  BY MR. MILLER:

5       Q     Yes was the answer?

6       A     Yeah.  We take the team approach so -- but when

7  push comes to shove, yes.

8       MR. MILLER:  All right.  I think I've got everything.

9  If I can have five minutes to go through my notes, we're

10  almost --

11      MR. SAX:  Sure.

12      MR. MILLER:  -- very close to being there.

13           Thank you.

14      THE VIDEOGRAPHER:  We're going off the record.  The

15  time is 12:46 p.m.

16                    (BRIEF RECESS.)

17      THE VIDEOGRAPHER:  We're going on the record.  The

18  time is 12:48 p.m.

19      MR. MILLER:  Mr. Lyon, that's all the questions I have

20  for you today.  Thank you so much for your time.

21      THE WITNESS:  Thank you.

22      MR. SAX:  All right.  Lynn, can you put up on the

23  screen Exhibit 15, the settlement agreement?

24           Dale I'm going to go over this agreement with

25  you, just some parts of it, to get some testimony and then

Page 171

1    I just have a few more questions and I'm going to be done.

2           Lynn, are you there or on a bathroom break?

3    There you go.  Thanks, Lynn.

4

5                   E X A M I N A T I O N

6    BY MR. SAX:

7        Q     Okay.  Dale, can you read the title of the

8    document?

9        A     Settlement Agreement And Mutual General Release.

10       Q     Did you understand this document to be a general

11   release rather than a limited release?

12       MR. MILLER:  Objection, leading.

13   BY MR. SAX:

14       Q     You can answer.

15       A     Yes.

16       Q     Okay.  Under Purpose, 1.2, where it references

17   any and all claims, did you understand this agreement to

18   refer to any and all claims that are raised or might have

19   been raised in the 2017 action?

20       MR. MILLER:  Objection, document speaks for itself,

21   leading.

22   BY MR. SAX:

23       Q     Go ahead.

24       A     Yes.

25       Q     Was it important to you to have the language or

Page 172

1   might have been raised?

2        MR. MILLER:  Objection, leading.

3        THE WITNESS:  Yes.

4   BY MR. SAX:

5        Q     Okay.  Why was that important to you?

6        A     Well, it -- it covered things going forward.  It

7   could have things that were unknown or unsuspected at the

8   time.

9        Q     Okay.  Was the purpose of entering the settlement

10  agreement to be done with Mr. Wakefield once and for all?

11       A     Yes.  Full and final, done, complete.

12       Q     Was it to avoid him coming back later and saying,

13  hey, I have another claim against you?

14       A     That was the intent.

15       Q     Okay.  Go down to 2.3.  You see where it says at

16  the end of the third line -- you can read the whole thing,

17  but I'll actually read it out loud.  Other than the

18  Wakefield Actions and the complaint filed with the FBI in

19  2012, Wakefield covenants and represents that he has not

20  filed any complaints, grievances, charges or charges or

21  lawsuits against the Olen parties, with any governmental

22  agency or court and that he will not do so at any time

23  hereafter.

24            Do you see that language?

25       A     I do.

```
                                        Page 173

  1        Q      While the word future may not be in that

  2   sentence, is the word hereafter in that sentence?

  3        A      It is.

  4        Q      To you do they have similar meanings?

  5        A      They do.

  6        Q      And then go to 3.1.  Dale, do you see about five,

  7   six lines down -- actually it's a little more, about

  8   eight, but before it says remedies of any nature

  9   whatsoever, known or unknown.  Do you see that?

 10        A      Yes.

 11        Q      Does the language or unknown have significance to

 12   you?

 13        A      Yes.

 14        Q      What's the significance?

 15        A      That if it's known or unknown, we're being

 16   released and he doesn't -- we have no claim against us.

 17        Q      Okay.  Was that to protect you from any future

 18   claim that he may assert?

 19        A      Yes.

 20        Q      Okay.  Next sentence talks about suspected or

 21   unsuspected.  Did the word unsuspected have any

 22   significance to you?

 23        A      Yeah.  You know, just again it just is more, you

 24   know, fortification to the previous known and unknown.

 25        Q      Okay.  Going towards the end of that paragraph,
```

Page 174

1    it's -- it's -- there's a sentence crossed out.  It says

2    Nothing in this agreement shall be construed to mean that

3    Wakefield is waiving or releasing claims to enforce this

4    agreement or any relief granted in the 2012 action.

5              Let me ask you this:  Was the relief granted in

6    the 2012 action the injunction that opposing counsel has

7    been asking you about today?

8         A    Yes.

9         Q    Okay.  Did you understand this cross-out to mean

10   that that claim was being waived by --

11        MR. MILLER:  Objection, leading.

12        THE WITNESS:  Yes.  It's very clear what it says.

13   BY MR. SAX:

14        Q    Okay.  All right.  Under 3.3, second sentence

15   says whether or not claimed or suspected.  Again was it

16   significant to you to have the language whether or not

17   claimed or suspected to be part of this release?

18        A    Yes.  There again --

19        Q    Why was that important to you?

20        A    Same as up above where we were just trying to be

21   done once and for all with Mr. Wakefield.

22        Q    Okay.  Take a look at 5.5.

23             Lynn, can you go to the fourth page?

24             Where it says Entire Agreement, do you

25   understand -- do you know what a merger clause is?

Page 175

```
 1      A      I don't know what merger clause is, but I -- from
 2   my construction contracts we deal with the entire
 3   agreement.
 4      Q      Okay.  And is that to avoid somebody later on
 5   saying, wait a minute, you misrepresented something to me
 6   or you made a representation to me and now I'm going to
 7   bring that up even though it's not contained in the
 8   agreement?
 9      MR. MILLER:  Objection, leading.
10   BY MR. SAX:
11      Q      You can answer your understanding.
12      A      That's my understanding.
13      Q      Was it your understanding of the injunction in
14   the Wakefield I case that it pertained to the sculptures
15   that were the subject matter of that lawsuit?
16      A      Yes.
17      Q      Do you recall any provision in the settlement
18   agreement that in any way obligated Olen to do any type of
19   investigation to find more sculptures?
20      A      I -- I see nowhere where it says that and didn't
21   understand we needed to.
22      Q      Did you see anywhere in the agreement where Olen
23   is representing there are no other sculptures out there?
24      A      No.
25      Q      Let me ask you about the Boynton Beach for a
```

Page 176

1    second.  Would any sculptures have satisfied the

2    Boynton Beach requirement to -- for their Art in Public

3    Places or were these two -- were these sculptures, the

4    subject of this lawsuit, the only ones that would have

5    satisfied the City?

6        MR. MILLER:  Objection, speculation, leading.

7    BY MR. SAX:

8        Q    You can answer it.

9        A    The sculptures -- it could be anybody's sculpture

10   or any sculpture, but there was a dollar amount that they

11   had to add up to to meet the coordinates.

12   BY MR. SAX:

13       Q    At some point in time when you removed the two

14   sculptures, what did you replace them with?

15       A    Well, I didn't personally, but, um, there was

16   some natural occurring -- I think it's -- I want to say

17   coral stone that was carved out, you know, in nature and

18   it was replaced with that.

19       Q    Did it have any particular cost or value to Olen?

20       A    No.

21       Q    Okay.  And as a result of a removal of the two

22   sculptures that are the subject of this lawsuit -- they

23   were replaced with these other two boulders -- did the

24   City of Boynton Beach pull your certificate of occupancy

25   and your ability to use the property?

Page 177

1      A      No.

2      Q      Okay.  Do you have every reason to believe that

3  Olen produced all responsive documents in this lawsuit?

4      MR. MILLER:  Objection, leading.

5  BY MR. SAX:

6      Q      You can answer.

7      A      Yes.  I agree.

8      Q      Okay.  Do you know of any documents -- responsive

9  documents that were destroyed?

10     A      No.

11     MR. SAX:  I don't have any other questions.  Chris,

12 you're on.

13     MR. MILLER:  Yeah.  Just one more thing.

14

15              F U R T H E R   E X A M I N A T I O N

16 BY MR. MILLER:

17     Q      The rock that was replacing the infringing

18 sculptures at Quantum Town Center, it's very rare rock,

19 correct?

20     MR. SAX:  First let me object to the use of the word

21 infringing.  That's, I guess, the subject of this lawsuit.

22              But let's go ahead and other than that objection

23 you can answer the question.

24     THE WITNESS:  Um, rare is a -- you know, there again,

25 you know, beauty is in the eye of the beholder type of

Page 178

1    thing, as well.  Um, so it is in nature and it was from

2    the site, so it was kind of cool.

3    BY MR. MILLER:

4        Q    Okay.  So are you saying and are you telling the

5    jury that nobody from Olen has ever represented that that

6    rock is rare and not to be found anywhere other than at

7    this site?

8        A    Oh, I don't know who said that.

9        Q    Right.  So you'd agree that the rock is rare?

10       A    Oh, yeah.  It's rare.

11       Q    It's rare.  And it's -- can't be found anywhere

12   else?

13       A    Oh, I can't tell you that.

14       Q    Has anyone from Olen ever told anybody that?

15       A    I don't know of anyone who's said that.

16       Q    Okay.  And Mr. Olenicoff currently is the

17   president of Olen, right?

18       A    That's correct.

19       Q    And if he represented to somebody that he was the

20   president of Olen in 2022, that would be a lie, right?

21       A    I don't know when that occurred.

22       Q    Well, if he did, though, it would be untrue,

23   correct?

24       A    There again that's hypothetical.  I don't know

25   when that happened.

Page 179

1      Q      Or if that happened?

2      A      Yeah.

3      Q      Because Mr. Olenicoff's not authorized to tell

4    people he's the president of Olen anymore, right?

5      A      I don't know how that works.

6      MR. MILLER:  That's all I have for you, sir.  Thank

7    you so much.

8      THE WITNESS:  Thank you.

9

10              F U R T H E R   E X A M I N A T I O N

11   BY MR. SAX:

12     Q      Just one quick follow-up.  Just so I understand

13   your testimony, Dale, that stone that's there now, that

14   was from the site itself?

15     A      It was from the site during excavation of the

16   site.

17     Q      Oh, okay.  So Olen doesn't have to go out and pay

18   any money to get that stone?

19     A      Well, no.  But I guess you could say we paid the

20   grader when he was removing it all.  But, no.  That --

21   that was all stockpiled and saved and we cleaned it up.

22     MR. SAX:  All right.  Good.  He'll read, Madam

23   Reporter.

24              All right.  Chris, nice meeting you.

25     MR. MILLER:  Nice to meet you, too.

Page 180

1        THE VIDEOGRAPHER:  This marks the conclusion of

2   today's deposition.  We are going off the record.  The

3   time is 12:59 p.m.

4                    (TIME NOTED:  12:57 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 181

1

2

3

4           I, the undersigned, a Certified Shorthand

5   Reporter of the State of California, do hereby certify:

6           That the foregoing proceedings were taken before

7   me at the time and place herein set forth; that any

8   witnesses in the foregoing proceedings, prior to

9   testifying, were placed under oath; that a verbatim record

10  of the proceedings was made by me using machine shorthand

11  which was thereafter transcribed under my direction;

12  further, that the foregoing is an accurate transcription

13  thereof.

14           I further certify that I am neither financially

15  interested in the action nor a relative or employee of any

16  attorney or any of the parties.

17           IN WITNESS WHEREOF, I have this date subscribed

18  my name.

19

20  Dated:  11/28/22

21

22

23

                 RAQUEL L. BROWN

24               CSR No. 10026, RPR

25

```
                                                    Page 182
 1                      Veritext Legal Solutions
                           1100 Superior Ave
 2                             Suite 1820
                         Cleveland, Ohio 44114
 3                       Phone: 216-523-1313
 4
      December 6, 2022
 5
      To: Spencer Sax, Esq.
 6
      Case Name: Wakefield, Donald v. Olenicoff, Igor, et al.
 7
      Veritext Reference Number: 5581188
 8
      Witness:  Dale Lyon       Deposition Date:  11/17/2022
 9
10    Dear Sir/Madam:

11
      Enclosed please find a deposition transcript.  Please have the witness
12
      review the transcript and note any changes or corrections on the
13
      included errata sheet, indicating the page, line number, change, and
14
      the reason for the change.  Have the witness' signature notarized and
15
      forward the completed page(s) back to us at the Production address
16    shown
17    above, or email to production-midwest@veritext.com.
18
      If the errata is not returned within thirty days of your receipt of
19
      this letter, the reading and signing will be deemed waived.
20
21    Sincerely,
22    Production Department
23
24
25    NO NOTARY REQUIRED IN CA
```

Page 183

1          DEPOSITION REVIEW
           CERTIFICATION OF WITNESS
2
       ASSIGNMENT REFERENCE NO: 5581188
3      CASE NAME: Wakefield, Donald v. Olenicoff, Igor, et al.
       DATE OF DEPOSITION: 11/17/2022
4      WITNESS' NAME: Dale Lyon
5          In accordance with the Rules of Civil
       Procedure, I have read the entire transcript of
6      my testimony or it has been read to me.
7          I have made no changes to the testimony
       as transcribed by the court reporter.
8
       _____          _____
9      Date                       Dale Lyon
10         Sworn to and subscribed before me, a
       Notary Public in and for the State and County,
11     the referenced witness did personally appear
       and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
               Statement; and
14         Their execution of this Statement is of
               their free act and deed.
15
           I have affixed my name and official seal
16
       this _____ day of_____, 20_____.
17
                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25

```
                                           Page 184

 1                 DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS
 2
        ASSIGNMENT REFERENCE NO: 5581188
 3      CASE NAME: Wakefield, Donald v. Olenicoff, Igor, et al.
        DATE OF DEPOSITION: 11/17/2022
 4      WITNESS' NAME: Dale Lyon
 5          In accordance with the Rules of Civil
        Procedure, I have read the entire transcript of
 6      my testimony or it has been read to me.
 7          I have listed my changes on the attached
        Errata Sheet, listing page and line numbers as
 8      well as the reason(s) for the change(s).
 9          I request that these changes be entered
        as part of the record of my testimony.
10
            I have executed the Errata Sheet, as well
11      as this Certificate, and request and authorize
        that both be appended to the transcript of my
12      testimony and be incorporated therein.
13      _____          _____
        Date                      Dale Lyon
14
            Sworn to and subscribed before me, a
15      Notary Public in and for the State and County,
        the referenced witness did personally appear
16      and acknowledge that:
17          They have read the transcript;
            They have listed all of their corrections
18              in the appended Errata Sheet;
            They signed the foregoing Sworn
19              Statement; and
            Their execution of this Statement is of
20              their free act and deed.
21          I have affixed my name and official seal
22      this _____ day of_____, 20_____.
23              _____
                Notary Public
24
                _____
25              Commission Expiration Date
```

Veritext Legal Solutions

Page 185

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 5581188

PAGE/LINE(S) /          CHANGE          /REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____


_____        _____

Date                   Dale Lyon

SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

DAY OF _____, 20_____ .

                    _____

                    Notary Public


                    _____

                    Commission Expiration Date

**[1 - 4]**                                                                 Page 1

## 1

**1**   1:10,25 2:10 11:17 27:21 59:2 159:17
**1-4**   5:16
**1.2**   151:24 171:16
**1.2.**   151:21
**10**   1:10 2:10 4:11 15:20 24:14 88:7
**10,000**   147:15
**10026**   1:23 2:20 181:24
**10:06**   56:6
**10:15**   56:9,14
**10:17**   56:17
**10:56**   88:11
**11**   4:20
**11-13**   5:18
**11/17/2022**   182:8 183:3 184:3
**11/28/22**   181:20
**1100**   182:1
**117**   5:17
**11:09**   88:14
**12**   4:24 37:10 147:6,6 148:6
**120**   3:6 4:13
**123**   4:14
**12:13**   147:25
**12:21**   148:3
**12:46**   170:15
**12:48**   170:18
**12:57**   2:18 180:4
**12:59**   180:3

**13**   4:25 36:16 37:10 73:24 74:3,5,8 75:8,8 75:21 76:5 77:13,14,24 78:2 78:14,18 79:19 80:1,21 81:4,19 81:25 84:17 110:17
**1300**   123:5
**14**   21:6,7
**148**   4:24
**15**   5:4 88:8 125:16 150:22 151:12 170:23
**150**   5:4
**158**   5:17
**1585**   1:8 2:8 6:15 7:15
**16**   5:5 18:4 56:20 58:18 59:2
**16-18**   5:15
**161**   5:18,18
**16439**   181:23
**17**   1:17 2:19 6:1
**17,000**   18:5 68:20
**17-19**   5:15
**171**   4:6
**177**   4:5
**179**   4:6
**17th**   6:6 7:6
**18**   125:14
**182**   1:25
**1820**   182:2
**18th**   65:25

**19-20**   5:18
**1978**   162:16

## 2

**2**   4:12,15,22 28:10 63:23 64:10 66:17 81:4,19,25
**2,000**   147:11,12
**2.3.**   152:11 172:15
**20**   16:7,8 17:5,8 43:5,8 183:16 184:22 185:22
**20-21**   5:16
**200**   3:15
**2008**   36:15
**2009**   105:15 106:21 107:5
**2012**   159:17 172:19 174:4,6
**2013**   4:14 36:16 37:10 39:3 124:3 125:25 128:6
**2014**   27:4 38:25
**2015**   49:4,9 57:11 125:15
**2017**   62:14,25 63:17 65:25 152:6 171:19
**2018**   57:18,20 59:25 60:2,9 61:7
**2021**   97:2,6 121:6,10
**2022**   1:17 2:19 6:1,6 7:6 178:20

**182:4**
**21**   4:11 5:17 10:10,11,12 40:2 40:6 75:5,7 159:12
**216-523-1313**   182:3
**22**   4:12 27:18,21 27:24
**23**   4:13 120:1,4,7
**24**   4:14,14 123:19,21,24 126:7
**24th**   57:18,20 59:25 60:2,9 61:7 124:3
**25**   5:16
**25382**   8:13
**27**   4:12 75:9,10

## 3

**3**   4:13,20,23 50:11,17,24 59:12 75:22
**3.1.**   173:6
**3.3**   152:12,20 174:14
**30**   159:12,14 160:3,9,21 161:13
**314**   3:8
**33**   5:15
**33487**   3:16

## 4

**4**   4:21,21 5:5 39:16,22 40:6 51:6,10,10 81:5 81:19,24 82:1

[4.1 - agree]                                                                    Page 2

| | | | |
|---|---|---|---|
| **4.1** 154:18 | **7** | **able** 10:22 11:5 | **actions** 47:13 |
| **4.1.** 154:18 | | 12:8 86:5,15 | 93:23 172:18 |
| **400** 16:10 | **7** 5:4,17 8:15 | 128:6 150:11 | **actual** 110:7 |
| **42** 4:22 | 16:1 61:20,25 | 166:8 | **add** 176:11 |
| **43** 17:7 | 62:4,13 63:9 | **absolutely** | **added** 36:16 |
| **44114** 182:2 | 64:1 65:7 66:6 | 156:14 | **address** 8:10 |
| **450,000** 23:19 | **70** 76:2 | **accept** 13:12 | 26:5,7,8,18,20 |
| **46** 5:15 | **700** 3:6 | 63:10,15 | 37:3,19 182:15 |

| | **71** 76:2 | **access** 26:23 | **adhere** 141:17 |
|---|---|---|---|
| **5** | **719-3732** 3:8 | 109:6 111:21,24 | 141:18 |
| | **72** 4:15 | **accessible** 26:21 | **administer** 7:22 |
| **5** 4:11,20,22 | **73** 4:25 120:18 | **account** 110:2 | **administered** |
| 42:22 43:1,4,8,9 | **75** 4:13 120:18 | 111:24 123:1,3 | 8:2 |
| 43:13 50:9 | | **accounting** | **admissible** 93:23 |
| 121:11 | **8** | 118:4 | **admit** 6:23 |
| **5.5.** 174:22 | | **accounts** 117:24 | **admitted** 130:8 |
| **51** 4:21 | **8** 4:5 18:1 32:14 | **accurate** 17:24 | 132:22 |
| **5581188** 1:24 | 32:15 33:5 | 29:16 30:15,16 | **advance** 14:19 |
| 182:7 183:2 | **83** 5:16 | 30:17,18 65:3 | **advantage** 96:3 |
| 184:2 185:2 | **84** 5:16 | 73:22 167:12 | **advice** 34:3 |
| **56** 5:5 | **8:21** 1:8 2:8 6:15 | 181:12 | 38:22 166:4 |
| **561** 3:17 | 7:15 | **accused** 136:5 | **advise** 57:11 |
| **58** 5:16 | **8:57** 2:18 6:2 | **acknowledge** | **affidavit** 64:1 |
| **5th** 2:17 | **8:59** 6:5 | 154:21 183:11 | 101:24 |
| | **8c** 34:11 | 184:16 | **affixed** 183:15 |

| | | **acknowledge...** | 184:21 |
|---|---|---|---|
| **6** | **9** | 154:20 | **agency** 172:22 |
| | | **acquire** 85:9,21 | **ago** 9:1,2 20:9,10 |
| **6** 4:23,24 18:4 | **92626** 2:17 | 88:20 | 20:10,11 38:12 |
| 49:4,9 57:11 | **994-4499** 3:17 | **acquired** 114:19 | 38:12 107:16 |
| 61:10,14,21 | **9:01** 7:2 | 115:4,7 | 164:23 |
| 68:20 84:18 | **9:05** 7:5 | **act** 34:9 183:14 | **agree** 12:21 |
| 121:11 182:4 | **9:30** 27:14 | 184:20 | 30:25 31:9 |
| **61** 4:23 | **9:32** 27:17 | **action** 6:12 7:12 | 35:25 48:18 |
| **611** 2:16 6:11 | | 32:21 152:6 | 57:20 60:15 |
| 7:11 | **a** | 171:19 174:4,6 | 66:5 78:14 |
| **6111** 3:15 | | 181:15 | 79:25 94:4,8,10 |
| **63105** 3:7 | **a.m.** 2:18 6:2,5 | | 94:12,13 97:1 |
| **64** 75:22 76:2 | 7:2,5 27:14,17 | | |
| **68** 4:25 | 56:6,9,14,17 | | |
| | 88:11,14 | | |
| | **ability** 176:25 | | |

**[agree - answering]**                                                                 Page 3

99:1 102:18,23
121:8 126:6
127:8 128:16
131:23,25 138:3
138:5 152:7,19
154:21 166:14
177:7 178:9
**agreed** 144:8
**agreement** 5:4
87:21 99:9,10,11
99:20,22,25
100:4 104:9
149:20 150:23
151:16,24 152:2
152:8,15 153:1,4
153:10,16,23
154:6,22,25
155:13 156:6,18
156:23 157:25
158:18 170:23
170:24 171:9,17
172:10 174:2,4
174:24 175:3,8
175:18,22
**agreements** 99:4
136:20
**ahead** 43:5 44:1
46:13 49:13
58:3 64:24
67:20 68:12
71:14 73:4
77:16 81:17
83:10 91:7
93:10 101:3
102:2,7,19,19,20
103:14 104:1
112:11 113:19
116:10,17 122:2

125:1 128:22
130:17 131:4
139:2 142:8
151:15 156:1
157:2,12,13
158:7 166:7,17
166:18 167:13
168:12,13
169:24 171:23
177:22
**al** 6:13 7:13
182:6 183:3
184:3
**alfred** 36:22
37:12 49:25
78:19 84:25
107:14 111:21
112:2 124:5
127:1 168:20
**alleged** 11:24
**allow** 98:17
**allowed** 13:16
70:10 99:10,12
101:16 160:6
**allows** 156:6,18
156:23
**allude** 65:24
150:9
**amex** 123:4
**amount** 176:10
**amounts** 122:24
**amundsen** 3:4
**angeles** 6:9 7:9
**answer** 5:14
9:12,17,20,24
11:3,19 12:4
13:21 15:25
16:14,17 18:21

22:25 24:1
27:25 29:25
30:7,21 31:5,14
31:17,25 32:8
33:22,23 34:3,8
35:17,22 36:9
41:5 43:2 44:1
44:11 45:4,15
46:6,13,14,21
47:9,25 48:22
49:12,19 50:6
52:16 53:1,12
54:16 55:23,24
58:3,9,24 59:10
60:6,12,20 61:4
64:23,25 65:11
65:13 66:12
67:18,19 69:4,19
70:2,7,21 71:6
71:14 73:2
76:23,25 78:25
80:4 82:14,21
83:10 84:6
85:23,25 86:5,16
86:18 89:7,17
90:4,20 91:6
92:21 93:9,10
94:16 95:24
96:7,15 97:11,18
98:7,20 101:3,11
102:2,7 103:2,4
103:14,17 104:1
104:17,18
108:21 109:3,5
113:3,19 116:2
116:10,17
117:11,16,20
120:8 122:3

123:25 125:1,13
126:12,24
127:24 128:2,22
129:4,6,17,23
130:6,17 131:4
132:17,18
133:18 134:18
134:21 135:1,2
135:13,21 136:2
137:11,24 139:2
140:1 143:5
144:5,12 145:6
146:19 149:3,24
150:16 151:13
152:22 154:1,11
155:16,22 157:2
157:14,23 158:6
158:22,23 159:2
159:23 160:5,7,8
160:11,20,25
161:22 162:2
166:19,20
167:13 168:3
169:23,25 170:5
171:14 175:11
176:8 177:6,23
**answered** 31:15
45:25 73:3 80:3
103:12 104:15
112:10 117:13
117:18,21
130:14 143:4
146:14 155:14
155:25 158:5
166:18 169:19
**answering**
167:18

**answers** 12:11
49:13
**anton** 2:16 6:11
7:11
**anybody** 14:10
21:9,11 25:19
33:12,17 55:2,5
55:14 73:11
76:11 83:2
87:23 92:16
105:21 110:4
115:14 122:11
122:15 136:8,10
136:15,25 137:3
137:14 149:6,11
153:19 165:11
178:14
**anybody's**
115:18 176:9
**anymore** 59:24
87:9 111:25
179:4
**anything's** 70:3
116:20
**anyway** 57:1
92:11
**anyways** 140:18
**apartment** 91:19
**apartments** 18:5
24:22 52:22
68:21
**apparent** 20:19
**appear** 77:14
79:25 152:20,23
152:25 153:9,14
183:11 184:15
**appearances** 3:1

**appearing** 3:19
3:24 77:23
**appears** 65:7
80:21 153:8
**appended**
184:11,18
**application** 4:25
74:9,14 80:20
110:16
**appreciate** 49:2
59:23
**approach** 89:2
170:6
**approaching**
134:12
**appropriate**
95:25 96:4,9,22
98:8 105:20
**approval** 141:22
141:23
**april** 4:14 124:3
**architects**
169:11
**area** 25:22
**arguing** 53:11
**argument** 54:1
161:16
**argumentative**
31:23 46:20
102:20 129:3
146:18 155:15
168:13
**arising** 154:24
155:12
**art** 4:25 80:20
80:23 86:14
94:22 98:17
110:16 111:6

124:7 130:19
137:20 139:5,19
140:2,3,24
141:21 142:1
143:6,7,9 144:7
145:8 148:11
157:15 163:3,4,5
163:9,18 164:12
165:2,9,12 176:2
**art's** 163:11
**artist** 83:20
84:14 94:14,15
94:21,24 95:11
95:13 115:1
135:24 138:3,5,7
139:14 148:20
**artist's** 94:11
95:21 101:17
**artistic** 95:17
**artists** 94:5,7
138:2
**arts** 139:21
**artwork** 55:25
68:22 88:19
90:23,25 91:3,9
91:24,25 92:2,17
93:4,18 95:21
98:25 101:15,17
107:23 118:13
118:15 138:9,14
139:11 140:15
142:13 146:9
156:19
**aruaz** 32:23
34:12,25
**aside** 59:15
106:15 123:8

**asked** 31:15
45:25 72:6,8
80:3 85:5 86:8
89:8,11,18 90:9
95:20 103:12
104:15 109:7
112:9 117:5,12
119:5 122:17
127:9,15,20,21
128:4 130:13
143:4 146:14
155:14,25 158:5
160:5 162:6
163:21 166:18
169:19
**asking** 12:16
14:6 34:6 58:8
71:13 77:8
90:22 104:13,13
127:14 130:10
132:12,13
167:22 174:7
**assembled** 114:6
**assert** 173:18
**asserted** 160:6
**asset** 159:15
**assets** 118:19
159:4
**assign** 18:15
**assignment**
183:2 184:2
185:2
**associate** 162:22
**associate's** 162:8
**assume** 10:4
37:18
**assumes** 91:5
113:17 115:25

126:22 127:11
135:11 167:10
167:25 168:10
**assuming**  137:17
**attached**  184:7
**attempt**  12:11
**attempted**  13:10
134:22
**attention**  15:19
27:6 32:13
54:15 56:24
57:3 61:9,20,25
73:23 75:4,7
84:16 150:21
151:7,20 152:10
159:12
**attorney**  3:5,14
6:17,18 7:17,19
12:10 33:21
52:25 53:3 58:1
58:22 70:22
114:11 140:1
150:3 153:20
167:17 181:16
**attorney's**  34:2
**attorneys**  14:20
14:21 42:15
53:6,17 54:15,16
57:8 58:18,20
76:14 77:7 79:9
79:16 98:14
105:8 106:8
114:10,11
136:13 167:2,15
167:21
**authorize**  82:24
83:5 184:11

**authorized**
28:14 58:20
179:3
**authorizing**
83:14
**available**  78:15
79:20 80:1
108:24
**ave**  182:1
**avoid**  172:12
175:4
**awarded**  23:19
**aware**  11:24
13:6,23 23:9,16
41:12,14 42:9
54:10 73:11
79:21 83:1,2,13
88:5 90:23 91:1
92:13,15 93:2,3
93:16 94:1
99:17 106:9,14
109:17 112:4
134:12 136:15
136:25 161:4

**b**

**b**  32:21 154:21
**back**  15:20
24:13 27:4
38:25 40:2
49:14,17 60:22
67:7 75:4 93:13
102:9 106:23
118:21 121:20
128:6 159:12
164:11 172:12
182:15

**background**
162:7
**backwards**
155:10
**bailiwick**  163:11
**bar**  93:3,17
**barrel**  144:6
**base**  87:8
**based**  18:6,12
49:12 99:19
153:13 154:1
**bases**  145:9
**basis**  39:11
**bates**  74:22,24
75:21 81:5,25
84:17 120:17
**bathroom**  171:2
**beach**  8:15 16:1
19:10 25:6
32:22 33:12
74:15 80:25
110:23 124:7
127:7 140:6
164:14 166:4
175:25 176:2,24
**beauty**  177:25
**becoming**  20:3
**bedford**  83:23
84:2,14 135:24
136:16 137:5,14
148:22,24 149:7
164:19,20,22
165:12
**bedford's**  83:25
138:5
**beef**  141:20
144:1,3

**beginning**  2:17
38:23 128:18
**behalf**  2:16 6:14
7:14 12:2,9 13:7
13:21 14:6 28:8
62:10 103:8
**behold**  88:21
**beholder**  177:25
**belief**  32:18
99:24
**believe**  12:1
23:21 25:9 29:6
66:4,7 67:1,14
77:23 95:21
96:11 97:23
98:16 99:7,12
100:13 120:1,7
120:16 148:7
154:5,6 156:17
156:22 157:19
157:19 158:2
168:18 177:2
**believed**  95:20
**believes**  94:10
95:7
**belong**  158:11
**best**  9:19 14:1
31:4,6 41:5
42:13 44:1 50:7
53:12 70:24
116:15 129:18
129:20 130:18
145:6 154:1
**bet**  34:4
**bill**  83:23 84:14
138:5 148:22
149:7 164:19,20
164:22

**[bit - center]** Page 6

**bit** 9:6 32:13
  39:18 61:16
  148:23
**board** 21:5
**boca** 3:16
**boom** 120:22
**boss** 90:13,14
**boston** 162:14
**bottom** 28:10
  64:4 74:11,23
  82:1
**boulders** 176:23
**boulevard** 2:16
  6:11 7:11
**boynton** 19:10
  25:6 32:22
  33:12 74:15
  80:25 110:23
  124:7 140:6
  166:4 175:25
  176:2,24
**brea** 139:18,22
  140:9,16 141:11
  141:14 142:16
  142:22 144:20
  144:23 145:18
  145:24
**brea's** 139:19
  140:24 143:3,15
  147:4
**break** 9:22,25
  88:8 171:2
**brief** 27:15 56:7
  56:15 88:7,12
  148:1 170:16
**bring** 175:7
**broadly** 91:25

**broken** 3:15
**brought** 54:15
**brown** 1:22 2:19
  181:23
**bucks** 123:5
**build** 21:25
  116:19
**building** 22:16
  22:17
**builds** 22:3
**built** 22:8,8
**bunch** 93:20
**business** 20:17
  22:22 118:3
  146:2,4
**buy** 134:22
  135:5
**buying** 134:13
  147:2

**c**

**c** 32:22
**ca** 182:25
**california** 1:2,16
  2:2,17 6:1,9,11
  7:9,11 8:13
  37:24 42:1,7
  45:8 51:23 72:4
  139:22 163:23
  165:6 181:5
**call** 32:19 33:18
  43:9 95:1 119:7
  119:12 157:17
**called** 41:13,24
  42:3 51:22
  85:12 86:11
  119:5 148:18

**calls** 97:16 98:19
  101:10 130:5
  132:2,16 136:1
  141:4 149:23
  153:25 154:10
  156:25 157:9
  165:23
**capable** 13:7
  76:18
**caplan** 3:13
**card** 123:4,4
**care** 130:19
  143:14,21,24
  144:2
**career** 162:20
**carved** 176:17
**case** 1:7 2:7 6:15
  7:15 11:21
  23:22 41:13
  54:5 68:4 71:15
  71:20,22 72:1
  74:20 75:1,12,18
  75:24 76:7,13,20
  77:4,15,25 79:2
  79:7,23 80:18
  89:22 107:18
  109:24 112:3
  114:2,7 120:15
  149:22 156:3
  161:20 162:1
  163:18 164:7
  175:14 182:6
  183:3 184:3
**cases** 156:3
  157:15
**categorization**
  43:25

**caused** 150:12
  150:19
**caution** 134:15
  136:19
**cease** 20:5
**cecelia** 19:14,15
  19:16,17 25:10
  25:17 26:17
  27:1 32:23
  34:12,12 35:8
  55:9,10 119:12
  119:19,22
**center** 4:12 19:9
  24:16,17,21 25:3
  25:5,7,10,19
  27:2,22 28:4,8
  28:14 32:23,24
  33:1 34:11,21
  35:3,4,11 36:1,7
  36:18 48:16,20
  49:5,10,23 52:11
  52:13,23 54:9
  59:7 60:3,10
  66:1 72:13 81:7
  81:22 82:4,25
  83:6,15 84:3
  85:11,22 86:12
  86:24 87:14
  93:1 96:13 97:3
  98:5 99:13
  100:18 105:22
  106:11,21 107:5
  108:14 109:1
  112:7 118:21,24
  119:9 120:25
  121:10,19 122:1
  122:7 126:18
  128:6,18 136:18

[center - complaint]

137:7,16 138:18
139:11 147:9
148:13,14
163:14 164:3
165:4,9,13
177:18
**central**   1:2 2:2
3:6
**certain**   109:22
161:1
**certainly**   21:17
45:16 66:18
70:5 80:9 98:16
106:4 137:5
142:12 146:8
149:6,25 150:11
156:5,21 157:6
158:2
**certificate**
176:24 184:11
**certification**
183:1 184:1
**certified**   2:19
181:4
**certify**   181:5,14
**cfo**   118:8,9
**chance**   9:20
**change**   50:8
131:19 158:19
182:13,14 184:8
185:3
**changes**   182:12
183:7 184:7,9
**charge**   16:11
26:23 35:11,13
89:1 90:11
106:19 107:3,12
108:12 114:9

119:9 137:20
**charges**   172:20
172:20
**checked**   72:6
**chinese**   114:25
**chipping**   95:19
**choose**   131:2
**chose**   70:18
**chris**   3:5 6:18
7:18 11:10 38:6
39:23 40:3 43:4
67:20 69:1 74:1
77:2 81:9 117:9
117:14 123:13
160:14 165:23
169:19 177:11
179:24
**cities**   169:13
**city**   32:21 74:15
80:6,25 110:21
110:22,23,24,25
111:12,20 124:7
139:19,22 140:3
140:9,15,23
141:11,14
142:16,22 143:3
143:15,23 144:1
144:2,20,23
147:4 176:5,24
**city's**   80:23
143:25 146:25
**civil**   13:16 183:5
184:5
**cjc**   1:8 2:8 6:15
7:15
**claim**   150:9,14
150:15 172:13
173:16,18

174:10
**claimed**   152:16
174:15,17
**claims**   23:4
149:17 152:5,16
154:23 155:4,9
156:12 171:17
171:18 174:3
**clarify**   14:16
16:14 25:2
148:24
**classic**   77:6
**clause**   100:4
174:25 175:1
**clauses**   99:21
100:13
**cleaned**   179:21
**clear**   12:24 13:1
45:18 47:17
53:20 96:23
156:14 174:12
**cleveland**   182:2
**client**   23:6 33:21
39:19 40:11
52:25 53:3
58:22 70:22
167:17
**close**   125:18
147:19 170:12
**closer**   18:3
**cognizance**
83:18 84:3,8,9
84:13 85:24
87:17
**coles**   124:10
**collect**   22:19
**collectively**
57:10

**college**   162:10
**come**   37:22
111:15,17,18
117:9 119:12
123:2 169:19
**comes**   142:12
170:7
**comfortable**
167:18
**comiller**   3:9
**coming**   98:13
111:11 130:10
130:12 147:19
172:12
**commercial**
141:1,4,7
**commission**
124:7 183:19
184:25 185:25
**commit**   156:23
157:7
**communications**
33:21 53:1
70:22 136:16
**companies**   17:22
20:18
**company**   8:20
16:15 19:22
21:22,23 25:4,23
35:9 38:13,14,21
112:20,25 113:6
**company's**   16:25
**compensating**
94:11 96:4
**compile**   105:9
**complaint**   11:20
11:24 159:5
172:18

complaints
172:20
complete 172:11
completed 84:19
84:21 85:2
182:15
complex 24:15
complexes 91:19
compliance 5:5
56:21
complied 56:1
68:4 70:25
101:12 143:16
165:21 166:15
comply 45:8,19
140:23 141:10
142:5,15 143:3
143:14 147:4
165:19
complying
143:21,24
compound 69:18
125:12 126:22
129:5 135:11
compromise
152:3
concerned
163:11
concluded 40:18
conclusion 97:17
98:19 101:10
130:5 132:2,16
136:1 141:4
149:23 153:25
154:10 156:25
157:9 165:23
180:1

confidence 72:19
72:21
confident 72:23
73:7 111:15
confidential 84:5
87:21 132:4,6,9
134:16,19
136:20 137:10
149:2 167:1
confirm 75:21
confusing 39:24
conglomeration
73:16
connection
51:19
consider 162:23
163:1
considered 17:3
consists 148:6
constitute 99:25
constituted
100:1
construction
16:5 25:21 26:3
37:2,5,8,15 38:2
38:9,19 100:9
162:10 168:22
169:1,5,10 175:2
construed 174:2
consultant 21:18
contact 26:14,23
84:25
contacted 98:3
contacting 98:12
contained 29:15
175:7
contents 31:2,11
32:12

context 65:15
continue 24:24
continued 5:1
continues 64:5
continuing 43:24
83:7
contractor 22:9
96:9
contractors
169:12
contracts 175:2
control 88:23,25
89:5,6 133:17
159:17
controlled 63:22
64:9,19 65:6
66:1
controlling
133:16
controversies
152:3
conversation
164:16
conversations
166:6 167:2
cool 178:2
coordinates
176:11
copies 42:10
43:21 44:20
45:1 47:4,22
57:11,21 67:2,15
67:23 103:9
114:19 115:4
127:15 128:4
129:15 134:23
135:8 166:23
167:9

copy 10:13 41:11
43:17 44:5 48:6
55:10,13 81:12
81:14,16 105:21
151:4
copyright 23:4
23:10,17 93:5,19
153:17 158:9
copyrighted
41:12 132:1,14
132:22 133:2
134:13 135:6
136:17 137:6,15
137:17 139:8
153:24 154:8
157:21
copyrights 94:5
94:7 135:25
136:6 158:10
coral 176:17
corp 1:9 2:9
16:18 17:1
32:19 57:9
corporate 8:15
8:16 10:9 11:5
12:20 13:2,11,14
13:20,23 16:1
17:18,18 63:7,15
75:15,20 115:2
corporation 8:18
13:18 15:21
16:4 28:5
145:21 167:15
correct 8:18
17:16 19:10
20:1,22 22:7,20
23:7,11,17,20,23
24:5,9,18,23

[correct - damage]                                                    Page 9

28:8,11,15,20,21
29:18 31:2,7,12
31:18 34:19
36:1,7 40:16,19
41:2 42:1,4,7,11
43:15,18,22
45:13 48:20
49:6,10,17,23
50:1,4 51:11,13
53:9,21,24 57:18
57:23 60:17
61:7,8 62:5,8,11
62:21 63:1,7
64:17,21 65:9
67:5,24 68:9
70:5,19 71:4
73:10,21 74:15
74:20 78:3,19,23
80:2,10,25 81:7
82:11,19 83:15
86:6 97:2
102:14,25
103:20,23 104:6
110:13,17
111:22 113:16
114:12,23
115:12,16,19
117:1,4 120:18
121:6 124:3,5,8
124:11,17,20
125:6,10 126:7
126:10,21
127:10 131:15
132:1 133:22
134:1 137:7
138:3,5 140:16
142:22 145:14
146:1,3,6 147:9

148:13,25
149:17,20
151:18 155:21
167:6 168:7
177:19 178:18
178:23
**corrections**
182:12 184:17
**correctly**   155:1
**cost**   86:8 146:16
149:25 176:19
**costa**   1:16 2:17
6:1,11 7:11
**costs**   143:8
145:5
**counsel**   5:14
98:8 100:21
123:10 126:25
166:5,7 174:6
**counter**   149:17
150:9,14,15
**country**   17:16
17:23
**county**   183:10
184:15
**couple**   17:12
122:12
**course**   38:1
76:19 77:15,25
88:9 114:7
124:14 127:14
128:18 140:13
147:23
**courses**   162:9
**court**   1:1 2:1
7:22 9:8 23:22
47:13 53:23,25
57:7 67:9 82:12

93:14,23 107:1
121:21 127:21
166:22 167:7,22
167:23 168:1,8
172:22 183:7
**covenants**
172:19
**covered**   172:6
**covers**   66:17
**created**   84:14
148:20
**creates**   94:22
95:16
**creating**   141:14
148:25
**creation**   95:17
**creations**   95:22
**credit**   123:4
**crimes**   157:16
**cross**   174:9
**crossed**   174:1
**csr**   1:23 181:24
**current**   32:21
158:21 169:4
**currently**   21:14
105:1 138:12
178:16
**custodia**   32:22
**custodial**   32:25
35:2,4,10
**custodian**   33:15
**cv**   1:8 2:8 6:15
7:15

---

**d**

**d**   32:23
**dale**   1:15 2:15
4:3 6:12 7:12

8:1,9 13:12
31:25 33:24
44:1 46:12,21
49:12 52:25
53:13 54:2,16
58:3,24 62:1
66:12 68:2 73:4
77:7,7,16 78:7
79:8 84:5,6
86:16 87:1,20
93:11,20 94:16
98:7 102:8
104:1,17 107:8
112:11 113:19
116:10,15,15
117:20 122:3
125:1 127:19,24
128:22 130:17
131:4 132:17
134:15 135:10
136:19 137:9
138:25 139:2,25
141:6 142:8
145:6 146:19
149:1,24 156:1
156:10 157:12
158:23 159:21
162:2 166:1,18
167:1,13 168:3
168:12 169:24
169:24 170:24
171:7 173:6
179:13 182:8
183:4,9 184:4,13
185:20
**dale's**   12:22
**damage**   150:1

**[damages - dfm]**                                                                    Page 10

damages   23:19
  149:22 150:8,12
  150:19
dare   34:4
data   73:16
database   73:15
date   20:8 37:9
  60:17,24 113:7
  121:5 181:17
  182:8 183:3,9,19
  184:3,13,25
  185:20,25
dated   124:2
  181:20
dates   133:12
dating   27:4
daughter   20:22
  90:15
day   21:15,15
  53:20 118:3,3
  152:17 183:16
  184:22 185:22
days   182:18
deal   156:3,12
  175:2
dealer   86:14
dealing   105:17
  127:5 162:10
dear   182:10
debating   95:10
debby   124:10
decades   20:9
deceased   108:5
december   65:25
  182:4
decided   135:7
  158:24

decision   144:10
declaration   4:12
  4:23 27:22 28:7
  28:17,23,25 29:2
  29:4,6,17,20
  30:5 31:1,10,11
  32:5,13 56:22
  62:4,7,10,13
  65:8 102:14
  103:7,22 167:23
declarations
  101:21 102:23
  167:7
decorators   91:18
deed   183:14
  184:20
deemed   105:24
  105:25 182:19
defend   149:25
defendant   8:17
defendants   1:11
  2:11 3:12 7:20
  57:9
defending   150:4
defense   32:20
definitive   47:15
degree   162:8,15
  162:17,22
delete   112:24
deleted   113:11
  113:23 115:22
  116:6 117:24
  124:23 125:22
  125:24 126:4
deletes   118:3
deliver   62:15
  63:1

delivery   62:15
  63:10,16
department   21:5
  32:22 33:13,18
  182:22
depends   12:5
  151:5 159:22
  160:10
depict   51:13
depicted   50:23
depo   166:1
deposed   8:25
  13:10
deposition   1:15
  2:15 4:11 6:12
  6:14 7:12,14
  8:21,23 10:11,20
  12:23 13:1,2,3
  13:13,13,17,19
  14:19 161:6
  169:20 180:2
  182:8,11 183:1,3
  184:1,3
depreciation
  159:4,15
derivative   64:9
  64:15 103:9
derivatives
  62:15,19 63:21
describes   81:5
description   4:10
  4:19 5:3
design   145:9
designated   13:8
  13:23
designed   158:13
designers   91:9
  91:12

designs   95:16
destroy   23:23
  24:5,8 42:10
  43:21 44:14,19
  45:6 47:4 50:4
  67:2,15,23
destroyed   42:17
  42:18 45:24
  46:3,18 52:12,14
  53:9,21,24 57:13
  57:22 59:13
  60:17,23 61:7
  106:11 116:24
  118:6 166:10,25
  177:9
destroying   45:1
  47:22
determination
  91:2
determine   69:24
  70:11,15 71:3
  89:12,24 129:11
  129:15 153:7
  166:9 168:15
determining
  91:22 92:1
developed
  161:25
development
  21:21,23 141:13
  141:16,18 142:5
  142:11 143:12
  162:11 168:22
developments
  142:22
dfm   1:8 2:8 6:15
  7:15

**difference** 95:12 95:15 102:10
**different** 17:17 17:18 50:20 82:3 140:5 144:14 145:5 147:3 169:13
**diligence** 131:7,9
**dinner** 134:10 135:4
**direction** 181:11
**directions** 37:25
**directives** 38:1
**directly** 20:12,15 21:2 35:8 127:9 169:15,17
**director** 169:1,2
**disciplined** 92:24
**discovered** 66:15 66:15 96:20 166:3,23
**discovery** 11:9 66:19 74:20 75:1 76:19 77:15,25 79:7,23 112:3 114:2,7 120:15 124:14 127:22
**discussed** 33:9
**discussion** 7:3 27:10 167:4
**display** 48:19 49:23 52:11 54:20,25 68:9,16 71:25 73:12 81:6,22 82:4,25 83:5,14 84:3

87:14,18 88:18 90:24 92:18 93:1 96:12 98:17,25 106:10 106:20 107:4 108:13 135:7 137:6 138:9,14 140:14 146:5,10 146:17,23 147:8 154:7
**displayed** 36:3,5 41:25 42:6 49:5 49:9 59:7 60:3 60:10 72:20 73:8 85:11,22 86:12,23 87:9,10 90:1 91:3,10,22 92:1,12 97:1,6 118:15,22 126:19 133:25 137:16 139:11 140:22 144:19 144:23 148:12 148:15 159:16 163:14 165:9,12
**displaying** 48:11 55:19 89:13 90:23 92:17 93:4,18 134:8,23 136:17
**displays** 140:24
**dispute** 135:17
**disputes** 152:3
**distinct** 55:25
**distinction** 49:2
**district** 1:1,2 2:1 2:2

**division** 1:3 2:3
**dobay** 124:10
**document** 23:25 41:3 42:12 43:23,25 45:3,14 46:10,19 53:10 56:20 58:10,17 58:21 59:12,17 59:23,24 61:23 65:1,12,16 66:14 76:2,9 77:9 78:4 78:8,23 79:2,6 79:13,14,19 81:11,16 103:3 103:11,12 105:2 105:11,14 112:23 113:1 124:13 126:11 126:16 127:12 127:13 152:21 153:3 155:6,24 156:8 171:8,10 171:20
**documents** 14:22,23,24 15:1 67:25 73:20 74:3 75:12,18,22 76:6,8,12,18 77:3,8,13,14,18 77:20,23 79:25 80:7 105:10 106:6,9,14,19 107:4 108:13,24 109:14,16,19 110:15 111:11 112:5 113:15 114:6 116:4,23 118:3 120:12,14

120:20 161:7,8 177:3,8,9
**doing** 114:9 142:18
**dollar** 176:10
**dollars** 145:16 146:5 147:5,7,10 147:11
**don** 23:6
**donald** 1:6 2:6 6:13,19 7:13,19 182:6 183:3 184:3
**double** 60:18
**doubt** 28:19 76:16 85:19 116:25 117:2,6,8 139:9 149:12
**doubts** 117:15
**due** 131:6,9
**duties** 18:6 38:2 169:9

**e**

**e** 8:5 32:25 171:5 177:15,15 179:10,10
**earlier** 10:8 12:13 25:9 34:13 40:10 51:19 52:7 68:20 73:14 83:8 95:20 97:21 101:15 103:7 110:16 138:2 148:23 162:6 165:15,25 169:14,20

**[easier - exhibit]**

easier 9:10,15
78:12
easily 68:7
easy 76:25
education
162:13
educational
162:6
effect 111:5
efforts 47:21
165:18
eight 173:8
either 14:15
20:25 22:2
26:22 55:19
60:16 83:15
113:10 114:16
132:5 145:25
elanne 3:23 6:7
7:7
elderwood 8:13
electrical 162:8
162:21
elicit 11:11
else's 66:11 93:5
93:19 128:21
email 26:5,7,8
26:18,20 37:3,18
39:13 110:2
111:24 112:3,8
112:20,24
113:20 117:24
182:17
emails 110:3
111:21 112:20
113:11,15,22
114:4 115:11,23
116:4 117:23

125:21 126:3
employed 17:4,6
91:12 108:6
125:9
employee 16:17
16:22 17:7
18:15,16 36:24
37:1 78:18,19
92:24 101:23
117:25 181:15
employees 15:3
16:9,11,19,20
21:2 69:11 93:4
93:17 101:16,21
102:13
employment
18:7 39:14
enclosed 182:11
encompasses
160:24
ends 26:10,19
enforce 174:3
engineering
162:9
engineers 169:12
ensure 47:21
entered 39:17
40:7,19 43:14
47:5 48:19 49:4
55:11,13,21
57:11 70:19
78:22 80:2
89:21 96:24
101:8 102:24
151:16 184:9
entering 172:9
entire 162:20
174:24 175:2

183:5 184:5
entities 17:11,13
18:19 19:21
24:25
entitled 6:12
7:12 13:19
56:21 160:20
entitlements
169:12
entity 17:6 84:23
133:16
entry 124:23
era 36:15
errata 182:13,18
184:7,10,18
185:1
esq 182:5
essential 22:22
estate 21:21,23
21:25 22:2
estimate 20:9
et 6:13 7:13
182:6 183:3
184:3
event 79:25
eventually 45:7
80:12 143:10
evidence 109:4
113:18 116:1
126:23 127:12
135:12 167:11
167:25 168:11
exact 9:19 20:7
41:8 51:25 52:2
133:12 168:20
exactly 41:18
examination 4:2

examined 8:2
example 38:25
excavation
179:15
excel 73:15
excellent 153:15
executed 104:2
184:10
execution 152:17
154:24 155:12
183:14 184:19
exhibit 4:11,12
4:13,14,20,21,22
4:23,24,25 5:4,5
10:10,11,12,15
27:7,18,21,24
40:2,6 42:20,22
43:1,4,8,13 50:9
50:11,17,24 51:5
51:6,10,10,15
56:11,20,20
58:18 59:2,15,17
59:20 61:10,14
61:21 62:4
66:24 67:12
73:24 74:2,3,5,8
75:5,7,21 76:5
77:13,14,24 78:2
78:14,18 79:19
80:1,21 81:4,19
81:24 84:17
85:6,9 110:17
119:24,25 120:4
120:7 123:12,19
123:21,24 126:7
148:6 150:22
151:12 159:12
170:23

[exhibits - financial]

exhibits   4:9,18
  5:2 147:21
existing   22:9
  152:4
expert   87:2
  145:4 161:19,25
  162:23 163:1
expertise   21:19
  21:20 119:13,15
  119:21
expiration
  183:19 184:25
  185:25
explain   111:18
extend   152:15
extent   134:16
  149:1 155:22
eye   177:25

**f**

f   177:15 179:10
faces   41:16,23
  42:10 43:21
  44:9,15,20 45:2
  45:12,17,23 47:5
  47:23 48:12,15
  48:19 49:5
  50:24 51:3 52:5
  54:9 55:20
  57:12,21 59:6
  60:3 62:20
  63:16 64:16
  66:8 67:2,16,23
  68:8 71:11
  72:11,20 73:12
  78:3,11 83:4,6
  83:14 85:20
  87:14 89:13,25

92:25 96:12
98:4 99:13
100:17 106:10
110:5,10 111:8
112:6 113:15
114:20 115:5,12
118:23 120:25
121:9,18,25
126:9,20 127:10
127:16 128:5
139:4 140:23
141:24 144:19
146:5 147:8
163:13 166:24
fact   102:17
  115:21 131:14
  136:13
facts   11:17,23
  28:22 30:4 91:5
  109:4 113:18
  115:25 126:22
  127:11 135:11
  167:11,25
  168:10
factually   104:13
fair   9:25 10:6
  21:23 34:10
  41:10 65:14
  76:3 84:24
  86:20
faith   54:4
fall   42:4,11
  43:22 44:9,15,20
  45:2,13,17,23
  47:5,23 48:12,15
  49:9 51:13,17,18
  51:22,24 54:8
  55:20 57:12,22

59:6 60:9 62:21
63:16 64:17
66:8 67:3,16,24
68:8 71:11
72:11 73:8 82:6
82:17,25 85:12
86:11,23 87:5
89:14,25 93:1
96:13 98:5
99:14 100:17
106:11 110:13
112:6 113:16
115:8,18 121:3,9
121:18,24 126:7
126:20 139:4
140:23 141:24
144:22,25 146:6
147:9 163:13
166:24
false   31:12 32:6
  60:15 101:21
  102:14,25 103:9
  103:23 104:14
  104:20,22 168:9
  168:11,16,16
familiar   23:6,8
  24:17 28:22
  76:9 120:11
  131:20,21
  139:14
far   11:24 13:23
  72:25 86:17
  113:1 130:25
  145:4 163:10
fault   130:2,11
fbi   172:18
federal   13:16

feel   76:24 167:18
feeling   160:14
fees   150:3
feet   68:20
felt   30:14 96:22
fighting   144:14
figure   19:5
  104:10,22
fike   36:22,23
  37:16,17 55:4,5
  107:13 108:3,5
file   58:21 80:20
  153:17
filed   11:8,17,20
  15:16 23:10
  39:19 40:11
  57:17 58:1,18
  59:3,5 71:15,20
  80:19 96:16
  97:22 105:7,23
  106:3 119:2
  149:16 159:21
  161:5 172:18,20
files   109:6,20
  110:3,5,9,12
  125:6
filing   78:15
  93:24 98:12
  109:10 138:21
final   100:10,10
  100:12 156:15
  172:11
finally   144:8
financial   11:9
  118:16 159:3,7
  159:14,22
  160:23

**financially** 181:14
**financials** 161:17
**find** 13:22 54:14 56:11 109:16 175:19 182:11
**finding** 54:8 79:6 100:15
**fine** 10:16 43:8 62:23 67:17 81:12,17 87:21 149:24 151:3 161:15
**finish** 9:11,14
**first** 23:13 24:14 38:23 39:20 40:11,21 41:22 46:10 54:9 56:24,25 57:4 58:8,11,11 61:22 74:8,11 75:11,17 75:23 76:7 83:7 95:6 100:23 105:23 106:3 151:12,20 164:11 177:20
**five** 50:20,23 104:15 117:5 148:7 170:9 173:6
**floor** 2:17
**florida** 3:16 19:10 25:6 32:20 37:2,24 71:23 72:5 80:6 119:8

**follow** 115:1 179:12
**following** 14:10 32:19 34:2 61:3 120:2
**follows** 8:3 67:10 93:15 107:2 121:22 154:21
**foot** 18:2
**forecast** 160:18
**foregoing** 181:6 181:8,12 183:13 184:18
**forest** 8:13
**forget** 69:5
**forklift** 119:17 120:22,23 122:7 163:24
**form** 15:24 18:20 22:24 23:25 24:10 29:24 30:6,20 31:3,13,23 32:9 35:16,21 36:8 41:3 42:12 43:23 44:10,16 45:3 46:10 47:8 47:24 48:21 49:11,18 50:5 52:15 53:10,25 55:22 57:24 59:8 60:5,18 64:22 65:10 66:10 67:25 68:11 69:18 70:1,20 71:5,12 72:25 76:21 80:3 82:12

89:15 92:19 93:7,21 95:23 96:6,14 97:10 98:6,19 99:2,15 101:25 102:6 103:1,11,24 104:8,16 108:19 109:2 112:9 113:1,17 115:25 116:8 124:25 125:12 126:22 127:11,20 128:8 128:20 129:22 130:16,16,25 132:2 133:11 134:3,25 135:11 136:1 137:22 139:1 140:17 141:3 142:7,24 144:11 150:13 153:3 154:10 155:6,24 156:8 157:9,22 158:5 166:16 167:10 168:1,10
**forth** 181:7
**fortification** 173:24
**forward** 141:19 143:12 155:10 172:6 182:15
**fought** 143:7
**found** 23:16 79:13,14,22 82:10,18 100:16 102:16 108:9 178:6,11

**founder** 21:17
**four** 51:10 81:5 81:20,21 82:3 162:22
**fourth** 174:23
**frame** 90:3 92:20 93:11,22 101:2 133:7,8
**franklin** 162:14
**free** 183:14 184:20
**front** 65:8 81:15 103:13 150:25 153:1
**full** 100:9,9,12 172:11
**fully** 154:20
**further** 29:21 141:13,15 154:19,20 181:12,14
**future** 152:20,25 153:8,9,14 154:8 155:5,21 156:7 156:19,24 157:8 173:1,17

**g**

**gain** 22:18
**game** 144:7
**garage** 52:19,21 52:22 121:13,15 122:19
**gears** 50:8 107:7 131:19
**geez** 138:19
**general** 5:4 22:8 91:7 160:4

[general - heard]                                                              Page 15

169:12 171:9,10
**generally**  38:20
  66:25 67:13
  92:2 94:5 162:5
**getting**  33:20
  102:19 169:12
  170:1
**give**  12:4,11
  13:12 37:25
  42:13 46:12
  54:2 60:12
  62:23 68:2
  86:25 116:15
  132:3 141:5
  154:1 155:8
  156:10
**given**  8:23 12:23
  42:16 45:7,7
  109:25 116:14
  116:18 156:14
**gives**  58:5 145:4
**giving**  9:12
**go**  6:24 9:6
  11:10,14 25:1
  27:11 43:5 44:1
  46:13 49:13
  52:25 56:3,12
  58:3 61:11
  64:24 67:20
  68:12 70:11
  71:14 72:2 73:4
  77:16 78:13
  79:5 81:17
  83:10 91:7
  93:10 100:6
  101:3 102:2,7,19
  102:19,20
  103:14 104:1

109:11,13,23,23
112:11 113:19
116:10,16 122:2
125:1 128:22
129:10 130:17
131:4 135:4,13
139:2,25 141:19
142:8 147:21
151:11,15 156:1
156:1 157:2,12
157:12 158:7
163:17 166:7,17
166:18 167:13
168:12,13
169:24 170:9,24
171:3,23 172:15
173:6 174:23
177:22 179:17
**god**  31:23
**goes**  21:17 76:2
  76:2
**going**  6:23 7:1
  8:20 9:9,11,19
  12:22 13:24
  27:13,16 33:21
  36:25 39:19
  40:5,12 43:24
  50:10 51:5 56:5
  56:8,13,16 57:5
  59:24 88:10,13
  102:20 116:18
  117:5 123:12
  140:18 143:11
  147:24 148:2
  153:11 154:18
  155:10 159:2
  160:15 161:22
  167:16 168:12

169:24 170:14
170:17,24 171:1
172:6 173:25
175:6 180:2
**good**  6:4 7:4 8:7
  38:7 53:7 54:4
  85:6 88:7
  179:22
**governmental**
  172:21
**grader**  179:20
**grandmother**
  116:19
**granite**  138:16
  148:12,15
**granted**  46:22
  174:4,5
**great**  144:4
**grievances**
  172:20
**grinding**  95:18
**ground**  9:5
**grounds**  35:11
  35:14
**group**  69:10,11
**guess**  17:13 29:5
  52:9 71:24
  73:14 76:4
  79:17 80:6
  87:23 94:22
  106:15 109:9
  110:4 139:23
  142:5 160:25
  164:9 177:21
  179:19
**guessing**  116:16
**guy**  36:21 38:16
  88:25 89:1,3

119:8 158:13,13
164:5
**guys**  119:18
  151:5

**h**

**h**  177:15 179:10
**half**  123:13
**hammering**
  95:19
**handed**  61:14
**handing**  10:13
  27:20 42:25
  73:25 120:6
  123:23 148:5
**handpicked**
  133:25
**happened**  47:14
  79:18 88:23
  135:7 136:13
  178:25 179:1
**hard**  151:3
**harm**  157:7
**he'll**  179:22
**head**  88:25 89:3
  100:7 150:10,20
**headquartered**
  15:21
**headquarters**
  63:22 64:10
  164:13 165:3
**hear**  6:21,24
  95:4 118:7
  139:17,23
**heard**  9:5 95:1,6
  95:9,10 108:10
  118:4 139:16,18

**hearsay**  135:12
**hefty**  69:6
**heir**  20:19
**held**  7:3 27:10
**help**  17:13
  119:18 122:12
**hereof**  152:17
**hereto**  152:4
**hey**  81:9 150:23
  166:23 172:13
**high**  116:19
**highest**  19:22
  162:12
**highly**  85:19
  116:25 117:2,6,8
  117:14 149:12
**hires**  16:19
**hiring**  169:11
**hold**  46:9,9
  58:22 67:6,6
  105:10 109:11
**home**  8:11,12
**honest**  12:11
**hong**  139:15
**hope**  30:1
**hour**  88:6
  123:13,14,15
**house**  91:17
**housekeeping**
  147:20 168:19
**huge**  147:2
**human**  41:22
  42:10 43:21
  44:9,15,20 45:1
  45:12,22 47:4,22
  48:11,14,19 49:4
  50:24 51:3 52:5
  54:8 55:20

57:12,21 59:5
60:2 62:20
63:16 64:16
66:7 67:2,16,23
68:8 71:11
72:10,19 73:11
78:2,11 83:4,5
83:14 85:20
87:13 89:13,25
92:25 96:12
98:4 99:13
100:16 106:10
110:5,10 111:8
112:5 113:15
114:19 115:5,12
118:23 120:24
121:8,18,25
126:9,20 127:9
127:15 128:5
140:22 141:24
144:18 146:5
147:8 163:13
166:24
**hundred**  77:9
**hypothetical**
  157:10 178:24

**i**

**idea**  113:24
  116:11 139:16
**identification**
  10:12 27:18
  120:4 123:21
**identified**  66:13
  70:23 126:15,17
**identifies**  78:2
  126:7,9

**identify**  6:16
  7:16 73:20
  127:9,15 128:4,6
**identifying**  79:6
**identities**  17:18
**ifs**  126:25
**igor**  1:9 2:9 6:13
  7:13 20:1,20
  32:21 33:8,10
  57:9 62:4 64:24
  85:17 88:1 91:8
  106:4 137:18
  182:6 183:3
  184:3
**igor's**  12:22
**ii**  129:19
**images**  57:13
**imagine**  36:14
  137:2
**immediately**
  53:18 100:20
**important**  22:12
  22:17 168:7
  171:25 172:5
  174:19
**improper**  167:10
**impunity**  156:7
**inaccurate**  30:23
  167:24
**inbox**  112:8,24
  113:12,14 114:3
  115:11,19,23
**inboxes**  117:24
**include**  127:1
  143:10 145:8
**included**  19:8
  118:16 145:8,9,9
  182:13

**includes**  59:17
**including**  11:9
  16:16 63:22
  64:10 93:21
  152:4,17 159:15
**inclusive**  1:10
  2:10
**incorporated**
  184:12
**incorrectly**
  158:6
**incurred**  150:3
**indefinitely**
  154:9
**index**  4:1 5:1
**indicating**
  182:13
**individual**  1:10
  2:10 25:9 37:11
  115:7 131:20,22
**individuals**
  69:15 91:21
**information**
  5:10 11:10
  32:18 86:2,5
**infringe**  101:17
**infringed**  23:17
  93:5,18 131:25
  132:14 133:1
  135:25
**infringement**
  23:4,10 133:8
**infringing**  23:23
  24:5,6,9 41:2
  82:11,18 116:5
  116:23 126:18
  129:15 132:22
  134:8,23 135:8

136:5 140:15
167:9 177:17,21
**initially** 101:2
**injunction** 39:17
40:7,19,22 41:1
42:16 43:13,18
43:20 44:5,25
45:11,22 46:7
48:6,18 49:4,8
51:19 52:7,10
53:15 55:11,13
55:21 70:19
78:21 80:2,17,19
89:21 90:5
96:24 101:8,12
102:24 104:23
124:17,20,24
125:6,9,14 126:3
126:17 165:16
165:19,22
166:15 174:6
175:13
**input** 163:10
**install** 145:16
147:8
**installation**
36:18
**installed** 35:23
36:1,12 112:7
**installing** 35:19
**instant** 11:21
75:12 78:15
**institute** 162:14
**instruct** 33:23
46:13,21 48:14
84:6 93:9
117:20 169:25

**instructed** 5:14
34:8 109:11,22
109:24 110:4
**instructing**
160:4,8
**instruction** 53:7
84:11
**intend** 161:19
**intends** 32:19
33:18
**intent** 172:14
**intentional**
156:23 157:1,3
**interested**
181:15
**interesting** 161:3
**interior** 91:9,12
91:18
**intermittent**
39:11,12
**interrupt** 9:13
**interrupting**
46:24
**intimate** 39:9,10
**investigate** 30:4
47:20 55:16,18
69:23 72:15
89:11,23 139:1
**investigated**
71:10 72:24
138:20 139:3
**investigating**
70:15 72:2
99:23
**investigation**
73:1 175:19
**invoices** 4:13
121:5 122:25

**invoicing** 120:21
**involve** 107:21
107:23
**involved** 15:12
21:14 36:17
79:2 91:21,22
92:1,4,6,9
105:20 118:12
119:3 122:11
133:24
**irvine** 127:7
**issue** 82:7 145:5
**issued** 40:23
41:13
**issues** 163:8
164:7
**items** 29:15
65:24

**j**

**jane** 118:11,12
**janitorial** 35:6,9
**january** 57:18
57:20 59:25
60:2,9 61:7
159:17
**job** 1:24 9:15
26:15 168:24
169:9
**jobs** 162:21
**john** 1:9 2:9
25:25 26:5,14
38:17 72:6,8
107:14 108:12
108:17 111:18
119:5,7,19,21
122:8,16,22
123:4 131:20

132:14 138:3
163:21 168:24
**john's** 26:3,12
**jones** 32:25
34:21,25
**judge** 158:24
**judgement** 4:22
56:21 57:10
**july** 49:4,9 57:11
62:14,25 63:17
**junior** 38:16
**jury** 23:16,19
31:21,22 32:1
178:5

**k**

**keep** 24:25 27:9
73:15 100:24
102:20 118:4
**keeping** 101:7
**kept** 108:18
**keywords**
110:20 115:12
**kind** 9:6 21:22
91:7 107:23
131:9 148:11
178:2
**kinds** 138:14
**knew** 44:22,24
46:2 48:1,2
49:17,20,22
50:25 55:3 65:2
68:4 103:17
127:6 144:5
**know** 9:13,16,23
11:7 12:17,18
14:9,10,14 15:16
16:9 18:3,4,6,12

| | | | |
|---|---|---|---|
| 18:24 19:16 | 105:9,9,13,16 | 150:7,10,18 | 159:8 |
| 20:7,7,18,24 | 106:4,17 108:9 | 151:8,13 153:18 | **l** |
| 21:3,16,16,17,18 | 108:22,24 | 153:19,20 154:3 | **l**  1:22 2:19 |
| 23:8,21 24:24 | 109:13,18,20,20 | 154:11,15,17 | 181:23 |
| 25:21,22,23 | 109:21,22,22,25 | 156:13 157:1,3,7 | **laborers**  122:12 |
| 27:25 29:2 | 110:7,18,24 | 157:24,25 158:4 | **lack**  47:24 50:5 |
| 30:14,16 31:21 | 111:18 112:14 | 159:21 160:5,15 | 59:8,8 70:1 83:8 |
| 33:12,14,15,17 | 112:17 113:7,9 | 160:16,16,17 | 89:15 92:19 |
| 33:20 34:16 | 113:10,20 114:1 | 161:11 163:9,21 | 101:25 103:24 |
| 35:3,23 37:7,25 | 114:5,13,14,15 | 163:21,24,24 | 109:4 113:17 |
| 38:11,19,22,24 | 114:24,25 | 165:11,14 166:8 | 116:1 126:23 |
| 39:6 41:6,15 | 115:13,14,17,20 | 167:14 168:4,5 | 134:6 135:20 |
| 43:2 45:5 47:16 | 115:22,24 | 169:23 173:23 | 167:25 168:11 |
| 48:22 49:1,3,12 | 116:22,23 117:1 | 173:24 174:25 | **lady**  19:14 91:17 |
| 49:14,15 50:2 | 117:4,6,7,14,18 | 175:1 176:17 | 124:9,9 |
| 51:1 52:2,12,18 | 118:4,6 119:1 | 177:8,24,25 | **lafave**  36:22 |
| 53:5,14,14 55:1 | 120:8,20,23 | 178:8,15,21,24 | 37:12 38:5,8,18 |
| 59:25 60:7,13 | 121:15 122:13 | 179:5 | 44:6 48:14 |
| 66:13,16,17,18 | 122:15,16,22 | **knowing**  29:18 | 49:25 50:3 55:2 |
| 68:15,20,22,24 | 123:1,25 124:18 | 31:1,11 32:6 | 78:19 81:2 |
| 69:9 70:14 72:4 | 125:3,7,23 126:2 | **knowingly** | 84:25 85:5 |
| 72:5,21 74:1,18 | 126:5 127:17,22 | 102:15 | 107:14,15 124:5 |
| 74:24 75:2 76:1 | 128:3,17 129:17 | **knowledge**  12:6 | 125:9 168:20 |
| 76:9,11 77:5,16 | 131:21 132:17 | 12:12,16,17 13:3 | **lafave's**  111:21 |
| 78:6 79:1,2,18 | 132:18 134:11 | 14:1,7,8 31:4,6 | 112:2,7 113:11 |
| 79:22 80:11,16 | 134:19 135:1,2 | 41:5 47:16 50:7 | 125:21 126:3 |
| 83:21,25 85:14 | 135:15,22 136:2 | 70:25 115:3,3,10 | 127:1 169:9 |
| 85:15 86:2,3,4 | 136:3,7,8,9,23 | 116:16 124:22 | **lake**  8:13 |
| 86:10,17 87:1 | 137:1,8,11,12,14 | 125:5 129:18,20 | **language**  41:9 |
| 88:18 89:8 | 137:18,19 | 130:18 | 171:25 172:24 |
| 91:15 92:22,24 | 138:19,19 | **known**  47:4 55:4 | 173:11 174:16 |
| 94:7,18,21,23,25 | 140:10 141:7,10 | 59:13 65:20,22 | **lauren**  91:18 |
| 95:17,18 96:25 | 141:14,15 | 96:21 100:12 | **law**  3:5,14 |
| 97:12,15,24 98:2 | 142:19 144:4 | 173:9,15,24 | **lawsuit**  15:7,10 |
| 98:11,14,14 | 145:7 146:13,16 | **knows**  12:22,23 | 15:13 23:3 33:5 |
| 100:7 101:5 | 147:16,17 | 13:4 14:15 45:2 | 33:10,19 40:11 |
| 102:10 104:7,18 | 148:18,20 149:2 | 69:8,9,16,20 | 45:18 53:11,16 |
| 104:20,21 105:5 | 149:4,8,9,10,13 | 85:18 149:14 | |

54:11,12,13,21
56:1 70:23
78:16 93:8,25
96:17 97:22
98:12 99:23
104:21 105:7,19
105:23 106:3
107:19 109:10
111:3,3 119:2
124:14 138:21
149:17 150:4
163:8 166:12
168:15 175:15
176:4,22 177:3
177:21
**lawsuits**   23:10
23:13 39:19
54:23 156:13
172:21
**layman**   102:8
141:5
**layman's**   89:7
**leading**   171:12
171:21 172:2
174:11 175:9
176:6 177:4
**learn**   40:21
54:19 83:22
**learned**   103:19
140:1
**learning**   54:24
**leasing**   143:11
**leave**   112:25
**leaves**   112:20
113:6 117:25
**left**   109:25
125:19

**legal**   6:8 7:8
16:17 97:12,16
98:8,19 99:4
101:10 105:3,5
105:17 130:5
132:2,16,19
136:1 141:3,4
149:23 153:25
154:10,12
156:25 157:9
165:23 182:1
185:1
**legally**   104:10,13
129:17
**lengthy**   81:16
**letter**   4:14 124:2
124:21 126:6
182:19
**letters**   111:5,7
**level**   162:12
**levels**   162:10
**liang**   1:9 2:9
**lie**   31:21 32:3,4
101:23 178:20
**life**   9:10
**liked**   86:18 89:2
**limited**   152:5
159:15 171:11
**limiting**   93:24
**line**   5:16,17,17
64:2 65:15,24
172:16 182:13
184:7 185:3
**lines**   5:15,15,16
5:16,18,18 173:7
**list**   24:2,5,6
42:16,17 45:8,11
45:22 47:15,17

58:5 75:3
**listed**   10:23 13:5
13:25 30:5 33:5
81:20 83:17,18
122:24 159:5
184:7,17
**listing**   184:7
**lists**   58:16 59:12
82:3
**little**   9:6 32:13
39:18 40:10
61:16 148:23
173:7
**llc**   4:12 27:22
28:4,5,8
**llc's**   28:14
**llp**   3:4
**lo**   88:21
**local**   139:21,22
140:24 141:11
142:1
**located**   6:8 7:8
19:9 25:5 45:13
45:18 68:16,25
69:17,24 70:12
70:16 71:4
72:16 73:17
129:16
**location**   46:8
99:14
**locations**   24:6
45:22 46:17
47:18 55:25
63:23 64:11
**logging**   6:22
**long**   16:6 20:15
27:1 34:18 37:5
38:8 43:8 81:14

87:20 113:6
151:2
**longer**   38:13,14
**longevity**   21:4
**look**   29:21 50:17
51:9 58:9 71:10
74:5 76:9
109:12,13 110:5
120:7 123:24
148:8 151:12
159:12 174:22
**looked**   52:6 68:7
71:3 74:21
78:22 103:7
109:18,19 110:9
110:12,16 112:2
113:25 114:3
115:11,18
131:11 159:13
**looking**   11:4
28:22 39:21
59:23 78:10
81:12,19 130:8
139:3 151:3,6
164:12
**looks**   50:20 51:2
51:3,10 57:17
123:3,5
**los**   6:9 7:9
**lose**   142:21
**lot**   21:4 38:23
68:19 76:10
77:19 88:23
126:25 128:24
141:21 143:6,9
145:10
**loud**   172:17

**louis**  3:7
**lowdown**  163:25
**lower**  169:2
**lynn**  3:24 170:22
  171:2,3 174:23
**lyon**  1:15 2:15
  4:3 6:12 7:12
  8:1,9 11:14 13:3
  13:20,24 14:5
  25:25 27:20
  28:3 34:2 38:17
  47:1 50:17 59:2
  72:6,8 102:10
  107:14 108:12
  108:25 119:5,7
  119:19,21 120:6
  122:8,22 123:4
  123:23 148:5
  161:12 164:2
  168:24 170:19
  182:8 183:4,9
  184:4,13 185:20
**lyon's**  168:25

**m**

**m**  3:14 8:5 57:9
  171:5 177:15
  179:10
**machine**  181:10
**madam**  67:7
  106:22 121:20
  179:22 182:10
**maintaining**
  22:21
**majority**  10:24
**making**  49:2
  87:1 88:7 144:1
  144:2,10 146:2

**manage**  21:25
  69:12,15 145:24
**management**
  16:15,18,24
**manager**  17:19
  18:22,23 19:2,6
  19:12 25:10,13
  25:15,22 26:3
  27:2 32:23,24
  34:12,18,20,22
  48:7 55:6,7
  105:22 108:18
  108:18,20
**managers**  34:24
**manages**  17:22
  18:1,18 22:3
**managing**  16:12
  28:5
**marble**  138:16
**mark**  27:7
  119:24 123:12
**marked**  4:10,19
  5:3 10:10,12
  27:18,20 42:22
  42:25 43:4,7
  50:10 56:19
  75:21 120:4,6
  123:21,24 148:6
  150:22
**market**  147:2
**marks**  180:1
**mason**  95:2,8,12
  95:22 96:5
**matter**  105:4
  175:15
**matters**  105:3,5
  105:17

**mean**  30:13
  37:22 39:8,10
  59:18 68:21
  77:19 80:6
  86:25 116:19
  117:10,11 141:7
  149:25 151:3
  155:3 156:5
  174:2,9
**meanings**  173:4
**means**  12:18
  14:14 155:20
**meant**  66:7
**meet**  143:7
  146:25 176:11
  179:25
**meeting**  179:24
**member**  28:6
**memory**  132:24
**mention**  79:9
**mentioned**  12:13
  34:13 37:11
  52:9 54:7
**mentioning**  14:5
**mentions**  34:11
**merger**  174:25
  175:1
**mesa**  1:16 2:17
  6:1,11 7:11
**met**  134:9
**mic**  60:22 61:2
**mid**  108:10
**midwest**  182:17
  185:1
**miller**  3:5 4:5
  6:18,18,25 7:18
  7:18 8:6 10:8,13
  10:17 11:13

12:25 13:15
14:2,4 16:2 19:1
23:2 24:4,12
27:11,19 30:3,9
30:24 31:8,19
32:2,11,17 34:1
34:6,10 35:18,24
36:11 38:7 40:1
40:4 41:10
42:19,24 43:6,10
44:4,13,18,23
45:10,20 46:4,15
46:22 47:11
48:3,5,24 49:16
49:21 50:8,16
51:5,8 52:20
53:4,19 54:6,18
56:3,10,18 58:7
59:1,14,19,22
60:8,14,22 61:5
61:13,17,19,24
62:3,24 65:4,17
66:20 67:21
68:6,13 69:2,7
69:22 70:4,9
71:1,8,16 73:6
74:4 76:24 77:3
77:11,21 78:6,11
79:4,11 80:8
81:10,14,18
82:16,23 83:12
84:9,12 86:19
87:4,22 88:6,15
89:10,19 90:6,8
90:21 91:11
92:23 93:13
94:3,20 96:2,10
96:18 97:14,20

**[miller - nature's]**

98:10,23 99:6,18
101:6,13 102:4,9
102:22 103:6,18
104:4,12,19
107:11 108:23
109:8 112:13
113:5,21 116:3
116:12,21
117:10,16,22
119:24 120:1,2,5
122:5 123:8,11
123:14,16,18,22
125:4,15,17,20
126:14 127:3,13
128:1,9,13 129:1
129:9 130:1,9,15
130:21 131:8
132:8,12,20
133:5,14,20
134:4,7,20 135:3
135:16,23 136:4
136:24 137:13
138:1 139:6
140:4,18,21
141:9 142:14
143:1,13 144:17
145:12 146:15
146:21 147:19
148:4 149:5
150:2,17,25
151:7,11 152:24
153:6 154:4,14
155:11,18 156:4
156:16 157:5,18
158:1,8 159:1,10
160:1,8,11,17
161:3,5,10,15,18
161:24 162:4

166:13,21 167:5
167:19 168:6,17
169:21 170:4,8
170:12,19
171:12,20 172:2
174:11 175:9
176:6 177:4,13
177:16 178:3
179:6,25
**million**   18:1,4
68:20
**mind**   66:11
77:23 128:21
131:2
**mine**   43:7 44:12
**minute**   67:6 88:8
175:7
**minutes**   170:9
**mischaracterizes**
98:6
**misrepresented**
175:5
**missing**   57:25
**missouri**   3:7
**misstates**   57:24
166:16
**mixed**   24:21
**moment**   10:18
15:20 24:13
27:25 42:20
43:1 50:8
115:21
**money**   116:14
116:19 142:5,11
142:20,21 144:9
144:13 146:2
179:18

**month**   9:1,2
**months**   20:10
112:19
**morning**   6:4 7:4
8:7
**move**   34:6,7
59:20 94:17
117:19 169:21
**moved**   39:25
103:9 108:9
**multiple**   117:21
**municipal**   142:6
142:15 143:15
**municipalities**
22:6 169:13
**mutual**   5:4
171:9
**mw**   1:24

**n**

**n**   8:5,5 171:5,5
177:15,15
179:10,10
**name**   6:7 7:7 8:7
16:25 19:14,15
23:8 25:16,25
34:15,16 52:3,4
52:6 78:3,9
91:16 110:5
131:21 139:14
139:16,17
181:18 182:6
183:3,4,15 184:3
184:4,21
**named**   25:10
36:21 84:14
**names**   17:18
35:3 91:20

109:22 126:20
**natalia**   19:18,19
**natalia's**   92:8
**natural**   176:16
**nature**   101:18
173:8 176:17
178:1
**nature's**   41:15
41:23 42:10
43:21 44:9,15,20
45:1,12,22 47:4
47:22 48:11,15
48:19 49:4
50:24 51:3 52:5
54:8 55:20
57:12,21 59:6
60:2 62:20
63:16 64:16
66:7 67:2,16,23
68:8 71:11
72:10,19 73:12
78:2,11 83:4,6
83:14 85:20
87:13 89:13,25
92:25 96:12
98:4 99:13
100:17 106:10
110:5,10 111:8
112:6 113:15
114:20 115:5,12
118:23 120:24
121:9,18,25
126:9,20 127:9
127:15 128:5
139:3 140:22
141:24 144:19
146:5 147:8
163:13 166:24

**[necessarily - objections]** Page 22

**necessarily** 74:2
147:1
**necessary** 32:20
80:24 105:24,25
127:5
**need** 9:22 11:10
13:12 26:15
46:8 105:9
151:1,8 153:7
166:9,11
**needed** 45:23
46:18 66:14
166:10 175:21
**needs** 150:13
**negative** 60:19
**neither** 181:14
**net** 158:21,23
**never** 71:2
100:25 101:4
129:2 137:5
148:24 155:20
161:5 164:16
166:24
**newport** 8:15
16:1 127:7
164:14
**nice** 179:24,25
**night** 162:21
**non** 114:11
**nonprofit** 145:21
**nonprofits**
145:24
**nonresponsive**
117:11
**normal** 118:3
**notarized** 182:14
**notary** 182:25
183:10,18

184:15,23
185:23
**note** 182:12
**noted** 180:4
**notes** 170:9
**notice** 4:11 5:5
10:11,20 13:5,25
14:25 15:17
56:21 57:4,8
105:8 111:6
161:6
**noticing** 6:17
7:17 110:8
**notify** 166:22
**november** 1:17
2:19 6:1,6 7:6
**number** 6:15
7:15 23:21
39:21 123:9
145:11 147:1,1
182:7,13
**numbered** 81:5
81:25 84:17
120:17
**numbers** 11:15
74:22,23 184:7
**nw** 3:15

**o**

**o** 3:5 8:5 171:5
177:15 179:10
**oath** 7:23 8:2
167:8 181:9
**object** 15:24
18:20 22:24
23:25 24:10
29:24 30:6,20
31:3,13,23 32:9

33:20 35:16,21
36:8 42:12
43:23 44:10,16
45:3 46:10 47:8
47:24 48:21
49:18 50:5
52:15 53:10,25
55:22 57:24
58:1 59:8 60:5
60:18 64:22
65:10 67:25
68:11 69:18
70:1,20 71:5
72:25 76:21
80:3 82:12 89:6
93:7 94:15
95:23 96:6,14
97:10 98:6,19
99:2,15 101:25
102:6 103:1,11
103:24 104:8
108:19 109:2
112:9 113:1,17
115:25 116:8
125:12 126:22
127:11 128:8
129:22 130:16
130:16,25 132:2
133:11,17 134:3
134:25 135:11
136:1 137:22
138:24 139:1,1
140:17 141:3
142:7,24 144:11
145:3 150:13
153:3 154:10
155:24 156:8
157:9,22 158:5

167:10 168:1,10
177:20
**objected** 161:10
**objection** 11:8
32:7 41:3 43:24
44:21 45:14,25
46:19,23 49:11
58:4 59:16
60:11 66:10,10
71:12 78:4,24
82:20 83:8
84:10 86:13
87:1 89:15,15,16
90:3,19 91:5
92:19 97:16
101:1,10 104:16
124:25 126:11
127:18,23
128:20 129:3
130:5,12 135:9
137:9 146:18
152:21 155:6,14
156:25 157:11
158:22 159:21
160:23 165:24
166:16 171:12
171:20 172:2
174:11 175:9
176:6 177:4,22
**objectionable**
31:24
**objections** 11:8
24:10 49:13
70:6 93:20
103:25 127:19
127:20 133:3
135:9,19 137:9
138:25 161:5

168:4
objects 12:10
obligated 129:7
175:18
obligation
129:10,15
obtain 36:6
80:24
obtaining 22:21
obtains 22:5
occupancy 22:6
22:12,22 36:6
80:24 140:8
176:24
occupy 22:16,17
occupying
143:11
occur 133:6
occurred 178:21
occurring
176:16
october 121:5,10
121:11
offer 63:4,5,10
161:19
offered 12:20
13:11 62:14,25
135:5
office 18:4 68:21
153:17 164:12
officer 19:23
official 19:22
183:15 184:21
oh 19:14 31:23
34:17 61:17
64:3 69:4 84:20
87:10 91:24
100:22 123:1

134:11 178:8,10
178:13 179:17
ohio 182:2
okay 7:21 9:5
10:8,19 11:14
12:1,13 14:14,18
15:19 16:11
19:2,5,8,12,25
20:15,24 21:11
23:9 24:8 27:1,6
28:25 29:4 30:4
30:10 32:12
33:7,17 34:15,17
34:20,24 36:5,12
36:17 37:17
38:18,25 39:6,12
39:16 40:2,15,18
41:18 43:20
44:24 45:11
46:9 47:19 48:3
49:8,25 50:14,23
51:5,9,15 52:9
53:5 54:7,14,17
56:24 57:2,3,17
57:20 58:20
59:15,21 62:2,13
63:14,19 64:14
66:3,23 67:11,17
67:20 68:7 69:4
69:14 70:18
72:2,18,23 73:11
73:23 74:7,19
75:4,6 78:2
80:16 81:4 82:2
82:6,24 83:4,17
84:10,16 86:1,8
87:8,10 88:2
89:20 90:15

92:10 94:4,10
95:1,20,21 97:1
97:6,15 98:1,16
99:7,11,19 100:3
100:22 101:9,23
101:24 104:23
105:18,21 106:9
107:6,8,10
108:24 109:13
109:16 111:7
113:10,14
114:15,18
115:10,21
118:21 119:3,24
120:10,11,20,23
121:2,8,12 122:2
122:6,19,22,24
123:8,17 124:1,2
124:22 125:5
126:6 128:4
131:14,19 133:1
133:6 134:21
137:5 140:8,13
141:1 142:4
144:18 146:8
147:7,19 148:9
149:16 150:8,21
152:10,13,19
153:22 154:5,18
155:19 156:5
157:6 158:18,21
161:15 164:1,6
164:16 165:8,21
166:8,14 171:7
171:16 172:5,9
172:15 173:17
173:20,25 174:9
174:14,22 175:4

176:21 177:2,8
178:4,16 179:17
old 165:3 169:8
olen 1:9 2:9 8:17
8:21 9:3 10:9
11:6,18 12:2,9
12:14,16,18 13:4
13:6,7,24 14:6
14:10,11,15 15:3
15:21 16:9,15,17
16:20,22 17:2,3
17:6,10,15,19,21
17:25 18:7,12,15
18:18 19:5,20,23
20:1,6,13,16,18
21:8,22 22:1,2,5
22:8,12 23:10,16
23:22 24:8,24,25
26:5,8,17,20,23
28:5 32:18
33:18 36:24
37:3,14,18 39:17
39:19 40:7,11,19
40:24 41:1,25
42:6,9 43:14,17
43:20 44:8 45:2
49:17,22 55:3,14
55:19 57:9,10,14
58:20 62:8,10,14
62:25 63:17,20
63:22,22 64:8,9
64:10,19 65:6
66:1,25 67:14
68:7,15,15,24
69:8,11,14,23,23
70:5,10,14,18
71:2,9 73:11,15
74:14,19,23 75:1

75:11,16,22,22
75:23 76:6,11,12
76:15,19 77:3,14
77:24 78:15,22
79:5 80:1,9,12
80:20 81:5,6,19
81:22,24 82:1,4
82:24 83:2,5,13
83:14 84:2,17,18
84:22,23 85:9,12
85:15,21 86:5
87:23 88:3,17,23
90:11,24 91:2,12
92:11,16 93:3,17
94:5,8,10 96:23
97:8,15 98:3,4
98:12 99:1,7,12
99:12 100:5,22
101:16,19,20,23
101:24 102:23
103:8 105:1,1,11
105:14 108:6,17
110:17 111:16
111:21,24
112:24 113:11
113:25 114:9
115:10,22 116:7
116:24 117:25
118:2,19 120:14
120:17,18,18,24
122:15,24 123:5
124:13,23 125:9
125:22 126:4,15
126:17 127:9,14
128:4,5 129:2,14
130:10,23,23
131:12,14,25
132:13,21 133:1

133:16 134:12
134:22 135:5,24
136:5,8,14,15,16
136:25 137:5,14
138:9 139:18,20
140:22 141:13
142:18,21 143:3
143:24 144:2,23
145:13,16,18
146:8,12,22
147:5,7 148:24
149:6,9,14,16
151:17 153:17
153:17,19,23
154:6,7,16,23
155:3,20 156:5
156:17,22
157:19 158:2,14
158:21 162:18
162:18,20
165:11,18,21
166:14,22 167:6
167:22 172:21
175:18,22
176:19 177:3
178:5,14,17,20
179:4,17

**olen's** 11:24 13:1
14:7 16:12 19:3
19:9 21:15 22:5
22:22 24:23
25:3 48:7,10
58:18 63:6,14
64:20 65:9,19
66:9 67:5,22
72:16,20,24 73:8
75:15,20 78:18
79:17,20 84:24

88:16 89:12,24
90:22,25 91:23
92:18 93:5,19
97:2 102:13
115:2,3 118:13
118:15,16
124:16 125:5
129:11,20
133:25 138:21
144:19 145:21
149:22 155:19
157:6 159:3,14
164:13

**olen.com** 26:10
26:19

**olen00003** 74:12

**olen00071** 4:14

**olen00073** 4:13

**olenicoff** 1:9 2:9
6:13 7:13 12:20
13:5 15:5,9 20:1
20:5 21:8,14
32:21 57:9 62:4
62:7 86:4 88:20
88:22 89:23
92:6,16 95:7
103:8,23 114:3
114:13,15,18
115:4 116:5
133:16,25 134:9
135:5 136:9
137:2 138:7,15
149:10,13
151:17 158:16
169:17 178:16
182:6 183:3
184:3

**olenicoff's** 13:13
20:22 86:1
113:22 115:11
115:18,23
133:21 139:10
179:3

**once** 34:7 53:16
172:10 174:21

**ones** 15:11 42:17
44:22,24 45:7,17
46:2,8 59:13
66:13 68:3
72:13 89:13
121:2 163:22
176:4

**ongoing** 46:23

**operate** 145:23

**operated** 122:6

**operates** 17:15

**operating** 16:12

**operations** 21:15
22:5

**opinion** 86:25
87:2,3,5,8,15,17
88:4 95:13
100:22 101:7
154:13 164:4

**opinions** 86:22
87:24 88:3
161:19 162:1
163:12,18,20
164:6

**opposing** 174:6

**order** 11:11 36:6
46:17 47:5
53:25 141:10
142:4

**ordered** 23:22 24:8 42:9 53:9 53:23
**orders** 43:20 67:25
**ordinance** 139:21 141:11 141:15,16 142:16,19 143:3 143:15,19,22
**ordinances** 142:6 143:25 147:4
**organization** 13:22 21:9,12 89:5
**organizational** 14:8
**organize** 147:21
**original** 36:21
**originally** 114:19 168:8
**ostensen** 19:18 19:19 20:21 21:11
**outbox** 112:25 113:12,14 114:4 115:11,19,23
**outboxes** 117:24
**outside** 35:9 91:18 164:9,11
**overall** 25:4 161:16
**overseeing** 108:25
**owner** 17:19 84:19,21,22 85:2

**ownership** 153:23
**owns** 17:15,22 18:1 22:3

**p**

**p.m.** 2:18 147:25 148:3 170:15,18 180:3,4
**pacific** 6:5 7:5
**page** 4:10,19 5:3 5:15,15,16,16,16 5:17,17,18,18 27:21 28:10 56:25 58:5,8,11 58:13,15,16 59:2 59:12 64:2,5 74:8,11 78:5 81:4,19,25 83:18 84:17 123:3 151:20 152:12 174:23 182:13 182:15 184:7 185:3
**pages** 1:25 56:25 76:10 77:18 120:8 123:24
**paid** 16:16 85:9 87:12 123:4,5 137:5,15 146:10 148:24 149:7 179:19
**pallets** 163:24
**paragraph** 32:14 33:5 34:11 61:20,25 62:13 63:9 64:1 65:7 65:21 66:6 75:8

75:8,9,10 173:25
**paragraphs** 65:24 151:5
**paralegal** 3:24
**parent** 17:3
**parkway** 3:15
**part** 9:3 22:5 24:23 25:3 26:15 39:24 45:17 56:1 64:3 68:4 84:18 85:3 109:23 112:19 142:19 143:19 161:16 174:17 184:9
**particular** 12:7 13:3,9 15:13 16:3 18:15,16,16 19:6,6,13 79:13 85:6,13,21 86:9 176:19
**parties** 57:7 62:14,25 63:20 64:8 152:4,14 154:20,23 172:21 181:16
**partner** 12:21
**parts** 76:8 170:25
**passed** 108:11
**passing** 15:14
**pay** 85:12,21 122:24 147:2 179:17
**pays** 16:19
**pending** 9:24 59:19 158:22

**people** 33:5,14 35:8 79:1 91:15 105:20 122:13 158:12 179:4
**percent** 77:9
**percentage** 143:8
**performance** 38:1 144:15
**performs** 95:18
**period** 59:9 93:7 104:16 133:15
**permanent** 39:17 40:7,18,21 41:1 43:13,17,20 44:25 45:11,21 46:7 48:6 51:19 78:21 80:2 89:21 96:24 102:24 124:17 124:19,24 125:6 125:8,14 126:3 126:17 165:15 165:19,22 166:15
**permission** 84:1 84:2 97:8,15 98:18,25 99:7,25 100:1,5,23 154:7 154:16,17 157:7
**permit** 36:6 140:9
**permits** 22:6,13 22:22 80:25
**person** 13:6 49:25 69:9,15,16 69:20 84:25 86:1 92:6 119:9

**[person - previous]** Page 26

122:6
**personal** 14:7
86:25
**personally** 28:25
54:10 100:16,16
119:3 122:9
161:25 176:15
183:11 184:15
**pertained**
175:14
**pgs** 4:11,12,13
4:15,20,21,22,23
4:24,25 5:4,5
**phone** 182:3
**phonetic** 118:11
**photographs**
50:20,24 51:9,11
51:17 148:7,8,10
148:15
**photos** 4:20,21
4:24
**phrase** 65:6
**pick** 91:9
**picked** 83:8
**piece** 91:3
148:11 164:12
165:2
**pieces** 36:15
47:18 62:15,19
63:1,21 64:9,15
122:7 130:19
139:4 140:2
144:14,15
145:17 146:9
156:13 157:15
**place** 22:11
47:14 88:18
90:23 100:23

126:18 139:5
140:5 181:7
**placed** 181:9
**placement**
118:13
**places** 45:12
80:23 128:25
139:19 140:3
176:3
**plaintiff** 1:7 2:7
2:16 3:3 6:19
7:18
**plaintiff's** 10:10
42:22 43:1
56:20 61:10,14
73:24 74:2
75:11,17,23 76:6
81:25 84:17
120:7 148:6
**plaintiffs** 6:14
7:14
**planning** 32:22
33:12,17
**play** 144:7
157:25
**plaza** 8:15 16:1
**pleading** 58:1
82:12 127:21
168:2
**please** 6:16 7:16
7:22 9:14 10:3
10:18 56:25
57:4,8 93:12,13
148:8 151:23
152:1 153:8
182:11,11
**plenty** 144:7

**plus** 77:7 135:20
**point** 57:3 71:9
78:5 85:7
100:12 110:9,11
110:12,16 111:1
113:10 117:25
118:22 125:21
151:5 176:13
**pointe** 139:18
145:18
**policies** 88:17,17
90:22 92:15
94:1 101:15,16
101:18,19,20
104:25 107:7
117:23 118:2
**policy** 90:23
91:1 92:10,22
93:3,16 105:2,6
105:12,15,18,22
106:2,7 109:23
112:23,24 113:2
**polite** 94:19
**porters** 35:7
**portfolio** 18:4
19:9 22:1,7,13
24:23 25:3 48:8
48:11 55:19
64:20 65:9,19
66:9 89:12,24
**pose** 11:7 86:13
**posed** 98:21
160:23
**position** 21:4
155:19 157:6
**possession**
124:16 127:10
127:16 128:5

129:11
**possible** 70:3
116:13,20
**power** 147:2
**predate** 93:8
**predicate** 47:24
49:11 50:5 59:8
70:1 83:9 89:16
92:19 102:1
103:24 109:4
113:17 116:1
126:23 134:6
135:20 167:10
168:1,11
**prepare** 14:18
**prepared** 10:25
11:16,23 159:18
160:2,21
**present** 3:22
106:21 107:5
**preserved**
106:15
**president** 16:5
17:9 19:20,25
20:1,3,5,12,16
20:20 21:8 62:8
88:22 89:4
133:21 168:22
168:25 169:2,4,6
169:7,10 178:17
178:20 179:4
**pretty** 69:6
76:24 164:4
169:24
**previous** 15:11
32:24 49:13,13
173:24

**previously** 10:14
  23:9 50:10 82:7
  131:23,25
  132:13 136:5
  140:22 148:5
  150:22
**prior** 39:18
  78:15 93:24
  134:8,23 167:7
  167:23 181:8
**privilege** 58:23
  167:17
**privileged** 70:22
  136:20
**probably** 9:5
  16:10 17:7,24
  18:3 21:5 36:14
  36:16,21 37:9
  38:23 40:23
  121:11 136:9,11
  153:20
**problem** 30:11
  30:13 40:1
  122:2 140:20
**procedure** 13:16
  92:10 183:5
  184:5
**procedures**
  88:17,18 94:2
  101:15 105:1
  118:2
**proceedings**
  6:10 7:10 181:6
  181:8,10
**process** 92:7
  140:12,13,14
  144:10

**produce** 79:6
  80:18
**produced** 13:20
  74:19,25 75:10
  75:16,22 76:6,12
  76:19 77:3,8,14
  77:24 79:22
  80:14,14 111:12
  111:13 116:6
  120:15 124:13
  177:3
**producing**
  159:22
**product** 33:22
  161:21
**production**
  75:12,17,24 76:7
  160:23 182:15
  182:17,22
**professional**
  2:20
**program** 80:23
  140:3
**progress** 88:7
**prohibit** 92:16
**prohibited** 41:1
**prohibiting**
  101:20
**pronounced**
  84:8
**properties** 1:9
  2:9 8:17 16:13
  17:15,17,20,22
  17:25 18:23,24
  19:3,8,20 22:7
  22:13 25:7
  32:18 42:1,7
  45:8 47:17 48:7

48:10 55:19
  57:9,14 63:22
  64:10,19,20 65:6
  65:9,19 66:9
  68:9,17,19,25
  69:1,2,3,25
  70:11,15,24 71:3
  71:10 72:3,4,16
  72:20,24 73:9,18
  88:19 89:12,24
  90:25 91:23
  93:6,19 97:2
  118:13,16
  129:16 130:8
  131:11 134:1
  138:10,15,21
  154:8
**property** 18:2,18
  18:22,22,23 19:2
  19:6,12,13 22:10
  22:19 32:23,24
  34:12,18,20,21
  34:24 35:20
  36:3,5,13 48:7
  66:1 69:12,16,17
  69:21 73:21
  91:4 92:12,18
  108:18,18,19,25
  123:2 144:16,19
  145:17,24
  146:24 159:16
  176:25
**protect** 173:17
**provided** 110:25
  111:19 152:15
**provision** 175:17
**public** 80:23
  81:22 90:24

139:19 140:3,24
  176:2 183:10,18
  184:15,23
  185:23
**publicly** 36:3,5
  49:5,9 59:7 60:3
  60:10 72:20
  73:8 84:3 89:25
**pull** 40:5 150:22
  151:1 176:24
**purchase** 135:6
  157:20,24 158:3
**purchased** 22:10
**purchases** 22:4
**purpose** 141:1,4
  141:8 151:23
  152:2,2,7 171:16
  172:9
**pursuant** 57:10
  106:6
**push** 170:7
**put** 10:14 41:20
  54:4 60:1,22
  74:23 81:12,13
  88:21 99:8,13,15
  100:23 122:23
  123:8,9 141:21
  141:23 142:20
  143:6 151:4,8
  165:24 170:22
**putting** 50:12
  101:2

| q |
|---|

**qualifications**
  86:14
**quantum** 4:12
  19:9 24:15,17

25:2,5,7,10,19
27:2,22 28:3,8
28:13 32:23,24
32:25 34:11,21
35:2,4,11 36:1,6
36:18 48:15,20
49:5,10,23 52:11
52:13,23 54:9
59:7 60:3,10
65:25 72:13
81:6,22 82:4,25
83:6,15 84:3
85:11,22 86:12
86:23 87:14
93:1 96:13 97:3
98:5 99:13
100:17 105:22
106:11,20 107:5
108:13,25 112:7
118:21,24 119:9
120:25 121:10
121:19,25 122:7
126:17 128:6,17
136:17 137:6,16
138:18 139:11
147:9 148:13,14
163:14 164:2
165:4,9,12
177:18
**question**   9:11,16
9:20,24,24 10:3
10:5 15:25
29:25 31:9
33:24 34:3,5
38:7 40:3 45:21
46:5,5,24 47:19
47:25 55:24
57:25 58:3,24

59:10,19 61:1
65:5,5 66:12
67:7,11,22 69:4
70:2 71:2 73:2
76:4,23,25 77:4
77:13 78:25
81:21 82:14,15
82:17 83:10
84:7 87:13
89:17 90:4,20
91:5,6,7 92:21
93:10,12,16,21
94:16 95:24
97:12 98:20,21
99:4 101:3,11
102:2,7 103:4,14
103:16 104:1
107:3,8 108:21
109:3 113:3,19
115:20 116:10
117:16,21
121:23 125:2
126:24 127:24
128:22 129:4
130:6,20 131:4
132:17,19
133:18 135:1,13
136:2 137:24
139:2 143:14
144:5,12 146:20
149:3 153:9
154:12 159:23
160:2,6,10,14,19
160:24 161:22
161:23 167:13
168:3 177:23
**question's**
117:12

**questions**   5:14
9:10 11:2,3 12:5
14:6 17:12 28:1
43:3 53:7 74:6
86:6 120:9
123:25 151:13
157:11 158:23
159:3 160:9
161:1 167:21
169:25 170:19
171:1 177:11
**quick**   62:1
147:21 150:22
179:12
**quote**   62:14
63:10 64:7
75:10 105:7
154:22

**r**

**r**   177:15,15
179:10,10
**radar**   128:15
**raimondi**   131:20
134:9,13 135:4,8
135:17 138:3
**raimondi's**
132:14,22 133:1
134:22
**raised**   152:5,6
171:18,19 172:1
**range**   133:13
**ranking**   19:22
**raquel**   1:22 2:19
181:23
**rare**   177:18,24
178:6,9,10,11

**raton**   3:16
**reach**   26:14
**reached**   50:3
143:10,16
**read**   12:3,4 29:6
29:10,12,16 34:8
41:7 61:22 66:6
67:7,9 78:7
93:13,14 106:22
107:1 114:25
121:20,21
151:23,25
152:23 153:2,4
153:11 155:1
171:7 172:16,17
179:22 183:5,6
183:12 184:5,6
184:17
**reading**   65:1
66:11 128:20
154:19 182:19
**ready**   27:25 28:2
43:2,11 74:6
76:25 120:8
123:25 151:13
161:12
**real**   21:21,23,25
22:2
**really**   11:10,19
12:4 15:8 28:18
34:16 41:8
61:25 66:16
88:20 101:4
120:13 132:18
135:2 139:9
140:10 144:4
153:11 154:3
166:9,11

| | | | |
|---|---|---|---|
| **realty** 16:18,24 | 168:8 170:14,17 | **related** 106:9,20 | 176:21 |
| 17:1 | 180:2 181:9 | 107:4 108:13 | **remove** 44:8 |
| **reason** 66:3 | 184:9 | 112:5 113:15 | 48:14 67:2,15,23 |
| 77:22 93:21 | **recording** 6:10 | 121:17,24 159:7 | 119:15 120:24 |
| 106:1 127:1,4 | 7:10 | 164:6 | 121:2 123:6 |
| 128:17 135:17 | **records** 75:10,16 | **relation** 26:1 | **removed** 45:23 |
| 177:2 182:14 | 79:17 108:18 | **relationship** | 46:8 52:11 |
| 184:8 185:3 | 111:8 121:17,23 | 58:13,14,15 | 57:13,13,22 |
| **reasonable** 66:6 | 126:16 160:24 | **relative** 181:15 | 60:16,23 61:6 |
| 130:22 | **refer** 8:20 39:20 | **release** 5:4 | 63:20 64:8 66:8 |
| **recall** 37:9 41:8 | 40:12 171:18 | 100:10 156:15 | 112:21 118:23 |
| 77:8,11,12,19 | **reference** 35:6 | 171:9,11,11 | 121:9 167:9 |
| 85:16 110:7 | 62:20 64:14,16 | 174:17 | 176:13 |
| 122:4 144:21 | 64:20 65:8 | **released** 155:4 | **removing** 35:13 |
| 145:1 175:17 | 182:7 183:2 | 173:16 | 122:7 179:20 |
| **receipt** 182:18 | 184:2 | **releases** 152:15 | **rent** 22:19 |
| **receive** 162:15 | **referenced** 4:18 | 155:9 | 119:17 |
| **received** 162:17 | 5:2 14:24 | **releasing** 154:23 | **rentals** 120:21 |
| **recess** 27:15 | 183:11 184:15 | 174:3 | 120:24 |
| 56:7,15 88:12 | **references** | **relevancy** 71:13 | **rents** 22:18 |
| 148:1 170:16 | 171:16 | **relevant** 59:9 | 142:12 |
| **recognize** 148:10 | **referred** 24:15 | **relief** 174:4,5 | **rep** 13:11 |
| 148:11 | 41:22 | **reluctantly** | **repeat** 44:17 |
| **recollection** | **referring** 127:12 | 143:16 | 93:12 117:11 |
| 42:14 87:25 | 127:13 | **rely** 167:3 | 126:12 |
| 159:20 | **reflect** 120:20 | **relying** 168:15 | **repeating** 61:1 |
| **record** 6:5,24 | **refresh** 159:19 | **remains** 76:4 | **repetitive** 155:25 |
| 7:1,3,5 8:8 9:16 | **refreshed** 132:24 | **remedial** 93:23 | 170:1 |
| 12:20,24,25 27:8 | **refusing** 34:3 | **remedies** 173:8 | **rephrase** 10:4 |
| 27:10,11,13,16 | **regarding** 88:18 | **remember** 25:16 | 158:6 |
| 32:22 33:15 | 90:24 116:23 | 28:17 34:17 | **replace** 176:14 |
| 46:23 49:3 56:3 | 159:3 | 91:20 95:5 | **replaced** 37:15 |
| 56:5,8,12,13,16 | **region** 37:2 | 103:16 132:25 | 37:17 38:15 |
| 57:8 67:9 88:10 | **registered** 2:20 | 139:12 164:24 | 176:18,23 |
| 88:13 93:14 | **regular** 39:11 | 165:1,16 168:20 | **replacing** 177:17 |
| 107:1 121:21 | **regularly** 39:1,4 | **remotely** 3:19,24 | **report** 19:17,18 |
| 147:22,24 148:2 | 39:7 | **removal** 119:4 | 20:12 21:2,9,11 |
| 160:22 167:6 | | 121:18,24 | 25:17,19 37:21 |

119:19
**reported** 1:22
20:15,19,25
38:19 169:15,17
**reporter** 2:20,21
7:22 67:8,10,19
93:15 106:22
107:2 121:20,22
179:23 181:5
183:7
**reporter's** 9:8
**reports** 25:22
**represent** 6:17
7:17 65:18
**representation**
131:1 153:13
175:6
**representative**
8:17 9:3 10:9
11:6 12:14,21
13:2,4,9,20,24
14:11 28:14
63:7,15 75:16,20
115:2
**represented**
130:23 178:5,19
**representing**
175:23
**represents**
172:19
**request** 75:11,17
75:23 76:7
161:7 184:9,11
**requested** 5:10
**required** 119:15
182:25
**requirement**
80:22 140:11

143:20,23 176:2
**requirements**
140:24 142:2
**researched**
128:24 129:2
**residential** 24:15
25:14,15
**residents** 32:20
**respect** 101:15
**respects** 94:5,8
**responding**
112:3 114:2
**response** 75:11
75:17,23 76:6
**responsibilities**
44:8
**responsibility**
44:14,19 47:3
67:1,5,15,22
68:5
**responsible**
35:19,21 163:23
169:11
**responsive** 177:3
177:8
**rest** 65:1,15
**restating** 158:6
**result** 176:21
**resulted** 98:13
140:14
**retail** 24:15,21
25:13
**retention** 105:2
105:11,14 107:7
112:23 113:1
**returned** 182:18
**reveal** 137:10
167:1

**review** 10:18
15:1 27:24 43:1
56:25 61:24
182:12 183:1
184:1
**reviewed** 10:20
11:20 14:22
76:8 77:17,20
**reviewing** 77:19
**revised** 4:25
74:9 110:16
**right** 7:4 14:15
18:2,7 22:3 23:4
23:14 26:8,24
27:24 28:3,13
31:20 33:4
34:15 37:1,11
40:13,24 42:9,15
42:19 43:13
47:6 48:23
50:21 51:20,22
51:25 52:1
58:18,21 59:19
64:5 69:8,11,12
70:12,16 71:2
73:18,19 74:12
74:23 78:16
80:9,13 81:23
82:4,8 85:2
86:24 88:4,16
89:1,5,14 92:12
92:17,18 94:6,14
96:24 97:6,9,24
98:18 99:1
100:18,20 102:5
102:10,11
103:19 108:14
110:10 111:14

114:4,7,20 115:5
115:8,15,23
116:7,13,22,22
116:24 117:25
118:24 123:18
124:14 125:22
126:2 128:19
129:10,12,14,16
129:21 130:24
132:10 133:16
134:10 135:18
135:25 136:6
137:1 138:22
139:11 140:6,9
140:24 141:2,11
141:14,19,23,24
142:2,6 145:2,17
145:21,25 146:2
146:10,24 147:5
148:16 150:12
150:18 156:7,17
156:19,24 157:8
158:3,14,16,19
161:11 162:1
163:18 164:7
165:16,19 169:5
169:15 170:8,22
174:14 178:9,17
178:20 179:4,22
179:24
**rights** 100:11
**riot** 34:9
**rise** 116:19
**robert** 32:25
34:21
**rock** 177:17,18
178:6,9

| | | | |
|---|---|---|---|
| **rodenbeck** 91:18 | 51:7 52:15,25 | 127:11,18 128:8 | 39:8 43:4 50:3 |
| **role** 37:14 | 53:10,25 54:16 | 128:11,20 129:3 | 65:18 68:15 |
| **rpr** 1:23 181:24 | 55:22 56:4 | 129:22 130:5,12 | 70:10,13 74:25 |
| **rude** 9:14 | 57:24 58:22 | 130:16,25 132:2 | 75:2 76:17 |
| **rules** 9:6 13:16 | 59:8,16,21 60:5 | 132:11,16 133:3 | 80:12 94:23 |
| 183:5 184:5 | 60:11,18 61:1,12 | 133:11,17 134:3 | 98:3 105:9 |
| **running** 27:9 | 61:16,18,22 62:1 | 134:6,15,25 | 108:17 112:23 |
| **s** | 62:23 64:22 | 135:9,19 136:1 | 129:12,14 |
| | 65:10 66:10 | 136:19,22 137:9 | 132:21 134:21 |
| **s** 182:15 184:8,8 | 67:6,17,20,25 | 137:22,24 | 145:13 156:12 |
| 185:3 | 68:11 69:1,3,18 | 138:24 139:25 | 167:8 172:12 |
| **sachs** 3:13 | 70:1,6,20 71:5 | 140:17,20 141:3 | 175:5 178:4 |
| **satisfied** 176:1,5 | 71:12 72:25 | 142:7,24 143:4 | **says** 28:13 32:18 |
| **satisfy** 142:1 | 74:1 76:21,23 | 144:11 145:3 | 44:3 45:5 46:17 |
| **save** 106:6 | 77:2,7,16 78:4,7 | 146:14,18 | 57:4,7,19 63:2 |
| 160:14 | 78:24 79:8 80:3 | 147:23 149:1,23 | 63:20 64:7 |
| **saved** 179:21 | 81:9,11,16 82:12 | 150:13,24 151:2 | 65:16,20,21,21 |
| **saw** 29:20 30:1 | 82:20 83:7 84:5 | 151:10 152:21 | 74:8,11,16 75:10 |
| 51:17 72:1 | 84:10 86:13,25 | 153:3,25 154:10 | 76:1 77:9 84:18 |
| 111:5 150:15 | 87:20 88:9 89:6 | 155:6,14,22 | 84:24 100:12 |
| **sax** 3:13,14 4:6 | 89:15 90:3,19 | 156:8,25 157:9 | 117:10 123:4 |
| 7:20,20 10:16 | 91:5 92:19 93:7 | 157:22 158:5,22 | 152:14 154:19 |
| 11:7 12:19 | 93:20 94:15 | 159:6,19 160:4 | 154:22 155:12 |
| 13:10 14:1,3 | 95:23 96:6,14 | 160:10,13,22 | 172:15 173:8 |
| 15:24 18:20 | 97:10,16 98:6,19 | 161:4,14,16,21 | 174:1,12,15,24 |
| 22:24 23:25 | 99:2,15 101:1,10 | 162:2 165:23 | 175:20 |
| 24:10 27:8 | 101:25 102:6,19 | 166:6,16 167:1 | **scan** 62:1 |
| 29:24 30:6,20 | 103:1,11,24 | 167:10,25 | **schedules** 159:4 |
| 31:3,5,13,23 | 104:8,15 106:22 | 168:10 169:19 | 159:16 |
| 32:7,15 33:20 | 107:6,10 108:19 | 169:23 170:11 | **school** 162:21 |
| 34:4,7 35:16,21 | 109:2 112:9 | 170:22 171:6,13 | **screen** 39:23 |
| 36:8 38:6 39:23 | 113:1,17 115:25 | 171:22 172:4 | 40:6 50:12 |
| 40:2 41:3 42:12 | 116:8,15 117:9 | 174:13 175:10 | 81:13 151:1,4,9 |
| 42:23 43:4,7,23 | 117:14,18 120:3 | 176:7,12 177:5 | 170:23 |
| 44:10,16,21 45:3 | 121:20 122:2 | 177:11,20 | **scroll** 32:15 |
| 45:14,25 46:9,19 | 123:13,15,17,20 | 179:11,22 182:5 | 61:16,17 |
| 47:8,24 48:21 | 124:25 125:12 | **saying** 9:9 20:24 | **sculpture** 41:2 |
| 49:11,18 50:5,14 | 126:11,22 | 24:25 29:14 | 41:13,25 42:3,6 |

50:23 51:25
52:6 73:17 82:6
82:10,11,18
83:17,20 84:14
85:11,13,21
86:11 92:4
132:1,14,23
133:2 139:8
148:12,16,18,21
148:25 149:7
153:24 157:21
158:11 159:16
176:9,10
**sculptures** 35:13
35:20,25 36:18
46:17 49:22
50:4 52:10,13
53:8 54:25
58:16 60:16
61:6 63:20 64:8
64:15 68:16
69:1,24 70:12,15
71:4,10 72:16
73:21 81:6,20,21
81:21 82:3
85:10 86:9
87:24 91:22
92:11 106:20
107:4 108:13
116:5,23 118:22
119:16 123:6
126:19 127:6
133:9,24 134:14
134:23 135:6
136:17 137:6,15
138:16,20
145:14 159:4,7
161:2 164:2

175:14,19,23
176:1,3,9,14,22
177:18
**seal** 183:15
184:21
**search** 109:21
111:9 129:20
**searching**
110:15 126:19
**second** 27:8,12
50:13 56:3
102:9 123:3
174:14 176:1
**section** 151:21
151:24 152:11
152:12,20,25
154:18 155:3
**sections** 153:10
**see** 6:22 11:3,18
27:22 30:11,12
32:15 33:2,3
40:8 42:23
48:11 50:15
51:6 56:22
57:15,16 62:17
63:12,23 64:2,3
64:12,13 74:9
75:13,14 83:18
83:19 84:18,24
84:25 111:7
120:3 123:18
126:13 150:13
151:8,21 152:14
152:17 172:15
172:24 173:6,9
175:20,22
**seen** 74:21
120:13,14

**select** 161:1
**selection** 118:13
**selects** 92:11
**self** 37:23
**send** 44:5 48:6
55:10,13 105:21
**senior** 16:5 17:9
169:6,7
**sense** 8:21 9:17
12:18 14:12,13
29:10 164:1
**sent** 105:8,19
106:2 116:4
124:5,10,19
161:6
**sentence** 57:4
58:11 63:9,19
64:1,7,14 65:7
173:2,2,20 174:1
174:14
**separate** 13:19
81:6 85:8 148:7
**sequential** 74:3
**served** 40:24
43:17
**servers** 79:17,20
**services** 16:18
16:24 17:1
**set** 59:15 106:15
181:7
**setting** 145:9
163:9 165:2
**settle** 152:3
**settlement** 5:4
84:6 87:21 99:9
99:19,22,25
100:4 104:9
132:4,7 136:20

143:10,17 149:2
149:19 150:23
151:16 152:8
153:1,10,16,23
154:6 156:6,18
156:23 157:25
158:18 170:23
171:9 172:9
175:17
**settlements**
137:10
**seven** 38:12
**shaped** 54:5
**share** 10:15 27:7
40:5 50:10
56:11
**sharing** 42:21
50:9 73:25
**sheet** 182:13
184:7,10,18
185:1
**shipping** 145:8
**shocked** 53:16
54:19,21,24
71:22,23 100:18
**shooting** 120:21
**short** 129:21
130:10,13
164:11
**shorthand** 2:20
181:4,10
**shortly** 40:23
119:2
**shot** 46:12
**shove** 170:7
**show** 10:10
41:11

[showing - started]                                                                Page 33

**showing** 56:19
**shown** 50:24
  182:16
**side** 25:13,14,15
**sight** 52:19 54:4
**sign** 28:19 29:17
  30:19,22 31:1,10
  32:5
**signature** 28:10
  181:23 182:14
**signed** 28:7 29:4
  29:11,13 30:15
  31:7,18 64:24
  102:24 153:16
  183:13 184:18
**significance**
  173:11,14,22
**significant**
  174:16
**signing** 28:17
  29:7,14,22 30:5
  101:21 182:19
**similar** 139:7
  173:4
**simple** 46:25
**sincerely** 182:21
**sir** 8:10 10:18
  11:20 32:3
  34:11 41:14
  42:20,25 43:11
  45:21 46:5
  51:10 56:19
  58:8,17 59:23
  61:15,20,24 74:8
  78:14 85:7
  107:12 117:4
  120:11 125:15
  128:2 153:9

159:11 179:6
  182:10
**sit** 12:8 41:6
  52:12 63:3
  72:18 73:7
  75:25 76:17
  99:24 101:7
  103:22 104:5,14
  115:21 150:18
  161:11 165:21
**site** 55:6,7 178:2
  178:7 179:14,15
  179:16
**six** 38:12 148:7
  173:7
**smart** 164:4
**smith** 3:4
**smithamundse...**
  3:9
**solutions** 6:8 7:8
  182:1 185:1
**somebody** 19:5
  26:22 38:15
  66:11 69:8,14
  93:5,18 95:16
  175:4 178:19
**someone's**
  112:24
**soon** 56:10
  169:24
**sorry** 16:14
  18:11 24:11
  31:15 39:12,21
  39:25 40:3
  44:17 46:22
  56:12 57:5
  58:17 60:22
  67:20 75:8

79:12 82:15
  102:21 106:16
  124:10 131:23
  140:19 152:11
  154:5
**sort** 73:16
**sound** 3:15 9:25
  10:6 40:12
**sounds** 73:14
  132:19
**south** 3:6
**southern** 1:3 2:3
**speak** 15:3,5,7
  38:5 67:25
  107:17 168:2
**speaks** 23:25
  41:3 42:12
  43:23 45:3,14
  46:10,19 53:10
  53:25 65:12
  78:4 82:12
  103:3,11 126:11
  152:21 153:3
  155:6,24 156:8
  171:20
**specific** 18:18
  122:19 160:6,13
**specifically** 77:9
**speculate** 116:16
  128:23 157:12
**speculation**
  176:6
**speculative**
  66:10 78:24
  89:16 90:19
  112:9 113:18
  116:8 126:23
  127:22 128:11

131:1 157:10
**spencer** 3:14
  6:20 7:20 10:14
  15:17 42:21
  50:12 51:6 53:6
  61:11 73:25
  76:24 86:17
  120:2 123:18
  150:23 167:4
  182:5
**spent** 145:16
  146:4,17,23
  147:5,7
**spoke** 38:20
  56:10 107:15
  108:4 164:22
  165:1,11
**spoken** 15:9 33:4
  107:25 164:9,17
  164:19
**spreadsheet**
  73:16
**square** 18:2
  68:20
**ssax** 3:18
**ssclawfirm.com**
  3:18
**st** 3:7
**staff** 32:25 35:2
  35:4,6 124:9
**stand** 13:13
**standing** 59:16
**standpoint** 99:21
**start** 8:12 36:23
  41:17 57:5
  91:25 154:19
**started** 36:14
  90:22 162:18

**starting** 6:17 7:17

**state** 8:7 12:19 159:19 181:5 183:10 184:15

**stated** 151:24

**statement** 58:12 59:2 65:3 102:14 183:13 183:14 184:19 184:19

**statements** 29:18 118:17 159:3,14 159:22

**states** 1:1 2:1 62:14 63:9 151:24

**statues** 70:24

**stay** 149:2

**steal** 94:11 95:21 95:22 156:6,18

**stealing's** 95:25

**stepped** 108:8

**steve** 36:22 55:4 55:5 107:13

**sticker** 43:9

**sticking** 46:14

**stockpiled** 179:21

**stone** 95:2,8,12 95:22 96:5 176:17 179:13 179:18

**stop** 20:3 50:9 81:13

**stopped** 37:7 38:11 39:7 89:4 159:8

**stopping** 70:14

**stored** 121:12

**straps** 119:17 163:24

**strategy** 161:21

**strictly** 146:25

**strike** 18:17 20:3 25:8 26:7 29:5 38:4 47:2,20 55:17 57:5 66:4 73:12 78:12 84:1 89:22 92:14 94:9 98:2 101:19 102:17 104:24 106:16 106:17 131:24 136:14 140:18 154:5 158:9 168:18

**stuff** 109:12 147:20 160:15 168:19

**subcontractor** 96:9

**subject** 45:16 58:4 84:5 162:24 166:11 175:15 176:4,22 177:21

**subjects** 162:25

**submittal** 139:19 139:20,24,24

**submitted** 74:14 78:18 81:2 139:20 140:2 167:8

**subpart** 154:21

**subscribed** 181:17 183:10 184:14 185:21

**subsequent** 93:22

**subsidiaries** 18:1,13 22:3 91:13 108:7 145:23

**subsidiary** 17:2 17:21 18:19 78:19

**sue** 155:20

**sufficient** 37:23

**suite** 3:6,15 182:2

**sunbelt** 120:21

**superior** 182:1

**support** 56:22

**suppose** 159:2

**sure** 12:15,24 14:1 16:17 26:19 27:5 29:8 29:21 41:6 46:24 56:4 61:2 65:2 71:24 72:1 76:1 77:10 86:21 89:7 90:18 97:25 98:11 111:13 125:18 129:7,17 133:12 134:18 151:10 157:1 163:15 169:22 170:11

**surface** 109:7

**surprise** 83:22

**suspected** 100:13 152:16 173:20 174:15 174:17

**switching** 107:7

**sworn** 102:14 167:23 183:10 183:13 184:14 184:18 185:21

**t**

**t** 8:5 171:5 177:15,15 179:10,10

**table** 85:2

**take** 9:25 13:19 39:23 45:6 47:21 51:9 54:3 57:4,8 65:15 66:23 67:11 74:5 81:9 85:10 88:7 96:23 98:9 102:9 117:17 119:18 120:7 123:24 148:8 151:12 163:22 164:2 170:6 174:22

**taken** 2:16 6:14 7:14 46:23 50:17 52:18 66:14 96:22 98:4 112:21 122:20 130:19 162:9 181:6

**talk** 14:20,21 22:1 24:14 32:12 39:8,16

54:7 100:8
104:25 131:19
149:16 165:8
167:14
**talked** 15:12,18
33:8,10 38:22
39:18 40:10
52:7 53:3,6,17
68:19 72:6
73:14 79:12
82:7 114:25
117:23 138:2
148:23 165:15
165:18 167:17
167:17,21
**talking** 32:1 38:6
39:1,3,7 51:18
63:25 66:21
100:15,21
101:14 107:6
112:23 161:7
**talks** 66:14
173:20
**team** 89:2 170:6
**tear** 42:3,11
43:22 44:9,15,20
45:2,13,16,23
47:5,23 48:12,15
49:9 51:13,17,18
51:22,23 54:8
55:20 57:12,22
59:6 60:9 62:21
63:16 64:16
66:8 67:3,16,24
68:8 71:11
72:11 73:8 82:6
82:17,25 85:12
86:11,23 87:5

89:13,24 92:25
96:13 98:5
99:14 100:17
106:10 110:13
112:6 113:16
115:8,18 121:3,9
121:18,24 126:7
126:20 139:4
140:23 141:24
144:22,25 146:5
147:9 163:13
166:23
**technician** 6:8
7:8
**telfer** 118:11,12
**tell** 9:13 11:15
19:16 46:7
54:17 72:8,18
75:25 76:5 79:8
84:13 114:3
142:8,9 153:12
153:14 156:10
162:6 178:13
179:3
**telling** 31:21
178:4
**tenure** 21:3
**term** 141:3
**terms** 57:10
96:12 132:11,12
**testified** 8:3
23:13 40:16
**testify** 10:22
11:1,5,12,16,23
12:2,8,22 75:15
76:25 86:15
99:16 150:11
159:18 160:3,21

160:25 161:12
**testifying** 13:7
13:25 47:16
76:18 181:9
**testimony** 11:11
15:6 98:6
166:16 170:25
179:13 183:6,7
184:6,9,12
**thank** 7:21 32:16
42:23 170:13,20
170:21 179:6,8
**thanks** 50:15
171:3
**thereabouts**
36:15
**thereof** 56:22
62:16,19 181:13
**thing** 9:20,23
41:7 135:19
172:16 177:13
178:1
**things** 11:9
89:21 100:23
109:22 119:14
157:16 159:7
167:18 172:6,7
**think** 10:24
12:25 18:3
20:17 30:8,18
32:4 35:7 39:24
41:24 46:25
48:23 53:7
65:14,20 68:18
68:18 69:20
70:23 73:22
74:21 78:12
79:1,3,12,14,16

81:20 83:16
85:5,6 86:7 95:3
95:9,10,16,25
96:4,8,16,20
97:21 99:9,22
100:2 101:12
103:5 104:3
106:1 107:9
109:7,21 110:19
110:25 111:4,5
111:12 112:12
112:14,15
117:18 118:10
118:18 122:8,10
123:13 127:5,7
128:7,10,12,14
130:7,7 131:6,9
132:6 136:3
140:11 141:16
142:10,10
146:20 148:22
154:12 155:9
156:13 157:14
158:12,20 159:8
160:19 168:7,14
168:25 169:14
170:1,8 176:16
**thinking** 31:7
**third** 46:12 58:5
58:13,15,16
63:25 65:7
172:16
**thirty** 182:18
**thought** 30:17
30:23 31:18
54:22 56:10
64:3 91:24
100:25 101:4

107:6 130:19
131:13 165:25
**thousands**
145:16 146:4,9
146:17,23 147:5
147:7,10,11
**three**   120:8
157:11
**thursday**   1:17
2:18 6:1
**time**   6:5,5 7:2,5
7:5 8:25 9:22
10:2 18:12 20:7
21:18 27:14,17
27:21 30:22
31:17 38:20
39:1,9,14 42:16
46:24 48:2,18
49:1,3,8 52:10
53:15 56:6,9,14
56:17 59:3,5,9
62:7 65:2,20,22
65:25 66:3
70:25 71:9,9,12
71:13 78:21
80:1 84:4 88:11
88:14 90:3,24
92:20 93:7,11,22
101:2 103:17
104:2,16,23
105:19 106:12
106:15 107:13
107:14,15,25
108:3,7 109:10
116:14,18
124:16 125:6,8
125:25 126:3,16
127:2,6 130:18

133:7,8,15,21
137:21 147:25
148:3 160:14
164:11,22
170:15,18,20
172:8,22 176:13
180:3,4 181:7
**times**   14:8
104:15 117:5,15
117:21 147:6,6
**title**   16:3,6 17:7
17:9 105:16
118:10 168:21
168:24 169:4
171:7
**titled**   27:21
**today**   6:5 7:6
8:16 9:10,22
10:19 11:1,6,16
12:2,8,14 13:21
13:22,25 14:6
15:6 43:9 52:12
63:3 72:18,21
73:7 75:15,25
76:17 99:5,24
101:7 103:22
104:5,14,22
115:22 119:10
150:18 159:11
159:18 161:12
165:21 170:20
174:7
**today's**   180:2
**told**   15:16 54:16
77:17 95:7
114:23 149:6
163:17 164:1,1
167:22 168:8

178:14
**tons**   68:22
**top**   27:21 57:18
74:9 84:18
100:7 150:10
154:19
**topic**   15:19
24:14 39:16,22
40:6 159:12,14
159:18 160:3,9
160:21,21
161:13
**topics**   10:23,25
11:15 12:1,7
13:4,6,8,9,25
**tort**   157:1,3
**torts**   156:24
**total**   17:25
**totalled**   123:7
**totally**   101:8,24
**town**   4:12 19:9
24:15,17 25:3,5
25:7,10,19 27:2
27:22 28:3,8,14
32:23,24,25
34:11,21 35:3,4
35:11 36:1,6,18
48:15,20 49:5,10
49:23 52:11,13
52:23 54:9 59:7
60:3,10 66:1
72:13 81:7,22
82:4,25 83:6,15
84:3 85:11,22
86:12,23 87:14
93:1 96:13 97:3
98:5 99:13
100:18 105:22

106:11,20 107:5
108:14,25 112:7
118:21,24 119:9
120:25 121:10
121:19,25 122:7
126:18 128:6,18
136:18 137:7,16
138:18 139:11
147:9 148:13,14
163:14 164:2
165:4,9,12
177:18
**transcribed**
181:11 183:7
**transcript**
182:11,12 183:5
183:12 184:5,11
184:17
**transcription**
181:12
**trial**   33:18 40:15
40:18 47:16,17
95:6 132:23
161:20
**trick**   18:11
117:3
**tried**   167:6
**trip**   163:16
**true**   17:23 29:18
31:2,11 32:6
58:12,14 59:3
63:3 87:1
104:20,22
132:13
**trumbower**   3:24
120:1
**trust**   130:23

**try**  31:16 54:16
  125:1 166:6
**trying**  9:14,15
  18:11 25:2
  41:19,20 111:14
  112:18,22 117:3
  117:4 160:11
  163:16,16
  167:20 170:1
  174:20
**turn**  15:19 27:6
  32:13 56:24
  61:9,20,25 73:23
  75:4,7 81:4
  84:16 150:21
  151:7,20 152:10
  154:18 159:11
**two**  7:20 41:20
  41:21 47:18
  49:22 50:4
  52:10 53:8
  56:25 61:6
  146:9 158:12
  166:3,23 176:3
  176:13,21,23
**type**  109:24
  110:2 111:8
  175:18 177:25
**typically**  92:5
  105:8
**typing**  110:19

**u**

**u**  177:15 179:10
**ultimately**  37:22
**um**  14:24 15:8
  15:16,23 16:10
  17:11 21:4

26:19 27:5 35:7
  36:14,21 37:9
  38:17 47:13,14
  70:24 72:4
  83:24 91:17,20
  99:21,22 106:4
  109:21 111:6
  122:23 125:11
  125:18 139:18
  139:18 140:2
  141:21 143:7
  144:5 148:11
  162:3 164:11
  165:2,14 166:4
  166:10 176:15
  177:24 178:1
**unable**  13:21
**unaware**  41:18
  122:19,21
  132:21 139:10
**unclear**  10:3
**uncovered**
  110:17,18,20
**undersigned**
  181:4
**understand**  10:2
  12:15 17:14
  23:3 41:19
  64:23 68:14
  93:11 96:15
  107:8 111:15
  114:22 131:5
  143:2 152:14
  154:20 155:3,23
  163:15 167:20
  171:10,17 174:9
  174:25 175:21
  179:12

**understanding**
  16:21 20:21
  42:13 52:17
  53:13 54:2,3
  63:5,6,14,18
  68:2,3 72:22
  78:20 80:22
  81:3 84:15,21
  113:4,13 114:21
  121:1 132:3
  141:6 149:15,21
  153:22 154:2
  155:8 156:9,10
  175:11,12,13
**understatement**
  116:9
**understood**  10:5
**united**  1:1 2:1
**unknown**  100:12
  100:14 172:7
  173:9,11,15,24
**unquote**  63:11
  154:25
**unsuspected**
  100:13 172:7
  173:21,21
**untitled**  41:2,14
  41:17 62:15,19
  63:21 64:9,15
  103:9 153:24
  158:11
**untrue**  178:22
**use**  24:21 72:25
  89:6 94:15
  100:9 102:6
  130:12 133:17
  140:17 141:3
  176:25 177:20

**utilized**  21:19

**v**

**v**  182:6 183:3
  184:3
**vague**  144:11
**valuation**  86:14
  87:2 143:7
  161:1 163:5
**valuations**
  144:14 145:3
**value**  86:10,22
  87:11,15,17,24
  88:1,3 118:19
  144:18,22,24
  145:13 146:12
  146:22,25 147:2
  176:19
**valued**  146:8
**values**  145:7
**various**  11:9
  14:8 16:12 22:6
**vary**  91:19
**venture**  63:23
  64:10 66:17
**verbatim**  181:9
**verbiage**  41:7
**veritext**  6:8 7:8
  182:1,7 185:1
**veritext.com.**
  182:17
**versus**  6:13 7:13
**vice**  16:5 17:9
  168:22,25 169:2
  169:4,6,7,9
**video**  6:7,12 7:7
  7:12 27:9

videographer
  3:23 6:4,22 7:1
  7:4,21 27:13,16
  56:5,8,13,16
  88:10,13 147:24
  148:2 170:14,17
  180:1
violation 99:3
visit 48:10
vp 37:1,5,7,15
  38:2,8,18
vs 1:8 2:8

w

wait 9:11,14
  67:6 101:1
  106:22,22 175:5
waived 100:11
  100:14 156:14
  174:10 182:19
waiving 174:3
wakefield 1:6
  2:6 6:13,19 7:13
  7:19 11:18 23:6
  39:17,20 40:7,12
  43:14 54:22
  55:11,14 62:16
  63:1,10,15 66:4
  66:6,21 78:22
  80:2 82:7,19,24
  83:5,13 94:13
  95:8 96:11
  97:22,23 98:1,3
  98:17 99:8,12
  105:23 106:3
  107:21 109:24
  110:2 111:6
  127:8,14 128:17

128:19 129:19
130:22 131:10
149:20 151:17
154:22 155:4,20
156:7,24 157:8
158:12 164:10
165:15 166:15
166:22 167:7,23
172:10,18,19
174:3,21 175:14
182:6 183:3
184:3
wakefield's 41:2
  41:12 67:1,14
  82:11,19 94:24
  129:10 130:2,11
  131:2 133:9
  139:7 140:15
  153:24 154:7
  157:20 158:10
want 9:6 10:9
  12:14,19,23
  13:11 15:19
  17:12 24:14,25
  27:6,24 29:17
  31:25 32:12
  41:11 42:14
  45:15 49:3 53:5
  54:1 56:24 57:3
  59:11,25 61:2,20
  61:22 66:25
  67:13 73:23
  74:5 75:7 77:10
  78:5,6,25 81:12
  81:13 84:16
  85:8 86:10,20
  88:16 93:22
  101:14 117:15

117:16 123:9
128:23 131:19
142:9,15,17,21
144:7 147:20
148:24 149:16
150:21 151:4,7
151:20,25 156:9
157:12,17
159:11 161:11
166:1 169:22
176:16
wanted 15:17
  39:13 76:1 81:6
  81:22 82:4
wants 159:23
way 10:3 27:4
  31:20 47:1
  77:22 78:12
  89:7 94:18
  110:19 113:10
  115:14,17 117:1
  140:10 142:20
  154:15 175:18
we've 9:16 33:9
  39:18 148:23
wear 170:1
website 57:14
went 40:15 48:1
  77:18 79:10
  114:24 128:24
  162:21 165:25
west 108:10
what'd 14:18
  107:17
whatsoever
  173:9
when's 8:25
  164:22

whereof 181:17
whichever 84:10
why'd 71:21
  119:7
willing 46:16
  161:12
wish 144:5
witness 4:2 6:21
  14:2,3 16:1
  18:22 23:1 24:2
  24:11 30:1,8,22
  31:4,6,17 32:1
  32:10 33:18
  35:23 36:10
  39:25 41:6
  42:15 44:3,12,17
  44:22 45:5,16
  46:2,14 47:10
  48:1,4,23 49:14
  49:20 50:7
  52:17 53:3,14
  54:3 55:24 58:2
  58:5 59:12 60:7
  60:13,21 62:2
  65:1,14 66:13
  68:3 69:5,20
  70:3,8,23 71:7
  71:15 73:5
  76:22 77:17
  78:9 79:1,10
  80:5 82:15,22
  83:11 84:8
  86:17 87:3 89:8
  89:18 90:5,7
  91:8 92:22
  93:12 94:1,18
  95:25 96:8,16
  97:12,19 98:8,21

**[witness - zoom]**

99:3,17 101:4,12
102:3 103:5,16
104:2,9,18 107:9
108:22 109:6
112:12 113:4,20
116:11,18 122:4
123:9 125:3,14
125:16,18
126:13,25
127:17 128:12
128:24 129:7,24
130:7,18 131:6
132:6,18 133:4
133:12,19
134:18 135:2,15
135:22 136:3,21
136:23 137:12
137:23 139:3
140:2 141:7
142:10 143:6
144:13 145:7
146:20 149:4,25
150:15 151:2
152:23 154:3,12
155:9,17 156:2
156:11 157:3,14
157:24 159:8
161:9 162:3
166:3,8,20 167:3
167:16 168:5,14
170:3,21 172:3
174:12 177:24
179:8 181:17
182:8,11 183:1,4
183:11 184:1,4
184:15
**witness's**   159:20

**witnesses**   32:19
181:8
**witness'**   182:14
**word**   35:21
57:25 72:25
89:6 94:15
96:14 99:15
100:9 102:6
130:12,25
133:17 139:1
140:17 152:19
152:25 153:8,9
173:1,2,21
177:20
**words**   110:10,13
**work**   8:11,14
18:10 33:22
35:8 82:19 94:6
94:11 96:3
161:21
**worked**   38:16
98:15
**worker**   18:17
**workers**   35:10
**working**   126:1
162:18
**works**   13:15
16:16 23:23
24:5,7,9 25:22
108:22 134:8
140:15 154:8
179:5
**world**   100:9
**worth**   87:3,5
99:22 145:14
158:21,23
**write**   28:25

**written**   92:11
105:18
**wrong**   31:1,10
31:21 32:3,4,5
96:12,14 102:5,6
102:11,13,16
103:20 104:3,5
104:11 135:8
**wrote**   29:2

**x**

**x**   8:5 171:5
177:15 179:10

**y**

**yeah**   6:25 17:3,3
17:11,11,11 24:2
25:4 28:24
30:22 31:6 37:1
40:2 41:20
44:18 49:22
52:4,4 61:18
64:5,6 66:22
73:5 74:1 78:7
80:15 82:22
84:20 86:3 89:2
92:3,8 93:13,20
110:3,3 113:4
114:24 122:23
123:7,16 127:17
129:24 133:10
133:12 134:18
139:12 140:20
142:10 150:24
154:12,17
155:17 163:19
166:20 167:3
168:23 169:16
169:18 170:6

173:23 177:13
178:10 179:2
**year**   38:6 107:16
113:8 162:19
**years**   16:7,8
17:5,7,8 20:10
20:11 27:3 37:6
38:10,12,12
108:2 118:5,6
162:22 164:23
**yep**   81:10 126:13

**z**

**zambrano**   3:23
6:7 7:7
**zero**   87:3 145:2
145:14,15
**zhou**   139:15
**zoom**   6:22

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.