Marc N. Bernstein (Cal. Bar No. 145837)
mbernstein@blgrp.com
The Business Litigation Group, P.C.
150 Spear Street, Suite 800
San Francisco, CA 94105
Telephone: 415.765.6634
Facsimile: 415.283.4804

Gene J. Brockland (Missouri State Bar No. 32770)
Christopher O. Miller (Missouri State Bar No. 70251)
*Admitted Pro Hac Vice*
gbrockland@amundsendavislaw.com
comiller@amundsendavislaw.com
Amundsen Davis LLC
120 South Central, Suite 700
St. Louis, MO 63105
Telephone: 314.719.3732
Facsimile: 314.719.3733

William J. O'Brien (Cal. Bar No. 99526)
wobrien@onellp.com
One LLP
23 Corporate Plaza Dr., Suite 150-105
Newport Beach, CA 92660
Telephone: 310.866.5157
Facsimile: 310.943.2085

*Attorneys for Plaintiff,
Donald Wakefield*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| DONALD WAKEFIELD, <br><br> Plaintiff, <br><br> v. <br><br> IGOR OLENICOFF, OLEN PROPERTIES CORP.; and DOES 1 through 10, inclusive, <br><br> Defendants, | Case No. 8:21-cv-1585-CJC-DFM <br><br> *Hon. Douglas F. McCormick* <br><br> **REPLY DECLARATION OF MARC N. BERNSTEIN IN SUPPORT OF PLAINTIFF'S APPLICATION FOR ATTORNEYS' FEES AND COSTS** <br><br> Hearing Date: August 8, 2023 <br> Time: 10:00 a.m. <br> Courtroom: 6B <br><br> Complaint Filed: September 27, 2021 |

I, Marc N. Bernstein, declare as follows:

1. I am counsel for Plaintiff Donald Wakefield in this matter. I have personal knowledge of the facts in this declaration and, if called and sworn as a witness, could and would testify to them.

2. I was tasked with spearheading settlement discussions in this case. Soon after this case was filed, I reached out to defendants' counsel about settlement. I spoke with Olen counsel Spencer Sax about it on January 24, 2022. Mr. Sax asked if there was a bottom-line number that would "make this whole thing go away." I explained the grounds for Mr. Wakefield's liability and damages theories. These included that many liability issues, including infringement, had been litigated to judgment in prior litigation, resulting in preclusion on a number of key issues. These also included preclusion on the predicate acts required for RICO. I said, and I believe, that Mr. Wakefield's RICO case was exceptionally strong. And that if Mr. Wakefield prevailed on a RICO claim, treble damages and a fee award were mandatory. Based on even a conservative estimate of the likely copyright damages for each accused work, and our attorney fees to date, this generated a figure well above $1 million. I offered to settle the case for something around $1 million. I encouraged him and his clients to settle early. I told him that otherwise, attorneys' fees were going to grow, and with them what we could settle for. The Olen Parties declined this settlement proposal. They did not make a counteroffer.

3. In early January 2023, after a December settlement mediation had not resolved the case, the parties agreed once again to discuss settlement. I was tasked with spearheading these discussions. I discussed settlement with Spencer Sax on January 9, 2023. In that call he suggested a settlement model in which the Olen Parties would pay Mr. Wakefield an initial lump sum, after which defendants would stipulate to Mr. Wakefield's entitlement to attorneys' fees, reserving only their right to contest the amount of the award. Mr. Wakefield was amenable to a

resolution of this kind, but there were many details that still needed to be worked out, including the amount of the lump sum payment and whether Mr. Wakefield could himself remove the two accused Florida sculptures, which was a key term for him. With trial set for February 21, the parties continued to work in parallel on pretrial preparations and settlement.

4. Over the next 12 days, Spencer Sax and I communicated repeatedly to close the gap in high-level settlement terms. On January 21, we agree to the key high-level terms, which included a $190,000 lump-sum payment, Mr. Wakefield's right to attorneys' fees, and his right to retrieve the two accused sculptures in Florida.

5. The next day, January 22, Julie Ault emailed me requesting that we inform the Court that the case had been settled, and that we agree to stop work preparing for trial. This seemed extremely unwise to me and my team, given that most of the settlement terms remained to be negotiated, no draft agreement had yet been exchanged, and that without the pressure of trial the Olen Parties would feel a greater freedom to drag out discussions and even to try to renegotiate agreed terms. Both fears materialized. In light of defendants' request, however, I completed a draft of settlement agreement, exchanged it with my colleagues, and got it off to defendants by the next day, January 23.

6. Subsequent drafts of the agreement from defendants altered material terms agreed on in the high-level settlement, such as Mr. Olenicoff's right to remove the Florida sculptures, and added terms that would make settlement impossible, notably defendants' explicit refusal to warrant that there were not *more* infringing sculptures, and a term that would not only release *past* infringements by the defendants, but would also purportedly immunize them from new infringements committed in the future. Immediately upon getting this draft, I called Ms. Ault to tell her that if these terms were to be required by defendants, we needed to call off the settlement, since one term was contrary to the high-level

3
**REPLY DECLARATION OF MARC N. BERNSTEIN IN SUPPORT OF**
**PLAINTIFF'S APPLICATION FOR ATTORNEYS' FEES AND COSTS**

agreement and others defeated Mr. Wakefield's ability to redress infringements in the future.

7. The parties continued negotiating these points, and I explained to Ms. Ault that without movement on the above key terms, and others, we could not take the trial off calendar. On January 26, in the middle of these negotiations, Judge Carney *sue sponte* vacated the trial date and directed the parties to further settlement talks.

8. The parties continued to exchange drafts of a settlement agreement, but the versions from the defendants persisted in including terms contrary to the original settlement proposal, and others unworkable for other reasons. I explained these issues to Ms. Ault multiple times in response to drafts she sent me, culminating in a February 20 email explaining these issues again in detail. We did not hear back from her for over a month, until March 21, in an email in which Ms. Ault cited the vacatur of the trial date as the basis for the delay.

9. After further discussions by telephone and Zoom, I sent Ms. Ault a new draft agreement on April 10. She sent a draft on April 19, which I turned around on April 21, and Julie accepted and which was executed by all parties that day.

10. As reflected by this timeline, I and all counsel for Mr. Wakefield worked diligently to reach final terms to resolve this case. The delays were caused by deal changes and lengthy response times by the defendants, not the plaintiff.

11. Ms. Ault's statement that in a Zoom conference (or at any other time) I stated that I was unaware that we had not given pre-suit notice to defendants is false. Having been part of the team that drafted and filed the lawsuit, I of course knew we had chosen not to try pre-suit contact with the defendants. The chances defendants would have paid Mr. Wakefield anything close to what it would take to resolve this suit prior to suit were zero, an assessment confirmed by my early, unsuccessful, post-suit settlement discussions with Mr. Sax. At the same time, the

chances that defendants would seize on pre-suit notice to preemptively sue Mr. Wakefield in Mr. Olenicoff's home district in Florida seemed substantial—another assessment that seems borne out by what followed, namely, defendants' motion to change venue. Ms. Ault's statement that I disagreed with the with the approach of not contacting defendants is thus categorically false.

12. It is also false that I ever said, to Ms. Ault or to anyone, or that I believed, that this case was "over-lawyered" by plaintiff. To the contrary. I believe our billable time and expenses were very economical given the vexatious manner in which this case was litigated. After over 33 years of litigating IP cases, I regard the charges in this case to be on the lower end of the range of charges for cases like this, particularly where the defendants multiplied the proceedings, such as by having their billionaire client dodge service, or filing a compulsory counterclaim as a separate, state-court proceeding. That lawyers at three firms worked on the case shows only that small firms sometimes band together to staff a case, where large firms can create the same (or larger) team internally. Having worked at three large law firms, including Morrison & Foerster and Wilson Sonsini, I'm confident that the size of our team and the hours we expended were at, and likely under, what a large firm would have used.

13. Since the June 22, 2023 filing of Plaintiff's Notice of Motion and Motion for Attorneys' Fees and Costs (ECF No. 147), The Business Litigation Group, P.C., has incurred an additional $3150.00 of fees and $18.80 of costs.

Executed this 25 day of July, 2023.

_Marc N. Bernstein_
Marc N. Bernstein